**Nos. 21-4072 and 22-3351**
**(Consolidated with Nos. 23-3196, 23-3324, 23-3366, and 23-3417)**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

**DAYTON POWER & LIGHT COMPANY, d/b/a AES OHIO;**
**AMERICAN ELECTRIC POWER SERVICE CORPORATION;**
**DUKE ENERGY OHIO, INC.; FIRSTENERGY SERVICE COMPANY,**
*Petitioners*,
**v.**

**FEDERAL ENERGY REGULATORY COMMISSION,**
*Respondent.*

---

**On Petitions for Reviews of Orders of the**
**Federal Energy Regulatory Commission**

---

**BRIEF OF INTERVENOR**
**PJM INTERCONNECTION, L.L.C. IN SUPPORT OF PETITIONERS**

Paul M. Flynn
Ryan J. Collins
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W., Suite 600
Washington, DC  20005-3898
202-393-1200
flynn@wrightlaw.com
collins@wrightlaw.com

*Counsel for*
*PJM Interconnection, L.L.C.*

Dated: August 22, 2023

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: __21-4072,22-3351__     Case Name: __The Dayton Power & Light Co. v. FERC__

Name of counsel: __Paul M. Flynn__

Pursuant to 6th Cir. R. 26.1, __PJM Interconnection, L.L.C.__
*Name of Party*
makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> PJM Interconnection, L.L.C. ("PJM") is a limited liability company organized and existing under the laws of the State of Delaware.  PJM has no parent companies.  Under Delaware law, the members of an L.L.C. have an "interest" in the L.L.C.  See Del. Code Ann. tit. 6, § 18-701 (2021).  PJM members do not purchase their interests or otherwise provide capital to obtain their interests.  An interest in PJM does not enter into governance of PJM and there are no individual entities that have a 10% or greater voting interest in the conduct of any PJM affairs.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> Yes.  Given that this case affects wholesale electric transmission rates in PJM, all parties that provide transmission service in PJM and their customers will be affected by the outcome.

---

CERTIFICATE OF SERVICE

I certify that on _____August 22, 2023_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ __Paul M. Flynn__
__Wright & Talisman, P.C.__
_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

STATEMENT OF ADDENDUM ................................................................1

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE...................................................................2

I.  UTILITY INDUSTRY EVOLUTION AND CREATION OF
    REGIONAL TRANSMISSION ORGANIZATIONS .........................2

II.  PJM.....................................................................................................6

III.  ENERGY POLICY ACT OF 2005 .....................................................7

IV.  ORDER NO. 679 AND THE RTO PARTICIPATION
     INCENTIVE.......................................................................................9

V.  ORDERS UNDER REVIEW..............................................................11

SUMMARY OF ARGUMENT ...............................................................12

ARGUMENT ..........................................................................................13

I.  STANDARD OF REVIEW ................................................................13

II.  FERC'S ORDERS CONFLICT WITH THE UNAMBIGIOUS
     STATUTORY COMMAND..............................................................16

   A.  FERC's Orders Contravene the Plain Language of FPA
       Section 219...............................................................................17

   B.  Neither *CPUC* Nor Order No. 679 Support FERC's
       Findings in *Dayton* and *AEP*...................................................20

      1.  *CPUC* Did Not Address—Nor Did It Claim to
          Address—Any Statutory Requirements .........................21

      2.  FERC's Use of *CPUC* to Read into Order No. 679
          a Voluntariness Requirement Years After
          Adoption Must Be Rejected ...........................................23

III.   FERC'S ORDERS ARE ARBITRARY AND CAPRICIOUS...........25

CONCLUSION.........................................................................................................29

ADDENDUM

# TABLE OF AUTHORITIES

## COURT CASES                                               Page

*California Public Utilities Commission v. FERC*,
   879 F.3d 966 (9th Cir. 2018) .................................................................*passim*

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*,
   467 U.S. 837 (1984)...............................................................................14, 17

*Connecticut National Bank v. Germain*,
   503 U.S. 249 (1992).....................................................................................18

*Consumer Product Safety Commission v. GTE Sylvania, Inc.*,
   447 U.S. 102 (1980).....................................................................................18

*Emera Maine v. FERC*,
   854 F.3d 9 (D.C. Cir. 2017)..........................................................................18

*FERC v. Electric Power Supply Association*,
   577 U.S. 260 (2016)....................................................................................2, 4

*Hays v. Federal Mine Safety & Health Review Commission*,
   965 F.2d 1081 (D.C. Cir. 1992).....................................................................16

*Hughes v. Talen Energy Marketing, LLC*,
   578 U.S. 150 (2016)....................................................................................2, 4

*KenAmerican Resources, Inc. v. United States Secretary of Labor*,
   33 F.4th 884 (6th Cir. 2022)...................................................................14, 17

*Kentucky Utilities Co. v. FERC*,
   766 F.2d 239 (6th Cir. 1985).........................................................................15

*Louisville Gas & Electric Co. v. FERC*,
   988 F.3d 841 (6th Cir. 2021) ...........................................................15, 27, 28

*Maine Public Utilities Commission v. FERC*,
   454 F.3d 278 (D.C. Cir. 2006).........................................................................6

iii

*Michigan v. Thomas*,
   805 F.2d 176 (6th Cir. 1986) ...................................................................16, 26

*Miles v. Apex Marine Corp.*,
   498 U.S. 19 (1990)........................................................................................19

*MISO Transmission Owners v. FERC*,
   860 F.3d 837 (6th Cir. 2017) .......................................................................14

*Morgan Stanley Capital Group v. Public Utility District No. 1*,
   554 U.S. 527 (2008)........................................................................................4

*Motor Vehicle Manufacturers Association v. State Farm Mutual
   Automobile Insurance Co.*,
   463 U.S. 29 (1983)...................................................................................*passim*

*Ohio Power Co. v. FERC*,
   668 F.2d 880 (6th Cir. 1982) .................................................................15, 28

*Pendley v. Federal Mine Safety & Health Review Commission*,
   601 F.3d 417 (6th Cir. 2010) ........................................................... 15-16, 29

*PPL EnergyPlus, LLC v. Solomon*,
   766 F.3d 241 (3d Cir. 2014)...........................................................................6

*Public Utility District No. 1 v. FERC*,
   272 F.3d 607 (D.C. Cir. 2001)....................................................................2, 4

*Simmons v. Himmelreich*,
   578 U.S. 621 (2016).....................................................................................18

## ADMINISTRATIVE CASES

*Dayton Power & Light Co.*,
   176 FERC ¶ 61,025 (2021), *order addressing arguments
   raised on reh'g*, 178 FERC ¶ 61,102 (2022)..........................................*passim*

*Office of the Ohio Consumers' Counsel v. American Electric Power Service Corp.*,
181 FERC ¶ 61,214 (2022), *order addressing arguments raised on reh'g*,
183 FERC ¶ 61,034 (2023).....................................................................*passim*

*Pennsylvania-New Jersey-Maryland Interconnection*,
81 FERC ¶ 61,257 (1997), *reh'g denied*, 92 FERC
¶ 61,282 (2000), *modified sub nom. Atl. City Elec. Co.
v. FERC*, 295 F.3d 1 (D.C. Cir. 2002)............................................................6

*PJM Interconnection, L.L.C.*,
101 FERC ¶ 61,345 (2002)..............................................................................6

*Promoting Wholesale Competition Through Open Access Non-
Discriminatory Transmission Services by Public Utilities; Recovery of
Stranded Costs by Public Utilities and Transmitting Utilities*,
Order No. 888, 75 FERC ¶ 61,080, 1991–1996 FERC Stats. & Regs.,
Regs. Preambles ¶ 31,036 (1996), *order on reh'g*,
Order No. 888-A, 78 FERC ¶ 61,220, 1996–2000 FERC
Stats. & Regs., Regs. Preambles ¶ 31,048, *order on reh'g*,
Order No. 888-B, 81 FERC ¶ 61,248 (1997), *reh'g denied*,
Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part
& remanded in part sub nom. Transmission Access Policy
Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd
sub nom. New York v. FERC*, 535 U.S. 1 (2002) ............................................3

*Promoting Transmission Investment Through Pricing Reform*,
Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*,
Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*,
Order No. 679-B, 119 FERC ¶ 61,062 (2007) ......................................*passim*

*Regional Transmission Organizations*,
Order No. 2000, 89 FERC ¶ 61,285, 1996–2000 FERC Stats. & Regs.,
Regs. Preambles ¶ 31,089 (1999), *order on reh'g*,
Order No. 2000-A, 90 FERC ¶ 61,201, 1996–2000 FERC
Stats. & Regs., Regs. Preambles ¶ 31,092 (2000), *petitions
for review dismissed sub nom. Pub. Util. Dist. No. 1 v. FERC*,
272 F.3d 607 (D.C. Cir. 2001)...............................................................*passim*

## **STATUTES**

5 U.S.C. § 706 ............................................................................................ 14, 15, 20

16 U.S.C. § 824 ......................................................................................................... 2

16 U.S.C. § 824s ............................................................................................... *passim*

Energy Policy Act of 2005,
   Pub. L. No. 109-58, 119 Stat. 594 (2005) ........................................................ 7

## STATEMENT REGARDING ORAL ARGUMENT

PJM Interconnection, L.L.C. concurs with the "Statement Regarding Oral Argument" set forth in the Brief of Petitioners Dayton Power & Light Co., American Electric Power Service Corp., and FirstEnergy Service Co., *Dayton Power & Light Co. v. FERC*, Nos. 21-4072, et al., at xv (6th Cir. Aug. 10, 2023) (corrected). These consolidated cases present questions of first impression regarding interpretation of section 219 of the Federal Power Act, 16 U.S.C. § 824s, and whether the Federal Energy Regulatory Commission acted in an arbitrary and capricious manner in disregarding substantial evidence. Oral argument will aid the Court in considering these important issues.

## STATEMENT OF ADDENDUM

Pertinent statues are provided in the addendum to this brief.

## STATEMENT OF JURISDICTION

PJM Interconnection, L.L.C. ("PJM") adopts the Jurisdiction statement set forth in the Brief of Petitioners Dayton Power & Light Co., American Electric Power Service Corp., and FirstEnergy Service Co., *Dayton Power & Light Co. v. FERC*, Nos. 21-4072, et al., at 6-8 (6th Cir. Aug. 10, 2023) (corrected) ("Transmission Owner Brief").[1]

## STATEMENT OF THE ISSUES

PJM addresses herein and adopts by reference issue number 1 in the Issues Presented statement set forth in the Transmission Owner Brief, *id.* at 8-9, and takes no position on issues numbered 2, 3, and 4.[2]

---

[1] Dayton Power and Light Co. ("Dayton"), American Electric Power Service Corp. (with its subject public utility affiliates Ohio Power Co. and AEP Ohio Transmission Co., Inc. (collectively "AEP Entities"), and FirstEnergy Service Co. are referred to collectively herein as "Transmission Owner Petitioners" to distinguish them from Petitioner Office of Ohio Consumers Counsel.

[2] PJM supports certain of the arguments made in the Transmission Owner Brief, and takes no position on others.  PJM does not support arguments submitted in the Opening Brief of Petitioner Office of Ohio Consumers Counsel in Nos. 23-3324 and 23-3417, *Am. Elec. Power Serv. Corp. v. FERC*, Nos. 23-3324 et al. (6th Cir. July 31, 2023), and reserves its right to file a responsive brief as intervenor in support of the Federal Energy Regulatory Commission ("FERC" or "Commission").

## STATEMENT OF THE CASE

PJM generally adopts the Statement of the Case set forth in the Transmission Owner Brief, at 9-25, with the following supplementation.

## I.    UTILITY INDUSTRY EVOLUTION AND CREATION OF REGIONAL TRANSMISSION ORGANIZATIONS

Under the Federal Power Act ("FPA"), 16 U.S.C. §§ 791 *et seq*., FERC is authorized to regulate the rates, terms, and conditions for transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce.  16 U.S.C. § 824; *see Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154 (2016) ("*Hughes*"); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 264 (2016) ("*EPSA*").  In light of economic and technical changes since the FPA's original enactment in 1935 and efforts by FERC and its predecessor agency, the electric industry has increasingly become a competitive business, with local, vertically integrated utilities providing "bundled" wholesale and retail generation, transmission, and distribution of electricity giving way to more competitive markets. *See Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 610 (D.C. Cir. 2001).

FERC adopted its landmark "Order No. 888" in 1996, which ordered all public utility transmission providers to file and offer transmission service under an "open access transmission tariff," and introduced the concept of "Independent System Operators" ("ISO"), entities that are tasked with operating the transmission

systems of their members independently, and that fulfill eleven "ISO Principles" including, among others, providing open access transmission at "non-pancaked rates"—i.e., a single access charge to transmit power over any of the facilities under the ISO's control. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 75 FERC ¶ 61,080, 1991–1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,036, at 31,636, 31,730-31 (1996), *order on reh'g*, Order No. 888-A, 78 FERC ¶ 61,220, 1996–2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *reh'g denied*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part & remanded in part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

Finding remaining barriers to competitive wholesale markets after implementation of Order No. 888, FERC acted again in 1999 to issue a new rule, Order No. 2000, which created the concept of Regional Transmission Organizations ("RTO"). *Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285, 1996–2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,089 (1999), *order on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201, 1996–2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,092 (2000), *petitions for review dismissed*

*sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001). FERC found that the creation of RTOs would remedy certain impediments to further development of competitive markets because RTOs could: (1) improve efficiencies in transmission grid management; (2) improve grid reliability; (3) remove remaining opportunities for discriminatory practices; (4) improve market performance; and (5) facilitate lighter handed regulation. *Id*. at 30,993; *Pub. Util. Dist.*, 272 F.3d at 611; *see also Hughes*, 578 U.S. at 155 (explaining the concept of RTOs and noting that they operate the transmission grid and independently administer wholesale energy markets); *EPSA*, 577 U.S. at 267-68 (explaining that each RTO "administers a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably"). Important for present purposes, FERC encouraged, but did not mandate, that transmission owners join RTOs and cede to RTOs functional control over their transmission assets (including planning for expansion of the transmission grid). Order No. 2000 at 30,992-95 (explaining FERC's voluntary approach to RTO creation); *Morgan Stanley Cap. Grp. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536-37 (2008) ("To further pry open the wholesale-electricity market and to reduce technical inefficiencies caused when different utilities operate different portions of the grid independently, the Commission has encouraged transmission providers to establish [RTOs, which are] entities to which transmission providers would

transfer operational control of their facilities for the purpose of efficient coordination."). FERC further explained that RTOs would "*benefit consumers through lower electricity rates resulting from a wider choice of services and service providers*" and that "*substantial cost savings* are likely to result from the formation of RTOs." Order No. 2000 at 30,993 (emphasis added).

Order No. 2000 "conclude[d] that properly structured RTOs throughout the United States can provide significant benefit," including:

> increased efficiency through regional transmission pricing and the elimination of rate pancaking; improved congestion management; more accurate estimates of [Available Transmission Capacity]; more effective management of parallel path flows; more efficient planning for transmission and generation investments; increased coordination among state regulatory agencies; reduced transaction costs; facilitation of the success of state retail access programs; facilitation of the development of environmentally preferred generation in states with retail access programs; improved grid reliability; and fewer opportunities for discriminatory transmission practices.

*Id.* at 31,024; *see also id.* (explaining that the list of benefits was not exhaustive). FERC explained that "[a]ll of these improvements to the efficiencies in the transmission grid will help improve power market performance, *which will ultimately result in lower prices to the Nation's electricity consumers*." *Id.* at 31,024 (emphasis added). FERC further opined that "by improving efficiencies in the management of the grid, improving grid reliability, and removing any remaining opportunities for discriminatory transmission practices, the widespread

development of RTOs will improve the performance of electricity markets in several ways and *consequently lower prices to the Nation's electricity consumers*." *Id.* at 31,025 (emphasis added); *see Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 280-81 (D.C. Cir. 2006) ("By combining various utilities' segmented transmission facilities into a regional transmission grid under the control of one independent entity, FERC anticipated that RTOs would eliminate certain transmission inefficiencies and opportunities for discrimination . . . and that these new structures would therefore result in significant benefits to the public."). At the time, FERC estimated up to $5.1 billion in annual savings nationwide from broad implementation of RTOs. Order No. 2000 at 31,026.

## II. PJM

PJM was approved by FERC first as an ISO, *see Pennsylvania-New Jersey-Maryland Interconnection*, 81 FERC ¶ 61,257 (1997), *reh'g denied*, 92 FERC ¶ 61,282 (2000), *modified sub nom. Atl. City Elec. Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002), and later as an RTO, *PJM Interconnection, L.L.C.*, 101 FERC ¶ 61,345 (2002). Today, PJM administers complex markets and manages a vast transmission system spanning thirteen states and the District of Columbia. PJM operates one of the largest centrally dispatched competitive electricity market in the world. *PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241, 247 (3d Cir. 2014).

At the time of record development in these proceedings, PJM explained that its markets and services provide total annual estimated customer benefits of between \$3.2 and \$4 billion "driven in no small part because of the stability of PJM's membership and the corresponding geographic footprint PJM services," including: (1) \$300 million in annual reliability savings; (2) \$1.2 to \$1.8 billion in annual savings related to lower reserve margins and competition from alternative resources; (3) \$1.1 to \$1.3 billion in annual savings from integrating more efficient resources; and (4) \$600 million in annual energy production cost savings because of PJM's expanded generation dispatch footprint. Comments of PJM Interconnection, L.L.C., Docket No. EL22-34-000, at 3-4 (Mar. 31, 2022) (JA\_\_\_-JA\_\_\_) ("PJM Complaint Comments"); Motion to Lodge of PJM Interconnection, L.L.C., Docket Nos. ER20-1068-000 & ER20-2100-000, Exhibit 1 ("PJM 2020 RM20-10 Comments") at 8 (Oct. 19, 2020) (JA\_\_\_).

## III.   ENERGY POLICY ACT OF 2005

On August 8, 2005, Congress enacted the Energy Policy Act of 2005 ("EPAct 2005"). Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005). Section 1241 of EPAct 2005 established section 219 of the FPA, which mandated that, within a year of enactment, "the Commission shall establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of electric energy in interstate commerce by public utilities for the

purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion." 16 U.S.C. § 824s(a). As part of the required rule, "the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization." *Id.* § 824s(c). Subsection (c) also required FERC to "ensure that any costs recoverable pursuant to this subsection may be recovered by such utility through the transmission rates charged by such utility or through the transmission rates charged by the Transmission Organization that provides transmission service to such utility." *Id.*

Congress's adoption of the FPA section 219 language mandating an incentive for joining an RTO was intentional. Indeed, the resulting language reflected a compromise between parties who called for mandating RTO participation and parties who wanted to renounce any reference to RTO participation in the EPAct 2005. *See* Comments of PJM Interconnection, L.L.C., Docket No. RM20-10-000, at 22-25 (June 25, 2021) ("PJM 2021 RM20-10 Comments") (addressing the statutory history and contemporaneous regulatory events) (incorporated by reference in the PJM Complaint Comments at 1 n.3 (JA___)). In enacting the requirement that FERC *shall* provide the incentive, the statute went beyond a previous legislative proposal that would have adopted a "sense of Congress" policy statement encouraging RTO participation. *See* PJM

8

2020 RM20-10 Comments at 4 n.6 (JA___) (citing *Energy Policy Act of 2005*, S. 10, 109th Cong. § 1232 (2005) (reflecting draft legislative language providing that FERC "*may* encourage and may approve the voluntary formation of RTOs," but that would have explicitly prohibited any requirement to transfer operational control to the transmission organization)).

## IV.   ORDER NO. 679 AND THE RTO PARTICIPATION INCENTIVE

In response to the clear Congressional directive to "provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization," 16 U.S.C. § 824s(c), FERC issued Order No. 679 in 2006.   *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007).   Order No. 679 was issued "[p]ursuant to the directives in section 1241 of the Energy Policy Act of 2005" that FERC provide incentives "that will help ensure the reliability of the bulk power transmission system in the United States and reduce the cost of delivered power to customers by reducing transmission congestion."   *Id.* at P 1.   FERC noted Congress's "clear directive that 'the Commission shall establish by rule, incentive-based . . . rate treatments . . . for the purpose of benefiting consumers.'"   *Id*. at P 5 (emphasis in original).

Regarding FPA section 219(c), FERC explained Congress's dual mandate to provide incentives "to *each* transmitting utility or electric utility *that joins* a Transmission Organization" and to ensure recovery of the incentive's cost through RTO rates. *Id.* at P 8 (emphasis added). FERC explained that "Congress did not enact section 219 in isolation," but instead that it was "part of a larger statutory framework in which Congress directed the Commission to take steps to address reliability [and] remedy the adverse effects of transmission congestion." *Id.* at P 41 (also noting that section 219 is "complementary" of other EPAct 2005 provisions). FERC also rejected requests for prior state approval of FPA section 219 incentives, noting that state approval "is not required by section 219." *Id.* at P 54. FERC adopted a policy to consider requests for a return on equity ("ROE")-based incentive for transmission organization participation,[3] "in recognition of the benefits [that transmission owner memberships in] such organizations bring to customers, as outlined in detail in Order No. 2000." *Id.* at P 312; *see also id.* at P 331 ("Our interpretation of the statute is that eligibility for this incentive flows to an entity that 'joins' a Transmission Organization."). FERC also stressed the

---

[3]    FERC explained, and there is no dispute, that RTOs like PJM qualify as "Transmission Organizations" under the statute. Order No. 679 at P 4 n.4 (explaining that Transmission Organizations are defined to include, among other entities, RTOs). For convenience, this brief refers to the incentive required by EPAct 2005 and Order No. 679 as the "RTO participation incentive," even though FERC has defined other entities that would also qualify as Transmission Organizations.

10

importance of continued, stable RTO membership. *Id.* at P 327 (explaining that eligibility for the incentive will be based on a showing that a transmission owner has joined an RTO and that its membership is ongoing).

On rehearing and clarification of Order No. 679, FERC explained in Order No. 679-A that "[t]he consumer benefits, including reliability and cost benefits, provided by Transmission Organizations are *well documented*, and the best way to ensure those benefits are spread to as many consumers as possible is to provide an incentive that is *widely available* to member utilities of Transmission Organizations." Order No. 679-A at P 86 (emphasis added) (citing Order No. 2000 at 31,024). According to Order No. 679-A, the incentive for transmission organization membership is "entirely consistent" with the purpose of FPA section 219 to establish incentives "that benefit consumers by ensuring reliability and reducing the cost of delivered power." *Id.* FERC also observed that "a more accurate interpretation of section 219(c) must recognize that an important component of section 219(c) is ensuring cost recovery, and therefore this section differs from the rest of section 219 that only address incentive-based rate treatments." *Id.* at P 87 n.143.

## V.    ORDERS UNDER REVIEW

These consolidated cases concern FERC's findings in the following series of orders that PJM members Dayton and the AEP Entities should be stripped of any

11

eligibility to receive the RTO participation incentive because their membership in a transmission organization is mandated by Ohio state law: (1) *Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (2021) (JA____-JA____) ("*Dayton*"), *order addressing arguments raised on reh'g*, 178 FERC ¶ 61,102 (2022) (JA____-JA____) ("*Dayton Rehearing*"); (2) *Office of the Ohio Consumers' Counsel v. Am. Elec. Power. Serv. Corp.*, 181 FERC ¶ 61,214 (2022) (JA____-JA____) ("*AEP*"), *order addressing arguments raised on reh'g*, 183 FERC ¶ 61,034 (2023) (JA____-JA____) ("*AEP Rehearing*").

## SUMMARY OF ARGUMENT

This case centers on the plain meaning of section 219(c) of the FPA and FERC's one-hundred-eighty degree reversal of its prior interpretation and implementation of that statute.  As such, this case is one in which the Court plays an important role in enforcing the statute using the words adopted by Congress rather than an agency interpretation not supported by the legislative text or its history.  In revoking the AEP Entities' RTO participation incentive and refusing to grant the incentive to Dayton, FERC acted in violation of the clear statutory demand that it provide incentives for *each* utility *that joins* an RTO.  The text of the statute is unambiguous, and FERC cannot interpret its way around a clear Congressional mandate.  Under longstanding precedent, FERC's interpretation of a statute is irrelevant when the meaning of the statute is clear on its face, and this

Court reviews such FERC interpretations of law *de novo*. Neither the plain language of the statute, nor FERC's regulations implementing it, nor judicial precedent interpreting those regulations, authorize FERC to deny Dayton's and the AEP Entities' eligibility for the RTO participation incentive on the basis of state law.

In this case, not only is the statutory text clear based on the choice of words Congress utilized, but the Court is faced with a complete reversal by FERC of its incentive policy based on its new interpretation of that statute. FERC's apparent reversal of decades of policy is arbitrary and capricious. Moreover, FERC acted arbitrarily and capriciously, and contrary to the record, in finding that Dayton should not be granted and the AEP Entities' should be stripped of the incentive. FERC ignored arguments and evidence that the Congressionally mandated RTO participation incentive was designed to restore symmetry and promote balance between the burdens and costs of RTO participation—which are faced by transmission owners who join RTOs—and the benefits of RTOs—which accrue primarily to energy consumers.

## ARGUMENT

## I.    STANDARD OF REVIEW

The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in

13

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(C). When confronted with an agency's interpretation of its authorizing statute, courts employ the familiar two-step test articulated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984) ("*Chevron*"). Under the *Chevron* analysis, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Only once a court determines that a statute is ambiguous does the court review the agency's interpretation, which it will uphold if it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

As this Court has explained, "[w]e review the Commission's interpretation of [statute] *de novo*. When interpreting a statute, our task is to give effect to Congressional intent. If the meaning of the language of the statute is clear, we apply the statute as written." *KenAmerican Res., Inc. v. United States Sec'y of Labor*, 33 F4th 884, 888 (6th Cir. 2022) (citing *Chevron* and other cases). In other words, while it "generally review[s] the Commission's orders under the arbitrary-and-capricious standard, [the Court] give[s] fresh review to questions of law." *MISO Transmission Owners v. FERC*, 860 F.3d 837, 841 (6th Cir. 2017) (also noting that this Court provides less deference to FERC than other circuits); *see also*

14

*Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021) (stating that questions of law are reviewed *de novo*).

In addition to complying with applicable statutes, a Commission decision must also be founded on reasoned decisionmaking, and cannot be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) ("*Motor Vehicle*"); *Ky. Utils. Co. v. FERC*, 766 F.2d 239, 242 (6th Cir. 1985). Under this standard of review, an agency rule is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is implausible. *Motor Vehicle*, 463 U.S. at 43. The agency is obligated to examine the relevant facts and to articulate a satisfactory explanation for its action, including a rational connection between the facts it finds and the decisions it makes. *Ohio Power Co. v. FERC*, 668 F.2d 880, 885-86 (6th Cir. 1982); *see also Ky. Utils. Co.*, 766 F.2d at 242 (acknowledging the deferential nature of review but explaining that "'[d]eference' is not, however, tantamount to mechanical acceptance by the reviewing forum").

Agencies must also adhere to their precedents, and must explain and justify any departures from precedent. *Pendley v. Fed. Mine Safety & Health Review*

*Comm'n*, 601 F.3d 417, 426 (6th Cir. 2010) (remanding a case to an agency "to reexamine its decision in light of its own precedent" (citing *Michigan v. Thomas*, 805 F.2d 176, 184 (6th Cir. 1986) (noting that agencies must provide an "explicit[] and rational[]" justification for departing from their precedents); *Hays v. Fed. Mine Safety & Health Review Comm'n*, 965 F.2d 1081, 1085 (D.C. Cir. 1992) ("It is especially important in cases where the agency has taken a sharp turn from prior holdings that its actions be supported by reasoned decisionmaking." (citation omitted)))).

## II.    FERC'S ORDERS CONFLICT WITH THE UNAMBIGIOUS STATUTORY COMMAND

In the orders under review, FERC refused Dayton's request to implement a fifty-basis-point ROE adder for participation in PJM and removed a similar adder from the AEP Entities' rates on the flawed premise that such an adder was inappropriate because the companies' participation in PJM was involuntary—i.e., mandated by Ohio state law. Regardless of the status of the Ohio law, FERC's findings unlawfully conflict with the FPA section 219 and rely on a faulty reading of precedent. The Court should grant the Transmission Owner Petitioners' appeals and vacate the underlying orders.

## A. FERC's Orders Contravene the Plain Language of FPA Section 219

In *Dayton*, FERC found that "Dayton does not qualify" for an RTO participation incentive "because: (1) Order No. 679 as interpreted in [*California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) ("*CPUC*")] requires a showing of *voluntary* membership in such a Transmission Organization; and (2) Dayton's membership . . . is not voluntary because the Ohio statute requires it." *Dayton* at P 14 (JA____) (emphasis in original). Regardless of what Order No. 679 or the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") said about Order No. 679 in *CPUC*, denying Dayton the requested RTO participation incentive conflicts with the plain language of FPA section 219 and therefore is unlawful. FERC's reliance on *Dayton* in its *AEP* order, *see AEP* at P 63 (JA____), infects that order with the same unlawfulness.

FPA section 219 is unambiguous: "[T]he Commission *shall*, to the extent within its jurisdiction, provide for incentives *to each* transmission utility or electric utility *that joins* a Transmission Organization." 16 U.S.C. § 824s(c) (emphasis added). Because the statute is clear on its face, the Court's inquiry ends at *Chevron* step 1, and the Court must reject FERC's alternative interpretation that conflicts with the plain wording of the statute. *Chevron*, 467 U.S. 842-43; *KenAmerican Res., Inc.*, 33 F4th at 888.

17

The statute mandates that FERC *shall* provide the RTO participation incentive and that it *shall* be available *to each* utility *that joins* an RTO. Congress's choice of words was deliberate and unequivocal. Nowhere does the statute state that the incentive is only available when a state statute also does not purport to require RTO membership, nor does the word "incentive" itself dictate any voluntariness requirement. Absent any language to the contrary, courts are required to "presume Congress says what it means and means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016); *Emera Maine v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (explaining that the "cardinal canon" of statutory interpretation is to "presume that a legislature says in a statute what it means and means in a statute what it says there"); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) (explaining that "the starting point for interpreting a statute is the language of the statute itself" and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive").

As important as what the statute says is what it does not say. The statute orders FERC to provide incentives "for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion." 16 U.S.C. § 824s(a). At the time Congress passed this

18

pronouncement, FERC had already established RTOs and had explained their intended benefits in Order No. 2000. Congress was well aware of the existence of RTOs and the benefits FERC found (including the reliability and cost savings benefits articulated in Order No. 2000), and ordered FERC to adopt an incentive for *each* utility *that joins* an RTO. Equally importantly, at the time of enactment of FPA section 219, state statutes such as the Ohio statute were already on the books, and Congress is presumed to have known about their existence when it passed EPAct 2005. PJM Complaint Comments at 2 (JA___) (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.")). Notwithstanding this knowledge, had Congress thought the benefits of RTO participation flow only from voluntary membership or intended a voluntariness requirement, Congress would have said so by using words such as "each utility" that "chooses" or "elects" (or similar qualifying verbiage) to join an RTO. Congress did no such thing.

Effectively, FERC is rewriting the statute to say that it is required to: "provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization *voluntarily when not required to do so by state law*." This language appears nowhere in the statutory text. FERC cannot rewrite statutes to embody what it might now wish Congress had said, but instead is required to apply the statute as written by Congress. The entire statutory scheme was designed

19

to recognize the continued benefits of RTO participation to customers (but not necessarily in equal amounts to transmission owners or their shareholders) by requiring an ongoing incentive for transmission owner participation.  FERC's new interpretation, engrafting a voluntariness standard, ignores that RTO mandates existed at the time section 219 was enacted and that they did not drive Congress to codify into the law a voluntariness exception, which the Commission, on its own, has now written into section 219.  *See, e.g.*, *Dayton*, dissent op. (Commissioner Danly) at P 3 (JA____) (explaining how the Commission added the word "voluntary," improperly amending the statutory text).

Because FPA section 219(c) dictates unambiguously that FERC *shall* provide an incentive to *each* utility *that joins* an RTO, by imposing a condition that does not appear in the words of the statute, FERC acted unlawfully in *Dayton* and *AEP* and the Court should vacate those orders.  5 U.S.C. § 706(2)(C).

## B.    Neither *CPUC* Nor Order No. 679 Support FERC's Findings in *Dayton* and *AEP*

As noted above, FERC based its decision in *Dayton* on the Ninth Circuit's interpretation of Order No. 679 in *CPUC*, and doubled down by relying on *Dayton* in *AEP*.  However, neither the Ninth Circuit's findings in *CPUC* nor Order No. 679 justify FERC's refusal to grant an incentive that is unambiguously available to Dayton and the AEP Entities under the FPA as long as they participate in PJM.

### 1. CPUC *Did Not Address—Nor Did It Claim to Address—Any Statutory Requirements*

First and foremost, *CPUC* did not address the statutory language, as Commissioner Danly pointed out in his dissents below. *AEP*, dissent op. (Commissioner Danly) at P 4 (JA____) ("The Court in *CPUC* did not interpret section 219(c) of the [FPA]; it only interpreted and ruled on Order No. 679."); *Dayton* dissent op. (Commissioner Danly) at P 4 (JA____-JA____) (same). *CPUC* contains no discussion or analysis (or even quotation) of the statutory text and makes no attempt to reconcile the plain language of the statute with any voluntariness requirement. Instead, *CPUC*'s analysis is limited to whether FERC properly interpreted and applied its own Order No. 679 to the case at hand, and reversed the Commission on the grounds that it had not explained its decision in that case. *See, e.g.*, *CPUC*, 879 F.3d at 973 (explaining that FERC's action was "arbitrary and capricious" and an "unexplained departure from longstanding policy" because "FERC did not reasonably interpret Order 679" and "created a generic adder in violation of the order"); *id.* at 979-80 (explaining why the California Commission's arguments were not "an impermissible collateral attack on Order 679").

While *CPUC* does not claim to hold that voluntariness is a statutory prerequisite to obtaining the RTO participation incentive, in *Dayton* and *AEP*, FERC appears to extend the reach of *CPUC* to the statutory text, and uses that as a

21

basis for its new-found policy that voluntariness is required.  FERC cannot twist a judicial remand for a better explanation of its application of its regulations to the facts of the case into a judicial holding of statutory interpretation, particularly when the court itself did not go that far.  Indeed, *CPUC* did not find that FERC violated the statute by granting an incentive to an RTO participant whose participation was mandatory per se, as *Dayton* appears to suggest.  *Dayton* at P 14 (JA____) (claiming that Order No. 679, as interpreted by *CPUC* requires a voluntariness showing); *id.* at P 27 (JA____) (finding a voluntariness showing to be a prerequisite "consistent with Order No. 679 and *CPUC*"); *id.* at P 28 (JA____) (claiming that "the Ninth Circuit made clear that the voluntariness of a utility's membership . . . is a necessary consideration"); *Dayton Rehearing* at P 10 (JA____) (same).  Instead, *CPUC* faulted FERC for not doing a better job of adhering to Order No. 679's requirements that FERC: (1) not provide incentives through "summary grants," *CPUC*, 879 F.3d at 973, 979; and (2) allow case-by-case determinations, *id.* at 974, 977-78.

Whether FERC correctly applied Order No. 679 or not in the administrative proceeding leading to *CPUC* is irrelevant here, in light of the plain statutory text.  Regardless of the Ninth Circuit's dicta on voluntariness, *see, e.g.*, *CPUC*, 879 F.3d at 974-75 (discussing the words "incentive" and "induce"), the plain language of the statute mandates the establishment of a rate-based incentive for "*each*

transmitting utility or electric utility *that joins*" an RTO—full stop. 16 U.S.C. § 824s(c) (emphasis added). The Ninth Circuit did not touch this language, but instead simply remanded to FERC to provide better reasoning for its apparent inconsistency with its own regulation. However, even if FERC had originally imposed a voluntariness condition when it adopted Order No. 679 as *CPUC* suggests, such a requirement has no grounding in the plain statutory text, and therefore would have been unlawful.

> ### 2. FERC's Use of CPUC *to Read into Order No. 679 a Voluntariness Requirement Years After Adoption Must Be Rejected*

While FERC claims in *Dayton* and *AEP* that voluntariness is required in light of *CPUC*'s interpretation of Order No. 679, *e.g.*, *Dayton* at PP 14, 27-31 (JA____, JA____-JA____); *AEP* at P 63 (JA____), Order No. 679 and FERC's history implementing it does not support such a voluntariness requirement. In Order No. 679, FERC stated that it "*will approve*, when justified, requests for ROE-based incentives for public utilities *that join and/or continue* to be a member of an" RTO. Order No. 679 at P 326 (emphasis added). While FERC limited its commitment to approve incentives to situations "when justified," nothing in the text of the order suggests that the incentive can be justified only when participation is voluntary. FERC also explained "[t]he basis for the incentive is a recognition of the benefits that flow from membership in such organizations and the fact that

23

continuing membership *is generally voluntary*," *id.* at P 331 (emphasis added), which illustrates that FERC understood that membership is sometimes mandatory, yet the "benefits that flow from membership" do not depend on whether membership is compulsory or voluntary. Indeed, despite rulemaking comments that "the incentive should not apply where a transmission owner is ordered to join a RTO/ISO by statute", *id.* at P 316 (summarizing comments), FERC did not expressly adopt such a restriction.

Order No. 679-A likewise shows that the decision in *Dayton* and *AEP* is lacking. In Order No. 679-A, FERC explained that the incentive "applies to *all* utilities joining transmission organizations," Order No. 679-A at P 86 (emphasis added), should be "widely available to member utilities of Transmission Organizations," *id.*, and be "effective for the entire duration of a utility's membership," *id.* Nothing in Order No. 679 suggests a voluntariness prerequisite.

FERC dismisses as "collateral attacks" arguments that the Ninth Circuit's interpretation of Order No. 679 conflicts with the plain language of FPA section 219. *Dayton Rehearing* at P 18 (JA____-JA____) (stating also that the order directing briefing "did not solicit briefing on this issue"). Whether FERC invited briefing on this issue is of no moment. The FPA unambiguously extends eligibility for the incentive to RTO membership—i.e., mandates that FERC *shall* provide the incentive to *each* utility *that joins*—regardless of how *CPUC*

24

interpreted Order No. 679 or how Order No. 679 interpreted section 219. *Dayton* and *AEP* ignore Congress's clear directive, and FERC cannot hide behind any purported interpretations from the Ninth Circuit or its own regulations to circumvent that directive.

## III. FERC'S ORDERS ARE ARBITRARY AND CAPRICIOUS

In addition to being contrary to law, FERC's orders under review are arbitrary and capricious. The Court should not only reverse FERC's orders on the grounds set forth above, but also because FERC erred by reversing its policy without sufficient explanation and acting contrary to the record in these proceedings.

First, after decades of awarding the RTO participation incentive without conditioning it on voluntariness, FERC abruptly reversed course and claimed, based solely on the *CPUC* remand, that a voluntariness prerequisite had always been intended under Order No. 679. *Dayton* at PP 26, 30, 54-55 (JA____-JA____, JA____, JA____); *AEP* at PP 61, 63 (JA____-JA____, JA____). However, that claim does not comport with history. Indeed, as the Ninth Circuit noted, prior to *CPUC*, FERC routinely granted the fifty-basis-point RTO participation incentive without regard for voluntariness. *See CPUC*, 879 F.3d at 971-72 (summarizing the history of FERC's grant of the RTO participation incentive to Pacific Gas & Electric Co.). Had a voluntariness requirement always been intended in Order No.

25

679, FERC would not have consistently awarded the RTO participation incentive without such a showing. Nor could it, because, as discussed above, the plain language of the statute from which Order No. 679 derives mandates an unconditional incentive for RTO participation. FERC's about face in the *Dayton* and *AEP* orders, therefore, is an unsupported and arbitrary and capricious departure from precedent. *Motor Vehicle*, 463 U.S. at 43 (noting that an agency cannot rely on factors (i.e., voluntariness) that Congress had not intended it to consider); *Michigan*, 805 F.2d at 184 (noting that agencies must provide *explicit* and *rational* justifications for departing from precedent).

FERC's *Dayton* and *AEP* orders are also arbitrary and capricious because they are contrary to the record. As explained above, Order No. 2000 recognized the myriad benefits that RTOs provide. Order No. 2000 at 31,017, 31,024-25. PJM submitted additional evidence demonstrating nearly $4 billion worth of annual benefits customers receive from its services, which dwarf the $156 million that the RTO incentive costs customers. *See* PJM Complaint Comments at 3-4 (JA\_\_\_); PJM 2021 RM20-10 Comments at 1-2, 28. PJM also explained that these benefits accrue primarily to customers and not to transmission owners, their shareholders, or their bottom lines. *See* PJM Complaint Comments at 2 (JA\_\_\_); PJM 2020 RM20-10 Comments at 6-8 (JA\_\_\_-JA\_\_\_); PJM 2021 RM20-10 Comments at 2-3. PJM provided further evidence of the numerous burdens

26

imposed on transmission owning members—including: relinquishing functional control over their assets; ceding to the RTO oversight and approval of the use of their assets, planned maintenance outages, and RTO-driven grid expansion decisions; and increased FERC regulatory requirements related to transmission planning and market reforms—and how Congress established the RTO participation incentive to promote symmetry and address the mismatch between the burdens and costs imposed on transmission owners and the benefits of RTOs, which largely accrue instead to customers.  *See* PJM 2020 RM20-10 Comments at 6-7 (JA___-JA___); PJM 2021 RM20-10 Comments at 3, 25-25.

   Rather than address PJM's evidence head-on, FERC summarily "den[ied] PJM's motion to lodge" in *Dayton* claiming that PJM's benefit evidence "is not relevant in our determination" and deflecting to an ongoing rulemaking proceeding.  *Dayton* at P 13 (JA____).  FERC also brushed aside PJM's (and other entities') similar evidence in *AEP*, stating simply that it was "not persuaded."  *AEP* at P 85 (JA____).  Precedent demands more.  FERC is required to "examine the relevant data and articulate a satisfactory explanation for [its] actions including a rational connection between the facts found and the choice made."  *Louisville Gas & Elec.*, 988 F.3d at 846 (citations omitted).  Given the demonstrated RTO benefits and their crucial link to the RTO participation incentive, FERC's failure to confront and discuss PJM's countervailing evidence failed the test of reasoned

27

decisionmaking. *See id.*; *Motor Vehicle*, 463 U.S. at 43; *Ohio Power Co.*, 668 F.2d at 885-86. By conditioning the RTO incentive on voluntariness, FERC upset the "symmetry" the RTO participation incentive was designed to achieve. *Motor Vehicle*, 463 U.S. at 43 (stating that an agency decision is arbitrary and capricious when it "entirely failed to consider an important aspect of the problem").

Finally, FERC arbitrarily and capriciously restricted eligibility for the RTO participation incentive in contravention of its more than two decade effort and Congress's clear desire to promote the broadest and most stable RTO participation possible. *See* Order No. 2000 at 30,993 ("Our objective is for *all transmission owning entities in the Nation* . . . to place their transmission facilities under the control of appropriate RTOs in a timely manner." (emphasis added)). A ruling against the RTO participation incentive, as FERC adopted in the orders below, works to undermine membership stability and the large geographic scope of RTOs that both Congress and FERC wanted to encourage—and from which consumers benefit. *See* Order No. 2000 at 31,079-80, 31,082-83 (explaining the importance of encouraging RTOs to have the largest possible geographic scope). Consequently, FERC's action goes against not only the plain meaning of the statute and FERC's own precedent, but works to erode the very policies that both Congress and FERC adopted over the years to support the continued existence, stability, and scope of RTOs. This result is contrary to law and has not been

addressed in FERC's orders in this case. *Motor Vehicle*, 463 U.S. at 43; *Pendley*, 601 F.3d at 426 (remanding so an agency could reexamine in light of its own precedent).

## CONCLUSION

For the foregoing reasons, the Court should grant the Transmission Owner Petitioners' petitions for review.

Respectfully submitted,

*/s/ Paul M. Flynn*
Paul M. Flynn
Ryan J. Collins
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W., Suite 600
Washington, DC  20005-3898
202-393-1200
flynn@wrightlaw.com
collins@wrightlaw.com

*Counsel for*
*PJM Interconnection, L.L.C.*

August 22, 2023

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Pursuant to Rules 32(a)(5)-(7) and 32(g)(1) of the Federal Rules of Appellate Procedure and 6 Cir. R. 32(a), the undersigned certifies that the foregoing brief complies with the applicable type-volume limitations.  The brief was prepared using a proportionally spaced type (Times New Roman, 14 point) and contains 6,532 words, excluding the parts of the brief exempted by FRAP 32(f) and 6 Cir. R. 32(b)(1).  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2016) used to prepare the brief.

*/s/ Paul M. Flynn*
Paul M. Flynn
WRIGHT & TALISMAN, P.C.
1200 G St., N.W., Suite 600
Washington, DC 20005-3898
(202) 393-1200
flynn@wrightlaw.com

**Counsel for**
**PJM Interconnection, L.L.C.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of August 2023, I electronically filed

the foregoing with the Clerk of the Court for the United States Court of Appeals

for the Sixth Circuit by using the CM/ECF system.  All participants in the case are

registered CM/ECF users and will be served by the CM/ECF system.

> */s/ Paul M. Flynn*
> Paul M. Flynn
> WRIGHT & TALISMAN, P.C.
> 1200 G St., N.W., Suite 600
> Washington, DC 20005-3898
> (202) 393-1200
> flynn@wrightlaw.com
>
> *Counsel for*
> *PJM Interconnection, L.L.C.*

# Addendum

## STATUTES:

Administrative Procedure Act, 5 U.S.C. § 706..................................................... A-1
Federal Power Act, section 201, 16 U.S.C. § 824 ................................................ A-2
Federal Power Act, section 219, 16 U.S.C. § 824s............................................... A-5

**Administrative Procedure Act, 5 U.S.C. § 706**

**Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> **(1)** compel agency action unlawfully withheld or unreasonably delayed; and
>
> **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> **(B)** contrary to constitutional right, power, privilege, or immunity;
>>
>> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>
>> **(D)** without observance of procedure required by law;
>>
>> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>>
>> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Federal Power Act, section 201, 16 U.S.C. § 824**

**Declaration of policy; application of subchapter**

**(a)    Federal regulation of transmission and sale of electric energy**
It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b)    Use or sale of electric energy in interstate commerce**

(1)    The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2)    Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility

or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c)    Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d)    "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e)    "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f)    United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

(1)    Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A)    an electric utility company subject to its regulatory authority under State law,

(B)    any exempt wholesale generator selling energy at wholesale to such electric utility, and

A-3

(C)    any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A), wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2)    Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3)    Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4)    Nothing in this section shall—

(A)    preempt applicable State law concerning the provision of records and other information; or

(B)    in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5)    As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

**Federal Power Act, section 219, 16 U.S.C. § 824s**

**Transmission infrastructure investment**

**(a)    Rulemaking requirement**

Not later than 1 year after August 8, 2005, the Commission shall establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of electric energy in interstate commerce by public utilities for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion.

**(b)    Contents**

**The rule shall—**

(1)    promote reliable and economically efficient transmission and generation of electricity by promoting capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce, regardless of the ownership of the facilities;

(2)    provide a return on equity that attracts new investment in transmission facilities (including related transmission technologies);

(3)    encourage deployment of transmission technologies and other measures to increase the capacity and efficiency of existing transmission facilities and improve the operation of the facilities; and

(4)    allow recovery of—

(A)    all prudently incurred costs necessary to comply with mandatory reliability standards issued pursuant to section 824o of this title; and

(B)    all prudently incurred costs related to transmission infrastructure development pursuant to section 824p of this title.

**(c)    Incentives**

In the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization. The Commission shall ensure that any costs

recoverable pursuant to this subsection may be recovered by such utility through the transmission rates charged by such utility or through the transmission rates charged by the Transmission Organization that provides transmission service to such utility.

**(d)     Just and reasonable rates**

All rates approved under the rules adopted pursuant to this section, including any revisions to the rules, are subject to the requirements of sections 824d and 824e of this title that all rates, charges, terms, and conditions be just and reasonable and not unduly discriminatory or preferential.