**Nos. 21-4072, 22-3351, 23-3196, 23-3324, 23-3366, & 23-3417**

# In the United States Court of Appeals for the Sixth Circuit

———————

DAYTON POWER & LIGHT COMPANY, DBA AES OHIO, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

**BRIEF FOR RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

———————

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

Carol J. Banta
Senior Attorney

For Respondent
Federal Energy Regulatory
 Commission
Washington, DC  20426
(202) 502-6433

October 30, 2023

# TABLE OF CONTENTS

**PAGE**

STATEMENT REGARDING ORAL ARGUMENT ...................................1

STATEMENT OF THE ISSUES..................................................2

STATUTORY AND REGULATORY PROVISIONS ...........................4

STATEMENT OF THE CASE ..................................................5

I.    STATUTORY AND REGULATORY BACKGROUND ...................5

      A.    Rate Approvals Under The Federal Power Act .....................5

      B.    Rate Incentives..................................................7

II.   BACKGROUND:  INCENTIVE-BASED RATE TREATMENT
      FOR PARTICIPATION IN A TRANSMISSION
      ORGANIZATION ..........................................................12

      A.    Regional Transmission Organizations..................................12

      B.    The Participation Adder .......................................14

III.  THE COMMISSION PROCEEDINGS AND ORDERS
      ON REVIEW.................................................................22

      A.    *Dayton Order* ........................................................22

      B.    *Dayton Rehearing Order* ...........................................24

      C.    *Complaint Order* ...................................................25

      D.    *Complaint Rehearing Order* .................................26

SUMMARY OF ARGUMENT ................................................28

# TABLE OF CONTENTS

**PAGE**

ARGUMENT ............................................................................... 30

I.    STANDARD OF REVIEW ............................................... 30

II.   THE COMMISSION APPROPRIATELY REQUIRED A
      SHOWING OF VOLUNTARY MEMBERSHIP IN A
      TRANSMISSION ORGANIZATION AND REASONABLY
      FOUND THAT OHIO LAW MANDATES SUCH
      MEMBERSHIP ................................................................ 34

      A.    The Commission Appropriately Ruled, Consistent
            With The Incentives Rule And The *California*
            Decisions, That Voluntariness Is A Prerequisite
            For The Participation Adder .................................... 34

      B.    The Commission Appropriately Declined To
            Consider Whether The Ohio Statute Is Preempted
            By Federal Law. ....................................................... 42

III.  THE COMMISSION REASONABLY DISTINGUISHED
      BETWEEN PARTICIPATION ADDERS THAT IT HAD
      SPECIFICALLY GRANTED AND THOSE ADOPTED AS
      PART OF COMPREHENSIVE RATE SETTLEMENTS .............. 47

      A.    The Commission Appropriately Removed The
            Participation Adders That It Had Specifically
            Granted To Ohio Power And AEP Ohio. ................ 50

      B.    Because The Commission Had Not Specifically Granted
            Participation Adders To Duke And American, It
            Appropriately Declined To Modify Their Returns On
            Equity That Were Embedded In Comprehensive Rate
            Settlements .............................................................. 56

# TABLE OF CONTENTS

**PAGE**

IV.  THE REMAINING ARGUMENTS OF PETITIONERS AND INTERVENORS ARE WITHOUT MERIT. ...................................66

    A.  An Unrelated, Pre-Incentives Proceeding Is Not Relevant To Whether Ohio Utilities Qualify For The Participation Adder. ...................................................................66

    B.  Intervenor PJM's Arguments, Which Are Jurisdictionally Barred, Merely Disagree With The Commission's Policy Judgment. ...............................................................68

    C.  Dayton Is Not Entitled To Collect An Elevated Return On Equity From Its Ratepayers Simply Because Utilities In Other States Qualify For The Incentive. ...........................71

CONCLUSION ...........................................................74

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*Aburto-Rocha v. Mukasey,*
    535 F.3d 500 (6th Cir. 2008) ........................................................ 22

*Black Oak Energy, LLC v. FERC,*
    725 F.3d 230 (D.C. Cir. 2013) ...................................................... 49

*Blumenthal v. FERC,*
    552 F.3d 875 (D.C. Cir. 2009) ........................................................ 5

*Brooklyn Union Gas Co. v. FERC,*
    409 F.3d 404 (D.C. Cir. 2005) ........................................................ 6

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ...................................................................... 31

*California Public Utilities Commission v. FERC,*
    879 F.3d 966 (9th Cir. 2018) ............................15, 17-21, 36, 39-41,
    51, 58, 66, 68, 71

*California Public Utilities Commission v. FERC,*
    29 F.4th 454 (9th Cir. 2022)........................................17, 21-22, 45

*Cities of Bethany v. FERC,*
    727 F.2d 1131 (D.C. Cir. 1984) ..................................................... 66

*Connecticut Department of Public Utility Control v. FERC,*
    593 F.3d 30 (D.C. Cir. 2010) .......................................................... 9

*Consolo v. Federal Maritime Commission,*
    383 U.S. 607 (1966) ...................................................................... 33

*DTE Energy Co. v. FERC,*
    394 F.3d 954 (D.C. Cir. 2005) ...................................................... 70

# TABLE OF AUTHORITIES

**COURT CASES (continued):**                                             **PAGE**

*East Kentucky Power Cooperative, Inc. v. FERC,*
  489 F.3d 1299 (D.C. Cir. 2007) ...................................................... 70

*Entergy Louisiana, Inc. v. Louisiana Public Service Commission,*
  539 U.S. 39 (2003) ........................................................................ 47

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021) .................................................................. 31

*FERC v. Electric Power Supply Association,*
  577 U.S. 260 (2016) ............................................................ 13, 31, 32

*FirstEnergy Service Co. v. FERC,*
  758 F.3d 346 (D.C. Cir. 2014) ........................................................ 6

*Gulf South Pipeline Co. v. FERC,*
  955 F.3d 1001 (D.C. Cir. 2020) .................................................... 64

*Hughes v. Talen Energy Marketing, LLC,*
  578 U.S. 150 (2016) ............................................................ 13, 14, 46

*International Transmission Co. v. FERC,*
  988 F.3d 471 (D.C. Cir. 2021) ...................9-10, 17, 32, 54-55, 63, 71

*Karimijanaki v. Holder,*
  579 F.3d 710 (6th Cir. 2009) ........................................................ 33

*Kentucky Utilities Co. v. FERC,*
  766 F.2d 239 (6th Cir. 1985) ........................................................ 33

*Kentucky Utilities Co. v. FERC,*
  789 F.2d 1210 (6th Cir. 1986) ...................................................... 33

## TABLE OF AUTHORITIES

**COURT CASES (continued):**                                    **PAGE**

*Louisville Gas & Electric Co. v. FERC,*
    988 F.3d 841 (6th Cir. 2021) ........................................................ 32

*MISO Transmission Owners v. FERC,*
    860 F.3d 837 (6th Cir. 2017) ............................................ 14, 32, 57

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*
    487 U.S. 354 (1988) ...................................................................... 47

*Missouri River Energy Services v. FERC,*
    918 F.3d 954 (D.C. Cir. 2019) ...................................................... 49

*Mobil Oil Corp. v. FPC,*
    417 U.S. 283 (1974) ........................................................................ 7

*Morgan Stanley Capital Group Inc. v. Public Utility*
    *District No. 1,*
    554 U.S. 527 (2008) ............................................................ 12, 31-32

*Motor Vehicle Manufacturers Association of the United States, Inc.*
    *v. State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983) ........................................................................ 31

*Municipal Resale Service Customers v. FERC,*
    43 F.3d 1046 (6th Cir. 1995) ........................................................ 70

*Nantahala Power & Light Co. v. Thornburg,*
    476 U.S. 953 (1986) ................................................................. 46-47

*NLRB v. Kentucky May Coal Co.,*
    89 F.3d 1235 (6th Cir. 1996) ........................................................ 33

# TABLE OF AUTHORITIES

**COURT CASES (continued):**                                    **PAGE**

*Natural Resources Defense Council v. Nuclear*
    *Regulatory Commission,*
    823 F.3d 641 (D.C. Cir. 2016) .........................................38

*New Jersey Department of Environmental Protection v.*
    *Nuclear Regulatory Commission,*
    561 F.3d 132 (3d Cir. 2009)...........................................38

*New York v. FERC,*
    535 U.S. 1 (2002) ..............................................5, 12, 32

*North Carolina Utilities Commission v. FERC,*
    741 F.3d 439 (4th Cir. 2014) .....................................7, 17

*NRG Power Marketing, LLC v. Maine Public Utilities Commission,*
    558 U.S. 165 (2010) ........................................................13

*NRG Power Marketing, LLC v. FERC,*
    718 F.3d 947 (D.C. Cir. 2013) .......................................32

*NSTAR Electric & Gas Corp. v. FERC,*
    481 F.3d 794 (D.C. Cir. 2007) .......................................32

*Oakbrook Land Holdings, LLC v. Commissioner*
    *of Internal Revenue,*
    28 F.4th 700 (6th Cir. 2022)...........................................31

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015) ........................................................46

*Permian Basin Area Rate Cases,*
    390 U.S. 747 (1968) ........................................................31

## TABLE OF AUTHORITIES

**COURT CASES (continued):**                                    **PAGE**

*Public Service Electric & Gas Co. v. FERC,*
    989 F.3d 10 (D.C. Cir. 2021) .......................................................... 60

*Public Utility District No. 1 v. FERC,*
    272 F.3d 607 (D.C. Cir. 2001) ........................................................ 13

*R.P. Carbone Construction Co. v. Occupational Safety & Health*
    *Review Commission,*
    166 F.3d 815 (6th Cir. 1998) .......................................................... 33

*San Diego Gas & Electric Co. v. FERC,*
    913 F.3d 127 (D.C. Cir. 2019) ............................ 9, 17, 35, 50-51, 61

*Simms v. National Highway Traffic Safety Administration,*
    45 F.3d 999 (6th Cir. 1995) ........................................................... 38

*Sithe/Independence Power Partners v. FERC,*
    165 F.3d 944 (D.C. Cir. 1999) ........................................................ 64

*Southern California Edison Co. v. FERC,*
    717 F.3d 177 (D.C. Cir. 2013) .......................................................... 8

*Transmission Access Policy Study Group v. FERC,*
    225 F.3d 667 (D.C. Cir. 2000) ........................................................ 32

*United Municipal Distributors Group v. FERC,*
    732 F.2d 202 (D.C. Cir. 1984) ............................................ 6, 58, 66

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ....................................................................... 33

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**                                          **PAGE**

*AEP Appalachian Transmission Co.*,
    130 FERC ¶ 61,075 (2010) ...........................................51, 52, 67, 68

*American Electric Power Service Corp.*,
    124 FERC ¶ 61,306 (2008) ..................................................51, 52, 68

*American Municipal Power, Inc. v. Appalachian Power Co.*,
    161 FERC ¶ 61,192 (2017) ............................................................53

*DATC Path 15, LLC*,
    177 FERC ¶ 61,115 (2021) ............................................................64

*Dayton Power & Light Co.*,
    172 FERC ¶ 61,140, *on reh'g*,
    173 FERC ¶ 61,154 (2020), *on reh'g and clarification*,
    174 FERC ¶ 61,111 (2021) ..................................................22-23, 47

*Dayton Power & Light Co.*,   [*Dayton Order*]
    176 FERC ¶ 61,025 (2021) ...................................3, 24-25, 34, 40-45,
                                    47, 69, 71, 72

*Dayton Power & Light Co.*,   [*Dayton Rehearing Order*]
    178 FERC ¶ 61,102 (2022) ................................3, 25, 35, 37, 38, 41,
                                  42-44, 46, 69, 72

*Florida Power & Light Co.*,
    175 FERC ¶ 61,024 (2021) ..............................................................6

*Golden Spread Electric Cooperative, Inc. v. Southwest Public*
    *Service Co.*,
    150 FERC ¶ 61,052 (2015) ............................................................65

*ISO New England Inc.*,
    138 FERC ¶ 61,238 (2012) ............................................................37

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES (continued):**                    **PAGE**

*ITC Holdings Corp.*,
121 FERC ¶ 61,229 (2007) ............................................................ 12

*Kansas Corporation Commission v. ITC Great Plains, LLC*,
172 FERC ¶ 61,037, *on reh'g*,
173 FERC ¶ 61,160 (2020) ............................................................ 55

*Midcontinent Independent System Operator, Inc.*,
151 FERC ¶ 61,166 (2015) ............................................................ 11

*New PJM Companies*,
107 FERC ¶ 61,271 (2004) ............................................................ 67

*North Carolina Electric Membership Corp. v. Duke Energy
Carolinas, LLC*,
155 FERC ¶ 61,048 (2016) ............................................................ 65

*Office of the Ohio Consumers' Counsel v. American Electric
Power Service Corp.*,   [*Complaint Order*]
181 FERC ¶ 61,214 (2022) ........... 3, 25-26, 34, 37, 40, 42-45, 47-55,
57, 59, 61, 62, 64, 72

*Office of the Ohio Consumers' Counsel v. American Electric
Power Service Corp.*,   [*Complaint Rehearing Order*]
183 FERC ¶ 61,034 (2023) ................................. 3, 27, 42, 48, 52, 53,
56-57, 61-64, 68

*Pacific Gas & Electric Co.*,
168 FERC ¶ 61,038 (2019), *reh'g denied*,
170 FERC ¶ 61,194 (2020) ............................................................ 21

*PJM Interconnection, L.L.C.*,
149 FERC ¶ 61,292 (2014) ............................................................ 59

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES (continued):**                    **PAGE**

*PJM Interconnection, L.L.C.*,
    151 FERC ¶ 61,029 (2015) .........................................................57-58

*PJM Interconnection, L.L.C.*,
    153 FERC ¶ 61,106 (2015) .........................................................57-59

*Promoting Transmission Investment through Pricing Reform*,
    Order No. 679, 116 FERC ¶ 61,057, *on reh'g*,
    Order No. 679-A, 117 FERC ¶ 61,345 (2006), *on reh'g*,
    Order No. 679-B, 119 FERC ¶ 61,062 (2007)......8, 9, 14, 15, 18, 19,
                                      34-37, 50, 61, 73

*Promoting Transmission Investment through Pricing Reform*,
    Order No. 679-A, 117 FERC ¶ 61,345 (2006), *on reh'g*,
    Order No. 679-B, 119 FERC ¶ 61,062 (2007)................. 8-10, 14-16,
                                       18-20, 35

*Regional Transmission Organizations*,
    Order No. 2000, FERC Stats. & Regs., ¶ 31,089 (1999)
    (cross-referenced at 89 FERC ¶ 61,285), *on reh'g*,
    Order No. 2000-A, FERC Stats. & Regs., ¶ 31,092 (1999)
    (cross-referenced at 90 FERC ¶ 61,201) .........................................13

*San Diego Gas & Electric Co.*,
    122 FERC ¶ 61,009 (2008) ..............................................................6

# TABLE OF AUTHORITIES

**STATUTES:**                                                                          **PAGE**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ....................................................................30-31

Federal Power Act

    Section 201, 16 U.S.C. § 824 ...............................................................5

    Section 205, 16 U.S.C. § 824d ......................................................5, 11

    Section 206, 16 U.S.C. § 824e .................................5, 6, 11, 49, 54

    Section 219, 16 U.S.C. § 824s .............................7-9, 11, 15, 16, 28, 34-36, 41, 52

    Section 313(b), 16 U.S.C. § 825*l*(b) ...................................33, 38, 70

Public Utility Regulatory Policies Act of 1978

    Section 205, 16 U.S.C. § 824a-1 .......................................................67

Ohio Revised Code

    Section 4928.12.....................................................................22-23, 42


**REGULATIONS:**

18 C.F.R. § 35.35 (2022) ................................................................8-11, 23

18 C.F.R. § 385.602 (2022) ..........................................................7, 23, 57

# TABLE OF AUTHORITIES

**OTHER:**                                                    **PAGE**

Federal Energy Regulatory Commission, *Energy Primer:  A Handbook
    of Energy Market Basics* (Apr. 2020),
    https://www.ferc.gov/sites/default/files/2020-06/energy-primer-
    2020_Final.pdf ...............................................................................14

# GLOSSARY

| | |
|---|---|
| AEP | Petitioner American Electric Power Service Corp. |
| AEP Ohio | Petitioner AEP Ohio Transmission Co., Inc. |
| American | Petitioner American Transmission Systems, Inc. |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| *Complaint Order* | Order on Complaint, *Office of the Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp., et al.*, FERC Docket No. EL22-34, 181 FERC ¶ 61,214 (Dec. 15, 2022), CR 39, JA ___, on review in Case Nos. 23-3196, 23-3324, 23-3366, and 23-3417 |
| *Complaint* Orders | Together, the *Complaint Order* and *Complaint Rehearing Order*, issued in FERC Docket No. EL22-34 |
| *Complaint Rehearing Order* | Order Addressing Arguments Raised on Rehearing, *Office of the Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp., et al.*, FERC Docket No. EL22-34, 183 FERC ¶ 61,034 (Apr. 20, 2023), CR 49, JA ___, on review in Case Nos. 23-3366 and 23-3417 |
| Consumers' Counsel | Office of Ohio Consumers' Counsel, Petitioner in Case Nos. 23-3324 and 23-3417 |

xiv

# GLOSSARY

| | |
|---|---|
| CR | Record item in the Certified Index filed in Case Nos. 23-3196, 23-3324, 23-3366, and 23-3417, which includes all record materials relevant to FERC Docket No. EL22-34 (*Complaint Orders*) |
| Dayton | Petitioner Dayton Power & Light Co. |
| *Dayton Order* | Order on Paper Hearing, *Dayton Power & Light Co.*, FERC Docket No. ER20-1068, 176 FERC ¶ 61,025 (July 15, 2021), DR 42, JA ___, on review in Case Nos. 21-4072 and 22-3351 |
| *Dayton* Orders | Together, the *Dayton Order* and *Dayton Rehearing Order*, issued in FERC Docket No. ER20-1068 |
| *Dayton Rehearing Order* | Order Addressing Arguments Raised on Rehearing, *Dayton Power & Light Co.*, FERC Docket No. ER20-1068, 178 FERC ¶ 61,102 (Feb. 17, 2022), DR 51, JA ___, on review in Case No. 22-3351 |
| DR | Record item in the Certified Index filed in Case Nos. 21-4072 and 22-3351, which includes all record materials relevant to FERC Docket No. ER20-1068 (*Dayton Orders*) |
| Duke | Petitioner Duke Energy Ohio, Inc. |

# GLOSSARY

| | |
|---|---|
| Incentives Rule | Together, 18 C.F.R. § 35.35 and *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007) |
| JA | Joint Appendix page(s) |
| OCC Br. | Brief of Petitioner Ohio Consumers' Counsel |
| Ohio Power | Petitioner Ohio Power Co. |
| P | Paragraph in a FERC order |
| Participation Adder or Adder | The 50 basis point adder to a base return on equity provided under the Incentives Rule for participation in a regional transmission organization (called the RTO Adder in the Commission orders on review) |
| TO Br. | Brief of Petitioners Transmission Owners |
| Transmission Owners | Collectively, Petitioners in Case Nos. 21-4072 and 22-3351: Dayton Power & Light Co., dba AES Ohio; FirstEnergy Service Co. (on behalf of American Transmission Systems, Inc.); Duke Energy Ohio, Inc.; and American Electric Power Service Corp.; and Petitioner in Case Nos. 23-3196 and 23-3366: American Electric Power Service Corp. (in its own name and on behalf of its affiliates, Ohio Power Co. and AEP Ohio Transmission Co., Inc.) |

# In the United States Court of Appeals for the Sixth Circuit

### Nos. 21-4072, 22-3351, 23-3196, 23-3324, 23-3366, & 23-3417

_____

DAYTON POWER & LIGHT COMPANY, DBA AES OHIO, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

_____

## STATEMENT REGARDING ORAL ARGUMENT

In accordance with Sixth Circuit Rule 28(b)(1)(B) and Federal
Rule of Appellate Procedure 34(a)(1), Respondent Federal Energy
Regulatory Commission (Commission or FERC) submits that oral
argument would assist the Court's resolution of this case. The issues in
these consolidated appeals concern incentive-based rate treatments
under the Federal Power Act and Commission regulations, including

the Commission's 2006 rulemaking on transmission incentives, as well as its policies and procedures regarding complex rate settlements. Oral argument will enable counsel to answer any questions the Court may have regarding not only the particular issues presented in the orders on review but also the broader context of electricity utility ratemaking, regional transmission organizations, and related Commission policies and proceedings.

## STATEMENT OF THE ISSUES

This case arises from two related proceedings concerning the Commission's rule allowing electric utilities to collect higher rates — via an adder in the return-on-equity component of their transmission rates — as an incentive for joining and remaining as members of a regional transmission organization (the Participation Adder or the Adder). In the challenged orders, the Commission considered whether transmission-owning utilities in Ohio are eligible to include the Participation Adder in their rates, where an Ohio statute requires them to join and remain in a regional transmission organization.

In one proceeding, the Commission denied the application of Petitioner Dayton Power & Light Company (Dayton) to include the

Adder in its rates. *Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (2021), JA ___, *on reh'g*, 178 FERC ¶ 61,102 (2022), JA ___ (together, *Dayton* Orders). In the other proceeding, the Commission partially granted and partially denied a complaint by Petitioner Office of Ohio Consumers' Counsel (Consumers' Counsel) that sought to modify the rates of several other Ohio utilities. *Office of the Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp., et al.*, 181 FERC ¶ 61,214 (2022), JA ___, *on reh'g*, 183 FERC ¶ 61,034 (2023), JA ___ (together, *Complaint* Orders). Based on its ruling in *Dayton*, the Commission removed the previously granted Participation Adder from the rates of two of the Petitioner Transmission Owners,[1] but declined to modify the settlement rates of two others.

These consolidated appeals present the following issues for review. (The first three are raised by Transmission Owners, claiming

---

[1]    In this Brief, "Transmission Owners" refers, collectively, to Petitioners Dayton Power & Light Co., dba AES Ohio; FirstEnergy Service Co. (on behalf of American Transmission Systems, Inc.); Duke Energy Ohio, Inc.; and American Electric Power Service Corp. (AEP) (in its own name and on behalf of its affiliates, Ohio Power Co. and AEP Ohio Transmission Co., Inc.). (We note, however, that Duke Energy Ohio, Inc. joined the other Transmission Owners on the petitions for review in Case Nos. 21-4072 and 22-3351, but did not join the opening brief jointly filed by the other Transmission Owners.)

from their perspective that the Commission went too far; the fourth is raised by Consumers' Counsel, claiming from the opposite end of the spectrum that the Commission did not go far enough.)

(1)  Whether the Commission reasonably determined that, under its incentives regulation and case law, Ohio utilities are not eligible to collect the Participation Adder because state law mandates their ongoing participation in a transmission organization;

(2)  Whether the Commission appropriately declined to determine whether the Ohio statute is preempted by federal law;

(3)  Whether the Commission appropriately exercised its Federal Power Act authority to remove Participation Adders that it had specifically granted on a single-issue basis; and

(4)  Whether the Commission reasonably declined to modify comprehensive rate settlements to adjust negotiated returns on equity where the Commission had never specifically granted Participation Adders.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the attached Addendum.

# STATEMENT OF THE CASE

## I.   STATUTORY AND REGULATORY BACKGROUND

### A.   Rate Approvals Under The Federal Power Act

Section 201 of the Federal Power Act ("FPA"), 16 U.S.C. § 824, gives the Commission jurisdiction over the rates, terms, and conditions of service for the transmission and wholesale sale of electric energy in interstate commerce.  This grant of jurisdiction is comprehensive and exclusive.  *See generally New York v. FERC*, 535 U.S. 1 (2002) (discussing statutory framework and FERC jurisdiction).

Section 205 of the Federal Power Act, 16 U.S.C. § 824d, provides that all rates for or in connection with jurisdictional sales and transmission services are subject to FERC review to assure they are just and reasonable, and not unduly discriminatory or preferential.  16 U.S.C. § 824d(a), (b), (e).  Section 206 of the Federal Power Act, 16 U.S.C. § 824e, authorizes the Commission, on its own initiative or on a third-party complaint, to investigate whether existing rates are lawful. In such a proceeding, the complainant bears "the burden of proof to show that any rate . . . is unjust, unreasonable, unduly discriminatory, or preferential . . . ."  FPA § 206(b), 16 U.S.C. § 824e(b); *see also, e.g., Blumenthal v. FERC*, 552 F.3d 875, 881 (D.C. Cir. 2009) (stating

complainant's burden of proof).  If the Commission finds that the

burden has been met, it must determine and set the new just and

reasonable rate.  FPA § 206(a), 16 U.S.C. § 824e(a); *see, e.g.*,

*FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353-54 (D.C. Cir. 2014)

(discussing "step one" and "step two" under section 206).

Complex rate filings are frequently resolved by settlements.  The

Commission has long taken the view, as have the courts, that

settlements are in the public interest and should be encouraged.  *See*

*United Mun. Distribs. Grp. v. FERC*, 732 F.2d 202, 209 (D.C. Cir. 1984);

*see also Brooklyn Union Gas Co. v. FERC*, 409 F.3d 404, 407 (D.C. Cir.

2005) (recognizing the Commission's "pro-settlement policy"); *Fla.*

*Power & Light Co.*, 175 FERC ¶ 61,024 P 6 (2021) ("Commission policy

favors settlements, as they provide parties with certainty, reduce

litigation costs, and permit parties to reach reasonable compromise in

resolving difficult issues.") (citing orders); *San Diego Gas & Elec. Co.*,

122 FERC ¶ 61,009 P 13 (2008) ("The Commission strongly favors

settlements, particularly in cases that are highly contested and

complex.") (citations omitted).

Under the Commission's procedural rules, "[a]n uncontested offer of settlement may be approved by the Commission upon a finding that the settlement appears to be fair and reasonable and in the public interest." 18 C.F.R. § 385.602(g)(3); *cf. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 314 (1974) ("If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public.") (citation omitted).

## B.    Rate Incentives

In 2005, Congress passed the Energy Policy Act to, among other things, increase transmission efficiency and innovation. *See N.C. Utils. Comm'n v. FERC*, 741 F.3d 439, 443 (4th Cir. 2014) (citing Pub. L. 109-58, 119 Stat. 594 (2005)). As part of that legislation, Congress added Section 219 to the Federal Power Act. *See* 16 U.S.C. § 824s. Section 219(a) directed the Commission to establish, by rule, incentive-based rate treatments for transmission infrastructure, "for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion." *Id.* § 824s(a). Among other provisions, section 219(c)

specified that "the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization." *Id.* § 824s(c). Section 219(d) provided that "[a]ll rates approved under the rules adopted pursuant to this section" are subject to the Federal Power Act's requirements "that all rates, charges, terms, and conditions be just and reasonable and not unduly discriminatory or preferential." *Id.* § 824s(d) (citing *id.* §§ 824d, 824e).

Pursuant to section 219, the Commission issued such a rule, codified at 18 C.F.R. § 35.35. *See Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007)[2]; *see also S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 179 (D.C. Cir. 2013) ("[p]ursuant to the Energy Policy Act of 2005, the Commission has also established incentive-based rate treatments to further encourage the construction of transmission

---

[2]   This Brief will refer to the Incentives Rule to mean, collectively, 18 C.F.R. § 35.35 and the Commission's orders issued in the rulemaking proceeding.  This Brief will refer to Order Nos. 679 and 679-A when citing paragraphs in those orders.

facilities"); *Conn. Dep't of Pub. Util. Control v. FERC*, 593 F.3d 30, 33
(D.C. Cir. 2010) (noting that the Commission issued the Incentives Rule
to comply with newly-added section 219 of the Federal Power Act).  The
Commission explained that "[t]he purpose of our Rule is to benefit
customers by providing real incentives to encourage new infrastructure,
not simply increasing rates in a manner that has no correlation to
encouraging new investment."  Order No. 679 P 6; *see also* Order No.
679-A P 1 ("These incentives are intended to benefit consumers by
ensuring reliability and reducing the cost of delivered power by
reducing transmission congestion.").

    To that end, the Commission enumerated a variety of incentives
that it would consider on a case-by-case basis.  *See, e.g.*, Order No. 679
PP 1, 5, 43, 93.  The rule does not automatically grant any incentive-
based rate treatment to any utility; each utility must demonstrate that
it meets the Commission's criteria for that incentive and that the
overall return on equity is just and reasonable.  18 C.F.R. § 35.35(c)-(e);
*see generally San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 130-33
(D.C. Cir. 2019) (discussing the Incentives Rule); *Int'l Transmission Co.
v. FERC*, 988 F.3d 471, 473 (D.C. Cir. 2021) (same).

Several of the enumerated incentives increase a utility's return on equity.[3] *See, e.g.*, 18 C.F.R. § 35.35(d)(1)(i) (allowing "[a] rate of return on equity sufficient to attract new investment in transmission facilities"); *id.* § 35.35(d)(2)(1) (allowing a "stand-alone transmission company" to include an elevated return on equity "that both encourages Transco formation and is sufficient to attract investment"); *see also* Order No. 679-A PP 6-7, 67 (each utility seeking an elevated return would be required to demonstrate the "nexus" between the incentive sought and the investment, and "to justify where in the zone of reasonableness [its] return should lie"); *cf. Int'l Transmission*, 988 F.3d at 474 ("FERC ties 'adders' to certain behaviors or characteristics of utilities, incentivizing needed actions by bumping up their returns on equity above the base level set by FERC."). The specific incentive at issue in this case (the Participation Adder) allows "public utilities that join a Transmission Organization" to receive "a return on equity that is

---

[3]    "As its name suggests, a FERC-authorized return on equity determines the extent to which a utility in the highly regulated electricity sector may earn a profit." *Int'l Transmission*, 988 F.3d at 474.

10

higher than . . . the Commission might otherwise allow . . . ."  18 C.F.R.

§ 35.35(e).[4]  *See infra* pp. 14-16.

Where the Commission grants such an adder, it also must find

that the total return on equity (base return plus the adder) remains

within the zone of reasonableness.  *See* 16 U.S.C. § 824s(d) (incentive

rates are subject to the requirements of 16 U.S.C. §§ 824d and 824e);

*see, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,166

PP 11-13 (2015) (awarding a Participation Adder but concluding that

the utility had not shown the total return on equity to be just and

---

[4]     This section provides:

   (e) *Incentives for joining a Transmission Organization.*  The
   Commission will authorize an incentive-based rate treatment, as
   discussed in this paragraph (e), for public utilities that join a
   Transmission Organization, if the applicant demonstrates that the
   proposed incentive-based rate treatment is just and reasonable
   and not unduly discriminatory or preferential.  Applicants for the
   incentive-based rate treatment must make a filing with the
   Commission under section 205 of the Federal Power Act.  For
   purposes of this paragraph (e), an incentive-based rate treatment
   means a return on equity that is higher than the return on equity
   the Commission might otherwise allow if the public utility did not
   join a Transmission Organization. . . .

18 C.F.R. § 35.35(e) (2022).  "Transmission Organization" is defined to
include Regional Transmission Organizations, Independent System
Operators, and certain other entities "approved by the Commission for
the operation of transmission facilities."  *Id.* § 35.35(b)(2).

reasonable); *cf. ITC Holdings Corp.*, 121 FERC ¶ 61,229 PP 39-44

(2007) (utility seeking a different incentive adder had not shown total

return on equity to be just and reasonable).

## II.  BACKGROUND:  INCENTIVE-BASED RATE TREATMENT FOR PARTICIPATION IN A TRANSMISSION ORGANIZATION

### A.    Regional Transmission Organizations

Since the 1970s, a combination of technological advances and

policy reforms has given rise to market competition among power

suppliers.  The expansion of vast regional grids and the possibility of

long-distance transmission has enabled electric utilities to make large

transfers of electricity in response to market conditions, thereby

creating opportunities for competition among suppliers.  *See New York*,

535 U.S. at 7-8 (explaining evolution of competitive markets).

In the 1990s, the Commission furthered the development of such

competition by ordering functional unbundling of wholesale generation

and transmission services, requiring utilities to provide open,

non-discriminatory access to their transmission facilities to competing

suppliers.  *See generally id.* at 11-13; *cf. Morgan Stanley Capital Grp.*

*Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536 (2008) ("the Commission

12

has attempted to break down regulatory and economic barriers that hinder a free market in wholesale electricity").

The Commission's efforts to foster wholesale electricity competition over broader geographic areas in recent decades have led to the creation of independent system operators and regional transmission organizations. *See Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999) (cross-referenced at 89 FERC ¶ 61,285), *on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *appeals dismissed*, *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001); *Morgan Stanley*, 554 U.S. at 536-37. These independent regional entities operate the transmission grid on behalf of transmission-owning member utilities and are required to maintain system reliability. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267-68 (2016); *see also NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 169 & n.1 (2010) (explaining responsibilities of regional system operators).

PJM is the independent system operator for a regional transmission system that spans thirteen states, plus the District of

Columbia, stretching from the mid-Atlantic to Chicago. *See Talen Energy Mktg.*, 578 U.S. at 155; FERC, *Energy Primer: A Handbook of Energy Market Basics* at 85, 90 (Apr. 2020), energy-primer-2020_Final.pdf (ferc.gov). The Transmission Owners in these consolidated cases are electric utility members of PJM. (Petitioners American Transmission Systems, Inc. and Duke Energy Ohio, Inc. were members of another regional transmission organization, Midcontinent Independent System Operator, Inc., before moving to PJM in 2011. *See MISO Transmission Owners v. FERC*, 860 F.3d 837, 839 (6th Cir. 2017). Midcontinent includes electric utilities in fifteen states in the Midwest and the South and one Canadian province. *See id.*; *Energy Primer* at 91.) A map showing both PJM and Midcontinent, among other regions, is available at https://www.ferc.gov/power-sales-and-markets/rtos-and-isos.

### B. The Participation Adder

#### 1. The Incentives Rule

As noted *supra* pp. 10-11, the package of rate incentives that the Commission developed in its Incentives Rule included a Participation Adder to return on equity for entities that joined regional transmission organizations. *See* Order No. 679 PP 326-33; Order No. 679-A PP 86-90;

*see also Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 970 (9th Cir. 2018) ("[Federal Power Act] section 219(c) required FERC to provide incentives to induce utilities to join regional transmission organizations. . . . FERC did so in 2006 through the adoption of Order [No.] 679 and the rehearing orders that followed.") (citation omitted).

In that rulemaking, the Commission explained that "[t]he basis for the incentive is a recognition of the benefits that flow from membership in such organizations and the fact continuing membership is generally voluntary." Order No. 679 P 331; *see also* Order No. 679-A P 86 (Adder is "an inducement for utilities to join, and remain in, Transmission Organizations"). The Commission decided not to create "a generic adder" for such membership, concluding instead that it would "consider the appropriate [return-on-equity] incentive" on a case-by-case basis when an electric utility requested the incentive. Order No. 679 P 326. The Commission further declined to "make a generic finding on the duration of incentives" for participation; it would presume eligibility if an entity could show that it had joined a transmission organization and that its membership "is on-going." *Id.* P 327; *see also id.* P 331 (clarifying that utilities "that have already joined, and that remain

15

members of," a transmission organization are eligible for the
Participation Adder).

Responding to arguments on rehearing, the Commission affirmed
its decision to allow the Participation Adder for utilities that had
already joined transmission organizations, emphasizing the
"inducement" effect of incentives:  "The stated purpose of [Federal
Power Act] section 219 is to provide incentive-based rate treatments
that benefit consumers by ensuring reliability and reducing the cost of
delivered power.  We consider an inducement for utilities to join, and
remain in, Transmission Organizations to be entirely consistent with
those purposes."  Order No. 679-A P 86; *see also id.* n.142 ("incentives
are equally important in inducing utilities to join and remain").  To that
end, the Commission declined to limit the incentive to utilities that had
not yet joined such organizations, as that limitation would "offer[] no
inducement to stay in these organizations for members with the option
to withdraw . . . ."  *Id.*

### 2.    The *California* Decisions

No party sought judicial review of the orders promulgating the
Incentives Rule.  Only a handful of court decisions have reviewed

Commission orders concerning any rate incentives requested or granted under the Incentives Rule.  *See N.C. Utils. Comm'n v. FERC*, 741 F.3d 439 (4th Cir. 2014) (affirming Commission orders that approved various rate incentives for reliability projects); *San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127 (D.C. Cir. 2019) (affirming Commission orders that granted an abandoned costs incentive only prospectively, excluding previously incurred costs); *Int'l Transmission Co. v. FERC*, 988 F.3d 471 (D.C. Cir. 2021) (affirming Commission orders that reduced the enhanced return-on-equity incentive for an independent transmission company, based on changes to its independence).  Prior to the cases now on review, only the Ninth Circuit has reviewed the Commission's rulings on the Participation Adder.  *See Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966 (9th Cir. 2018) (*California I*); *Cal. Pub. Utils. Comm'n v. FERC*, 29 F.4th 454 (9th Cir. 2022) (*California II*).

### a.    *California I*

Beginning in 2007, after the Commission issued the Incentives Rule, Pacific Gas & Electric Company (PG&E) regularly included the Participation Adder in its annual tariff filings establishing its transmission revenue requirement as a participant in the California

Independent System Operator. *See California I*, 879 F.3d at 971. Until 2014, those tariff filings were resolved by settlements. *See id.* at 972, 980. In 2014 and 2015, however, California regulators objected to PG&E's annual filing, arguing that a state regulatory order required PG&E to continue its participation in the transmission organization; accordingly, the Participation Adder would give PG&E an incentive to do something that was mandatory. *See id.* at 972. Nevertheless, the Commission summarily granted the Participation Adder in both annual filings, based on PG&E's ongoing participation. *See id.*

On review, the Ninth Circuit concluded that the Commission had not reasonably interpreted the Incentives Rule. *Id.* at 973. First, Order No. 679 provides that a utility that remains in a transmission organization is "presumed to be eligible" for the Participation Adder. Order No. 679 P 327, *quoted in* 879 F.3d at 974. But "language throughout Order[ Nos.] 679 and 679-A suggests that the presumption of eligibility may be rebutted . . . and that ongoing membership is not sufficient for an incentive adder." 879 F.3d at 974; *see also id.* ("The orders commit FERC to case-by-case review of incentive adders even for utilities that have demonstrated ongoing membership in transmission

18

organizations."); *id.* at 979 (the Incentives Rule requires a "case-by-case analysis").

The court then focused on the Commission's justification for the Participation Adder, based on "'a recognition of the benefits that flow from membership in [transmission] organizations *and the fact that continuing membership is generally voluntary.*'" *Id.* at 974 (quoting Order No. 679 P 331); *see also id.* at 976 ("By observing that transmission organization membership was '*generally* voluntary," FERC indicated that it knew some utilities could not voluntarily leave.") (also quoting P 331).  The court further explained that the Commission had tied that justification to the purpose of Federal Power Act section 219, "describ[ing] incentive adders as 'an *inducement* for utilities to join, and remain in, Transmission Organizations.'" 879 F.3d at 974 (quoting Order No. 679-A P 86); *see also id.* (citing the Commission's determination that the Adder should apply to continuing membership as an "'inducement to stay'" for those having "'the option to withdraw'") (quoting Order No. 679-A P 86); *cf. id.* at 975 (also noting that a "prior contractual commitment or statute may have a bearing on

[the Commission's] nexus evaluation" of applications for incentives) (quoting Order No. 679-A P 122).

The court thus concluded that parties may challenge the presumption of a utility's eligibility for the Participation Adder and that ongoing membership "is not dispositive" as to eligibility. *Id.* at 975; *see also id.* at 977 ("this presumption is rebuttable"); *id.* (the Incentives Rule "permits challenges to incentives on the grounds that they will not induce continuing participation"). As to the merits of such a challenge, "the voluntariness of a utility's membership in a transmission organization is logically relevant to whether it is eligible for an adder." *Id.* at 975. Specifically, "[w]hen membership is not voluntary, the incentive is presumably not justified." *Id.* at 974. That is, "[a]n incentive cannot 'induce' behavior that is already legally mandated." *Id.*

Therefore, the court found that the Commission had improperly granted the Participation Adder to PG&E by failing to address arguments that its continuing participation was not voluntary but mandated by state law. *Id.* at 977; *accord id.* at 979 ("FERC needed to inquire into PG&E's specific circumstances, i.e., whether it could

unilaterally leave the [organization] and thus whether an incentive adder could induce it to remain in the [organization]").  The court remanded the matter to the Commission to consider whether PG&E could demonstrate that it was eligible for the Adder.  *Id.* at 979, 980.

### b.    Orders on Remand and *California II*

On remand, the Commission determined that California law did not mandate utilities' participation in a transmission organization and that the Participation Adder induced PG&E to continue its membership in the California Independent System Operator.  *See, e.g.*, *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 P 2 (2019), *reh'g denied*, 170 FERC ¶ 61,194 PP 5, 21 (2020).  Therefore, the Commission affirmed its grant of the Adder.

Back on judicial review, the Ninth Circuit affirmed the remand orders, holding that the Commission had followed the *California I* mandate, had correctly interpreted California law, and had reasonably awarded the Participation Adder based on voluntariness.  *California II*, 29 F.4th at 462, 466-68.  The court also held that the Commission appropriately had interpreted the relevant state law (declining to defer to California regulators' interpretation), because the issue in the case —

21

eligibility for the Participation Adder — arose from federal law.  *Id.* at
463.

## III.   THE COMMISSION PROCEEDINGS AND ORDERS ON REVIEW

### A.   *Dayton Order*

In February 2020, Dayton submitted an application, under
Federal Power Act section 205, requesting approval of certain
transmission rate incentives for planned transmission projects.
Application to Establish Incentive Rate Treatment for Qualifying
Transmission Projects, DR 2, JA ___.  In August 2020, the Commission
granted the application in part, approving certain rate incentives for
various projects, but suspended the proposed 50-basis-point (one-half
percent) Participation Adder and set a "paper hearing" to explore
"whether Dayton has shown that its participation in PJM . . . is
voluntary, as required for it to be entitled to the adder, or if such
participation is mandated by Ohio law."  Order on Transmission
Incentives, *Dayton Power & Light Co.*, 172 FERC ¶ 61,140 P 22, DR 14,
JA ___, *on reh'g*, 173 FERC ¶ 61,154 (2020), DR 37, JA ___, *on reh'g and
clarification*, 174 FERC ¶ 61,119 (2021), DR 41, JA ___.  Specifically,
the Commission directed Dayton to address the requirements of Ohio

Revised Code § 4928.12 in relation to the Adder provided in 18 C.F.R.

§ 35.35(e).[5]  172 FERC ¶ 61,140 P 22 and Appendix – Paper Hearing

Questions, JA ___, ___.

　　After reviewing the parties' briefs, the Commission found that

Dayton does not qualify for the Participation Adder because:  (1) the

Incentives Rule requires a showing of voluntary membership in a

regional transmission organization; and (2) Dayton's membership is not

voluntary because Ohio law requires it.  Order on Paper Hearing,

*Dayton Power & Light Co.*, 176 FERC ¶ 61,025 PP 2, 14 (2021) (*Dayton*

*Order*), DR 42, JA ___, ___; *see id.* PP 25-31, JA ___-__ (discussing

voluntariness requirement); *id.* PP 54-64, JA ___-___ (discussing effects

---

[5]　　The Ohio statute provides, in pertinent part:

> Except as otherwise provided in [other sections], no entity shall
> own or control transmission facilities as defined under federal law
> and located in this state on or after the starting date of
> competitive retail electric service unless that entity is a member
> of, and transfers control of those facilities to, one or more
> qualifying transmission entities . . . that are operational.

Ohio Rev. Code § 4928.12(A); *see also id.*, § 4928.12(B) (listing nine
specifications that a "qualifying transmission entity" must meet); *id.*,
section 4928.12(B)(1) (among those specifications, requiring that the
transmission entity "is approved by the federal energy regulatory
commission").

of Ohio law).  The Commission declined to address arguments that the

Ohio statute is preempted by federal law, concluding that the rate

proceeding was "not an appropriate vehicle to address the

constitutionality of the Ohio statute."  *Id.* P 71, JA ___.

### B.    *Dayton Rehearing Order*

Several parties, including Dayton and the other Petitioner

Transmission Owners, timely filed requests for rehearing.  *See* DR 44,

JA ___ (Dayton); DR 43, JA ___ (other Transmission Owners).  On

February 17, 2022, the Commission issued the Order Addressing

Arguments Raised on Rehearing, reaffirming its conclusions that

parties must demonstrate that their participation is voluntary to

qualify for the Adder and that Dayton's participation is required by

Ohio law.  *Dayton Power & Light Co.*, 178 FERC ¶ 61,102 PP 10, 14-18,

22-26, 33-36 (2022) (*Dayton Rehearing Order*), DR 51, JA ___, ___-__,

___-__, ___-__.  The Commission again declined to address preemption.

*Id.* PP 31-36, JA ___-__.

Dayton and the other Transmission Owners filed a petition for

review of the *Dayton Order* in Case No. 21-4072 and a petition for

review of both *Dayton* Orders in Case No. 22-3351.  This Court

consolidated the petitions on May 4, 2022 and held them in abeyance

pending the outcome of the related complaint proceeding.

### C.    *Complaint Order*

On February 24, 2022, Consumers' Counsel filed a complaint

before the Commission alleging that the other Transmission Owners —

Ohio Power Company (Ohio Power) and AEP Ohio Transmission

Company Inc. (AEP Ohio); Duke Energy Ohio, Inc. (Duke); and

American Transmission Systems, Inc. (American) — likewise are

ineligible for the Adder because their participation in PJM is not

voluntary under Ohio law.  Complaint, CR 1, JA ___.

The Commission granted the complaint in part and denied it in

part.  Order on Complaint, *Office of the Ohio Consumers' Counsel v. Am.*

*Elec. Power Serv. Corp.*, 181 FERC ¶ 61,214 P 1 (2022) (*Complaint*

*Order*), CR 39, JA ___, ___.  Specifically, the Commission found that

Ohio Power and AEP Ohio do not qualify for the Adder, which the

Commission had specifically evaluated and granted in previous rate

filings (prior to *California I* and the *Dayton* Orders), because their

participation in a transmission organization is mandatory.  *Id.*

PP 62-63, JA ___-__.  The Commission thus removed the 50-basis-point

Adder from Ohio Power's and AEP Ohio's formula rates. *Id.* PP 76-79,

JA ___-__. But the Commission concluded that Duke and American are

not similarly situated because the Commission had never granted them

Participation Adders; their returns on equity, including any adders,

"were each embedded in a comprehensive settlement agreement," so

that the Commission did not know "the precise trade-offs and

concessions" made by the settling parties. *Id.* P 64, JA ___. For that

reason, the Commission would not "change unilaterally a single aspect

of such a comprehensive settlement," absent a showing that the overall

returns on equity were unjust and unreasonable. *Id.* PP 65-66, JA ___-

__.

The Commission also declined to address arguments that the

*California I* court had misinterpreted the Incentives Rule, that the Ohio

statute is preempted, or that the Commission should allow the Adder

even where participation is mandatory. *See id.* PP 83-85, JA ___-__.

**D.  *Complaint Rehearing Order***

AEP and Consumers' Counsel each timely filed requests for

rehearing. CR 40, JA ___ (AEP); CR 41, JA ___ (Consumers' Counsel).

On rehearing, the Commission reaffirmed its conclusions on all issues.

Order Addressing Arguments Raised on Rehearing, *Office of the Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp.*, 183 FERC ¶ 61,034 P 20 (2023) (*Complaint Rehearing Order*), CR 49, JA ___. The Commission again explained that Duke and American were not similarly situated to Ohio Power and AEP Ohio because the Commission had not specifically authorized the Adder in Duke's and American's returns on equity. *Id.* PP 27, 33-34, 37-38, JA ___, ___-__, ___-__. Because those returns on equity had been established in comprehensive settlements, the Commission would not "strip[] out a single component" of a settlement rate "on a piecemeal basis." *Id.* PP 28-29, JA ___-__. Finally, Commission again rejected arguments regarding preemption, the Incentives Rule, and *California I.  Id.* PP 42-43, JA ___-__.

AEP and Consumers' Counsel each filed petitions for review of the *Complaint Order* in Case Nos. 23-3196 and 23-3324, respectively, and petitions for review of both *Complaint* Orders in Case Nos. 23-3366 and 23-3417, respectively.  This Court consolidated all of these petitions, together with the two petitions for review of the *Dayton* Orders, on July 12, 2023.

27

## SUMMARY OF ARGUMENT

This case concerns the Commission's responsibility under the Federal Power Act to ensure that incentive-based rate treatments for transmission infrastructure investment, like all FERC-jurisdictional rates, are "just and reasonable."  To that end, the Commission ensures that incentives have the effect of inducing conduct — here, by limiting the Participation Adder incentive to utilities that voluntarily join and remain in transmission organizations.  In addition, in keeping with its longstanding view that the resolution of complex rate cases by settlement is in the public interest, the Commission holds to a policy of declining to revisit individual elements of comprehensive settlement packages.

In the *Dayton* Orders, the Commission reasonably found that its Incentives Rule, as interpreted by the Ninth Circuit in the recent *California* cases, requires a utility requesting the Adder to show that it participates in a regional transmission organization voluntarily.  The Commission properly declined to revisit whether its promulgation of the Incentives Rule complied with the directives in Federal Power Act section 219, 16 U.S.C. § 824s, concluding that Transmission Owners'

challenge raises a collateral attack on the 2006 rulemaking.  In addition, the Commission appropriately followed *California*'s interpretation of the Incentives Rule, grounded in the Rule's description of rate incentives as an inducement and its premise that membership in transmission organizations is generally voluntary.

Applying the Ohio statute, the Commission found that Ohio utilities' participation in transmission organizations is not voluntary but mandatory, rendering them ineligible for the Adder.  Neither its interpretation of Ohio law nor its factual findings are in dispute. Instead, Transmission Owners contend that the Ohio statute is preempted by federal law.  The Commission appropriately declined to consider that constitutional issue, finding that it lacked a sufficient record and that these individual adjudications under the Incentives Rule were not an appropriate procedural vehicle to litigate the question.

In the *Complaint* Orders, the Commission reasonably distinguished between two sets of Transmission Owners, removing the Adders that it had previously granted on a single-issue basis but declining to modify negotiated rates in comprehensive settlements.  The Commission had specifically approved the requested Adders for Ohio

Power and AEP Ohio in rate orders that had evaluated the incentive on the merits. By contrast, Commission had never considered or approved Adders for Duke and American; rather, both resolved all issues in their rate cases with complex, multiparty settlements that the Commission approved as fair and reasonable and in the public interest without evaluating the merits of any individual component. For these reasons, the Commission reasonably determined that the Adders for Ohio Power and AEP Ohio could be removed apart from any other aspects of their rates, but reasonably concluded that its long-standing policy of respecting rate settlements cautioned against stripping out a single component embedded in Duke's and American's negotiated rates.

Other arguments raised by AEP, Dayton, and Intervenor PJM — concerning AEP's reliance on an unrelated 2004 proceeding, and PJM's efforts to introduce general evidence about regional membership, and Dayton's argument claim of unfair disadvantage relative to other PJM members — are meritless.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews FERC orders under the Administrative Procedure Act's "arbitrary and capricious" standard, 5 U.S.C.

§ 706(2)(A); the scope of review under that standard is "'extremely narrow.'" *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 720 (6th Cir. 2022) (citation omitted), *cert. denied*, 143 S. Ct. 626 (2023). The relevant inquiry is whether the agency has "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("deferential" standard requires only that agency action "be reasonable and reasonably explained"); *Elec. Power Supply Ass'n*, 577 U.S. at 292 (the question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives").

The Commission's decisions regarding rate issues are entitled to broad deference because of "the breadth and complexity of the Commission's responsibilities." *Permian Basin Area Rate Cases*, 390 U.S. 747, 790 (1968); *see also Morgan Stanley*, 554 U.S. at 532 (affording "great deference" to Commission's rate decisions). This is

31

particularly true in cases, like this one, that involve "a technical area like electricity rate design," meaning the Court "'afford[s] great deference to the Commission in its rate decisions.'" *Elec. Power Supply Ass'n*, 577 U.S. at 292 (quoting *Morgan Stanley*, 554 U.S. at 532); *cf. Int'l Transmission*, 988 F.3d at 480 ("the Court's review . . . is particularly deferential because [rate-related] matters are either fairly technical or involve policy judgments that lie at the core of the regulatory mission") (cleaned up); *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 702 (D.C. Cir. 2000) (Commission's "policy assessment[s]" are "owe[d] great deference"), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

This Court "give[s] fresh review to questions of law . . . ." *MISO Transmission Owners*, 860 F.3d at 841; *see also Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021). That said, "[a]n agency's interpretation of its own precedents receives considerable deference." *Aburto-Rocha v. Mukasey*, 535 F.3d 500, 503 (6th Cir. 2008) (citing *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 799 (D.C. Cir. 2007)); *see also*, *e.g.*, *NRG Power Mktg., LLC v. FERC*, 718 F.3d 947, 957 (D.C. Cir. 2013) ("[W]e afford FERC substantial deference in its

interpretation of its own orders."); *Ky. Utils. Co. v. FERC*, 789 F.2d 1210, 1217 (6th Cir. 1986) ("In the complex area of ratemaking, the Commission's construction of its own opinions and orders is entitled to deference.").

The Commission's factual findings are conclusive if supported by substantial evidence. Federal Power Act § 313(b), 16 U.S.C. § 825*l*(b); *see Ky. Utils. Co. v. FERC*, 766 F.2d 239, 241 (6th Cir. 1985). The substantial evidence standard requires "more than a scintilla, but less than a preponderance, of the evidence." *R.P. Carbone Constr. Co. v. Occupational Safety & Health Rev. Comm'n*, 166 F.3d 815, 818 (6th Cir. 1998). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." *Id.*; *accord Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). If the evidence is susceptible of more than one rational interpretation, the Court must uphold the agency's findings. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *Karimijanaki v. Holder*, 579 F.3d 710, 714 (6th Cir. 2009); *NLRB v. Ky. May Coal Co.*, 89 F.3d 1235, 1242 (6th Cir. 1996).

33

## II.  THE COMMISSION APPROPRIATELY REQUIRED A SHOWING OF VOLUNTARY MEMBERSHIP IN A TRANSMISSION ORGANIZATION AND REASONABLY FOUND THAT OHIO LAW MANDATES SUCH MEMBERSHIP.

### A.  The Commission Appropriately Ruled, Consistent With The Incentives Rule And The *California* Decisions, That Voluntariness Is A Prerequisite For The Participation Adder.

Transmission Owners argue that the Incentives Rule, as interpreted in the *Dayton* Orders, violates section 219 of the Federal Power Act, 16 U.S.C. § 824s.  TO Br. 28-33.  Specifically, they contend that the statute plainly entitles each member of a regional transmission organization to an incentive.  TO Br. 29.  The Commission, however, appropriately applied its rule implementing that statute, consistent with the *California* decisions.

The Commission implemented Congress's directive in the Incentives Rule.  *Dayton Order* P 26, JA ___; *Complaint Order* P 83, JA ___.  There, the Commission did adopt a specific rate incentive — an elevated return on equity — for utilities that join a transmission organization.  Order No. 679 PP 326-33.  As discussed *supra* pp. 15-16, the premise of voluntary membership underpinned the Participation Adder from the outset:  "The basis for the incentive is a recognition of

34

the benefits that flow from membership in such organizations and the fact that continuing membership is generally voluntary." *Id.* P 331, *cited in Dayton Rehearing Order* P 14, JA ___. Indeed, voluntariness is key to the function of an incentive in inducing (voluntary) action. *See* Order No. 679-A P 86 n.142 ("*incentives* are equally important in *inducing* utilities to join and remain") (emphases added). For that reason, the Commission found an inducement to voluntary membership "entirely consistent" with the "stated purpose" of Federal Power Act section 219 "to provide incentive-based rate treatments that benefit consumers . . . ." *Id.* P 86; *see also Dayton Rehearing Order* P 36, JA ___ (reaffirming that this focus on inducing voluntary conduct is consistent with section 219 and remains "good policy").

In terms of procedure, the Commission made clear that no incentive would be automatically applicable — a utility that wished to take advantage of any of the "palette of incentive rate treatments" (*San Diego*, 913 F.3d at 137) must seek Commission approval. *See, e.g.*, Order No. 679 PP 80, 82. The Commission provided that it would consider such applications on a case-by-case basis, including where utilities sought packages of multiple incentives. *Id.* PP 43, 326. As to

the Participation Adder, the Commission also declined to create a generic incentive for all members of regional transmission organizations; every member would be required to file for Commission approval, even if other members of the same transmission organization already had received such approval. *Id.* PP 80 ("a [transmission organization] member will not automatically receive incentives granted to another . . . member"), 326 ("we are not persuaded that we should create a generic adder for such membership, but instead will consider the appropriate . . . incentive when public utilities request this incentive"). Moreover, the Commission determined that a member would be presumed eligible for the Adder, but that the presumption would be rebuttable. *See id.* P 327; *see also California I*, 879 F.3d at 977.

Relying on the Incentives Rule is not, as Transmission Owners contend, "beside the point." TO Br. 34. That Rule fulfilled the directive of Federal Power Act section 219: "[T]he Commission shall establish, by rule, incentive-based . . . rate treatments" for interstate transmission. 16 U.S.C. § 824s. To the extent that Transmission Owners argue that the Incentives Rule was not consistent with section 219(c), they seek to

relitigate the Commission's original implementation of the statute —
precisely what the collateral attack rule precludes. *Dayton Rehearing
Order* P 18, JA ___ ("The parties are making a collateral attack on
Order No. 679 by arguing that [it] failed to go as far as section 219(c)
requires."); *accord Complaint Order* P 83, JA ___-__; *see also, e.g., ISO
New England Inc.*, 138 FERC ¶ 61,238 P 17 (2012) ("a collateral attack
is an attack on a judgment in a proceeding other than a direct appeal,
and is generally prohibited") (cleaned up).

No party sought judicial review of Order No. 679 at the time —
notwithstanding that more than 100 parties (or groups of parties) filed
comments and 20 filed requests in two rounds of agency rehearing — so
the Incentives Rule, including its consistency with the statute, cannot
be challenged here. *Complaint Order* P 83, JA ___ ("Such issues should
have been raised on rehearing of Order No. 679 and not as collateral
attacks on a rulemaking determination."). Transmission Owners
contend that they had no reason to seek review, as the Commission had
not categorically excluded utilities ordered by statute to join
transmission organizations. TO Br. 35-36. This argument fails
because, at the outset, the Incentives Rule premised the Participation

37

Adder on the "generally voluntary" membership in transmission organizations and emphasized the role of incentives in inducing conduct. *See supra* pp. 15-16. That some parties may have assumed that the Commission would apply the Rule a certain way, or that no court would interpret its text to require a showing of voluntariness, is no justification for a collateral attack on the rulemaking. *Cf.* 16 U.S.C. § 825*l* (requiring parties to petition for review within 60 days of final agency rehearing order).

In any event, the Commission appropriately declined to revisit the Incentives Rule here: "It is hornbook administrative law that an agency need not — indeed should not — entertain a challenge to a regulation in an individual adjudication." *N.J. Dep't of Env't Prot. v. Nuclear Regulatory Comm'n*, 561 F.3d 132, 143 (3d Cir. 2009) (cleaned up); *accord Nat. Res. Def. Council v. Nuclear Regulatory Comm'n*, 823 F.3d 641, 651 (D.C. Cir. 2016), *quoted in Dayton Rehearing Order* P 18 n.36, JA ___; *cf. Simms v. Nat'l Highway Traffic Safety Admin.*, 45 F.3d 999, 1010 (6th Cir. 1995) (noting with approval that the petitioners before the court had participated in an agency rulemaking process, then

sought judicial review of the final rule, "rather than mounting a
collateral attack on the regulations" in a later case).

Nor can Transmission Owners brush off the Ninth Circuit
*California* decisions. *See* TO Br. 34. Those cases did not remake the
substance of the Incentives Rule — the court interpreted the
Commission's initially-stated rationale and requirements for the Adder,
holding that the Commission's then-approach to Adder approvals was
inconsistent with the plain language of the Incentives Rule. *See*
*California I*, 879 F.3d at 975-77.

It is true that, in the decade following the Incentives Rule, the
Commission routinely granted the Participation Adder without
considering whether participation was voluntary. *See* TO Br. 36. But
in 2018, the first court to consider the Adder found that the Commission
had failed to adhere to its own Incentives Rule. *See supra* pp. 17-21.
Specifically, following from the Commission's explanation that incentive
adders act "'as an *inducement* for utilities to join, and remain in,
Transmission Organizations,'" the court concluded that voluntariness is
"is logically relevant to whether [a utility] is eligible for an adder."
*California I*, 879 F.3d at 974-75 (quoting Order No. 679-A P 86), *quoted*

*in Dayton Order* P 27, JA ___, *and Complaint Order* P 83, JA ___.  Put differently, by its own terms, an incentive cannot meet its purpose of inducing "behavior that is already mandated."  *California I*, 879 F.3d at 974, *cited in Dayton Order* PP 27, 28, JA ___, ___.  (Transmission Owners contend that "the Ninth Circuit did not even hold that Order [No. 679] *requires* voluntariness."  TO Br. 34 n.10; *see also* PJM Br. 22 (slighting "the Ninth Circuit's dicta on voluntariness").  The Commission did not take the court's probing analysis of the Rule's text so lightly, understandably finding its conclusions prescriptive: "[*California I*] made clear that the voluntariness of a utility's membership in [a transmission organization] is a necessary consideration in granting the [Participation] Adder."  *Dayton Order* P 28, JA ___.)  The court further faulted the Commission for — having emphasized in the Incentives Rule that the Participation Adder is neither automatically granted nor generically applicable (*see supra* pp. 9, 15) — failing to consider whether a legal mandate rebuts the presumption of a utility's eligibility.  *See California I*, 879 F.3d at 974-75, 979; *Dayton Order* P 28, JA ___.

Accordingly, applying the Incentives Rule and case law, the Commission appropriately requires a utility to show that its membership in a transmission organization is voluntary as "a prerequisite" to granting a Participation Adder. *Dayton Order* P 27, JA ___; *Dayton Rehearing Order* P 42, JA ___. Moreover, as a policy matter, the Commission "continue[s] to believe that 'only providing incentives to induce future voluntary conduct' is good policy and appropriately balances Congress's direction in [Federal Power Act] section 219(c) with section 219(d)'s requirement that rates, including incentive adders, must remain just and reasonable and not unduly discriminatory or preferential." *Dayton Rehearing Order* P 36, JA ___ (quoting *California I*, 879 F.3d at 978); *see also id.* P 35, JA ___ (where a utility is mandated to participate in a transmission organization, "it would be inconsistent with Commission policy and [the Incentives Rule] to reward [the utility] with a windfall for an action that it has no choice but to take").

**B.    The Commission Appropriately Declined To Consider Whether The Ohio Statute Is Preempted By Federal Law.**

In the challenged orders, the Commission found that the presumption of eligibility for the Participation Adder is rebutted, for Ohio utilities, by the fact that their membership in a regional transmission organization is not voluntary.  *Dayton Order* PP 54-55, 63, JA ___, ___; *see also Dayton Rehearing Order* PP 22, 24, JA ___, ___; *Complaint Order* PP 60, 63, JA ___, ___; *Complaint Rehearing Order* P 20, JA ___.

Specifically, Ohio law requires any utility having transmission facilities in Ohio to join a transmission organization.  Ohio Rev. Code § 4928.12(A); *see supra* note 5.  The Commission found that any transmission organization that would satisfy the Ohio statute's criteria would also be a transmission organization under the Federal Power Act and Commission regulations, including the provisions governing the Participation Adder.  *Dayton Order* PP 57-58, JA ___-__; *Dayton Rehearing Order* P 22, JA ___.  Responding to the arguments of various parties that utilities could find alternative arrangements to satisfy Ohio law without joining PJM or another a regional transmission

42

organization, the Commission found no such daylight between the state-law mandate and requirements for the Participation Adder.  *Dayton Order* PP 59-63, JA ___-__; *Dayton Rehearing Order* P 23, JA ___.

Accordingly, the Commission concluded that the membership of an Ohio utility in a transmission organization "would not be voluntary." *Dayton Order* P 63, JA ___.  Thus, "this lack of voluntariness rebuts the presumption of Dayton's eligibility for the [Participation] Adder based on its ongoing membership" in a transmission organization because the Adder "would not be an inducement" for the continuing membership that is "already required under Ohio statute."  *Id.*; *see also Complaint Order* P 63 & n.127, JA ___ (adhering to findings in the *Dayton* Orders).

Neither the Commission's interpretation of the Ohio statute nor its factual findings are challenged on appeal.  Rather, the Transmission Owners argue that the Commission should have held that the Ohio statute is preempted by federal law, either because Congress has occupied the field or because the Ohio law conflicts with federal policy. *See* TO Br. 37-47.  Failing that, they contend that this Court should find the statute preempted and remand the challenged orders to the Commission to determine whether Transmission Owners' continued

membership in PJM is voluntary in the absence of the state law

mandate. *Id.* 47-48.

The Commission noted that "the ultimate determination" on

preemption "would need to be made by a federal court." *Dayton Order*

P 71, JA ___; *id.* ("[O]nly a federal court has the ultimate authority to

invalidate the Ohio statute."); *accord Complaint Order* P 84, JA ___.

That said, the Commission rightly concluded that these agency

proceedings were "not an appropriate procedural vehicle to address the

constitutionality of the Ohio statute." *Dayton Order* P 71, JA ___;

*Complaint Order* P 84, JA ___; *see also Dayton Rehearing Order* P 31,

JA ___ ("this proceeding is an inappropriate vehicle to address

preemption concerns"). For that reason, the Commission reasonably

exercised its discretion to decline to address preemption in the

challenged orders. *Dayton Order* P 71, JA ___; *Complaint Order* P 84,

JA ___. The Commission submits that, for the same reasons, this Court

should likewise decline to reach beyond these orders to consider

preemption in the first instance.

First, the posture of these individual adjudications does not

support a ruling on the broad legal question of preemption. Dayton's

contested rate filing and Consumers' Counsel's complaint both concern the Commission's determinations whether Transmission Owners' rates are "just and reasonable" under the Federal Power Act, based on application of the Incentives Rule. *See Dayton Order* PP 1-2, JA ___; *Complaint Order* P 1, JA ___; *cf. California II*, 29 F.4th at 463 ("The incentive adder and the requirement that a utility be a *voluntary* member of [a transmission organization] to qualify for the incentive adder arise from federal law. . . .  That [state] law dictates whether membership in [a transmission organization] is voluntary does not change [that] 'the source of the right sued upon' is federal law.").

Thus, both sets of orders turned on whether Transmission Owners were eligible for the Participation Adder, which required the Commission to determine whether Transmission Owners' ongoing participation in a transmission organization was voluntary. *See Dayton Order* P 14, JA ___; *Complaint Order* P 60, JA ___.  The records in both proceedings reflect that focus, with lengthy submissions from numerous parties regarding the circumstances of Transmission Owners' participation, as well as arguments about applying the Incentives Rule and the Ohio statute to those facts.  *See* DR  24-31, 33-36, 43-46; CR 1-

36, 40-43.  Ultimately, the Commission reasonably determined that, "[a]s the facts stand currently before us, the Ohio law is in place, rendering . . . participation mandatory." *Dayton Rehearing Order* P 32, JA ___.

Therefore, the orders now on judicial review, and the administrative records on which the Court must evaluate the Commission's reasoning, center on the Commission's determinations under the Federal Power Act.  Tellingly, the preemption cases on which Transmission Owners rely (TO Br.  38-39, 42-43) did not arise on direct review of Commission orders.  *See Talen Energy Mktg.*, 578 U.S. 150 (utilities sought declaratory judgment against state regulators in federal district court); *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (natural gas customers' antitrust claims against pipeline companies were removed to federal district court).  Other leading cases on the preemptive effect of the Commission's jurisdiction have arisen to the United States Supreme Court from state supreme court appeals of state regulators' orders, in cases where parties disputed the states' authority to act.  *See, e.g.*, *Nantahala Power & Light Co. v. Thornburg*, 476 U.S.

953 (1986); *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988); *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39 (2003).

In all of those cases, the preemption issue was squarely presented and fully litigated in lower courts.  Here, the fact-intensive agency record is not sufficient to consider preemption, nor have all relevant parties briefed the issue.  In setting Dayton's proposed rate filing for hearing, the Commission did not include the constitutional question. *See Dayton Order* P 71 n.147, JA ___; *Dayton*, 172 FERC ¶ 61,140, Appendix – Paper Hearing Questions, JA ___.  Nor did the Ohio Attorney General intervene or provide a defense of that state's law in either proceeding.  *See Complaint Order* P 84 n.175, JA ___.  In both proceedings, the Commission properly concluded that it lacked "a sufficient record . . . on this constitutional issue." *Id.* P 84; *Dayton Order* P 71, JA ___.  This Court should conclude the same.

## III.   THE COMMISSION REASONABLY DISTINGUISHED BETWEEN PARTICIPATION ADDERS THAT IT HAD SPECIFICALLY GRANTED AND THOSE ADOPTED AS PART OF COMPREHENSIVE RATE SETTLEMENTS.

Petitioners AEP, on one hand, and Consumers' Counsel, on the other, raise mirror-image claims that the Commission should have treated all Transmission Owners the same:  AEP argues that the

Commission erred by eliminating Ohio Power's and AEP Ohio's Participation Adders while leaving others in place, while Consumers' Counsel argues that the Commission erred by declining to modify Duke's and American's rates as well.  *See* TO Br. 52-58 (AEP only) (arguing that the Commission "irrationally distinguished" its subsidiaries, Ohio Power and AEP Ohio, from Duke and American); OCC Br. 24-52 (contending that the Commission unreasonably failed to remove Duke's and American's Adders).  As discussed *infra*, both AEP and Duke attempt to blur critical distinctions between the Transmission Owners' various rates.

The Commission, however, fully justified its determination as to each Transmission Owner based on the facts, the law, and its long-established policy priorities.  In particular, the Commission explained that the Transmission Owners are not similarly situated, so their different outcomes are not unduly discriminatory.  *See Complaint Order* P 64, JA ___; *Complaint Rehearing Order* PP 33, 37, JA ___, ___.  "A mere difference in the treatment of two entities does not violate the Federal Power Act; instead, undue discrimination occurs only if the entities are similarly situated . . . such that there is no reason for the

difference . . . ." *Mo. River Energy Servs. v. FERC*, 918 F.3d 954, 958 (D.C. Cir. 2019) (cleaned up); *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 239 (D.C. Cir. 2013) (courts "accept disparate treatment between ratepayers only if FERC offer[s] a valid reason for the disparity . . . [such as by] pointing to differences between parties that are relevant to the achievement of permissible policy goals") (cleaned up).

Here, the differences in the Adders' provenance go to the core of the Commission's reasoning in each case: How each utility obtained its enhanced return on equity would determine how the Commission could modify that return. As to Ohio Power and AEP Ohio, the Commission had previously granted the Participation Adder on each utility's specific application for the incentive. Therefore, in the *Complaint* Orders, the Commission properly invoked its authority under section 206 of the Federal Power Act, 16 U.S.C. § 824e, to reevaluate and revise those Adders on a single-issue basis, separate from the utilities' base returns on equity. *Complaint Order* P 62, JA ___. By contrast, the Commission had never granted Participation Adders to Duke and American; it had only approved comprehensive settlements that resolved all return-on-

49

equity issues together.  For that reason, the Commission appropriately

applied its long-standing policy of preserving rate settlements and

declined to strip out a single component of those settlement packages.

*Id.* P 64, JA ___.

### A. The Commission Appropriately Removed The Participation Adders That It Had Specifically Granted To Ohio Power And AEP Ohio.

Every utility that wishes to take advantage of incentive-based rate

treatments established in the Incentives Rule must seek Commission

approval of such incentive(s).  *See* Order No. 679 PP 1-2, 80.

Commission approval is no mere formality.  For example, in *San Diego*,

913 F.3d 127, a utility requested an incentive allowing full cost recovery

if the project were abandoned.  The utility requested the incentive after

it had already invested millions of dollars over several years; the utility

argued that all costs should be recoverable because it had been entitled

to the incentive from the outset.  *See id.* at 137.  The Commission,

however, ruled that the incentive would apply only prospectively from

the date of the order granting it, and the D.C. Circuit agreed.  *Id.* at

137-42.  "The Commission responds that the [Incentives] Rule sets the

general terms, but a utility's entitlement depends on FERC's approval.

It could hardly be otherwise." *Id.* The Commission "grants incentive rate authority 'when justified' on a 'case-by-case basis' . . . ." *Id.* at 141 (citations omitted); *accord* Order No. 679 P 326; *California I*, 879 F.3d at 978. Thus, no utility is entitled to any incentive unless and until it obtains case-specific Commission approval.

Both Ohio Power and AEP Ohio did just that. In 2008 and 2009, respectively, Ohio Power and AEP Ohio submitted proposed tariff filings that included requests for Participation Adders. *See Complaint Order* P 62, JA ___ (citing cases). In each case, the Commission specifically approved the incentive. *Am. Elec. Power Serv. Corp.*, 124 FERC ¶ 61,306 P 30 (2008) (granting "up to 50 basis points of incentive [return on equity]" to Ohio Power, among other AEP operating companies, "for [its] continued participation in PJM") (citing Commission precedents); *AEP Appalachian Transmission Co.*, 130 FERC ¶ 61,075 P 21 (2010) (approving proposal by AEP Ohio, among other new AEP transmission subsidiaries, to include a 50 basis point adder to base return on equity for continued participation in PJM) (citing *Am. Elec. Power*). In both cases, the Commission made a merits finding that its decision to grant the incentive was consistent with the

purpose of Federal Power Act section 219 and the Commission's policy of encouraging continued involvement with a regional transmission organization. *See id*.

In both cases, the Commission then set the tariff proposals for hearing and settlement judge procedures, but expressly excluded the Adder from the scope of those proceedings. *AEP Appalachian*, 130 FERC ¶ 61,075 P 19 ("Except for the issues discussed below [the first of which was the Participation Adder], all other issues raised in the proceeding . . are set for hearing."); *Am. Elec. Power*, 124 FERC ¶ 61,306 P 22 (accepting proposed formula rate "subject . . . to the outcome of hearing and settlement judge procedures" and "granting the request for the 50 basis point adder for continued participation" in PJM). This was consistent with the Commission's practice: "The Commission determines a utility's eligibility for the [Participation] Adder separately from its analysis of the utility's base [return on equity] . . . ." *Complaint Order* P 61, JA ___. For that reason, when the parties to those proceedings entered into settlement discussions, "they knew they were negotiating only the base [return on equity]" because the Commission had already resolved entitlement to the Participation

Adder.  *Id.* P 62 n.123, JA ___-__; *accord Complaint Rehearing Order*

P 37 & n.107, JA ___-__.

Similarly, when a group of customers later filed a complaint

challenging the AEP companies' base return on equity, which the

parties ultimately settled, the companies (including Ohio Power and

AEP Ohio) went into that negotiation with their previously granted

Participation Adders already in hand.  "Those . . . Adders were in effect

at the time . . . , meaning there was nothing to negotiate regarding

those [A]dders" and only the base return on equity was set for hearing

and settlement.  *Complaint Rehearing Order* P 38, JA ___; *see Am. Mun.*

*Power, Inc. v. Appalachian Power Co.*, 161 FERC ¶ 61,192 PP 2, 4

(2017) (explaining that the complaint challenged the base return on

equity and noting that the "overall" return included the "50 basis point

adder awarded for . . . participation in PJM"); *id.*, ordering para. (A)

(setting a hearing on the base return on equity).

AEP glosses over the Commission's express rulings granting the

Adders and its clear instructions regarding the base returns on equity.

*See* TO Br. 54-58; *id.* 54 (claiming that "AEP's transmission rate and

[Participation] Adder stem from multiple settlements").  AEP also

seems to suggest that, in the rate settlements that followed, the parties might have disregarded the Commission's explicit orders on the scope of the proceedings. *See id.* 57-58. These musings, however, find no support in the record and are contrary to the Commission's unambiguous directives.

In short, once the Commission granted the Adders, Ohio Power and AEP Ohio remained entitled to those incentives, separate from any other rate issues that might be litigated or settled, unless and until the Commission removed the Adders under Federal Power Act section 206, 16 U.S.C. § 824e. But just as it can award an incentive adder on a single-issue basis, the Commission can remove such an adder on a single-issue basis, without finding that the overall return on equity has become unjust and unreasonable. *Complaint Order* P 62, JA ___.

Indeed, the Commission has done so in other cases. For example, in *International Transmission*, 988 F.3d 471, on a complaint brought by transmission customers, the Commission removed a previously granted incentive adder that allows an enhanced return on equity for stand-alone transmission companies (which sell transmission services and are independent from market participants). There, the changed

54

circumstances were factual; the Commission found that the

transmission company had, following a change in corporate ownership,

lost some of the independence that justifies that particular incentive.

*See id.* at 481-85.  The Commission determined that the full amount of

that adder (which, in that case, was 50 basis points) had been rendered

unjust and unreasonable.  *Id.* at 485.  (Because the Commission found

that the utility's independence was diminished, but not eliminated, the

Commission then set a new replacement incentive of 25 basis points.

*Id.* at 485.  *See generally supra* p. 6 (explaining "step two" under section

206, setting a replacement rate).)  The Commission subsequently

removed and replaced the same adder for a related company, on the

same grounds.  *Kan. Corp. Comm'n v. ITC Great Plains, LLC*, 172

FERC ¶ 61,037, *on reh'g*, 173 FERC ¶ 61,160 (2020).

Similarly, in this case, having "specifically evaluated and granted

[Participation Adders] to Ohio Power and AEP Ohio . . . on a single-

issue basis, separate from all other [return on equity] issues," the

Commission properly could "reevaluate and revise those specific

incentives on a single-issue basis in response to the changed

circumstances raised in the Complaint." *Complaint Order* P 62, JA ___.

In doing so, the Commission did not (as AEP contends, *see* TO Br. 54-58) modify the rate settlements that established Ohio Power's and AEP Ohio's base returns on equity — both because the Commission "essentially revers[ed] our prior stand-alone rulings" granting the Adders (*Complaint Rehearing Order* P 38, JA ___) and because the Commission had excluded those incentives from further examination when it set the base return on equity issues for hearing and, ultimately, settlement. *See supra* pp. 52-53.

> **B.  Because The Commission Had Not Specifically Granted Participation Adders To Duke And American, It Appropriately Declined To Modify Their Returns On Equity That Were Embedded In Comprehensive Rate Settlements.**

By contrast, the Commission never granted the Participation Adder to Duke or American. *Complaint Rehearing Order* P 26, JA ___. Rather, each resolved its rate proceeding in a comprehensive settlement, without a Commission order that evaluated its eligibility and found the Adder just and reasonable for that utility. *Id.* P 27, JA ___. To the extent that the overall returns on equity embedded in those settlement packages include any enhancements, they resulted

from negotiations and not from Commission determinations. *Complaint Order* P 64, JA ___; *Complaint Rehearing Order* P 38, JA ___.

In approving such settlements, the Commission does not evaluate individual components of a settled rate. Rather, where no party contests a settlement, the Commission, in accordance with its regulations and longstanding practice, determines whether "the settlement appears to be fair and reasonable and in the public interest." 18 C.F.R. § 385.602(g)(3), *see supra* p. 7. The Commission made that finding in approving Duke's and American's rate settlements. *See PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029 P 14 (2015) (Duke); *PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,106 P 3 (2015) (American). In both cases, comprehensive settlement packages were the result of extended negotiations among multiple parties on a variety of issues stemming from the transmission owners' entry into PJM, ultimately reaching complex agreements that no party contested.

In May 2011, American left the Midcontinent region and joined PJM; at the end of that year, Duke and its Kentucky affiliate did the same. *See MISO Transmission Owners*, 860 F.3d at 839. Duke's integration into PJM entailed several years of litigation and

negotiations, including multiple settlements and Commission orders,

before the various parties reached an uncontested settlement in 2014

that the Commission ultimately approved the following year.  *See PJM*,

151 FERC ¶ 61,029 PP 1-5 (recounting history of prior settlements and

proceedings).  The Commission approved the settlement, which resolved

numerous rate issues, under the "fair and reasonable and in the public

interest" standard.  *PJM*, 153 FERC ¶ 61,106 P 14.  The Commission

did not address the merits of any single issue, including the purported

Adder — indeed, it disclaimed any such consideration:  "The

Commission's approval of the . . . Settlement does not constitute

approval of, or precedent regarding, any principle or issue in this

proceeding."  *Id.*; *see United Mun. Distribs. Grp.*, 732 F.2d at 207 n.8

("The Commission's approval of an uncontested settlement has no

precedential value as settled practice."); *cf. California I*, 879 F.3d at 980

(holding that, where the Commission had previously approved rate

settlements that included a Participation Adder, with this disclaimer of

precedential effect, those approvals did not preclude parties from

challenging utility's entitlement to the Adder in later proceedings).

For its part, American entered PJM with transmission rates that the Commission accepted in a 2011 filing and a 2013 settlement. *See PJM Interconnection, L.L.C.*, 149 FERC ¶ 61,292 PP 3-4 (2014) (discussing prior proceedings). In 2014, American proposed revisions to its transmission formula rate; other parties protested numerous issues, including American's overall return on equity, and the Commission set those issues for hearing. *See id.* PP 25-29. The parties filed an uncontested settlement in 2015, which the Commission approved as fair and reasonable and in the public interest, with the same disclaimer as to specific issues. *PJM*, 153 FERC ¶ 61,106 P 3.

AEP and Consumers' Counsel correctly point out — and the Commission recognized — that both settlements purported to include a 50 basis point adder, for participation in PJM, in the overall returns on equity. *See* TO Br. 55; OCC Br. 32; Brief of Intervenor Buckeye Power, Inc. at 7-9; *Complaint Order* P 65, JA ___; *see also PJM*, 153 FERC ¶ 61,106 P 10 (summarizing the Duke settlement, which described the overall return on equity as consisting of the base return "and a 0.5 percent . . . adder for participation in a regional transmission organization"); [American] Settlement Agreement and Offer of

Settlement § II.C.2, FERC Docket No. ER15-303-000 (filed July 20,

2015) (included in TO Br. Addendum at A87) (explaining that all return

on equity values set forth in the settlement "are inclusive of any

incentive adder for [transmission organization] participation").[6]

(Consumers' Counsel asserts that "it was imperative" that those

settlements identified adders and argues that the Commission failed to

respond to that assertion, warranting remand.  OCC Br. 37 (citing

Consumers' Counsel Reh'g Req. at 11, JA ___).  But the Commission

need not address every contention.  *See Pub. Serv. Elec. & Gas Co. v.*

*FERC*, 989 F.3d 10, 19-20 (D.C. Cir. 2021) (the Commission must

respond to major arguments but need not address "insignificant ones")

(citing cases).  In any event, the Commission did recognize that the

Duke and American settlements described the returns on equity as

including adder amounts.)

     The Commission approved the settlement packages that included

those negotiated overall returns on equity, but did not make any

determination authorizing a Participation Adder in the settled rates.

---

[6]     Neither the 2014 order setting American's tariff filing for hearing
nor the 2015 order approving the settlement mentioned the purported
adder in the overall return on equity.

*Complaint Rehearing Order* P 30, JA ___.  In the orders challenged here, the Commission acknowledged that, had Duke and American sought Commission approval of the Adders at that time (in 2015, prior to the Ninth Circuit *California* decisions), the Commission likely would have granted the Adders.  *Complaint Rehearing Order* P 28, JA ___.

But no incentive is automatic.  *See* Order No. 679 P 1 (the Incentives Rule "does not grant outright any incentives to any public utility"); *see also supra* pp. 50-51 (discussing *San Diego* court case).  This is true even for the Participation Adder; in the Incentives Rule, the Commission noted that a member of a transmission organization "will not automatically receive incentives granted to another . . . member" of the same organization.  Order No. 679 P 80.  Therefore, where a settlement purports to incorporate, in a negotiated return on equity, an incentive that the Commission has not granted, that incentive amount must be a product of the settlement itself.  *Complaint Order* P 60, JA ___; *Complaint Rehearing Order* P 26, JA ___.

For that reason, the Commission concluded that it could not separate the purported Adder amounts from the negotiated rates in the Duke and American settlements, or assume that the ungranted Adders

were included without bargaining on other issues.  "Even if the settlements included an amount reflecting [a Participation Adder], that does not explain how that . . . Adder came to be included in the settlement agreements and what trade-offs led to that outcome." *Complaint Rehearing Order* P 28, JA ___; *see also id.* ("we do not know the precise trade-offs and concessions made by the parties to those proceedings"); *Complaint Order* P 65, JA ___ ("we cannot know what, if anything, the parties agreed to in exchange for settling on those [return on equity] figures" as part of "integrated, comprehensive settlements of the entire proceeding(s)"); *id.* P 64, JA ___ ("We do not know the precise trade-offs and concessions made by the parties to those proceedings during the settlement process and the terms . . . and conditions to which those parties would have agreed with respect to Ohio transmission assets had the Commission policy on [Participation] Adders been different.").

This is not simply a matter of whether the Commission could assume what interests drove the negotiations, or venture an informed guess at the trade-offs the parties might have made.  (Both AEP and Consumers' Counsel offer their own suppositions.  *See* TO Br. 56-58;

OCC Br. 35-38.)  In these circumstances, the Commission reasonably found that carving out the Adder "would, in effect, modify the settlement agreement by stripping out a single component of an intricate financial package that the parties to the settlement found balanced and thus agreeable." *Complaint Rehearing Order* P 28, JA ___.  Precisely because the Commission strongly favors settlements in complex rate cases, revisiting individual elements of rate settlements contravenes Commission policy.  *Id.*; *see also id.* P 29, JA ___ ("adjusting settlement rates on a piecemeal basis . . . would undermine the certainty provided to settling parties and would be inconsistent with the Commission's longstanding policy of promoting settlements").  *See generally supra* p. 6 (discussing the Commission's policy of favoring and preserving settlements).  Such policy judgments are at the core of the Commission's regulatory authority and deserve deference.  *See, e.g.*, *Int'l Transmission*, 988 F.3d at 480.

With that policy in mind, the Commission reasonably distinguished between the Adders (for Ohio Power and AEP Ohio) that it had specifically granted, and could remove, on a single-issue basis, and those ungranted Adders (for Duke and American) that were

embedded in comprehensive settlements. *See Complaint Order* PP 64-66, JA \_\_\_-\_\_; *Complaint Rehearing Order* PP 29 n.79, 30, 33, JA \_\_\_, \_\_\_. The Commission appropriately determined that, to meet the complainant's burden under section 206 of the Federal Power Act to revise Duke's and American's settlement rates, Consumers' Counsel must make a threshold showing that the overall returns on equity had become unjust and unreasonable. *Complaint Order* PP 64-66, JA \_\_\_-\_\_; *Complaint Rehearing Order* PP 30, 33-34, JA \_\_\_, \_\_\_-\_\_. *See, e.g., Sithe/Indep. Power Partners v. FERC*, 165 F.3d 944, 951 (D.C. Cir. 1999) (noting that Commission has required customers to demonstrate the overall rate is unjust and unreasonable, not just single cost components); *DATC Path 15, LLC*, 177 FERC ¶ 61,115 PP 24-25 (2021) (finding that the level of an overall return on equity, which included several incentives, was unjust and unreasonable). The Commission recognized that this standard places a burden on complainants, but found "that countervailing policy considerations caution against adjusting settlement rates on a piecemeal basis." *Complaint Rehearing Order* P 29, JA \_\_\_.

Consumers' Counsel (Br. 44-45) points to cases that are not actually to the contrary.  *See Gulf S. Pipeline Co. v. FERC*, 955 F.3d 1001, 1014 (D.C. Cir. 2020) (noting that a pipeline can choose to specify a rate of return *outside* of a black-box settlement — that is, with details of components, costs, and methodology — if it wishes to establish a Commission-approved rate of return for use going forward) (citing cases); *N.C. Elec. Membership Corp. v. Duke Energy Carolinas, LLC*, 155 FERC ¶ 61,048 PP 2-5 (2016) (finding that an overall return on equity may have been rendered unjust and unreasonable, based on the Commission's change in methodology); *Golden Spread Elec. Coop., Inc. v. Sw. Pub. Serv. Co.*, 150 FERC ¶ 61,052 P 3 (2015) (allowing a challenge to a negotiated return on equity where the settlement had expressly "reserved the parties' rights to seek changes to the negotiated [return on equity] through filings with the Commission").

Because the utilities with granted Adders and those without are not similarly situated, treating their rates differently is not impermissibly discriminatory.  Nor is it discriminatory, as Consumers' Counsel contends (Br. 51), that some customers will continue to pay Participation Adders to Duke and American (as well as to other

transmission owners in PJM whose participation is not required by state law).  *See, e.g.*, *United Mun. Distribs. Grp.*, 732 F.2d at 212 (noting that "a rate disparity among customers of the same public utility that was solely the result of a settlement among some of the parties was not unlawfully discriminatory") (citing *Cities of Bethany v. FERC*, 727 F.2d 1131, 1138-40 (D.C. Cir. 1984)).

Furthermore, because the Commission never granted Participation Adders to Duke and American, they are not entitled to such Adders for the purpose of any future rate cases.  *Cf. California I*, 879 F.3d at 980.  Should Duke, American, or any other Ohio utility seek specific Commission approval for Participation Adders, they too would be subject to the precedential effect of the *Dayton* Orders.

## IV.   THE REMAINING ARGUMENTS OF PETITIONERS AND INTERVENORS ARE WITHOUT MERIT.

### A.   An Unrelated, Pre-Incentives Proceeding Is Not Relevant To Whether Ohio Utilities Qualify For The Participation Adder.

AEP argues that the Commission disregarded its finding on voluntariness in an unrelated 2004 proceeding.  TO Br. 59-63.  But the Commission reasonably concluded that its analysis in that case, which

predated the Incentives Rule, nearly two decades ago and in a different statutory and regulatory context, is not determinative here.

In 2004, the Commission resolved various issues related to the entry of AEP's affiliated operating companies (including Ohio Power[7]) into the PJM system. One of those issues was whether the companies' commitment to join PJM constituted "voluntary coordination," a necessary element for Commission action under section 205(a) of the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 824a-1(a). *See New PJM Cos.*, 107 FERC ¶ 61,271 PP 41-44 (2004). That provision authorizes the Commission, in certain circumstances, to exempt utilities from state laws or regulations that "prohibit[] or prevent[] the voluntary coordination of electric utilities." 16 U.S.C. § 824a-1(a).

That 2004 ruling, which predated the Incentives Rule by two years, the orders approving the utilities' Participation Adders by four and six years, and the first *California* decision by 14 years, did not address voluntariness as applied in the context of the Participation

---

[7]    It appears that AEP's other Ohio affiliate, AEP Ohio, was not involved in that proceeding because it did not yet exist. *See AEP Appalachian*, 130 FERC ¶ 61,075 (2010) (accepting tariffs for seven newly formed AEP transmission subsidiaries, including AEP Ohio).

Adder as available under the Incentives Rule, let alone under the
analysis under *California I* and subsequent Commission orders that
have followed the Ninth Circuit's holding.  *See Complaint Rehearing
Order* P 43, JA ___.

Moreover, the Commission did not even note the 2004 decision
when it specifically granted the Adder to Ohio Power in 2008 and to
AEP Ohio in 2010.  *See Am. Elec. Power*, 124 FERC ¶ 61,306 P 30 (Ohio
Power); *AEP Appalachian*, 130 FERC ¶ 61,075 P 21 (AEP Ohio); *see
supra* p. 51.  Nor could that past dispute about utilities' original entry
into PJM have spoken to their continued participation two decades
later.  Accordingly, the determination under the Public Utility
Regulatory Policies Act could not be "determinative" of Ohio Power's (let
alone AEP Ohio's) qualification for Participation Adders under the
Incentives Rule.  *See Complaint Rehearing Order* P 43, JA ___.

**B.    Intervenor PJM's Arguments, Which Are
Jurisdictionally Barred, Merely Disagree With The
Commission's Policy Judgment.**

PJM, as an Intervenor supporting the Transmission Owners,
claims that the Commission ignored arguments and evidence of the
benefits that regional transmission organizations provide and the

burdens on transmission-owning members.  PJM Br. 13, 25-29.  (PJM's other arguments, concerning the Commission's interpretation of Federal Power Act section 219, the Incentives Rule, and *California I*, are substantially the same as those raised by the Transmission Owners and addressed in Part II, *supra*.)  In particular, PJM points to the Commission's denial of PJM's motion to lodge its evidence regarding those costs and benefits in the *Dayton* proceeding.  *Id.* 27; *see Dayton Order* P 10, JA ___ (describing the content of PJM's Motion to Lodge, DR 33).  The Commission denied that motion because the evidence, which related to PJM membership in general and to incentive policy issues, was not relevant to the Commission's determination on Dayton's application for a Participation, which would be "based on the specific circumstances of its request . . . ."  *Dayton Order* P 13, JA ___.

PJM, however, failed to seek agency rehearing on any issue — including the denial of its motion to lodge — in either of the underlying proceedings.[8]  Therefore, PJM's argument — which no petitioner has

---

[8]    PJM filed only a Request for Clarification, in the *Dayton* proceeding, concerning the relationship between that proceeding and a separate rulemaking.  DR 45, JA ___.  The Commission found the clarification "unnecessary."  *Dayton Rehearing Order* P 43, JA ___.  As

raised on appeal — is jurisdictionally barred.  *See* FPA § 313(b), 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."); *see also Mun. Resale Serv. Customers v. FERC*, 43 F.3d 1046, 1051 (6th Cir. 1995) ("Noncompliance with § 313 imposes a jurisdictional bar to appellate review."); *DTE Energy Co. v. FERC*, 394 F.3d 954, 961 (D.C. Cir. 2005) ("This well-settled principle is 'an unusually strict requirement that will not be ignored by the courts'") (citation omitted).  Moreover, "absent extraordinary circumstances, intervenors may join only on a matter that has been brought before the court by a petitioner."  *E. Ky. Power Coop., Inc. v. FERC*, 489 F.3d 1299, 1305 (D.C. Cir. 2007) (cleaned up).

In any event, the Commission did address the substance of PJM's challenge to the Commission's policy judgment, rejecting arguments that it should grant Participation Adders without regard to whether participation is voluntary or mandatory, because of the benefits and

---

PJM does not mention its Request or the Commission's response, that determination is not before the Court.

risks of transmission organization membership.  *Dayton Order* P 30,

JA ___.  The Commission has long held "that rate incentives must be

prospective and that there must be a connection between the incentive

and the conduct meant to be induced."  *California I,* 879 F.3d at 977,

*quoted in Dayton Order* P 30, JA ___.  "Consistent with that

longstanding policy, we do not believe it would be appropriate to award

an incentive for an action that the requested entity is required by law to

take, *even where that action comes with substantial benefits and risks*."

*Dayton Order* P 30, JA ___ (emphasis added).  This is exactly the kind of

policy judgment that "lie[s] at the core of [the Commission's] regulatory

mission" and is given great deference.  *Int'l Transmission*, 988 F.3d at

480.

### C.    Dayton Is Not Entitled To Collect An Elevated Return On Equity From Its Ratepayers Simply Because Utilities In Other States Qualify For The Incentive.

Finally, Dayton contends that it is "at a disadvantage," relative to

other transmission owners in PJM and the neighboring Midcontinent

region that receive the Participation Adder, "when attempting to attract

capital" to construct transmission projects.  TO Br. 63-64.  But the

Adder is justified only as an incentive to induce those transmission

owners — located in states that do not require them to participate in
transmission organizations — to continue their voluntary participation.
*See supra* pp. 34-41. "That outcome is a result of state law, and not
because of an arbitrary application of the Commission's criteria."
*Dayton Rehearing Order* P 46, JA ___; *see also id.* P 47, JA ___ (noting
that the issue of voluntariness under any other state's laws could be
addressed in future proceedings).

Moreover, the Participation Adder — or denial thereof — is
"irrelevant" to Dayton's ability to attract capital investment. *Dayton
Order* P 29, JA ___; *see also Complaint Order* P 77, JA ___. A utility's
base return on equity is required "to preserve the utility's financial
integrity and enable the utility to attract capital investment." *Dayton
Order* P 29, JA ___ (citing cases). For that reason, "it is the base [return
on equity], rather than incentives such as the [Participation] Adder,
that was intended to ensure a utility's financial integrity." *Dayton
Order* P 29, JA ___. If Dayton believes its base return on equity is too
low to meet those requirements, it may file for Commission approval of
proposed changes to that rate component. But it is not entitled, absent
justification for the incentive, to recover an elevated return on equity

72

from transmission ratepayers.  *See generally* Order No. 679 P 6
(purpose of Incentives Rule "is to benefit customers by providing real
incentives to encourage new infrastructure, not simply increasing rates
in a manner that has no correlation to encouraging new investment");
*cf. id.* P 26 (Commission reforms "continue to meet the just and
reasonable standard by achieving the proper balance between consumer
and investor interests on the facts of a particular case").

## CONCLUSION

For the reasons stated, the petitions should be denied and the

challenged Commission Orders should be affirmed.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

/s/ *Carol J. Banta*
Carol J. Banta
Senior Attorney

Federal Energy Regulatory
  Commission
Washington, DC  20426
Tel.:  (202) 502-6433
carol.banta@ferc.gov

October 30, 2023

# CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(a)(7)(B), (f), and (g), and this Court's July 12, 2023 Order, I certify that the Brief for Respondent has been prepared in a proportionally spaced typeface (using Microsoft Word, in 14-point Century Schoolbook) and contains 13,927 words, not including the tables of contents and authorities, the glossary, the certificates of counsel, and the addendum.

/s/ *Carol J. Banta*
Carol J. Banta
Senior Attorney

Federal Energy Regulatory
  Commission
Washington, DC  20426
(202) 502-6433
carol.banta@ferc.gov

October 30, 2023

# CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ *Carol J. Banta*
Carol J. Banta
Senior Attorney

Federal Energy Regulatory
  Commission
Washington, DC  20426
(202) 502-6433
carol.banta@ferc.gov

October 30, 2023

# ADDENDUM

## STATUTES AND REGULATIONS

# TABLE OF CONTENTS

**STATUTES:**                                                    **PAGE**

Federal Power Act

    Section 201, 16 U.S.C. § 824 .................................................................. A-1

    Section 205, 16 U.S.C. § 824d ............................................................. A-4

    Section 206, 16 U.S.C. § 824e.............................................................. A-5

    Section 219, 16 U.S.C. § 824s.............................................................. A-9

    Section 313, 16 U.S.C. § 825*l* ........................................................... A-10

Public Utility Regulatory Policy Act of 1978

    Section 205, 16 U.S.C. § 824a-1 ....................................................... A-12

Regulations

    18 C.F.R. § 35.35 (2022) ................................................................... A-14

    18 C.F.R. § 385.602 (2022) ............................................................... A-17

Ohio Revised Code § 4928.12 ...................................................................... A-20

**(g) Qualifying criteria for closed-loop pumped storage projects**

**(1) In general**

The Commission shall establish criteria that a pumped storage project shall meet in order to qualify as a closed-loop pumped storage project eligible for the expedited process established under this section.

**(2) Inclusions**

In establishing the criteria under paragraph (1), the Commission shall include criteria requiring that the pumped storage project—

(A) cause little to no change to existing surface and ground water flows and uses; and

(B) is unlikely to adversely affect species listed as a threatened species or endangered species under the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.].

**(h) Savings clause**

Nothing in this section affects any authority of the Commission to license a closed-loop pumped storage project under this subchapter.

(June 10, 1920, ch. 285, pt. I, § 35, as added Pub. L. 115–270, title III, § 3004, Oct. 23, 2018, 132 Stat. 3865.)

### Editorial Notes

#### REFERENCES IN TEXT

The Fish and Wildlife Coordination Act, referred to in subsec. (c)(2), (3)(A), is act Mar. 10, 1934, ch. 55, 48 Stat. 401, which is classified generally to sections 661 to 666c–1 of this title. For complete classification of this Act to the Code, see section 661(a) of this title, Short Title note set out under section 661 of this title, and Tables.

The National Environmental Policy Act of 1969, referred to in subsec. (e), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Endangered Species Act of 1973, referred to in subsec. (g)(2)(B), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified principally to chapter 35 (§ 1531 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

### § 823g. Considerations for relicensing terms

**(a) In general**

In determining the term of a new license issued when an existing license under this subchapter expires, the Commission shall take into consideration, among other things—

(1) project-related investments by the licensee under the new license; and

(2) project-related investments by the licensee over the term of the existing license.

**(b) Equal weight**

The determination of the Commission under subsection (a) shall give equal weight to—

(1) investments by the licensee to implement the new license under this subchapter, including investments relating to redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or

environmental, recreation, or other protection, mitigation, or enhancement measures required or authorized by the new license; and

(2) investments by the licensee over the term of the existing license (including any terms under annual licenses) that—

(A) resulted in redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or environmental, recreation, or other protection, mitigation, or enhancement measures conducted over the term of the existing license; and

(B) were not expressly considered by the Commission as contributing to the length of the existing license term in any order establishing or extending the existing license term.

**(c) Commission determination**

At the request of the licensee, the Commission shall make a determination as to whether any planned, ongoing, or completed investment meets the criteria under subsection (b)(2). Any determination under this subsection shall be issued within 60 days following receipt of the licensee's request. When issuing its determination under this subsection, the Commission shall not assess the incremental number of years that the investment may add to the new license term. All such assessment shall occur only as provided in subsection (a).

(June 10, 1920, ch. 285, pt. I, § 36, as added Pub. L. 115–270, title III, § 3005, Oct. 23, 2018, 132 Stat. 3867.)

## SUBCHAPTER II—REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

### § 824. Declaration of policy; application of subchapter

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce**

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted

across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing act-

ing as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, § 201, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 847; amended Pub. L. 95–617, title II, § 204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, § 714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title XII, §§ 1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub. L. 114–94, div. F, § 61003(b), Dec. 4, 2015, 129 Stat. 1778.)

**Editorial Notes**

REFERENCES IN TEXT

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, as amended, which is classified generally to chapter 31 (§ 901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§ 16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

Case: 21-4072 Document: 55 Filed: 10/30/2023 Page: 98

AMENDMENTS

2015—Subsec. (b)(2). Pub. L. 114–94, §61003(b)(1), inserted "824*o*–1," after "824*o*," in two places.

Subsec. (e). Pub. L. 114–94, §61003(b)(2), inserted "824*o*–1," after "824*o*,".

2005—Subsec. (b)(2). Pub. L. 109–58, §1295(a)(1), substituted "Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title" for "The provisions of sections 824i, 824j, and 824k of this title" and "Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "Compliance with any order of the Commission under the provisions of section 824i or 824j of this title".

Subsec. (e). Pub. L. 109–58, §1295(a)(2), substituted "section 824e(e), 824e(f), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "section 824i, 824j, or 824k of this title".

Subsec. (f). Pub. L. 109–58, §1291(c), which directed amendment of subsec. (f) by substituting "political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year," for "political subdivision of a state,", was executed by making the substitution for "political subdivision of a State," to reflect the probable intent of Congress.

Subsec. (g)(5). Pub. L. 109–58, §1277(b)(1), substituted "2005" for "1935".

1992—Subsec. (g). Pub. L. 102–486 added subsec. (g).

1978—Subsec. (b). Pub. L. 95–617, §204(b)(1), designated existing provisions as par. (1), inserted "except as provided in paragraph (2)" after "in interstate commerce, but", and added par. (2).

Subsec. (e). Pub. L. 95–617, §204(b)(2), inserted "(other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title)" after "under this subchapter".

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by section 1277(b)(1) of Pub. L. 109–58 effective 6 months after Aug. 8, 2005, with provisions relating to effect of compliance with certain regulations approved and made effective prior to such date, see section 1274 of Pub. L. 109–58, set out as an Effective Date note under section 16451 of Title 42, The Public Health and Welfare.

STATE AUTHORITIES; CONSTRUCTION

Nothing in amendment by Pub. L. 102–486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub. L. 102–486, set out as a note under section 796 of this title.

PRIOR ACTIONS; EFFECT ON OTHER AUTHORITIES

Pub. L. 95–617, title II, §214, Nov. 9, 1978, 92 Stat. 3149, provided that:

"(a) PRIOR ACTIONS.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission [Federal Energy Regulatory Commission] before the date of the enactment of this Act [Nov. 9, 1978].

"(b) OTHER AUTHORITIES.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall

limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title."

## § 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

### (a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

### (b) Sale or exchange of energy; establishing physical connections

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

### (c) Temporary connection and exchange of facilities during emergency

(1) During the continuance of any war in which the United States is engaged, or whenever

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

## § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

### (a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

### (b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

### (c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

### (d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

### (e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

### (f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under

any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142.)

AMENDMENTS

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds

**Editorial Notes**

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, §207(a), substituted "sixty" for "thirty" in two places.
Subsec. (f). Pub. L. 95–617, §208, added subsec. (f).

**Statutory Notes and Related Subsidiaries**

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

## § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric

utility company of the holding company to re-
cover such increase in costs for the period be-
tween the refund effective date and the effective
date of the Commission's order. For purposes of
this subsection, the terms "electric utility com-
panies" and "registered holding company" shall
have the same meanings as provided in the Pub-
lic Utility Holding Company Act of 1935, as
amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon
the request of any State commission whenever
it can do so without prejudice to the efficient
and proper conduct of its affairs, may inves-
tigate and determine the cost of the production
or transmission of electric energy by means of
facilities under the jurisdiction of the Commis-
sion in cases where the Commission has no au-
thority to establish a rate governing the sale of
such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an
agreement for the sale of electric energy at
wholesale in interstate commerce that is for a
period of 31 days or less (excluding monthly
contracts subject to automatic renewal).

(B) The term "applicable Commission rule"
means a Commission rule applicable to sales
at wholesale by public utilities that the Com-
mission determines after notice and comment
should also be applicable to entities subject to
this subsection.

(2) If an entity described in section 824(f) of
this title voluntarily makes a short-term sale of
electric energy through an organized market in
which the rates for the sale are established by
Commission-approved tariff (rather than by con-
tract) and the sale violates the terms of the tar-
iff or applicable Commission rules in effect at
the time of the sale, the entity shall be subject
to the refund authority of the Commission under
this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including
affiliates of the entity) less than 8,000,000
megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund au-
thority under paragraph (2) with respect to a
voluntary short term sale of electric energy by
the Bonneville Power Administration only if the
sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under
subparagraph (A) only for short-term sales made
by the Bonneville Power Administration at
rates that are higher than the highest just and
reasonable rate charged by any other entity for
a short-term sale of electric energy in the same
geographic market for the same, or most nearly
comparable, period as the sale by the Bonneville
Power Administration.

(C) In the case of any Federal power mar-
keting agency or the Tennessee Valley Author-
ity, the Commission shall not assert or exercise
any regulatory authority or power under para-
graph (2) other than the ordering of refunds to
achieve a just and reasonable rate.

[1] See References in Text note below.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug.
26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amend-
ed Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299;
Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug.
8, 2005, 119 Stat. 980, 981, 985.)

**Editorial Notes**

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, re-
ferred to in subsec. (c), is title I of act Aug. 26, 1935, ch.
687, 49 Stat. 803, as amended, which was classified gen-
erally to chapter 2C (§ 79 et seq.) of Title 15, Commerce
and Trade, prior to repeal by Pub. L. 109–58, title XII,
§ 1263, Aug. 8, 2005, 119 Stat. 974. For complete classifica-
tion of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, § 1295(b)(1), sub-
stituted "hearing held" for "hearing had" in first sen-
tence.

Subsec. (b). Pub. L. 109–58, § 1295(b)(2), struck out "the
public utility to make" before "refunds of any amounts
paid" in seventh sentence.

Pub. L. 109–58, § 1285, in second sentence, substituted
"the date of the filing of such complaint nor later than
5 months after the filing of such complaint" for "the
date 60 days after the filing of such complaint nor later
than 5 months after the expiration of such 60-day pe-
riod", in third sentence, substituted "the date of the
publication" for "the date 60 days after the publica-
tion" and "5 months after the publication date" for "5
months after the expiration of such 60-day period", and
in fifth sentence, substituted "If no final decision is
rendered by the conclusion of the 180-day period com-
mencing upon initiation of a proceeding pursuant to
this section, the Commission shall state the reasons
why it has failed to do so and shall state its best esti-
mate as to when it reasonably expects to make such de-
cision" for "If no final decision is rendered by the re-
fund effective date or by the conclusion of the 180-day
period commencing upon initiation of a proceeding pur-
suant to this section, whichever is earlier, the Commis-
sion shall state the reasons why it has failed to do so
and shall state its best estimate as to when it reason-
ably expects to make such decision".

Subsec. (e). Pub. L. 109–58, § 1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, § 2(1), inserted provi-
sions for a statement of reasons for listed changes,
hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, § 2(2), added sub-
secs. (b) and (c) and redesignated former subsec. (b) as
(d).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, § 4, Oct. 6, 1988, 102 Stat. 2300, provided
that: "The amendments made by this Act [amending
this section] are not applicable to complaints filed or
motions initiated before the date of enactment of this
Act [Oct. 6, 1988] pursuant to section 206 of the Federal
Power Act [this section]: Provided, however, That such
complaints may be withdrawn and refiled without prej-
udice."

LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, § 3, Oct. 6, 1988, 102 Stat. 2300, provided
that: "Nothing in subsection (c) of section 206 of the
Federal Power Act, as amended (16 U.S.C. 824c(c)) shall
be interpreted to confer upon the Federal Energy Regu-
latory Commission any authority not granted to it
elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an
order that (1) requires a decrease in system production
or transmission costs to be paid by one or more electric
utility companies of a registered holding company; and
(2) is based upon a determination that the amount of
such decrease should be paid through an increase in the

costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.].''

STUDY

Pub. L. 100–473, §5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

## § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, §207, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

## § 824g. Ascertainment of cost of property and depreciation

### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, §208, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

## § 824h. References to State boards by Commission

### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon notify a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

### (c) Availability of information and reports to State commissions; Commission experts

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of public utilities. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may upon request from a State make available to such State as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement to the Commission by such State of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 10, 1920, ch. 285, pt. II, §209, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

## § 824i. Interconnection authority

### (a) Powers of Commission; application by State regulatory authority

(1) Upon application of any electric utility, Federal power marketing agency, geothermal power producer (including a producer which is not an electric utility), qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring—

(A) the physical connection of any cogeneration facility, any small power production fa-



with the firm transmission rights described in subsection (a).

(June 10, 1920, ch. 285, pt. II, §218, as added Pub. L. 109–58, title XII, §1235, Aug. 8, 2005, 119 Stat. 960.)

## § 824s. Transmission infrastructure investment

### (a) Rulemaking requirement

Not later than 1 year after August 8, 2005, the Commission shall establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of electric energy in interstate commerce by public utilities for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion.

### (b) Contents

The rule shall—

(1) promote reliable and economically efficient transmission and generation of electricity by promoting capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce, regardless of the ownership of the facilities;

(2) provide a return on equity that attracts new investment in transmission facilities (including related transmission technologies);

(3) encourage deployment of transmission technologies and other measures to increase the capacity and efficiency of existing transmission facilities and improve the operation of the facilities; and

(4) allow recovery of—

(A) all prudently incurred costs necessary to comply with mandatory reliability standards issued pursuant to section 824o of this title; and

(B) all prudently incurred costs related to transmission infrastructure development pursuant to section 824p of this title.

### (c) Incentives

In the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization. The Commission shall ensure that any costs recoverable pursuant to this subsection may be recovered by such utility through the transmission rates charged by such utility or through the transmission rates charged by the Transmission Organization that provides transmission service to such utility.

### (d) Just and reasonable rates

All rates approved under the rules adopted pursuant to this section, including any revisions to the rules, are subject to the requirements of sections 824d and 824e of this title that all rates, charges, terms, and conditions be just and reasonable and not unduly discriminatory or preferential.

(June 10, 1920, ch. 285, pt. II, §219, as added Pub. L. 109–58, title XII, §1241, Aug. 8, 2005, 119 Stat. 961.)

## § 824s–1. Incentives for cybersecurity investments

### (a) Definitions

In this section:

#### (1) Advanced cybersecurity technology

The term "advanced cybersecurity technology" means any technology, operational capability, or service, including computer hardware, software, or a related asset, that enhances the security posture of public utilities through improvements in the ability to protect against, detect, respond to, or recover from a cybersecurity threat (as defined in section 1501 of title 6).

#### (2) Advanced cybersecurity technology information

The term "advanced cybersecurity technology information" means information relating to advanced cybersecurity technology or proposed advanced cybersecurity technology that is generated by or provided to the Commission or another Federal agency.

### (b) Study

Not later than 180 days after November 15, 2021, the Commission, in consultation with the Secretary of Energy, the North American Electric Reliability Corporation, the Electricity Subsector Coordinating Council, and the National Association of Regulatory Utility Commissioners, shall conduct a study to identify incentive-based, including performance-based, rate treatments for the transmission and sale of electric energy subject to the jurisdiction of the Commission that could be used to encourage—

(1) investment by public utilities in advanced cybersecurity technology; and

(2) participation by public utilities in cybersecurity threat information sharing programs.

### (c) Incentive-based rate treatment

Not later than 1 year after the completion of the study under subsection (b), the Commission shall establish, by rule, incentive-based, including performance-based, rate treatments for the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce by public utilities for the purpose of benefitting consumers by encouraging—

(1) investments by public utilities in advanced cybersecurity technology; and

(2) participation by public utilities in cybersecurity threat information sharing programs.

### (d) Factors for consideration

In issuing a rule pursuant to this section, the Commission may provide additional incentives beyond those identified in subsection (c) in any case in which the Commission determines that an investment in advanced cybersecurity technology or information sharing program costs will reduce cybersecurity risks to—

(1) defense critical electric infrastructure (as defined in section 824o–1(a) of this title) and other facilities subject to the jurisdiction of the Commission that are critical to public safety, national defense, or homeland security, as determined by the Commission in consultation with—

(A) the Secretary of Energy;

(B) the Secretary of Homeland Security; and

ices. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

#### EDITORIAL NOTES

##### CODIFICATION

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

##### CHANGE OF NAME

"Director of the Government Publishing Office" substituted for "Public Printer" in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

"Government Publishing Office" substituted for "Government Printing Office" in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States

upon certiorari or certification as provided in section 1254 of title 28.

#### (c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

#### Editorial Notes

##### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

##### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

#### Statutory Notes and Related Subsidiaries

##### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

### § 825m. Enforcement provisions

#### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available

concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

#### (b) Writs of mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

#### (c) Employment of attorneys

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

#### (d) Prohibitions on violators

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

    (1) acting as an officer or director of an electric utility; or

    (2) engaging in the business of purchasing or selling—

        (A) electric energy; or

        (B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, §314, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, §32(b), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 109–58, title XII, §1288, Aug. 8, 2005, 119 Stat. 982.)

#### Editorial Notes

##### CODIFICATION

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of Title 28 which states that "the District of Columbia constitutes one judicial district".

##### AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

to regulation as such under other provisions of this subchapter. The State within which any such facilities are located may regulate any such transaction insofar as such State regulation does not conflict with the exercise of the Commission's powers under or relating to subsection (e).

**(g) Continuance of service**

In order to insure continuity of service to customers of public utilities, the Commission shall require, by rule, each public utility to—

(1) report promptly to the Commission and any appropriate State regulatory authorities any anticipated shortage of electric energy or capacity which would affect such utility's capability of serving its wholesale customers,

(2) submit to the Commission, and to any appropriate State regulatory authority, and periodically revise, contingency plans respecting—

(A) shortages of electric energy or capacity, and

(B) circumstances which may result in such shortages, and

(3) accommodate any such shortages or circumstances in a manner which shall—

(A) give due consideration to the public health, safety, and welfare, and

(B) provide that all persons served directly or indirectly by such public utility will be treated, without undue prejudice or disadvantage.

(June 10, 1920, ch. 285, pt. II, §202, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 848; amended Aug. 7, 1953, ch. 343, 67 Stat. 461; Pub. L. 95–617, title II, §206(a), Nov. 9, 1978, 92 Stat. 3141; Pub. L. 114–94, div. F, §61002, Dec. 4, 2015, 129 Stat. 1772.)

EDITORIAL NOTES

AMENDMENTS

2015—Subsec. (c). Pub. L. 114–94, §61002(a), designated existing provisions as par. (1) and added pars. (2) to (5).

Subsec. (d). Pub. L. 114–94, §61002(b), inserted "or municipality" before "engaged in the transmission or sale of electric energy".

1978—Subsec. (g). Pub. L. 95–617 added subsec. (g).

1953—Subsec. (f). Act Aug. 7, 1953, added subsec. (f).

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1978 AMENDMENT

Pub. L. 95–617, title II, §206(b), Nov. 9, 1978, 92 Stat. 3142, provided that: "The amendment made by subsection (a) [adding subsec. (g) of this section] shall not affect any proceeding of the Commission [Federal Energy Regulatory Commission] pending on the date of the enactment of this Act [Nov. 9, 1978] or any case pending on such date respecting a proceeding of the Commission."

EXECUTIVE DOCUMENTS

DELEGATION OF FUNCTIONS

Functions of President respecting certain facilities constructed and maintained on United States borders delegated to Secretary of State, see Ex. Ord. No. 11423,

Aug. 16, 1968. 33 F.R. 11741, set out as a note under section 301 of Title 3, The President.

PERFORMANCE OF FUNCTIONS RESPECTING ELECTRIC POWER AND NATURAL GAS FACILITIES LOCATED ON UNITED STATES BORDERS

For provisions relating to performance of functions by Secretary of Energy respecting electric power and natural gas facilities located on United States borders, see Ex. Ord. No. 10485, Sept. 8, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, set out as a note under section 717b of Title 15, Commerce and Trade.

## § 824a–1. Pooling

**(a) State laws**

The Commission may, on its own motion, and shall, on application of any person or governmental entity, after public notice and notice to the Governor of the affected State and after affording an opportunity for public hearing, exempt electric utilities, in whole or in part, from any provision of State law, or from any State rule or regulation, which prohibits or prevents the voluntary coordination of electric utilities, including any agreement for central dispatch, if the Commission determines that such voluntary coordination is designed to obtain economical utilization of facilities and resources in any area. No such exemption may be granted if the Commission finds that such provision of State law, or rule or regulation—

(1) is required by any authority of Federal law, or

(2) is designed to protect public health, safety, or welfare, or the environment or conserve energy or is designed to mitigate the effects of emergencies resulting from fuel shortages.

**(b) Pooling study**

(1) The Commission, in consultation with the reliability councils established under section 202(a) of the Federal Power Act [16 U.S.C. 824a], the Secretary, and the electric utility industry shall study the opportunities for—

(A) conservation of energy,

(B) optimization in the efficiency of use of facilities and resources, and

(C) increased reliability,

through pooling arrangements. Not later than 18 months after November 9, 1978, the Commission shall submit a report containing the results of such study to the President and the Congress.

(2) The Commission may recommend to electric utilities that such utilities should voluntarily enter into negotiations where the opportunities referred to in paragraph (1) exist. The Commission shall report annually to the President and the Congress regarding any such recommendations and subsequent actions taken by electric utilities, by the Commission, and by the Secretary under this Act, the Federal Power Act [16 U.S.C. 791a et seq.], and any other provision of law. Such annual reports shall be included in the Commission's annual report required under the Department of Energy Organization Act [42 U.S.C. 7101 et seq.].

(Pub. L. 95–617, title II, §205, Nov. 9, 1978, 92 Stat. 3140.)

**Editorial Notes**

REFERENCES IN TEXT

This Act, referred to in subsec. (b)(2), means Pub. L. 95–617, Nov. 9, 1978, 92 Stat. 3117, known as the ''Public Utility Regulatory Policies Act of 1978''. For complete classification of this Act to the Code, see Short Title note set out under section 2601 of this title and Tables.

The Federal Power Act, referred to in subsec. (b)(2), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to this chapter. For complete classification of this Act to the Code, see section 791a of this title and Tables.

The Department of Energy Organization Act, referred to in subsec. (b)(2), is Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, which is classified principally to chapter 84 (§ 7101 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of Title 42 and Tables.

CODIFICATION

Section was enacted as part of the Public Utility Regulatory Policies Act of 1978, and not as part of the Federal Power Act which generally comprises this chapter.

**Statutory Notes and Related Subsidiaries**

DEFINITIONS

For definitions of terms used in this section, see section 2602 of this title.

## § 824a–2. Reliability

### (a) Study

(1) The Secretary, in consultation with the Commission, shall conduct a study with respect to—

(A) the level of reliability appropriate to adequately serve the needs of electric consumers, taking into account cost effectiveness and the need for energy conservation,

(B) the various methods which could be used in order to achieve such level of reliability and the cost effectiveness of such methods, and

(C) the various procedures that might be used in case of an emergency outage to minimize the public disruption and economic loss that might be caused by such an outage and the cost effectiveness of such procedures.

Such study shall be completed and submitted to the President and the Congress not later than 18 months after November 9, 1978. Before such submittal the Secretary shall provide an opportunity for public comment on the results of such study.

(2) The study under paragraph (1) shall include consideration of the following:

(A) the cost effectiveness of investments in each of the components involved in providing adequate and reliable electric service, including generation, transmission, and distribution facilities, and devices available to the electric consumer;

(B) the environmental and other effects of the investments considered under subparagraph (A);

(C) various types of electric utility systems in terms of generation, transmission, distribution and customer mix, the extent to which differences in reliability levels may be desirable, and the cost-effectiveness of the various methods which could be used to decrease the number and severity of any outages among the various types of systems;

(D) alternatives to adding new generation facilities to achieve such desired levels of reliability (including conservation);

(E) the cost-effectiveness of adding a number of small, decentralized conventional and nonconventional generating units rather than a small number of large generating units with a similar total megawatt capacity for achieving the desired level of reliability; and

(F) any standards for electric utility reliability used by, or suggested for use by, the electric utility industry in terms of cost-effectiveness in achieving the desired level of reliability, including equipment standards, standards for operating procedures and training of personnel, and standards relating the number and severity of outages to periods of time.

### (b) Examination of reliability issues by reliability councils

The Secretary, in consultation with the Commission, may, from time to time, request the reliability councils established under section 202(a) of the Federal Power Act [16 U.S.C. 824a(a) of this title] or other appropriate persons (including Federal agencies) to examine and report to him concerning any electric utility reliability issue. The Secretary shall report to the Congress (in its annual report or in the report required under subsection (a) if appropriate) the results of any examination under the preceding sentence.

### (c) Department of Energy recommendations

The Secretary, in consultation with the Commission, and after opportunity for public comment, may recommend industry standards for reliability to the electric utility industry, including standards with respect to equipment, operating procedures and training of personnel, and standards relating to the level or levels of reliability appropriate to adequately and reliably serve the needs of electric consumers. The Secretary shall include in his annual report—

(1) any recommendations made under this subsection or any recommendations respecting electric utility reliability problems under any other provision of law, and

(2) a description of actions taken by electric utilities with respect to such recommendations.

(Pub. L. 95–617, title II, § 209, Nov. 9, 1978, 92 Stat. 3143.)

**Editorial Notes**

CODIFICATION

Section was enacted as part of the Public Utility Regulatory Policies Act of 1978, and not as part of the Federal Power Act which generally comprises this chapter.

**Statutory Notes and Related Subsidiaries**

DEFINITIONS

For definitions of terms used in this section, see section 2602 of this title.

(i) The Regional Transmission Organization planning and expansion process must encourage market-driven operating and investment actions for preventing and relieving congestion.

(ii) The Regional Transmission Organization's planning and expansion process must accommodate efforts by state regulatory commissions to create multi-state agreements to review and approve new transmission facilities. The Regional Transmission Organization's planning and expansion process must be coordinated with programs of existing Regional Transmission Groups (See § 2.21 of this chapter) where appropriate.

(iii) If the Regional Transmission Organization is unable to satisfy this requirement when it commences operation, it must file with the Commission a plan with specified milestones that will ensure that it meets this requirement no later than three years after initial operation.

(8) *Interregional coordination.* The Regional Transmission Organization must ensure the integration of reliability practices within an interconnection and market interface practices among regions.

(l) *Open architecture.* (1) Any proposal to participate in a Regional Transmission Organization must not contain any provision that would limit the capability of the Regional Transmission Organization to evolve in ways that would improve its efficiency, consistent with the requirements in paragraphs (j) and (k) of this section.

(2) Nothing in this regulation precludes an approved Regional Transmission Organization from seeking to evolve with respect to its organizational design, market design, geographic scope, ownership arrangements, or methods of operational control, or in other appropriate ways if the change is consistent with the requirements of this section. Any future filing seeking approval of such changes must demonstrate that the proposed changes will meet the requirements of paragraphs (j), (k) and (l) of this section.

[Order 2000–A, 65 FR 12110, Mar. 8, 2000, as amended by Order 679, 71 FR 43338, July 31, 2006]

## Subpart G—Transmission Infrastructure Investment Provisions

### § 35.35    Transmission infrastructure investment.

(a) *Purpose.* This section establishes rules for incentive-based (including performance-based) rate treatments for transmission of electric energy in interstate commerce by public utilities for the purpose of benefiting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion.

(b) *Definitions.* (1) *Transco* means a stand-alone transmission company that has been approved by the Commission and that sells transmission services at wholesale and/or on an unbundled retail basis, regardless of whether it is affiliated with another public utility.

(2) *Transmission Organization* means a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities.

(c) *General rule.* All rates approved under the rules of this section, including any revisions to the rules, are subject to the filing requirements of sections 205 and 206 of the Federal Power Act and to the substantive requirements of sections 205 and 206 of the Federal Power Act that all rates, charges, terms and conditions be just and reasonable and not unduly discriminatory or preferential.

(d) *Incentive-based rate treatments for transmission infrastructure investment.* The Commission will authorize any incentive-based rate treatment, as discussed in this paragraph (d), for transmission infrastructure investment, provided that the proposed incentive-based rate treatment is just and reasonable and not unduly discriminatory or preferential. A public utility's request for one or more incentive-based rate treatments, to be made in a filing pursuant to section 205 of the Federal Power Act, or in a petition for a declaratory order that precedes a filing pursuant to section 205, must include a detailed explanation of how the proposed

**Federal Energy Regulatory Commission** §35.35

rate treatment complies with the requirements of section 219 of the Federal Power Act and a demonstration that the proposed rate treatment is just, reasonable, and not unduly discriminatory or preferential. The applicant must demonstrate that the facilities for which it seeks incentives either ensure reliability or reduce the cost of delivered power by reducing transmission congestion consistent with the requirements of section 219, that the *total* package of incentives is tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project, and that resulting rates are just and reasonable. For purposes of this paragraph (d), incentive-based rate treatment means any of the following:

(1) For purposes of this paragraph (d), incentive-based rate treatment means any of the following:

(i) A rate of return on equity sufficient to attract new investment in transmission facilities;

(ii) 100 percent of prudently incurred Construction Work in Progress (CWIP) in rate base;

(iii) Recovery of prudently incurred pre-commercial operations costs;

(iv) Hypothetical capital structure;

(v) Accelerated depreciation used for rate recovery;

(vi) Recovery of 100 percent of prudently incurred costs of transmission facilities that are cancelled or abandoned due to factors beyond the control of the public utility;

(vii) Deferred cost recovery; and

(viii) Any other incentives approved by the Commission, pursuant to the requirements of this paragraph, that are determined to be just and reasonable and not unduly discriminatory or preferential.

(2) In addition to the incentives in §35.35(d)(1), the Commission will authorize the following incentive-based rate treatments for Transcos, provided that the proposed incentive-based rate treatment is just and reasonable and not unduly discriminatory or preferential:

(i) A return on equity that both encourages Transco formation and is sufficient to attract investment; and

(ii) An adjustment to the book value of transmission assets being sold to a Transco to remove the disincentive associated with the impact of accelerated depreciation on federal capital gains tax liabilities.

(e) *Incentives for joining a Transmission Organization.* The Commission will authorize an incentive-based rate treatment, as discussed in this paragraph (e), for public utilities that join a Transmission Organization, if the applicant demonstrates that the proposed incentive-based rate treatment is just and reasonable and not unduly discriminatory or preferential. Applicants for the incentive-based rate treatment must make a filing with the Commission under section 205 of the Federal Power Act. For purposes of this paragraph (e), incentive-based rate treatment means a return on equity that is higher than the return on equity the Commission might otherwise allow if the public utility did not join a Transmission Organization. The Commission will also permit transmitting utilities or electric utilities that join a Transmission Organization the ability to recover prudently incurred costs associated with joining the Transmission Organization, either through transmission rates charged by transmitting utilities or electric utilities or through transmission rates charged by the Transmission Organization that provides services to such utilities.

(f) *Approval of prudently-incurred costs.* The Commission will approve recovery of prudently-incurred costs necessary to comply with the mandatory reliability standards pursuant to section 215 of the Federal Power Act, provided that the proposed rates are just and reasonable and not unduly discriminatory or preferential.

(g) *Approval of prudently incurred costs related to transmission infrastructure development.* The Commission will approve recovery of prudently-incurred costs related to transmission infrastructure development pursuant to section 216 of the Federal Power Act, provided that the proposed rates are just and reasonable and not unduly discriminatory or preferential.

(h) *FERC–730, Report of transmission investment activity.* Public utilities that have been granted incentive rate treatment for specific transmission projects

355

must file FERC–730 on an annual basis beginning with the calendar year incentive rate treatment is granted by the Commission. Such filings are due by April 18 of the following calendar year and are due April 18 each year thereafter. The following information must be filed:

(1) In dollar terms, actual transmission investment for the most recent calendar year, and projected, incremental investments for the next five calendar years;

(2) For all current and projected investments over the next five calendar years, a project by project listing that specifies for each project the most up-to-date, expected completion date, percentage completion as of the date of filing, and reasons for delays. Exclude from this listing projects with projected costs less than $20 million; and

(3) For good cause shown, the Commission may extend the time within which any FERC–730 filing is to be filed or waive the requirements applicable to any such filing.

(i) *Rebuttable presumption.* (1) The Commission will apply a rebuttable presumption that an applicant has demonstrated that its project is needed to ensure reliability or reduces the cost of delivered power by reducing congestion for:

(i) A transmission project that results from a fair and open regional planning process that considers and evaluates projects for reliability and/or congestion and is found to be acceptable to the Commission; or

(ii) A project that has received construction approval from an appropriate state commission or state siting authority.

(2) To the extent these approval processes do not require that a project ensures reliability or reduce the cost of delivered power by reducing congestion, the applicant bears the burden of demonstrating that its project satisfies these criteria.

(j) *Commission authorization to site electric transmission facilities in interstate commerce.* If the Commission pursuant to its authority under section 216 of the Federal Power Act and its regulations thereunder has issued one or more permits for the construction or modification of transmission facilities in a na-

tional interest electric transmission corridor designated by the Secretary, such facilities shall be deemed to either ensure reliability or reduce the cost of delivered power by reducing congestion for purposes of section 219(a).

[Order 679, 71 FR 43338, July 31, 2006, as amended by Order 679–A, 72 FR 1172, Jan. 10, 2007, Order 691, 72 FR 5174, Feb. 5, 2007]

## Subpart H—Wholesale Sales of Electric Energy, Capacity and Ancillary Services at Market-Based Rates

SOURCE: Order 697, 72 FR 40038, July 20, 2007, unless otherwise noted.

### § 35.36   Generally.

(a) For purposes of this subpart:

(1) *Seller* means any person that has authorization to or seeks authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under section 205 of the Federal Power Act.

(2) *Category 1 Seller* means a Seller that:

(i) Is either a wholesale power marketer that controls or is affiliated with 500 MW or less of generation in aggregate per region or a wholesale power producer that owns, controls or is affiliated with 500 MW or less of generation in aggregate in the same region as its generation assets;

(ii) Does not own, operate or control transmission facilities other than limited equipment necessary to connect individual generating facilities to the transmission grid (or has been granted waiver of the requirements of Order No. 888, FERC Stats. & Regs. ¶ 31,036);

(iii) Is not affiliated with anyone that owns, operates or controls transmission facilities in the same region as the Seller's generation assets;

(iv) Is not affiliated with a franchised public utility in the same region as the Seller's generation assets; and

(v) Does not raise other vertical market power issues.

(3) *Category 2 Sellers* means any Sellers not in Category 1.

(4) *Inputs to electric power production* means intrastate natural gas transportation, intrastate natural gas storage

356

**Federal Energy Regulatory Commission**                    **§ 385.602**

(2) If any excluded evidence is in the form of an exhibit or is a public document, a copy of such exhibit will constitute the offer of proof or the public document will be specified for identification.

## Subpart F—Conferences, Settlements, and Stipulations

### § 385.601  Conferences (Rule 601).

(a) *Convening.* The Commission or other decisional authority, upon motion or otherwise, may convene a conference of the participants in a proceeding at any time for any purpose related to the conduct or disposition of the proceeding, including submission and consideration of offers of settlement or the use of alternative dispute resolution procedures.

(b) *General requirements.* (1) The participants in a proceeding must be given due notice of the time and place of a conference under paragraph (a) of this section and of the matters to be addressed at the conference. Participants attending the conference must be prepared to discuss the matters to be addressed at the conference, unless there is good cause for a failure to be prepared.

(2) Any person appearing at the conference in a representative capacity must be authorized to act on behalf of that person's principal with respect to matters to be addressed at the conference.

(3) If any party fails to attend the conference such failure will constitute a waiver of all objections to any order or ruling arising out of, or any agreement reached at, the conference.

(c) *Powers of decisional authority at conference.* (1) The decisional authority, before which the conference is held or to which the conference reports, may dispose, during a conference, of any procedural matter on which the decisional authority is authorized to rule and which may appropriately and usefully be disposed of at that time.

(2) If, in a proceeding set for hearing under subpart E, the presiding officer determines that the proceeding would be substantially expedited by distribution of proposed exhibits, including written prepared testimony and other documents, reasonably in advance of

the hearing session, the presiding officer may, with due regard for the convenience of the participants, direct advance distribution of the exhibits by a prescribed date. The presiding officer may also direct the preparation and distribution of any briefs and other documents which the presiding officer determines will substantially expedite the proceeding.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 578, 60 FR 19505, Apr. 19, 1995]

### § 385.602  Submission of settlement offers (Rule 602).

(a) *Applicability.* This section applies to written offers of settlement filed in any proceeding pending before the Commission or set for hearing under subpart E. For purposes of this section, the term ''offer of settlement'' includes any written proposal to modify an offer of settlement.

(b) *Submission of offer.* (1) Any participant in a proceeding may submit an offer of settlement at any time.

(2) An offer of settlement must be filed with the Secretary. The Secretary will transmit the offer to:

(i) The presiding officer, if the offer is filed after a hearing has been ordered under subpart E of this part and before the presiding officer certifies the record to the Commission; or

(ii) The Commission.

(3) If an offer of settlement pertains to multiple proceedings that are in part pending before the Commission and in part set for hearing, any participant may by motion request the Commission to consolidate the multiple proceedings and to provide any other appropriate procedural relief for purposes of disposition of the settlement.

(c) *Contents of offer.* (1) An offer of settlement must include:

(i) The settlement offer;

(ii) A separate explanatory statement;

(iii) Copies of, or references to, any document, testimony, or exhibit, including record citations if there is a record, and any other matters that the offerer considers relevant to the offer of settlement; and

(2) If an offer of settlement pertains to a tariff or rate filing, the offer must include any proposed change in a form

1201

A-17

suitable for inclusion in the filed rate schedules or tariffs, and a number of copies sufficient to satisfy the filing requirements applicable to tariff or rate filings of the type at issue in the proceeding.

(d) *Service.* (1) A participant offering settlement under this section must serve a copy of the offer of settlement:

(i) On every participant in accordance with Rule 2010;

(ii) On any person required by the Commission's rules to be served with the pleading or tariff or rate schedule filing, with respect to which the proceeding was initiated.

(2) The participant serving the offer of settlement must notify any person or participant served under paragraph (d)(1) of this section of the date on which comments on the settlement are due under paragraph (f) of this section.

(e) *Use of non-approved offers of settlement as evidence.* (1) An offer of settlement that is not approved by the Commission, and any comment on that offer, is not admissible in evidence against any participant who objects to its admission.

(2) Any discussion of the parties with respect to an offer of settlement that is not approved by the Commission is not subject to discovery or admissible in evidence.

(f) *Comments.* (1) A comment on an offer of settlement must be filed with the Secretary who will transmit the comment to the Commission, if the offer of settlement was transmitted to the Commission, or to the presiding officer in any other case.

(2) A comment on an offer of settlement may be filed not later than 20 days after the filing of the offer of settlement and reply comments may be filed not later than 30 days after the filing of the offer, unless otherwise provided by the Commission or the presiding officer.

(3) Any failure to file a comment constitutes a waiver of all objections to the offer of settlement.

(4) Any comment that contests an offer of settlement by alleging a dispute as to a genuine issue of material fact must include an affidavit detailing any genuine issue of material fact by specific reference to documents, testimony, or other items included in the offer of settlement, or items not included in the settlement, that are relevant to support the claim. Reply comments may include responding affidavits.

(g) *Uncontested offers of settlement.* (1) If comments on an offer are transmitted to the presiding officer and the presiding officer finds that the offer is not contested by any participant, the presiding officer will certify to the Commission the offer of settlement, a statement that the offer of settlement is uncontested, and any hearing record or pleadings which relate to the offer of settlement.

(2) If comments on an offer of settlement are transmitted to the Commission, the Commission will determine whether the offer is uncontested.

(3) An uncontested offer of settlement may be approved by the Commission upon a finding that the settlement appears to be fair and reasonable and in the public interest.

(h) *Contested offers of settlement.* (1)(i) If the Commission determines that any offer of settlement is contested in whole or in part, by any party, the Commission may decide the merits of the contested settlement issues, if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact.

(ii) If the Commission finds that the record lacks substantial evidence or that the contesting parties or contested issues can not be severed from the offer of settlement, the Commission will:

(A) Establish procedures for the purpose of receiving additional evidence before a presiding officer upon which a decision on the contested issues may reasonably be based; or

(B) Take other action which the Commission determines to be appropriate.

(iii) If contesting parties or contested issues are severable, the contesting parties or uncontested portions may be severed. The uncontested portions will be decided in accordance with paragraph (g) of this section.

(2)(i) If any comment on an offer of settlement is transmitted to the presiding officer and the presiding officer determines that the offer is contested,

**Federal Energy Regulatory Commission**                    **§ 385.603**

whole or in part, by any participant, the presiding officer may certify all or part of the offer to the Commission. If any offer or part of an offer is contested by a party, the offer may be certified to the Commission only if paragraph (h)(2)(ii) or (iii) of this section applies.

(ii) Any offer of settlement or part of any offer may be certified to the Commission if the presiding officer determines that there is no genuine issue of material fact. Any certification by the presiding officer must contain the determination that there is no genuine issue of material fact and any hearing record or pleadings which relate to the offer or part of the offer being certified.

(iii) Any offer of settlement or part of any offer may be certified to the Commission, if:

(A) The parties concur on a motion for omission of the initial decision as provided in Rule 710, or, if all parties do not concur in the motion, the presiding officer determines that omission of the initial decision is appropriate under Rule 710(d), and

(B) The presiding officer determines that the record contains substantial evidence from which the Commission may reach a reasoned decision on the merits of the contested issues.

(iv) If any contesting parties or contested issues are severable, the uncontested portions of the settlement may be certified immediately by the presiding officer to the Commission for decision, as provided in paragraph (g) of this section.

(i) *Reservation of rights.* Any procedural right that a participant has in the absence of an offer of settlement is not affected by Commission disapproval, or approval subject to condition, of the uncontested portion of the offer of settlement.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 541, 57 FR 21734, May 22, 1992; Order 578, 60 FR 19505, Apr. 19, 1995]

### § 385.603 Settlement of negotiations before a settlement judge (Rule 603).

(a) *Applicability.* This section applies to any proceeding set for hearing under subpart E of this part and to any other proceeding in which the Commission has ordered the appointment of a settlement judge.

(b) *Definition.* For purposes of this section, *settlement judge* means the administrative law judge appointed by the Chief Administrative Law Judge to conduct settlement negotiations under this section.

(c) *Requests for appointment of settlement judges.* (1) Any participant may file a motion requesting the appointment of a settlement judge with the presiding officer, or, if there is no presiding officer for the proceeding, with the Commission.

(2) A presiding officer may request the Chief Administrative Law Judge to appoint a settlement judge.

(3) A motion under paragraph (c)(1) of this section may be acted upon at any time, and the time limitations on answers in Rule 213(d) do not apply.

(4) Any answer or objection filed after a motion has been acted upon will not be considered.

(d) *Commission order directing appointment of settlement judge.* The Commission may, on motion or otherwise, order the Chief Administrative Law Judge to appoint a settlement judge.

(e) *Appointment of settlement judge by Chief Administrative Law Judge.* The Chief Administrative Law Judge may appoint a settlement judge for any proceeding, if requested by the presiding officer under paragraph (c)(2) of this section or if the presiding officer concurs in a motion made under paragraph (c)(1) of this section.

(f) *Order appointing settlement judge.* The Chief Administrative Law Judge will appoint a settlement judge by an order, which specifies whether, and to what extent, the proceeding is suspended pending termination of settlement negotiations conducted in accordance with this section. The order may confine the scope of any settlement negotiations to specified issues.

(g) *Powers and duties of settlement judge.* (1) A settlement judge will convene and preside over conferences and settlement negotiations between the participants and assess the practicalities of a potential settlement.

(2)(i) A settlement judge will report to the Chief Administrative Law Judge



AUTHENTICATED,
OHIO LEGISLATIVE SERVICE
COMMISSION
DOCUMENT #236656

# Ohio Revised Code
## Section 4928.12 Qualifying transmission entities.

Effective: October 5, 1999
Legislation: Senate Bill 3 - 123rd General Assembly

(A) Except as otherwise provided in sections 4928.31 to 4928.40 of the Revised Code, no entity shall own or control transmission facilities as defined under federal law and located in this state on or after the starting date of competitive retail electric service unless that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities, as described in division (B) of this section, that are operational.

(B) An entity that owns or controls transmission facilities located in this state complies with division (A) of this section if each transmission entity of which it is a member meets all of the following specifications:

(1) The transmission entity is approved by the federal energy regulatory commission.

(2) The transmission entity effects separate control of transmission facilities from control of generation facilities.

(3) The transmission entity implements, to the extent reasonably possible, policies and procedures designed to minimize pancaked transmission rates within this state.

(4) The transmission entity improves service reliability within this state.

(5) The transmission entity achieves the objectives of an open and competitive electric generation marketplace, elimination of barriers to market entry, and preclusion of control of bottleneck electric transmission facilities in the provision of retail electric service.

(6) The transmission entity is of sufficient scope or otherwise operates to substantially increase economical supply options for consumers.

(7) The governance structure or control of the transmission entity is independent of the users of the



AUTHENTICATED,
OHIO LEGISLATIVE SERVICE
COMMISSION
DOCUMENT #236656

transmission facilities, and no member of its board of directors has an affiliation, with such a user or with an affiliate of a user during the member's tenure on the board, such as to unduly affect the transmission entity's performance. For the purpose of division (B)(7) of this section, a "user" is any entity or affiliate of that entity that buys or sells electric energy in the transmission entity's region or in a neighboring region.

(8) The transmission entity operates under policies that promote positive performance designed to satisfy the electricity requirements of customers.

(9) The transmission entity is capable of maintaining real-time reliability of the electric transmission system, ensuring comparable and nondiscriminatory transmission access and necessary services, minimizing system congestion, and further addressing real or potential transmission constraints.

(C) To the extent that a transmission entity under division (A) of this section is authorized to build transmission facilities, that transmission entity has the powers provided in and is subject to sections 1723.01 to 1723.08 of the Revised Code.

(D) For the purpose of forming or participating in a regional regulatory oversight body or mechanism developed for any transmission entity under division (A) of this section that is of regional scope and operates within this state:

(1) The commission shall make joint investigations, hold joint hearings, within or outside this state, and issue joint or concurrent orders in conjunction or concurrence with any official or agency of any state or of the United States, whether in the holding of those investigations or hearings, or in the making of those orders, the commission is functioning under agreements or compacts between states, under the concurrent power of states to regulate interstate commerce, as an agency of the United States, or otherwise.

(2) The commission shall negotiate and enter into agreements or compacts with agencies of other states for cooperative regulatory efforts and for the enforcement of the respective state laws regarding the transmission entity.

(E) If a qualifying transmission entity is not operational as contemplated in division (A) of this



AUTHENTICATED,
OHIO LEGISLATIVE SERVICE
COMMISSION
DOCUMENT #236656

section, division (A)(13) of section 4928.34 of the Revised Code, or division (G) of section 4928.35 of the Revised Code, the commission by rule or order shall take such measures or impose such requirements on all for-profit entities that own or control electric transmission facilities located in this state as the commission determines necessary and proper to achieve independent, nondiscriminatory operation of, and separate ownership and control of, such electric transmission facilities on or after the starting date of competitive retail electric service.