**Nos. 21-4072, 22-3351, 23-3196, 23-3324, 23-3366, 23-3417**

IN THE
**United States Court of Appeals**

FOR THE SIXTH CIRCUIT

DAYTON POWER & LIGHT COMPANY, d/b/a AES OHIO;
AMERICAN ELECTRIC POWER SERVICE CORPORATION;
DUKE ENERGY OHIO, INC.; FIRSTENERGY SERVICE COMPANY,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**JOINT APPENDIX
VOLUME 1 OF 2
PAGES JA1 – JA311**

William M. Rappolt
Assistant General Counsel,
FERC
AES US SERVICES, LLC
4300 Wilson Blvd.
Arlington, VA 22203
(571) 533-9018

*Counsel for The Dayton Power
and Light Co. d/b/a AES Ohio*

Matthew E. Price
Zachary B. Cohen
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC 20001
(202) 639-6000

*Counsel for American Electric
Power Service Corp., in its own
name and on behalf of its public
utility affiliates Ohio Power Co. and
AEP Ohio Transmission Co., Inc.*

*Additional Counsel Listed On Inside Cover*

William M. Keyser
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-8186

*Counsel for American Electric Power Service Corp., in its own name and on behalf of its public utility affiliates Ohio Power Co. and AEP Ohio Transmission Co., Inc.*

Morgan E. Parke
P. Nikhil Rao
FIRSTENERGY SERVICE CO.
76 South Main Street
Akron, OH 44308
(330) 384-2422

Sanford I. Weisburst
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Counsel for FirstEnergy Service Company on behalf of and as agent for American Transmission Systems, Inc.*

Matthew R. Christiansen
  General Counsel
Robert H. Solomon
  Solicitor
Carol J. Banta
  Senior Attorney
FEDERAL ENERGY REGULATORY COMMISSION
888 First Street NE
Washington, DC 20426
(202) 502-6433

*Counsel for Federal Energy Regulatory Commission*

Maureen Willis
  Consumers' Counsel
Angela O'Brien
  Deputy Consumers' Counsel
OFFICE OF THE OHIO CONSUMERS' COUNSEL
65 East State Street, 7th Floor
Columbus, Ohio 43215
(614) 466-8574

*Counsel for Office of The Ohio Consumers' Counsel*

Denise C. Goulet
Wendy Simon-Pearson
MCCARTER & ENGLISH, LLP
1301 K Street, N.W.
Suite 1000 West
Washington, DC 20005
(202) 753-3400

*Special Counsel to the Ohio
Office of the Attorney General
for the Office of the Ohio
Consumers' Counsel*

Heather M. Horne
DUKE ENERGY CORP.
1301 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20004
(202) 824-8009

Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-4716

*Counsel for Duke Energy Ohio, Inc.*

Cynthia S. Bogorad
David E. Pomper
Jeffrey M. Bayne
Lauren L. Springett
SPIEGEL & MCDIARMID LLP
1875 Eye Street, NW
Suite 700
Washington, DC 20006
(202) 879-4000

*Counsel for Buckeye Power, Inc.*

Noel H. Symons
Carrie Mobley
MCGUIREWOODS LLP
888 16th Street, NW
Suite 500
Washington, DC 20006
(202) 857-1700

Dave Yost
  Ohio Attorney General
John H. Jones
  Section Chief
Thomas G. Lindgren
Lauren M. Williams
  Assistant Attorneys General
Public Utilities Section
30 East Broad St., 26th Floor
Columbus, Ohio 43215
(614) 466-4395

*Counsel for The Public Utilities
Commission of Ohio and Its
Office of The Federal Energy
Advocate*

Paul M. Flynn
Ryan J. Collins
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W., Suite 600
Washington, DC 20005-3898
202-393-1200

*Counsel for PJM Interconnection,
L.L.C.*

# INDEX

# VOLUME 1

## *Dayton Power & Light Co.*, FERC Docket No. ER20-1068

Certified Index To The Record .............................................................. JA1

Application of the Dayton Power and Light Company to Establish Incentive Rate Treatment for Qualifying Transmission Projects Pursuant to Sections 205 and 219 of the Federal Power Act and Request for Waivers (filed Feb. 24, 2020), R.2 ........................................................................................ JA13

Order on Transmission Incentives, 172 FERC ¶ 61,140 (Aug. 17, 2020), R.14 ................................................................................. JA96

Motion To Lodge of PJM Interconnection, L.L.C. (filed Oct. 19, 2020), R.33 ...................................................................................... JA135

Order Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order, in Part, 173 FERC ¶ 61,154 (Nov. 19, 2020), R.37 ................................................................................. JA158

Order Granting Clarification, Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order, in Part, 174 FERC ¶ 61,119 (Feb. 18, 2021), R.41 ............................................... JA168

Order on Paper Hearing, 176 FERC ¶ 61,025 (July 15, 2021), R.42 ..................................................................................... JA173

Request for Rehearing of the Indicated Ohio Transmission Owners for the July 15, 2021 Order (filed Aug. 13, 2021), R.43 ....................................................................................... JA210

Request for Rehearing of the Dayton Power and Light Company for the July 15, 2021 Order (filed Aug. 13, 2021), R.44 ....................................................................................... JA243

Request for Clarification of PJM Interconnection, L.L.C. for the July 15, 2021 Order (filed Aug. 16, 2021), R.45 ........................ JA270

i

Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration, 176 FERC ¶ 62,136 (Sept. 16, 2021), R.47 ...................................................................... JA279

Order Addressing Arguments Raised on Rehearing, 178 FERC ¶ 61,102 (Feb. 17, 2022), R.51 .............................................. JA280

Petition for Review of the Dayton Power and Light Company, American Electric Power Service Corporation, Duke Energy Ohio, Inc. and FirstEnergy Service Co., No. 21-4072 (6th Cir. Nov. 16, 2021) .................................................................................. JA304

Petition for Review of the Dayton Power and Light Company, American Electric Power Service Corporation, Duke Energy Ohio, Inc. and FirstEnergy Service Co., No. 22-3351 (6th Cir. Apr. 18, 2022) .................................................................................. JA307

## VOLUME 2

### *Office of the Ohio Consumers' Counsel v. American Electric Power Service Corp.*, FERC Docket No. EL 22-34

Certified Index To The Record ........................................................ JA312

Complaint to Protect Ohio Consumers from Unreasonable Electric Transmission Charges and Request for Establishment of Refund Effective Date and Request for Expedited Processing of Complaint by Office of the Ohio Consumers' Counsel (filed Feb. 24, 2022), R.1 ................................ JA324

Answer of American Electric Power Service Corp. (filed Mar. 31, 2022), R.19 .................................................................................. JA353

Duke Energy Ohio, LLC Answer to Complaint of Office of the Ohio Consumers' Counsel (filed Mar. 31, 2022), R.20 ..................... JA393

Comments of PJM Interconnection (filed Mar. 31, 2022), R.24 ........................................................................................ JA411

Answer to American Electric Power Service Corporation's and Duke Energy Ohio's Answer and to American Transmission Systems, Inc.'s Motion to Dismiss the Complaint to Protect Ohio Consumers From Unnecessary Charges by Office of the Ohio Consumers' Counsel (filed Apr. 15, 2022), R.32 ..................... JA422

Motion for Leave to Answer and Answer of Buckeye Power, Inc. to ATSI and AEP Answers (filed May 13, 2022), R.36 ............ JA457

Order on Complaint, 181 FERC ¶ 61,214 (Dec. 15, 2022), R.39 ....................................................................................................... JA464

Request for Rehearing of American Electric Power Service Corporation of the December 15, 2022 Order (filed Jan. 17, 2023), R.40 ..................................................................................... JA503

Ohio Consumers' Counsel submits Request for Rehearing of the December 15, 2022 Order (filed Jan. 17, 2023), R.41 ................ JA528

Motion for Leave to Answer and Answer of Office of the Ohio Consumer's Counsel re Safeguarding Consumer Rate Refunds and Request for Rehearing of American Electric Power Service Corporation (filed Feb. 1, 2023), R.43 (filing rejected by FERC on procedural grounds) ...................................................... JA549

Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 182 FERC ¶ 62,095 (Feb. 17, 2023), R.46 ......................................................................... JA574

Order Addressing Arguments Raised on Rehearing, 183 FERC ¶ 61,034 (Apr. 20, 2023), R.49 ................................................. JA575

Petition for Review of American Electric Power Service Corp., Case No. 23-3196 (6th Cir. Mar. 8, 2023) ........................................ JA599

Petition for Review by Office of the Ohio Consumers' Counsel, Case No. 23-3324 (6th Cir. Apr. 17, 2023) ...................................... JA601

Petition for Review by American Electric Power Service Corp., Case No. 23-3366 (6th Cir. Apr. 26, 2023) ........................................ JA604

iii

Petition for Review by Office of the Ohio Consumers' Counsel,
Case No. 23-3417 (6th Cir. May 9, 2023) ........................................ JA608

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

Dayton Power and Light Company,     )
  dba AES Ohio, *et al.*,          )
           Petitioners,    )
                          )
   v.                      )    Nos. 21-4072 and 22-3351
                          )    (consolidated with 23-3196,
Federal Energy Regulatory Commission,  )    23-3324, 23-3366,
             Respondent.    )    and 23-3417)

**CERTIFIED INDEX TO THE RECORD**

Pursuant to the provisions of section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), the provisions of 28 U.S.C. § 2112, and Rule 17 of the Federal Rules of Appellate Procedure, the Federal Energy Regulatory Commission hereby certifies that the materials listed and described below are:  (1) the orders complained of, "Order on Paper Hearing," 176 FERC ¶ 61,025, issued July 15, 2021, "Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration," 176 FERC ¶ 62,136, issued September 16, 2021, "Order Addressing Arguments Raised on Rehearing," 178 FERC ¶ 61,102, issued February 17, 2022 in *The Dayton Power and Light Company*, FERC Docket No. ER20-1068; and (2) the complete record upon which such orders were entered.

**Record
Item No.**     **Description**

**Docket No. ER20-1068**

1.        Issued By:  Secretary Of The Commission, FERC
          Filed Date:  2/25/2020
          Accession No.:  20200225-3058
          Description:  Combined Notice of Filings #1, February 25, 2020. This
          notice contains information concerning multiple filings received by
          FERC.

2.        Filed By:  The Dayton Power and Light Company
          Filed Date:  2/25/2020
          Accession No.:  20200225-5081
          Description:  Application to Establish Incentive Rate Treatment for
          Qualifying for Transmission Projects, et al. of The Dayton Power and
          Light Company under ER20-1068.

3.        Filed By:  Public Citizen, Inc.
          Filed Date:  3/9/2020
          Accession No.:  20200309-5019
          Description:  Motion to Intervene of Public Citizen, Inc. under ER20-
          1068.

4.        Filed By:  Ohio Federal Energy Advocate
          Filed Date:  3/11/2020
          Accession No.:  20200311-5059
          Description:  Motion to Intervene of Ohio Federal Energy Advocate
          under ER20-1068.

5.        Filed By:  Public Utilities Commission of Ohio Office of the Federal
          Energy Advocate
          Filed Date:  3/16/2020
          Accession No.:  20200316-5182
          Description:  Comments and Protests submitted on behalf of the
          Public Utilities Commission of Ohio's Office of the Federal Energy
          Advocate in response to Applications by Dayton Power & Light
          Company under ER20-1068, et al.

| Record Item No. | Description |
|---|---|

6.          Filed By:  Office of the Ohio Consumers' Counsel
Filed Date:  3/16/2020
Accession No.:  20200316-5118
Description:  Motion to Intervene by the Office of the Ohio Consumers' Counsel under ER20-1068.

7.          Filed By:  Buckeye Power, Inc.
Filed Date:  3/16/2020
Accession No.:  20200316-5054
Description:  Motion to Intervene of Buckeye Power, Inc. under ER20-1068.

8.          Filed By:  Industrial Energy Users-Ohio
Filed Date:  3/17/2020
Accession No.:  20200317-5025
Description:  Motion to Intervene of Industrial Energy Users-Ohio under ER20-1068.

9.          Filed By:  Dayton Power and Light Company
Filed Date:  3/17/2020
Accession No.:  20200317-5193
Description:  Protest of Dayton Power and Light Company's Request for Transmission Rate Incentives by the Office of the Ohio Consumers' Counsel under ER20-1068.

10.        Filed By:  American Municipal Power, Inc.
Filed Date:  3/17/2020
Accession No.:  20200317-5028
Description:  Motion to Intervene of American Municipal Power, Inc. under ER20-1068.

**JA3**

**Record
Item No.**      **Description**

11.          Filed By:  The Dayton Power and Light Company
             Filed Date:  3/24/2020
             Accession No.:  20200324-5192
             Description:  Motion for Leave to Leave to Answer and Answer of
             The Dayton Power and Light Company to Comments and Protests by
             the Public Utility Commission of Ohio's Office of the Federal Energy
             Advocate and the Office of the Ohio Consumers Counsel under ER20-
             1068.

12.          Filed By:  Ohio Consumers' Counsel
             Filed Date:  7/9/2020
             Accession No.:  20200709-5157
             Description:  Protest of the Ohio Consumers' Counsel to June 18,
             2020, et al. transmission rate incentive filings by The Dayton Power
             and Light Company under ER20-2100, et al.

13.          Filed By:  The Dayton Power and Light Company
             Filed Date:  7/13/2020
             Accession No.:  20200713-5124
             Description:  Motion to Answer and Answer of The Dayton Power
             and Light Company to July 9, 2020 Protest by the Ohio Consumers'
             Counsel under ER20-2100, et al.

14.          Issued By:  Secretary Of The Commission, FERC, Commissioners &
             Immediate Staff (The Commission)
             Filed Date:  8/17/2020
             Accession No.:  20200817-3068
             Description:  Order on Transmission Incentives re The Dayton Power
             and Light Company under ER20-1068 et al. Commissioner Glick is
             dissenting in part with a separate statement attached. Commissioner
             Danly is concurring in part with a separate statement attached.

15.          Filed By:  American Electric Power Service Corporation
             Filed Date:  8/26/2020
             Accession No.:  20200826-5085
             Description:  Motion to Intervene Out-of-Time of American Electric
             Power Service Corporation under ER20-1068, et al.

4

**JA4**

| Record Item No. | Description |
|---|---|

16.   Filed By:  Duke Energy Ohio, Inc.
Filed Date:  8/31/2020
Accession No.:  20200831-5401
Description:  Motion to Intervene Out-of-Time of Duke Energy Ohio, Inc. under ER20-1068 et al.

17.   Filed By:  FirstEnergy Service Company
Filed Date:  9/4/2020
Accession No.:  20200904-5052
Description:  Motion to Intervene Out-of-Time of FirstEnergy Service Company under ER20-1068 et al.

18.   Filed By:  Industrial Energy Users - Ohio
Filed Date:  9/9/2020
Accession No.:  20200909-5074
Description:  Motion to Intervene Out-of-Time of Industrial Energy Users - Ohio under ER20-1068, et al.

19.   Filed By:  WIRES
Filed Date:  9/10/2020
Accession No.:  20200910-5198
Description:  Motion to Intervene Out-of-Time of WIRES under ER20-1068.

20.   Filed By:  WIRES
Filed Date:  9/10/2020
Accession No.:  20200910-5197
Description:  Motion to Intervene Out-of-Time of WIRES under ER20-1068.

21.   Filed By:  The Dayton Power and Light Company
Filed Date:  9/16/2020
Accession No.:  20200916-5106
Description:  Request for Rehearing and Clarification of The Dayton Power and Light Company under ER20-1068, et al.

| **Record Item No.** | **Description** |
|---|---|

22.     Filed By:  PJM Interconnection, L.L.C.
        Filed Date:  9/16/2020
        Accession No.:  20200916-5118
        Description:  Request for Clarification and Motion to Intervene Out-of-Time of PJM Interconnection, L.L.C. under ER20-2100, et al.

23.     Filed By: Public Utilities Commission of Ohio Office of the Federal Energy Advocate
        Filed Date:  9/25/2020
        Accession No.:  20200925-5067
        Description:  Motion for Leave to File Answer and Answer of Public Utilities Commission of Ohio's Office of the Federal Energy Advocate to September 16, 2020 Request for Rehearing and Clarification by Dayton Power and Light Company under ER20-1068, et al.

24.     Filed By:  The Dayton Power and Light Company
        Filed Date:  10/16/2020
        Accession No.:  20201016-5224
        Description:  Initial Brief on RTO Participation Adder Paper Hearing of the Dayton Power and Light Company under ER20-1068, et al.

25.     Filed By:  Office of The Ohio Consumers' Counsel, Office of The Federal Energy Advocate at The Public Utilities Commission of Ohio
        Filed Date:  10/16/2020
        Accession No.:  20201016-5220
        Description:  Initial Brief by Office of The Ohio Consumers' Counsel and Office of The Federal Energy Advocate at The Public Utilities Commission of Ohio under ER20-1068, et al.

26.     Filed By:  Industrial Energy Users of Ohio
        Filed Date:  10/16/2020
        Accession No.:  20201016-5223
        Description:  Brief of the Industrial Energy Users of Ohio under ER20-1068, et al.

6

**JA6**

| Record Item No. | Description |
|---|---|

27. Filed By:  Duke Energy Ohio, Inc.
Filed Date:  10/16/2020
Accession No.:  20201016-5221
Description:  Initial Response in Paper Hearing of Duke Energy Ohio, Inc. under ER20-1068, et al.

28. Filed By:  Edison Electric Institute
Filed Date:  10/16/2020
Accession No.:  20201016-5142
Description:  Motion to Intervene Out-of-Time or in the Alternative to Participate as Amicus Curiae and Comments of the Edison Electric Institute under ER20-1068, et al.

29. Filed By:  American Electric Power Service Corporation
Filed Date:  10/16/2020
Accession No.:  20201016-5222
Description:  Initial Brief of American Electric Power Service Corporation, on behalf of affiliates Ohio Power Company and AEP Ohio Transmission Company, Inc. under ER20-1068, et al.

30. Filed By:  WIRES
Filed Date:  10/16/2020
Accession No.:  20201016-5219
Description:  Brief of WIRES under ER20-1068, et al.

31. Filed By:  FirstEnergy Service Company
Filed Date:  10/16/2020
Accession No.:  20201016-5131
Description:  Comment of FirstEnergy Service Company under ER20-1068, et al.

32. Issued By:  Secretary Of The Commission, FERC
Filed Date:  10/19/2020
Accession No.:  20201019-3057
Description:  Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration re The Dayton Power and Light Company et al. under ER20-1068 et al.

**Record**
**Item No.**      **Description**

33.           Filed By:  PJM Interconnection, L.L.C.
              Filed Date:  10/19/2020
              Accession No.:  20201019-5154
              Description:  Motion to Lodge of PJM Interconnection, L.L.C. under
              ER20-2100, et al.

34.           Filed By:  Duke Energy Corporation
              Filed Date:  11/16/2020
              Accession No.:  20201116-5269
              Description:  Reply Brief of Duke Energy Corporation, on behalf of
              Duke Energy Ohio, Inc. under ER20-1068, et al.

35.           Filed By:  American Electric Power Service Corporation
              Filed Date:  11/16/2020
              Accession No.:  20201116-5317
              Description:  Reply Brief of American Electric Power Service
              Corporation on behalf of its affiliates, Ohio Power Company, et al.
              under ER20-1068, et al.

36.           Filed By:  The Dayton Power and Light Company
              Filed Date:  11/16/2020
              Accession No.:  20201116-5279
              Description:  Reply Brief on RTO Participation Adder Paper Hearing
              Questions of the Dayton Power and Light Company under ER20-
              1068, et al.

37.           Issued By:  Secretary Of The Commission, FERC, Commissioners &
              Immediate Staff (The Commission)
              Filed Date:  11/19/2020
              Accession No.:  20201119-3039
              Description:  Order Addressing Arguments Raised on Rehearing, and
              Setting Aside Prior Order, in Part re The Dayton Power and Light
              Company et al. under ER20-1068 et al.

8

**JA8**

| Record Item No. | Description |
|---|---|

38.    Filed By:  The Dayton Power and Light Company
Filed Date:  12/8/2020
Accession No.:  20201208-5179
Description:  Request for Clarification or, in the Alternative,
Rehearing on the November 19, 2020 Rehearing Order of the Dayton
Power and Light Company under ER20-1068 et al.

39.    Issued By:  Secretary Of The Commission, FERC
Filed Date:  1/8/2021
Accession No.:  20210108-3014
Description:  Notice of Denial of Rehearing by Operation of Law and
Providing for Further Consideration re The Dayton Power and Light
Company et al. under ER20-1068 et al.

40.    Filed By:  FirstEnergy Service Company
Filed Date:  1/12/2021
Accession No.:  20210112-5126
Description:  Request to Update Service List of FirstEnergy Service
Company under ER20-1068, et al.

41.    Issued By:  Secretary Of The Commission, FERC, Commissioners &
Immediate Staff (The Commission)
Filed Date:  2/18/2021
Accession No.:  20210218-3054
Description:  Order Granting Clarification, Addressing Arguments
Raised on Rehearing, and Setting Aside Prior Order, in Part re The
Dayton Power and Light Company et al. under ER20-1068 et al.

42.    Issued By:  Secretary Of The Commission, FERC, Commissioners &
Immediate Staff (The Commission)
Filed Date:  7/15/2021
Accession No.:  20210715-3070
Description:  Order on Paper Hearing re The Dayton Power and Light
Company under ER20-1068. Commissioner Chatterjee is dissenting
with a separate statement attached. Commissioner Danly is dissenting
with a separate statement attached.

**JA9**

| Record Item No. | Description |
| --- | --- |

**43.**  Filed By:  Indicated Ohio Transmission Owners
Filed Date:  8/13/2021
Accession No.:  20210813-5227
Description:  Request for Rehearing of the Indicated Ohio Transmission Owners for the July 15, 2021 Order under ER20-1068. \

**44.**  Filed By:  The Dayton Power and Light Company
Filed Date:  8/13/2021
Accession No.:  20210813-5070
Description:  Request for Rehearing of The Dayton Power and Light Company for the July 15, 2021 Order under ER20-1068.

**45.**  Filed By:  PJM Interconnection, L.L.C.
Filed Date:  8/16/2021
Accession No.:  20210816-5257
Description:  Request for Clarification of PJM Interconnection, L.L.C. for the July 15, 2021 Order under ER20-1068.

**46.**  Filed By:  Edison Electric Institute, WIRES
Filed Date:  8/16/2021
Accession No.:  20210816-5229
Description:  Request for Rehearing of the July 15, 2021 Order of Edison Electric Institute and WIRES under ER20-1068.

**47.**  Issued By:  Secretary Of The Commission, FERC
Filed Date:  9/16/2021
Accession No.:  20210916-3042
Description:  Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration re The Dayton Power & Light Company under ER20-1068.

**Record**
**Item No.**     **Description**

48.     Filed By:  The Dayton Power and Light Company, American Electric
        Power Service Corporation, et al.
        Filed Date:  11/22/2021
        Accession No.:  20211122-0010
        Description:  Petition for Review filed in the U.S. Court of Appeals
        for the Sixth Circuit of The Dayton Power and Light Company,
        American Electric Power Service Corporation etc. under ER20-1068.

49.     Filed By:  The Dayton Power and Light Company
        Filed Date:  1/24/2022
        Accession No.:  20220124-5201
        Description:  Compliance Filing of The Dayton Power and Light
        Company with respect to the Clinton 345 kV/69 kV Transformer
        Project under ER20-1068, et al.

50.     Issued By:  Secretary Of the Commission, FERC
        Filed Date:  2/15/2022
        Accession No.:  20220215-3068
        Description:  Errata to the 01/25/2022 Combined Notice of Filing #1
        re The Dayton Power and Light Company under ER20-1068 et al. For
        notice see accession number 20220125-3061.

51.     Issued By:  Commissioners And Immediate Staff (The Commission),
        Secretary Of The Commission, FERC
        Filed Date:  2/17/2022
        Accession:  20220217-3113
        Description:   Order Addressing Arguments Raised on Rehearing re
        The Dayton Power and Light Company under ER20-1068.
        Commissioner Danly is dissenting with a separate statement attached.

              In witness whereof I have hereunto subscribed and
        caused the seal of the Federal Energy Regulatory
        Commission to be affixed this 14th day of July, 2023, at
        Washington, DC.

                            /s/ *Kimberly D. Bose*
                            Kimberly D. Bose,
                                Secretary.

11

**JA11**

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d) and Circuit Rule 25, I hereby

certify that on the 14th day of July 2023, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit

by using the CM/ECF system.  All participants in the case are registered CM/ECF

users and will be served by the CM/ECF system.


/s/ Carol J. Banta
Carol J. Banta
Senior Attorney


Federal Energy Regulatory
  Commission
888 First Street, NE
Washington, DC  20426
Tel.:  (202) 502-6433
Email:  carol.banta@ferc.gov

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power and Light Company     )                    Docket No. ER20-__-000

APPLICATION OF
THE DAYTON POWER AND LIGHT COMPANY
TO ESTABLISH INCENTIVE RATE TREATMENT
FOR QUALIFYING TRANSMISSION PROJECTS
PURSUANT TO SECTIONS 205 AND 219 OF
<u>THE FEDERAL POWER ACT AND REQUEST FOR WAIVERS</u>

       The Dayton Power and Light Company ("DP&L") hereby requests that the Federal Energy Regulatory Commission ("FERC" or the "Commission"), pursuant to Section 205 of the Federal Power Act ("FPA") and Part 35 of the Commission's Regulations, Section 1241 of the Energy Policy Act of 2005 ("EPAct 2005") (adding Section 219 of the FPA), and Order No. 679,[1] approve the specific, requested incentive rate treatments described below for the construction of transmission projects needed to meet required North American Electric Reliability Corporation ("NERC") reliability criteria and other transmission projects that are critically-needed reliability improvements to the DP&L transmission system. The incentives are being sought for the Transmission Enhancement Plan ("TEP") projects listed in Appendix A that are planned to be in service before the end of 2024. By themselves, these TEP projects are estimated to cost approximately $170 million and will improve the reliability of the DP&L

---

[1] Federal Power Act, §§ 824d and 824s; 18 C.F.R. Part 35; and Promoting Transmission Investment Through Pricing Reform, Order No. 679, FERC Stats. & Regs. ¶ 31,222 (2006); *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006).

transmission system.  This level of investment in transmission projects represents a 40% increase in DP&L's current gross transmission investment.[2]

The requested incentives are proposed to remain in place and apply to DP&L's TEP projects listed in Attachment A.  This is a subset of DP&L's total planned transmission investment, since DP&L plans to continue to invest in transmission projects to maintain, repair or make minor upgrades to existing facilities that have typically averaged between $5 million to $14 million per year.

It is further noted that DP&L's current transmission rates are fixed, stated rates that are also the lowest transmission rates of any of Ohio's investor-owned utilities.  DP&L forecasts that there will be a gap in the future between the actual transmission costs required to maintain reliable service and the revenues under the current stated rate.  Therefore, in the near future, DP&L will be filing to establish a formula rate mechanism and protocols to set new transmission rates that would be trued-up and reset annually.  This will ensure timely recovery of DP&L's transmission costs, including the costs TEP projects that are needed to maintain a reliable transmission system to serve customers in the Dayton zone.

DP&L requests that the transmission incentives be implemented contemporaneously with the effective date that will be established by the Commission in its review of the transmission formula rate filing that DP&L plans to file under FPA section 205 in March 2020.

## I.     BACKGROUND

### A.     Description of Applicant.

DP&L is an Ohio public utility that owns transmission facilities subject to the functional control of the PJM Interconnection, LLC ("PJM") and provides electric distribution services to

---

[2]  As compared to DP&L's year-end 2018 gross transmission investment of $412 million, as reported in FERC Form 1, p. 206.

deliver electric energy to over 520,000 customers in the Dayton, Ohio area.  DP&L is a signatory to the PJM Operating Agreement.  DP&L's transmission and sales for resale of electric energy in interstate commerce are regulated by the Commission, while its retail electric services are regulated by the Public Utilities Commission of Ohio ("PUCO").  DP&L is authorized by the FERC to make sales for resale at market-based rates.[3]

DP&L is an indirect, wholly-owned subsidiary of The AES Corporation, which is a Fortune 500 global power company that provides affordable, sustainable energy to 14 countries through a diverse portfolio of distribution businesses as well as thermal and renewable generation facilities, with 2018 revenues of $11 billion and assets of $33 billion.

**B.    The Current DP&L Transmission System.**

DP&L provides electric service to over 520,000 customers in 24 counties over a 6,000 square mile service territory, and these customers rely on the transmission system to deliver reliably the electrical energy they need.  DP&L's current transmission system includes 310 miles of 345 kV transmission, 380 miles of 138 kV transmission and 992 miles of 69 kV and below transmission.[4]    DP&L also owns and operates nine substations operating at 345 kV, 31 substations operating at 138 kV, and 114 substations operating at 69 kV or below.  DP&L's transmission system is interconnected with the transmission systems of Ohio Power Company, Duke Energy Ohio, Inc., American Transmission Systems, Inc., and East Kentucky Power Cooperative.  DP&L is also interconnected with several municipalities and electric cooperative companies whose loads are wholly within the Dayton Zone, as that term is used within PJM.

---

[3]  *The Dayton Power and Light Co.*, ER12-1776-000 (July 3, 2012).  FERC Rate Schedule No. 10.

[4]  63 miles of 138 kV are underbuilt on 345 kV structures; 76 miles of 69 kV are underbuilt on either 345 kV or 138 kV structures.

## II.    IDENTIFICATION AND DESCRIPTION OF REQUESTED INCENTIVES

### A.    Requested Incentives.

FPA Section 219(a) directs the Commission to establish "incentive-based . . . rate treatments."  Section 219(b) requires that the Commission's rules, among other things, provide a return on equity that attracts new investment in transmission facilities.  Section 219(c) requires that the Commission's rules provide incentives to each transmitting utility that joins a Regional Transmission Organization.  Order No. 679, issued to implement these requirements, clarifies at ¶55 that "an applicant may request any combination of the incentives" provided for therein and, in addition, may request additional incentives.  Order No. 679-A at P 6 clarifies that applicants must demonstrate that "the <u>total</u> package of incentives is tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project." [Emphasis in original.]

DP&L is hereby requesting one incentive that predates Order No. 679 and two of the Order No. 679 authorized incentives.  Specifically, DP&L respectfully requests that the Commission authorize the following rate incentives to be reflected in rates only after the effective date of a rate change authorized pursuant to a separate transmission formula rate filing under Section 205 of the FPA:

1.  A 50 basis point adder to the authorized return on equity ("ROE") to reflect DP&L's continued membership in PJM Interconnection, L.L.C. ("PJM") ("RTO Adder") with such ROE not to exceed the upper end of the zone of reasonableness.  This incentive predates Order No. 679 and, to DP&L's knowledge, has been authorized for every transmission owner operating within PJM that has a formula-based transmission rate.  DP&L requests that this incentive apply to its entire transmission rate base, including both TEP projects and non-TEP project investments.

2.  For TEP projects only, authorization to include 100% of construction work in progress ("CWIP") in rate base.  Accordingly, if granted and once reflected in rates, DP&L would cease accruing AFUDC on the TEP projects.  This incentive was approved by the Commission in

*Duquesne Light Co.*, 118 FERC ¶ 61,087 at PP 59-60 (2007) ("*Duquesne 2007*"), subsequently approved for many other transmission owning utilities, and approved again as recently as last year in another Duquesne case, *Duquesne Light Co.*, 167 FERC ¶ 61,081 at P 30 (2019) ("*Duquesne 2019*").

3.    For TEP projects only, authorization to recover all prudently incurred transmission-related development and construction costs if one or more TEP project are cancelled or abandoned, in whole or in part, as a result of factors beyond DP&L's control. This incentive was also approved by the Commission in *Duquesne 2007, supra,* at P 61, subsequently for many other transmission owning utilities, and again in *Duquesne 2019, supra,* at P 25.

**B.    Implementation of Requested Incentives.**

DP&L is requesting that the incentives be authorized as of the date of a Commission order approving them. It is understood, however, that implementation of the incentives and their reflection in rates will only occur as of the date that a separate filing under FPA section 205 is made and made effective by the Commission. In this regard, DP&L intends to file in March 2020 an FPA section 205 filing to establish a formula rate and protocols that would have within the formula rate placeholders for the implementation of any incentive rate mechanisms approved in this proceeding. The rate change to reflect the formula rate and these requested incentives would be the first day that the Commission authorizes such rates to go into effect.

### III.    SUMMARY DESCRIPTION OF
### DP&L TRANSMISSION ENHANCEMENT PLAN ("TEP")

**A.    The Need for Transmission Enhancements.**

DP&L is required to meet NERC criteria to ensure the reliability of the Bulk Power System that serves the Dayton area load. The DP&L transmission system is also part of the wider PJM transmission system. PJM does transmission planning studies of the Bulk Electric System, consistent with NERC standards that apply to facilities operating at and above 100 kV. DP&L conducts its own transmission studies for its 69 kV transmission facilities. Under certain

outage or system conditions, the transmission system will need reinforcements to continue operating within its rated limits. While most of these projects are specifically planned to meet NERC planning standards, there are certain projects in this category needed for operational system voltage issues that are identified through DP&L's studies. Some of these issues surface only at certain load levels that may occur regularly in operations but are not studied within the context of the PJM transmission planning studies. DP&L developed the portfolio of TEP projects to improve area voltage profiles, ensure adequate thermal loadings on transmission facilities, and address operational issues that surface under different load and generation scenarios, including under scenarios affecting 69 kV transmission facilities.

In addition to meeting our required NERC reliability obligations, DP&L is tasked with evolving its legacy system of 1,682 miles of transmission line miles and 154 substations to meet the reliability needs of our customers. The DP&L transmission system was largely built out in the 1950's through 1970's. Presently, approximately 60% of transmission line facilities are greater than 50 years old and approximately 500 miles of wood pole 69kV lines will be at least 60 years old by 2025. While DP&L does not intend to establish a blanket requirement that any line or structure of a certain age be replaced, internal evaluations of poorly performing circuits and other data on outages and maintenance requirements indicate that selective replacement of older transmission facilities and enhanced system configurations (i.e. addition of circuit breakers at tapped substations) will improve customer reliability. DP&L faces major challenges addressing reliability issues while also working to modernize the system. The TEP projects will play a major role in ensuring reliability through the changes happening on the system.

**B.**    <u>**Identified Reliability Upgrades**</u>.

The TEP projects listed in Attachment A as RTEP Baseline Projects and Supplemental Projects have been identified by PJM and DP&L, respectively, as upgrades or new facilities necessary to resolve NERC reliability violations or to address other critically needed reliability improvements to the Dayton transmission system.

For the PJM RTEP Baseline Projects, PJM's annual RTEP filings incorporate a description of the project and the regional reliability violation identified by PJM.[5]    Summary descriptions of the Baseline Projects (referred to below as within Category 1) are also provided below in this Application section VI.B.2.    For each of the Supplemental Projects (Categories 2 and 3), sections VI.B.3 and VI.C. below, respectively, identify the basis and need for the project.

**C.**    <u>**Planned In-Service Dates**</u>.

Engineering and other project planning work is under way for the TEP projects that are expected to be in-service dates on or before the end of 2024.    As shown in Attachment A, almost all the TEP projects will be placed into service by the summer of 2023.    This timeline for the TEP projects is similar to but slightly longer than the three-year timeline set forth in *Duquesne 2007*, *supra*, at P 5 (2006 filing including facilities to be in service by 2009).    There may be subsequent phases of the DP&L TEP planned over the next few years for upgrades or new facilities to be in service after 2024.    DP&L is not requesting, at this time, transmission incentives that would apply with respect to these potential future projects.

---

[5]  *See, e.g., PJM Interconnection, L.L.C.,* Docket No. ER19-2708-000, Application (Aug. 29, 2019) at pdf pp. 38-40, identifying Baseline projects b3108.1. b3108.2 and b3108.3 to install a 100 MVAR reactor in each of three substations in order to rectify NERC criteria violations of "High voltage across the Dayton system."

D.    **Summary Description of Need for Transmission Enhancements and Incentives**.

DP&L has determined that the portfolio of transmission projects listed in Attachment A is needed to address current reliability concerns and to ensure the sustainability of the DP&L transmission system.  The projected investment in the TEP projects would increase DP&L's gross transmission plant in service by approximately 40% over the next four years and its net transmission investment by 90%.[6]  There are two primary drivers to this transmission expansion.

First, DP&L, as a member of PJM, is subject to PJM transmission reliability requirements, including those associated with PJM's Regional Transmission Expansion Plan ("RTEP").  The TEP projects listed herein on Attachment A that have been approved under the RTEP as PJM Baseline Projects are identified as such in Category 1 of Attachment A, consistent with PJM terminology.

A second driver is based on the need to address system reliability performance issues based on DP&L's local transmission planning criteria and planning assumptions. These reliability issues have caused excessive customer outages and other operational issues, and are the result of a variety of factors such as aging infrastructure, legacy system design and electrical configurations, and retirements of generation plants in the region.  The TEP projects addressing those issues can be found in Categories 2 and 3 of Appendix A as Supplemental Projects, again consistent with how PJM designates such projects.

The Commission has approved PJM's RTEP process as just and reasonable. Accordingly, as the product of this Commission-approved RTEP process, the PJM Baseline Projects are needed to ensure reliability or to reduce the cost of delivered power by reducing

---

[6]  Projected TEP investment of $170 million; FERC Form 1 (2018) Gross Transmission Plant of $412 million (page 206, line 58, col. (g)); Net Transmission Plant of $189 million (Gross Transmission Plant minus $223 million in reserve for depreciation (page 219, line 25).

congestion (18 C.F.R. §35.35(i)) and they satisfy the rebuttable presumption under FPA § 219 under 18 C.F.R. 35.35(ii).  With respect to the projects in Attachment A designated as Supplemental Projects, those that involve equipment operating at 125 kV and above are required to be approved by the Ohio Power Siting Board and, as such are rebuttably presumed to meet the requirements of FPA § 219 under 18 C.F.R. §35.35(ii).  Additionally, all these Supplemental projects, including the ones operating at 69 kV, are incorporated by PJM into the Commission-approved RTEP planning processes as Supplemental Projects.

Each of the projects listed in Attachment A is supported by DP&L's materials presented in this Application that demonstrates that these projects meet objectives set forth in FPA section 219.  Evidence is also presented herein to demonstrate that the total package of incentives is tailored to address the demonstrable risks or challenges faced by DP&L in undertaking the projects.

The rate incentives that DP&L is requesting herein are necessary to provide adequate revenues and support to finance the TEP projects and to help maintain DP&L's credit quality. DP&L, therefore, respectfully requests the Commission to authorize the rate incentives requested herein.

## IV.  DESCRIPTION OF SUPPORTING DOCUMENTS

Attachment A to this Application lists all the TEP projects for which DP&L is requesting all three incentives and includes the year-by-year projected costs and planned in-service date of each project.

Attachment B to this Application contains selected pages from six PJM documents, labeled Attachments B-1 through B-6, that identify DP&L's Baseline and Supplemental Projects. These include: Attachment B-1 consisting of relevant pages from PJM's filed and approved

Open-Access Transmission Tariff showing as Required Transmission Enhancements the projects that are listed in Attachment A; Attachment B-2 consisting of relevant pages from PJM's RTEP filing in Docket No. ER19-2708-000 showing the reliability problems being resolved by project b3108 listed in Attachment A; Attachment B-3 consisting of relevant pages from a 2011 Report of the Sub-Regional RTEP Committee for the PJM West Region showing certain of the Supplemental Projects listed in Attachment A; Attachment B-4 consisting of relevant pages from a 2018 Report of the Sub-Regional RTEP Committee for the PJM West Region showing the Cisco to Bodkins Supplemental Project listed in Attachment A; Attachment B-5 consisting of the relevant pages from the 2019 PJM Local Plan for the Dayton Zone developed under the protocols now set forth in PJM's M-3 Process and showing certain Supplemental Projects listed in Attachment A, and Attachment B-6 showing an additional Supplemental Project incorporated into the 2020 Local Plan for the Dayton Zone.

Attachment C to this Application is the Affidavit and Verification of Michael F. Russ, DP&L's Manager of Transmission Planning, filed in support of this Application and verifying the facts set forth herein.

## V.    STATEMENT OF ISSUES

1.    Whether the Commission should find that the DP&L TEP projects qualify for the incentives contemplated by Section 219 of the FPA?

Answer:  Yes.

Relevant authorities:  EPAct 2005 §§ 1223 and 1241; Order No. 679, supra.; *Duquesne Light Co 2007, supra; Duquesne Light Co. 2019, supra*; *American Electric Power Service Corp.*, 116 FERC ¶ 61,059 (2006); *Allegheny Energy, Inc.,* 116 FERC ¶ 61,058 (2006); *United Illuminating Co.*, 167 FERC ¶61,126 (2019).

-10-

In further support of its Application, DP&L states as follows:

## VI.     FACTORS SUPPORTING THE APPLICATION

### A.     Overview.

DP&L will make significant reliability investments in the TEP projects to meet NERC reliability requirements and to ensure DP&L addresses other reliability needs on its transmission system. DP&L has excelled at maintaining and responding to outages on its transmission system throughout its history, as evidenced by its receipt recently of an EEI Emergency Response Award for recovery efforts after 15 tornadoes touched down in the Dayton area on May 27, 2019. The TEP projects will enable DP&L to expand its excellence in operations into the future by ensuring that mandatory NERC criteria are met and by improving the overall reliability of its transmission network.

It is noteworthy that DP&L has been able to perform at a high level without having to seek transmission rate increases. DP&L has not had a transmission rate increase since 1998 and currently has the lowest network transmission rate of any major Ohio utility.[7]

Projects included here are part of PJM's multi-year transmission expansion plan resulting from the RTEP process. The DP&L TEP projects that are designated by PJM as "Baseline" projects are designed to satisfy NERC reliability criteria by (1) relieving overloaded facilities, (2) providing critically needed redundancy for contingency situations, and (3) improving voltage support. The DP&L TEP projects that are designated by PJM as "Supplemental Projects" are designed to address other operational performance issues that include thermal overloads, low and

---

[7] Within PJM's tariff (OATT Attachment H-15), DP&L's current network integrated transmission service rate is $1,046.79 per MW per month. AEP East's NITS rate as of January 1, 2020, is 34,750.39 per MW per year or $3,227.22 per MW per month. ATSI's NITS rate is $57,340.35 per MW per year or $4,778.36 per MW per month. Duke Energy Ohio's NITS rate is $1,671 per MW per month.

-11-

high voltage issues, excessive outages and other poor performance under certain operating conditions and result from applying DP&L's local transmission planning criteria and planning assumptions.

As discussed with respect to each requested incentive, DP&L's TEP is "rationally related to the incentives being proposed."[8]   The DP&L TEP represents a major undertaking for a company the size of DP&L because:

> Even excluding other investment in transmission plant, the TEP projects will increase DP&L's gross transmission plant in service by about 40% and its net transmission plant by 90% in just five years;

> The TEP projects will require capital expenditures that average approximately $35 million per year for the next four years, or more than three times DP&L's net annual average transmission plant additions over the past several years;

> The capital needed to finance the TEP will decrease DP&L's cash-flow coverage ratios and put downward pressure on DP&L's credit rating, which is currently at or only slightly higher than the lowest level considered investment grade and on a negative outlook watch.[9]

The DP&L TEP poses significant business, financial, and regulatory risks.   The incentives that DP&L is requesting have a direct nexus in overcoming these risks.   The incentives requested will provide a greater degree of regulatory certainty, reduce the magnitude of the negative effects that financing these projects would otherwise have on DP&L's cash flow and credit rating, and will promote new transmission investment that is necessary to ensure continued reliable transmission service and the sustainability of DP&L transmission

---

[8]  Order No. 679, *supra*, at P 48.

[9]  Standard and Poors Financial Services LLC ("S&P") rates DP&L's senior secured debt at its lowest level considered investment grade, BBB-, with a negative outlook.  Moody's Investors Service, Inc. ("Moody's") rates DP&L's senior secured debt at A3 with a negative outlook and DP&L's issuer rating at Baa2, one notch above the lowest investment grade rating, with a negative outlook.

infrastructure.  As such, DP&L submits that its request falls squarely within the eligibility guidelines set forth in Order No. 679.

**B.      There is a Rebuttable Presumption for Incentive
         Rate Treatment for the Projects Grouped into Categories 1 and 2 of Attachment A.**

       1.      Presumptions of Eligibility.

As set forth in Order No. 679 at P 58:

> [T]he Commission will rebuttably presume that transmission projects that result from a fair and open regional planning process that considers and evaluates projects for reliability and/or congestion and is found to be acceptable by the Commission satisfy the requirements of this Rule. . . . We will also attach a rebuttable presumption that an applicant has met the requirements of section 219 . . . where a project has received construction approval from an appropriate state commission or state siting authority."

The projects listed in Attachment A fall into three categories:  1) Baseline Projects identified and selected by PJM through its RTEP process as necessary to resolve NERC reliability violations; 2) Supplemental Projects incorporated into PJM's RTEP that operate at or above 125 kV and which are required under Ohio law to be approved by a state agency after making a determination of public need; and 3) Supplemental Projects incorporated into PJM's RTEP that are needed to enhance reliable operations not directly modeled by the RTEP baseline process, and, because they operate at voltage levels below 138 kV, are not subject to state agency approval.  The first two categories are eligible for the rebuttal presumption of eligibility under FPA § 219.  The third category is discussed separately below.

       Unless otherwise noted, all references to transmission lines and substations are transmission facilities wholly-owned by DP&L.

2.    <u>Category 1:  PJM Baseline Projects</u>.

The Commission has accepted PJM's RTEP as just and reasonable and has accepted the PJM RTEP to meet the requirements of Order No. 679.[10]  Each of the TEP projects identified in Appendix A as "Baseline" are incorporated into the PJM RTEP in order to resolve a reliability violation that PJM has identified.  These Baseline projects receive the rebuttable presumption of eligibility for incentives set forth in Order No. 679.

As further support for the eligibility of the PJM Baseline projects, DP&L first notes that the Baseline Projects, even without considering other projects, constitute a major investment for a utility DP&L's size.  DP&L is obligated to construct these PJM Baseline Projects to be in-service between 2020 and 2022 with projected costs of $82.5 million, including $9.8 million already incurred and an additional $72.7 planned for the period 2020-2022.  As of year-end 2018, DP&L's current net transmission plant was $412 million.  An $82 million investment may not significantly strain the financial responses of larger transmission owners, but for a utility DP&L's size it represents a hefty 20% increase in gross transmission plant over only a three-year period.  The cash flow strains and other financial effects of financing that percentage increase in transmission plant will place an extraordinary burden on DP&L, particularly given DP&L's credit ratings that are currently barely investment grade and on a negative credit watch.[11]

---

[10]    *Duquesne 2007, supra* at PP 65.

[11]    As noted in footnote 9 above, DP&L's current credit rating is BBB- by Standard & Poors, which is its lowest investment grade rating.  Moody's rates DP&L at A3 for senior secured debt but only Baa2 as an issuer rating, or one notch above its lowest investment grade rating.  And all three ratings are subject to a negative outlook watch.  It is DP&L's understanding that most public utilities regulated by the FERC have investment grade ratings at or above this level.  Thus, DP&L's credit rating is already below the average rating for public utilities regulated by the FERC.

-14-

A brief description of each baseline project and its need as determined under PJM's regional planning process is summarized here:

a.  <u>West Milton Substation Transformers (PJM b1275, b1276)</u>

This project and the related West Milton area projects listed below in subparts b. and c. are all PJM baseline projects approved by PJM and are mandated Regional Transmission Expansion Plan (RTEP) Project.  The projects are being constructed to resolve a NERC reliability criterion violation related to the multiple contingency outage of DP&L's Shelby-Sidney 138 kV circuit and DP&L's Miami-Eldean 138 kV circuit, which results in voltages below the minimum acceptable level per NERC reliability criteria at multiple transmission buses. The projects will resolve loading issues on the existing West Milton 345/138 kV transformer for the loss of the Miami-Bath 345 kV transmission line and Miami-West Milton 345 kV transmission line.  This particular portion of the project will install a second 345/138 kilovolt (kV) transformer, a second 138/69 kV transformer, and facilities for the new West Milton-Eldean 138kV line at the existing West Milton Substation, which will also help relieve thermal loading issues associated with the West Milton-Greenville 138 kV transmission line for the contingency of a loss of the existing 138/69 kV transformer at West Milton Substation.  Overall, this set of projects will help provide sufficient operating capacity, operational flexibility, and reliability to the northern Dayton metropolitan area.

b.  <u>West Milton-Eldean 138kV line (PJM b1572)</u>.

This portion of the set of West Milton area project has been approved by PJM and is a mandated RTEP Project.  As described above, this project is part of a set of projects to resolve a NERC violation that would arise at multiple transmission facilities under various loss contingencies.  This particular portion of the set of projects involves the construction of a 16.7-

-15-

mile single circuit 138 kV transmission line from the existing West Milton Substation to the existing Eldean Substation.

### c. West Milton – Salem/Englewood Rebuild/Reconductor Transmission Lines (PJM b1269)

This portion of the set of West Milton area project has been approved by PJM and is a mandated RTEP Project. As described above, this project is part of a set of projects to resolve a NERC violation that would arise at multiple transmission buses under various loss contingencies. This particular portion of the set of projects entails rebuilding a 1920's vintage double circuit 69kV transmission line serving customers in the Northwest Dayton service territory. These circuits share the same structures for a total distance of 8.6 miles. The existing 336 ACSR conductor will be replaced with 795 ACSR conductor to increase the circuit's capacity based on PJM requirements. The rebuilds of the West Milton-Salem and West Milton-Englewood 69kV transmission lines will help resolve aging infrastructure concerns and improve capacity and reliability for customers in this area.

### d. New and Reconductored Transmission Lines in the Maryville Area (PJM b1570.1, b1570.2, and b1570.3)

This baseline project identified with three PJM baseline subparts, and the related project b1570 listed below in subpart e. are all PJM baseline projects approved by PJM and are mandated RTEP Projects. The projects are being constructed to resolve NERC reliability criterion violations that include an overload on the Quincy-East Sidney-Shelby 138 kV line if there is a loss of the Darby 138/69 kV transformer and Urbana 138/69 kV transformer, and low voltage issues arising at several buses in the Marysville area under various transformer contingencies. This particular portion of the related projects entails constructing 2.5 miles of new double circuit 69kV line from the new Peoria Substation and rebuilding 17 miles of 69kV

circuit 6619 from Darby Substation to the Honda Marysville Tap.  The existing 69kV line from Darby Substation to Honda East Liberty Substation is approximately 22 miles long and was constructed in 1968 with wood poles.  The final configuration will split the existing circuit 6619 into two circuits: (1) Peoria-Darby and (2) Peoria-Union REA-Honda Marysville-Honda East Liberty.  In addition to resolving the PJM identified NERC reliability criterion violations in the Marysville area, these projects are needed to meet growing customer needs for transmission capacity and reliability in this area.

e.  Marysville (Peoria) Substation (PJM b1570).

As described above in subpart d., this project is part of a related set of projects necessary to resolve PJM identified NERC violations.  This particular portion of the set of projects will construct a new transmission substation called Peoria Substation.  Peoria Substation will include a 345/69kV transformer, a single 345kV circuit breaker, and a three-breaker 69kV ring bus.  The project has been approved by PJM and is a mandated RTEP Project.

f.  Bath-Trebein Reconductor 138kV line (PJM b1270)

This project is being constructed as a PJM baseline upgrade required to resolve a NERC reliability criterion violation related to an overload of the Bath-Trebein 138 kV transmission line in the event of the loss of both Greene 345/138 kV transformers.  This project will reconductor the existing 138 kV transmission line connecting the existing Bath Substation to the existing Trebein Substation. The transmission line is approximately 4.6 miles in length. There will be one new steel pole structure associated with the project, but the remaining existing transmission line towers will remain as is.  The project has been approved by PJM and is a mandated RTEP Project.  Additionally, this Project will help provide sufficient operating capacity, operational flexibility, and reliability to the metro Dayton load center which provides service to some of

-17-

Dayton's largest customers.

### g. Bath Substation Transformer (PJM b1273)

This Project will install a second 345/138kV transformer at Bath Substation. The project has been approved by PJM and is a mandated RTEP Project. The project is being constructed as a baseline upgrade required to resolve a NERC reliability criterion violation related to an overload of the Greene 345/138 kV transformer #1 if there is a loss of the Greene Substation 345/138 kV transformer #2 and the existing Bath Substation 345/138 kV transformer. Additionally, this Project will help provide sufficient operating capacity, operational flexibility, and reliability to the metro Dayton load center which provides service to some of DP&L's largest customers.

### h. Trebein Substation Transformer (PJM b1274)

This project will install a second 138/69kV 200MVA transformer at the existing Trebein Substation. The project has been approved by PJM and is a mandated RTEP Project. The second 138/69kV 200 MVA transformer at Trebein substation is required to resolve low voltage issues that arise in the southeast part of the DP&L transmission system in the event of the loss of various existing transformers.

### i. System Reactors for Voltage Control (PJM b3108.1, b3108.2, b3108.3)

This project will install new 100MVAR reactors at the Miami, Sugarcreek, and Hutchings Substations. These projects have been approved by PJM and are mandated RTEP Projects. Both as modeled and as actually experienced, minimum or very low load conditions can result in high voltage conditions throughout DP&L's transmission system. DP&L has experienced an excessive amount of high voltage alarms over the past few years. One contributing factor to this was the retirements in 2018 of the Stuart and Killen coal-fired

generation stations, which resulted in the loss of ~600 MVAR of reactive absorption capability in the DP&L zone.  In addition to implementing typical operating procedures, DP&L is frequently forced to switch out equipment to avoid long-term damage from high voltage exposure. This practice of switching out equipment is not a sustainable operating practice and does not effectively solve the high voltage issues.  The three new reactors will greatly improve the ability of DP&L System Operations to control voltage across the system.

   3.    Category 2.  PJM Supplemental Projects
         Requiring Approval by a State Siting Agency.

   DP&L is entitled to a rebuttable presumption that the TEP projects within Category 2 satisfy the requirements of Order No. 679.

   Order No. 679 establishes a rebuttable presumption that projects constructed pursuant to an approval of a state agency meet the standard set forth in FPA section 219.[12]  Under Ohio law, the Ohio Power Siting Board ("OPSB") has jurisdiction to review and approve any "major utility facility," including electric transmission lines and substations operating at 125 kV or more.[13]  In order to approve the construction and operation of the major electric facility, the OPSB is then required to make determinations of public need and, with respect to electric transmission lines, find consistency with regional plans and that the facility serves the interests of reliability.[14]  Each of the Supplemental projects identified in Appendix A that operate at 138 kV or above have been

-------

[12]  *Order No. 679, supra* at P 58.

[13]  Ohio Revised Code § 4906.01(B)(2).

[14]  Ohio Revised Code, § 4906.10(A)(1) and (4) ("The board shall not grant a certificate for the construction, operation and maintenance of a major utility facility, either as proposed or as modified by the board, unless it finds and determines all of the following:  (1) The basis of the need for the facility. . . .  (4) In the case of an electric transmission line, that the facility is consistent with regional plans for expansion of the electric power grid of the electric systems serving this state and interconnected utility systems and that the facility will serve the interests of electric system economy and reliability. . . ."

or will be submitted in the near future to the OPSB to make a public need determination on the basis of enhancing reliability.

As further support for the eligibility of the projects approved by a state siting agency, DP&L first notes that these projects are not standing alone as the only significant projects that need to be constructed over the next few years. As noted above, DP&L is obligated to construct a number of PJM Baseline Projects to be in-service between 2020 and 2022 that are projected to cost $82.5 million. The Supplemental Projects that are or will be approved by a state siting agency are projected to cost an additional $26.7 million over the next four years (2020-2023). Together these costs total $109.2 million, which constitute a major investment for a utility DP&L's size. As of year-end 2018, DP&L's current net transmission plant was $412 million. An investment of $109 million for a utility DP&L's size represents a very sizable 26% increase in gross transmission plant over only a four year period. Financing that percentage increase in transmission plant will place an extraordinary strain on DP&L's cash flow and potentially impair its credit rating, which are barely investment grade now.[15]

The reliability need and status for each of the projects that are or are expected to be approved by the OPSB are summarized below:

a.    Buckeye Haas Delivery Point, Bethel Township (PJM s1847)

This project will tap the 138kV Miami to New Carlisle transmission line to serve a new customer substation. The purpose of this project is to tap DP&L's 138kV transmission line from Miami Substation to New Carlisle Substation and extend a 138kV line for approximately 600

---

[15] DP&L's current credit rating is BBB- by Standard & Poors, which is its lowest "investment grade" rating. Moody's issuer credit rating for DP&L is Baa2, or one notch above its lowest investment grade rating. And these ratings are issued with a "negative outlook," which the rating agencies use to signal that a downgrade is more likely that an upgrade.

-20-

**JA32**

feet (0.11 miles) to provide power to Pioneer Rural Electric Cooperative's new Haas Substation. A line will be constructed from the existing Miami to New Carlisle 138kV line (13838) to a tap pole on the new Haas Delivery Point line, which will subsequently connect to the new Pioneer Rural Electric Cooperative Haas Substation. This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project. This project has been approved for siting and construction after a finding of need by the Ohio Power Siting Board, Case No. 19-1347-EL-BNR (Jan. 21, 2020).

        b.    <u>Gebhart Substation 138kV (PJM s1874).</u>

This project will tap the existing Hutchings-Sugarcreek 138 kV line and loop the 138 kV in and out of a new Gebhart Substation. There will be a single 138/12kV distribution transformer installed at the new substation and three new 138 kV breakers arranged in a ring bus configuration. There is significant load growth in the area east of I-75 and south of I-675 which has resulted in existing distribution circuits approaching, and in some cases exceeding, their thermal rated capacity. There are no ties in the vicinity of the load center with enough unused capacity to serve growing loads. This new substation and transmission extensions will ensure DP&L is able to keep providing reliable service to customers in the growing load center. This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project. DP&L has an application pending for siting and construction authority after a finding of need by the Ohio Power Siting Board in Case No. 20-0031-EL-BNR (filed Feb. 11, 2020).

        c.    <u>South Charleston (Madison) Substation 345kV (PJM s0322)</u>

This project will tap the existing DP&L Greene to Beatty 345kV line and establish a new 345/69kV substation (Madison Substation). The Madison substation will include a 345kV and

69kV ring bus design. The project is needed to provide reliability through a new source to radial substations in the southeastern portion of the DP&L service territory. The proposed new Madison 345kV substation will provide service to the 69kV South Charleston and Jeffersonville facilities. This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project. DP&L intends to file an application with respect to this project for siting and construction authority after a finding of need by the Ohio Power Siting Board before the end of 2020.

       d.     Clinton 345/69kV Transformer (PJM s0324)

This project will install a second 345/69kV transformer at the Clinton Substation. This will also require the addition of three 345kV breakers to establish a ring bus, 69kV circuit breakers, and associated equipment. It is needed to relieve operational loading and reliability concerns on the 69k system in the area. This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project. DP&L intends to file an application with respect to this project for construction authority after a finding of need by the Ohio Power Siting Board before the end of 2020.

       e.     Fort Recovery Line, Transformer, and Capacity Bank
             (PJM s 0326, s0327, s0328)

This related set of projects includes the construction of a new 138 kV transmission line between the existing Jay Substation owned by AEP and the DP&L Fort Recovery Substation and the installation of a new138/69 kV transformer and a 30 MVAR capacitor bank at the Fort Recovery Substation. The projects are necessary to resolve thermal overloads and low voltage issues that arise in the Northwest portion of DP&L's service territory under various operating and loss contingencies. This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project. DP&L intends to file

an application with respect to this project for construction and siting authority after a finding of

need by the Ohio Power Siting Board before the end of 2020.

**C.      The Category 3 Projects Listed in Attachment A are Eligible**
**For the Requested Incentives Because They Also Meet the**
**Reliability Enhancement Requirement of Order No. 679.**

      1.      <u>Introduction and Summary of Applicable Standards</u>.

Order No. 679 makes clear that there are mechanisms under which projects that are

neither RTEP Baseline Projects nor subject to the review and approval of a state agency may still

be eligible for incentive rates.  The applicant is not afforded a rebuttable presumption, but

incentive rates are still available if the applicant demonstrates, among the other requirements,

that "the project ensures reliability or reduces the cost of delivered power by reducing

congestion."[16]  Each of the projects identified here as part of Group 3 meet that threshold

requirement of ensuring reliability.

For DP&L and other utilities operating in PJM, Supplemental Projects are identified and

developed by transmission owners to address local reliability needs, including customer service

and load growth, equipment material condition (asset condition), operational performance and

risk, and infrastructure resilience.  PJM does not specifically approve an individual Supplement

Project.  Supplemental Projects are, however, integrated into the Regional Transmission

Expansion Planning Process that leads to an RTEP that is approved by the PJM Board.  Pursuant

to the PJM Operating Agreement, Schedule 6, section 1.6(a), "Supplemental Projects shall be

integrated into the Regional Transmission expansion plan approved by the PJM Board but shall

not be included for cost allocation purposes."

---

[16]  Order No. 679, *supra*, at P 49.

Each of DP&L's Supplemental projects in Category 3 have gone through this PJM process. They are designed to enhance reliable service to customers, to reduce and recover faster from outages, to enhance technology on the grid and to play a major role in the overall modernization of transmission equipment to meet the challenges of an evolving grid.

DP&L's request for incentive rates with respect to these Supplement Projects is based in significant part on the fact that these projects are planned for construction during the same time that DP&L is projecting to spend $109 million of PJM Baseline Projects and higher voltage Supplemental Projects that require approval from a state regulatory agency. The projected costs of $59.5 million for these additional Supplemental Projects for the period 2020-2024, when added to the $109 million costs of the other projects, creates substantial financial risks for a utility DP&L's size. This is particularly true when, as noted above, DP&L's debt rating is barely at investment grade and even its current ratings are established with a negative outlook.

2.      <u>Project-by-Project Descriptions and Justification.</u>

As summarized below, the Supplemental Projects within Group 3 meet the requirements of Order No. 679.

a.      <u>South Dayton Metro -- Sugarcreek BK-7 Ring Bus (PJM s1876.1)</u>

This project and the related projects listed below in subpart 2.b. and 2.c. are designed to relieve real-time loading issues on the Hutching-Sugarcreek 138 kV line that is regularly occurring during peak and shoulder peak times. To address these loading issues pending a more permanent solution, DP&L has been switching an existing 138/69 kV transformer out of service temporarily, which is not always a fully sufficient solution and is not a best practice. These related projects will relieve that 138 kV loading issue in a way that does not shift the overload to other lines and provide a fourth source into a growing load center. This particular portion of the

-24-

**JA36**

related projects will expand the Sugarcreek Substation by installing a 138/69 kV 200 MVA transformer, forming a new 69 kV ring bus, and building a new 69 kV line from Sugarcreek to Normandy Substation that will connect directly into the load center.  These upgrades will provide a critical fourth source into the load center which will address shoulder peak loading concerns and will improve reliability of an existing 69 kV transmission line that has historically been a poor performing circuit.  This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan as a supplemental project.

> b.    <u>South Dayton Metro -- Normandy Substation  (PJM s1876.2).</u>

This portion of the South Dayton Metro projects will convert Normandy to a complete 69kV substation and will tie back to the new 69kV source at Sugarcreek substation.  This particular portion of the project will provide DP&L Operations with greater flexibility for switching loads through parallel transformer operation at Normandy and will provide flexibility for outages in the area.  This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

> c.    <u>South Dayton Metro -- Yankee 69 kV Transmission Line (s1876.3).</u>

This portion of the South Dayton Metro projects will loop the Dayton Mall-Yankee-Normandy 69kV transmission line in and out of Yankee Substation to eliminate a three terminal line configuration.  This particular portion of the projects will require the addition of a single 69kV breaker at Yankee Substation and a single 69kV breaker at Normandy substation.  The final configuration will split the existing circuit 6671 into two circuits: (1) Yankee-Dayton Mall and (2) Yankee-Normandy.  The three terminal Dayton Mall-Yankee-Normandy 69kV was constructed in 1970 with wood poles and eliminating the three terminal line will improve

reliability. This project was submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

        d.     <u>New Lebanon to Crystal 69 kV line (PJM s0329).</u>

This project (identified in Attachment B-3 as the Garage Road-New Lebanon line) will build a new ~14 mile 69kV transmission line connecting the New Lebanon Substation to the Crystal Substation. New 69kV termination facilities will also need to be constructed at New Lebanon Substation and Crystal Substation. It is needed to provide an additional source to the 6602 line which spans a very long corridor along the western boundary of the DP&L service territory. The existing 6602 line emanates from Hutchings Substation and terminates at Crystal Substation with taps in between at Camden Substation, Gratis Substation, and Germantown Substation. The 6602 line has approximately 31 miles of exposure, was constructed in 1964 with wood poles, and has been identified as one of the worst performing 69kV lines on the DP&L transmission system. This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

        e.     <u>Cisco-Botkins (PJM s1746)</u>

This project will rebuild 10 miles of the 69kV transmission line (6631) from the Sidney Substation to the Botkins Substation in order to reduce customer outages and increase overall system reliability. The existing line was built in 1971 with wood poles and plays a critical role in providing transmission service to several thousand customers in Shelby, Auglaize, and Logan counties in the northern part of DP&L's service territory. It is one of two critical 69kV lines that supplies service to those counties. The existing line has provided reliable service through its service life but in recent years, performance has decreased largely due to failing equipment. The new line will be constructed using ductile iron poles, which are lighter, stronger, more flexible,

-26-

durable, and corrosion resistant.  The project was submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

       f.       <u>Edgewood Substation (Urbana) (PJM s1875)</u>

The loads at the exiting Urbana Substation have grown beyond the capacity of the existing distribution transformers.  To avoid thermal overloads, DP&L has been employing the temporary solution of using a mobile transformer at the Urbana Substation to take load of the distribution banks that would otherwise be pushed beyond their thermal limits.  This project will tap the existing DP&L Urbana to Kings Creek 69 kV transmission line and build a new 1 mile 69 kV extension to the new Edgewood Substation. There will be a single 69/12 kV distribution transformer installed at the new substation and two new 69 kV breakers.  This transmission source will ensure that DP&L has sufficient capacity to serve the load center and offload other area substations. The solution will also enhance the ability to switch load between other substations and reduces outage exposure on the Urbana to Kings Creek 69kV line.  This project was submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

       g.       <u>Clinton to Wilmington 69kV line (PJM s0325).</u>

This project will install a second 69kV transmission line from the existing Clinton Substation to the existing Wilmington Substation.  This will entail building approximately 2 miles of new 69kV transmission.  One new 69kV breaker will need to be installed at Clinton substation and two new 69kV breaker will need to be installed at Wilmington substation.  It is needed to relieve operational loading and reliability concerns on the 69k system in the area.  This project was submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

h.    <u>South Charleston -Transmission 69 kV line (PJM s0323).</u>

This project will build new 69kV transmission lines from the new Madison Substation to the existing South Charleston Substation and to the existing Jeffersonville Substation. This will entail building a total of ~13 miles of new 69kV transmission line.  This project is needed to improve reliability performance to substations fed from a radial transmission supply.  The DP&L Glady Run to Jamestown to Xenia 69kV line has approximately 32 miles of exposure, was constructed in 1988 with wood poles, and has been identified as one of the worst performing 69kV lines on the DP&L transmission system.  The DP&L Washington CH to Jamestown 69kV line has approximately 31 miles of exposure, was constructed in 1950 with wood poles, and has been identified as one of the worst performing 69kV lines on the DP&L transmission system. This project will improve the reliability of both poor performing lines.  This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

i.    <u>Greenville 138/69kV Transformer (PJM s1846).</u>

This project will replace the existing 150 MVA 138/69kV transformer at Greenville Substation with a 200 MVA transformer.  The existing transformer failed in 2009 and was repaired.  In the summer of 2018, the existing transformer experienced several instances of rising temperatures and frequently approached its nameplate ratings.  Based on current and projected operating conditions, the transformer is undersized and could fail during peak loading conditions. This project will increase the rated capacity of the Greenville transformer to perform with adequate capacity during a wide range of loading scenarios when Greenville generation is offline to improve the reliability of this area.  This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

j.    Wolfcreek Substation (PJM s2150)

This project will tap the existing DP&L Brookville to West Manchester 69 kV transmission line to serve a new distribution substation called Wolfcreek. This new transmission tap will loop in and out of a new three breaker 69kV ring bus substation and help reduce outage exposure on the Brookville to West Manchester 69kV line to improve reliability. The project is being done to support a new industrial customer's delivery needs. It will also support local economic development and maintain system reliability for all customers. This project has been submitted, reviewed, and integrated into PJM Regional Transmission Expansion Plan by PJM as a supplemental project.

**D.    DP&L's Request for Incentives Satisfies the Commission's Nexus Requirement.**

In addition to the threshold question of whether the projects ensure reliability or reduce congestion costs, Order No. 679 requires that the applicant "show some nexus between the incentives being requested and the investment being made, *i.e.*, to demonstrate that the incentives are rationally related to the investments being proposed."[17]

As discussed below, there is a close nexus between each of the incentives that DP&L is requesting herein and the investment in TEP projects that it plans to make. Each of the incentives that DP&L has requested in this Petition will help it to mitigate risks of this major construction program, including preserving DP&L's credit quality and facilitating the completion of the DP&L TEP.

1.    The Effect of the DP&L TEP on DP&L's Credit Rating and Cash Flow.

Moody's currently assigns DP&L a long-term issuer rating of Baa2, one notch above its lowest investment grade rating. On December 20, 2019, Moody's confirmed this rating but also

---

[17]  Order No. 679, *supra*, at P 48.

revised its outlook on the Company's credit standing to "negative."[18]    This is a signal to investors that a downgrade is more likely than an upgrade and that there are concerns with DP&L's financial metrics. On November 26, 2019, S&P downgraded DP&L's corporate credit rating from BBB- to BB, which places DP&L as an issuer in the same category as speculative grade bonds.[19]  Similarly, in December 2019, Fitch also moved to lower DP&L's issuer default rating (from BBB to BBB-) and assigned a ratings outlook of "Negative" to the Company, indicating the possibility of further deterioration in DP&L's credit standing.[20]

According to Moody's, DP&L's Baa2 rating ranks the Company at the very bottom of the ratings range for other transmission and distribution operating companies,[21] with only two of the forty-one companies—Cleveland Electric Illuminating Company and Potomac Edison Company—having ratings as low as DP&L.  S&P's BB rating ranks DP&L below those for all of the other 244 North American electric, gas, and water utilities regularly compiled by S&P.[22]

The DP&L TEP represents a major capital commitment for a company the size of DP&L. DP&L's year-end 2018 gross transmission plant was $412 million.  DP&L presently estimates that the TEP will cost approximately $170 million to complete through 2024. This new

---

[18]  Moody's Investors Service, *Moody's confirms DPL and Dayton Power and Light's ratings; outlook negative*, Rating Action (Dec. 20, 2019).

[19]  S&P's rating for DP&L's senior secured debt is BBB- with a negative outlook, which is S&P's lowest investment grade ranking.  The BB rating is a corporate credit rating that is applicable for unsecured debt issuances.

[20]  Fitch Ratings, Inc., *Fitch Downgrades DPL to 'BB+' and DP&L to 'BBB-'; Outlook Negative*, Press Release (Dec. 29, 2019).

[21]  Moody's Investors Service, *Regulated Electric and Gas Utilities—US; 2020 outlook moves to stable on supportive regulation, weaker but steady credit metrics*, Outlook (Nov. 7, 2019).  In contrast to the "stable" outlook assigned to Cleveland Electric Illuminating Company and Potomac Edison Company, however, as noted earlier, Moody's has assigned a "negative" outlook to DP&L.

[22]  S&P Global Ratings, *North American Electric, Gas, And Water Utilities—Strongest To Weakest*, Issuer Ranking (Nov. 7, 2019).

investment will average about $35 million per year, which is substantially more than DP&L's typical capital spend on transmission of around $10 million per year.[23]  The major increase to capital expenditures required by the DP&L TEP projects in the face of already low credit ratings relative to other utilities who also participate in capital markets demonstrates the importance to DP&L of the incentive rate treatments requested in this Application.

    2.    <u>DP&L Meets the Requirements for the RTO Participation Adder of 50 Basis</u>.

With respect only to this incentive, DP&L requests that the RTO Participation Adder be made applicable to all of DP&L's transmission investment, whether part of the TEP or not.

The Commission has a long-standing policy that predates Order 679 that provides a 50 basis point adder to the base return on equity, which is designed to encourage transmission owning utilities to join and remain as participants within a Regional Transmission Organization. That policy continues and has recently been affirmed in *PJM Interconnection, L.L.C. and Jersey Central Power & Light Co.*, Docket No. ER20-227-000, 169 FERC ¶ 61,205 at P 30 (Dec. 19, 2019) where the Commission held that the requested 50 basis point adder for participation in an RTO is consistent with Federal Power Act section 219 and Commission precedent, so long as the resultant ROE falls within the applicable zone of reasonableness and the transmission owner remains a member of an RTO.

Although DP&L has been a member of PJM since 2004, it has not previously had any rate case in which it filed to have the Commission approve the 50 basis point RTO Participation Adder.  Its current transmission rates were originally designed when DP&L was independent of an RTO and, in 2004, were rolled-into the PJM tariff without recomputation for the 50 basis

---

[23]  Over the past 10 years, DP&L's additions to transmission plant have ranged from about $5.0 million to $15.4 million averaging a bit less than $10 million.  (This calculation excludes a year in which there were actually "negative" additions as the result of a swap of ownership interests in co-owned transmission facilities so that previously co-owned facilities were wholly-owned).

point adder.[24]

DP&L therefore requests here that the Commission authorize the incentive of a 50 basis point RTO Participation Adder to be included in a transmission formula rate and made effective when DP&L files for and the Commission makes effective a formula rate.

DP&L recognizes and accepts that the transmission formula rate may be made effective subject to refund and further accepts the standard limitations that any resultant rate of return, after this adder, remains within the range of reasonableness and that this adder remains effective only so long as DP&L remains a member of an RTO.

> 3.    The Construction Work In Progress (CWIP) in Rate Base
>        Incentive Helps Mitigate Risk During Construction.
>
> a.    DP&L's Circumstances are Aligned with Commission
>       Precedent Supporting the CWIP in Rate Base Incentive.

DP&L's current Network Integrated Transmission rate as reflected in PJM's Open Access Transmission Tariff, Sch. H-15, dates back to 2004, when DP&L joined PJM. Those rates did not include an adjustment to rate base for construction work in progress ("CWIP") that was then ongoing. Thus, DP&L has accrued Allowance for Funds Used During Construction ("AFUDC") on its construction work in process over the years. Once those facilities were placed in service, the investment, including capitalized AFUDC, is eligible to be reflected in rate base and annual depreciation expense can be recovered.[25] While this approach may have few adverse consequences for a utility whose construction costs are relatively minor and stable over time, this

---

[24] There was a recomputation to use 1 CP instead of 12 CP as a billing determinant and more recently to reflect the reduced expenses from the lower federal income tax rate.

[25] In reality, because transmission rates have been fixed, DP&L rates have not reflected even the capitalized AFUDC once the transmission plant went into service. Of course, fixed transmission rates also do not reflect changes in other factors that may have had offsetting effects.

approach can place additional stress on a company's credit rating and finances during a time when there is an unusually large construction program underway.

In Order No. 679, the Commission determined that public utilities may request authorization to recover in rates up to 100% of their construction work in progress for eligible transmission projects.[26] By providing some degree of regulatory certainty prior to the in-service date and enhancing rate stability and improved cash flow, this approach furthers the objectives of FPA 219 and Order No. 679.  In particular, it will mitigate the adverse effects on DP&L's finances that otherwise arise from major construction programs.

DP&L will be subject to exactly the same financial pressures that were facing Duquesne when the Commission stated:

> Consistent with Order No. 679, we find that authorizing 100 percent of CWIP would enhance Duquesne's cash flow, reduce interest expense, assist with financing, and improve coverage ratios used by rating agencies to determine credit quality by replacing non-cash AFUDC with cash earnings.  Considering the amount of the investment in comparison to Duquesne's average annual average investment, we find that authorization of the CWIP incentive is appropriate and this increase in cash flow will greatly assist Duquesne's ability to obtain financing for the Project.

*Duquesne 2019, supra,* at P 31.[27]

As discussed above, the approximately $170 million to be invested in DP&L's TEP projects is a significant and financially burdensome undertaking for a company the size of DP&L.  Absent the ability to include CWIP in rate base, DP&L's cash flow and its coverage ratios will suffer during the construction period.  Such cash flow declines can cause a decline in company debt ratings, with a resulting negative impact on the ability of the company to raise

---

[26]  Order No. 679, *supra*, at P 115.

[27]  *See also* Order No. 679, *supra,* at P 105; *Allegheny*, 116 FERC ¶ 61,058, at P 75; *United Illuminating Co.*, 167 FERC ¶ 61,126 at PP 35-37 (2019)

debt to finance ongoing operations.  In both Duquesne 2019 and other cases, the Commission has found that such factors justify a finding of a nexus between the investments and the incentive. [28]

It is ultimately customers who benefit from a strong credit rating because reduced costs of borrowing are ultimately reflected in lower rates to customers.  Similarly, however, deterioration in DP&L's credit quality could lead to higher interest rates and increased costs that would be borne by customers.  Thus, there is a nexus between DP&L's request to recover 100% of CWIP in rates and the burdens on DP&L arising from the DP&L TEP.  DP&L's request to recover 100% of its CWIP in current rates strikes an appropriate balance between the company's need to maintain its credit quality against the interests of its customers in paying reasonable rates.  The use of CWIP in rate base also tends to have a smoothing effect on rate changes over time relative to accruing AFUDC and interest, which can result in sizable rate changes all at once when the asset is placed in service and reflected in rates. [29]

With respect to balancing the interests of DP&L with customer interests, the Commission has correctly found that this incentive does not change the level of cost recovery, but instead will "only change the timing of the cost recovery."  Order No. 679-A at P 38.

        b.    <u>Accounting Procedures</u>.

As previously noted, the requested incentives will not become effective until the Commission accepts a formula rate application that is planned to be filed in the near future by DP&L.  In that formula rate application and as part of the accepted tariff, DP&L will include "Formula Rate Implementation Protocols" that will include accounting procedures consistent with those previously accepted by the Commission for other transmission owners with formula

---

[28] *See, e.g., Wabash Valley Power Association, Inc.,* 110 FERC ¶ 63,055, at P 65,137 (2005); *Xcel Energy Services, Inc.,* 121 FERC ¶ 61,284 at PP 58-61 (2007).

[29] *Duquesne 2019, supra* ,at P 32; *United Illuminating Co., supra,* at  P 36 and ft. 61 and cases cited therein.

rates.  These accounting procedures will be designed to ensure that DP&L does not recover an Allowance for Funds Used During Construction ("AFUDC"), to the extent that it has been authorized by a Commission order to include 100 percent of CWIP in transmission rate base for affected incentive transmission projects.  The accounting procedures to be adopted as part of DP&L's Formula Rate Implementation Protocols will be proposed in substantially identical form as set forth here:

i.   DP&L shall assign each authorized incentive transmission project a unique Funding Project Number ("FPN") for internal cost tracking purposes.

ii.   DP&L shall record actual construction costs to each FPN through work orders that are coded to correspond to the FPN for each incentive transmission project. Such work orders shall be segregated from work orders for non-incentive transmission projects for which the Commission has not authorized DP&L to include any portion of CWIP in rate base.

iii.   For each incentive transmission project, DP&L shall prepare monthly work order summaries of costs incurred under the associated FPN. These summaries shall show monthly additions to CWIP and transfers to plant in service and shall correspond to amounts recorded in DP&L's FERC Form 1.  DP&L shall use these summaries as data inputs into the Annual Update calculated for the Formula Rate.  DP&L shall make such work order summaries available upon request under review procedures that will also be set forth in the Rate Protocols.

iv.   When an incentive transmission project, or portion thereof, is placed into service, DP&L shall deduct from the total CWIP the accumulated charges for work orders under the FPN for that project, or portion thereof. The purpose of this control process is to ensure that expenditures are not double counted as both CWIP and as additions to plant.

v.   For non-incentive transmission projects, DP&L shall record AFUDC to be applied to CWIP and capitalized as part of CWIP and included in the project investment when the project is placed into service.

vi.   For incentive transmission projects, DP&L will include in the investment for such projects AFUDC accrued prior to the date that DP&L first includes the CWIP for such projects in rate base.

vii.   Annual Reporting. For each incentive project, DP&L shall file a report with the Commission at the time of DP&L's Publication Date that includes the following information concerning each project:

-35-

**JA47**

    (a)   the actual amount of CWIP recorded for each project by month;

    (b)   a statement of the current status of each project; and

    (c)   the estimated in-service date for each project.

    4.    <u>Incentive for Recovery of Costs Upon Project Abandonment</u>.

The Commission has recognized the value of reducing regulatory risks associated with transmission projects that are abandoned.  Consequently, Order No. 679 discussed and in subsequent cases the Commission has allowed a recovery of up to 100% of prudently-incurred costs associated with abandoned transmission projects if the abandonment is outside of the control of the utility's management.[30]  Authorization to recover such abandonment costs is necessary to mitigate the risk to DP&L that portions of the DP&L TEP may need to be cancelled, or may be supplanted for reasons beyond its control.

Examples of the risks faced include:  a) PJM cancellation of projects; b) state and local permitting requirements that prevent the siting of projects; or c) federal and state environmental permitting that prevent the siting of projects.  With respect to the first, DP&L would note that PJM's RTEP permits PJM to cancel projects, including the projects listed herein at Attachment A, if PJM decides that the conditions originally supporting the project have changed.  This is a risk beyond the control of DP&L.  With respect to the second and third types of risks, DP&L has not obtained all of the needed permits and local approvals to proceed with all of the TEP projects.  Significant portions of the TEP projects will be constructed through urban areas where

---

[30]  Order No. 679, *supra,* at PP 163-167*; Southern California Edison Company*, 112 FERC ¶ 61,014, at PP 58-61, *reh'g denied*, 113 FERC ¶ 61,143 (2005); *Duquesne 2007, supra,* at P 61 (2007).

organized community opposition may arise, and, almost ironically, when construction is planned for more remote areas, organized opposition may arise on environmental grounds.

The risks faced by DP&L in this context of a significant transmission program make it appropriate for the Commission to authorize DP&L to recover up to 100% of abandonment costs for reasons not in the control of DP&L.[31]  As the Commission found in *Allegheny* and *Duquesne 2007*, and *Duquesne 2019*, these risks support up to 100% recovery of abandonment costs.[32]

DP&L also recognizes and agrees that this incentive is not self-executing as of the time a project is canceled, but would be subject to a further requirement that DP&L make a separate filing demonstrating that the abandonment was for reasons not in the control of DP&L and the costs expended prior to abandonment were prudently incurred.  This approach is consistent with the Commission's 2019 United Illuminating order.[33]  In that separate filing, DP&L would identify whether it seeks 100% recovery of prudently incurred costs or some lesser percentage.

## VII.    TECHNOLOGY STATEMENT

In compliance with the direction in Order No. 679 to provide a technology statement, [34] DP&L states as follows:

The construction of the needed TEP projects will enhance the technological capability of the transmission system.  There are certain areas of the system today where DP&L has limited data visibility and remote operator control. Specifically, DP&L will replace electro-mechanical relays with newer microprocessor-based relays that will isolate faults quicker and more reliably

---

[31]  *Southern California Edison Company*, 112 FERC ¶ 61,014, at PP 58-61, *reh'g denied*, 113 FERC ¶ 61,143 (2005).

[32]  *Allegheny, supra*, at P 126, *Duquesne 2007, supra*, at P 61 (2007); *Duquesne 2019, supra* at PP 26-29.

[33]  *United Illuminating Co.,* 167 FERC ¶61,126 at P 42 (2019).

[34]  Order No. 679, *supra*, at P 302.

while providing more data back to operations staff. These modern relays will help improve the overall reliability of the system because they will help reduce mis-operations (excessive tripping that could lead to more customer outages than necessary) and will help restore outages quicker because of better fault locating capability. Along with specific relay upgrades, Remote Terminal Units (RTU's) will be installed at more substation locations to obtain more real-time data and monitoring of equipment. These modernization improvements encompassed within the TEP projects will greatly improve access by third parties to information regarding the transmission and distribution grid in real time, and will help integrate newer technologies in the future such as intermittent generators connected to the transmission system, Distributed Energy Resources ("DERs"), Distribution Automation ("DA"), and Electric Vehicles ("EVs") Operationally, the TEP projects will also help reduce the number and duration of outages through advanced analytics, and robust use of technologies such as automatic reclosers and remote operator SCADA controls.

### VIII.  CORRESPONDENCE AND COMMUNICATIONS

Correspondence and other communications concerning this Petition should be sent to the undersigned counsel for DP&L, and to the following individual, each of whom should be placed on the Commission's official service list in this proceeding:

| | |
|---|---|
| Randall V. Griffin<br>Chief Regulatory Counsel<br>The Dayton Power and Light Company<br>1065 Woodman Drive<br>Dayton, OH 45432<br>(937) 259-7221 (office)<br>(937) 259-7813 (Facsimile)<br>randall.griffin@aes.com | Sharon Schroder<br>Senior Director, Regulatory<br>The Dayton Power and Light Company<br>1065 Woodman Drive<br>Dayton, Ohio 45432<br>(937) 259-7153 (office)<br><br>sharon.schroeder@aes.com |

A copy of this Application has been served on the Ohio Public Utilities Commission ("PUCO"), the Ohio Consumer Counsel ("OCC") and on PJM.

## IX.    EFFECTIVE DATE

DP&L requests that the Commission authorize the requested rate incentives as of the date of a Commission order approving them. DP&L further requests that the authorized incentives for the RTO Adder and CWIP in rate base be reflected in rates only after the effective date of rate change authorized pursuant to a separate rate filing under Section 205 of the FPA. The effective date for a rate change to recover costs associated with abandoned projects would be reflected in rates only after a filing establishing the factual bases for recovery in rates.

## X.    ADDITIONAL SUPPORTING MATERIAL

DP&L submits the following additional information in substantial compliance with relevant provisions of Section 35.13:

Contents of this Filing – Section 35.13(b)(1)

This filing consists of the following documents: •

The instant Application;

Attachment A: List of Transmission Enhancement Plan Projects, Projected In-service dates and costs

Attachment B:  PJM Materials
    B-1    PJM OATT as of 2/17/2020 (Selected Pages)
    B-2    PJM Application, Docket No. ER19-2708-000 (Selected Pages)
    B-3    Sept. 19, 2011 Sub Regional RTEP Committee – Western (Selected Pages)
    B-4    August 31, 2018 Sub Regional RTEP Committee – PJM West (Selected Pages)
    B-5    Dayton Local Plan – 2019 (Selected Pages)
    B-6    Dayton Local Plan – 2020 Supplement

Attachment C:  Sworn Affidavit of Michael F. Russ;

Verification Statement of an officer of DP&L.

Certificate of Service

## XI.  <u>REQUEST FOR WAIVERS</u>

In consideration of the facts that this is not a general rate adjustment application but rather a filing specially authorized pursuant to Order No. 679, DP&L respectfully requests that, for good cause shown, DP&L be granted a waiver of any requirement that the filing contain Statements AA through BM from 18 C.F.R. Part 35 in support of the filing. In particular, DP&L specifically requests waivers of Section 35.13 of the Commission's Regulations, 18 C.F.R. § 35.13, including waiver of Period I-Period II data requirements, and waiver of the requirement in Section 35.13(a)(2)(iv) to determine if and the extent to which a proposed change constitutes a rate increase based on Period I-Period II rates and billing determinants. Although DP&L has not identified any additional waivers of the Commission's Regulations that are necessary to permit this filing to be granted, DP&L further requests that the Commission grant any additional waivers of its rules and regulations it may deem necessary to approve this rate application.

## XII.  <u>MISCELLANEOUS</u>

No agreement is required by contract for the filing of this rate application. There are no costs included in this filing that have been alleged or adjudged in any administrative or judicial proceeding to be illegal, duplicative, or unnecessary costs, nor has any expense or cost been demonstrated to be the product of discriminatory or employment practices, within the meaning of Section 35.13(d)(3).

## XIII.  <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, DP&L respectfully requests that the Commission issue an order approving the RTO Adder rate incentive for DP&L's transmission facilities and approving the CWIP in rate base and abandonment incentives for the projects

included in DP&L's Transmission Enhancement Plan, described more fully above and listed in Attachment A, hereto.

Respectfully submitted,

ss:// *Randall V. Griffin*

Randall V. Griffin
ATTORNEY FOR
THE DAYTON POWER AND LIGHT COMPANY
1065 Woodman Drive
Dayton, Ohio 45432
937-259-7221
Randall.griffin@aes.com

Dated: February 24, 2020

cc:    Ohio Public Utilities Commission
       Ohio Consumers Counsel
       PJM Interconnection, L.L.C.

**ATTACHMENT A**

Dayton Power and Light Company
Docket No. EL20-____-000

### DAYTON POWER AND LIGHT COMPANY ACTUAL AND PROJECTED CAPITAL SPEND ON TRANSMISSION ENHANCEMENT PLAN PROJECTS

| Existing RTEPP Description | Voltage Equipment | PJM Project Designation and Exhibit Reference | Projected In-Service | Total Est. Cost | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **GROUP 1 Baseline Projects** | | **BASELINE PROJECTS** | | | | | | | | | |
| West Milton Sub | 345/138kV and 138/69kV transformers | b1275, b1276 - Att. B-1 | 2021 | $11,924,764 | | $1,340,000 | $9,207,435 | $1,377,329 | | | |
| West Milton - Eldean | 138kV line | b1572 - Att. B-1 | 2022 | $14,495,001 | $125,000 | $1,662,314 | $3,927,000 | $4,579,395 | $4,201,292 | | |
| West Milton - Salem/Englewood | 69kV lines | b1269 - Att. B-1 | 2020 | $7,165,000 | | $2,365,000 | $4,800,000 | | | | |
| Marysville - Reconductor | 69kV line | b1570.1, b1570.2, b1570.3 - Att. B-1 | 2020 | $10,703,854 | | $1,768,854 | $8,935,000 | | | | |
| Marysville - New Sub | 345/69kV transformer | b1570 - Att. B-1 | 2021 | $14,574,384 | | $1,552,000 | $2,223,384 | $10,799,000 | | | |
| Bath - Trebein | 138kV line | b1270 - Att. B-1 | 2021 | $1,396,000 | | | $600,000 | $796,000 | | | |
| Bath Substation | 345/138kV transformer | b1273 - Att. B-1 | 2021 | $8,003,000 | | | $839,000 | $7,164,000 | | | |
| Trebein Substation | 138/69kV transformer | b1274 - Att. B-1 | 2021 | $2,826,416 | | | $184,000 | $2,642,416 | | | |
| System Reactors for High Voltage Control | 138kV reactors | b3108.1, b3108.2, b3108.3 - Att. B-2 | 2021 | $11,500,000 | | $1,000,000 | $4,500,000 | $6,000,000 | | | |
| **Total GROUP 1** | | | | $82,588,419 | $125,000 | $9,688,168 | $35,215,819 | $33,358,140 | $4,201,292 | | |
| | | | | | | | | | | | |
| **GROUP 2 Supplemental Projects incorporated into RTEP and Subject to Approval by a State Agency (at or above 138 kV)** | | **SUPPLEMENTAL PROJECTS** | | | | | | | | | |
| Gebhardt Sub - Dist | 138/12kV transformer | S1874, integrated into 2019 RTEP Plan - Att. B-5 | 2020 | $2,100,000 | | | $2,100,000 | | | | |
| Buckeye Haas Delivery Pt., Bethel Twp | 138/12kV transformer | s1847, integrated into 2019 RTEP Plan - Att. B-5 | 2020 | $850,000 | | $100,000 | $750,000 | | | | |
| South Charleston - Sub | 345/69kV transformer | s0322, integrated into 2011 RTEP Plan - Att. B-3 | 2023 | $7,600,000 | | | | | $1,700,000 | $5,900,000 | |
| Clinton - 345/69kV Transformer | 345/69kV transformer | s0324, integrated into 2011 RTEP Plan - Att. B-3 | 2023 | $6,100,000 | | | | | $5,350,000 | $750,000 | |
| Fort Recovery | 138/69kV transformer | s0326,d0327, s0328, integrated into 2011 RTEP Plan - Att. B-3 | 2023 | $10,000,000 | | | | | $3,350,000 | $6,650,000 | |
| **Total GROUP 2** | | | | $26,650,000 | $ - | $100,000 | $2,850,000 | $ - | $10,400,000 | $13,300,000 | |
| | | | | | | | | | | | |
| **GROUP 3 Supplemental Projects incorporated into RTEP at 69 kV** | | | | | | | | | | | |
| South Dayton Metro (Sugarcreek Bk-7 Ring Bus) | 138/69kV transformer, 69kV bus and lines | s1876.1, integrated into 2019 RTEP Plan - Att. B-5 | 2021 | $9,600,000 | | $1,000,000 | $6,350,000 | $2,250,000 | | | |
| South Dayton Metro (Normandy Sub) | Cobert 138kV to 69kV | s1876.2, integrated into 2019 RTEP Plan - Att. B-5 | 2021 | $5,950,000 | | | $2,300,000 | $3,650,000 | | | |
| South Dayton Metro (Dayton Mall-Yankee-Normandy) | 69kV line work | s1876.3, integrated into 2019 RTEP Plan - Att. B-5 | 2021 | $2,950,000 | | | $1,195,000 | $1,755,000 | | | |
| New Lebanon - Crystal 69kV (aka Garage Rd-New Lebanon) | 69kV line | s0329, integrated into 2011 RTEP Plan - Att. B-3 | 2020 | $13,230,000 | $50,000 | $3,475,000 | $9,705,000 | | | | |
| Cisco-Bodkins | 69kV line | s0330, integrated into 2018 RTEP Plan - Att. B-4 | 2020 | $7,425,000 | | $6,425,000 | $1,000,000 | | | | |
| Edgewood Sub - Dist (Urbana) | Substation, 69/12kV transformer, 69kV line | s1875, integrated into 2019 RTEP Plan - Att. B-5 | 2020 | $2,016,000 | | $1,066,000 | $950,000 | | | | |
| Clinton to Wilmington- 69kV | 69kV line | s0325, integrated into 2011 RTEP Plan - Att. B-3 | 2022 | $1,300,000 | | | | | $1,300,000 | | |
| South Charleston - Transmission | 69kV line | s0323, integrated into 2011 RTEP Plan - Att. B-3 | 2024 | $13,200,000 | | | | | $3,200,000 | $6,500,000 | $3,500,000 |
| Greenville 138/69 kV transformer | 138/69 transformer | s1846, integrated into 2019 RTEP Plan - Att. B-5 | 2020 | $2,000,000 | | $480,000 | $1,520,000 | | | | |
| Wolfcreek (Brookville) Sub | 69kV/12kV transformer | s2150, integrated into 2019 RTEP Plan - Att. B-6 | 2020 | $1,800,000 | | | $1,800,000 | | | | |
| **Total GROUP 3** | | | | $59,471,000 | $50,000 | $12,446,000 | $24,820,000 | $7,655,000 | $4,500,000 | $6,500,000 | $3,500,000 |
| | | | | | | | | | | | |
| **GRAND TOTAL** | | | | $168,709,419 | $175,000 | $22,234,168 | $62,885,819 | $41,013,140 | $19,101,292 | $19,800,000 | $3,500,000 |

NOTE: Column D reflects updated In-Service Dates. Some projects as initially approved or integrated into PJM RTEP Plans had earlier in-service dates.

**JA54**

**ATTACHMENT B-1**

# PJM OPEN ACCESS

# TRANSMISSION TARIFF

Case: 21-4072    Document: 66    Filed: 12/15/2023    Page: 64

**ATTACHMENT B-1**

Intra-PJM Tariffs --> OPEN ACCESS TRANSMISSION TARIFF --> OATT VI. ADMINISTRATION AND STUDY OF NEW SERVICE REQUESTS; R --> OATT SCHEDULE 12 – APPENDIX --> OATT SCHEDULE 12.APPENDIX 16 The Dayton Power and Light

## SCHEDULE 12 – APPENDIX

### (16) The Dayton Power and Light Company

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0901 | Replace Greene 138 kV breaker GJ-D | | Dayton (100%) |
| b0902 | Replace Greene 138 kV breaker GJ-E | | Dayton (100%) |
| b0903 | Replace Greene 138 kV breaker GJ-F | | Dayton (100%) |
| b0904 | Replace Greene 138 kV breaker GJ-H | | Dayton (100%) |
| b0905 | Replace Greene 138 kV breaker GJ-I | | Dayton (100%) |
| b1062 | Add 2nd 345/138 kV transformer at Shelby | | Dayton (100%) |
| b1063 | Add two 30 MVAR capacitor banks at Sidney 69 kV station | | Dayton (100%) |
| b1064 | Add a 30 MVAR capacitor bank at Eldean 69 kV station | | Dayton (100%) |
| b1065.1 | Install a new Shelby 138/69 kV transformer at Shelby station | | Dayton (100%) |
| b1065.2 | Install a 69 kV line between Shelby 69kV station and Blue Jacket 69 kV station | | Dayton (100%) |
| b1065.3 | Install a new 30 MVAR capacitor bank at Blue Jacket 69 kV station | | Dayton (100%) |
| b1066 | Install a new 30 MVAR shunt at Amsterdam 69 kV station | | Dayton (100%) |
| b1067 | Install a new 30 MVAR shunt at Logan 69 kV station | | Dayton (100%) |
| b1068 | Install a new 30 MVAR shunt at Darby 69 kV station | | Dayton (100%) |
| b1077 | Reconductor East Sidney-Shelby 138 kV | | Dayton (100%) |

**ATTACHMENT B-1**

### The Dayton Power and Light Company (cont.)

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1078 | Reconductor Greene - Alpha 138 kV | | Dayton (100%) |
| b1079 | Perform sag study on Bath - Trebein 138 kV line to ensure clearance for rating increase | | Dayton (100%) |
| b1268 | Reconductor Shelby – Sidney 138 kV | | Dayton (100%) |
| b1269 | Reconductor West Milton – Salem 69 kV and West Milton – Englewood | | Dayton (100%) |
| b1270 | Reconductor Bath – Trebein 138 kV | | Dayton (100%) |
| b1271 | Reconductor Underground Section of OHH – Sugarcreek 138 kV | | Dayton (100%) |
| b1272 | Reconductor Burdox – Webster 138 kV | | Dayton (100%) |
| b1273 | Add 2nd Bath 345/138 kV Xfr | | Dayton (100%) |
| b1274 | Add 2nd Trebien 138/69 kV Xfr | | Dayton (100%) |
| b1275 | Add 2nd W. Milton 138/69 kV Xfr | | Dayton (100%) |

**ATTACHMENT B-1**

**The Dayton Power and Light Company (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1276 | Add 2nd W. Milton 345/138 Xfr | | Dayton (100%) |
| b1570 | Add a 345/69 kV transformer at AEP Marysville 345 kV bus | | ATSI (9.93%) / Dayton (90.07%) |
| b1570.1 | Add Marysville - Darby 69 kV line | | ATSI (9.93%) / Dayton (90.07%) |
| b1570.2 | Add Marysville - Union REA 69 kV line | | ATSI (9.93%) / Dayton (90.07%) |
| b1570.3 | Reconductor Union REA - Honda MT 69 kV line | | ATSI (9.93%) / Dayton (90.07%) |
| b1572 | Construct a new 138 kV line from West Milton to Eldean | | Dayton (100%) |
| b2176 | Change the tap setting on the Stuart 345/138 kV transformer from 1.00 pu to 1.025 pu | | Dayton (100%) |

**JA58**

ATTACHMENT B-2



PJM Interconnection, L.L.C.
2750 Monroe Blvd.
Audubon, PA 19403

Pauline Foley
Associate General Counsel
T:  (610) 666-8248 | F:  (610) 666-8211
pauline.foley@pjm.com

August 29, 2019

Honorable Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A
Washington, D.C. 20426

Re:      *PJM Interconnection, L.L.C., Docket No. ER19-2708-000*
         *[30-Day Comment Period Requested]*

Dear Secretary Bose:

In accordance with PJM Open Access Transmission Tariff, Schedule 12 ("Tariff" or

"Schedule 12")[1] and Amended and Restated Operating Agreement of PJM Interconnection, L.L.C.,

Schedule 6, section 1.6 ("Operating Agreement" or "Schedule 6"), and pursuant to section 205 of

the Federal Power Act,[2] PJM Interconnection, L.L.C. ("PJM") hereby submits amendments to the

Tariff, Schedule 12-Appendix A to incorporate cost responsibility assignments for 51 baseline

upgrades in the recent update to the Regional Transmission Expansion Plan ("RTEP") approved

by the PJM Board of Managers ("PJM Board") on July 30, 2019.[3]  PJM requests that the revised

Tariff sections become effective on November 27, 2019, **90 days after the date of this filing**.

---

[1] All capitalized terms that are not otherwise defined herein have the meaning as defined in the Tariff, Operating Agreement, and Reliability Assurance Agreement among Load Serving Entities in the PJM Region ("RAA").

[2] 16 U.S.C, section 824d.

[3] Of the 51 baseline upgrades approved by the PJM Board on July 30, 2019, 42 baseline upgrades are incorporated in the update to the RTEP as new baseline upgrades.

**ATTACHMENT B-2**

**Baseline Upgrade b3108.1**

- Overview of Reliability Problem
  - o   Criteria Violation: High voltage across the Dayton system
  - o   Contingency:
  - o   Criteria test: Operational Performance

- Overview of Reliability Solution
  - o   Description of Upgrade: Install 100 MVAR reactor at Miami 138 kV substation
  - o   Required Upgrade In-Service Date: June 01, 2019
  - o   Estimated Upgrade Cost: $ 5.00 M
  - o   Construction Responsibility: Dayton

- Cost Allocation
  - o   The upgrade benefits load entirely within the zone receiving the allocation. The distribution factor would be based on an interface entirely within the zone receiving the allocation. Therefore no distribution factor table is provided. The cost for this baseline upgrade is allocated 100% to Dayton.

**ATTACHMENT B-2**

**Baseline Upgrade b3108.2**

- Overview of Reliability Problem
    - o   Criteria Violation: High voltage across the Dayton system
    - o   Contingency:
    - o   Criteria test: Operational Performance

- Overview of Reliability Solution
    - o   Description of Upgrade: Install 100 MVAR reactor at Sugarcreek 138 kV substation
    - o   Required Upgrade In-Service Date: June 01, 2019
    - o   Estimated Upgrade Cost: $ 5.00 M
    - o   Construction Responsibility: Dayton

- Cost Allocation
    - o   The upgrade benefits load entirely within the zone receiving the allocation. The distribution factor would be based on an interface entirely within the zone receiving the allocation. Therefore no distribution factor table is provided. The cost for this baseline upgrade is allocated 100% to Dayton.

29

**JA61**

**ATTACHMENT B-2**

**Baseline Upgrade b3108.3**

- Overview of Reliability Problem
  - o  Criteria Violation: High voltage across the Dayton system
  - o  Contingency:
  - o  Criteria test: Operational Performance

- Overview of Reliability Solution
  - o  Description of Upgrade: Install 100 MVAR reactor at Hutchings 138 kV substation
  - o  Required Upgrade In-Service Date: June 01, 2019
  - o  Estimated Upgrade Cost: $ 5.00 M
  - o  Construction Responsibility: Dayton

- Cost Allocation
  - o  The upgrade benefits load entirely within the zone receiving the allocation. The distribution factor would be based on an interface entirely within the zone receiving the allocation. Therefore no distribution factor table is provided. The cost for this baseline upgrade is allocated 100% to Dayton.

Sub Regional RTEP Committee - Western

September 19, 2011

PJM©2011

**JA63**

**ATTACHMENT B-3**

## DAYTON Transmission Zone

- Supplemental Project
- Build South Charleston 345/69 kV Substation. (S0322)
- Estimated Cost: $7.0M
- Projected IS date: 6/1/2016





**JA64**

**ATTACHMENT B-3**

## DAYTON Transmission Zone







- Supplemental Project
- Install South Charleston - Jefferson 69 kV Circuit. (S0323)
- Estimated Cost: $8.6M
- Projected IS date: 6/1/2016

**ATTACHMENT B-3**
DAYTON Transmission Zone



- Supplemental Project
- Install 2nd Clinton 345/69 kV Transformer (S0324)
- Estimated Cost: $9.0M
- Projected IS date: 6/1/2016

**ATTACHMENT B-3**
## DAYTON Transmission Zone



- Supplemental Project
- Build Clinton - Wilmington 69 kV #2 Circuit (S0325)
- Estimated Cost: $1.0M
- Projected IS date: 6/1/2016

**ATTACHMENT B-3**
DAYTON Transmission Zone





- Supplemental Project
- Build Jay (AEP) - Fort Recovery 138 kV Circuit (S0326)
- Estimated Cost: $11.0M
- Projected IS date: 6/1/2016

9/19/2011
Subregional RTEP – PJM West

PJM©2011

69

JA68

## ATTACHMENT B-3
### DAYTON Transmission Zone



- Supplemental Project
- Install Fort Recovery 138/69 kV Transformer (S0327)
- Estimated Cost: $6.0M
- Projected IS date: 6/1/2016

**JA69**



**ATTACHMENT B-3**
DAYTON Transmission Zone

- Supplemental Project
- Install 30MVar Cap Bank at Fort Recovery 69kV (S0328)
- Estimated Cost: $0.25M
- Projected IS date: 6/1/2016

**JA70**

**ATTACHMENT B-3**
DAYTON Transmission Zone





- Supplemental Project
- Install Garage Road - New Lebanon
  69 kV Circuit (S0329)
- Estimated Cost: $8.5M
- Projected IS date: 6/1/2016

JA71

ATTACHMENT B-4

# Sub Regional RTEP Committee
# PJM West

August 31, 2018



PJM©2018

SRRTEP-West 8/31/2018

JA72



## Dayton Transmission Zone – Supplemental

### AREA SUMMENT B-4

## Rebuild 69kV Line (6631) from Cisco Substation to Botkins Substation





**Problem Statement:**

A reliability issue has been identified on the 69kV line from Cisco Substation to Botkins Substation. The line was constructed in the 1950s with wood poles and crossarms. In last 5 years: 7 Permanent Outages, 10 Momentary Outages. The line has several sleeves and many have failed in recent years, impacting customers in the area.

**Potential Solution:**

The proposed project will rebuild the 69kV line (6631) from Cisco Substation to Botkins Substation. This project addresses transmission performance concerns due to the degradation of this line over time.

Old conductor: 477 ACSR (18x1)  New conductor: 1351 AAC
Cisco-Anna 69kV Old Rating: SN/SE (80/98),  Anna-Botkins 69kV Old Rating SN/SE (80/98); Cisco-Anna 69kV New Rating: SN/SE (151/187),  Anna-Botkins 69kV Old Rating SN/SE (151/165)

**Estimated Cost:** $7.425M

**Alternatives:**

- Reconductor the 69kV line (6631) from Cisco Substation to Botkins Substation.
  **Estimated Cost:** $3.5M

The alternative is not recommended because the line is more than 60 years old with wood poles and crossarms, and some of the structures need to be replaced.

**Required In-Service:** 12/31/2019

**Status:** Engineering

**ATTACHMENT B-5**

# Submission of Supplemental Projects for Inclusion in the Local Plan

1

Dayton Local Plan - 2019

**JA74**

**ATTACHMENT B-5**

## Dayton Transmission Zone M-3 Process
## Greenville 138/69 kV Transformer



**Need Number:** Dayton-2019-006

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 8/15/2019

**Previously Presented:**
Needs Presented: 2/20/19
Solution Presented: 3/25/19

**Project Driver:**
Operational Performance

**Specific Assumption Reference:**
Dayton Local Plan Assumptions (Slide 5)

**Problem Statement:**

- Greenville 138/69kV transformer was built in 1978

- Failed, repaired, and placed back in-service in 2009

- In the summer of 2018, this transformer experienced issues evidenced by rising transformer temperatures, generation had to be called on to relieve the loading constraint on several occasions.

- This transformer is undersized and routinely approaches its nameplate ratings as evidenced by frequent PCLLRW's issued on this facility. Due to the operational issues this past summer and regular loading near nameplate capacity, this transformer could fail or not be available during peak load conditions which potentially creates real-time issues. It is critical for real-time operations that this transformer issue be addressed in a planned manner to ensure reliability of the 138kV and 69kV system in this area.

- The existing Greenville 138/69 kV transformers is the only 150 MVA transformer on the Dayton system, the standard 138/69 kV transformer size is 200 MVA. The extra capacity provided by a 200 MVA transformer is needed in this area to account for the wide range of loading scenarios depending on the status of Greenville Generation.

Dayton Local Plan -2019

2

**JA75**

**ATTACHMENT B-5**

Dayton Transmission Zone M-3 Process
Greenville 138/69 kV Transformer



West Milton
138kV

Greenville
138/69kV

Replace Existing 150MVA
138/69kV TRF with new
200MVA TRF

**Legend**
— =138kV
— = 69kV
— = New

3

**JA76**

**Need Number:** Dayton-2019-006

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 8/15/2019

**Selected Solution:**
Replace the existing 150 MVA Greenville 138/69 kV transformer with a single 200 MVA 138/69 kV transformer. This will increase the rated capacity of the Greenville Transformer to perform with adequate capacity during shoulder peak times when Greenville Generation is offline and will address the equipment concerns associated with the existing transformer.

**Estimated Cost:** $2,000,000

**Projected In-Service:** 12/31/2020

**Supplemental Project ID:** s1846

**Project Status:** Conceptual

Model: NA

Dayton Local Plan -2019

**ATTACHMENT B-5**

## Dayton Transmission Zone M-3 Process
## Bethel Township, Ohio



**Need Number:** Dayton-2019-007

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 8/15/2019

**Previously Presented:**
Needs Presented: 2/20/19
Solution Presented: 3/25/19

**Project Driver:**
New customer delivery point

**Specific Assumption Reference:**
Dayton Local Plan Assumptions (Slide 5)

**Problem Statement:**

- Customer requested a new delivery point in Miami County, within Bethel Township.

- Initial loading projected at ~5-7 MW, with expected annual growth of 1.2%

Dayton Local Plan -2019

4

**JA77**

**ATTACHMENT B-5**

Dayton Transmission Zone M-3 Process
Bethel Township, Ohio



**Need Number:** Dayton-2019-007

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 8/15/2019

**Selected Solution:**

- This project will tap the Miami-New Carlisle 138 kV line with sectionalizing switches on each side of the delivery point and provide a short 138kV service to the proposed customer substation in near proximity to the existing transmission line.

**Estimated Cost:** $850,000

**Projected In-Service:** 12/31/2019

**Supplemental Project ID:** s1847

**Project Status:** Conceptual

Model: NA

**JA78**

**ATTACHMENT B-5**

Dayton Transmission Zone M-3 Process
Gebhart Distribution Sub

**Need Number:** Dayton-2019-002

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 9/5/19

**Previously Presented:**
Needs Presented: 2/20/19
Solution Presented: 4/23/19

**Project Driver:**
Source for Underlying Distribution

**Specific Assumption Reference:**
DPL Local Plan Assumptions (Slide 5)

**Problem Statement:**

- Significant load growth in the area east of I-75 and south of I-675

- Distribution Circuit RH1211 served from Yankee Substation exceeded its thermal rating this past summer and RH1204 from Yankee Substation is approaching its rated capacity. There are no ties in the vicinity of the load center with sufficient capacity to serve growing loads.

- DP&L must develop a solution immediately to have capacity to serve distribution load in this load center or risk overloading existing equipment and not having sufficient distribution capacity to serve growing load. There is a need for a new distribution source closer to the load center.

- DP&L must offload the Yankee and Normandy circuits to ensure sufficient capacity to serve growing load centers in Centerville and Waynesville.

Dayton Local Plan - 2019

6

**JA79**

**ATTACHMENT B-5**

# Dayton Transmission Zone M-3 Process
## Gebhart Distribution Sub



**Need Number:** Dayton-2019-002

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 9/5/19

**Selected Solution:**

- The project will tap the existing Hutchings-Sugarcreek 138kV line and loop the 138 kV in and out of the substation which is in close proximity to the existing 138 kV line. There will be a single 138/12 kV 30 MVA distribution transformer installed at the new substation and three new 138 kV breakers arranged in a ring bus configuration. The location of this substation will allow Dayton to offload distribution circuits served from Yankee and Normandy while also serving as a centrally located source for growth in the Centerville and Waynesville areas.

**Estimated Cost:** $2.5 M

**Projected In-Service:** 12/31/2020

**Supplemental Project ID: S1874**

**Project Status:** Conceptual

**Model:** NA

Dayton Local Plan -2019

7

**JA80**

**ATTACHMENT B-5**

## Dayton Transmission Zone M-3 Process
### Urbana, Ohio



= 138kV
= 69kV

**Need Number:** Dayton-2019-003

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 9/5/19

**Previously Presented:**
Needs Presented: 2/20/19
Solution Presented: 4/23/19

**Project Driver:**
Source for Underlying Distribution

**Specific Assumption Reference:**
DP&L Local Plan Assumptions (Slide 5)

**Problem Statement:**

- The loads at the existing Urbana Substation have grown beyond the capacity of the existing distribution transformers and DP&L has utilized a mobile transformer at the Urbana substation to take load off of the distribution banks that would otherwise be pushed beyond their thermal limits.

- The existing Urbana and Kings Creek substations are not centrally located to the growing load center which makes load transfers to and from either sub nearly impossible.

- Distribution circuits DB1205 and DB1206 from Urbana Substation both reached their peak circuit capacities this past summer.

- There is a need for a new distribution source closer to the load center to provide loading relief on the Urbana Substation transformers and circuits.

Dayton Local Plan -2019

8

JA81

**ATTACHMENT B-5**

# Dayton Transmission Zone M-3 Process
## Urbana, Ohio



**Need Number:** Dayton-2019-003

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 9/5/19

**Selected Solution:**

- The project will tap the existing Urbana-Kings Creek 69kV line and build a new 1 mile 69 kV extension to the new substation. There will be a single 69/12 kV 30 MVA distribution transformer installed at the new substation and two new 69kV breakers. This substation will be located in close proximity to the load center on the southwest side of Urbana where many of the large commercial and industrial loads are located. This location will ensure that DP&L has sufficient capacity to serve the load center and offload the transformers at Urbana Substation. The solution will also enhance the ability to switch distribution circuits and facilitate load transfers between the new substation, Urbana, and Kings Creek Substations.

**Estimated Cost:** $2.5 M

**Projected In-Service:** 06/01/2020

**Supplemental Project ID: S1875**

**Project Status:** Conceptual

Model: NA

Dayton Local Plan -2019

9

**JA82**

**ATTACHMENT B-5**

## Dayton Transmission Zone M-3 Process
## South Dayton Metro



Legend:
- ═ 345kV
- ═ 138kV
- ═ 69kV

**Need Number:** Dayton-2019-004

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 9/5/19

**Previously Presented:**
Needs Presented: 2/20/19
Solution Presented: 4/23/19

**Project Driver:**
Operational Performance

**Specific Assumption Reference:**
DPL Local Plan Assumptions (Slide 5)

**Problem Statement:**

-The Dayton 138kV system regularly experiences real-time loading issues on the Hutching-Sugarcreek 138kV 13805 line during peak and shoulder peak times. Dayton System Operations works with PJM and frequently switches the Crown 138/69kV transformer out of service to avoid a PCLLRW but in some instances, this is not a possibility. Also, this switching and segmentation of the system is not a good practice for the equipment and reliability of the system. Dayton has a plan to help solve this issue by installing a 138/69kV transformer at Normandy Substation but we have concerns this could shift the operational loading issues from the Sugarcreek-Hutchings 138kV line to the Sugarcreek to Normandy 138kV line with the growth in this area. Also, Normandy Substation has space limitations for a 138kV transformer. If this issue is not addressed immediately, it could lead to more real-time issues and further degradation to the equipment that is switched out in this quickly growing load center.

-In addition to the 138kV loading issues in this area, this growing load center is served by three 69kV sources with limited capacity and a performance issue. These factors make performing regular maintenance more difficult and puts the reliability of the system at risk. In the event of a single outage (planned for maintenance or unplanned due to system event) to one of these three sources, a subsequent 69kV outage would lead to severe reliability implications including loadings in excess of the emergency line ratings. The 6610 Yankee-Caesars-Trebein 69kV line is one of the three 69kV lines supplying the load center and it is a 31 mile line, three terminal line constructed in 1950 with wood poles that has experienced 7 permanent and 16 momentary outages the past 5 years.

10

Dayton Local Plan -2019

**JA83**

**ATTACHMENT B-5**

## Dayton Transmission Zone M-3 Process
## South Dayton Metro

**Need Number:** Dayton-2019-004

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 9/5/19

**Selected Solution:**

- This project will expand the Sugarcreek Substation by installing a 138/69kV 200MVA transformer, forming a new 69kV ring bus, and building a new 69kV line from Sugarcreek to Normandy Substation that will connect directly into the load center which will address shoulder peak loading concerns and will improve reliability of the three terminal 6610 Yankee-Caesars-Trebein 69kV line that has historically been a poor performing circuit. Estimated Cost: $ 8.251M **(S1876.1)**

- Normandy Substation has an existing distribution transformer that will need to be changed from 138/12kV to 69/12kV. This will provide operations greater flexibility for switching loads through parallel distribution bank operation at Normandy. Estimated Cost: $5.114M **(S1876.2)**

- The Dayton Mall-Yankee-Normandy 6671 line will be looped in and out of Yankee Substation to eliminate a three terminal arrangement. A single 69kV breaker will be needed at Normandy Substation to separate the 69kV bus and a single 69kV breaker will be installed at Yankee to eliminate the three terminal line configuration. Estimated Cost: $2.535M **(S1876.3)**

**Estimated Cost:** $15.9M

**Projected In-Service:** 12/31/2021

**Supplemental Project ID: S1876.1 – S1876.3**

**Project Status:** Conceptual

Model: 2023 RTEP

Dayton Local Plan -2019



Legend

― = 138kV
― = 69kV
― = New

Centerville

Trebein

Remove/Cut Open

Convert to 69kV & Reconductor

Sugarcreek 138/69kV

Caesars Cr. 69kV

Normandy

Yankee 69kV

Tie together to make 69kV sub

Remove Span to Loop Yankee

Dayton Mall

Benner

OHH Hutchings

11

JA84

# Revision History

- 8/15/2019 – V1 – Local Plan posted to pjm.com for S1846 – S1847
- 9/5/2019 – V2 – Local Plan posted to pjm.com for S1874 – S1877
- 9/12/2019 – V3 – Remove the duplicate slides (#6-13)

Dayton Local Plan -2019

14

**JA85**

ATTACHMENT B-6

# Submission of Supplemental Projects for Inclusion in the Local Plan

**JA86**

Dayton Transmission Planning Process
ATTACHMENT B-6
Brookville, Ohio



| | |
|---|---|
| = 345kV | |
| = 138kV | |
| = 69kV | |

**JA87**



**Need Number:** Dayton-2019-009

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 2/3/2020

**Previously Presented:**
Need Meeting: 10/25/2019
Solution Meeting: 12/18/2019

**Project Driver:**
New customer delivery point

**Specific Assumption Reference:**
Dayton Local Plan Assumptions (Slide 5)

**Problem Statement:**

An new industrial customer has requested a new delivery point in Brookville, Ohio. The potential customer site is located north of Upper Lewisburg Salem Rd and west of Arlington Rd in close proximity to the existing 6639 transmission line. The route of the existing 6639 line is shown in the graphic on the right side of the slide.

Prior to the need for full transmission capacity, the customer will require 500kW of capacity immediately to begin construction activities. By April 1, 2020 the customer will require a minimum of 5MW of total capacity to finalize building construction and the installation of production equipment. By November of 2020, the full substation and capacity for an 11MVA load will be required. There are long-terms plan for the customer to potentially grow to a 26MVA load.

In order to support the customer's delivery needs, support local economic development, and maintain system reliability for all customers, it is necessary to promptly begin designing and building a comprehensive solution that can supply the customer needs and meet the schedule outlined in this slide.

**DAYTON Local Plan - 2020**



Dayton Transmission Review Process

ATTACHMENT B-6

Brookville, Ohio



**Need Number:** Dayton-2019-009

**Process Stage:** Submission of Supplemental Project for inclusion in the Local Plan 2/3/2020

**Selected Solution:**

Dayton has developed a comprehensive distribution and transmission solution to meet both the short-term and long term needs identified in problem statement. Dayton plans to install distribution level service to provide service to the first 500kW and 5MW loads. The transmission project to serve the initial 11MVA of load will entail tapping the existing Brookville-West Manchester 69 kV line (6639). This new transmission tap, constructed with 477 ACSR conductor, will loop in and out of a new three breaker 69kV ring bus substation where one 69/12kV 30MVA transformer will be installed. Fiber will be added from Brookville Substation to the new sub, so remote end relay changes will be needed at Brookville Substation. Remote end relay setting updates will be required at West Manchester Substation.

**Estimated Cost:** $2.5M

**Projected In-Service:** 10/31/2020

**Supplemental Project ID: S2150**

**Project Status:** Conceptual

**Model:** 2018 MMWG 2020SUM

**DAYTON Local Plan - 2020**

**JA88**

ATTACHMENT B-6

4

# Revision History

2/3/2020 – V1 – Added  S2150

**DAYTON Local Plan - 2020**

**JA89**

**ATTACHMENT C**

## AFFIDAVIT OF MICHAEL F. RUSS

## INTRODUCTION

1.      My name is Michael F. Russ.  My business address is 1900 Dryden Road, Dayton, Ohio 45439.  I am Manger of Resource Planning for The Dayton Power and Light Company ("DP&L" or the "Company").  I hold a Bachelor's degree in Electrical and Computer Engineering from The Ohio State University and a Master's degree in Business Administration from Ohio University.  I am a licensed professional engineer in the State of Ohio. I began my career at AEP in 2011 as an engineer in the Transmission Planning department where I performed system planning and generation interconnection studies.  In 2013, I joined DP&L and worked in Service Operations from 2013 until 2016 overseeing technical field work.  In 2016, I transitioned to the Transmission Planning department at DP&L.  In 2018, I was promoted to Manager of the Transmission Planning department at DP&L.

## PURPOSE OF AFFIDAVIT AND CONCLUSIONS

2.   The purpose of my affidavit is to affirm and support the factual statements made in the Application filed by The Dayton Power and Light Company ("DP&L or the "Company") seeking approval of certain incentives for the specified transmission projects listed in the Application.

3.   I am responsible for transmission planning for DP&L and work closely with the system planners at the PJM Interconnection, L.L.C. ("PJM") in the development of both the baseline and the supplement projects that PJM incorporates into its Regional

1

**ATTACHMENT C**

Transmission Expansion Plans ("RTEP") and the Local Plans developed for the Dayton Zone.

4. In that capacity and with my background, I affirm that the Company's Transmission Enhancement Plan ("TEP") is accurately and fairly described and includes each of the baseline and supplement projects described in the Application. Each such project is being planned for construction in order to improve system reliability. For the baseline projects, each is necessary in order to rectify an identified NERC reliability violation. The supplemental projects have been incorporated into PJM's regional and the Dayton Zone local plans. These supplemental projects are necessary to improve system reliability. While DP&L is not adopting a blanket requirement to retire facilities at any specific age, elective replacement of older transmission facilities and enhanced system configurations (i.e. addition of circuit breakers at tapped substations) will help improve customer reliability. These system upgrades are further needed to keep pace with an evolving generation profile.

5. The baseline and supplemental projects together will improve area voltage profiles, ensure adequate thermal loadings on transmission facilities, reliability to customers, and address operational issues that arise under different load and generation scenarios.

6. I further confirm that: the projected costs and projected in-service dates are the Company's best estimates at the present time; that the overall costs of the Transmission Enhancement Plan are substantial for a utility DP&L's size and will affect cash flows negatively absent incentives; and that the Company is prepared to fulfill all the commitments that it is making in the Application.

2

**JA91**

# ATTACHMENT C

This concludes my Affidavit.

**ATTACHMENT C**

# VERIFICATION

I swear that the foregoing affidavit is true and correct to the best of my information,

knowledge and belief.

Executed on February 2⁰, 2020 in Dayton, Ohio.

Michael F. Russ

Michael F. Russ
Manager, Resource Planning
The Dayton Power and Light Company

Sworn to before me this 20th day of February, 2020

Notary Public

CLAUDIUS R WALKER III, Notary Public
In and for the State of Ohio
My Commission Expires Sept. 28, 2021

4

**JA93**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Verification of Application of
The Dayton Power and Light Company

County of Montgomery        )
                            )
State of Ohio               )

      Vincent Parisi, being duly sworn, deposes and says:  That he is the President of
The Dayton Power and Light Company, the Applicant in the above-referenced proceeding, and
has the authority to verify the foregoing Application on behalf of the Applicant, that he has read
said Application, and that, to the best of his knowledge, information and belief, all of the
statements contained therein are true and correct.

SUBSCRIBED AND SWORN to before me
on this 21ˢᵗ day of FEBRUARY , 2020.

Notary Public

My commission expires:  MAY 31, 2024

Joya L Murr, Notary Public
In and for the State of Ohio
My Commission Expires May 31, 2019  2024

4

**JA94**

CERTIFICATE OF SERVICE

I hereby certify that I have this day, February 24, 2020, served via e-mail or by first-class mail, a copy of the foregoing on counsel representing the Public Utilities Commission of Ohio, the Ohio Consumers Counsel, and PJM Interconnection, L.L.C.

On behalf of          The Dayton Power and Light Company

*Randall V. Griffin*

Randall V. Griffin
Chief Regulatory Counsel
AES U.S. Services, LLC
1065 Woodman Drive
Dayton, OH 45432
(937) 259-7221 (office)
(937) 259-7813 (Facsimile)
randall.griffin@aes.com

**JA95**

172 FERC ¶ 61,140
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Neil Chatterjee, Chairman;
Richard Glick, Bernard L. McNamee,
and James P. Danly.

The Dayton Power and Light Company                  Docket Nos. ER20-1068-000
                                                                                  ER20-2100-000

ORDER ON TRANSMISSION INCENTIVES

(Issued August 17, 2020)

1.      On February 25, 2020, as supplemented on June 18, 2020, the Dayton Power and Light Company (Dayton) submitted, pursuant to sections 205 and 219 of the Federal Power Act (FPA),[1] Part 35 of the Commission's regulations,[2] and Order No. 679,[3] a request for approval of certain transmission rate incentives for investment in transmission projects Dayton asserts are needed for reliability (i.e., the Transmission Enhancement Plan (TEP) Projects) (Incentive Rate Application).[4] Dayton requests that the Commission grant three transmission rate incentives:  (1) a 50 basis point adder to the authorized return on equity (ROE) to reflect Dayton's continued membership in PJM Interconnection, L.L.C. (PJM) (RTO Participation Adder), with such ROE not to exceed the upper end of the zone of reasonableness, to apply to Dayton's entire transmission rate base; (2) inclusion of 100% Construction Work in Progress (CWIP) in rate base for TEP Projects only (CWIP Incentive); and (3) 100% recovery of all prudently-incurred transmission-related development and construction costs if one or more TEP Projects are

---

[1] 16 U.S.C. §§ 824d, 824s (2018).

[2] 18 C.F.R. pt. 35 (2019).

[3] *Promoting Transmission Inv. through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[4] On June 18, 2020, Dayton submitted a supplement to its initial application in Docket No. ER20-2100 by submitting eTariff records to establish a statutory effective date for the Incentive Rate Application (Supplemental Filing) under 18 C.F.R. § 35.7 (2019).

Docket Nos. ER20-1068-000 and ER20-2100-000                              - 2 -

cancelled or abandoned, in whole or in part, as a result of factors beyond Dayton's control (Abandoned Plant Incentive).

2.      As discussed below, Dayton's filing is rejected in part, accepted in part to become effective May 3, 2020, and, with respect to the requested RTO Participation Adder, accepted for filing and suspended for a five month period , subject to refund and to the outcome of the paper hearing procedure established herein.  We also reject as moot the eTariff records in the Supplemental Filing and deny the request to consolidate Docket Nos. ER20-1068-000 and ER20-2100-000.

# I.      **Background**

3.      Dayton is an Ohio public utility that is an indirect, wholly owned subsidiary of the AES Corporation.  Dayton owns transmission facilities subject to the functional control of PJM and is a signatory to the PJM Amended and Restated Operating Agreement.  Dayton provides electric service to the Dayton, Ohio area.

## A.      **The TEP Projects**

4.      Dayton states that the TEP Projects are baseline upgrades and Supplemental Projects[5] that have been identified by PJM and Dayton, respectively, as upgrades or new facilities necessary to resolve NERC reliability violations or to address other critically needed reliability improvements to the Dayton transmission system.  Dayton explains that the TEP Projects are estimated to cost approximately $170 million, which is projected to increase Dayton's gross transmission plant in service by approximately 40% over the next four years and its net transmission investment by 90%.  Dayton notes that the TEP Projects comprise a subset of Dayton's total planned transmission investment, since Dayton plans to continue to invest in transmission projects to maintain, repair, or make minor upgrades to existing facilities that have typically averaged between $5 million and $14 million per year.  Dayton states that almost all the TEP projects will be placed into service by the summer of 2023.[6]

---

[5] A Supplemental Project is defined as a transmission expansion or enhancement that is not required for compliance with the following PJM criteria:  system reliability, operational performance or economic criteria, pursuant to a determination by PJM, and is not a state public policy project pursuant to section 1.5.9(a)(ii) of Schedule 6 of the PJM Operating Agreement.  PJM, Intra-PJM Tariffs, Operating Agreement, Definitions S-T.

[6] Incentive Rate Application Transmittal at 5-8.  Dayton states that there may be subsequent phases of projects planned over the next few years for upgrades or new facilities to be in service after 2024 but that Dayton is not requesting, at this time,

5.      Dayton explains that, while most of the TEP Projects are specifically planned to meet NERC planning standards, there are certain projects needed for operational system voltage issues that are identified through Dayton's studies that will improve area voltage profiles, ensure adequate thermal loadings on transmission facilities, and address operational issues that surface under different load and generation scenarios, including under scenarios affecting 69 kV transmission facilities.  Thus, Dayton explains that there are two primary drivers to this transmission expansion:  first, the TEP Projects that are baseline upgrades addressing PJM transmission reliability requirements that are approved in PJM's Regional Transmission Expansion Plan (RTEP) process and, second, the TEP Projects that are Supplemental Projects addressing system reliability performance issues based on Dayton's local transmission planning criteria and planning assumptions, such as aging infrastructure, legacy system design and electrical configurations, and retirements of generation plants in the region.[7]

6.      Dayton explains that the TEP Projects fall into three categories:  (1) Category 1, which are baseline upgrades identified and selected by PJM through its RTEP process as necessary to resolve NERC reliability violations; (2) Category 2, which are Supplemental Projects that operate at or above 125 kV and that are required under Ohio law to be approved by the Ohio Power Siting Board (Ohio Siting Board) after making a determination of public need; and (3) Category 3, which are Supplemental Projects that Dayton states are required to enhance reliable operations but, because they operate at voltage levels below 125 kV, are not subject to approval from either the PJM RTEP or the Ohio Siting Board.  These 24 projects are listed in the Appendix.

## B.      Incentive Rate Application in Docket No. ER20-1068-000

7.      Dayton requests a 50 basis point RTO Participation Adder, with the total ROE not to exceed the upper end of the zone of reasonableness, to apply to its entire transmission rate base, including both TEP Projects and non-TEP Project investments.  Dayton states that this incentive predates Order No. 679 and has been authorized for every transmission owner operating within PJM that has a formula-based transmission rate.  Additionally, for the TEP Projects, Dayton requests both the CWIP Incentive and Abandoned Plant Incentive.  Dayton requests that the transmission incentives be implemented contemporaneously with the effective date that will be established by the Commission in its review of its transmission formula rate filing submitted under FPA section 205 in Docket No. ER20-1150-000 (Transmission Formula Rate Filing).[8]  On

---

transmission incentives that would apply with respect to these potential future projects. *Id.* at 7.

[7] *Id.* at 5-8.

[8] *Id.* at 4-5.

May 1, 2020, the Commission accepted the Transmission Formula Rate Filing and suspended it for a nominal period, to become effective May 3, 2020, as requested, subject to refund, and set it for hearing and settlement judge procedures.[9]

### C.    Supplemental Filing in Docket No. ER20-2100-000

8.    On June 18, 2020, Dayton submitted the Supplemental Filing to establish a statutory effective date with respect to the Incentive Rate Application in Docket No. ER20-1068-000 and an eTariff record on June 3, 2020 (Supplemental Filing).[10] Dayton moves to consolidate the Supplemental Filing in Docket No. ER20-2100-000 with the Incentive Rate Application in Docket No. ER20-1068-000.[11]

## II.    Notice of Filings and Responsive Pleadings

9.    Notice of the Incentive Rate Application filing was published in the *Federal Register*, 85 Fed. Reg. 12,283 (Mar. 2, 2020), with interventions and comments due on or before March 17, 2020.  Timely motions to intervene were filed by Public Citizen, Inc., American Municipal Power, Inc. (AMP), Buckeye Power, Inc., and Industrial Energy Users-Ohio.  The Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (Ohio Commission) filed a notice of intervention and protest. The Office of the Ohio Consumers' Counsel (Ohio Consumers' Counsel) filed a timely motion to intervene and protest.

10.    On March 24, 2020, Dayton filed an answer to the Ohio Commission and Ohio Consumers' Counsel protests.

11.    Notice of the Supplemental Filing was published in the *Federal Register*, 85 Fed. Reg. 37,931 (June 24, 2020), with interventions and comments due on or before July 9, 2020.  AMP submitted a timely motion to intervene.  Ohio Consumers' Counsel filed a timely motion to intervene and protest.

12.    On July 13, 2020, Dayton filed an answer to the Ohio Consumers' Counsel protest.

---

[9] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,087 (2020) (May 1, 2020 Order).

[10] Supplemental Filing Transmittal at 1-2 (citing *Electronic Tariff Filings*, Docket No. RM01-5-000 (June 3, 2020) (June 3 Notice of Procedures)).

[11] *Id.* at 2.

## III.    Discussion

### A.    Procedural Matters

13.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2019), the notice of intervention and timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

14.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2019), prohibits an answer to a protest unless otherwise ordered by the decisional authority.  We accept Dayton's answers because they have provided information that assisted us in our decision-making process.

### B.    Substantive Matters

#### 1.    RTO Participation Adder

##### a.    Filing

15.    Regarding its request for the RTO Participation Adder, Dayton explains that the Commission has a long-standing policy that pre-dates Order No. 679 to provide a 50 basis point adder to the base ROE of a transmission owner's entire rate base, to encourage transmission-owning utilities to join (and remain as participants of) a Regional Transmission Organization (RTO).  Dayton notes that it has been a member of PJM since 2004 but has not had a rate case since then to seek this incentive.  Dayton explains that its stated transmission rates, which were effective prior to the Commission accepting Dayton's Transmission Formula Rate Filing, pre-date Dayton's membership in PJM and that Dayton is now requesting this incentive so that it can be included in a transmission formula rate and made effective when Dayton files for, and the Commission makes effective, that formula rate.[12]

##### b.    Protests and Answers

16.    Ohio Commission objects to Dayton's request for the RTO Participation Adder. Ohio Consumers' Counsel argues that there is no automatic entitlement to a 50 basis point RTO Participation Adder for any transmission owner joining an RTO.  Ohio Consumers' Counsel states that the Commission explicitly rejected in Order No. 679 calls for a "generic adder" for RTO membership and that the Commission instead tied

---

[12] Incentive Rate Application Transmittal at 31-32.  As noted above, the Commission accepted the Transmission Formula Rate Filing on May 1, 2020 to be effective May 3, 2020.

eligibility for the RTO Participation Adder to the fact that RTO membership is generally voluntary.[13]

17.    Ohio Commission and Ohio Consumers' Counsel both assert that, under Ohio state law, all transmission owners with facilities in Ohio are required to be members of PJM or an RTO.[14]  Ohio Consumers' Counsel contends that, if Dayton were not a member of PJM or another qualifying transmission entity, Dayton would be forbidden to own or control transmission facilities located in Ohio.[15]  Ohio Commission argues that it makes no sense to incent an activity that has already been accomplished and is required in any event under applicable law.[16]  Ohio Commission asserts that over time the RTO Participation Adder has become the rule rather than the exception in much of the country.

18.    Ohio Commission and Ohio Consumers' Counsel both cite *CPUC v. FERC*,[17] in which the U.S. Court of Appeals for the Ninth Circuit held that the Commission was arbitrary and capricious in awarding Pacific Gas & Electric Company (PG&E) an RTO Participation Adder.  Ohio Commission states that the court explained that the Commission has "a longstanding policy that incentives should only be awarded to induce future behavior."[18]  Both Ohio Commission and Ohio Consumers' Counsel thus argue that this case supports the proposition that an incentive cannot induce behavior that is already legally mandated and that, because Ohio law requires RTO membership, the Commission should deny Dayton's request for the RTO Participation Adder.  Ohio Commission acknowledges that, in its order on remand of the underlying proceeding at issue in *CPUC v. FERC*, the Commission approved PG&E's RTO Participation Adder because it determined that PG&E's participation in the California Independent System Operator was voluntary.[19]

---

[13] Ohio Consumers' Counsel Protest at 26.

[14] Ohio Commission Protest at 6; Ohio Consumers' Counsel Protest at 26 (citing Ohio Rev. Code § 4928.12).

[15] *Id.* at 26.

[16] Ohio Commission Protest at 6.

[17] *Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966 (2018) (*CPUC v. FERC*).

[18] Ohio Commission Protest at 6 (citing *CPUC v. FERC*, 879 F.3d 966).

[19] *Id.* at 6 (citing *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 (2019), *reh'g denied*, 170 FERC ¶ 61,194 (2020) (*PG&E*)).

19.     In its answer, Dayton argues that its request for a 50 basis point RTO Participation Adder provides a continuing inducement for Dayton to remain a member of PJM.[20]  Dayton alleges that Ohio Commission overstates the Ohio law by asserting "under state law in Ohio, all transmission owners with facilities in Ohio, are required to be members of a fully-functional RTO."  Dayton states that Ohio Revised Code section 4928.12 does not require Dayton to continue to be a member of PJM or of any other RTO but that instead the law requires Dayton to transfer operational control to a third-party transmission operator that is:  (1) approved by the Commission; (2) operates independently from the transmission owner; (3) eliminates barriers to market entry by others; (4) operates in real-time to enhance reliability; and (5) reduces congestion, among other criteria.  Dayton contends that none of these requirements include centralized transmission planning or construction.  Dayton concludes that it could withdraw from PJM and enter into an arrangement with an independent transmission organization, not an RTO.  Dayton asserts that this alternative arrangement would fully comply with Ohio law and would recapture all autonomy over bulk transmission system planning and construction programs that it has otherwise yielded to PJM by remaining a member.  Dayton recognizes that such an arrangement would diminish benefits that are currently provided—as a result of Dayton's membership in PJM—to customers, transmission-dependent utilities, and interconnected generators within Dayton's footprint.[21]

20.     Dayton also argues that Ohio Commission and Ohio Consumers' Counsel misconstrue the court's ruling in *CPUC v. FERC* in their attempt to apply it to Dayton.  Dayton states that the court ruled that the Commission incorrectly established the equivalent of a generic rule in granting the RTO Participation Adder to PG&E on the sole basis of membership in an RTO, without conducting further case-by-case analysis.[22]  Dayton states that neither Ohio Commission nor Ohio Consumers' Counsel recognize that, when the Commission did perform that individual case analysis for PG&E, the Commission again granted an RTO Participation Adder of 50 basis points.[23]  Dayton contends that a similar case-by-case review for Dayton will yield the same result.

21.     Finally, Dayton clarifies that its request for the RTO Participation Adder is not predicated on its investment in the TEP Projects.  However, Dayton notes that the RTO Participation Adder would support Dayton's financial integrity and ability to borrow at reasonable rates while constructing the TEP Projects.  Dayton asserts that it is currently

---

[20] Dayton Answer at 6-7.

[21] *Id.* at 7-8.

[22] *Id.* at 8-9.

[23] *Id.* (citing *PG&E*, 168 FERC ¶ 61,038 at P 2).

on the lower edge of investment grade status among the major credit rating entities and that, over its first full year, the RTO Participation Adder would contribute an additional $650,000 toward Dayton's ability to maintain its coverage ratios and cover its financing costs.[24]

### c.     Determination

22.     Based upon a review of the filing, we find that the requested 50 basis point RTO Participation Adder has not been shown to be just and reasonable, and may be unjust, unreasonable, unduly discriminatory, or otherwise unlawful. Accordingly, we will accept this part of the proposal for filing and suspend it for a five month period, subject to refund and the outcome of a paper hearing to explore whether Dayton has shown that its participation in PJM or another RTO is voluntary, as required for it to be entitled to the adder,[25] or if such participation is mandated by Ohio law. Initial responses to the questions in the Appendix of this order are due within 60 days of the date of this order and reply comments to the initial responses are due within 30 days of the initial responses.

### 2.     Project-Specific Transmission Incentives

23.     As discussed below, evaluating Dayton's request for the CWIP and Abandoned Plant Incentives requires a multi-step analysis. First, we examine whether Dayton has demonstrated that its request satisfies the eligibility requirements under FPA section 219. Next, we examine whether Dayton's request satisfies the Commission's nexus test as established in Order No. 679. For those projects that we find are eligible under FPA section 219 and the Order No. 679 nexus test, we then examine Dayton's specific requests for the CWIP Incentive and the Abandoned Plant Incentive, each in turn.

### a.     General Matters

### i.     FPA Section 219 Requirement

24.     In the Energy Policy Act of 2005,[26] Congress added section 219 to the FPA, directing the Commission to establish, by rule, incentive-based rate treatments to promote capital investment in certain transmission infrastructure. The Commission subsequently issued Order No. 679 in 2006, which sets forth processes by which a

---

[24] *Id.* at 6, 9.

[25] *See CPUC v. FERC*, 879 F.3d 966, 979 (2018).

[26] Pub. L. No. 109-58, § 1241, 119 Stat. 594 (2005).

public utility may seek transmission rate incentives pursuant to FPA section 219, including the incentives Dayton is requesting here. Additionally, in November 2012, the Commission issued a policy statement providing additional guidance regarding its evaluation of applications for transmission rate incentives under FPA section 219 and Order No. 679.[27]

25.    Pursuant to Order No. 679, an applicant may seek to obtain incentive rate treatment for a transmission infrastructure investment that satisfies the requirements of FPA section 219, i.e., the applicant must show that "the facilities for which it seeks incentives either ensure reliability or reduce the cost of delivered power by reducing transmission congestion."[28] Order No. 679 established the process for an applicant to demonstrate that it meets this standard, including a rebuttable presumption that the standard is met if: (1) the transmission project results from a fair and open regional planning process that considers and evaluates the project for reliability and/or congestion and is found to be acceptable to the Commission; or (2) a project has received construction approval from an appropriate state commission or state siting authority.[29] The Commission also stated that "other applicants not meeting these criteria may nonetheless demonstrate that their project is needed to maintain reliability or reduce congestion by presenting [to the Commission] a factual record that would support such a finding."[30]

**(a)    Filing**

26.    Dayton argues that the Category 1 and Category 2 projects qualify for the rebuttable presumption of eligibility under FPA section 219. Regarding the Category 1 projects—TEP Projects that are baseline upgrades—Dayton asserts that the Commission has previously accepted the RTEP process as just and reasonable and has also found that the RTEP process satisfies the requirements of Order No. 679 regarding the rebuttable presumption.[31] Regarding the Category 2 projects—TEP Projects that are Supplemental Projects and require state siting approval—Dayton states that each such TEP Project has

---

[27] *Promoting Transmission Inv. through Pricing Reform*, 141 FERC ¶ 61,129 (2012) (2012 Policy Statement).

[28] Order No. 679, 116 FERC ¶ 61,057 at P 76.

[29] *Id.*

[30] *Id.* at 57; Order No. 679-A, 117 FERC ¶ 61,345 at P 41.

[31] Incentive Rate Application Transmittal at 9, 13-14 (citing *Duquesne Light Co.*, 118 FERC ¶ 61,087, at P 65 (2007)).

been, or will be submitted in the near future, to the Ohio Public Siting Board to make a public need determination on the basis of enhancing reliability.[32]

27.     As for the Category 3 projects—TEP Projects that are Supplemental Projects and do not require either PJM RTEP or state siting approval—Dayton contends that those projects also qualify for transmission incentives under Order No. 679, although not for the rebuttable presumption of eligibility.  Dayton states that each such project is designed to:  (1) enhance reliable service to customers; (2) reduce, and recover faster from, outages; (3) enhance technology on the grid; and (4) play a major role in the overall modernization of transmission equipment to meet the challenges of an evolving grid.  Dayton also states that these projects will be built contemporaneously with the other categories of TEP Projects and that, accordingly, the TEP Projects in this third category will contribute to Dayton's substantial financial risks associated with implementing the TEP.[33]  For these reasons, Dayton argues that this category of TEP Projects should also qualify for transmission incentives.

                    (b)     **Protests and Answers**

28.     Ohio Consumers' Counsel contends that projects that the applicant is required to build for reliability should not be eligible for transmission incentives.[34]  Ohio Consumers' Counsel concedes that Dayton is entitled to the rebuttable presumption for all Category 1 projects[35] and for one of the Category 2 projects (Buckeye Haas Delivery Point, Bethel Township), but argues that Dayton is not entitled to the rebuttable presumption for the remaining four Category 2 projects[36] or for any of the Category 3 projects.  Regarding these contested projects, Ohio Consumers' Counsel argues that Dayton has not demonstrated that these projects otherwise satisfy the requirement in FPA section 219 and Order No. 679 that "only projects [that are needed to improve] reliability *and* access to lower cost power supplies should be eligible for transmission [] incentives."[37]  In particular, Ohio Consumers' Counsel states that Dayton discusses the

---

[32] *Id.* at 19-20.

[33] *Id.* at 24.

[34] Ohio Consumers' Counsel Protest at 16-19.

[35] *Id.* at 12.

[36] These are:  (1) Gebhart Substation 138kV; (2) South Charleston (Madison) Substation 345 kV; (3) Clinton 345 kV/69 kV Transformer; and (4) Fort Recovery Line, Transformer, and Capacity Bank.  *Id.*

[37] *Id.* at 14.

projects' reliability benefits but does not discuss whether those projects "will also provide the required lower cost power supply benefits."[38]

29.     In its answer, Dayton clarifies that Gebhart Substation 138kV, a Category 2 project, also received Ohio Siting Board approval after the original filing.[39]  For the remaining three Category 2 projects that have yet to be approved by the Ohio Siting Board, Dayton states that these projects are also eligible for the rebuttable presumption because it has committed to file for approval of these projects from the Ohio Siting Board, without which Dayton would be prohibited from construction.  Dayton states that it would not object to the Commission imposing an additional requirement that it inform the Commission and parties in its annual informational filing, which is part of its proposed formula rate, once requested approvals are received from the Ohio Siting Board.[40]  With respect to the Category 3 projects, Dayton agrees that the rebuttable presumption does not apply.  However, Dayton argues that it has demonstrated that the Category 3 projects address reliability needs and provide associated benefits.  Dayton submits that there is no requirement to demonstrate that these projects *also* reduce congestion.[41]  Moreover, Dayton argues that the "and" test does not exist and never has. Dayton states that the "and" test interpretation was proposed by some commenters in Order No. 679, but the Commission rejected it.  Dayton explains it only needs to show that its projects ensure reliability *or* reduce the cost of delivered power in order to meet the rebuttable presumption under Order No. 679.

30.     Dayton responds that Ohio Consumers' Counsel's argument, that projects that are required to be built should be ineligible for incentives, makes the rebuttable presumption meaningless.  Dayton alleges that Ohio Consumers' Counsel offers inconsistent arguments:  on the one hand, Dayton notes Ohio Consumers' Counsel claims that four Category 2 projects are ineligible for incentives because they lack the rebuttable presumption, while on the other hand Dayton notes Ohio Consumers' Counsel claims that these same projects would be ineligible for incentives once they are approved by PJM because they would be required.[42]

---

[38] *Id.*

[39] Dayton Answer at 17.

[40] *Id.* at 17-18.

[41] *Id.* at 18-19.

[42] *Id.* at 14-15.

Document Accession #: 20200817-3068    Filed Date: 08/17/2020

### (c)    **Determination**

31.    Pursuant to Order No. 679, an applicant may seek to obtain incentive rate treatment for a transmission infrastructure investment that satisfies the requirements of section 219, i.e., the applicant must show that "the facilities for which it seeks incentives either ensure reliability or reduce the cost of delivered power by reducing transmission congestion."[43]  The Commission established the process for an applicant to demonstrate that it meets this standard, including a rebuttable presumption that the standard is met if: (1) the transmission project results from a fair and open regional planning process that considers and evaluates the project for reliability and/or congestion and is found to be acceptable to the Commission; or (2) a project has received construction approval from an appropriate state commission or state siting authority.[44]  The Commission also stated that "other applicants not meeting these criteria may nonetheless demonstrate that their project is needed to maintain reliability or reduce congestion by presenting [to the Commission] a factual record that would support such a finding."[45]

32.    The Commission has found that transmission projects that are approved as baseline upgrades and approved in PJM's RTEP are entitled to the rebuttable presumption, as established under Order No. 679, because such projects will either ensure reliability or reduce the cost of delivered power by reducing transmission congestion.  Here, the transmission facilities that make up the Category 1 projects were approved for inclusion in the PJM RTEP as baseline upgrades, as demonstrated by the nine construction notices that PJM issued to Dayton.  Accordingly, we find that all the Category 1 projects are entitled to the rebuttable presumption as established under Order No. 679.

33.    In addition, the Commission has found that transmission projects approved by a state siting board are entitled to the rebuttable presumption.  Here, two of the Category 2 projects—Buckeye Haas Delivery Point, Bethel Township and Gebhart Substation 138 kV—were approved by the Ohio Siting Board.  Accordingly, we find that these two Category 2 projects are entitled to the rebuttable presumption.

34.    The three remaining Category 2 projects—(1) South Charleston (Madison) Substation 345 kV, (2) Clinton 345 kV/69 kV Transformer, and (3) Fort Recovery Line, Transformer, and Capacity Bank—have not been approved by the Ohio Siting Board and ordinarily would not be entitled to the rebuttable presumption.

---

[43] Order No. 679, 116 FERC ¶ 61,057 at P 76.

[44] *Id*. P 58.

[45] *Id.* P 57; *see also* Order No. 679-A, 117 FERC ¶ 61,345 at P 41.

35.    Dayton, however, states that these three projects must receive Ohio Siting Board approval before Dayton can build them.  Given the facts and circumstances in this matter whereby the projects cannot be built without Ohio Siting Board approval, we find, conditionally, that:  (1) South Charleston (Madison) Substation 345 kV, (2) Clinton 345 kV/69 kV Transformer, and (3) Fort Recovery Line, Transformer, and Capacity Bank, do qualify for the rebuttable presumption.  Our finding, however, is conditioned upon each project being approved by the Ohio Siting Board.  To that end, we direct Dayton to submit a compliance filing within 60 days of the approval of each of these three projects by the Ohio Siting Board, notifying and providing evidence to the Commission of any such approval.  In this compliance filing, Dayton must provide evidence that the planning process included a finding that the projects will ensure reliability or reduce the cost of delivered power by reducing congestion, consistent with Order No. 679-A.[46]

36.    The Category 3 projects have neither been approved in the PJM RTEP nor by the Ohio Siting Board.  Therefore, the Category 3 projects are not entitled to the rebuttable presumption.  In addition, we find that Dayton has failed to meet its evidentiary burden under FPA section 219 and the Commission's transmission incentives policy to independently show that each project in Category 3 is needed to maintain reliability or reduce congestion.

37.    Dayton principally relies on the inclusion of these TEP Projects as Supplemental Projects within the RTEP, supported by brief project descriptions and slides presented at PJM stakeholder meetings.  Dayton indicates that Category 3 includes projects that primarily improve segments of its 69 kV transmission system and states that the majority of these projects will improve reliability by reducing outages and line overloading.  However, we note that the PJM Board does not approve or select Supplemental Projects in the RTEP.[47]  Further, Dayton provides no congestion analysis nor any third-party analyses of reliability benefits.  Where the Commission previously has granted requests for incentives for projects that have not relied on FPA section 219's rebuttable presumption, the applicants supported their requests with comprehensive and clear data, as well as internal and, in several cases, external studies.[48]  For these reasons, we find

_____

[46] *See* Order No. 679-A, 117 FERC ¶ 61,345 at P 49; *see also Cent. Me. Power Co.*, 125 FERC ¶ 61,182, at P 57 (2008).

[47] PJM, Intra-PJM Tariffs, Operating Agreement, Schedule 6, § 1.5.6(n) ("Supplemental Projects shall be separately identified in the RTEP and are not subject to approval by the PJM Board.").

[48] *See, e.g.*, *Green Power Express LP*, 127 FERC ¶ 61,031 (2009); *Pioneer Transmission, LLC*, 126 FERC ¶ 61,281 (2009); *Tallgrass Transmission, LLC*, 125 FERC ¶ 61,248 (2008).

the record here insufficient to warrant granting incentives under Order No. 679 for any of the Category 3 projects.

38.    We disagree with Ohio Consumers' Counsel that projects that an applicant is required to build should not be eligible for incentives because a transmission incentive can expedite a transmission project.[49]

### ii.    Order No. 679 Nexus

39.    In Order No. 679, the Commission required an applicant to demonstrate that there is a nexus between the incentives sought and the investment being made, in addition to satisfying the FPA section 219 requirement of ensuring reliability or reducing the cost of delivered power by reducing congestion.[50]  In Order No. 679-A, the Commission clarified that the nexus test is met when an applicant demonstrates that the total package of incentives requested is "tailored to address the demonstrable risks or challenges faced by the applicant."[51]  The Commission requires a project-specific demonstration of the nexus between the requested incentives and the risks and challenges of the project.[52]

### (a)    Filing

40.    Dayton asserts that there is a close nexus between each of the incentives that Dayton is requesting and the investment in TEP Projects that it plans to make.  Dayton states that each of the requested incentives will help Dayton mitigate the risks of a major construction program such as TEP and, thus, will preserve Dayton's credit quality and facilitate completion of the TEP.  Specifically regarding its credit quality, Dayton explains that its current credit ratings are tenuous relative to other utilities that compete for capital and that a large investment program like the TEP will place further downward pressure on those ratings.  Dayton notes that the TEP represents a major capital commitment for a company the size of Dayton:  its year-end 2018 gross transmission plant was $412 million, with the TEP costing approximately $170 million to complete through 2024.  In other terms, Dayton states that the TEP will require $35 million per

---

[49] *Bangor Hydro-Electric Company*, Opinion No. 489, 117 FERC ¶ 61,129, at P 109 (2006).

[50] Order No. 679, 116 FERC ¶ 61,057 at P 48.

[51] Order No. 679-A, 117 FERC ¶ 61,345 at P 40.

[52] *See* 18 C.F.R. § 35.35(d) (2019).

Docket Nos. ER20-1068-000 and ER20-2100-000                                          - 15 -

year, which is substantially higher than Dayton's typical transmission capital investment levels of $10 million per year.[53]

41.    Dayton also explains that the TEP Projects will enhance the technology capability of the transmission system by improving both data visibility and the ability of operators to remotely control facilities. Dayton states that the TEP Projects will replace electro-mechanical relays with newer microprocessor-based relays that isolate faults quicker and more reliably while providing more data to operators. Dayton states the TEP Projects will also implement technologies such as automatic reclosers and remote operator supervisory control and data acquisition controls. Dayton asserts that, as a result, these technologies will help improve overall system reliability by reducing mis-operations (such as excessive tripping), improving outage restoration time (through better capabilities to locate faults), and reducing the frequency and duration of outages. Additionally, Dayton states that it will install Remote Terminal Units at more substations. Dayton asserts that the data collected from these units will greatly improve third-party access to information regarding the transmission and distribution systems, which will help integrate newer technologies such as intermittent generators, distributed energy resources, distribution automation, and electric vehicles.[54]

### (b)    Protests and Answers

42.    Ohio Consumers' Counsel makes two arguments that apply to all of Dayton's transmission incentive requests. First, Ohio Consumers' Counsel argues that incentives must not apply to expenditures that have already occurred. Ohio Consumers' Counsel points out that in Dayton's filing, $22 million has already been spent on the TEP Projects by the end of 2019.[55] Second, Ohio Consumers' Counsel argues that Dayton's failure to invest in its grid over the last 50 or more years is being offered by Dayton as a justification for incentives.[56]

### (c)    Determination

43.    In applying the nexus test, we find that Dayton has sufficiently demonstrated that the Category 1 and Category 2 projects present risks and challenges that warrant the total package of incentives requested. As discussed above, because we find that Dayton has not demonstrated that the Category 3 projects satisfy the FPA section 219

---

[53] Incentive Rate Application Transmittal at 29-31.

[54] *Id.* at 37-38.

[55] Ohio Consumers' Counsel Protest at 25-27.

[56] *Id.* at 22-23.

requirements, we do not make a finding here regarding the nexus between the requested risk-reducing incentives and any risks and challenges associated with the Category 3 projects. For the Category 1 and Category 2 projects, we discuss our specific findings regarding the nexus between individual projects and the requested CWIP Incentive and the Abandoned Plant Incentive each in turn, in the following sections.

44.     Regarding Ohio Consumers' Counsel's contention that the $22 million that Dayton has already spent on the TEP Projects should be ineligible for incentives, we confirm that expenses incurred prior to the date of this order are ineligible for the Abandoned Plant Incentive.[57]  Regarding Ohio Consumers' Counsel's comment about Dayton's lack of investment in its facilities leading to old average age, the age of Dayton's facilities played no role in our determination of granting any incentives in this order.

### b.    Risk-Reducing Incentives

### i.    CWIP Incentive

### (a)    Filing

45.     Dayton states it is requesting the CWIP Incentive because it will help mitigate risk during construction and because Commission precedent supports granting Dayton the CWIP Incentive. Dayton explains that historically it has accrued an Allowance for Funds Used During Construction (AFUDC), an approach that has few adverse consequences when construction costs are relatively minor and stable over time. Dayton asserts that the size of investment contemplated in the TEP will impose significant financial pressure and that, absent the ability to include CWIP in rate base, Dayton's cash flow and its coverage ratios will suffer during the construction period. Dayton explains this will cause a decline in company debt ratings and adversely affect Dayton's ability to raise debt to finance ongoing operations.[58]

46.     Dayton notes that the Commission has previously found such factors justify a finding of a nexus between the CWIP Incentive request and the financial burdens associated with the TEP. Dayton argues that its request for the CWIP Incentive also strikes an appropriate balance between the company's need to maintain credit quality against the interests of its customers in paying reasonable rates. Dayton notes that including CWIP in rate base tends to smooth rate changes over time, relative to accruing AFUDC and interest during construction and then including those balances in rate base

---

[57] *See, e.g.*, *Pac. Gas and Elec. Co.*, 172 FERC ¶ 61,057, at PP 6-11 (2020); *see infra* note 89.

[58] Incentive Rate Application Transmittal at 32-33.

when the associated facilities enter service.  Dayton also notes that the Commission has previously found that the CWIP Incentive does not change the level of cost recovery but instead affects the timing of the cost recovery.[59]

47.     Finally, Dayton states that its formula rate application contains accounting procedures that are consistent with those accepted by the Commission for other transmission owners with formula rates.  Dayton explains that those account procedures are designed to ensure that it does not recover AFUDC to the extent that the Commission has granted the CWIP Incentive for certain transmission projects.[60]

### (b)     Protests and Answers

48.     Ohio Consumers' Counsel argues that Dayton fails to acknowledge the "duplicative cash flow improvement benefits" available under both a fully projected transmission formula rate (which Dayton seeks to implement) and the requested CWIP Incentive.[61]  Ohio Consumers' Counsel states that the Commission has repeatedly found that transmission formula rates promote regulatory certainty and rate stability while improving cash flow to ease financial pressure caused by transmission development programs.  Given this alleged duplication in cash flow benefits, Ohio Consumers' Counsel concludes that Dayton has failed to demonstrate that the overall package of requested incentives is just and reasonable.  Ohio Consumers' Counsel additionally notes that Dayton should not be concerned about being denied collection of its financing costs associated with constructing the TEP Projects, because the Commission's long-held policy of authorizing AFUDC ensures that Dayton would be made whole.  Ohio Consumers' Counsel argues that, at a minimum, the Commission should reject the CWIP incentive pending Dayton submitting an informational report in two years that provides a status update on the TEP Projects and any continuing funding concerns.  Ohio Consumers' Counsel contends that this requirement would be consistent with the 2012 Policy Statement's requirement that transmission incentives applicants should first take all reasonable steps to mitigate risks before requesting incentives.[62]

49.     Ohio Consumers' Counsel further argues that Dayton has not justified the nexus between Category 2 and 3 projects and the need for incentives because the annual

---

[59] *Id.* at 34 (citing Order No. 679-A, 117 FERC ¶ 61,345 at P 38).

[60] *Id.* at 34-35.

[61] Ohio Consumers' Counsel Protest at 8, 10.

[62] *Id.* at 9-11.

expenditures for these projects are "within the realm of Dayton's traditional $5 million to $14 million in annual transmission expenses."[63]

50.    Ohio Commission argues that Dayton does not support its 100% CWIP recovery proposal and that Dayton simply and generally references the same incentive granted to other transmission utilities, most recently Duquesne Light Company. Ohio Commission believes that granting transmission incentives should not be automatic but evaluated on a project-by-project basis, notwithstanding the reasonableness of a CWIP incentive. Ohio Commission argues that Dayton has not attempted to do that here; rather Dayton included "placeholders but no positive values for an additional return incentive (above the RTO participation adder) for qualified projects."[64] Ohio Commission argues that Dayton should be required to demonstrate that CWIP is necessary for a proposed project to proceed; otherwise, if the CWIP incentive is not necessary, the resulting formula rate for that project is not just and reasonable.

51.    In response to Ohio Commission's argument that Dayton has not justified its proposal on a project-by-project basis, Dayton states that the protest ignores that Category 1 projects are eligible for a rebuttable presumption and thus do not require a project-by-project analysis of eligibility. Regardless, Dayton claims that its application does, in fact, identify and describe each individual Category 1 project and the need for each of the PJM mandated baseline upgrades.[65] Dayton also rejects the test proposed by Ohio Commission to "demonstrate that the CWIP incentive is necessary for the individual project to proceed," noting that the test was explicitly rejected in Order No. 679.[66]

52.    In response to Ohio Consumers' Counsel, Dayton argues that transitioning to a formula rate does not eliminate its need for the CWIP Incentive. Dayton states that the recovery of costs through a formula rate that, for example, becomes effective January 2023 would not help enhance cash flow during 2021 and 2022 when significant construction costs are incurred. Further, Dayton argues, a formula rate made effective January 2023, including one based on forward projections, does not recover a year's worth of costs for a project with a planned in-service date of November 2023; instead,

---

[63] *Id.* at 15-16.

[64] Ohio Commission Protest at 7-8.

[65] Dayton Answer at 14.

[66] *Id.* (citing Order No. 679, 116 FERC ¶ 61,057 at P 48) ("We reject arguments that an applicant must show that but for the incentives the expansion would not occur.").

the January 2023 rate would reflect the annualized amount of only the last two months of costs for that project.[67]

53.    In response to calls for mitigation measures before employing incentives, Dayton states that the CWIP Incentive is the "mitigation method" that the Commission has said should be considered before requesting "other incentives."[68]

54.    In response to Ohio Consumers' Counsel's arguments that projects with annual expenditures are already within the realm of Dayton's traditional $5 million to $14 million covered in annual transmission expenses, Dayton counters that the TEP projects' expenses are above and beyond the traditional $5 million to $14 million that Dayton traditionally spends annually on transmission expenses.  Additionally, Dayton states that the requirement to impose a specific size threshold for eligibility has previously been declined by the Commission.[69]  Dayton argues that the Category 2 or Category 3 costs cannot be regarded in a vacuum, as the $86 million in Category 2 and 3 costs will be incurred over the same time frame as the $82.6 million being spent on Category 1 projects.  Dayton states that it is requesting the CWIP Incentive not because there is one exceptionally large project pending, but to provide necessary cash flow and reduce the financing and regulatory risk of a portfolio of reliability projects that together will provide important customer benefits while placing a utility of Dayton's size and credit rating under significant financial pressure.[70]

### (c)    Determination

55.    We grant Dayton's request for the CWIP Incentive for the Category 1 projects. We also grant Dayton's request for the CWIP Incentive for two of the Category 2 projects, Buckeye Haas Delivery Point, Bethel Township and Gebhart Substation 138 kV.  Furthermore, we grant Dayton's request for the CWIP incentive for the three remaining Category 2 projects—(1) South Charleston (Madison) Substation 345 kV, (2) Clinton   345 kV/69 kV Transformer, and (3) Fort Recovery Line, Transformer, and Capacity Bank—each conditioned upon its approval by the Ohio Siting Board, as discussed above.

56.    In Order No. 679, the Commission established a policy that allows utilities to include, where appropriate, 100% of prudently-incurred transmission-related CWIP in

---

[67] *Id.* at 15.

[68] *Id.* at 15-16 (citing 2012 Policy Statement, 141 FERC ¶ 61,129 at P 11).

[69] *Id.* at 19-20 (citing Order No. 679, 116 FERC ¶ 61,057 at P 50).

[70] *Id.* at 19-20.

rate base.[71]  The Commission stated that this rate incentive treatment will further improve the goals of FPA section 219 by providing up-front regulatory certainty, rate stability, and improved cash flow, reducing the pressure on an applicant's finances caused by investing in transmission projects.[72]

57.     We find that Dayton has shown a nexus between the proposed CWIP Incentive and its investment in the Category 1 and Category 2 projects.  These projects are each expected to cost altogether about $109 million, which will add approximately 25% to Dayton's total gross transmission investment.  The cost for completing these projects will put pressure on Dayton's finances.  Granting the CWIP Incentive will help ease this pressure by providing upfront certainty, improved cash flow, and reduced interest expense as Dayton proceeds with these projects.

58.     We disagree with Ohio Consumers' Counsel that a formula rate makes the CWIP Incentive unnecessary.  Both the formula rate and the CWIP Incentive do address cash flow issues for a utility, but in different ways.  The formula rate provides for recovery of the costs of the project once it goes into service (including the costs of financing the project during the construction phase).  CWIP provides for the recovery of costs during construction, which helps in obtaining financing at lower cost.[73]  It is appropriate and not duplicative for a utility to have both a formula rate and the CWIP Incentive for its projects, as each serve a different purpose.

59.     The Commission has also previously determined that some projects that are underway can be eligible for incentives, and such incentives apply to all project expenditures, including expenses that the developer has already occurred.[74]  In the case of the CWIP Incentive, the purpose of this incentive is to improve the cash flow of a utility that is undertaking a large transmission build.[75]  It is just and reasonable to allow the CWIP Incentive to apply to the portion of expenses that have already been incurred, since this expense is part of the reason the utility requires the incentive.

---

[71] Order No. 679, 116 FERC ¶ 61,057 at PP 29, 117.

[72] *Id*. P 115.

[73] A utility with CWIP recovers less after the project goes into service as it has already recovered some of its costs through CWIP.

[74] *See, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 165 FERC ¶ 61,083 at PP 17-22 (2018).

[75] Order No. 679, 116 FERC ¶ 61,057 at P 115.

Docket Nos. ER20-1068-000 and ER20-2100-000                                    - 21 -

60.     We also disagree with protesters that the size of the individual projects makes the
CWIP Incentive unwarranted.  For the CWIP Incentive, the relevant consideration is the
impact that the total suite of projects would have on the finances of the utility.  Here, the
project costs of the total suite of projects that are granted incentives in this order is large
relative to Dayton's total gross plant investment.

### ii.    **Abandoned Plant Incentive**

#### (a)    **Filing**

61.     Dayton requests the Abandoned Plant Incentive because of three categories of
risks facing the TEP Projects:  (1) cancellation by PJM; (2) state and local permitting
requirements that prevent project siting; and (3) federal and state environmental
permitting requirements that prevent project siting.  Regarding the first risk category,
Dayton states that PJM is entitled to cancel RTEP projects, including the TEP Projects,
if PJM decides that the conditions originally supporting the need for the project have
changed.  Regarding the second and third risk categories, Dayton states that it has not
yet obtained all the needed permits and local approvals to proceed with the TEP
Projects, and significant portions of these projects will be constructed through areas that
may trigger opposition from community or environmental groups.  Dayton asserts that
all three risk categories are outside of the control of Dayton's management, and
therefore the TEP Projects qualify for the Abandoned Plant Incentive.[76]

62.     Dayton states that it also recognizes that the Abandoned Plant Incentive is not
self-executing as of the time a project is canceled.  Dayton notes its obligation to make a
separate FPA section 205 filing demonstrating that the abandonment occurred for
reasons outside Dayton's control and that the costs expended prior to abandonment were
prudently incurred.  Dayton explains that such a separate filing would identify whether
Dayton seeks to recover 100% of prudently incurred costs, or some lesser percentage.[77]

#### (b)    **Protests and Answers**

63.     Ohio Consumers' Counsel argues that, regarding Dayton's request for the
Abandoned Plant Incentive for Category 1 projects, Dayton fails to identify specific
additional risks beyond siting, which is a risk that all projects carry and one that the base
ROE adequately addresses in most cases.  Further, Ohio Consumers' Counsel states that
none of the Category 1 projects will provide the lower cost power supply benefits but

---

[76] Incentive Rate Application Transmittal at 36-37.

[77] *Id.* at 37.

will provide only reliability improvements deemed necessary due to Dayton's failure in the past to invest in needed improvements.[78]

64.     Ohio Consumers' Counsel also argues that Dayton's request for the Abandoned Plant Incentive for Category 2 and 3 projects is purely based on its claim of not being able to obtain all needed permits and local approvals to proceed, which is insufficient because the Commission requires a demonstration of the scope, size, and federal and state siting requirements, which Dayton also fails to demonstrate.[79]

65.     Ohio Consumers' Counsel further protests that the "scope" and "size" of Dayton's projects do not satisfy the Commission's requirement because none of the projects entail investment of more than $15 million, and four of the nine fall well below $10 million.  Ohio Consumers' Counsel also argues that Dayton provides no information showing that its ROE does not already address the financial and siting risks given that these Category 2 and 3 projects are ordinary maintenance and upgrade projects, projects undertaken for local customer growth, or upgrades needed for individual customers.[80]

66.     In its answer, Dayton rebuts Ohio Consumers' Counsel's argument that, with respect to the Category 1 projects, Dayton failed to show that the projects provide lower cost power supply benefits in addition to reliability benefits, arguing that it need only show that the projects improve reliability *or* reduce congestion.[81]

67.     Dayton argues that Ohio Consumers' Counsel undervalues the risk of being unable to obtain all necessary permits and approvals.  Dayton argues that those risks are neither "normal" nor "controllable" as claimed by Ohio Commission; the risk of being unable to obtain all necessary permits and approvals alone is sufficient to warrant the Abandoned Plant Incentive.  Dayton further argues that the Abandoned Plant Incentive is exactly the tailored approach to mitigate the risk of being unable to obtain all necessary permits and approvals in the face of potential opposition.[82]

68.     Dayton disagrees with Ohio Consumers' Counsel's assertion that its projects' size is not large enough for the incentive.  Dayton argues that there is no specific size

---

[78] Ohio Consumers' Counsel Protest at 20-21.

[79] *Id.* at 21 (citing 2012 Policy Statement, 141 FERC ¶ 61,129 at P 11).

[80] *Id.* at 21-22.

[81] Dayton Answer at 21-22.

[82] *Id.* at 22-23.

threshold requirement.[83]  Moreover, Dayton asserts that it requests incentives due to the size of the portfolio of projects, not the size of any one particular project or category of projects.  The TEP, when complete, will nearly double Dayton's net transmission investment and represents a sizable investment over a four-year window for a utility of Dayton's size.[84]

### (c)    **Determination**

69.    We grant the requested Abandoned Plant Incentive for all the Category 1 projects, prospectively from the date of this order.[85]  We also grant the requested Abandoned Plant Incentive for two of the Category 2 projects prospectively, from the date of this order:  Buckeye Haas Delivery Point, Bethel Township and Gebhart Substation 138kV.  Furthermore, we also grant the requested Abandoned Plant Incentive for the remaining three Category 2 projects—(1) South Charleston (Madison) Substation 345 kV, (2) Clinton 345 kV/69 kV Transformer, and (3) Fort Recovery Line, Transformer, and Capacity Bank—conditioned upon and effective on their approval by the Ohio Siting Board as set forth in a compliance filing approved by the Commission, all as discussed above.

70.    In Order No. 679, the Commission found that the Abandoned Plant Incentive is an effective means of encouraging transmission development by reducing the risk of

---

[83] *Id.* at 23 (citing Order No. 679, 116 FERC ¶ 61,057 at P 50).

[84] *Id.*

[85] *See supra* note 61.  While the abandoned plant incentive granted by the Commission in this order is available only on a prospective basis, that does not foreclose the possibility of recovering certain abandoned plant costs incurred before the effective date of this abandoned plant incentive.  Specifically, the Commission's policy set forth in Opinion No. 295 controls the ability to obtain recovery of abandoned plant costs incurred prior to the effective date of the abandoned plant incentive and under that policy "prudently incurred abandoned plant costs should be equitably allocated between ratepayers and shareholders, and this allocation is typically limited to 50% of predeclaratory order costs, absent any unique circumstances that warrant deviation from this general principle." *Pac. Gas and Elec. Co.*, 172 FERC ¶ 61,057 at P 5; *see New England Power Co.*, Opinion No. 295, 42 FERC ¶ 61,016, *order on reh'g*, Opinion No. 295-A, 43 FERC ¶ 61,285 (1988).

non-recovery of costs.[86]  We find that Dayton has demonstrated a nexus between the recovery of prudently-incurred costs associated with abandoned transmission projects and its planned investment in the Projects.  We agree with Dayton that these projects face substantial risks outside of Dayton's control.  Projects in Category 1 could be cancelled by PJM, and projects in Category 2 could be cancelled by the Ohio Siting Board.  In addition, all projects in Categories 1 and 2 face the risk of various federal, state, or local permitting requirements that may prevent the siting of those projects.  We find that the risk of project cancellation is particularly acute when, as Dayton notes, Dayton has not yet obtained all the needed permits and local approvals to proceed with building these projects.[87]  Approval of the Abandoned Plant Incentive will attract financing for the Category 1 and Category 2 projects and protect Dayton from further losses if any of these projects should be cancelled for reasons outside Dayton's control.

71.     We will not determine the justness and reasonableness of Dayton's abandoned plant recovery, if any, until Dayton seeks such recovery in a future FPA section 205 filing.[88]  Order No. 679 specifically reserves the prudence determination for the later FPA section 205 filing that every utility is required to make if it seeks abandoned plant recovery.[89]

72.     We disagree with Ohio Consumers' Counsel that the size of the TEP Projects do not justify the Abandoned Plant Incentive.  For the reasons discussed above, we find that Dayton has made an adequate showing to satisfy the Order No. 679 nexus test with respect to this incentive.

### 3.   Waivers

#### a.   Filing

73.     Dayton states that, in consideration that this is not a general rate adjustment application but rather a filing specially authorized pursuant to Order No. 679, it requests waiver, for good cause shown, of any requirement in the Commission's regulations (18 C.F.R. Part 35) that would require Dayton to provide Statements AA through BM in support of its filing.  Dayton specifically requests waiver of section 35.13 of the

---

[86] Order No. 679, 116 FERC ¶ 61,057 at PP 163-166.

[87] *Supra* P 63.

[88] *Primary Power, LLC*, 131 FERC ¶ 61,015, at P 124 (2010).

[89] Order No. 679, 116 FERC ¶ 61,057 at PP 165-166.

Commission's regulations,[90] including waiver of Period I/Period II data requirements, and waiver of the requirement in section 35.13(a)(2)(iv) to determine if and the extent to which a proposed change constitutes a rate increase based on Period I/Period II rates and billing determinants.  Dayton states that it has not identified any additional waivers that are necessary, but requests that the Commission grant any additional waivers of its rules and regulations that are necessary to grant Dayton's application.[91]

### b.    Determination

74.    We find that Dayton's request for waiver of specific requirements of section 35.13 is reasonable and supported by Commission precedent.  Because Dayton will establish transmission rates prospectively using a formula rate that relies substantially on inputs from FERC Form No. 1 data, we find that Dayton is similarly situated to utilities for whom the Commission has waived certain filing requirements of section 35.13 involving other transmission incentive applications.[92]  We therefore grant waiver of the requirements to:  (1) provide Period I/Period II data (section 35.13(d)); (2) determine if, and the extent to which, a proposed change constitutes a rate increase based on Period I/Period II data (section 35.13(a)(2)(iv)); and (3) provide cost of service Statements AA through BM (section 35.13(h)).

75.    Section 35.13(a) requires Dayton to specifically identify the filing requirement that it wishes the Commission to waive.[93]  Except for the waivers granted above, we thus deny Dayton's request for blanket waiver of the requirements of section 35.13 of the Commission's regulations.

### 4.    Supplemental Filing

### a.    Filing

76.    Dayton states that, at the time it submitted its Incentive Rate Application, its belief was that it had made an FPA section 205 filing through the eLibrary system because there were no tariff sheets that needed to be filed as part of its application. Dayton states that it intended for the requested incentives to be included within

---

[90] 18 C.F.R. § 35.13 (2019).

[91] Incentive Rate Application Transmittal at 40.

[92] *See, e.g.*, *United Illuminating Co.*, 167 FERC ¶ 61,126, at P 71 (2019); *Commonwealth Edison Co.*, 119 FERC ¶ 61,238, at PP 92, 94 (2007).

[93] 18 C.F.R. § 35.13(a).

"placeholders" in the tariff sheets that were filed in the Transmission Formula Rate Filing.[94]

77.     Dayton states that, on June 3, 2020, in the Commission's June 3 Notice of Procedures, the Commission provided additional guidance as to how applicants should make filings under FPA section 205 where there is no need for a new or revised tariff sheet.  Dayton notes that the Commission described when these circumstances may arise including where an applicant is seeking approval of recovery of abandonment costs through a transmission formula rate.  Dayton states that, in conformance with the guidance of the June 3 Notice of Procedures, it filed a supplement to the Incentive Rate Application via eTariff to include the unchanged "live" tariff sheets for PJM OATT, Attachment H-15 (i.e., Dayton's Annual Transmission Rates for Network Integration Transmission Service).[95]  Dayton states that the June 3 Notice of Procedures recognizes the use of a single unchanged tariff sheet that relates to the filing being made in order to ensure recognition of a filing as statutorily submitted.[96]

78.     Dayton states that it prefers the effective date to be May 3, 2020, as it requested in its Incentive Rate Application,  Dayton also states that May 3, 2020 is the effective date of its Transmission Formula Rate Filing, which has been made effective subject to refund and further proceedings.[97]  Dayton states that, if the Commission is unable to issue a final order authorizing the requested incentives in the Incentive Rate Application, it requests an order establishing a May 3, 2020, effective date, subject to refund and further proceedings.[98]  Finally, Dayton states that, as an alternative, it requests that the Commission exercise its discretion and issue an order establishing an effective date one day after the date of this filing.

### b.      Protests and Answers

79.     Ohio Consumers' Counsel protests Dayton's request to charge the requested transmission rate incentives retroactively.  Ohio Consumers' Counsel argues that making the charges retroactive would be fundamentally unfair to Ohio consumers, would not provide adequate notice of this filing to those consumers, and would be inconsistent with section 205 of the FPA judicial precedent related to retroactive ratemaking and

---

[94] Supplemental Filing Transmittal at 3.

[95] *Id.* at 4.

[96] *Id.*

[97] *Id.*

[98] *Id.* at 5.

Commission policy.[99]  Ohio Consumers' Counsel argues that, because Dayton failed to request an effective date for the proposed incentives in its Incentive Rate Application, Ohio consumers had no notice of when Dayton wanted to make the incentives effective. Ohio Consumers' Counsel requests that the Commission reject Dayton's request for a retroactive effective date for the transmission rate incentives and instead make those rates, if authorized, effective no earlier than August 18, 2020.[100]

80.    In its answer, Dayton states that, with one ministerial exception, its Supplemental Filing is unchanged from its Incentive Rate Application, with the ministerial exception being that the Incentive Rate Application was filed in eLibrary as an FPA section 205 filing instead of eTariff.  Dayton states that it submitted the Supplemental Filing in eTariff, with unchanged tariff sheets from the Transmission Formula Rate Filing that became effective May 3, 2020.[101]  With respect to Ohio Consumers' Counsel's argument that Ohio consumers had no notice of when Dayton wanted to make the requested incentives effective, Dayton notes that its Incentive Rate Application, filed on February 24, 2020, requests that the transmission incentives be implemented contemporaneously with the effective date that would be established by the Commission in its review of the Transmission Formula Rate Filing, i.e., May 3, 2020.[102]  Dayton argues that its requested effective date provided 69 days' notice of its requested incentives.[103]

---

[99] Ohio Consumers' Counsel Supplemental Filing Protest at 1.

[100] Id. at 5.

[101] Dayton Supplemental Filing Answer at 2.

[102] Id. at 3 (citing Incentive Rate Application Transmittal at 2).  Dayton acknowledges that it may have inadvertently created an ambiguity on page 39 of its Incentive Rate Application Transmittal by specifying a requested effective date "as of the date of a Commission order approving them and after the effective date of a rate change authorized pursuant to a separate rate filing."  Dayton explains that the separate rate filing was a reference to the then-not-yet-filed Transmission Formula Rate Filing, which was filed eight days later on March 3, 2020 and made effective May 3, 2020, subject to further proceedings and potential refunds.  Dayton states that its assumption was that the Commission would issue an order in the Incentive Rate Application either prior to or contemporaneously with an order in the subsequently filed Transmission Formula Rate Filing.  Id. at 4 n.6.

[103] Id. at 3.

### c.     **Determination**

81.     As an initial matter, we find that Dayton's Incentive Rate Application requested that the transmission incentives be implemented contemporaneously with the effective date that was established in the Transmission Formula Rate Filing, and, thus, Dayton provided adequate advance notice of its request to permit that effective date.  The Supplemental filing merely established a date on which the filing would become effective in the event that the Commission failed to act on Dayton's filing.  We reject as moot the eTariff records submitted on June 18, 2020 in the Supplemental Filing as they duplicate existing tariff records.  We also reject Dayton's request to consolidate Docket Nos. ER20-1068-000 and ER20-2100-000 as unnecessary.

The Commission orders:

(A)     Dayton's requests for the CWIP Incentive are hereby granted for the Category 1 and Category 2 TEP Projects, effective May 3, 2020, as requested, as discussed in the body of this order.

(B)     Dayton's requests for the Abandoned Plant Incentive are hereby granted for the Category 1 projects effective on the date of this order, as discussed in the body of this order.  Dayton's requests for two of the Category 2 projects are hereby granted effective from the date of this order, as discussed in the body of this order:  Buckeye Haas Delivery Point, Bethel Township and Gebhart Substation 138kV.  Dayton's requests for the Abandoned Plant Incentive for the remaining three Category 2 projects are hereby granted—(1) South Charleston (Madison) Substation 345 kV, (2) Clinton 345 kV/69 kV Transformer, and (3) Fort Recovery Line, Transformer, and Capacity Bank—conditioned upon and effective on their approval by the Ohio Siting Board as set forth in a compliance filing approved by the Commission, all as discussed in the body of this order.

(C)     Dayton's requests for the CWIP Incentive and the Abandoned Plant Incentive are hereby denied for the Category 3 TEP Projects, as discussed in the body of this order.

(D)     Dayton's proposed RTO Incentive Adder is accepted for filing and suspended for a five month period, subject to refund and the outcome of the paper hearing procedure, as discussed in the body of the order.

(E)     Responses to the questions discussed in the Appendix to this order, accompanied by documents or affidavits, if necessary, are due within 60 days of the date of this order.  Reply testimony, evidence, and/or argument may be submitted 30 days thereafter, as discussed in the body to this order.

Docket Nos. ER20-1068-000 and ER20-2100-000                                    - 29 -

(F)    Dayton's waiver requests are hereby granted in part, and denied in part, as discussed in the body of this order.

(G)    Dayton's eTariff records submitted on June 18, 2020 are hereby rejected as moot, as discussed in the body of this order.

(H)    Dayton's motion to consolidate Docket Nos. ER20-1068-000 and ER20-2100-000 is hereby dismissed.

By the Commission.    Commissioner Glick is dissenting in part with a separate statement attached.
Commissioner Danly is concurring in part with a separate statement attached.

( S E A L )

Kimberly D. Bose,
Secretary.

Docket Nos. ER20-1068-000 and ER20-2100-000                                    - 30 -

## Appendix – Paper Hearing Questions

1.      Is there an arrangement under which Dayton could withdraw from an RTO and comply with the Ohio law, while not being eligible for an RTO Participation Adder?  If so, please describe that alternative arrangement.  If not, please explain why not.

2.      Explain how any alternative arrangement identified in response to Question 1 would comply with the Ohio Revised Code section 4928.12, but would not at the same time qualify for incentives for joining a Transmission Organization under section 35.35(e) of the Commission's regulations, 18 C.F.R § 35.35(e) (2019).  As part of your answer, please: (1) explain why such arrangement would not qualify for an incentive under section 35.35(e) of the Commission's regulations; and (2) address each of the 9 requirements for such an arrangement specified in Ohio Revised Code section 4928.12(B) and explain how the arrangement satisfies each such requirement.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power and Light Company          Docket Nos.    ER20-1068-000
                                                            ER20-2100-000

(Issued August 17, 2020)

GLICK, Commissioner, *dissenting in part*:

1.    I dissent in part from today's order because the record before us is clear that Ohio
law requires The Dayton Power and Light Company (Dayton) to be a member of a
Transmission Organization. As a result, there is nothing for the Commission to
incentivize by awarding an additional ROE for Transmission Organization membership.
Consistent with Commission precedent, that alone should be more than enough for us to
reject this aspect of Dayton's filing.

2.    Nevertheless, the Commission orders another round of briefing on the question of
whether Dayton is required to be a member of a Transmission Organization, including on
specific issues that the parties have already addressed. Where the law is as clear as it is
here, I see no reason to give Dayton a second bite at the apple after it has already failed to
adequately prove an essential element of its case for the requested incentive. Under those
circumstances, our role is to answer the legal questions presented to us, not to punt those
questions to another day.

*         *         *

3.    Section 219 of the Federal Power Act (FPA) requires the Commission to establish
an incentive for a utility that "joins" a "Transmission Organization."[1]  Section 3(29) of
the FPA, in turn, defines a Transmission Organization as "a Regional Transmission
Organization, Independent System Operator, independent transmission provider, or other
transmission organization finally approved by the Commission for the operation of
transmission facilities."[2]  To implement Congress's directive in section 219, the
Commission issued Order No. 679, which established an ROE adder for a transmission
owner that joins a "Transmission Organization."[3]  That incentive has come to be known

---

[1] 16 U.S.C. § 824s(c) (2018).

[2] 16 U.S.C. § 796(29).

[3] *See* 18 C.F.R. § 35.35(b)(2) (defining "Transmission Organization"); *id.*
§ 35.35(e) (codifying the RTO Participation Adder); *see also Promoting Transmission
Inv. through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, at P 326, *order on*

as an "RTO Participation Adder,"[4] even though, strictly speaking, the statutory definition of "Transmission Organization" is not limited only to RTOs or ISOs. The Commission has applied the RTO Participation Adder expansively, granting the incentive not just for joining a Transmission Organization, but also for remaining in one indefinitely.[5] Indeed, under the Commission's current policy, it presumes that any transmission owner in a Transmission Organization is eligible for an ROE adder, although that presumption is subject to rebuttal.[6]

4.      But even that expansive interpretation has its limits. Consistent with the Commission's "longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced,"[7] the Commission has, so far at least, refused to create a generic RTO Participation Adder that is categorically available to all transmission-owning members of an RTO or other Transmission Organization.[8] As a result, Commission precedent provides that parties may rebut the presumption that a transmission-owning member of a Transmission Organization is entitled to an RTO Participation Adder based on the specific circumstances of each individual proceeding.

5.      The U.S. Court of Appeals for the Ninth Circuit recently addressed an argument along those lines. In that case, the Commission took the still-hard-to-fathom position that Order No. 679 did not require it to consider the voluntariness of a utility's membership in a Transmission Organization and that it could summarily grant the RTO Participation Adder even where the relevant transmission owner was required to remain in the RTO.[9]

---

reh'g, Order No. 679-A, 117 FERC ¶ 61,345 (2006), order on reh'g, 119 FERC ¶ 61,062 (2007).

[4] See, e.g., N.Y. Indep. Sys. Operator, Inc., 171 FERC ¶ 61,119, at P 2 (2020).

[5] In Order No. 679, the Commission explained that the basis for granting the RTO Participation Adder to "entities that have already joined, and that remain members of" a Transmission Organization "is a recognition of the benefits that flow from membership in such organizations and the fact continuing membership is generally voluntary," 116 FERC ¶ 61,057 at P 331, with that voluntariness presumably being the reason that the RTO Participation Adder provides some incentive under those circumstances.

[6] Id. P 326.

[7] Cal. Pub. Utils. Comm'n v. FERC, 879 F.3d 966, 977 (9th Cir. 2018) (CPUC v. FERC); id. (explaining that "[t]his policy is incorporated in Order 679").

[8] Order No. 679, 116 FERC ¶ 61,057 at P 326.

[9] CPUC v. FERC, 879 F.3d at 972.

The court rejected the Commission's position, finding that it was a plainly erroneous interpretation of Order No. 679 and an arbitrary and capricious application of the Commission's policy on incentives.[10]  In particular, the Court admonished the Commission that its "policy that incentives should only be awarded to induce future behavior" was still very much in place following Order No. 679 and that granting an incentive for involuntary RTO participation would appear to violate that policy.[11]

6.      On remand from that decision, the Commission, for the first time, addressed whether California law required the transmission owner to be a member of CAISO, concluding that it did not.[12]  Although I dissented from the Commission's earlier approach of summarily granting RTO Participation Adders to transmission owners that had no choice but to remain in a Transmission Organization,[13] I agreed with the conclusion that California law did not require the transmission owner's participation in CAISO and, as a result, I concurred in the decision to award the RTO Participation Adder.[14]  Nevertheless, I noted that the Commission's reasoning supported the seemingly obvious conclusion that an RTO Participation Adder is inappropriate where a transmission owner is required to be a member of a Transmission Organization, leaving nothing for the adder to incentivize.[15]

7.      This case forces the Commission to confront that issue directly.  Dayton has requested an RTO Participation Adder and the Ohio Entities[16] have responded that granting the adder would be inappropriate because Dayton's participation in PJM or another Transmission Organization is statutorily required.[17]  I agree with the Ohio Entities.  Ohio law gives Dayton no choice but to remain in a Transmission Organization. Accordingly, awarding Dayton an RTO Participation Adder is inconsistent with the

---

[10] *Id.* at 974; *see also id.* ("When membership is not voluntary, the incentive is presumably not justified.").

[11] *CPUC v. FERC*, 879 F.3d at 977-78.

[12] *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038, at P 42 (2019).

[13] *S. Cal. Edison Co.*, 161 FERC ¶ 61,309 (2017) (Glick, Comm'r, dissenting).

[14] *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 (Glick, Comm'r, concurring).

[15] *Id.* (Glick, Comm'r, concurring at P 3).

[16] The Ohio Entities are the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (Ohio Commission) and the Ohio Consumers' Counsel.

[17] Ohio Consumers' Counsel Protest at 25-29; Ohio Commission Protest at 6-7.

Commission's longstanding policy that incentives must incentivize something and, therefore, arbitrary and capricious.[18]

8.      Section 4928.12 of the Ohio Code prohibits any entity from owning transmission facilities within the state "unless that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities."[19]  Ohio law then proceeds to define a qualifying transmission entity as one that meets all of nine defined criteria,[20] including, first and foremost, that the "transmission entity is approved by the Federal Energy Regulatory Commission."[21]

9.      That first criterion is all we need to resolve this issue.  As noted, the Commission's regulations provide that the RTO Participation Adder will be presumptively available to an entity that joins a Transmission Organization, which the FPA (and the Commission's regulations) define to include not just RTOs and ISOs, but also other transmission entities approved by the Commission.[22]  Nothing in this record explains how Dayton could comply with its obligation under Ohio law to be a member of and transfer control of its facilities to a transmission entity approved by the Commission without also meeting the criteria to be eligible for the RTO Participation Adder.  But if Ohio law effectively requires Dayton to be a member of a Transmission Organization, then an ROE adder, by definition, "will not induce [Dayton's] continuing participation in transmission organizations."[23]  Under those circumstances, forcing Dayton's customers to pay several hundred thousand dollars a year[24] because Dayton is a member of PJM would be inconsistent with the Commission's longstanding policy that incentives must incentivize something.

---

[18] *Cf. CPUC v. FERC*, 879 F.3d at 978 (explaining that awarding the RTO Participation Adder in that proceeding "was a departure from FERC's longstanding policy that incentives should only be awarded to induce voluntary conduct").

[19] Ohio Rev. Code § 4928.12(A).

[20] *Id.* § 4928.12(B).

[21] *Id.* § 4928.12(B)(1).

[22] *See supra* P 3.

[23] *CPUC v. FERC*, 879 F.3d at 977.

[24] Dayton Answer at 9 (suggesting that the RTO Participation Adder would permit it to recover an additional $650,000 in the first year it is available).

10.     Dayton responds to the Ohio Entities' arguments with a hypothetical in which it would leave PJM, give certain administrative duties to another RTO, and appoint a third organization as its reliability coordinator—a situation that would, according to Dayton, comply with Ohio law.[25]  As an initial matter, the relevant Ohio law requires Dayton to both be a member of *and* transfer operational control of its facilities to a transmission entity approved by the Commission.[26]  That means that whatever form the contemplated "delegation" to the other RTO (or other non-RTO Transmission Organization) took, it would need to include formal membership and actual transfer of operational control, which would make Dayton presumptively eligible for the RTO Participation Adder.[27]  But that brings us right back to where we were at the end of the previous paragraph, with Dayton having no choice under Ohio law but to be a member of a Transmission Organization, meaning that there is nothing for the RTO Participation Adder to incentivize.

11.     Instead, the decision purportedly being influenced by the RTO Participation Adder in Dayton's hypothetical is not whether to remain in a Transmission Organization generally—since even Dayton's hypothetical would seem to have it be a member of such an organization—but whether to leave a particular Transmission Organization, in this case, PJM, and enter some seemingly less advantageous arrangement.  That too is a dead end for Dayton.  Nothing in FPA section 219 or our precedent supports awarding an RTO Participation Adder on the basis that it induces participation in a *particular* Transmission Organization, rather than just a Transmission Organization generally.[28]

12.     In any case, it is far from clear that any arrangement short of full RTO membership would satisfy the other eight criteria enumerated in Ohio law.  As explained in the Ohio Entities' protests, those criteria include that the transmission entity must,

---

[25] *Id.* at 7-8.

[26] Ohio Rev. Code § 4928.12(A) (providing that "no entity shall own or control transmission facilities . . . unless that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities").

[27] Order No. 679, 116 FERC ¶ 61,057 at P 327 ("An entity will be presumed to be eligible for the incentive if it can demonstrate that it has joined an RTO, ISO, or other Commission-approved Transmission Organization, and that its membership is on-going.").

[28] *See* 16 U.S.C. § 824s(c) (requiring the Commission to adopt an incentive for "each transmitting utility or electric utility that joins *a* Transmission Organization" (emphasis added)); *see generally* Order No. 679, 116 FERC ¶ 61,057 at PP 326-332 (describing the benefits of Transmission Organization membership generally).

among other things, have an independent board, minimize pancaked transmission rates, be of sufficient scope to "substantially" increase economical supply options, and be capable of "maintaining real-time reliability of the electric transmission system, ensuring comparable and nondiscriminatory transmission access and necessary services, minimizing system congestion, and further addressing real or potential transmission constraints."[29]  Dayton has not provided any reason to believe that its hypothetical alternative arrangement could meet these criteria, which seem clearly designed to describe an RTO or, at the very least, an RTO-like entity that would constitute a Transmission Organization under the FPA and the Commission's regulations.  As such, the record indicates that Dayton's membership in a Transmission Organization is required by Ohio law and there is nothing for the RTO Participation Adder to incentivize.[30]

13.    Today's order provides no response to these arguments or any reason to doubt this straightforward reading of the principal legal issues.  Instead, the Commission simply orders the parties to rebrief those issues, including ones that Dayton has already addressed directly.[31]  We don't ordinarily give parties that fail to adequately address the key legal questions a second bite at the apple, especially where the legal issues are as clear as they are in this case.  Commissioner Danly should be commended for recognizing this point and for his concern about the impacts of Dayton's proposal on customers.[32]  But, while I share his concern for customers, I believe that our role as

---

[29] *See, e.g.*, Ohio Consumers' Counsel Protest at 26-27; *see also* Ohio Rev. Code § 4928.12(B)(1)-(9) (providing the full list of criteria).

[30] Dayton also suggests that the RTO Participation Adder is appropriate because the adder will support its "financial integrity and ability to borrow at reasonable rates." Dayton Answer at 9.  Taken seriously, that suggestion would support any increase in ROE irrespective of whether it has any relationship to the conduct it is supposed to incentivize, which, quite obviously, is not what Congress had in mind when it required that the incentive rates approved under section 219 be just and reasonable.  *See* 16 U.S.C. § 824s(d).

[31] One of the Commission's questions set for hearing is whether there is "an arrangement under which Dayton could withdraw from an RTO and comply with the Ohio law, while not being eligible for an RTO Participation Adder."  *The Dayton Power and Light Company*, 172 FERC ¶ 61,140 at Appendix (2020) (Order).  As noted, Dayton already proposed what it apparently believes to be such an arrangement, *see* Dayton Answer at 7-8, but which is unconvincing for the reasons addressed above, *see supra* PP 10-12.  I see no reason to require parties to revisit that issue a second time.

[32] *See* Order, 172 FERC ¶ 61,140 (Danly, Comm'r, concurring at P 2).

Commissioners requires us to answer legal questions as they are presented, rather than putting them off in the hopes of a more favorable outcome down the road.

14.    My dispute with the majority on this point may seem minor.  After all, the Commission may ultimately reject Dayton's request for the RTO Participation Adder, potentially for the reasons stated above.  But the Commission's decision to punt on the legal questions in today's order is concerning for two reasons.  First, the burden of proof in this filing, now made pursuant to section 205 of the FPA,[33] is squarely on Dayton, meaning that it is Dayton's obligation to demonstrate that it is entitled to the RTO Participation Adder.  The Commission's decision to require additional briefing appears to suggest that even the majority agrees that Dayton has not adequately addressed the legal issues that are essential to its ability to carry that burden.  And, unlike disputed issues of material *fact*, which may require the development of an additional record before an administrative law judge, legal issues, by definition, require no such record and are to be resolved by the Commission, aided by the FPA's burden of proof rules.  Applying those rules here, it is clear that Dayton has not carried its burden and that the only reasonable thing to do is reject its request for an RTO Participation Adder.  I recognize that the Commission has come under criticism from some who would prefer that transmission owners receive higher ROEs, but when the law and facts require it, sometimes you have to say no.

15.    Second, what makes that outcome particularly concerning is that today's order grants Dayton its requested effective date of May 3, 2020, for all accepted incentives, including the RTO Participation Adder.[34]  I am concerned that the second-bite-at-the-apple approach taken in this order creates an asymmetric risk for the very customers that Congress intended to protect by putting the burden of proof on a utility that seeks to increase its rates.  If Dayton's arguments prove no more convincing on the second go around, then customers will not have to pay the higher rates.  But, as explained in the previous paragraph, that is the result to which they are already entitled given Dayton's failure to adequately address the critical legal question and resulting failure to meet its burden of proof.  However, if Dayton ultimately succeeds where it has failed to date, and receives the RTO Participation Adder, its customers will be forced to pay that adder as of the May 3, 2020 date requested in Dayton's original filing, even though that filing, and the related pleadings, failed to carry Dayton's burden.  I see no principled reason for putting that asymmetric risk on customers where Dayton so patently failed to meet its burden of proof.

16.    Perhaps, given Commissioner Danly's concurrence, this approach will lead to a better outcome for customers *in this case*, although that remains to be seen.  But, even so,

---

[33] 16 U.S.C. § 824d.

[34] Order, 172 FERC ¶ 61,140 at P 2.

Docket Nos. ER20-1068-000 and ER20-2100-000                    - 8 -

I cannot avoid the conclusion that this type of procedural gambit creates an asymmetric risk for customers that is inconsistent with the burdens of proof established by the FPA. As such, even if the approach ultimately helps reach a better result in this particular instance, I cannot support it out of concern for the harm that legitimizing it may ultimately do in other cases down the road.

For these reasons, I respectfully dissent in part.

_____
Richard Glick
Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power and Light Company                Docket Nos.    ER20-1068-000
                                                                 ER20-2100-000

(Issued August 17, 2020)

DANLY, Commissioner, *concurring in part*:

1.      I concur in the ruling in this case on the RTO Participation Adder and join in the rest of the order.  I write separately to express my view that the issue set for hearing on the RTO Participation Adder is a legal question that likely could be resolved without a hearing.  Although I would have ruled on that question now, I acknowledge that it is within the Commission's discretion to set the matter for hearing instead.

2.       Further, were I to join in Commissioner Glick's dissent, that would cause a 2-2 split on The Dayton Power and Light Company's request for the RTO Participation Adder.  It would then go into effect by operation of law without further consideration of the legal question being set for hearing.  By concurring in the decision to set the RTO Participation Adder for hearing, that outcome is avoided.

        For these reasons, I respectfully concur in part.

_____
James P. Danly
Commissioner

**JA134**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | : | **Docket No. ER20-2100-000** |
| **The Dayton Power and Light Company** | : | |
| | : | |
| **The Dayton Power and Light Company** | : | **Docket No. ER20-1068-000** |

MOTION TO LODGE OF
PJM INTERCONNECTION, L.L.C.

Pursuant to Rule 212 of the Federal Energy Regulatory Commission's (the "Commission")

Rules of Practice and Procedure,[1] PJM Interconnection, L.L.C. ("PJM") submits this motion to

lodge in the record of the above-captioned proceedings a copy of PJM's July 1, 2020 comments

and the PJM Value Proposition, both of which were previously filed in Docket No. RM20-10-

000.[2]  The same Regional Transmission Organization ("RTO") Participation Adder policy issues

addressed in PJM's July 1 Comments and the attached PJM Value Proposition are implicated in

these proceedings.  Indeed, some of these same issues may be addressed by the Commission in

the paper hearing.  As such, the introduction of these materials will help ensure a more accurate

and complete record and will assist the Commission's deliberations.  For the reasons set forth

herein, the Commission should grant PJM's motion to lodge.

PJM's July 1 Comments and the PJM Value Proposition address, among other things, the

overall value of PJM membership to consumers.  The PJM Value Proposition, in particular, is

uncontested evidence submitted in other proceedings addressing how "PJM operations, markets

---

[1] 18 C.F.R. § 385.212 (2020).

[2] *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, Comments and Exhibits of PJM Interconnection, L.L.C., Docket No. RM20-10-000, at 1-12 and the PJM Value Proposition attached as Exhibit A (July 1, 2020) ("July 1 Comments and the PJM Value Proposition"), attached hereto as Exhibit 1.  PJM filed its July 1 Comments and the PJM Value Proposition in relation to the Notice of Proposed Rulemaking regarding electric transmission incentives policy under Section 219 of the Federal Power Act.  *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, 85 FR 18784-01 (Apr. 2, 2020) ("Proposed Rule").

and planning result in annual savings of $3.2 – 4 billion. . . . represent[ing] the vital functions that PJM provides and that lead to less cost to consumers."[3]  This evidence should be among the factors the Commission considers when deciding whether to award Dayton Power and Light Company's ("Dayton") request for the RTO Participation Adder.

PJM is aware that the Commission's August 17, 2020 Order on Transmission Incentives[4] focused on seeking briefs addressing two specific questions related to Ohio law.  However, through its September 16, 2020 Request for Clarification,[5] PJM urges the Commission to clarify that its procedural order stating an intent to "explore" the "voluntariness" of Dayton's participation in an RTO under Ohio law should not be construed as a holding that "voluntariness" is the sole criterion by which to judge the appropriateness of Dayton's RTO Participation Adder request.  PJM's clarification request notes that although the "voluntariness" issue is relevant to the analysis, the Commission should clarify that under applicable law,[6] an investigation of this singular issue is not dispositive of the question of the appropriateness of the RTO Participation Adder – especially absent review of a complete record.  The material PJM seeks to lodge will help develop a more complete record for the Commission to consider in its deliberations.

Moreover, in addressing requests by transmission owners for the RTO Participation Adder, the Commission has not previously required individual repeat showings in each individual rate

---

[3] July 1 Comments at Exhibit A at 1.

[4] *PJM Interconnection, L.L.C. and The Dayton Power and Light Company*, 172 FERC ¶ 61,140 (Aug. 17, 2020) (the "August 17 Order").

[5] *PJM Interconnection, L.L.C. and The Dayton Power and Light Company*, Request for Clarification and Motion to Intervene Out of Time in Docket No. ER20-1068-000 of PJM Interconnection, L.L.C., Docket Nos. ER20-2100-000 and ER20-1068-000 (Sept. 16, 2020) ("Request for Clarification").

[6] Such applicable law includes Commission regulation, precedent, and the Ninth Circuit's decision in *California Public Utilities Commission v. Federal Energy Regulatory Commission* 879 F. 3d 966 (2018).

2

proceeding of the RTO benefits that inure to consumers and members.  In fact, the Commission presumes that any transmission owner demonstrating ongoing membership in an RTO is eligible for the RTO Participation Adder.[7]  Should the Commission seek a specific showing of RTO benefits in each individual transmission owner rate proceeding, the material PJM seeks to lodge will assist the Commission's analysis on this issue.

Because the issues addressed in the July 1 Comments and the PJM Value Proposition are directly relevant to the ongoing proceedings here, the Commission should grant PJM's motion to lodge them in the record of these proceedings.

Date:  October 19, 2020                             Respectfully submitted,

Craig Glazer                                        By:  /s/ Mark J. Stanisz
Vice President–Federal Government Policy                 Mark J. Stanisz
PJM Interconnection, L.L.C.                             Senior Counsel
1200 G Street, N.W.                                      PJM Interconnection, L.L.C.
Suite 600                                               2750 Monroe Boulevard
Washington, D.C. 20005                                  Audubon, PA 19403
Ph:  (202) 423-4743                                     Ph:  (610) 666-4707
Fax: (202) 393-7741                                     Fax:  (610) 666-8211
craig.glazer@pjm.com                                    mark.stanisz@pjm.com

---

[7] *See Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 at P 327 (2006) ("An entity will be presumed to be eligible for the incentive if it can demonstrate that it has joined an RTO, ISO, or other Commission-approved Transmission Organization, and that its membership is on-going.").

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in the above-captioned proceedings.

Dated at Audubon, PA, this 19th day of October, 2020.

/s/ Mark J. Stanisz
Mark J. Stanisz
Attorney for PJM Interconnection, L.L.C.

Case: 21-4072     Document: 66     Filed: 12/15/2023     Page: 147

# Exhibit 1

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| | ) | |
| **Electric Transmission Incentives Policy** | ) | **Docket No. RM20-10-000** |
| **Under Section 219 of the Federal Power Act** | ) | |
| | ) | |

## COMMENTS OF PJM INTERCONNECTION, L.L.C.

Pursuant to the Federal Energy Regulatory Commission's ("Commission") Notice of Proposed Rulemaking ("Proposed Rule"),[1] PJM Interconnection, L.L.C. ("PJM") hereby submits comments that:

- affirm the Proposed Rule's findings related to the Commission's proposal to continue to grant the Congressionally-mandated incentive for joining a Transmission Organization, including independent system operators ("ISOs") and regional transmission organizations ("RTOs"), like PJM (the "RTO-Participation Incentive");

- identify potential implementation challenges with certain aspects of the Proposed Rule's Return on Equity ("ROE") incentives, including potential consequences of importing aspects of the RTO planning process into the Commission's ratemaking process; and

- emphasize that although, as the RTO, PJM does not have the authority to function as the rate and incentives regulator and does not wish to be in that role, within clearly defined limits, PJM can provide certain data, analytics and information

---

[1] *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, 85 FR 18784-01 (Apr. 2, 2020).

{W0228900.1 }

(including benefit-to-cost ratios) that might be helpful to the Commission should it decide to proceed with implementation of the Proposed Rule's ROE incentives.

As noted below, should the Commission proceed with the Proposed Rule in its present form, PJM would benefit from additional Commission guidance and clarification on certain open questions and challenges posed by the Proposed Rule. As an example, PJM seeks Commission guidance on overcoming the challenges with the implementation of pilot projects in light of the Order No. 1000 competitive proposal process. PJM does not believe that the challenges identified in these Comments are insurmountable to implementation, but they do underscore the need for any final rule to offer additional precision and clarity on the interrelationship of the established drivers embodied in PJM's tariffed planning processes and the Commission's various eligibility criteria for incentives outlined in the Proposed Rule's incentive setting/ratemaking process.

## I.    COMMENTS

### A.    *Comments in Support of the Proposed Rule's RTO-Participation Incentive*

The Proposed Rule's proposal to continue (and increase) the RTO-Participation Incentive is appropriate as it is grounded in the legislative and policy backdrop of the Energy Policy Act of 2005[2] ("EPAct") and implements Congress's statutory directive and intent.[3] The Proposed Rule's RTO-Participation Incentive recognizes the many functions RTOs perform today, and the

---

[2] Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005).

[3] *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, 85 FR 18784-01 (Apr. 2, 2020); *Promoting Transmission Investment through Pricing Reform*, Order No. 679, FERC Stats. & Regs. P 31,222, *order on reh'g*, Order No. 679-A, FERC Stats. & Regs. P 31,236, at P 86 (2006), *order on reh'g*, Order No. 679-B, 119 FERC P 61,062 (2007); *see also Promoting Transmission Investment Through Pricing Reform*, 141 FERC P 61,129 (2012).

corresponding value consumers derive from transmission owners' participation in RTOs.[4]

> 1.    *The EPAct Expresses Congress's Intent to Mandate an RTO-Participation Incentive and the Proposed Rule Would Implement that Mandate.*

Congress's enactment of the EPAct clearly recognizes the value of independent RTOs. Congress relies upon the continued effective functioning of RTOs as a lynchpin to promote Congress's (and ultimately the Commission's) energy policy goals.    In 2005, Congress incorporated into the EPAct various provisions that emphasize the benefits of an independently operated transmission grid and independently administered auction-based day ahead and real time wholesale markets.    By way of example:

- EPAct amended the Public Utility Regulatory Policies Act ("PURPA") to provide an exemption to the mandatory obligation to purchase electric energy and capacity from qualifying cogeneration or small power production facilities ("QF") with a net capacity in excess of 20 megawatts if a QF has non-discriminatory access to certain independently administered auction-based and wholesale markets and transmission and interconnection services provided by a Commission-approved regional transmission entity (EPAct § 1253(a); PURPA section 210(m)(1))[5];

- EPAct authorizes federal utilities to transfer control of their transmission systems to RTOs (EPAct § 1222);

- EPAct calls for regional coordination of state energy policies "to provide reliable and affordable demand response services to the public" (EPAct § 1252(e)(1)); and

- EPAct provides that RTO reliability standards that conflicted with proposed Electric Reliability Organization reliability standards were to remain in place until the Commission addressed the conflict (EPAct § 1211(d)(2)).

To further drive home the importance of independent RTOs, Congress directed that

---

[4] PJM leaves it to other commenters to address the specific incentive levels offered in the Proposed Rule. The exact level of returns on transmission investment or incentive adders are ratemaking issues beyond PJM's purview as an RTO charged with planning the expansion of the transmission grid.

[5] Pending at the Commission today is a Notice of Proposed Rulemaking that proposes to reduce this threshold from 20 MW to 1 MW for small power production facilities, but not cogeneration facilities. *Qualifying Facility Rates & Requirements Implementation Issues Under the Public Utility Regulatory Policies Act of 1978*, 168 FERC ¶ 61184, at PP 10, 118, 126 - 130 (Sept. 19, 2019).

through rulemaking:

> The Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization.[6]

In 2006, the Commission promulgated precisely such RTO-Participation Incentive rules through the adoption of Order No. 679 and the rehearing orders that followed.[7]

Congress's enactment of the EPAct clearly sought to provide a stronger push toward the RTO model by superseding Order No. 2000's provisions (which merely called for transmission owners to "consider" joining RTOs) with explicit policy directives, including a specific directive to the Commission to implement an RTO-Participation Incentive requirement as embodied in section 1241 of the EPAct. The Proposed Rule is consistent with these Congressional directives.[8]

> 2.  *The Proposed Rule Appropriately Recognizes that the Commission's Observations in Order No. 679 Are Even More Applicable Today.*

In first promulgating the RTO-Participation Incentive rules in 2006, the Commission

---

[6] EPAct § 1241; Federal Power Act ("FPA") § 219(c); codified at 16 U.S.C. 824s(c). This statutory requirement is notably different from the "would consider" RTO-Participation Incentive language the Commission previously employed in Order No. 2000 and its Pricing Policy Statement issued in 2003. *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 809 (Jan. 6, 2000), FERC Stats. & Regs., Regulations Preambles July 1996-December 2000 P 31,089 (1999), *order on reh'g*, Order No. 2000-A, 65 Fed. Reg. 12,088 (Mar. 8, 2000), FERC Stats. & Regs., Regulations Preambles July 1996-December 2000 P 31,092 (2000), *aff'd sub nom. Public Utility District No. 1 of Snohomish County, Washington v. FERC*, 272 F.3d 607 (D.C. Cir. 2001); *Proposed Pricing Policy for Efficient Operation and Expansion of Transmission Grid*, 102 FERC P 61,032 (2003).

This statutory directive also evidences the abandonment of an alternative proposal that had been considered. In lieu of a softer "sense of Congress" policy statement (Energy Policy Act, H.R. 6, 108th Cong. § 16022(b) (2003) (passed by the House only)), Congress ultimately went a step further to mandate the issuance of Commission rules to implement an RTO-Participation Incentive.

[7] *Promoting Transmission Investment through Pricing Reform*, Order No. 679, FERC Stats. & Regs. P 31,222, *order on reh'g*, Order No. 679-A, FERC Stats. & Regs. P 31,236, at P 86 (2006), *order on reh'g*, Order No. 679-B, 119 FERC P 61,062 (2007).

[8] Proposed Rule P 97.

summarized Congress's purpose in enacting section 1241 of the EPAct as follows:

> the incentive applies to all utilities joining transmission organizations, irrespective of the date they join, based on a reading of section [1241 of EPAct] in its entirety. . . . The stated purpose of section [1241 of EPAct] is to provide incentive-based rate treatments that benefit consumers by ensuring reliability and reducing the cost of delivered power. We consider an inducement for utilities to join, and remain in, Transmission Organizations to be entirely consistent with those purposes.[9]

The Commission further noted that the benefits of RTO participation inure to customers on an ongoing basis and also noted the continued value of transmission-owning utilities' stable membership in RTOs:

> _The consumer benefits, including reliability and cost benefits, provided by Transmission Organizations are well documented, and the best way to ensure those benefits are spread to as many consumers as possible is to provide an incentive that is widely available to member utilities of Transmission Organizations and is effective for the entire duration of a utility's membership in the Transmission Organization._ To limit the incentive to only utilities yet to join Transmission Organizations offers no inducement to stay in these organizations for members with the option to withdraw, and hence risks reducing Transmission Organization membership and its attendant benefits to consumers. Because the incentive is applicable to utilities that join Transmission Organizations and is consistent with the requirements of section 219 of the FPA, the incentive complies with EPAct 2005 and the FPA.[10]

The Commission's observations about membership stability and the need for an incentive that is ongoing, rather than static, is even more relevant today than in the past as RTOs continue to expand in different parts of the nation. Incentivizing consistent and stable RTO membership is essential to the RTO's ability to achieve grid reliability and consumer cost benefits.

---

[9] Order No. 679-A P 86.

[10] Order No. 679-A P 86 (emphasis added).

3.    *The RTO-Participation Incentive Achieves a Fair and Appropriate Balance Between Costs and Benefits.*

Congress was well aware that RTO participation was voluntary in light of the Commission's Order No. 2000. Thus, at its core, the RTO-Participation Incentive, as implemented by the Commission, was required by Congress to promote RTO membership while providing some symmetry between, on the one hand, the costs borne by the transmission owners for joining an RTO (in the form of relinquishing functional control of its assets, agreeing to RTO oversight and approval of the use of the owner's assets, planned maintenance outages, and RTO-driven regional grid expansion decisions), and, on the other hand, the benefits consumers uniquely enjoy due to the efficiencies of the grid system realized by transmission owners' decisions to relinquish control over system operations and attendant market rules (for example, on account of the RTO's markets and more efficient dispatch).[11] Greater alignment between these costs and benefits should continue to be encouraged and is in fact reinforced by the Commission in the Proposed Rule because, as noted further below, the dollar value of benefits for consumers are related to RTOs' reliability, market, and planning functions – benefits that do not necessarily show up in the bottom line of transmission owner operations.

The Proposed Rule's RTO-Participation Incentive appropriately balances the noted asymmetry in terms of the size of benefits that consumers receive versus the added costs and smaller dollar value of benefits that transmission owners receive. Although the benefits continue to far outweigh the costs to consumers, the RTO-Participation Incentive rules represent a modest attempt by the Commission to address this asymmetry between the transmission owners' costs

---

[11] Proposed Rule P 97 ("find[ing] that the RTO-Participation Incentive remains an effective incentive to recognize the benefits, risks, and associated obligations of RTO membership"); Order No. 679 P 8 ("Section 219(c) requires that the Rule provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization and to ensure that any recoverable costs associated with joining may be recovered through transmission rates charged by the utility or through the transmission rates charged by the Transmission Organization that provides transmission service to the utility.").

and benefits as compared to consumers' costs and benefits.  This modest effort devised in 2006 through the design of the RTO-Participation Incentive continues to be sound public policy today as set forth in the Proposed Rule.

> 4.    *Commission Orders Since 2006 Further Underscore the Need for the RTO-Participation Incentive to Better Align Costs to the Transmission Owners and Benefits to Consumers.*

The Proposed Rule's approach to the RTO-Participation Incentive also consistently tracks a number of Commission Orders that have underscored the need to maintain a certain degree of balance between costs of RTO participation to transmission owners versus customer benefits.  For example, as a result of the competitive bidding processes directed in Order No. 1000[12] and largely administered by RTOs, the planning process has become more complex for all parties than it was in 2006 when the RTO-Participation Incentive was first established.[13]  Thus, the proposals to maintain and increase the RTO-Participation Incentive are appropriate to promote membership stability given the altered landscape for economic opportunities compared to the landscape at the time of the incentive's initiation in 2006.[14]  By the same token, since 2006, RTO markets have further facilitated the recognition of demand response and energy efficiency resources.  These developments, which have clearly benefited consumers, can potentially erode the need for new transmission.  This represents another changed circumstance that weighs in

---

[12] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

[13] *See* Proposed Rule P 96.

[14] Although it is true that if a transmission owner were to leave an RTO, the transmission owner would still maintain an Order No. 1000 obligation, the larger footprint-based planning process utilized by RTOs triggers more robust competitive alternatives which benefits customers.

favor of maintaining the RTO-Participation Incentive to address asymmetries between costs to the transmission owner and benefits to the consumer.

> 5.    *The Annual Value to Consumers from Transmission Owner Participation in PJM Ranges From $3.2 to $4 Billion.*

Despite significant developments in how transmission is planned, developed, operated, and maintained (for example, the issuance of Order No. 1000), in the years since the Commission promulgated Order No. 679 and a related policy statement, the justifications for the Congressional and Commission policies favoring the creation and vitality of RTOs continue to grow.  The present day realities fortify the Commission's already strong policy justifications for implementing the Congressionally-mandated RTO-Participation Incentive as set forth in the Proposed Rule.

By way of example, as with all other RTOs and ISOs, PJM's Value Proposition for consumers has continued to increase over the last thirteen years.  Today, PJM calculates that it provides a total estimated annual savings of $3.2 to $4.0 billion to the energy marketplace driven in no small part because of the stability of PJM's membership and the corresponding geographic footprint PJM services.  Breaking this overall value down reveals:

- $300 million in annual reliability savings, inclusive of savings relating to congestion reduction;

- $1.2 to $1.8 billion in annual savings relating to lower reserve margins and competition from alternative resources due to planning efficiencies over a large region;

- $1.1 to $1.3 billion in annual savings relating to integrating more efficient resources; and

- $600 million in annual savings relating to energy production costs on account of the PJM footprint's expanded dispatch area.

A copy of PJM's Value Proposition is attached hereto as Exhibit A, and can be accessed on the PJM website.[15]

As recognized by the Proposed Rule,[16] the ongoing value of RTOs based on the stability of their membership and footprint strongly suggests that the incentive should be continuously awarded (because the benefits to consumers accrue based upon ongoing RTO membership by transmission owners), and not simply awarded once or for a fixed period of time.

It should also be noted that PJM does not have expensive exit fees that could work to disincentive transmission owners from opportunistically leaving PJM's membership ranks depending upon short-term market conditions (which could impose costs on members who remain to absorb the costs of longer-term market impacts).[17]    Thus, in crafting the Proposed Rule's RTO-Participation Incentive, the Commission duly considered the appropriateness of maintaining the RTO-Participation Incentive in order to ensure membership stability for such RTOs, including PJM, that do not have expensive exit fees.  PJM does not believe that imposing exit fees should be a means to drive membership stability.  Rather, Congress's incentive-based directive is consistent with the current PJM model for transmission owner participation in the PJM RTO.

---

[15]  https://www.pjm.com/about-pjm/~/media/about-pjm/pjm-value-proposition.ashx.    The Commission should also take note of the fact that other RTOs and ISOs publish similarly compelling value propositions that add further support to the points PJM advances in these comments.  *See, e.g.*, MISO claims $3.6 billion in annual benefits to its members (https://www.misoenergy.org/about/miso-strategy-and-value-proposition/miso-value-proposition/). Moreover, the Commission has recently adopted an RTO Metrics report so the public can see the benefits in a single report using common metrics.

[16]  Proposed Rule P 98 ("propos[ing] that the RTO-Participation Incentive should be applied to transmitting utilities that join and remain enrolled in an RTO/ISO regardless of the voluntariness of their participation").

[17]  *See generally* Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. ("Operating Agreement"), Section 18.18.2.

> 6.  *The Proposed Rule Would Appropriately Award the RTO-Participation Incentive Independent of Whether a Transmission Owner's Participation in an RTO is Voluntary or Not.*

The Proposed Rule appropriately declines to condition receipt of the RTO-Participation Incentive based on an examination as to whether a particular transmission owner's decision to join an RTO was truly "voluntary."[18]   A "voluntary" requirement has never been an express requirement for the RTO-Participation Incentive under Order No. 679 and the orders on rehearing for good reason:  the benefits realized from the transmission owners' relinquishment of functional control exist regardless of whether that relinquishment is voluntary or not.  As a practical matter, any reliance on the "voluntariness" of RTO membership would likely require the Commission to determine what "voluntary" membership actually means by examining the text and underlying legislative history of many different states' laws and examining in detail the specific circumstances and trade-offs that led to a utility proposing RTO membership as part of settlement and resolution of a disputed corporate merger proceeding either at the state or federal level, or potentially both.  The Proposed Rule's proposal to award the RTO-Participation Incentive regardless of whether membership is voluntary will minimize ongoing Commission litigation[19] about transmission owners' motives for joining an RTO and the degree of "voluntariness" of their decision given the facts facing their management at the time the decision

---

[18] Proposed Rule ¶¶ 8, 95, 98.

[19] Proposed Rule P 98 ("not[ing] that the issue of whether RTO/ISO membership is voluntary for certain transmitting utilities within RTOs/ISOs has become subject to litigation and challenges at the Commission"); *see, e.g.*, *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 (July 18, 2019),  *reh'g denied* 170 FERC ¶ 61,194 (2020) (following remand from the Ninth Circuit, reaffirming the Commission's prior grant of PG&E's request for the RTO-Participation Incentive based upon findings that California law does not mandate PG&E's participation in California Independent System Operator Corporation, and that the RTO-Participation Incentive induces PG&E to continue its membership).

to join was made.[20]  Imposing a requirement that the utility demonstrate that its decision was "voluntary" would also overlook the merits associated with stable, robust RTO membership going forward.

It is also important to recall that although several states have mandatory RTO membership provisions in their statutes, such provisions were generally included at the time of passage as part of a comprehensive state restructuring statute to transform the then-vertically integrated utility framework.  As part of that restructuring initiative, RTO participation language was included as part of the *quid pro quo* of the state opening up retail markets and granting stranded costs.  For example, the Ohio statute is explicit in this regard:  "no entity shall own or control transmission facilities as defined under federal law and located in this state *on or after the starting date of competitive retail electric service* unless that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities[.]"[21]  As noted above, the RTO-Participation Incentive serves to re-balance the asymmetry between these costs to the transmission owners and the benefits received by the consumers.

Congress assigned the creation of an RTO-Participation Incentive to the Commission.  Congress was well aware at the time that some states such as Ohio had passed their own mandates for RTO participation.  Nevertheless, Congress did not condition its directive to the Commission on the existence or non-existence of such state legislation.  As a result, the Proposed Rule is appropriately cautious about having Congress's policy directives on this targeted issue turn on state legislation.

---

[20] A "voluntary" requirement could also precipitate a flood of state legislation that would make RTO membership mandatory under the guise of saving consumers the costs of the RTO-Participation Incentive. But such a result would incentivize an "end-run" around Congress's express statutory directive to implement the RTO-Participation Incentive in furtherance of federal energy policy objectives.  The Commission should not invite a new round of FERC/state jurisdictional tensions.

[21] Ohio Revised Code Ann. § 4928.12 (emphasis added).

As noted above, RTO benefits to consumers are ongoing. State legislation does not void the need for this Commission to ensure fair alignment between the costs to transmission owners to remain members of an RTO versus the ongoing benefits realized by consumers. The Proposed Rule's RTO-Participation Incentive strikes the appropriate balance in light of the relevant policy considerations.

**B.      The Proposed Rule Should Be Clarified and Simplified to Avoid Adding Additional Complexity to PJM's Commission-Approved Regional Planning Process.**

*1.      Overview of PJM Comments on the ROE Incentives.*

As has been documented in various analyses, new transmission development provides significant benefits to customers in improving market efficiency, enhancing reliability, and effectuating state public policies.[22] Congress so recognized this in Section 219 of EPAct and PJM's analysis of the value of transmission to consumers was examined in a 2019 paper[23] that PJM proposes to be made part of this record.[24]

Nevertheless, PJM's comments also aim to highlight challenges that may be encountered in the implementation of the Proposed Rule. In an effort to be helpful to the Commission, PJM also outlines certain information that is produced out of PJM's planning process that PJM can submit to the Commission for consideration during the Commission's review of proposed incentives should the Commission decide to proceed with the Proposed Rule.

---

[22] *See, e.g.*, Special Report: The Benefits of the PJM Transmission System (Apr. 16, 2019), available at: https://www.pjm.com/-/media/library/reports-notices/special-reports/2019/the-benefits-of-the-pjm-transmission-system.pdf; Southwest Power Pool, The Value of Transmission (Jan. 26, 2016), available at: https://www.spp.org/documents/35297/the%20value%20of%20transmission%20report.pdf.

[23] Special Report: The Benefits of the PJM Transmission System (Apr. 16, 2019), attached as Exhibit B.

[24] As noted above, the level of returns on transmission investment or incentive adders are ratemaking issues beyond PJM's purview as an RTO charged with planning the expansion of the transmission grid. PJM leaves it to other commenters to address the specific incentive levels offered in the Proposed Rule.

**Exhibit A**

# PJM's Value Proposition

Document Accession #: 20201019-5154    Filed Date: 10/19/2020

# PJM Value Proposition

PJM Interconnection's operation of the high-voltage power grid, wholesale electricity markets and its long-term planning process provide significant value to the 65 million people in the region it serves.

**PJM operations, markets and planning result in annual savings of $3.2 – 4 billion.** These savings represent the vital functions that PJM provides and that lead to less cost to consumers:





- Ensuring reliable power 24 hours a day, 7 days a week
- Providing capacity for the future and reserves for emergencies

- Managing generation and other resources in real time to meet consumer demand
- Procuring specialized services that protect the stability of the grid

- Lowering emissions by encouraging generator efficiency
- Offering additional benefits including training, compliance audits and knowledge sharing



*All numbers are estimates.*

Working to Perfect the Flow of Energy



Document Accession #: 20201019-5154     Filed Date: 10/19/2020

# Reliability

**Transmission enhancements in PJM are expected to reduce costs by nearly $300 million a year by alleviating congestion.**

## Regional Planning Efficiencies

PJM's regional planning process assesses the need for transmission upgrades to ensure reliability, increase efficiency and support public-policy goals.

PJM's large footprint makes the transmission planning process more effective by considering the region as a whole, rather than by individual states or separate transmission-owner territories, in determining transmission needs.

Investing in the transmission system can increase its ability to move more power, which can decrease congestion costs. *Transmission enhancements in PJM are expected to reduce costs by nearly $300 million a year by alleviating congestion.*



## $300 M
SAVINGS

# Generation Investment

**This results in savings of $1.2–1.8 billion.**

## Lower Reserve Margin and Competition from Alternative Resources

The fact that PJM plans for resource adequacy over a large region results in a lower reserve margin than otherwise would be necessary.

Resource adequacy means having enough generating resources available to meet the demand for electricity, plus a reserve margin to cover emergencies.

There is considerable diversity in electrical use patterns in the large PJM footprint; not all areas peak at the same time of the year.

As a result, resources in one area of the system are available to help serve other areas at peak times, and a smaller reserve is required.

In addition, the large and varied resource fleet across the entire PJM region spreads the generator outage risk across a larger collection of generators, improving reliability.

PJM's Reliability Pricing Model capacity market promotes competition between traditional generation and alternative supply resources such as demand response. With more cost-effective alternatives to maintain adequate power supplies, less investment is needed in new generation. *This results in savings of $1.2–1.8 billion.*

## $1.2–1.8 B
SAVINGS

# Integrating More Efficient Resources

**More efficient units demonstrate a savings of $1.1–1.3 billion a year**

## Replacement of Less Efficient Resources

PJM's efficient generation interconnection process, combined with the competitive RPM capacity market, has enabled less efficient generation resources to retire and to be replaced with more efficient, less costly, plants.

From the annual RPM auction from 2011 through 2018, nearly 30,000 megawatts of new, increasingly efficient natural gas combined-cycle generation either has already commenced operation or is committed to be built through the RPM auctions.

These resources operate more efficiently, with lower heat rates and in most cases lower fuel costs, than the older, less efficient resources they have replaced through retirement.

Simulations of the increased cost that would be associated with continuing to operate the retired resources instead of the new, more efficient units demonstrate a *savings of $1.1–1.3 billion a year.*



**$1.1–1.3 B**
SAVINGS

# Energy Production Costs

**Operating the larger market creates production cost savings of $600 million a year**

## Expanded Dispatch Area

PJM's dispatch process enables energy to be exchanged economically and automatically when less expensive resources in one area can be used to meet consumer electricity demand in another area.

Prior to the expansion of the PJM footprint more than a decade ago, energy usually was exchanged between areas only when energy sales transactions were scheduled between two suppliers.

Without the operation of the centralized market structure that exists today, economic energy exchanges occurred much less frequently and efficiently.

Simulations of the economic dispatch and energy exchange before and after the PJM market expansion show that operating the larger market creates production cost *savings of $600 million a year.*



**$600 M**
SAVINGS

# Emissions Savings

**Annual average reduction of more than 10 million fewer tons of CO$_2$ emissions**

PJM contributes to climate policy goals while maintaining reliability through the efficient operation of the wholesale power markets.

Competition in organized markets results in greater energy efficiency. Efficient plants burn less fuel and produce fewer emissions. Since 2005, PJM has seen an overall reduction in emissions of approximately 30 percent as a result of an increase in wind generation, other renewables and the inexpensive shale gas boom in the PJM region. This translates to an *annual average reduction of more than 10 million fewer tons of CO$_2$ emissions.*

## +10 M
### Fewer Tons of Emissions
(annual avg.)

# Additional Benefits

PJM is a source of neutral, independent data, analysis, knowledge and expertise for the industry, lawmakers and regulators. In this role, PJM facilitates information sharing and informs decisions that help strengthen the grid and drive the power industry forward.

## Training

PJM is dedicated to continuing education and providing training for industry professionals.

- PJM offers more than 160 training days a year, attended by 7,000 trainees, including 1,000 member company operators

- PJM awards 45,000 NERC continuing education hours annually

- 17,000 of the continuing education hours are simulation training, which prepares trainees for real-world experiences in system and market operations





## Compliance Audits

As a regional transmission organization, PJM is audited periodically (every three years) by ReliabilityFirst, NERC and SERC Reliability Corporation. These audits review PJM's compliance with Critical Infrastructure Protection standards, operations and planning standards. The approximate cost for PJM to complete an audit is $2 million. Because PJM is registered as the transmission operator and is audited by ReliabilityFirst, NERC and SERC, individual transmission owners do not have to participate in the audits on their own. The cost for an audit for a transmission owner would vary but could total more than $2 million for one individual transmission owner alone.



## Innovation

PJM provides opportunities and a marketplace for innovators – such as PJM member organizations, research and academic institutions, and industry experts – to strengthen and enhance the power grid. PJM also conducts in-depth research and produces detailed white papers on various topics to promote information and knowledge sharing.

PJM supports and facilitates emerging technology programs to integrate batteries, electric vehicles and other power storage into PJM's markets, as well as ongoing initiatives to explore how the burgeoning development of distributed energy resources can be integrated more effectively with grid operations.



**Working to Perfect the Flow of Energy**

PJM Interconnection © 2019
www.pjm.com | (610) 666-8980 | (866) 400-8980

5

**JA157**

173 FERC ¶ 61,154
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  James P. Danly, Chairman;
                        Neil Chatterjee and Richard Glick.

The Dayton Power and Light Company                Docket No.  ER20-1068-001

PJM Interconnection, L.L.C. and                   Docket No.  ER20-2100-001
The Dayton Power and Light Company

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING, AND SETTING
ASIDE PRIOR ORDER, IN PART

(Issued November 19, 2020)

1.     On February 25, 2020, as supplemented on June 18, 2020, the Dayton Power and
Light Company (Dayton) submitted, pursuant to sections 205 and 219 of the Federal
Power Act (FPA),[1] Part 35 of the Commission's regulations,[2] and Order No. 679,[3] a
request for approval of certain transmission rate incentives for investment in transmission
projects that Dayton asserts are needed for reliability (i.e., the Transmission Enhancement
Plan (TEP) Projects) (Incentive Rate Application).[4]

---

[1] 16 U.S.C. §§ 824d, 824s.

[2] 18 C.F.R. pt. 35 (2020).

[3] *Promoting Transmission Inv. through Pricing Reform*, Order. No. 679, 116 FERC
¶ 61,057, *order on reh'g*, Order. No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*,
119 FERC ¶ 61,062 (2007).

[4] On June 18, 2020, Dayton submitted a supplement to its initial application in
Docket No. ER20-2100 by submitting eTariff records to establish a statutory effective
date for the Incentive Rate Application under 18 C.F.R. § 35.7 (2019).

2.      On August 17, 2020, the Commission granted, in part, and denied, in part, the Incentive Rate Application and set certain issues for paper hearing.[5]  On September 16, 2020, Dayton filed a request for rehearing and clarification.[6]

3.      Pursuant to *Allegheny Defense Project v. FERC*,[7] the rehearing request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the Federal Power Act,[8] we are modifying the discussion in the Incentives Order and setting aside the order, in part, as discussed below.[9]  The request for clarification is granted, in part, and rejected, in part.

I.      **Background**

4.      Dayton is an Ohio public utility.  Dayton owns transmission facilities subject to the functional control of PJM and is a signatory to the PJM Amended and Restated Operating Agreement.  Dayton provides electric service to the Dayton, Ohio area.

5.      In Dayton's application, it stated that the TEP Projects are baseline upgrades and Supplemental Projects that have been identified by PJM and Dayton, respectively, as upgrades or new facilities necessary to resolve North American Electric Reliability Corporation (NERC) reliability violations or to address other critically needed reliability improvements to the Dayton transmission system.[10]

---

[5] *The Dayton Power & Light Co.*, 172 FERC ¶ 61,140 (2020) (Incentives Order).

[6] On September 16, 2020, PJM Interconnection, L.L.C. (PJM) also filed a request for clarification and motion to intervene out-of-time in Docket No. ER20-1068.  PJM's request for clarification relates to the issues that have been set for paper hearing and thus, the motion and request for clarification will be addressed in the order on the paper hearing.

[7] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[8] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[9] *Allegheny Def. Project*, 964 F.3d at 16-17.

[10] Incentive Rate Application Transmittal at 5-8.  Dayton stated that there may be subsequent phases of projects planned over the next few years for upgrades or new facilities to be in service after 2024 but that Dayton was not requesting, at that time,

6.      Dayton explained that the TEP Projects fall into three categories:  (1) Category 1, which are baseline upgrades identified and selected by PJM through its Regional Transmission Expansion Plan (RTEP) process as necessary to resolve NERC reliability violations (Category 1 Projects); (2) Category 2, which are Supplemental Projects that operate at or above 125 kV and that are required under Ohio law to be approved by the Ohio Power Siting Board (Ohio Siting Board) after making a determination of public need (Category 2 Projects); and (3) Category 3, which are Supplemental Projects that Dayton states are required to enhance reliable operations but, because they operate at voltage levels below 125 kV, are not subject to approval from either the PJM RTEP or the Ohio Siting Board (Category 3 Projects).

7.      Dayton requested that the Commission grant three transmission rate incentives: (1) a 50 basis point adder to the authorized return on equity (ROE) to reflect Dayton's continued membership in PJM (RTO Adder), with such ROE not to exceed the upper end of the zone of reasonableness, to apply to Dayton's entire transmission rate base; (2) inclusion of 100% Construction Work in Progress (CWIP) in rate base for TEP Projects only (CWIP Incentive); and (3) 100% recovery of all prudently-incurred transmission-related development and construction costs if one or more TEP Projects are cancelled or abandoned, in whole or in part, as a result of factors beyond Dayton's control (Abandoned Plant Incentive).

8.      In the Incentives Order, the Commission granted, in part, and denied, in part, the filing.[11]  The Commission granted Dayton's request for the CWIP Incentive for the Category 1 Projects and two of the Category 2 Projects, Buckeye Haas Delivery Point, Bethel Township and Gebhart Substation 138 kV, effective May 3, 2020 (collectively, the Approved Category 2 Projects).[12]  The Commission also granted Dayton's request for the CWIP Incentive for the three remaining Category 2 projects—(1) South Charleston (Madison) Substation 345 kV, (2) Clinton 345 kV/69 kV Transformer, and (3) Fort Recovery Line, Transformer, and Capacity Bank—each conditioned upon its approval by the Ohio Siting Board (collectively, the Conditionally Approved Category 2 Projects).[13]

---

transmission incentives that would apply with respect to these potential future projects. *Id.* at 7.

[11] Incentives Order, 172 FERC ¶ 61,140 at P 2.

[12] *Id.* P 55.

[13] *Id.*

Docket Nos. ER20-1068-001 and ER20-2100-001                                    - 4 -

9.      The Abandoned Plant Incentive was granted for all the Category 1 Projects and the
Approved Category 2 Projects, prospectively from the date of the Incentives Order.[14]
The Abandoned Plant Incentive was also granted for the Conditionally Approved
Category 2 Projects, conditioned upon and effective on their approval by the Ohio Siting
Board.[15]

10.     Dayton's requests for the CWIP Incentive and the Abandoned Plant Incentive
were denied for the Category 3 Projects.[16]  The RTO Adder was accepted for filing and
suspended for a five-month period, subject to refund and to the outcome of a paper
hearing.[17]

## II.    **Request for Clarification and Rehearing**

11.     Dayton seeks clarification and rehearing with regard to the appropriate effective
dates for the CWIP Incentive, the Abandoned Plant Incentive, and the RTO Adder.[18]
Specifically, Dayton claims that the Commission was unclear regarding whether, or erred in
failing to find that:  (1) as to Category 1 Projects and the Approved Category 2 Projects, the
CWIP Incentive should apply to costs incurred prior to the effective date of May 3, 2020
established in the Incentives Order;[19] (2) as to the Conditionally Approved Category 2
Projects, the CWIP Incentive should likewise apply to costs incurred prior to the May 3,
2020 effective date once applicable conditions are met;[20] (3) as to the Abandoned Plant
Incentive for the Conditionally Approved Category 2 Projects, the effective date should be
the date of the Incentives Order rather than the date the Ohio Siting Board approves the
applicable projects, and upon which the incentive was conditioned;[21] and (4) as to the RTO

---

[14] *Id.* P 69.

[15] *Id.*

[16] *Id.* PP 36-37.

[17] *Id.* P 22.

[18] Request for Rehearing at 2.

[19] *Id.* at 2-3.

[20] *Id.* at 3.

[21] *Id.* at 3-4.

Docket Nos. ER20-1068-001 and ER20-2100-001                                    - 5 -

Adder, the effective date should be May 3, 2020 without a delay to account for a five-month suspension period.[22]

12.      In addition, Dayton argues that the Commission erred in failing to grant the requested incentives for Category 3 Projects.[23]  In the alternative, Dayton requests the Commission to clarify that the rejection of the Category 3 Projects is without prejudice to Dayton making a subsequent filing.[24]

13.      On September 25, 2020, the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (Ohio Commission) filed a motion for leave to answer and answer objecting to the request for rehearing and clarification.

## III.    Discussion

### A.    Procedural Matters

14.      Rule 713(d)(1) of the Commission's Rules of Practice and Procedure prohibits an answer to a request for rehearing.[25]  Therefore, we deny Ohio Commission's motion and reject the answer.[26]

### B.    Substantive Matters

#### 1.    CWIP Incentive

15.      We disagree with Dayton's suggestion that the Incentives Order was unclear about the treatment of costs incurred before the effective date of the CWIP Incentive.[27]  Nor are we persuaded by Dayton's interpretation that it was entitled to apply the CWIP Incentive

---

[22] *Id.* at 4-6.

[23] *Id.* at 6-9.

[24] *Id.* at 9.

[25] 18 C.F.R. § 385.713(d)(1) (2020).

[26] The Commission has considered responses to motions for clarification in certain circumstances.  *See PJM Interconnection, L.L.C.*, 152 FERC ¶ 61,035, at P 16 (2015).  Here, the Ohio Commission's answer responds to issues related to Dayton Power's respective rehearing and clarification requests without distinction.  Given that the answer addresses substantive rehearing issues, we find that the pleading is an answer responding to a request for rehearing and reject it.

[27] Request for Rehearing at 2-3.

to costs incurred for the approved Category 1 Projects, Approved Category 2 Projects, and Conditionally Approved Category 2 Projects prior to the effective date established in the Incentives Order.[28]  The Commission's "longstanding policy" is that "rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced."[29]  The Incentives Order provided no indication that it was diverging from this longstanding policy, and Dayton has not provided any basis for such a divergence.  Thus, costs incurred before the effective date are not eligible for the CWIP Incentive.

## 2.  **Abandoned Plant Incentive**

16.    In the Incentives Order, the Commission granted the Abandoned Plant Incentive for the Conditionally Approved Category 2 Projects conditioned upon and effective on approval by the Ohio Siting Board.[30]  We will set aside this portion of the order, in part, as requested by Dayton,[31] and find that the effective date of the incentive should run from the date of the Incentives Order.  While the Commission has the flexibility to grant incentives "'when justified' on a 'case-by-case basis' in orders tailored to the demonstrated needs of each project,"[32] in the typical case, the Commission does not delay the effective date of the incentive after the date on which the order approving the incentive issues.[33]  We are persuaded that the application for the Conditionally Approved Category 2 Projects is sufficiently typical that the effective date of the Abandoned Plant Incentive should run from the date of the Incentives Order, and any language in the Incentives Order suggesting otherwise is set aside.  However, nothing in this order is intended to modify or set aside the holding in the Incentives Order that recovery under the Abandoned Plant Incentive for the Conditionally Approved Category 2 Projects is conditioned upon the approval by the Ohio Siting Board.

---

[28] *Id.*

[29] *San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 137 (D.C. Cir. 2019) (*San Diego Gas*).

[30] Incentives Order, 172 FERC ¶ 61,140 at P 69.

[31] Request for Rehearing at 4.

[32] *San Diego Gas*, 913 F.3d at 141.

[33] *Id.* at 134 (quoting *Pac. Gas & Elec. Co.*, 163 FERC ¶ 61,187, at P 5 (2018)).

Docket Nos. ER20-1068-001 and ER20-2100-001                                - 7 -

### 3.    RTO Adder

17.    We are not persuaded by Dayton's argument that the Commission was unclear whether May 3, 2020, was the effective date for the RTO Adder or if a five-month suspension applied.[34]  Dayton relies on language used in the dissent in the Incentives Order to suggest that the five-month suspension did not apply.[35]  But the Incentives Order expressly stated that the RTO Adder was subject to a five-month suspension.[36]  As the effective date of the order was May 3, 2020, the RTO Adder became effective October 3, 2020, subject to refund.

18.    We are also not persuaded by Dayton's argument that the Commission erred in applying a five-month suspension.[37]  Dayton argues that the May 3, 2020 effective date is appropriate because the request for the RTO Adder was made in the same request as the request for the CWIP Incentive, which was granted a May 3, 2020 effective date.[38]  The Commission has "broad discretion in determining the particular length of the suspension period in each case" and "is not obligated to provide a detailed explanation of its suspension determination."[39]  The Commission need only "'state reasons for a suspension and for the length of the suspension' that are in some way 'related to [the Commission's] interim or ultimate inquiries.'"[40]  Moreover, "when its preliminary analysis indicates that proposed rates may be unjust and unreasonable, and may be substantially excessive, the Commission will generally impose a maximum suspension (i.e., five months)."[41]  Here, the Incentives Order explained its distinction between the CWIP Incentive and the RTO Adder.  Namely, the Commission granted the CWIP Incentive for the Category 1 and

---

[34] Request for Rehearing at 4.

[35] *Id.*

[36] Incentives Order, 172 FERC ¶ 61,140 at P 22 ("we will accept this part of the proposal for filing and suspend it for a five month period, subject to refund and the outcome of a paper hearing").

[37] Request for Rehearing at 5-6.

[38] *Id.* at 6.

[39] *GenOn Energy Mgmt., LLC*, 160 FERC ¶ 61,108, at P 3 (2017) (citing 16 U.S.C. § 824d(e)).

[40] *GenOn Energy Mgmt., LLC*, 154 FERC ¶ 61,113, at P 4 (2016) (quoting *Exxon Pipeline Co. v. United States*, 725 F.2d 1467, 1473 (D.C. Cir. 1984)).

[41] *Id.* P 11.

Docket Nos. ER20-1068-001 and ER20-2100-001          - 8 -

Category 2 Projects but found that "the requested 50 basis point RTO [] Adder has not been shown to be just and reasonable, and may be unjust, unreasonable, unduly discriminatory, or otherwise unlawful" and set the issue for hearing.[42]  Thus, unlike the other incentives, the Commission's preliminary analysis expressly found that the RTO Adder might be unjust and unreasonable, which justifies the five month suspension.

19.    We are also not convinced by Dayton's argument that if the legal issues are resolved, then the RTO Adder should be provided retroactively.[43]  In support of this argument, Dayton notes that the RTO Adder would only increase Dayton's revenue requirement by around $650,000 or a 1.5% increase in rates, and thus would not lead to excessive rates if the RTO Adder is ultimately approved.[44]  The potential that a utility may be deprived of some portion of rates that are eventually found to be just and reasonable is an inherent risk in any suspension and is a risk that a utility can only avoid by demonstrating in the first instance that its rates are not excessive.[45]  The logic underlying Dayton's argument could, in fact, equally justify never suspending any proposed rate, and effectively write the Commission's authority to suspend proposed rates for five months out of the FPA entirely.[46]

### 4.    Category 3 Projects

20.    We are not persuaded by Dayton's argument that the Commission erred by finding that the Category 3 Projects did not qualify for CWIP and Abandoned Plant Incentives.[47]  As discussed in the Incentives Order, Dayton bears the evidentiary burden to independently show that each project in Category 3 is needed to maintain reliability or

---

[42] Incentives Order, 172 FERC ¶ 61,140 at P 22.

[43] Request for Rehearing at 5-6.

[44] *Id.*

[45] *See FPC v. Tenn. Gas Transmission Co.*, 371 U.S. 145, 152 (1962) ("the company can never recoup the income lost when the five-month suspension power of the Commission is exercised"). *See also S. Cal. Edison Co.*, 116 FERC ¶ 61,099, at P 18 (2006) ("while SCE does note in passing that it will be deprived of that portion of its proposed rates that is not substantially excessive, that is a risk a utility can avoid by proposing rates that are not substantially excessive").

[46] *See S. Cal. Edison Co.*, 116 FERC ¶ 61,099 at P 16.

[47] Request for Rehearing at 6-9.

reduce congestion.[48]  Dayton principally relied on the inclusion of these TEP Projects as Supplemental Projects within the RTEP.  However, as the Commission noted in the Incentives Order, PJM does not plan these projects and does not evaluate whether they are necessary for reliability or to relieve congestion.[49]  On rehearing, Dayton admits that it did not put forth as much evidence as in cases where the Commission has previously found the evidentiary burden to be met, but suggests that the parties in those cases provided more evidence than necessary.[50]  However, we are not convinced that the cases cited by Dayton require a different result, given that Dayton points to no precedent in which a party presented less or similar evidence to what it presented here and was nonetheless granted incentives.

21.     We disagree with Dayton's suggestion that the Incentives Order requires that "third-party analyses must be submitted to establish the existence of a reliability benefit."[51]  While the Commission noted that external studies were provided in several cases where incentives were granted, it also noted that Dayton additionally failed to provide a congestion analysis, comprehensive data or internal studies.[52]

22.     We are also not convinced by Dayton's argument that "no party in this proceeding has alleged that these projects would not enhance reliability" and that its proffered evidence should be accepted as true "absent any allegations to the contrary."[53]  As discussed above, Dayton bears the burden of proof to present sufficient evidence in the first instance.

23.     We grant Dayton's alternative request for clarification and find that the denial of the request for incentives for Category 3 Projects was not intended to be with prejudice as

---

[48] Incentives Order, 172 FERC ¶ 61,140 at PP 31-36.

[49] *Id.* P 37;  PJM Interconnection, L.L.C., Intra-PJM Tariffs, S–T, OA Definitions S – T (17.0.0) ("Supplemental Project shall mean a transmission expansion or enhancement that is not required for compliance with the following PJM criteria: system reliability, operational performance or economic criteria, pursuant to a determination by the Office of the Interconnection and is not a state public policy project").

[50] Request for Rehearing at 8-9 (discussing *Green Power Express LP*, 127 FERC ¶ 61,031 (2009); *Pioneer Transmission, LLC*, 126 FERC ¶ 61,281 (2009); *Tallgrass Transmission, LLC*, 125 FERC ¶ 61,248 (2008)).

[51] *Id.* at 9.

[52] Incentives Order, 172 FERC ¶ 61,140 at P 37.

[53] Request for Rehearing at 9.

Document Accession #: 20201119-3039    Filed Date: 11/19/2020

Docket Nos. ER20-1068-001 and ER20-2100-001                                              - 10 -

to any future filing that provides adequate evidence to support incentives for these projects.

<u>The Commission orders</u>:

In response to Dayton's request for clarification and rehearing, clarification is granted, in part, and rejected, in part, and the Incentives Order is hereby modified and set aside, in part, as discussed in the body of this order.

By the Commission.

( S E A L )

Kimberly D. Bose,
Secretary.

174 FERC ¶ 61,119
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                       Neil Chatterjee, James P. Danly,
                       Allison Clements, and Mark C. Christie.

The Dayton Power and Light Company                    Docket No. ER20-1068-002

PJM Interconnection, L.L.C. and                       Docket No. ER20-2100-002
The Dayton Power and Light Company

ORDER GRANTING CLARIFICATION, ADDRESSING ARGUMENTS RAISED ON
REHEARING, AND SETTING ASIDE PRIOR ORDER, IN PART

(Issued February 18, 2021)

1.      On February 25, 2020, as supplemented on June 18, 2020, the Dayton Power and
Light Company (Dayton) submitted, pursuant to sections 205 and 219 of the Federal
Power Act (FPA),[1] Part 35 of the Commission's regulations,[2] and Order No. 679,[3] a
request for approval of certain transmission rate incentives for investment in transmission
projects that Dayton asserts are needed for reliability (i.e., the Transmission Enhancement
Plan Projects (TEP Projects)) (Incentive Rate Application).

2.      On August 17, 2020, the Commission granted, in part, and denied, in part, the
Incentive Rate Application and set certain issues for paper hearing.[4] On September 16,
2020, Dayton filed a request for rehearing and clarification (First Rehearing Request).
On November 19, 2020, the Commission issued an order addressing the issues raised by
Dayton's First Rehearing Request and set aside the Incentives Order, in part.[5]

---

[1] 16 U.S.C. §§ 824d, 824s.

[2] 18 C.F.R. pt. 35 (2020).

[3] *Promoting Transmission Inv. through Pricing Reform*, Order No. 679, 116 FERC
¶ 61,057, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*,
119 FERC ¶ 61,062 (2007).

[4] *The Dayton Power & Light Co.*, 172 FERC ¶ 61,140 (2020) (Incentives Order).

[5] *The Dayton Power & Light Co.*, 173 FERC ¶ 61,154 (2020) (Rehearing Order).

JA168

3.      On December 8, 2020, Dayton filed a request for clarification, or in the alternative, rehearing of the Rehearing Order (Second Rehearing Request).

4.      Pursuant to *Allegheny Defense Project v. FERC*,[6] the Second Rehearing Request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the Federal Power Act,[7] we are modifying the discussion in the Rehearing Order and setting aside the order, in part, as discussed below.[8]  We also grant Dayton's clarification request.

## I.      **Background**

5.      In the Incentives Order, the Commission granted Dayton's request for inclusion of 100% Construction Work in Progress (CWIP) in rate base for certain projects (CWIP Incentive).[9]  Dayton sought clarification and rehearing of the Incentives Order regarding the appropriate effective dates for the CWIP Incentive.[10]  Dayton claimed that the Commission was unclear regarding how the CWIP Incentive should apply to costs incurred prior to the effective date of May 3, 2020 established in the Incentives Order.[11]

6.      In the Rehearing Order, the Commission found that Dayton was not entitled to apply the CWIP Incentive to costs incurred for the Approved TEP Projects prior to the effective date established in the Incentives Order.[12]

---

[6] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[7] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[8] *Allegheny Def. Project*, 964 F.3d at 16-17.

[9] Incentives Order, 172 FERC ¶ 61,140 at P 55.  We refer to the particular projects approved in the Incentives Order – Category 1 and Category 2 Projects – as the Approved TEP Projects.  For a subgroup of the Approved TEP Projects, the CWIP Incentive was granted subject to applicable conditions being met.  *Id.* PP 35, 55.

[10] First Rehearing Request at 2.

[11] *Id.* at 2-3.

[12] Rehearing Order, 173 FERC ¶ 61,154 at P 15.

## II.    **Second Rehearing Request**

7.    Dayton's Second Rehearing Request states that language in the Rehearing Order contradicts language in the Incentives Order granting Dayton the CWIP Incentive for costs incurred for Approved TEP Projects prior to the effective date.[13]  Dayton argues that, while unclear, the intent of its First Rehearing Request was to gain clarification as to Dayton's plan for *accounting treatment* for the CWIP Incentive, and in response, the Rehearing Order inadvertently reversed its prior determination as to *eligibility* for the CWIP Incentive.[14]  To resolve this inconsistency, Dayton's Second Rehearing Request asks that the Commission:  (1) revert to the Incentives Order's finding that the CWIP Incentive could apply to costs incurred prior to the effective date of May 3, 2020; and (2) clarify whether Dayton's planned accounting treatment for the CWIP Incentive is acceptable.[15]

## III.    **Discussion**

### A.    **Eligibility**

8.    We grant Dayton's request for clarification.  As noted in the Incentives Order, "the purpose of this incentive is to improve the cash flow of a utility that is undertaking a large" project and "[i]t is just and reasonable to allow the CWIP Incentive to apply to the portion of expenses that have already been incurred, since this expense is part of the reason the utility requires the incentive."[16]  We find that this ruling on eligibility in the Incentives Order is consistent with CWIP Incentive precedent[17] and should not have been changed in the Rehearing Order.  Accordingly, we modify the discussion in the Rehearing Order, and set it aside, in part, to be consistent with the ruling in the Incentives

---

[13] Second Rehearing Request at 3-4.

[14] *Id.*

[15] *Id.*

[16] Incentives Order, 172 FERC ¶ 61,140 at P 59 (citing Order No. 679, 116 FERC ¶ 61,057 at P 115).

[17] *See Transource Mo., LLC*, 141 FERC ¶ 61,075, at PP 48, 52 (2012) (rejecting argument that CWIP Incentive should be denied for costs "incurred prior to any approval for incentives") (citing *RITELine Illinois, LLC*, 137 FERC ¶ 61,039, at P 96 (2011); *Green Power Express LP*, 127 FERC ¶ 61,031, at P 60 (2009); *Pioneer Transmission, LLC*, 126 FERC ¶ 61,281, at P 84 (2009)).

Docket Nos. ER20-1068-002 and ER20-2100-002                                     - 4 -

Order that the CWIP Incentive may apply to the portion of expenses that have already been incurred for Approved TEP Projects.[18]

### B.     Accounting Treatment

9.      We approve Dayton's proposed accounting treatment for the CWIP Incentive for Approved TEP Projects.  To qualify for the CWIP Incentive, applicants "must propose accounting procedures that ensure customers will not be charged for both capitalized [Allowance for Funds Used During Construction (AFUDC)] and corresponding amounts through inclusion of CWIP in rate base."[19]  To satisfy the requirement, procedures must be in place "to ensure that it does not double recover through AFUDC and a return on CWIP in rate base."[20]  Here, Dayton proposed to "cease collecting [AFUDC] for the relevant project costs as of May 3, 2020, and recharacterize already-incurred costs (plus accumulated AFUDC) as [CWIP] as of that date."[21]  We find Dayton's proposed accounting treatment will ensure that customers are not charged for both capitalized AFUDC and corresponding amounts associated with CWIP in rate base, and is consistent with Commission precedent.[22]

---

[18] To the extent that incentives for particular projects were conditioned on approval by the Ohio Siting Board, *see e.g.* Incentives Order, 172 FERC ¶ 61,140 at PP 35, 55, nothing in this order should be read to change such conditions.

[19] *Midwest Indep. Transmission Sys. Operator, Inc.*, 141 FERC ¶ 61,121, at P 30 (2012).

[20] *Id.*

[21] Second Rehearing Request at 3.

[22] *See Transource Mo., LLC*, 141 FERC ¶ 61,075 at PP 47-48, 52 (approving accounting procedures that contemplated already incurred AFUDC costs would be transferred to CWIP upon approval of CWIP Incentive).

Docket Nos. ER20-1068-002 and ER20-2100-002                                    - 5 -

<u>The Commission orders</u>:

(A)     Dayton's clarification request is hereby granted, as discussed in the body of this order.

(B)     In response to Dayton's Second Rehearing Request, the Rehearing Order is hereby modified and set aside, in part, as discussed in the body of this order.

By the Commission.

( S E A L )

Kimberly D. Bose,
Secretary.

176 FERC ¶ 61,025
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                            Neil Chatterjee, James P. Danly,
                            Allison Clements, and Mark C. Christie.

| | |
|---|---|
| The Dayton Power and Light Company | Docket No.  ER20-1068-000 |

ORDER ON PAPER HEARING

(Issued July 15, 2021)

1.      On February 25, 2020, as supplemented on June 18, 2020, the Dayton Power and Light Company (Dayton) submitted, pursuant to sections 205 and 219 of the Federal Power Act (FPA),[1] Part 35 of the Commission's regulations,[2] and Order No. 679,[3] a request for approval of certain transmission rate incentives for investment in transmission projects that Dayton asserts are needed for reliability (i.e., the Transmission Enhancement Plan Projects (TEP Projects)) (Incentive Rate Application).

2.      On August 17, 2020, the Commission granted, in part, and denied, in part, the Incentive Rate Application and set certain issues for paper hearing.[4]  Specifically, the Commission accepted and suspended for a five-month period Dayton's request for a 50 basis point adder to the authorized return on equity (ROE) to reflect Dayton's continued membership in PJM Interconnection, L.L.C. (PJM) (RTO Adder), subject to refund and the outcome of a paper hearing to explore whether Dayton has shown that its participation in PJM or another Regional Transmission Organization (RTO) is voluntary or if such participation is mandated by Ohio law.  Having reviewed the briefs submitted

---

[1] 16 U.S.C. §§ 824d, 824s.

[2] 18 C.F.R. pt. 35 (2020).

[3] *Promoting Transmission Inv. through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[4] *The Dayton Power & Light Co.*, 172 FERC ¶ 61,140 (2020) (August 17 Order).

in response to the August 17 Order, we find that Dayton does not qualify for the RTO Adder and, therefore, deny it. We also order refunds for amounts collected pursuant to the RTO Adder.

## I.    **Background**

3.      In its Incentive Rate Application, Dayton requested:  (1) an RTO Adder; (2) inclusion of 100% Construction Work in Progress (CWIP) in rate base for the TEP Projects only (CWIP Incentive); and (3) 100% recovery of all prudently-incurred transmission-related development and construction costs if one or more TEP Projects are cancelled or abandoned, in whole or in part, as a result of factors beyond Dayton's control (Abandoned Plant Incentive).  Dayton stated that it was transitioning from a stated transmission rate to a transmission formula rate and that it planned to invest approximately $170 million in the TEP Projects over the next several years, which would be planned through or coordinated with PJM for the benefit of its customers and others in the PJM region.

4.      Regarding its request for the RTO Adder, Dayton explained that the Commission has a long-standing policy that pre-dates Order No. 679 to provide a 50 basis point ROE adder to encourage transmission-owning utilities to join (and remain as participants of) an RTO.  Dayton noted that, although it has been a member of PJM since 2004, it has not had a rate case since then to seek this incentive.  Dayton explained that its stated transmission rates pre-date Dayton's membership in PJM and that Dayton is now requesting the RTO Adder to be included in its forthcoming transmission formula rate filing.[5]

5.      The Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (Ohio FEA) and Office of the Ohio Consumers' Counsel (OCC) protested Dayton's request for the RTO Adder.  They argued that the incentive was unnecessary as, under an Ohio statute, all transmission owners with facilities in Ohio are required to be members of PJM or an RTO.[6]  Ohio Revised Code, section 4928.12 states:

> (A) Except as otherwise provided in sections 4928.31 to 4928.40 of the Revised Code, *no entity shall own or control transmission facilities* as defined under federal law and

---

[5] Dayton February 25, 2020 Filing at 31-32.  The Commission accepted and suspended Dayton's proposed transmission formula rate on May 1, 2020, effective May 3, 2020, and set it for hearing and settlement judge procedures.  *The Dayton Power & Light Co.*, 171 FERC ¶ 61,087 (2020).

[6] Ohio FEA Protest at 6; OCC Protest at 26 (citing Ohio Rev. Code § 4928.12).

located in this state on or after the starting date of competitive retail electric service *unless that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities, as described in division (B) of this section, that are operational.*

(B) An entity that owns or controls transmission facilities located in this state complies with division (A) of this section if each transmission entity of which it is a member meets all of the following specifications…[7]

6.    Ohio FEA and OCC cited to *CPUC*,[8] in which the U.S. Court of Appeals for the Ninth Circuit (Ninth Circuit) held that the Commission was arbitrary and capricious in awarding Pacific Gas & Electric Company (PG&E) an RTO Adder without determining whether PG&E's membership was mandatory under state law.  Ohio FEA asserted that *CPUC* supported the argument that, because Ohio law requires RTO membership, the Commission should deny Dayton's request for the RTO Adder because the incentive should only be awarded to induce future behavior.[9]

---

[7] Under the Ohio statute, the qualifying transmission entity must:  (1) be approved by the Commission; (2) effect separate control of transmission facilities from control of generation facilities; (3) implement policies and procedures designed to minimize pancaked transmission rates within the state; (4) improve service reliability within the state; (5) achieve the objectives of an open and competitive electric generation marketplace, elimination of barriers to market entry, and preclusion of control of bottleneck electric transmission facilities in the provision of retail electric service; (6) be of sufficient scope or otherwise operate to substantially increase economical supply options for consumers; (7) have a governance structure or control that is independent of the users of the transmission facilities; (8) operate under policies that promote positive performance designed to satisfy the electricity requirements of customers; and (9) be capable of maintaining real-time reliability of the electric transmission system, ensuring comparable and nondiscriminatory transmission access and necessary services, minimizing system congestion, and further addressing real or potential transmission constraints.  Ohio Rev. Code, §§ 4928.12 (B)(1)-(B)(9).

[8] *Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966 (Ninth Circuit 2018) (*CPUC*).

[9] Ohio FEA Protest at 6 (citing *CPUC*, 879 F.3d 966).

Docket No. ER20-1068-000                                              - 4 -

## II.    **August 17 Order**

7.      In the August 17 Order, the Commission granted, in part, and denied, in part,
Dayton's request for the CWIP and Abandoned Plant Incentives.  The Commission also
found that the requested 50 basis point RTO Adder had not been shown to be just and
reasonable, and may be unjust, unreasonable, unduly discriminatory, or otherwise
unlawful.[10]  The August 17 Order accepted the RTO Adder for filing and suspended it
for a five month period, subject to refund and the outcome of a paper hearing to explore
whether Dayton had shown that its participation in PJM or another RTO is voluntary, or
if such participation is mandated by Ohio law.[11]

8.      The August 17 Order directed responses to the following questions:

> (1) Is there an arrangement under which Dayton could
> withdraw from an RTO and comply with the Ohio law, while
> not being eligible for an RTO Participation Adder?  If so,
> please describe that alternative arrangement.  If not, please
> explain why not.

> (2) Explain how any alternative arrangement identified in
> response to Question 1 would comply with the Ohio Revised
> Code section 4928.12, but would not at the same time qualify
> for incentives for joining a Transmission Organization under
> section 35.35(e) of the Commission's regulations, 18 C.F.R
> § 35.35(e) (2019).  As part of your answer, please:  (1)
> explain why such arrangement would not qualify for an
> incentive under section 35.35(e) of the Commission's
> regulations; and address each of the 9 requirements for such
> an arrangement specified in Ohio Revised Code section
> 4928.12(B) and explain how the arrangement satisfies each
> such requirement.

Initial responses were due within 60 days of the date of the August 17 Order and reply
comments were due within 30 days of the initial responses.

## III.    **Motions to Intervene/Requests for Clarification**

9.      American Electric Power Service Corporation (AEP-Ohio), Duke Energy Ohio,
Inc. (Duke Ohio), FirstEnergy Service Company (FirstEnergy), Industrial Energy Users –

---

[10] August 17 Order, 172 FERC ¶ 61,140 at P 2.

[11] *Id.* P 22.

Ohio (IEU-Ohio), WIRES, and Edison Electric Institute (EEI) filed motions to intervene out-of-time. On September 16, 2020, PJM filed a motion to intervene out-of-time and a request for clarification.[12]

10.    On October 19, 2020, PJM filed a motion to lodge its July 1, 2020 comments, as well as evidence that "PJM operations, markets and planning result in annual savings of $3.2 - 4 billion … represent[ing] the vital functions that PJM provides and that lead to less cost to consumers" (PJM Value Proposition), both of which were previously filed in response to a notice of proposed rulemaking on transmission incentives in Docket No. RM20-10-000.[13]  PJM states that both of these indicate the overall value of PJM membership to consumers.  PJM also states that because the same RTO Adder policy issues are implicated in this proceeding, inclusion of these materials will ensure a more accurate and complete record for the Commission's consideration of whether to grant Dayton the RTO Adder, as well as whether to grant PJM's requested clarification.

11.    Dayton, WIRES, Duke Ohio, FirstEnergy, AEP-Ohio, IEU-Ohio, and Ohio FEA and OCC jointly (together, Ohio FEA/OCC) filed initial briefs.  Dayton, AEP-Ohio, and Duke Ohio filed reply briefs.

## IV.    Discussion

### A.    Procedural Matters

12.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d) (2020), we grant the late-filed motions to intervene to the entities that filed them given their interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

---

[12] On September 16, 2020, Dayton also filed a request for rehearing and clarification that did not relate to the issues that have been set for paper hearing, which the Commission addressed in *The Dayton Power & Light Co.*, 173 FERC ¶ 61,154 (2020), *order on reh'g*, 174 FERC ¶ 61,119 (2021).

[13] PJM Mot. to Lodge at 1-2 (citing *Elec. Transmission Incentives Policy Under Section 219 of the Federal Power Act*, Notice of Proposed Rulemaking, 170 FERC ¶ 61,204 (2020) (Transmission Incentives NOPR)).  The Commission issued a supplemental notice of proposed rulemaking in April 2021.  *See Elec. Transmission Incentives Policy Under Section 219 of the Federal Power Act*, Supplemental Notice of Proposed Rulemaking, 86 FR 21972 (Apr. 26, 2021), 175 FERC ¶ 61,035 (2021) (Supplemental NOPR).

Docket No. ER20-1068-000                                                    - 6 -

13.    We deny PJM's Motion to Lodge its July 1, 2020 comments and PJM Value
Proposition, which have been submitted in the Transmission Incentives NOPR
proceeding.  According to PJM, this information relates to both the overall value of PJM
membership to consumers, as well as RTO Adder policy issues.  Because we address
Dayton's application for an RTO Adder based on the specific circumstances of its
request, this information is not relevant in our determination and is more appropriately
addressed in the Transmission Incentives NOPR proceeding.

### B.    Commission Determination

14.    As discussed below, given Ohio law, Dayton does not qualify for a 50 basis
point RTO Adder under the Commission's current incentives policy because:
(1) Order No. 679 as interpreted in *CPUC* requires a showing of *voluntary* membership
in such a Transmission Organization,[14] and (2) Dayton's membership in a Transmission
Organization is not voluntary because the Ohio statute requires it.

### 1.    Requirement of Voluntariness for the RTO Adder Under Section 219

#### a.    Initial Briefs and Request for Clarification

15.    AEP Ohio, EEI, Dayton, Duke Ohio, FirstEnergy, and WIRES (together,
Supporting Parties) support granting Dayton the RTO Adder.  They argue that the
Commission incorrectly concluded in the August 17 Order that a transmission owner's
participation in a RTO must be voluntary to be eligible for the RTO Adder.[15]  Supporting
Parties argue that section 219 does not require or suggest that voluntariness is a
requirement for the RTO Adder.  Rather, Dayton argues, section 219 obligates the
Commission to set up a system to encourage membership in Transmission Organizations,
and to award incentives to those utilities that do.[16]

---

[14] *CPUC*, 879 F.3d at 975 (finding that "the voluntariness of a utility's
membership in a transmission organization is logically relevant to whether it is eligible
for an adder" under Order No. 679).

[15] AEP Ohio Initial Brief at 25-28; Dayton Initial Brief at 4-5 (citing 16 U.S.C.
§ 824s(c) ("In the rule issued under this section, the Commission *shall*, to the extent
within its jurisdiction, provide for incentives to *each* transmitting utility or electric utility
that joins a Transmission Organization.")); Duke Ohio Initial Brief at 10-11; EEI Initial
Brief at 6-9; FirstEnergy Initial Brief at 9-11; WIRES Initial Brief at 7.

[16] Dayton Initial Brief at 5-6.

Docket No. ER20-1068-000                                          - 7 -

16.     Duke Ohio asserts that had Congress intended to require voluntariness to be
eligible for incentives pursuant to section 219, it would have so specified.[17]  WIRES
notes that section 202 of the FPA[18] directed the Commission to establish regional districts
for the voluntary interconnection and coordination of electric facilities, and encouraged
interconnection within those districts.  Similarly, WIRES argues that section 219 directed
the Commission to add incentives for participation in an RTO, which suggests that
Congress meant to encourage participation in an RTO without a mandate but did not
explicitly limit those incentives to utilities whose participation in an RTO is voluntary.[19]

17.     Duke Ohio further asserts that the Commission's position in the August 17 Order
contradicts Order Nos. 679 and 679-A by consolidating the Commission's review of an
RTO Adder request to a single factor, rather than performing a case-by-case review that
considers the benefits and burdens that flow from RTO membership.[20]

18.     Supporting Parties disagree with the August 17 Order's suggestion that the Ninth
Circuit's decision in *CPUC* demonstrates that RTO membership must be voluntary in
order to receive the RTO Adder.  Instead, they argue, neither the Ninth Circuit's decision
in *CPUC* nor the Commission's order on remand in *PG&E* addressed whether
voluntariness was necessary in order to receive the RTO Adder.  According to Supporting
Parties, the Ninth Circuit found that the Commission violated the requirement of Order
No. 679 to review requests for the RTO Adder on a case-by-case basis because the
Commission summarily rejected the CPUC's arguments without addressing them on their
merits; thus, they argue that while the Ninth Circuit found the Commission did not
support its decision to award the RTO Adder to PG&E, the Ninth Circuit did not rule on
the merits of the CPUC's claim and did not address whether mandatory continued
membership merited the RTO Adder.[21]

19.     Supporting Parties also argue that the voluntariness of Dayton's participation in
PJM should be immaterial to the decision of whether to grant the RTO Adder because
benefits accrue to the public regardless of whether membership is voluntary.[22]  WIRES

---

[17] Duke Ohio Initial Brief at 5-6.

[18] 16 U.S.C. § 824a.

[19] WIRES Initial Brief at 6.

[20] Duke Ohio Initial Brief at 7-8.

[21] AEP Ohio Initial Brief at 23-24; FirstEnergy Initial Brief at 9-10; Dayton Initial Brief at 8.

[22] *See, e.g.*, EEI Initial Brief at 5-6; FirstEnergy Initial Brief at 10.

Docket No. ER20-1068-000                                                    - 8 -

states that RTO participation should not be conditional on participation being voluntary because the benefits accrue not only to utilities, but to customers as well, and such benefits are the basis of the RTO Adder.  For instance, WIRES states that a full and active participant in an RTO, including participation in all of its studies and processes, provides a valuable platform to realize state and federal policy goals while also capturing the benefits of regionalization for customers.[23]  WIRES and AEP Ohio further argue that RTO membership imposes substantial and increasingly complex requirements on transmission utilities, including the loss of operational control, competitive risks, and added administrative responsibilities and costs.[24]  AEP Ohio states that some of these risks include being subject to PJM cancelling a project after beginning development of a project; being obligated to build a project even if the project was not proposed or developed by the utility; and being engaged in RTO markets where transmission owners do not control the market rules.[25]

20.     Supporting Parties contend that a voluntariness threshold effectively abdicates to the states the decision of whether to award the RTO Adder by basing the incentive on state policy.[26]  EEI asserts that given a state's ability to enact or repeal legislation at any time, conditioning the RTO Adder on voluntariness of RTO membership undermines regulatory and investment certainty.[27]  Dayton argues that if section 219 requires individualized voluntariness findings, a utility voluntarily joining an RTO would lose its incentive adder if a state passes a law compelling the utility to continue its membership.[28]  Dayton also claims that such an interpretation of section 219 will force the Commission to catalog the many different state laws, regulations, and orders on the subject to determine which states have legal authorities that compel RTO participation.[29]  Dayton and Duke Ohio argue that because state statutes are not static over time, the Commission may face a perpetual slate of litigation on this issue.[30]  AEP Ohio states that basing federal transmission incentives on state policy is inconsistent with similar federal

---

[23] WIRES Initial Brief at 7-11.

[24] *Id.* at 9-10; AEP Ohio Initial Brief at 11-12, 18-21.

[25] AEP Ohio Initial Brief at 11-12, 18-21.

[26] *See, e.g.*, AEP Ohio Initial Brief at 29; Duke Ohio Initial Brief at 9-10.

[27] EEI Initial Brief at 7-8.

[28] Dayton Initial Brief at 4-5.

[29] *Id.* at 9-10.  *See also* FirstEnergy Initial Brief at 8.

[30] Dayton Initial Brief at 9-10; Duke Ohio Initial Brief at 9-10.

programs incentivizing investment in renewable energy facilities regardless of state policies.[31]

21.     AEP Ohio and EEI contend that a voluntariness threshold discriminates between similarly situated transmission owners based on state policies, making utilities in Ohio less able to attract investment capital relative to utilities in other states in PJM with similar risk profiles.[32]  Dayton argues that this would result in divergent and uncertain investment signals if the availability of the adder is based on the Commission's interpretation of ambiguous state laws.[33]  Duke Ohio asserts that this would lead to investors favoring states with less restrictive statutes, which would further undermine the Commission's transmission investment objectives.  Duke Ohio argues that allowing states to effectively dictate eligibility for RTO Adders would lead to situations where utilities are unable to earn returns on investment commensurate with returns of utilities with similar risk profiles.[34]

22.     Supporting Parties argue that the Commission should find that, in line with the proposal in the Transmission Incentives NOPR to provide a fixed 100-basis-point transmission incentive for RTO participation regardless of whether a state requires such participation, that Dayton would qualify for an ROE Adder for being a transmission owning member of PJM regardless of whether doing so is voluntary and regardless of any interpretation of Ohio law.[35]  Duke Ohio and EEI state that in the Transmission Incentives NOPR, the Commission reasons that section 219 "obligates" the Commission to provide an incentive to each transmission utility or electric utility that joins an RTO or Independent System Operator (ISO), regardless of the voluntariness of their joining.[36]  Supporting Parties encourage the Commission to implement the proposal in the Transmission Incentives NOPR through a final rule, which would resolve the issues raised in the instant proceeding.[37]  Duke Ohio states that, given the widespread precedential impact such a decision would have on transmission owners across the

---

[31] AEP Ohio Initial Brief at 27-28.

[32] *Id.* at 25-26; EEI Initial Brief at 6-7.

[33] Dayton Initial Brief at 9.

[34] Duke Ohio Initial Brief at 8-9.

[35] *See, e.g.*, FirstEnergy Initial Brief at 9; AEP Ohio Initial Brief at 29.

[36] Duke Ohio Initial Brief at 6, n.14 (citing Transmission Incentives NOPR, 170 FERC ¶ 61,204 at PP 8, 92, 98); EEI Initial Brief at 6.

[37] EEI Initial Brief at 6; WIRES at 3-4; FirstEnergy Initial Brief at 9-11.

country, the Commission should address the issue of voluntary participation in an RTO as part of the Transmission Incentives NOPR.[38]

23.    Ohio FEA/OCC state that Dayton indicated in its previous answer in this proceeding that the RTO Adder is an important element in supporting Dayton's financial integrity and ability to borrow at reasonable rates.[39]  In response, Ohio FEA/OCC state that the incentive adder has no relationship to the utility's credit ratings; thus, Commission approval of the RTO Adder on this basis would result in charges to consumers that are unjust and unreasonable and unduly discriminatory.[40]

24.    Finally, PJM requests clarification that the Commission's intent in the August 17 Order to explore the voluntariness of Dayton's participation in an RTO under Ohio law should not be construed as a holding that voluntariness is the sole criterion by which to judge the appropriateness of Dayton's RTO Adder request in the place of the "case-by-case" eligibility analysis presently required by Order No. 679.

## b.    **Commission Determination**

25.    At the outset, we note that several parties argue that the Commission should address the issue of voluntary participation as part of a final rule implementing its March 2020 Transmission Incentives NOPR proposal, which they contend would render this question moot here.[41]  After these comments were filed, the Commission issued a Supplemental NOPR in April 2021.  We find that it is not appropriate to defer action on Dayton's request for an RTO Adder until after resolution of any potential generic final rule that may result from the Transmission Incentives NOPR or Supplemental NOPR, as regardless of the outcome of those proceedings, we would need to apply the requirements of Order No. 679 to determine Dayton's rates for the locked-in period prior to the effective date of any new final rule.

26.    We disagree with arguments that, because section 219 does not explicitly require voluntariness, the Commission in the August 17 Order erroneously concluded that a transmission owner's participation in an RTO must be voluntary for it to be eligible for the RTO Adder.  Section 219(c) states that, "[i]n the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each

---

[38] Duke Ohio Initial Brief at 10-11.

[39] FEA Ohio/OCC Initial Brief at 14 (citing Dayton March 24, 2020 Answer at 3).

[40] *Id.* at 14-15.

[41] *See, e.g.*, EEI Initial Brief at 6; WIRES at 3-4; FirstEnergy Initial Brief at 9-11. We note that Dayton neither made nor supported these arguments as made by others.

Document Accession #: 20210715-3070    Document: 66    Filed Date: 07/15/2021
Case: 21-4072    Document: 66    Filed: 12/15/2023    Page: 191

Docket No. ER20-1068-000                                                    - 11 -

transmitting utility or electric utility that joins a Transmission Organization."[42]  The Commission implemented this directive in Order No. 679, finding that an RTO Adder is appropriate for entities that choose to remain members of a Transmission Organization because, in relevant part, continuing membership is "generally voluntary."[43]

27.     In *CPUC*, the Ninth Circuit addressed Commission orders where, pursuant to section 219 and Order No. 679, the Commission summarily granted PG&E's requests for the RTO Adder for its continuing membership in the California Independent System Operator (CAISO), notwithstanding California Public Utility Commission's (CPUC) argument that PG&E was ineligible for the incentive because California law required PG&E to participate in CAISO.[44]  The Ninth Circuit recognized that Order No. 679's presumption that a utility that has joined and has ongoing membership in a Transmission Organization is eligible for the RTO Adder may be rebutted by evidence that such membership is not voluntary.[45]  Relying on the Commission's description of incentive adders as "an *inducement* for utilities to join, and remain in, Transmission Organizations,"[46] the Ninth Circuit concluded that, since an incentive cannot induce behavior that is already legally mandated, "the voluntariness of a utility's membership in a transmission organization is logically relevant to whether it is eligible for an adder."[47] The Ninth Circuit remanded the underlying proceedings and instructed the Commission to "inquire into PG&E's specific circumstances, i.e., whether it could unilaterally leave [CAISO] and thus whether an incentive adder could induce it to remain in [CAISO]."[48] On remand, the Commission concluded that California law does not mandate PG&E's

---

[42] 16 U.S.C. § 824s(c).

[43] Order No. 679, 116 FERC ¶ 61,057 at P 331.

[44] *CPUC*, 879 F.3d at 971-72 (additional citations omitted).

[45] *Id.* at 974-75 ("Order 679 provides that a utility demonstrating that it has remained in a transmission organization is 'presumed to be eligible' for an incentive adder… However, language throughout Orders 679 and 679-A suggests that the presumption of eligibility may be rebutted by the arguments CPUC has made and that ongoing membership is not sufficient for an incentive adder… When membership is not voluntary, the incentive is presumably not justified.").

[46] *Id.* at 974 (citing Order No. 679-A, 117 FERC ¶ 61,345 at P 86) (emphasis in original).

[47] *Id.* at 975 (citing Order No. 679-A, 117 FERC ¶ 61,345 at P 86).

[48] *Id.* at 979.

participation in CAISO and that the RTO Adder induces PG&E to continue its membership, affirming its grant of an incentive *because* it found PG&E membership in CAISO to be voluntary.[49]  Therefore, consistent with Order No. 679 and *CPUC*, we find that a showing that RTO membership is voluntary is a prerequisite to granting Dayton an RTO Adder.

28.     Several parties argue that *CPUC* does not require a showing of voluntariness because the Ninth Circuit did not address the issue of whether mandatory RTO participation warranted an RTO Adder, but rather focused only on the fact that the Commission had failed to justify granting the RTO Adder by summarily rejecting the CPUC's arguments.[50]  We disagree.  While the Ninth Circuit specifically found that it was erroneous and unreasonable for the Commission to have interpreted Order No. 679 as justifying a summary grant of the RTO Adder to PG&E, without further inquiry into the circumstances of its continued membership,[51] the Ninth Circuit further determined that a presumption of eligibility due to a utility's ongoing RTO membership could be rebutted by a demonstration that ongoing membership is not voluntary.[52]  Moreover, the Ninth Circuit stated that, given the Commission's longstanding policy to award incentives to incent future behavior, an incentive cannot induce behavior that already is legally mandated; accordingly, while the Commission could provide an incentive for continued RTO membership, the utility's choice to remain in the RTO must be voluntary.[53]  Thus, the Ninth Circuit made clear that the voluntariness of a utility's membership in an RTO is a necessary consideration in granting the RTO Adder.

---

[49] *Pacific Gas &Electric*, 168 FERC ¶ 61,038, at P 2. (2019) (*PG&E*).

[50] AEP Ohio Initial Brief at 23-24; FirstEnergy Initial Brief at 9-10; Dayton Initial Brief at 8.

[51] *CPUC*, 879 F.3d at 973-74.

[52] *Id.* at 976-77 ("A utility that joins a regional transmission organization is 'presumed to be eligible' for incentive adders under Order 679, but this presumption is rebuttable…Given the order's evident purpose of inducing utilities to voluntarily remain in transmission organizations, and given its language specifying that incentives will be awarded 'when justified' and on a 'case-by-case basis,' it permits challenges to incentives on the grounds that they will not induce continuing participation in transmission organizations.").

[53] *Id.* at 977-78 ("FERC has a longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced…The policy prohibits FERC from rewarding utilities for past conduct or for conduct which they are otherwise obligated to undertake... Awarding

29.     Dayton also argues that the Commission should grant Dayton the RTO Adder because not doing so threatens Dayton's financial integrity, credit ratings, and/or ability to attract investment.  Dayton's argument is misplaced.  One of the requirements of a utility's base ROE, as established in *FPC v. Hope Natural Gas Co.*[54] and *Bluefield Water Works & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*,[55] is to preserve the utility's financial integrity and enable the utility to attract capital investment.[56]  Therefore, it is the base ROE, rather than incentives such as RTO Adder, that was intended to ensure a utility's financial integrity.  In contrast, as the Commission stated in Order No. 679, the basis for the RTO Adder is a recognition of the benefits that flow from membership in RTOs/ISOs and to incentivize utilities to join them.[57]  Therefore, the Commission's decision to deny the incentive RTO Adder here is irrelevant to Dayton's base ROE and financial integrity, credit ratings, and ability to attract investment.

30.     We are not persuaded by assertions that, regardless of whether participation is mandatory, the Commission should approve the RTO Adder because both ratepayer benefits from RTO membership and the risks to a utility continue to accrue.  As *CPUC* observed, the Commission:

> [h]as a longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced.  This policy is incorporated in Order 679.  The policy prohibits FERC from rewarding utilities for past conduct or for conduct which they are otherwise obligated to undertake.[58]

Consistent with that longstanding policy, we do not believe it would be appropriate to award an incentive for an action that the requesting entity is required by law to take, even where that action comes with substantial benefits or risks.

---

PG&E incentive adders was a departure from FERC's longstanding policy that incentives should only be awarded to induce voluntary conduct.").

[54] 320 U.S. 591 (1944).

[55] 262 U.S. 679 (1923).

[56] *See Martha Coakley v. Bangor-Hydro-Elec. Co.*, Opinion No. 531, 147 FERC ¶ 61,234, at P 153.

[57] Order No. 679, 116 FERC ¶ 61,057 at P 331.

[58] *CPUC*, 879 F.3d at 977.

Docket No. ER20-1068-000                                           - 14 -

31.     In response to Duke Ohio's argument and PJM's request for clarification that voluntariness is not the sole criterion in awarding an RTO Adder, we reiterate that, pursuant to Order No. 679 as interpreted in *CPUC*, the Commission must determine whether membership is voluntary.[59]  Neither Duke Ohio nor PJM explains how awarding Dayton an RTO Adder is consistent with Order No. 679 as interpreted in *CPUC*.

## 2.    Whether Transmission Organization Membership is Required under the Ohio Statute and Alternatives to Transmission Organization Membership

### a.    Supporting Parties' Initial Briefs

32.     Dayton argues that, to the extent the Commission continues to apply a utility-specific voluntariness requirement, it should find that requirement satisfied so long as there is a colorable argument that state law does not compel a utility to join a Transmission Organization that would qualify for incentive treatment, or if the utility has a choice among which Transmission Organization to join.  Dayton and Supporting Parties argue that the Ohio statute does not require utilities to join PJM specifically or any RTO generally as a transmission-owning member.[60]  Dayton argues that the Ohio Legislature's choice to enumerate the qualities of a transmission entity and not mandate participation in a tight power pool, RTO, or ISO was deliberate, particularly since other Ohio laws expressly reference the concept of RTOs and the Ohio statute has not been amended since it was enacted in 1999 to include such reference.[61]  Dayton argues that, no matter how broadly or narrowly the Ohio statute is read, it is unquestionable that Dayton has choices about whether to join and remain in PJM, to change RTOs, to adopt an alternative arrangement, or even to divest its transmission assets.[62]

33.     As a threshold matter, Dayton argues that the Commission must make an independent legal determination into the role the Ohio statute plays in eligibility for the RTO Adder.  Dayton asserts that it is not appropriate to rely on a state commission's

---

[59] *Id.* at 978 (awarding incentive adders to a company required to belong to an RTO "was a departure from FERC's longstanding policy that incentives should only be awarded to induce voluntary conduct.").

[60] *See, e.g.*, Dayton Initial Brief at 16; FirstEnergy Initial Brief at 5; Duke Ohio Initial Brief at 12-15.

[61] Dayton Initial Brief at 17-20.

[62] *Id.* at 16.

reading of its state laws given its status as a litigant at the Commission and not a neutral, authoritative arbiter of what the state law means.[63]  Duke Ohio similarly states that the Commission should not defer to Ohio FEA as to the proper interpretation of the Ohio statutes because the Commission's subject matter jurisdiction over these proceedings arises under the FPA, and not diversity jurisdiction.  Accordingly, Duke Ohio asserts that the *Erie* doctrine is inapplicable, and the Commission is free to interpret the relevant Ohio statute *de novo*.[64]  AEP Ohio contends that utilities have not challenged the Ohio statute to date because it has not been applied in a way that would make RTO membership involuntary.

34.    Dayton asserts that the "control" required by the Ohio statute is not "operational control" as that term is used to characterize RTOs or Transmission Organizations; rather, it speaks to functional control that Dayton could achieve through an alternative arrangement such as an independent transmission coordinator.[65]  Dayton contends that the Ohio statute does not meaningfully distinguish between physical control of facilities and operational and functional control of facilities, a fundamental distinction embedded into the Commission's RTO concept.[66]  Dayton argues that because the meaning of "control" is ambiguous and undefined, the statute is reasonably interpreted to mean that transmission-owing utilities can satisfy a "transfer of control" by something less than what the RTO model compels and certainly something less than complete transfer of all property rights.[67]  Dayton argues that, given that the concept of operational control was prominent at the time of enactment of the Ohio statute and the Ohio Legislature later added specific references to RTOs in other statutory provisions but did not amend the relevant Ohio statute, it is reasonable to interpret the lack of specific reference to that idea and lack of definition around the word "control" by the Ohio Legislature as allowing something less than full operational control by a qualifying transmission entity.  Dayton claims that control sufficient to guarantee non-discriminatory access to transmission is the most reasonable interpretation of what the Ohio Legislature meant when it used

---

[63] *Id.* at 15 (citing *PG&E*, 168 FERC ¶ 61,038 at PP 40-41, *order on reh'g*, 170 FERC ¶ 61,194, at PP 33-34) (2020).

[64] *Id.* at 11-12.

[65] Dayton Initial Brief at 17.

[66] *Id.* at 20-21.

[67] *Id.* at 21.

the word "control."[68]  Dayton similarly argues the Ohio statute's requirement for "membership" in a qualifying transmission entity does not require transmission owners to "join" an RTO, which requires a utility to turn over jurisdictional facilities to an RTO "for the operation of [those] transmission facilities" under the Commission's transmission incentive regulations.[69]  Rather, Dayton argues that RTOs have non-transmission owner membership categories and such membership would satisfy the requirement under the Ohio statute.

35.     Supporting Parties further argue that there are alternative arrangements to comply with the Ohio statute other than membership in PJM due, in part, to the statute not requiring Dayton to transfer its central planning function to the transmission entity.[70]  AEP Ohio contends that, if Dayton were to establish a separate transmission entity without central planning authority that met the requirements of the Ohio statute, such an arrangement would not qualify for the RTO Adder because it would not provide the benefits to customers that the central planning function of an RTO provides.  Specifically, AEP Ohio suggests that utilities in Ohio could establish a state-wide transmission coalition that includes an independent transmission entity approved by the Commission to take over the control of their respective transmission systems, which would minimize pancaked transmission rates and improve reliability service within the state.[71]  However, because the Ohio statute does not require transfer of the central transmission planning of its transmission system, AEP Ohio argues that these utilities would retain the requirement to plan their own transmission systems, which would make this arrangement ineligible for an RTO Adder under Order No. 679.  AEP Ohio asserts that, while the Commission does not specifically define the criteria that must be met to qualify as a "Transmission Organization" in Order No. 679, central planning must be

    [68] *Id.* at 22-23.

    [69] *Id.* at 25-26 (citing 18 C.F.R. §§ 35.35(b)(2),(e) (2020); *Entergy Servs., Inc.*, 110 FERC ¶ 61,295, at PP 21, 35 (2005); *Duke Power*, 113 FERC ¶ 61,288 (2005)).

    [70] *Id.* at 26; AEP Ohio Initial Brief at 5; Duke Ohio Initial Brief at 13-14; FirstEnergy Initial Brief at 5-6.  AEP Ohio and Dayton thus argue that the Commission should incentivize Dayton to remain in PJM due to the increased consumers' savings and added risks resulting from membership.  AEP Ohio Initial Brief at 11, 16-18; Dayton Initial Brief at 27-31.

    [71] AEP Ohio states that this coalition can also establish a generation market that satisfies the requirements for an independent, competitive marketplace and that increases economic supply for customers by expanding the market of each Ohio utilities' service territory to the entire state.  AEP Ohio Initial Brief at 7-8.

Docket No. ER20-1068-000                                                    - 17 -

necessary to be eligible for the RTO Adder to recognize the benefits a robust planning process provides to consumers.[72]

36.     Dayton suggests it is possible to comply with the Ohio statute while being ineligible for an RTO Adder by pursuing an independent coordinator of transmission (ICT) structure, which the Commission has previously approved.[73]  Dayton states that such an arrangement would have four main components:  (1) transfer of control over certain core transmission functions to the ICT, including administrating Dayton's reestablished open access transmission tariff (OATT) and calculating and posting Total Transmission Capability and Available Transmission Capability on Dayton's Open Access Same-Time Information System; (2) a procurement process for energy; (3) reciprocity agreements for rate de-pancaking; and (4) a market monitoring plan to ensure competitiveness of the Dayton transmission system.[74]

37.     Dayton claims that the ICT arrangement would meet the nine criteria of the Ohio statute, as follows.  For the first criterion (i.e., the transmission entity must be approved by the Commission), Dayton could propose an agreement for an ICT as part of its open access transmission tariff upon exit from PJM, which would need to be approved by the Commission under FPA section 205.  Dayton asserts that, because approval is given no special meaning in the Ohio statute, approval or acceptance of such an agreement would

---

[72] *Id.* at 8-9.

[73] Dayton Initial Brief at 7 (citing *Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282 (2006) (*Louisville*); *MidAmerican Energy Co.*, 113 FERC ¶ 61,274 (2005); *Duke Power.*, 113 FERC ¶ 61,288 ; *Entergy Servs., Inc*., 110 FERC ¶ 61,295, *order on clarification*, 111 FERC ¶ 61,222 (2005), *order on reh'g denied* , 115 FERC ¶ 61,095 (2006) (*Entergy*); *Am. Elec. Pwr. Co.*, 91 FERC ¶ 61,208, at 61,747 (2000)).  *See also* FirstEnergy Initial Brief at 6; Duke Ohio Initial Brief at 14 (suggesting that Dayton could comply with the Ohio statute by contracting with an entity to provide independent transmission management/tariff administration services and with a separate reliability coordinator to manage its reliability duties).  However, FirstEnergy submits that "there is no way that [Dayton] would not qualify for the [RTO Adder]," under such an alternative arrangement.  FirstEnergy Initial Brief at 5.

[74] Dayton Initial Brief at 35.

comply.  Dayton further notes that the Commission has granted or accepted RTO status, as opposed to approved such status, in previous orders.[75]

38.     For the second criterion (i.e., the transmission entity separates control of transmission facilities from control of generation facilities), Dayton notes that it has transferred all previously-owned generation to an affiliate and also argues that the Commission has found previous ICT arrangements to be consistent with or superior to the requirements of Order No. 888,[76] which requires functional separation of generation and transmission functions.[77]  Dayton states that entering into a reciprocity agreement with PJM for rate de-pancaking would meet the third criterion (i.e., the transmission entity implements policies to minimize rate pancaking in the state).[78]

39.     For the fourth criterion (i.e., the transmission entity improves service reliability), Dayton asserts that the Commission should interpret this provision to provide that reliability would be improved compared with the situation when the law was enacted in 1999 and mandatory reliability standards did not exist.  Dayton argues that the ICT arrangement would improve reliability over the status quo in 1999 by providing greater redispatch opportunities through its administration of the energy procurement process, by ensuring that available transmission capability is accurately calculated and fairly allocated, and by taking action to address emergencies in its management of interchange schedules.[79]

---

[75] *Id.* at 39-40 (citing *Sw. Pwr. Pool, Inc.*, 106 FERC ¶ 61,110, at P 1 (2004); *PJM Interconnection, L.L.C.*, 101 FERC ¶ 61,345, at P 1 (2002); *Midwest Indep. Transmission Sys. Oper., Inc.*, 97 FERC ¶ 61,326, at 62,500 (2001)).

[76] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[77] Dayton Initial Brief at 40-41 (citing *Entergy*, 115 FERC ¶61,095 at P 291)).

[78] *Id.* at 41.

[79] *Id.* at 42-43.

40.     According to Dayton, the arrangement would comply with the fifth criterion (i.e., the transmission entity achieves the objectives of an open and competitive electric generation marketplace, elimination of barriers to market entry, and preclusion of control of bottleneck electric transmission facilities in the provision of retail electric service).  To achieve the open and competitive electric generation marketplace and eliminate barriers to market entry, Dayton states that a procurement process patterned on a previously-approved process;[80] use of a market monitor to provide impartial monitoring and reporting on the effects of generation dispatch on transmission constraints and associated effects on market prices;[81] and the reciprocity agreement[82] would together comply.  To achieve the objective of preclusion of control of bottleneck electric transmission facilities, Dayton states that its arrangement would comply by having the ICT calculate Total Transmission Capability and Available Transmission Capability; ensure that Available Transmission Capability values are calculated on a nondiscriminatory basis; validate interchange schedules; and manage interchange with Dayton neighbors.[83]

41.     Addressing the sixth criterion (i.e., the transmission entity is of sufficient scope or otherwise operates to substantially increase economical supply options for consumers), Dayton argues that the energy procurement process under its arrangement, which is

---

[80] *Id.* at 43 (citing *Entergy*, 115 FERC ¶ 61,095 at P 290).  Dayton states that the Commission found the procurement process in *Entergy* to be "structured adequately to permit merchant generators and other wholesale suppliers to compete to serve loads that participate in the [procurement process]."

[81] *Id.*

[82] *Id.* (citing *Louisville*, 114 FERC ¶ 61,282 at P 95).  Dayton states that the Commission found a similar agreement in *Louisville* allowed "[c]ompeting suppliers within the [RTO] footprint [to] retain the ability to compete for sales into the [exiting utility] customers' market.")).

[83] *Id.* at 44 (citing *Louisville*, 114 FERC ¶ 61,282 at P 89; *Duke Power*, 113 FERC ¶ 61,288 at P 18).  Dayton states that the Commission found that these same elements allowed in the independent entity in *Louisville* to "perform functions that take away [the utility's] ability to maintain congested interfaces" and that an independent entity administering these same functions in *Duke Power* "is an improvement over the existing transmission services and transmission decision-making [currently] offered under [a utility's] OATT."  *Id.*

Document Accession #: 20210715-3070     Filed Date: 07/15/2021

modeled after Entergy's Weekly Procurement Process, would substantially increase supply options.[84]

42.    Dayton argues that for the seventh criterion (i.e., the governance structure or control of the transmission entity is independent of the users of the transmission facilities), previous ICT arrangements using an existing RTO or ISO were approved by the Commission as consistent with or superior to the pro forma OATT in Order No. 888, but to the extent Dayton used a different ICT, it would ensure it met this requirement.[85] Regarding the eighth criterion (i.e., the transmission entity operates under policies that promote positive performance designed to satisfy the electricity requirements of customers), Dayton states that these would be adopted by any ICT with which Dayton would hypothetically contract.[86]

43.    Finally, for the ninth criterion (i.e., the transmission entity is "capable of maintaining real-time reliability of the electric transmission system, ensuring comparable and nondiscriminatory transmission access and necessary services, minimizing system congestion, and further addressing real or potential transmission constraints"), Dayton says that the four-component hypothetical arrangement would meet this requirement by: (1) ensuring that the ICT and the Reliability Coordinator coordinate to implement bulk transmission reliability functions that ensure real-time reliability; (2) exceeding the comparability and non-discriminatory requirements of Order No. 888 by employing an independent entity to ensure access to transmission and interconnection services; (3) providing supply alternatives through the energy procurement process to provide redispatch to address system congestion as well as monitoring to ensure prices in that process do not reflect market power; and (4) using all of the above functions to address real or potential transmission constraints in real-time.[87]

44.    Dayton argues that the hypothetical arrangement, however, would not qualify Dayton for an RTO Adder as a Transmission Organization under section 35.35(e) of the Commission's regulations.  First, Dayton argues the Commission has determined that a Transmission Organization that qualifies for an RTO Adder must have been "approved by the Commission for the operation of transmission facilities," but under the ICT arrangement, Dayton would not transfer operational control but only control over certain

---

[84] *Id.* at 45-46 (citing *Entergy*, 115 FERC ¶ 61,095 at PP 247-260, 296).

[85] *Id.* at 46-47.

[86] *Id.* at 47.

[87] *Id.* at 47-50.

functions.[88]  Second, Dayton argues that the Commission has not awarded RTO Adders to any utilities that have had their independent coordinator arrangements approved by the Commission.  Dayton argues that any such adders were received only after making a subsequent decision to join an RTO with centralized transmission planning and full operational authority over the transmission owner's transmission facilities.[89]

### b.    Ohio Parties' Initial Briefs

45.    Ohio FEA/OCC and IEU-Ohio (together Ohio Parties) urge the Commission to deny Dayton the RTO Adder.  They argue that the Ohio statute requires Dayton to belong to a qualifying transmission entity that is approved by the Commission and that Dayton has not met its burden to demonstrate that its RTO participation is voluntary.[90]  IEU-Ohio claims that whether Dayton's participation in PJM or another RTO is voluntary is determined by the construction of relevant terms in the Ohio statute in accordance with their ordinary and natural meaning, unless they are defined.[91]  Noting that the Ohio statute provides that "no entity *shall* own or control transmission facilities…*unless* that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities," IEU-Ohio asserts that the terms "shall" and "unless" determine the nature of the mandatory obligation created by the Ohio Legislature in this section.[92]  Specifically, IEU-Ohio argues that the term "shall" confers a duty to, and precludes any discretion of, the transmission owner.

46.    Ohio Parties contend that because membership in a Commission-approved transmission entity is required by Ohio law, no incentive payment is needed to get Dayton to join or remain in such an entity or an RTO and it would be unjust and unreasonable for Dayton's customers to pay the charges for the RTO Adder for merely doing what Ohio law requires.[93]  Noting that in the Commission's order on remand following from *CPUC*, the Commission approved PG&E's RTO Adder because it determined that PG&E's participation in the CAISO was voluntary, Ohio FEA/OCC

---

[88] *Id.* at 37-38, (citing 18 C.F.R. § 35.35(b)(2)).

[89] *Id.* at 35 (citing *Midcontinent Indep. Sys. Oper., Inc.*, 150 FERC ¶ 61,004 at PP 39, 44-45 (2015)).

[90] Ohio FEA/OCC Initial Brief at 1, 4-5; IEU-Ohio Initial Brief at 3-4.

[91] IEU-Ohio Initial Brief at 3.

[92] *Id.* at 3-4.

[93] Ohio FEA/OCC Initial Brief at 5-7; IEU-Ohio Initial Brief at 3-4.

argue that Dayton's situation here is inapposite because participation in a Commission-authorized RTO is mandated by Ohio law.[94]

47.    Ohio FEA/OCC contend that there would be no legal justification to grant the RTO Adder on the basis of joining a different RTO.  Ohio FEA/OCC contend that the Commission has never approved an RTO Adder as a "clear inducement" to remain in a particular RTO, but rather the Commission requires that transmission owners provide a cost/benefit analysis to demonstrate benefits as a result of RTO realignment; here, Dayton itself recognizes that leaving PJM would diminish benefits to its customers.[95]

48.    Ohio FEA/OCC argue that, in response to individual protests by Ohio FEA and OCC in this proceeding, Dayton argued that it could enter into an alternative RTO scenario where it could "[withdraw] from PJM, [turn] over only operational control of its transmission system to an independent transmission operator, and [recapture] its autonomy and power to design and construct new transmission facilities."[96]  Ohio FEA/OCC argue that any such alternative RTO scenario involves speculation about a hypothetical situation that is neither plausible nor practical, stating that Dayton would be required to demonstrate how the hypothetical new arrangement complies with Ohio law and how it furthers the goals of the state of Ohio.[97]  Ohio FEA/OCC state that if Dayton was permitted to abandon its PJM membership to join a hypothetical alternative transmission entity, that hypothetical "transmission alternative," would need to be a "qualifying transmission entity" as defined by Ohio law, meaning that it must perform all the RTO functions listed in Ohio law and secure Commission approval.[98]

49.    Ohio FEA/OCC argue that Dayton's hypothetical alternative would be inconsistent with the requirements of the Ohio statute that are intended to increase consumers' service quality, market choices, and economies of scale.[99]  Ohio FEA/OCC further state that, on a practical level, it is unclear how Dayton's hypothetical alternative would deliver the same service quality, market efficiency, and economies of scale that are currently being delivered by PJM.  Ohio FEA/OCC contend that allowing Dayton to

---

[94] Ohio FEA/OCC Initial Brief at 7 (citing *PG&E*, 168 FERC ¶ 61,038, *order on reh'g*, 170 FERC ¶ 61,194).

[95] *Id.* at 12-14.

[96] *Id.* at 9 (citing Dayton March 24, 2020 Answer at 3-4, 7-8).

[97] *See id.* at 9-10.

[98] *Id.* at 6.

[99] *Id.* at 11 (citing Ohio Rev. Code, §§ 4928.12 (B) (3)-(6), (8), & (9)).

Docket No. ER20-1068-000                                                    - 23 -

move to the new hypothetical alternative that is likely smaller and less efficient would be inconsistent with the Commission policy.[100]

### c. **Supporting Parties' Reply Briefs**

50.     Dayton argues that *CPUC* provides a rebuttable presumption of eligibility for the RTO Adder for utilities that join RTOs based, in part, on the fact that that RTO participation is voluntary.[101] Dayton claims that IEU-Ohio misunderstands this presumption as applied in this case, asserting that whether that presumption may be rebutted in an individual case is a burden shouldered by challengers, which IEU-Ohio and Ohio Parties have not done here.[102] Dayton also argues Ohio Parties misunderstand federal law in asserting that participation in an RTO is mandatory or that transmission owners that withdraw from an RTO are required to immediately join another Transmission Organization. Dayton contends that federal law does not require Dayton to join an RTO and that lack of a requirement is one reason why incentives under section 219 exist in the first place.[103]

51.     Dayton argues that Ohio Parties fail to recognize that the substantial benefits provided by Dayton's continued participation in PJM support receipt of the RTO participation adder. Dayton argues there is no doubt that RTO membership yields the most efficiencies and customer benefits of the choices that Dayton has under state and federal law, and Dayton does not contend that hypothetical alternative arrangements would be superior to PJM.[104] Dayton states that membership in PJM has been very beneficial, and thus continuing to make that choice merits an RTO Adder.[105]

---

[100] Ohio FEA/OCC Initial Brief at 11-12 (citing *All. Companies*, 100 FERC ¶ 61,137 (2002)). Ohio FEA/OCC argue that in that decision, the Commission rejected a new proposed RTO, the Alliance RTO, because it was of insufficient size and scope to provide the benefits intended by RTO/ISO participation and because it could not satisfy certain requirements for RTO status, which would likely be true for any alternative RTO arrangement here. *Id.* at 12.

[101] Dayton Reply Brief at 5.

[102] *Id.* at 4-6.

[103] *Id.* at 6 (citations omitted).

[104] *Id.* at 13.

[105] *Id.* at 13-14.

52.     Duke Ohio asserts that Commission precedent refutes contentions by Ohio Parties that RTOs were only formed to remedy anticompetitive behavior.[106]  Duke Ohio asserts that the Commission has repeatedly discussed the benefits of RTOs in providing efficiencies in the operation of the transmission grid and other benefits to members, and that RTO formation and participation is voluntary.[107]  Duke Ohio concludes that if the claim were true that RTOs only exist to remedy anticompetitive behavior, then the Commission would have never offered an RTO Adder to incentivize membership.[108]

53.     Dayton claims that both IEU-Ohio and Ohio Parties incorrectly argue that state commission approval is required for any alternative arrangement that Dayton might pursue.[109]  AEP Ohio similarly rejects Ohio Parties' assertion that, in order to withdraw from PJM and join a separate transmission entity, Dayton would be required to demonstrate how the arrangement would further the goals of the state of Ohio, arguing that such a requirement is not reflected in the Ohio statute, or in Commission precedent.[110]  Duke Ohio disputes assertions from Ohio Parties that the Commission wouldn't approve an "inferior" option that would result from Dayton's withdrawal from PJM, arguing that such speculation is beyond the scope of this proceeding and contrary to precedent.[111]  Duke Ohio notes that in *PG&E*, the Commission examined only the "voluntary nature of RTO/ISO membership" under California law, and once the Commission found that membership was not mandatory, it did not engage in a speculative exercise about what PG&E would do if it were not an RTO member.[112]  Duke Ohio also disputes the relevance of the Alliance RTO proposal cited by Ohio Parties, asserting that it is inapposite whether the Commission rejected a proposal to form an alternative RTO arrangement, since the relevant question is whether Dayton could comply with the Ohio law via a non-RTO arrangement.[113]

---

[106] Duke Ohio Reply Brief at 8-9.

[107] *Id.* at 9-10.

[108] *Id.* at 10.

[109] Dayton Reply Brief at 11.

[110] AEP Ohio Reply Brief at 3-4.

[111] Duke Ohio Reply Brief at 4-5.

[112] *Id.* at 5-6 n.11 (citing *PG&E*, 168 FERC ¶ 61,038 at P 52).

[113] *Id.* at 7.

Docket No. ER20-1068-000                                                    - 25 -

d.    **Commission Determination**

54.    As discussed below, we find that the Ohio statute requires Dayton to be a member of a Transmission Organization.  We also find that parties have not demonstrated that there are alternative arrangements through which Dayton could comply with that law without joining a Transmission Organization.[114]  Because a showing of *voluntary* membership in a Transmission Organization is needed to rebut the presumption of eligibility based on ongoing membership under Order No. 679 and that showing is absent here, we deny Dayton's request for an RTO Adder.[115]

55.    Dayton argues that it should be granted the RTO Adder because the Commission presumes that a utility is eligible for the incentive it if joins an RTO.  In Order No. 679, the Commission stated that "[a]n entity will be presumed to be eligible for the incentive if it can demonstrate that it has joined an RTO, ISO, or other Commission-approved Transmission Organization, and its membership is on-going."[116]  However, the Ninth Circuit's found in *CPUC* that, when "membership is not voluntary, the incentive is presumably not justified."[117]  Thus, we disagree with Dayton because its presumption of eligibility based on its membership in PJM is rebutted by the fact that its membership in PJM is not voluntary.  Ohio Parties challenge Dayton's eligibility for the adder based on the argument that membership is not voluntary under the Ohio statute.  In support, Ohio Parties note that the statute requires an entity that owns or controls transmission facilities in Ohio to be a member of, and transfer control of those facilities to, one or more operational "qualifying transmission entities" that embody nine criteria, including that "the transmission entity is approved by the [Commission]."[118]

56.    As noted above, in *PG&E*, the Commission's order on remand following *CPUC*, the Commission affirmed its decision to grant PG&E's request for a 50 basis point adder for its continued participation in CAISO.  The Commission interpreted the California statutory provisions as not requiring utilities to remain within an RTO, but as provisions

---

[114] Because we find that the Ohio statute requires Dayton to be a member of a Transmission Organization, we need not address Dayton's argument that we could reach a different decision here had it made a colorable argument to the contrary.

[115] Order No. 679, 116 FERC ¶ 61,057 at P 331.

[116] *Id.* P 327.

[117] *CPUC*, 879 F.3d at 974-75, 77.

[118] Ohio FEA/OCC Initial Brief at 1, 4-5; IEU-Ohio Initial Brief at 3-4. (citing Ohio Rev. Code, § 4928.12 (B)(1)).

Docket No. ER20-1068-000                                                        - 26 -

that "speak in terms of encouragement and facilitation of [CAISO] participation."[119]   The
Commission noted that section 330(m) of the California Code provides that:

> It is the intention of the Legislature that California's publicly
> owned electric utilities and investor-owned electric utilities
> *should* commit control of their transmission facilities to the
> Independent System Operator.   These utilities *should* jointly
> advocate to the *Federal Energy Regulatory Commission* a
> pricing methodology for the Independent System Operator
> that results in an equitable return on capital investment in
> transmission facilities for all Independent System Operator
> participants.[120]

However, in contrast to the California statutory provisions that encourage but do not
require RTO membership, the Ohio statute mandates that an entity shall not "own or
control transmission facilities…unless [it] is a member of, and transfers control of those
facilities to, one or more qualifying transmission entities" that complies with nine criteria,
one of which is that the qualifying transmission entity be approved by the Commission.[121]

57.     We further find that any qualifying transmission entity that would satisfy the
requirements of the Ohio statute would also be a Transmission Organization under the
FPA and the Commission's regulations.   The Ohio statute requires that the qualifying
transmission entity be "approved by the [Commission]" and meet eight other criteria.
The FPA defines a Transmission Organization as "a Regional Transmission
Organization, Independent System Operator, independent transmission provider, or other
transmission organization finally approved by the Commission for the operation of
transmission facilities,"[122] a broader definition that encompasses a qualifying
transmission entity.   Thus, we agree with arguments that the Ohio statute does not limit
membership to PJM or another RTO.   Rather, it requires membership in a qualifying
transmission entity that is a Transmission Organization.

58.     This finding is relevant because, under section 219 and Order No. 679, the RTO
Adder is not limited to membership in an RTO or ISO but to membership in a
Transmission Organization, which, as noted, is defined more broadly.   Section 219

---

[119] *PG&E*, 168 FERC ¶ 61,038 at P 45.

[120] *PG&E*, 170 FERC ¶ 61,194 at P 7 (citing Cal. Pub. Util. Code § 330(m))
(emphasis added).

[121] Ohio Rev. Code, § 4928.12.

[122] 16 U.S.C. § 796(29); 18 C.F.R. § 35.35(e).

Document Accession #: 20210715-3070    Filed Date: 07/15/2021

requires the Commission to "provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization," not only an RTO or ISO.[123]  Accordingly, we disagree with the argument that the Commission has granted RTO Adders only for utilities that have joined an RTO with centralized transmission planning and, thus, Dayton's choice to be a member of PJM (or another RTO), as opposed to a non-RTO or - ISO, should entitle it to the RTO Adder.  As noted, consideration of whether to grant the RTO Adder incentive is not limited to a utility's membership in an RTO or ISO but to any Transmission Organization, and there is no requirement that a Transmission Organization plan for expansion of transmission facilities.[124]

59.    Similarly, Dayton says that it has choices under the Ohio statute about whether to remain in PJM, join another RTO, or enter into an alternative arrangement.[125]  However, the Ohio statute requires membership in a Transmission Organization, and Dayton's choice about *which* Transmission Organization it joins is not relevant to the inquiry of whether its membership in a Transmission Organization is voluntary.  If Dayton left PJM to join another RTO, that action would comply with the Ohio statute and Dayton would also continue to be a member of a Transmission Organization.  While Dayton could move from one RTO to another, its ability to change RTOs would not qualify Dayton for the adder in the new RTO, because the Ohio statute requires Dayton to belong to a Transmission Organization.

60.    We are not persuaded by arguments that:  (1) the "control" required by the Ohio statute is not "operational control," but rather speaks to "functional control," or "control sufficient to guarantee non-discriminatory access to transmission," and (2) the Ohio statute's requirement for "membership" in a qualifying transmission entity is distinguishable from "joining" a Transmission Organization, which requires turning over jurisdictional facilities to a Transmission Organization "for the operation of [those] transmission facilities" under the Commission's transmission incentive regulations, i.e., an entity could comply with the Ohio statute as a member of a Transmission Organization at a lesser level of membership than as a Transmission Owner.  Dayton did not articulate a clear distinction between transferring "operational control" and "functional control" to

---

[123] 16 U.S.C. § 824s(c).

[124] 16 U.S.C. § 796(29); 18 C.F.R. § 35.35(e).  The definition of "Transmission Organization" requires operation of transmission facilities, but not planning for expansion of those facilities.

[125] Dayton also states that it has the choice to divest its transmission facilities to comply with the statute, but this option is not relevant for purposes of the RTO Adder because it is an incentive for membership in a Transmission Organization.  Dayton Initial Brief at 16.

a Transmission Organization.  The Ohio statute requires an entity owning or operating transmission in Ohio to be "a member of, and [transfer] control of those facilities." While the Ohio statute does not include the term "operational control," a reasonable interpretation of the word "control" means control in all aspects of operations.[126]  It is unclear what less extensive aspect of control could apply to a "transfer of control" to a qualifying transmission entity as mandated by the Ohio statute.[127]  Moreover, Dayton itself previously acknowledged that the statute requires a transfer of "operational control."[128]  Because we find that a transfer of operational control is required under the Ohio statute, we do not agree with Dayton that it can comply with the Ohio law without transferring operational control of its transmission facilities to a Transmission Organization.

61.    Supporting Parties also suggest two alternative approaches to an RTO that could meet the requirements of the Ohio statute, specifically a state-wide transmission coalition approach or an ICT approach.  We find that neither approach has been shown to comply with the Ohio statute.  For the state-wide transmission coalition approach, AEP Ohio argues that such an arrangement relies on an independent transmission entity that is tailored to meet the requirements of the Ohio statute and that would be approved by the Commission to assert control over the Ohio utilities' respective transmission systems. However, AEP Ohio does not specify how its proposal complies with all the criteria of the Ohio statute.  Rather, AEP Ohio only states, in general terms, that the state-wide transmission coalition/independent transmission entity:

> could eliminate or minimize pancaked transmission rates within the state and improve reliability service within the state[;]…can also establish a generation market that satisfies the requirements for an independent, competitive marketplace and that increases economic supply for customers by expanding the market of each Ohio utilities' service territory to the entire state[;]…[and] could also ensure that the

---

[126] *Control* is defined as "exercis[ing] restrain[t] or directing influence over" or "to have power over:  RULE."  Merriam-Webster Online Dictionary, Control, https://www.merriam-webster.com/dictionary/control.

[127] *See* Ohio Rev. Code, § 4928.12.

[128] Dayton March 24, 2020 Answer at 4, 7 (the Ohio statute "does not require DP&L to continue to be a member of PJM or of any other regional transmission organization.  It does require DP&L to transfer operational control to a third-party transmission operator that is approved by FERC…").

independent transmission entity and coalition satisfies the
requirements of the statute for governance.[129]

62.     Similarly, we are not persuaded by Dayton's argument that the ICT alternative
arrangement would comply with the Ohio statute.  While Dayton has attempted to make a
showing regarding how the ICT model would comply with each of the nine criteria of a
qualifying transmission entity,[130] we are not persuaded that the ICT arrangement, which
would not transfer operational control of facilities to the ICT, would comply with the
Ohio statutory requirement that the entity must "transfer control of those facilities" to the
qualifying transmission entity.  As stated above, while the Ohio statute does not include
the term "operational control," a reasonable interpretation of the word "control" means
control in all aspects of operations, and Dayton has acknowledged that transfer of
"operational control" is necessary to comply with the Ohio statute.[131]

63.     Even if Supporting Parties had sufficiently demonstrated that their proposed
alternative approaches would satisfy the requirements of the Ohio statute, we find that
they have not demonstrated that any transmission entity that would satisfy the
requirements of the Ohio law would *not* be a Transmission Organization.  Because the
Ohio statute requires an entity owning or operating transmission in Ohio to be a member
in a qualifying transmission entity that is equivalent to a Transmission Organization, for
purposes of the RTO Adder, that entity's membership in a Transmission Organization
would not be voluntary.  We find that this lack of voluntariness rebuts the presumption of
Dayton's eligibility for the RTO Adder based on its ongoing membership in PJM.  The
RTO Adder would not be an inducement for Dayton to continue its membership in PJM
because its membership in a Transmission Organization eligible for the RTO Adder is
already required under Ohio statute.

64.     Accordingly, given that under Order No. 679, Dayton is not eligible for the
incentive because its decision to remain in PJM is not voluntary, we deny Dayton's
request for an RTO Adder.

---

[129] AEP Ohio Initial Brief at 9-10.

[130] *See* Dayton Initial Brief at 38-50.

[131] Dayton March 24, 2020 Answer at 4, 7.

### 3.    Preemption of the Ohio Statute

#### a.    Initial Briefs

65.    Supporting Parties argue that the Ohio Law is preempted by the FPA and federal policy.[132]  Dayton states that, under Ohio law, "where there is more than one possible interpretation of a statute, a court will construe the statute so as to save it from constitutional infirmities,"[133] and, accordingly, the Commission should not interpret the Ohio statute as compelling RTO participation.  However, Dayton argues, if the Commission interprets the Ohio statute as compelling Dayton to join an RTO, the Ohio statute would be preempted by the FPA by both field and conflict preemption.[134]

66.    Dayton argues that the Commission has "built on" FPA section 202, and implemented section 219, by pursuing a "voluntary approach to RTO formation" and membership."[135]  Dayton argues that, on that basis, the Commission has rejected RTO requirements mandating continued participation in an RTO as contrary to [the Commission's] policy that RTOs are voluntary.[136]  Dayton argues that the Ohio statute, if construed to mandate RTO participation, would conflict with and frustrate this policy of Congress and the Commission of voluntary RTO participation, yielding conflict preemption.[137]  Dayton further argues that, if all states adopted laws mandating RTO membership, such laws would make it impossible for the Commission to establish "incentives" for RTO participation, because RTO membership would already be mandatory for all utilities.[138]

---

[132] *See, e.g.*, Dayton Initial Brief at 33-34; AEP Ohio Initial Brief at 12-15.

[133] Dayton Initial Brief at 32 (citing *State v. Ritchey*, 64 N.E.3d 599, 601 (Ohio App. 2016) (citation omitted)).

[134] *Id.* at 32.

[135] *Id.* at 33 (citing Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,028-34 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish County, Washington v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)).

[136] *Id.* (citing *E.ON U.S. LLC*, 116 FERC ¶ 61,020 at P 9 (2006)).

[137] *Id.* at 32-33.  *See also* WIRES Initial Brief at 5-6; AEP-Ohio Initial Brief at 13.

[138] Dayton Initial Brief at 33.

67.     Dayton also argues that interpreting the Ohio law to compel RTO participation would yield field preemption under *Hughes v. Talen Energy Marketing, LLC*[139] because the Ohio statute would be invading the Commission's "regulatory turf" and "tethering" the requirements of the Ohio statute to RTO participation.  Dayton states that the *Hughes* Court did not mean to foreclose states from encouraging their preferred policy results but found that the FPA did not leave room for states to mandate those results.[140]

68.     WIRES and FirstEnergy similarly claim that reliance on state statutes to make a determination about the RTO Adder being conditioned on voluntary membership in an RTO runs afoul of the Commission's exclusive jurisdiction over the rates, terms, and conditions of transmission service in interstate commerce and preempts state policies on the subject.[141]  FirstEnergy states that the Commission has "occupied the field" of electric transmission regulation such that the Ohio statute is impermissible regardless of impact. FirstEnergy argues that only the Commission should have the regulatory authority to determine whether and how a public utility may exert (or divest) control over its own transmission assets, as well as to determine the rates, terms, and conditions of transmission service, including whether a public utility would qualify for the RTO Adder. FirstEnergy states that the Ohio statute interferes with the Commission's exclusive jurisdiction by requiring the transfer of control over the transmission assets owned by the state's utilities to a third party and restricting the availability of the RTO Adder to utilities operating in that state.[142]

69.     AEP-Ohio states that the Ohio statute's requirement for Dayton to join and remain in a transmission entity that is approved by the Commission requires a filing under section 205 to effectuate the necessary tariff changes to allow a utility such as Dayton to join an RTO.  AEP-Ohio argues, however, that the courts have held that states cannot compel utilities to make changes to their tariffs under section 205.[143]  AEP-Ohio asserts that, as recognized in *Mass. v. U.S.*, allowing states to dictate section 205 filings has the

[139] 136 S.Ct. 1288 (2016) (*Hughes*).

[140] Dayton Initial Brief at 33-34 (citing *Hughes*, 136 S. Ct. at 1297, 1299).

[141] WIRES Initial Brief at 5-6; FirstEnergy Initial Brief at 6-8.

[142] FirstEnergy Initial Brief at 6-8.

[143] AEP-Ohio Initial Brief at 14 (citing *Mass., Dep't of Pub. Utils. v. U.S.*, 729 F.2d 886, 888 (1st Cir. 1984) (*Mass. v. U.S.*) (rejecting Massachusetts' attempt to compel a utility to make a section 205 filing, finding the net effect would be to allow a state to do what the Commission itself cannot, namely, to change an interstate rate practice that the Commission has not found unjust and unreasonable)).

net effect of allowing states to change interstate transmission practices the Commission has not found unjust or unreasonable under FPA section 206[144] and the comprehensive regulatory scheme for interstate transmission services established by Congress leaves no room for such state interference.  AEP-Ohio contends that, by requiring an Ohio utility to make a section 205 filing to join an RTO, the Ohio statute suffers from a similar flaw.[145]

## b.    Commission Determination

70.    We decline to address the merits of the preemption arguments raised by Supporting Parties in this order.

71.    This filing turns on whether accepting the proposed rate, i.e., the RTO Adder, would be just and reasonable, which, as relevant here and as discussed above, requires the Commission to consider whether a utility is currently a member of a Transmission Organization and whether that membership is voluntary.[146]  By contrast, Supporting Parties preemption arguments seek a determination from the Commission regarding the constitutionality of an Ohio law.  We find that, given the facts and circumstances before us, Dayton's Incentive Rate Application is not an appropriate procedural vehicle to address the constitutionality of the Ohio statute.[147]  Moreover, even if we were to agree the Ohio statute is preempted, only a federal court has the ultimate authority to invalidate the Ohio statute.  Given the facts before us, the lack of a sufficient record in this proceeding on this constitutional issue, and the fact that the ultimate determination on that issue would need to be made by a federal court, we will exercise our discretion to decline to further address the preemption issue as presented by Supporting Parties.

---

[144] 16 U.S.C. § 824e.

[145] AEP-Ohio Initial Brief at 14-15.

[146] *See CPUC*, 879 F.3d at 974-975 ("Order 679 provides that a utility demonstrating that it has remained in a transmission organization is 'presumed to be eligible' for an incentive adder… However, language throughout Orders 679 and 679-A suggests that the presumption of eligibility may be rebutted by the arguments CPUC has made and that ongoing membership is not sufficient for an incentive adder… When membership is not voluntary, the incentive is presumably not justified.").

[147] We note that the August 17 Order did not solicit briefing on the question of preemption as part of the paper hearing and that not all parties addressed preemption in their briefs.

Docket No. ER20-1068-000                                                                          - 33 -

### 4.    **Refunds**

72.    Pursuant to our determination in this order, within 30 days of the date of this order, Dayton is required to submit a compliance filing making necessary changes to its tariff records to remove the RTO Adder from its ROE on file.  In addition, Dayton shall refund all amounts collected pursuant to its RTO Adder, which became effective on October 3, 2020, with interest at the rate prescribed by section 35.19a of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 35.19a, and then file with the Commission a refund report, within 30 days of the date of the issuance of this order, unless there is a timely request for rehearing in these dockets.  In that event, the refunds and refund report must be submitted within 30 days of the Commission's final disposition of any such rehearing request.

The Commission orders:

(A)    Dayton's request for an RTO Adder in hereby denied, as discussed in the body of this order.

(B)    PJM's motion to lodge is hereby denied, as discussed in the body of this order.

(C)    Dayton is hereby directed to submit a compliance filing to revise its tariff records within 30 days of the date of this order, as discussed in the body of this order.

(D)    Dayton is hereby ordered to make refunds of all amounts collected pursuant to its RTO Adder, which became effective on October 3, 2020, with interest at the rate prescribed by section 35.19a of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 35.19a, and then to file with the Commission a refund report, within 30 days of the date of the issuance of this order, unless there is a timely request for rehearing in these dockets.  In that event, the refunds and refund report must be submitted within 30 days of the Commission's final disposition of any such rehearing request.

By the Commission.  Commissioner Chatterjee is dissenting with a separate statement attached.
Commissioner Danly is dissenting with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

**JA205**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power and Light Company            Docket No.    ER20-1068-000

(Issued July 15, 2021)

CHATTERJEE, Commissioner, *dissenting*:

1.      I oppose today's order denying Dayton Power and Light Company's (Dayton) request for a 50-basis point adder to the authorized return on equity to reflect Dayton's continued membership in PJM (RTO Adder).  I have previously made clear my views on the RTO Adder's critical importance in attracting and maintaining RTO/ISO membership, the substantial benefits RTOs/ISOs provide to consumers, and the vital role RTOs/ISOs will play in advancing the energy transition.[1]  As I noted, in PJM alone, the benefits to consumers from RTO membership may be as much as $4 billion per year.[2]

2.      I have serious procedural concerns about acting in this proceeding today.  Since we issued our order establishing a hearing in this proceeding almost a year ago, the Commission has supplemented a pending generic proceeding to drastically reconsider the RTO Adder.[3]  The April 2021 Supplemental NOPR explicitly teed up the very issue that is at the center of this proceeding by seeking comment on whether the RTO Adder should be available only to transmitting utilities that join a Transmission Organization voluntarily, how the Commission should determine whether a utility's decision to join is voluntary, and whether there should be any exceptions to the voluntariness requirement.[4]

---

[1] I discussed this at length in my dissent to the Commission's April 2021 Supplemental NOPR.  *See Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, Supplemental Notice of Proposed Rulemaking, 175 FERC ¶ 61,035 (2021) (Transmission Incentives Supplemental NOPR) (Chatterjee, Comm'r, dissenting).

[2] *Id.* at P 6; *see also Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, Notice of Proposed Rulemaking, 170 FERC ¶ 61,204, at P 93, *errata notice*, 171 FERC ¶ 61,072 (2020) (March 2020 NOPR) (stating that "PJM estimates that the total annual benefits and savings to PJM's customers in the 13 states and the District of Columbia in which it operates to be between $3.2 and $4 billion").

[3] *See* Transmission Incentives Supplemental NOPR.

[4] *See id.* at P 19.  I support removing the voluntariness requirement because, as the Commission explained in the March 2020 NOPR, permitting some RTO/ISO members to receive the RTO Adder, while prohibiting other members from receiving that same

Docket No. ER20-1068-000                                                          - 2 -

3.       It makes little sense to move forward now in this narrow proceeding while those larger policy questions are still pending in Docket No. RM20-10-000.  Parties to this proceeding reasonably requested that the Commission act expeditiously to implement the proposal in the March 2020 NOPR before ruling on Dayton's request, correctly noting that the proposal would have resolved the issues raised in this proceeding.[5]  I agree that acting on Dayton's application now, before addressing the issues in that larger proceeding, creates unnecessary procedural disarray.[6]  Given all the water under the bridge and the potential ripple effects of this outcome on other transmission owners, both within Ohio and beyond, I cannot support this approach.

4.       I implore the Commission to move quickly to put in place a comprehensive transmission incentives policy, including an appropriate RTO Adder, that advances the Commission's long-standing policy objectives and incentivizes what is needed now more than ever — investment in transmission infrastructure and robust organized markets.

For these reasons, I respectfully dissent.

_____

Neil Chatterjee
Commissioner

_____

incentive, creates an uneven playing field in the competition for investment capital. March 2020 NOPR at P 98.

[5] *See* EEI Initial Br. at 5; WIRES Initial Br. at 4; FirstEnergy Initial Br. at 9-11.

[6] I note that, because the majority chooses not to address the arguments raised regarding whether the Ohio law is preempted, it is also unclear whether Dayton will be owed refunds if a federal court were to invalidate the Ohio statute.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power and Light Company                    Docket No.        ER20-1068-000

(Issued July 15, 2021)

DANLY, Commissioner, *dissenting*:

1.      I dissent from this order because the Federal Power Act does not limit incentives to only those utilities that "voluntarily" join a transmission organization.  The Commission improperly added this non-statutory requirement in Order No. 679.[1]  We had no authority to do so then or now.

2.      Section 219(c) of the Federal Power Act provides that "the Commission shall . . . provide for incentives to each transmitting utility or electric utility *that* joins a Transmission Organization."[2]  This plain statutory text does not limit the provision of incentives to only those utilities "that 'voluntarily' join[]" a transmission organization. Congress could have established this limitation, but Congress did not.

3.      The Commission itself added the "voluntary" limitation in Order No. 679 and subsequent orders implementing the statutory text.  I do not see this addition as an example of the Commission filling in the unforeseen interstices in a statutory regime or acting in the face of statutory ambiguity.  Order No. 679 works an amendment of unambiguous law and only Congress—not FERC—has the authority to pass and amend statutes.  Congress said the Commission should provide incentives to a utility "that joins" a transmission organization.  Ohio could thus mandate that The Dayton Power and Light Company join a transmission organization and The Dayton Power and Light Company would *still* qualify for the incentive under the plain terms of the statute for as long as it remains in a transmission organization.

4.      The ruling of the 9th Circuit Court of Appeals that under Order No. 679 "the voluntariness of a utility's membership in a transmission organization is logically relevant to whether it is eligible for an adder" does not change the meaning of the statute.[3]  The Court in *CPUC* did not interpret section 219(c) of the Federal Power Act; it

---

[1] *See Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, at P 331 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[2] 16 U.S.C. § 824s(c) (emphasis added).

[3] *Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 975 (9th Cir. 2018) (*CPUC*).

Docket No. ER20-1068-000                                                    - 2 -

only interpreted and ruled on Order No. 679.  *CPUC* does not address whether FERC improperly exceeded the statutory text by limiting the incentive to a utility "that 'voluntarily' joins" a transmission organization.

5.      I therefore would approve the 50-basis point adder because The Dayton Power and Light Company has "joined" PJM, which is a transmission organization.  I also would reverse our "voluntariness" limitation in Order No. 679 because it runs afoul of the statute.


        For these reasons, I respectfully dissent.


_____

James P. Danly
Commissioner

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **The Dayton Power and Light** | ) | **Docket No. ER20-1068-00____** |
| **Company** | ) | |

**REQUEST FOR REHEARING OF**
**THE INDICATED OHIO TRANSMISSION OWNERS**

Stacey Burbure
Senior Counsel
American Electric Power
801 Pennsylvania Ave, NW
Suite 735
Washington, DC 20004

Richard L. Roberts
Steven J. Ross
Will Keyser
Shaun M. Boedicker
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, D.C.  20036

P. Nikhil Rao
Senior Corporate Counsel
FirstEnergy Service Company
76 South Main St.
Akron, OH 44308

Heather M. Horne
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave., NW
Suite 200
Washington, DC  20004

August 13, 2021

## <u>TABLE OF CONTENTS</u>

I.  **Introduction and Summary** ..................................................................... 1

II.  **Background** ........................................................................................... 4

   A.  Paper Hearing Briefs and the Initial Order ............................................ 4

   B.  The Commission's Ongoing Proceeding in RM20-10 ........................... 5

**ARGUMENT** ................................................................................................. 6

III.  **The Initial Order Provides No Valid Basis to Impose a Voluntariness Requirement on the RTO Participation Adder** ................................... 6

   A.  FPA Section 219 Does Not Permit Imposing a Voluntariness Requirement ........ 7

   B.  The Ninth Circuit's Decision in *CPUC* Does not Require Imposing a Voluntariness Requirement ........................................................... 9

   C.  Evaluating the "Voluntariness" of a Transmission Owner's Decision to Join an RTO is an Unexplained and Unsupported Departure from Commission Policy 12

   D.  Imposing a Voluntariness Requirement is Arbitrary and Capricious, and Contrary to Law ........................................................................ 14

   E.  The Commission Cannot Abdicate, to the States, its Congressionally-Mandated Duty Concerning RTO Incentives nor Allow State Laws to Dictate Commission Policy .............................................................. 17

IV.  **Even if the Commission Can Impose a Voluntariness Requirement, Dayton is Still Entitled to the Adder** ....................................................... 22

   A.  There is No Basis for the Initial Order to Hold That Every "Transmission Entity" Dayton is Required to Join Under the Ohio Statute Would be a "Transmission Organization" Under the FPA ............................... 22

   B.  The Initial Order Finds Dayton Was Not Required to Join an RTO Under the Ohio Statute—Thus Dayton Should Qualify for the RTO Participation Adder 25

V.  **Statement of Issues and Specification of Errors** ............................... 28

VI.  **Conclusion** ........................................................................................ 30

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| The Dayton Power and Light | ) | Docket No. ER20-1068-00____ |
| Company | ) | |

**REQUEST FOR REHEARING OF**
**THE INDICATED OHIO TRANSMISSION OWNERS**

The Indicated Ohio Transmission Owners[1] respectfully request, pursuant to 16 U.S.C. § 825*l*(a) and 18 C.F.R. § 385.713 (2021), rehearing of the Federal Energy Regulatory Commission's ("Commission's") July 15, 2021 Order on Paper Hearing in this proceeding.[2]

## I.    Introduction and Summary

The Initial Order finds that Dayton Power and Light Company ("Dayton") cannot receive its requested fifty basis-point adder to its base ROE (the "RTO Participation Adder" or "Adder"), even though Dayton is currently a member of a Regional Transmission Organization ("RTO"), PJM Interconnection, L.L.C. ("PJM"). The Initial Order reaches this conclusion based on two primary findings: "(1) Order No. 679 as

---

[1] The Indicated Ohio Transmission Owners consist of American Electric Power Service Corporation, on behalf of its affiliates Ohio Power Company and AEP Ohio Transmission Company, Inc. (collectively, "AEP"); Duke Energy Ohio, Inc. ("Duke Ohio"); and FirstEnergy Service Company, on behalf of its affiliates American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, West Penn Power Company, The Potomac Edison Company, and Monongahela Power Company (collectively, "FirstEnergy"). The Indicated Ohio Transmission Owners are all parties to this proceeding.

[2] *The Dayton Power and Light Co.*, 176 FERC ¶ 61,025 (2021) (the "Initial Order").

interpreted in [*Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966 (9th Cir. 2018) ("*CPUC*")] requires a showing of voluntary membership in . . . a Transmission Organization, and (2) Dayton's membership in a Transmission Organization is not voluntary because the Ohio statute requires it."[3]  However, both of these premises are mistaken and the result is arbitrary and capricious and not supported by substantial record evidence.  Accordingly, the Indicated Ohio Transmission Owners request rehearing of the Initial Order for the reasons discussed below.

    **There is no basis to impose a voluntariness requirement**.  The Initial Order first concludes that it must evaluate the voluntariness of Dayton's decision as a threshold matter, and deny Dayton's request if its participation is not voluntary.  This is incorrect.

- Section 219 of the Federal Power Act ("FPA") does not permit imposing a voluntariness requirement.  The language of the statute provides that *each* utility that joins an RTO be eligible for an incentive, and there is no dispute that Dayton satisfies this statutory requirement.  The Initial Order's reading of extra-textual limitations into Congress' mandate is contrary to fundamental statutory interpretation principles.

- The Initial Order misreads *CPUC* to hold that the Ninth Circuit's decision mandates that any utility whose participation in an RTO is not mandatory cannot receive the Adder.  The holding in *CPUC* is a narrow holding that simply finds the Commission did not justify its decision in light of CPUC's argument that Pacific Gas & Electric Company ("PG&E") was required to join California Independent System Operator, Inc. ("CAISO").  A decision that Dayton is eligible for the RTO Participation Adder based on the record in this proceeding would be consistent with the Court's findings in *CPUC*, even if the Commission determines that Ohio statute requires Dayton to join a Transmission Organization.

- Imposing a voluntariness mandate is an unsupported and unexplained departure from Commission precedent consistently holding that RTO

---

[3] *Id*. at P 14.

2

participation is voluntary.  The Commission re-emphasized this policy even after *CPUC*.  However, the Initial Order's finding that Dayton is not eligible for the RTO Participation Adder based on a finding that Dayton was required to join a Transmission Organization is contrary to this policy.  The Initial Order neither acknowledges nor explains this departure, as it must do.

- The Initial Order's decision to impose a voluntariness mandate is also arbitrary and capricious, and contrary to law.  It ignores the substantial benefits generated by Dayton's participation in an RTO, which do not turn on whether Dayton's participation is voluntary.  It further ignores the risks and burdens Dayton must face by remaining a member of PJM, and therefore impermissibly awards a lower total ROE to Dayton than a utility of identical risk that is not mandated to be in an RTO.  This results in dissimilar treatment for similarly situated entities, which is inconsistent with Commission precedent.

- Finally, there is no basis for the Initial Order's decision to abdicate to the states the Commission's ratemaking responsibility required under Section 219.  The Ohio statute is preempted under principles of field and conflict preemption, and while it is true that the Commission cannot invalidate it under the doctrine of preemption, the Commission can (and should) choose to not rely on a state statute subject to preemption to determine the appropriate ratemaking for Dayton.  It is both bad policy and contrary to law.

**Even if the Commission could impose a voluntariness requirement, Dayton**

**meets it**.  After concluding that it must administer a voluntariness test, the Initial Order then finds that Dayton fails it.  But there is no basis to conclude that Dayton's participation in PJM is not voluntary.

- The Initial Order errs in finding that the Ohio statute requires Dayton to join a Transmission Organization.  Dayton can satisfy the requirements of the Ohio statute without joining an entity that would qualify as a "Transmission Organization" under FPA Section 219.  Dayton's participation in a "Transmission Organization" is not mandated by the Ohio statute.

- The Initial Order recognizes that under the Ohio statute, Dayton is not required to participate in PJM (or any other RTO for that matter).  That

3

**JA214**

should be the end of the voluntariness inquiry as Dayton voluntarily chose to participate in PJM.  Even if the Ohio statute requires Dayton to participate in *a* Transmission Organization, there is no record evidence to support a finding that all Transmission Organizations are equal or that the Transmission Organization Dayton joins is irrelevant.  The record evidence demonstrates the important benefits PJM participation provides to Dayton's customers, as well as additional and unique risks and burdens Dayton faces by its participation.  The Initial Order fails to explain how Dayton's voluntary decision to remain in PJM and provide benefits to Dayton's customers despite the risks to Dayton fails to satisfy the requirements of Section 219(c) and Order No. 679.

## II.    Background

### A.    Paper Hearing Briefs and the Initial Order

Following an application by Dayton to receive rate incentives for Dayton's

investment in transmission projects needed for reliability and Dayton's continued

participation in PJM, the Commission issued an order granting in part, and denying in

part, Dayton's request.[4]  As part of that order, the Commission requested briefs asking

parties to discuss whether it was appropriate for Dayton to receive the RTO Participation

Adder in light of an Ohio statute that certain parties argued require Dayton to participate

in an RTO.[5]

The Indicated Ohio Transmission Owners along with a number of other parties,

submitted briefs to the Commission.  The Indicated Ohio Transmission Owners

demonstrated that Dayton should be eligible for the RTO Participation Adder regardless

of the requirements of the Ohio statute and the Ohio statute does not make Dayton

---

[4] *The Dayton Power & Light Co*., 172 FERC ¶ 61,140 (2020).

[5] *Id*. at Ordering Paragraph E.  The Ohio statute in question is Ohio Revised Code section 4928.12, and is generally referred to herein as the Ohio statute.

ineligible for the RTO Participation Adder.[6]  The Commission disagreed in the Initial

Order, finding that in determining whether to award the RTO Participation Adder under

Order No. 679, the Commission is required to evaluate the voluntariness of a utility's

participation in the RTO,[7] and that Dayton's participation in a Transmission Organization

is not voluntary due to the Ohio statute.[8]  The Commission therefore found that Dayton

was not eligible for the RTO Participation Adder.

### B.    The Commission's Ongoing Proceeding in RM20-10

After the parties submitted their briefs in this proceeding, the Commission issued a

Supplemental Notice of Proposed Rulemaking ("Supplemental NOPR") in Docket No.

RM20-10-000.[9]  In it, the Commission (among other things) "request[ed] comment on

whether the [RTO Participation Adder] should be available only to transmitting utilities

that join a Transmission Organization voluntarily," and further asked for comment on

"how the Commission should apply that standard and, in particular, how the Commission

should determine whether a transmitting utility's decision to join a Transmission

Organization is voluntary."[10]  The Indicated Ohio Transmission Owners, as well as a host

---

[6] *See generally* "Initial Brief of American Electric Power Service Corporation," Docket No. ER20-1068 (Oct. 16, 2020) (hereinafter the "AEP Paper Hearing Br.").

[7] Initial Order at PP 25-31.

[8] *Id.* at PP 54-64.

[9] *See Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, 175 FERC ¶ 61,035 (2021).

[10] *Id.* at P 19.

5

**JA216**

of other parties, submitted comments in reply to the Supplemental NOPR, including comments responding to the Commission's inquiry regarding voluntariness.[11]

In the Initial Order, the Commission recognized its issuance of the Supplemental NOPR, but found that "it is not appropriate to defer action on Dayton's request for an RTO Adder until after resolution of any potential generic final rule that may result from the Transmission Incentives NOPR or Supplemental NOPR, as regardless of the outcome of those proceedings, we would need to apply the requirements of Order No. 679 to determine Dayton's rates for the locked-in period prior to the effective date of any new final rule."[12]

## **ARGUMENT**

### III.    The Initial Order Provides No Valid Basis to Impose a Voluntariness Requirement on the RTO Participation Adder

The Initial Order first finds that "Order No. 679 as interpreted in *CPUC* requires a showing of voluntary membership in . . . a Transmission Organization."[13]  But this premise is contrary to the Commission's statutory obligations under Section 219(c) of the FPA, relies on a misreading of *CPUC*, and ignores governing Commission policy.  It also impermissibly leaves federal ratemaking in the hands of states.  Accordingly, the Initial

---

[11] *See generally* "Comments of American Electric Power Service Corporation," Docket No. RM20-10-000 (June 25, 2021); "Comments of Indicated PJM Transmission Owners," Docket No. RM20-10-000 (June 25, 2021).

[12] Initial Order at P 25.

[13] *Id*. at P 14.

Order provides no valid basis to impose a voluntariness requirement, and in doing so is arbitrary and capricious and contrary to law.

### A.    FPA Section 219 Does Not Permit Imposing a Voluntariness Requirement

FPA Section 219 provides that "the Commission shall, to the extent within its jurisdiction, provide for incentives to *each* transmitting utility or electric utility *that joins* a Transmission Organization."[14]  This statutory command is clear—the Commission must provide incentives to every utility that joins an RTO.  There is no dispute that Dayton is a utility, and that it has joined an RTO.  Therefore, under the plain statutory language, the Commission "shall provide" incentives to Dayton for doing so.  As the Initial Order acknowledges, "section 219 does not explicitly require voluntariness."[15]

But rather than adhering to the statutory command, the Initial Order imposes an extra-textual requirement—which Congress explicitly *did not* impose—that the "transmitting utility or electric utility" must have *voluntarily* joined, and not merely joined, "a Transmission Organization."  To support this requirement, the Initial Order points to its own findings in Order No. 679 that RTO membership is "generally voluntary,"[16] a non-sequitur that does not address the language of the statute.  Congress required that all utilities that join an RTO receive an incentive—that membership is

---

[14] 16 U.S.C. § 824s(c) (emphasis added).

[15] Initial Order at P 26.

[16] *Id*. (quoting Order No. 679, 116 FERC ¶ 61,057 at P 331).

7

"generally voluntary" is irrelevant to whether all utilities, or only some, should receive an incentive under Congress's clear statutory command.

There is no basis to impose this extra-textual requirement where, as here, the "unambiguously expressed intent of Congress" is clear from the face of the statute.[17] "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts,"[18] a holding that applies with equal force to agencies such as the Commission.

Congress could have imposed a voluntariness requirement in the statute, but elected not to do so. There is no basis to read the statute as permitting one.[19] And pointing to a prior Commission order, as the Initial Order does, cannot resolve this deficiency. The purpose of FPA Section 219—which is relevant to determining its meaning[20]—is to "benefit[] consumers by ensuring reliability and reducing the cost of

---

[17] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 843 (1984).

[18] *Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 140 S. Ct. 2367, 2381 (2020) (ciattion and quotation marks omitted); *see also Borden v. United States,* 141 S. Ct. 1817, 1829 (2021) ("Once again, statutory construction does not work that way: A court does not get to delete inconvenient language and insert convenient language to yield the court's preferred meaning.").

[19] *E.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A*., 511 U.S. 164, 177 (1994) ("If, as respondents seem to say, Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not."); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (finding "no indication that Congress intended to make this phase of national banking subject to local restrictions, as it has done by express language in several other instances"); *Meghrig v. KFC W., Inc*., 516 U.S. 479, 485 (1996) ("Congress . . . demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and . . . the language used to define the remedies under RCRA does not provide that remedy.").

[20] *E.g.*, *Cuozzo Speech Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142-44 (2016).

8

delivered power by reducing transmission congestion."[21]  As record evidence makes plain, this purpose is effectuated by Dayton *joining* an RTO, regardless of its reason for joining.[22]  Accordingly, there is no basis to impose a voluntariness requirement under the plain language of Section 219 and the Initial Order errs in doing so.

### B.    The Ninth Circuit's Decision in *CPUC* Does not Require Imposing a Voluntariness Requirement

The Initial Order largely relies on the Ninth Circuit's opinion in *CPUC* to hold that voluntariness is required to be eligible for the RTO Participation Adder.[23]  The Initial Order concludes that "the Ninth Circuit made clear that the voluntariness of a utility's membership in an RTO is a necessary consideration in granting the RTO Adder."[24]  This overstates the Ninth Circuit's holding.

As an initial matter, *CPUC* did not evaluate, interpret, or apply Section 219's statutory language.  Thus, *CPUC* has no bearing on whether Section 219 requires or even allows the Commission to impose a voluntariness requirement on the RTO Participation Adder.  Rather, the Ninth Circuit's review focused on the Commission's application of Order No. 679.

---

[21] 16 U.S.C. § 824s(a).

[22] *See e.g.*, AEP Paper Hearing Br. 16-21.

[23] *See* Initial Order at PP 27-28.

[24] *Id.* at P 28.

Specifically, the Court found that that the Commission "did not reasonably interpret Order 679,"[25] because Order No. 679 (and Order No. 679-A) require the Commission to conduct a "case-by-case review of incentive adders even for utilities that have demonstrated ongoing membership in transmission organizations."[26]  Because the Commission had summarily rejected arguments raised by the CPUC in the orders under review, the Ninth Circuit found that the Commission did not satisfy this requirement and remanded the case for future proceedings (wherein PG&E was awarded the Adder).[27]

The Commission went on to address the question of voluntariness on remand in order to respond to the arguments raised by CPUC.[28]  But the Commission did not—nor was it required to—impose a voluntariness requirement to satisfy the Ninth Circuit's concerns.  Rather, an order providing a reasoned explanation why voluntariness was not a standard required to be met under Section 219 would also have satisfied the Ninth Circuit's remand.  And ample evidence exists in the current record to make that determination in this proceeding.[29]

The Ninth Circuit's discussion of the Commission's policy of awarding incentives to induce future behavior—which the Initial Order cites as support for its reading of

---

[25] *CPUC*, 879 F.3d at 973.

[26] *Id*. at 974.

[27] *Id*. at 980; *see also Pac. Gas & Elec. Co*., 168 FERC ¶ 61,038 (2019).

[28] *Pac. Gas & Elec. Co*., 168 FERC ¶ 61,038 (2019).

[29] *See, e.g.*, AEP Paper Hearing Br. 10-12, 16-22.

10

**JA221**

*CPUC*[30]—does not impose a voluntariness requirement.  Rather, the Court merely found that the Commission had not engaged in reasoned decision-making by dismissing the CPUC's challenges at the pleading stage in light of the Commission's policy, which the Commission cannot disregard its policy "without acknowledgment or explanation."[31] The Court ***did not*** conclude that the Commission could never award the RTO Participation Adder to a utility whose participation in an RTO was mandated, only that it must provide a reasoned explanation for doing so.[32]

None of the additional language the Initial Order relies on from *CPUC* supports a finding that the Ninth Circuit imposed voluntariness as a necessary condition.  For instance, the Commission notes language where the Ninth Circuit stated that Order No. 679 "permits challenges to incentives on the grounds that they will not induce continuing participation in transmission organizations."[33]  That Order No. 679 "permits challenges" does not mean that those challenges should always prevail.  The Initial Order also emphasizes the Ninth Circuit's finding that "the voluntariness of a utility's membership in a transmission organization is logically relevant to whether it is eligible for anadder."[34] But just because voluntariness is "logically relevant" does not mean that it is required—if the Ninth Circuit had meant as much, it surely would have said so.

---

[30] Initial Order at P 28 & n.53.

[31] *CPUC*, 879 F.3d. at 977.

[32] *Id*. at 978-79.

[33] Initial Order at P 28 n.52 (quoting *CPUC*, 879 F.3d at 976-77).

[34] *Id*. at P 27 (quoting *CPUC*, 879 F.3d at 979).

11

Moreover, the Ninth Circuit also acknowledged that Order No. 679 considered and rejected arguments that "utilities legally mandated to join transmission organizations should not be eligible to receive incentive adders."[35]  It is logically inconsistent to conclude that the same reasoning should not apply to utilities that are legally mandated to remain in an RTO.[36]

Regardless, nothing in *CPUC* indicated that the Commission is foreclosed from ever awarding an Adder to a utility whose participation is non-voluntary, nor could it.[37] Accordingly, the Initial Order errs in relying on *CPUC* to reach this conclusion.

### C.    Evaluating the "Voluntariness" of a Transmission Owner's Decision to Join an RTO is an Unexplained and Unsupported Departure from Commission Policy

The Commission's longstanding policy is that RTO formation, and (more importantly here) RTO participation by utilities, is voluntary.[38]  That policy has remained unchanged even after the Ninth Circuit's order in *CPUC*; in the Commission's order on remand, it reiterated that "under Commission precedent and policy, [a utility's]

---

[35] *CPUC*, 879 F.3d at 979.

[36] In *CPUC*, the Court acknowledged that the argument was not raised in Order No. 679 and therefore declined to extend the logic to support the Commission's underlying decision to award the RTO Participation Adder to PG&E for remaining in CAISO.

[37] *See, e.g.*, *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33 (D.C. Cir. 1974).

[38] *See, e.g.*, *Reg'l Transmission Orgs.*, Order No. 2000, 89 FERC ¶ 61,285 at 31,003 (1999) ("we continue to believe . . . that at this time we should pursue a voluntary approach to participation in RTOs"), *order on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) ("*Snohomish*"); *Pac. Gas & Elec. Co.*, 160 FERC ¶ 61,090 at P 14 (2017) (holding that the "longstanding Commission policy of voluntary RTO/ISO formation and membership remains unchanged.").

participation in [an RTO] is voluntary."[39]  "Involuntary RTO/ISO participation would be contrary to th[e] Commission's policy."[40]

In fact, the D.C. Circuit's ruling upholding Order No. 2000 is based largely on the fact that "RTO participation is voluntary."[41]  Because "Order 2000 does not mandate RTO participation, the court lack[ed] jurisdiction to address the Utilities' challenges to the final rule."[42]  The Court went on to state that while Order 2000 established certain mandatory requirements for RTO formation, participation in an RTO is voluntary.[43]

The Initial Order neither acknowledges, nor applies, this longstanding policy. Rather, by finding that Dayton is not eligible for the RTO Participation Adder because its participation in PJM is not voluntary, the Initial Order departs from the Commission's long-standing policy and finds that some utilities (including Dayton) *are* required to join RTOs.  As a result, their participation is *not* voluntary.[44]  However, the Commission may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[45]  "[U]nder the rigorous standards of *FCC v. Fox Television Stations, Inc.*," the Commission is required to "display awareness that it is changing position, show the new

---

[39] *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 at P 51 (2019).

[40] *Pac. Gas & Elec. Co.*, 160 FERC ¶ 61,090 at P 14.

[41] *Snohomish*, 272 F.3d at 616.

[42] *Id*. at 617.

[43] *Id*. at 614.

[44] *E.g.*, Initial Order at P 64 (finding that Dayton's "decision to remain in PJM is not voluntary").

[45] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

policy is permissible under the statute, and show that there are good reasons for the new policy."[46]  The Initial Order never does this—it never even discusses its own policy.  This is impermissible.[47]

## D.    Imposing a Voluntariness Requirement is Arbitrary and Capricious, and Contrary to Law

Application of a voluntariness requirement to bar utilities from receiving the RTO Participation Adder is also arbitrary and capricious because it entirely ignores the record evidence that shows substantial benefits generated for customers by RTO participation, and the corresponding risks faced by a utility that participates in an RTO.  These benefits and risks do not change based on whether or not RTO participation is mandated.  It is also contrary to law as it leads to disparate treatment of similarly situated entities, in that two entities of exactly identical risks will receive different returns under the Commission's new policy.

The Indicated Ohio Transmission Owners' briefs discussed at length the benefits that existing RTOs provide to customers, as well as the risks and burdens utilities face once they become members.[48]  The Initial Order does not dispute any of these factual assertions.  Rather, the Initial Order merely states that it "do[es] not believe it would be

---

[46] *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (quoting *FCC v. Fox*, 556 U.S. 502 at 515-16).

[47] *E.g.*, *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 213 (D.C. Cir. 2018) ("Although FERC may be sincere in its change of heart and, as a substantive matter, correct that its new rationale is just and reasonable, the Commission must provide some analysis and explanation in its Orders regarding why it changed course.").

[48] *E.g.*, AEP Paper Hearing Br. 16-22; Duke Paper Hearing Br. 7-8.

14

appropriate to award an incentive for an action that the requesting entity is required by law to take, even where that action comes with substantial benefits or risks."[49]

This holding is arbitrary and capricious because it fails to provide a reasonable explanation for simply sweeping aside the risks of RTO membership on the participating utility and the benefits that existing RTO membership provides to customers.[50]  In Order No. 679, the first "basis" the Commission identified for the RTO Participation Adder was "a recognition of the benefits that flow from membership in such organizations," i.e., RTOs.[51]  Moreover, the express purpose of enacting Section 219 is to "benefit[] consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion."[52]  Dayton's membership in PJM effectuates that purpose, and provides substantial benefits—yet the Initial Order finds these facts irrelevant in its analysis.  That is arbitrary and capricious.

The Initial Order is also contrary to law as it treats similarly situated entities differently without a valid basis.  The Indicated Ohio Transmission Owners raised this argument in their briefs,[53] but the Initial Order did not respond to it.[54]  For example, AEP

---

[49] Initial Order at P 30.

[50] *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[51] Order No. 679, 116 FERC ¶ 61,057 at P 331.

[52] 16 U.S.C. § 824s(a).

[53] *See* Initial Order at P 21 (discussing arguments made by AEP and EEI).

[54] This alone is reversible error.  *E.g.*, *Canadian Ass'n of Petroleum Producers, v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("Unless the Commission answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.").

explained in its Initial Brief, a voluntariness requirement will significantly disadvantage utilities that are required to join an RTO and therefore get no RTO Participation Adder.[55] A utility that must join an RTO faces the same risks and burdens as one that voluntarily joins the same RTO—and the amount of benefits their customers enjoy does not change based on whether their participation was voluntary or not. Yet one utility would receive the incentive, while the other wouldn't—this is impermissible.[56]

Order No. 679 implicitly recognized this fact in holding that "[i]t would also be unduly discriminatory for the Commission to consider the benefits of membership in determining the appropriate ROE for new members but not for similarly situated entities that are already members."[57] Here, the Commission is admittedly ignoring the "substantial benefits"[58] Dayton's participation in PJM generates, while relying on those same benefits to award the RTO Participation Adder to other utilities.[59]

By imposing a voluntariness threshold, the Commission's ruling will mean that Transmission Owners of equal risk within an RTO will be subject to disparate rate

---

[55] AEP Paper Hearing Br. 25-26.

[56] *See, e.g.*, *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) ("It is textbook administrative law that an agency must provide[] a reasoned explanation for departing from precedent or treating similar situations differently.") (citation and quotation marks omitted); *Burlington N. Santa Fe R.R. Co. v. Surface Transp'n Bd.*, 403 F.3d 771, 777 (2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").

[57] Order No. 679, 116 FERC ¶ 61,057 at P 331.

[58] Initial Order at P 30.

[59] Order No. 679, 116 FERC ¶ 61,057 at P 331 (finding the Adder appropriate because, *inter alia*, it "recogni[zes] . . . the benefits that flow from membership in [RTOs]").

16

treatment.  This places certain utilities at a competitive disadvantage and is contrary to the fundamental canon that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks."[60]  The Commission's ruling will cause investors to carefully review whether to shift away from investing in a Transmission Owner that cannot recover the Adder, as that entity would be facing the same risks as a Transmission Owner that can receive the Adder, but with less compensation.  Given that the Commission's new policy is being driven by the states, utilities within particular states (such as Ohio) will become less attractive to investors than utilities in another state, based solely on state policies that have *zero* impact on the relative risks or burdens on the utilities in question.

### E.    The Commission Cannot Abdicate, to the States, its Congressionally-Mandated Duty Concerning RTO Incentives nor Allow State Laws to Dictate Commission Policy

Review of "voluntariness" of RTO participation, based on state statutes or other policies, is also inappropriate as the Commission, not states, has plenary authority over RTOs and participation in them.  As emphasized above, the Commission's policy is that RTO participation is (and should be) voluntary.[61]  There is no valid basis for the Commission to abdicate its role and allow states to dictate which utilities are eligible for the Congressionally-mandated incentive, and which are not.

---

[60] *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944).

[61] *See supra* § III.C.

17

**JA228**

As an initial matter, the Commission should not defer (and legally is not required to defer) to state statutes or other policies because they are both field and conflict preempted.  Under the Supremacy Clause of the Constitution, "federal law preempts contrary state law."[62]  This happens both where "'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law'—known as field preemption—and also "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,"[63] known as conflict preemption.

State statutes requiring RTO participation are field preempted because there is no doubt that "Congress has legislated comprehensively to occupy an entire field of regulation," namely the regulation of interstate transmission service and all "classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services."[64]

State statues requiring RTO participation are also conflict preempted, as they are in direct conflict with sections 202 and 219 of the FPA, the Consolidated PJM

---

[62] *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016).

[63] *Id.* (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).

[64] 16 U.S.C. § 824d(c).

18

Transmission Owner Agreement ("CTOA"), as well as the Commission's general policy holding that RTO participation is voluntary.

- In section 202 of the FPA, Congress required the Commission "both 'to divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy' and 'to promote and encourage such interconnection and coordination within each such district and between such districts.'"[65] These regional districts perform the same function as the RTOs and ISOs of today, and this Congressional mandate is behind "the Commission's overarching objective to encourage participation in and formation of RTOs."[66]

- In section 219 of the FPA, Congress directed the Commission to establish incentives for participation in an RTO, but did not require participation in RTOs.

- Section 3.2 of the PJM CTOA states that Dayton may withdraw from the agreement and therefore PJM upon satisfying certain requirements. Thus, Dayton's participation is voluntary under the CTOA. As the filed rate, the CTOA is "the 'equivalent of a federal regulation'"[67] and "carries the force of federal law."[68] "Federal regulations have no less preemptive effect than federal statutes."[69] Therefore, to the extent a filed tariff and a state statute conflict—as

---

[65] *Snohomish*, 272 F.3d at 612 (citing to FPA Section 202(a), 16 U.S.C. § 824a(a)) (emphasis added).

[66] *Id.*

[67] *Cal. ex rel. Lockyer v. Dynegy, Inc*., 375 F.3d 831, 839 (9th Cir. 2004) (quoting *Cahnmann v. Sprint Corp*., 133 F.3d 484, 488 (7th Cir. 1998)), *opinion amended on denial of reh'g*, 387 F.3d 966 (9th Cir. 2004).

[68] *Bryan v. Bellsouth Commc'ns, Inc*., 377 F.3d 424, 429 (4th Cir. 2004).

[69] *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984) (citation omitted); *see also City of New York v. FCC*, 486 U.S. 57, 63-64 (1988) ("[A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law.") (citation omitted).

they certainly do here—the filed tariff takes precedence.[70]  Courts have uniformly applied this logic in a host of different proceedings.[71]

- The Commission's "longstanding . . . policy" is for "voluntary RTO/ISO formation and membership."[72]

The Initial Order fails to address the preemption argument, suggesting instead that the Indicated Ohio Transmission Owners and others may go to court to resolve the matter.[73]  While it is true that the Commission cannot invalidate a state law,[74] it *can and should* decline to adopt policies that allow a state law (or other state mandate) to dictate the level and form of Commission-jurisdictional rates under the FPA.[75]  This is especially true where the statute is contrary to Commission policy, and would not survive a preemption analysis.[76]

---

[70] In fact, as the Supreme Court has noted, "[w]hen the filed rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through the Supremacy Clause." *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003).

[71] *See, e.g., Entergy*, 539 U.S. at 50 ("It matters not whether FERC has spoken to the precise classification . . . but only whether the FERC tariff dictates how and by whom that classification should be made. The [tariff] clearly does so, and therefore the [state's] second-guessing of the classification of ERS units is pre-empted."); *United Gas Pipe Line Co. v. FERC*, 824 F.2d 417, 428 (5th Cir. 1987) ("Were a state to apply a standard of culpability less than negligence [i.e., the standard set out in the FERC-approved tariffs], that standard would directly conflict with the Commission's jurisdictional determination of the public interest and would be void under the supremacy clause, U.S. Const. art. VI, cl. 2.").

[72] *Pac. Gas & Elec. Co.*, 160 FERC ¶ 61,090 at P 14 (2017).

[73] *See* Initial Order at PP 70-71.

[74] *Id.* at P 71 ("[E]ven if we were to agree the Ohio statute is preempted, only a federal court has the ultimate authority to invalidate the Ohio statute.").

[75] *See, e.g., Cities of Bethany v. FERC*, 727 F.2d 1131, 1137 (D.C. Cir. 1984) (finding there was no basis to require Commission to adopt views of state commission "when the Commission evaluates the reasonableness of [jurisdictional] rates").

[76] While the Commission cannot invalidate a state law, it can (and regularly) does evaluate preemption issues as necessary in determining how to apply its policy. *E.g., Advanced*

The Commission should also decline to apply a voluntariness test that turns on state law because it is tacit approval of states subjecting utilities to federal filing requirements, something courts have consistently rejected.  For example, in *Massachusetts Department of Public Utilitis v. United States*,[77] the First Circuit rejected Massachusetts' attempt to compel a FERC-jurisdictional utility to make a section 205 filing.  Allowing Massachusetts to do so "would prevent the utility from choosing among reasonable rate-practice alternatives."[78]  It would completely undermine the FPA:

> Massachusetts' interpretation threatens confusion, possibly chaos.  What is to prevent each state in a multistate service area from requiring the utility to file a different set of 'reasonable' rate practices with FERC?  Neither law nor economics can identify one unique set of rates or practices as 'reasonable,' and each state would prefer a rate structure that benefitted its residents to the detriment of its neighbors. . . . Furthermore, the net effect of accepting Massachusetts' argument is to allow a state to do what FERC itself cannot, namely, to change an interstate rate practice that FERC has not found unreasonable [under Section 206].  In analogous circumstances, the Supreme Court has forbidden others to exercise powers denied FERC but within FERC's general area of authority.[79]

---

*Energy Econ.*, 163 FERC ¶ 61,030 (2018); *Tri-State Generation & Transmission Ass'n, Inc.*, 172 FERC ¶ 61,173 (2020).

[77] 729 F.2d 886, 888 (1st Cir. 1984).

[78] *Id.*

[79] *Id.* (quoting *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951)) (citing *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 579-80 (1981)); *Montana-Dakota Utils. Co.*, 341 U.S. at 254-55 (court cannot grant, on grounds of fraud and deceit, reparations for allegedly unreasonable past rates on file with the Commission)).

21

The comprehensive regulatory scheme for interstate transmission services established by Congress leaves no room for state interference. There is no basis for the Commission to apply to state law to determine appropriate rates for interstate transmission services offered by Dayton.

## IV. Even if the Commission Can Impose a Voluntariness Requirement, Dayton is Still Entitled to the Adder

After first finding that a voluntariness test applies, the Initial Order then finds that Dayton cannot pass the test, holding that "Dayton's membership in a Transmission Organization is not voluntary because the Ohio statute requires it."[80] The Initial Order reaches this conclusion on the assumption that any "transmission entity" under the Ohio statute would also be a "Transmission Organization" under the FPA. But there is no basis to so conclude, and Dayton can satisfy the requirements of the Ohio statute without joining an entity that would qualify as a "Transmission Organization" under FPA Section 219. Further, Dayton's membership in PJM *is* voluntary—the Initial Order explicitly recognizes this fact. So even if the Commission could impose a voluntariness threshold, Dayton would pass it.

### A. There is No Basis for the Initial Order to Hold That Every "Transmission Entity" Dayton is Required to Join Under the Ohio Statute Would be a "Transmission Organization" Under the FPA

In their Paper Hearing Briefs, the Indicated Ohio Transmission Owners demonstrated that Dayton can satisfy the requirements of the Ohio statute—which are

---

[80] Initial Order at P 14.

simply that Dayton become a member of and transfer control of its transmission facilities to a "qualifying transmission entity"[81]—by creating an independent transmission entity or other unique structure.[82]   In other words, Dayton is not required by the statute to join PJM or an RTO or ISO—it can meet its requirements without doing so.   The Initial Order accepts that Dayton need not join PJM (or any RTO or ISO),[83] but holds that this fact is irrelevant on a finding that "any qualifying transmission entity that would satisfy the requirements of the Ohio statute would also be a Transmission Organization under the FPA and the Commission's regulations."[84]   There is no valid basis for this conclusion.

For example, the Indicated Ohio Transmission Owners demonstrated that centralized transmission planning is a requirement of RTO qualification and an important factor for the benefits that RTOs provide to customers.[85]   And a "qualifying transmission entity" that satisfies the requirements of the Ohio statute would not need to engage in centralized transmission planning.[86]   There is no record basis for the Initial Order to conclude that an entity that does not undertake this vital function—which could satisfy the Ohio statute—would be eligible for the RTO Participation Adder.

---

[81] Ohio Rev. Code Ann. § 4928.12(E) (West 2021).

[82] AEP Paper Hearing Br. 5-10; Duke Paper Hearing Br. 3-4.

[83] Initial Order at P 57.

[84] *Id.*

[85] *See id.* at P 35 (summarizing arguments); *see also* Order No. 2000, 65 Fed. Reg. at 909.

[86] Initial Order at P 35.

The Initial Order states that because "there is no requirement that a Transmission Organization plan for expansion of transmission facilities,"[87] an entity that does not undertake that function could nevertheless qualify as a "Transmission Organization" under the FPA's statutory definition of Transmission Organization.[88]  But this statement is supposition.  The Indicated Ohio Transmission Owners are not aware of any instance where the Commission has found that any organizations other than RTOs or ISOs that engage in central planning would qualify as a "Transmission Organization" under their statutory FPA definition.[89]  Therefore, the Initial Order rests on the possibility that some unknown alternative arrangement without central planning would still be approved as a Transmission Organization by the Commission.  Such "speculation, conjecture, [or] divination" cannot sustain the Initial Order's findings—they must be "based on substantial evidence,"[90] and the Initial Order's findings are not.

---

[87] *Id*. at P 58.

[88] 16 U.S.C. § 796(29).

[89] *See, e.g.*, *Long-Term Firm Transmission Rts. in Organized Elec. Markets*, 116 FERC ¶ 61,077 at P 31 n.26 (2006) (explaining that "[t]he new FPA definition of transmission organization leaves open th[e] possibility" that there are "transmission organizations other than ISOs and RTOs approved by the Commission," but that "[a]t the current time, however, RTOs and ISOs are the only such organizations approved by the Commission.").

[90] *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010).

24

### B.    The Initial Order Finds Dayton Was Not Required to Join an RTO Under the Ohio Statute—Thus Dayton Should Qualify for the RTO Participation Adder

The Initial Order expressly finds that "the Ohio statute does not limit membership to PJM or another RTO."[91]  In other words, nothing in the Ohio statute requires Dayton to join PJM, or an RTO at all.  Yet, the Initial Order still denies the incentive to Dayton on the theory that "it would [not] be appropriate to award an incentive for an action that the requesting entity is required by law to take."[92]  Because Dayton is not "required by law" to join PJM, as the Initial Order admits, any voluntariness inquiry should be satisfied.

That is the case even if the Commission believes that Dayton must join *some* Transmission Organization, as there is no record evidence to support a finding that all Transmission Organizations are equivalent.  Indeed, as discussed in Section IV.A., the Initial Decision fails to explain what would qualify as a "Transmission Organization" under the Federal Power Act, other than an RTO and ISO.  Thus, there is no basis for the Initial Decision's determination that "Dayton's choice about *which* Transmission Organization it joins is not relevant to the inquiry of whether its membership in a Transmission Organization is voluntary."[93]  As the record shows, there are substantial benefits achieved by participation in existing RTOs like PJM, as well as corresponding risks and burdens for the Transmission Owner.[94]  There is no record evidence to support a

---

[91] Initial Order at P 57.

[92] *Id*. at P 30.

[93] *Id.* at P 59.

[94] *See e.g.*, AEP Paper Hearing Br. 16-20.

25

**JA236**

finding that an alternative arrangement would create the same level of benefits, or impose the same risks and burdens, as participation in PJM. In other words, through award of the Adder the Commission can (and should) incentivize Dayton to remain *in PJM*, and recognize the benefits that flow from membership in PJM.[95]

The Commission's reasoning is also contrary to its prior precedent, namely *Pacific Gas and Electric Co*.[96] There, the Commission concluded that "PG&E could unilaterally leave CAISO without obtaining CPUC authorization."[97] It therefore found awarding the Adder for PG&E appropriate. Here, the Commission admits that, like PG&E, Dayton can leave PJM even under the Commission's interpretation of the Ohio statute. Thus, Dayton should be eligible for the RTO Participation Adder for its voluntary decision to joint PJM. There is no basis to reach a different outcome than what the Commission reached for PG&E.

The Commission should *want* to incentivize participation in RTOs and ISOs, given that existing RTOs provide benefits to customers.[98] Of course, RTOs and ISOs also present risks and burdens to the Transmission Owner. Dayton's decision to face these risks and burdens, and join PJM and not form a Transmission Organization, is a voluntary one. Dayton is not required to take on the additional burdens of PJM

---

[95] Order No. 679, 116 FERC ¶ 61,057 at P 331.

[96] 168 FERC ¶ 61,038 (2019).

[97] *Id*. at P 52.

[98] PJM, *PJM Value Proposition,* PJM Interconnection at 1 (2019), https://www.pjm.com/-/media/about-pjm/pjm-value-proposition.ashx.

membership, but the Commission should encourage it to do so given the benefit that PJM

membership provides to Dayton's customers.

PJM produces annual savings of $3.2 to $4 billion for consumers.[99]  PJM's market

spans thirteen states and the District of Columbia, providing significant benefits to

consumers in Ohio by granting access to a wider pool of resources that has significantly

reduced generation costs.  The integrated PJM transmission system has reduced the need

for additional generation by up to $3.78 billion annually.[100]  There is no record evidence

to support that Dayton's customers could enjoy these benefits if Dayton joined a

transmission entity that merely met the criteria set forth in the Ohio statute even if the

Commission were to find that entity satisfied the yet to be identified criteria for

qualifying as a Transmission Organization (other than RTO or ISO) under the FPA.

By deciding to remain in PJM rather than create another entity to control its

transmission facilities, Dayton also encounters significant risks that it would not

otherwise face were it to elect to join a different "Transmission Organization."  For

example, as a transmission owner in PJM, Dayton is required to build all transmission

projects PJM instructs it build, and is also subject to PJM cancelling a project after

Dayton begins developing the project.[101]  These types of development requirements and

---

[99] *See id*.

[100] PJM, *The Benefits of the PJM Transmission Sys.*, PJM Interconnection at 1 (Apr. 16, 2019), https://www.pjm.com/-/media/library/reports-notices/special-reports/2019/the-benefits-of-the-pjm-transmission-system.pdf.

[101] While Transmission Owners can receive an abandonment incentive in certain instances, full recovery is not guaranteed and the risks of project being cancelled are not fully mitigated.

27

risks would not exist if Dayton were to choose to satisfy the requirements of Ohio Law

outside of PJM.  There is no basis for the Initial Order to ignore that Dayton's

participation *in PJM* is voluntary, and should be incentivized.   The Initial Order's

conclusion is arbitrary and capricious and not reasoned decision making.

## V.    Statement of Issues and Specification of Errors

The following Specification of Errors and Statement of Issues are provided

pursuant to Rule 713(c)(1) and Rule 713(c)(2).

1.      The Initial Order's imposition of a voluntariness requirement is contrary to
the plain language of Section 219(c), which the Commission may not deviate from.  16
U.S.C. § 824s(c); 16 U.S.C. § 824s(a); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,
Inc.*, 467 U.S. 837 (1984); *Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 140
S. Ct. 2367, 2381 (2020); *see also Borden v. United States,* 141 S. Ct. 1817 (2021); *Cent.
Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994);
*Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954); *Meghrig v. KFC W., Inc.*,
516 U.S. 479, 485 (1996); *Cuozzo Speech Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142-44
(2016).

2.      The Initial Order relies on a misreading of *CPUC* to justify its action.
*CPUC* did not (and could not) impose voluntariness as a threshold requirement to qualify
for the RTO Participation Adder.  *Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966 (9th
Cir. 2018); *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 (2019); *Pac. Gas & Elec. Co. v.
FPC*, 506 F.2d 33 (D.C. Cir. 1974).

3.      The Initial Order impermissibly departs from Commission policy without
recognition it is doing so, or a sufficient explanation for why departure is appropriate.
*Reg'l Transmission Orgs.*, Order No. 2000, 89 FERC ¶ 61,285 at 31,003 (1999); *Pac.
Gas & Elec. Co.*, 160 FERC ¶ 61,090 at P 14 (2017); *Pac. Gas & Elec. Co.*, 168 FERC ¶
61,038 (2019); *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001); *FCC v.
Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Baltimore Gas & Elec. Co. v.
FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020); *New England Power Generators Ass'n, Inc.
v. FERC*, 881 F.3d 202, 213 (D.C. Cir. 2018).

4.      The Initial Order is arbitrary, capricious, and otherwise unlawful because it
fails to justify why awarding Dayton the RTO Participation Adder is impermissible in
light of the significant benefits generated by Dayton's participation in PJM, which are
unrelated to whether Dayton's participation is voluntary, and because the Initial Order's

imposition of a voluntariness requirement leads to disparate rate treatment for similarly situated entities. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); Order No. 679, 116 FERC ¶ 61,057 at P 331; *Canadian Ass'n of Petroleum Producers, v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001); 16 U.S.C. § 824s(c)); *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014); *Burlington N. Santa Fe R.R. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (2005); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944).

5.     The Initial Order is arbitrary, capricious, and otherwise unlawful because it relies on a state statute to govern federal ratemaking decisions, when such statute is both field and conflict preempted and directly conflicts with tariffs on file with the Commission. *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016); 16 U.S.C. § 824d(c) ; *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 612 (D.C. Cir. 2001); *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004); *Bryan v. Bellsouth Commc'ns, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984); *City of New York v. FCC*, 486 U.S. 57, 63-64 (1988); *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003); *United Gas Pipe Line Co. v. FERC*, 824 F.2d 417 (5th Cir. 1987); *Pac. Gas & Elec. Co.*, 160 FERC ¶ 61,090 at P 14 (2017); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1137 (D.C. Cir. 1984); *Advanced Energy Econ.*, 163 FERC ¶ 61,030 (2018); *Tri-State Generation & Transmission Ass'n, Inc.*, 172 FERC ¶ 61,173 (2020); *Mass., Dep't of Pub. Utils. v. United States*, 729 F.2d 886, 888 (1st Cir. 1984); *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951).

6.     The Initial Order is arbitrary, capricious, and otherwise unlawful because it relies on an unsupported assumption—that any entity that would qualify as a "transmission entity" under the Ohio statute would be approved as "Transmission Organization" under the FPA—that is not supported by substantial evidence.  Ohio Rev. Code Ann. § 4928.12(E) (West 2021); 16 U.S.C. § 796(29); *Long-Term Firm Transmission Rts. in Organized Elec. Markets*, 116 FERC ¶ 61,077 at P 31 n.26 (2006); Order No. 2000, 65 Fed. Reg. at 909; *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010).

7.     The Initial Order is arbitrary, capricious, and otherwise unlawful because it ignores its own holding that Dayton's participation in PJM is voluntary, and therefore its award of an Adder to Dayton can (and does) incentivize Dayton's participation *in PJM*. Ohio Rev. Code Ann. § 4928.12(E) (West 2021); Order No. 679, 116 FERC ¶ 61,057 at P 331; *Pac. Gas and Elec. Co.*, 168 FERC ¶ 61,038 (2019); PJM, *PJM Value Proposition*, PJM Interconnection at 1 (2019), https://www.pjm.com/-/media/about-pjm/pjm-value-proposition.ashx; PJM, *The Benefits of the PJM Transmission Sys.*, PJM Interconnection at 1 (Apr. 16, 2019), https://www.pjm.com/-/media/library/reports-notices/special-reports/2019/the-benefits-of-the-pjm-transmission-system.pdf.

29

**JA240**

## VI.    Conclusion

There is no valid basis for the Commission to impose a voluntariness requirement on Dayton, but even if there was, Dayton would pass it.  Therefore, for the reasons stated herein, the Initial Order should be modified on rehearing, and Dayton awarded the RTO Participation Adder.

Respectfully submitted,

*/s/ Stacey Burbure*
Stacey Burbure
Senior Counsel
American Electric Power
801 Pennsylvania Ave, NW
Suite 735
Washington, DC 20004
(202) 383-3452
slburbure@aep.com

*Counsel for AEP*

*/s/ Richard L. Roberts*
Richard L. Roberts
Steven J. Ross
Will Keyser
Shaun M. Boedicker
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, D.C.  20036
(202) 429-3000
rroberts@steptoe.com
sross@steptoe.com
wkeyser@steptoe.com
sboedicker@steptoe.com

*Counsel for AEP*

*/s/ P. Nikhil Rao*
P. Nikhil Rao
Senior Corporate Counsel
FirstEnergy Service Company
76 South Main St.
Akron, OH 44308
(330) 384-2422
pnrao@firstenergycorp.com

*Counsel for FirstEnergy*

*/s/ Heather M. Horne*
Heather M. Horne
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave., NW
Suite 200
Washington, DC  20004
Phone: (202) 824-8009
Email: heather.horne@duke-energy.com

*Counsel for Duke Energy*

August 13, 2021

30

**JA241**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing "Request for Rehearing of the Indicated Ohio Transmission Owners" was served this 13th day of August, 2021, upon the official service list maintained by the Secretary in this proceeding.

*/s/ Shaun M. Boedicker*
Shaun M. Boedicker
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, D.C.  20036
(202) 429-8066
sboedicker@steptoe.com

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

The Dayton Power and Light Company )       Docket No.    ER20-1068-000

**REQUEST FOR REHEARING OF**
**THE DAYTON POWER AND LIGHT COMPANY**

**I.    Introduction.**

The Dayton Power and Light Company ("Dayton Power"), pursuant to Section 313 of the

Federal Power Act ("FPA"), 16 U.S.C. § 825l(a), and Rule 713 of the Rules of Practice and

Procedure of the Federal Energy Regulatory Commission ("Commission" or "FERC"), 18 C.F.R.

§ 385.713, hereby submits this Request for Rehearing of the Commission's order issued on July

15, 2021, (the "Order") in the above-captioned proceeding. [1]  The U.S. Congress, in legislation

duly signed by the President and enacted into law, explicitly directs the FERC to promote

membership in Transmission Organizations as set forth in Federal Power Act section 219(c) (the

"219(c) Incentive").[2]  The Order, issued by a split Commission, makes Dayton Power the only

known significantly-sized transmission owner operating within PJM Interconnection, L.L.C.,

("PJM") that is ineligible for the 219(c) Incentive, i.e., a 50 basis point adjustment to its Return

on Equity ("ROE") as an incentive for its membership within PJM, a Regional Transmission

Organization ("RTO").  The incentive discussed here is defined as the "219(c) Incentive" because

it is not an incentive limited to transmission owners joining an RTO.  The term "RTO Adder" is

---

[1] *The Dayton Power and Light Company*, 176 FERC ¶ 61,025 (2021).

[2] 16 U.S.C. §824s. *See also* definition of "Transmission Organization" in 16 U.S.C. §719(a)(29),
As used in this Request for Rehearing, the capitalized "Transmission Organization" is defined
consistent with the federal definition codified at codified at 16 USC §719(a)(29).  The lower-
case "transmission organization" is defined more broadly to include organizations that would
meet the criteria established in Ohio Revised Code ("ORC") 4928.012 and organizations that
would not qualify for the 219(c) Incentive.

a misnomer and its widespread use has contributed to the confusion in how to analyze and apply the requirements of FPA section 219(c).

The Order is defective from a statutory and Constitutional perspective. It creates an unduly discriminatory end-result and an unworkable analytic structure. But, significantly, there is an "off-ramp" available under which the Commission could avoid further appeals, preserve the statutory mandate of FPA section 219, eliminate the Constitutional defects, make a case-by-case determination as directed by the 9th Circuit, and even preserve to some degree the concept of "voluntariness," all while finding that Dayton Power, like virtually all other transmission owners in PJM, is eligible for the 219(c) Incentive. That "off-ramp" is a nuanced recognition that there is an entire spectrum of transmission organizations that would meet the requirements of the Ohio statute and that, within that spectrum, Dayton Power has voluntarily chosen to become a member of an RTO, the type of transmission organization that provides public benefits including centralized transmission planning that other transmission organizations do not provide.

The benefits of PJM membership flow primarily to the public; the detrimental surrender of autonomy, particularly in the area of transmission planning, is a burden on Dayton Power. The voluntary choice to join the form of Transmission Organization that requires Dayton Power to surrender the most sovereignty and independence and that provides incremental public benefits beyond the benefits provided by other forms of transmission organizations combine to provide ample justification to authorize the 219(c) Incentive for Dayton Power.

For these and other reasons discussed in more detail below, Dayton Power seeks rehearing of the Order.

**II.**     **Request for Rehearing:  Statement of Issues and Specifications of Error.**

Pursuant to Rule 713, 18 C.F.R. § 385.713(c), Dayton Power submits the following

statement of issues and specifications of error:

1.      The Order errs in unlawfully applying a "voluntariness" requirement for eligibility for the 219(c) Incentive, where there is no such requirement in the statute.

2.      The Order errs in disallowing the 219(c) Incentive to Dayton Power by applying a "voluntariness" requirement that is ultra vires and beyond the Commission's authority to impose in contravention to the statute and is not a requirement in existing Commission rules.

3.      The Order errs in arbitrarily and capriciously failing to harmonize federal and Ohio statutes to avoid a Constitutional conflict that preserves eligibility for the 219(c) Incentive even if a voluntariness standard were to be applied.

4.      The Order errs in arbitrarily and capriciously establishing an analytic approach that promotes uncertainty and cannot be consistently applied.

5.      The Order errs in arbitrarily and capriciously disallowing the 219(c) Incentive to Dayton Power with an end-result that is unduly discriminatory against Dayton Power.

6.      The Order is Constitutionally defective under the Supremacy and Commerce Clauses of the U.S. Constitution in permitting Ohio State law to preempt and eliminate an incentive that was enacted by the federal government.

8.      The Order errs in arbitrarily and capriciously establishing a standard for eligibility that, contrary to the mandate of federal law, discourages participation in Transmission Organizations that provide benefits to the public with little or no benefits retained by the transmission owner.

9.      The Order errs in prematurely and with an unduly discriminatory end-result in creating and applying a new generic standard for disallowance of the 219(c) Incentive for in an adjudicatory proceeding while in the process of re-evaluating the entire incentive structure in a generic rulemaking proceeding.

## III.  **Argument.**

### A.    A "Voluntariness" Requirement for Eligibility for the Transmission Organization Incentive Does Not Exist in the Statute.

Congress mandated that the Commission provide incentives for utilities and transmission owners that joined Transmission Organizations including Regional Transmission Organizations ("RTOs") such as PJM.  These incentives were to be provided in order to make available the benefits to the public that transmission organizations can create.  Congress did not enact legislation that restricted or limited incentives only to utilities and transmission owners who were motivated solely by charitable impulses or the potential to obtain an incentive.

FPA section 219(c) certainly contains no requirement that the utility be free from any and all other influences and, thus, had joined a Transmission Organization on a purely voluntary basis.  FPA Section 219(c) instead imposes on the <u>Commission</u> the following duty:

> In the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization.  The Commission shall ensure that any costs recoverable pursuant to this subsection may be recovered by such utility through the transmission rates charged by such utility or through the transmission rates charged by the Transmission Organization that provides transmission service to such utility.

This is a "shall" directive with no caveats about what other motivations or incentives a utility may have for joining a Transmission Organization.  The Commission acknowledged this early in the regulatory process, stating that:  "section 219(c) contains no requirement that participation in an RTO/ISO must be voluntary to merit the incentive; rather, it states the Commission shall provide for incentives."[3]  The Commission in Order No. 679 further recognized that there can be other factors leading to a utility's decision to join or maintain

---

[3] *Electric Transmission Incentives Policy Under Section 219 of the Fed. Power Act*, 170 FERC ¶ 61,204 at P 95 (2020) ("Transmission Incentives NOPR")).

membership in an RTO, such as merger conditions or conditions to obtaining market based rate authority, and that such other factors would not control eligibility for the RTO adder. [4]

In the instant order for which rehearing is sought, the Commission never explained why utilities should be treated different if they joined PJM to comply with the requirement of a merger order issued by a state regulatory body or joined PJM to comply with a state statute.

The Order also fails to explain why having other motivations or inducements to join a transmission organization should cause a transmission owner to lose the incentive that Congress explicitly mandated should be provided. The effect of the Order is, in effect, saying that if a State actively opposed one of its utilities from joining a transmission organization or was indifferent to the point of silence, then the mandate of Congress can be implemented and the 219(c) incentive applied. But if a State shares the view of Congress and also would like to promote membership in a transmission organization --  the same end-result that Congress wanted to encourage -- then the Congressionally-mandated incentive becomes unavailable. It is hard to imagine a more arbitrary, capricious, and illogical result. Imagine the uproar, for example, if high school students remained on the honor roll or were removed from it based on whether or not their parents also provided incentives for achieving high grades.

B.    Applying a "Voluntariness" Requirement Is *Ultra Vires* and Beyond the Commission's Authority to Impose in Contravention to the Statute and Is Not a Requirement in Existing Commission Rules.

The Commission's powers are defined by statute and actions taken in contravention to the statute are *ultra vires* and must be rejected as a matter of law.[5] As noted above, the

---

[4]  Promoting Transmission Investment through Pricing Reform, Order No. 697, 116 FERC ¶ 61,057 at P 331, n. 118 (2006) (finding that the incentives would be available to utilities joining joined RTOs or ISOs because of merger conditions or market-based rate requirements).

[5]  *City of Arlington, Texas v. FCC*, 569 U.S. 290, 297, (2013) ("No matter how it is framed, the

Commission itself, in initiating the rulemaking process to implement the mandates of FPA section 219(c) acknowledged that: "section 219(c) contains no requirement that participation in an RTO/ISO must be voluntary to merit the incentive; rather, it states the Commission shall provide for incentives."[6]  Commissioner Danly correctly reasoned that because Section 219 of the FPA "does not limit the provision of incentives to only those utilities 'that voluntarily join[]' a transmission organization," the addition by the Commission of a voluntariness standard "works an amendment of unambiguous law and only Congress—not FERC—has the authority to pass and amend statutes."[7]

Section 219 does not specify exactly what kinds of incentives or how large those incentives should be to effectuate the goals and objectives set forth by Congress.  This ambiguity as to the size of any incentive and Congress' stated intent in FPA section 291(a) "to establish by rule" the incentives to be provided grant the Commission discretionary powers that will be accorded a significant degree of deference under the *Chevron* doctrine.[8]  However, as further explained by the U.S. Supreme Court in *United States v. Mead Corp*., 533 U. S. 218, 226-27 (2001), an agency's interpretation of "a particular statutory provision" qualifies for Chevron deference only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was

---

question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*" [emphasis in original] and " . . . for agencies charged with administering congressional statutes. Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires."

[6]  *Electric Transmission Incentives Policy Under Section 219 of the Fed. Power Act*, 170 FERC ¶ 61,204 at P 95 (2020) ("Transmission Incentives NOPR")).

[7]  Order, Danly Dissent at PP 2-3 (internal quotations omitted).

[8]  *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984).

promulgated in the exercise of that authority."  In the context of the instant case, it is significant that FPA section 219(c) has mandatory language that the Commission "shall" provide an incentive for utilities that join a Transmission Organization.  Congress did not delegate to the Commission the power to pick and choose among different utilities and provide that incentive to some utilities that joined a Transmission Organization and not to others.  Congress did not delegate to the Commission the power to establish a "voluntariness" standard that appears nowhere in the statute or to apply such a standard in a way that results in State government action determining whether or not a utility that joins a Transmission Organization is eligible for the 219(c) Incentive.

In assessing whether or not the Commission's actions are ultra vires, reviewing courts will look to Congressional intent and traditional rules of statutory interpretation and will likely find it significant that the Commission itself, until recently, interpreted the statute as not having any requirement of voluntariness to qualify for the 219(c) Incentive:   "section 219(c) contains no requirement that participation in an RTO/ISO must be voluntary to merit the incentive; rather, it states the Commission shall provide for incentives."[9]

Order Nos. 679 promulgated regulations at 18 CFR 35.35(e) to implement FPA section 219(c) and nowhere within the text of the regulations does the word "voluntary" or any variant of that word appear.  To this day, those regulations are devoid of any requirement for a showing by a utility that joined a Transmission Organization "voluntarily."

It is understood that there was one sentence within the Commission's discussion issuing the regulations in Order No. 679 stating that both members who were joining and were already members of an RTO should be eligible for the incentive and that:  "The basis for the incentive is

---

[9]  Transmission Incentives NOPR, *supra* at P 95 (2020).

a recognition of the benefits that flow from membership in such organizations and the fact that continuing membership is generally voluntary."

The Order errs in taking this one sentence and converting it into a requirement that is not part of the statute or included as part of the Commission's regulations and was initially written to explain an expansive interpretation of section 219(c) eligibility.  The expansive aspect of this sentence is made crystal clear in context:   (1) it was stated as part of the explanation for why both entities joining and those already members of an RTO should retain their eligibility; and (2) when the Commission noted the "fact that continuing membership is generally voluntary," it did not go on to state that where continued membership is not voluntary, the incentive is removed.  But perhaps most significantly and compellingly, it was at that point the Commission dropped a footnote stating that the clarification of eligibility "applies to utilities that joined RTOs or ISOs because of merger conditions or market-based rate requirements."[10]  In other words – MANDATORY requirements in a merger order to join an RTO did not bar the utility from eligibility for the 219(c) Incentive.[11]

In short, this sentence within the explanatory text of Order No. 679 was not to create a new eligibility requirement that lay lurking and undiscovered for nearly 15 years and, once imposed, would discriminatorily bar some utilities from the incentive while continuing eligibility for others.  The degree of deference to be accorded by Courts to the Commission's interpretation of the statute is ultimately dependent the Court's view as to whether the Commission has stayed

---

[10]  Order No. 679 at  P 331, n. 180.

[11]  Arguably, a merger condition is not "mandatory" in that the affected public utility could voluntarily choose not to go forward with the merger.  That kind of nuance is missing, however, from the Order as applied to Dayton Power who retains the power to withdraw from PJM and could join an alternative form of transmission organization that satisfies the criteria of Ohio statute, but who instead voluntarily chose to join and remain within an RTO and, among other things, gave up a substantial amount of independence by turning over the transmission planning function to PJM.

within its delegated powers or has instead created a new requirement where Congress has not

delegated powers to establish such a requirement. Dayton Power respectfully submits that the

mandatory words in section 219 enacted by Congress, the normal rules of statutory

interpretation, and the Commission's past interpretation of the statute, all lead to the conclusion

that imposing a voluntariness test for eligibility for the 219(c) incentive is ultra vires and must be

reversed on rehearing or on appeal.

    C.    <u>The 9th Circuit Did Not Mandate a Voluntariness Standard</u>.

    The Commission errs to the extent the Order is grounded in a belief that a voluntariness

requirement was imposed by the 9th Circuit in *Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966

(9th Cir. 2018) ("*CPUC*"). As an initial observation, the 9th Circuit did not review or discuss in

any detail the statutory language of FPA Section 219, but instead focused solely on the

Commission's Order 679 and whether the Commission had reasonably interpreted Order 679 in

the context of the facts before it involving a California utility.[12] The holding of the case was that

the Commission is required to perform a "case-by-case review of incentive adders even for

utilities that have demonstrated ongoing membership in transmission organizations."[13]

    With respect to "voluntariness," the 9th Circuit only ruled that the Commission must

consider those arguments raised by interveners in the case, not summarily reject them, and

remanded to the Commission for further consideration [14] The Court did not find that the

Commission was precluded from granting the 219(c) Incentive to a utility whose participation in

a transmission organization was required under State law, only that it must provide a reasoned

---

[12] *CPUC*, *supra*, at 973.

[13] *Id*. at 974.

[14] *Id*. at 980.

- 9 -

**JA251**

explanation for doing so.[15]  As discussed above, a reasoned basis for rejecting a voluntariness

standard is the statutory language of FPA §219(c) itself.

 *CPUC* thus stands for the proposition that the Commission must look at the facts specific

to Dayton Power; but it does not require that the Commission create and impose a

"voluntariness" standard.  It is not controlling authority with respect to whether or not a

voluntariness standard is to be applied.

  D. Even If "Voluntariness" Is the New Standard to Be Applied, Federal and Ohio
   Statutes Can Still Be Harmonized to Avoid a Constitutional Conflict
   <u>and Preserve Dayton Power's Eligibility for the 219(c) Incentive</u>.

 There are serious issues statutory and Constitutional issues arising out of the Order's

interpretation of Ohio law and unduly discriminatory end-results as set forth in more detail in

following sections of this Request for Rehearing.  However, there is an "off-ramp" to avoid these

defects, harmonize the federal and Ohio statutes, meet the 9th Circuit's directive in *CPUC* to

employ individual case analysis, avoid an unduly discriminatory end-result, and even preserve to

a significant degree the concept of voluntariness.

 Dayton Power respectfully submits that the Order's ruling could be fairly summarized as

follows:  if mandated by State law to join any kind of transmission organization, then one is

ineligible for the 219(c) Incentive irrespective of the organization joined.  *See* Order at PP 57-59.

 On rehearing, the Commission could and should develop an analytical structure for

reviewing eligibility for the 219(c) Incentive that is more nuanced.  The Commission should

consider instead the full spectrum of types of organizations that Dayton Power could have joined

to comply with Ohio law and recognize that Dayton Power voluntarily chose to join an RTO

within that spectrum of choices.

---

[15] *CPUC*, *supra*, at 978-79.

As explained in detail in Dayton Power's initial brief at 34-50, Ohio law did not mandate joining an RTO.  In very brief synopsis, the language in Ohio Revised Code 4928.12 uses the term "transmission organization" and specifies the criteria that such an organization must meet. Dayton Power established in that extensive portion of its initial brief that it could meet all those Ohio criteria by turning over open-access and certain other duties to an independent transmission coordinator.[16]  Significantly, these criteria do not include the central hallmark of an RTO, i.e., turning over the transmission planning function.[17]  Congress also used term "Transmission Organization" for 219(c) Incentive eligibility, but it defined that term differently by reference to the types of transmission organizations listed in 16 USC § 791(a)(29), instead of using criteria identical to that used by Ohio.[18]

The Order recognizes that the "Ohio statute does not limit membership to PJM or another RTO."[19]  But the Order takes a step too far in interpreting the Ohio statute as:  "Rather it requires membership in a qualifying transmission entity that is a Transmission Organization."[20] The Ohio statute does not define "transmission organization" by reference to the federal statute or by using the same defined terms.  Instead it created a set of criteria independent of and not co-

---

[16] *See also*, Order at PP 36-43 summarizing Dayton Power's initial brief on the Ohio criteria.

[17] In this regard it is noteworthy that other sections of Ohio law specifically do reference Regional Transmission Organizations when the Ohio legislature did want to be more restrictive as to the scope or application of a provision.  Ohio Revised Code ("ORC")  4928.09(A)(1), 4928.20(J), 4928.64(C)(4)(b), 4928.111, 4928.142(B)(1) and (2)

[18] *See* FPA section 219(c), cross-referencing to definitions codified at 16 USC §719(a)(29), which provides that:  "The term "Transmission Organization" means a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities."

[19] Order at P 57.

[20] *Id.*

- 11 -

extensive with the federal definition.  Dayton Power's Initial Brief at p. 7 and in more detail at pp. 34-47 explained how Dayton Power could comply with all the element of a state defined transmission organization in a way that would not meet the differently defined "Transmission Organization" under the FPA.  Of particular note, even the Ohio requirement that the organization be approved by the FERC does not make the Ohio and federal definitions co-extensive – the FERC has approved independent transmission coordinator structures in the past, and did not award the 219(c) Incentive to the participants then operating under such structures.[21] Dayton Power therefore disputes and preserves for appeal the issue of whether the "transmission organization" as defined by the Ohio statute is exactly co-extensive with the definition of "Transmission Organization" as used in FPA section 219(c). [22]

Dayton Power further disputes the Order's finding that because the Ohio statute requires Dayton Power to join some form of transmission organization, its decision as to "which Transmission Organization it joins is not relevant to an inquiry as to whether its membership in a Transmission Organization is voluntary."[23]  It is highly relevant that the two definitions are not co-extensive and that transmission organizations exist that would comply with the Ohio statute but not fit the FPA definition of a Transmission Organization.

---

[21] *Louisville Gas & Electric Co.*, 114 FERC ¶ 61,282 (2006); *MidAmerican Energy Co.*, 113 FERC ¶ 61,274 (2005); *Duke Power*, 113 FERC ¶ 61,288 (2005); *Entergy Services, Inc*., 110 FERC ¶ 61,295, *order on clarification*, 111 FERC ¶ 61,222 (2005), *order conditionally approving filing*, 115 FERC ¶ 61,095 (2006); *American Electric Power Co*., 91 FERC ¶ 61,208 at 61,747 (2000).

[22] As previously footnoted at n.17, other provisions within Ohio law specifically refer to RTOs when the General Assembly intended only such organizations to be covered.  Thus, when the broader term "transmission organization" is specified in ORC 4928.12 and defined in ways that do not include all features of an RTO, there is strong statutory interpretation support for a finding that the Ohio statute does not mandate joining an RTO.

[23] Order at P 59.

But the crux of Dayton Power's argument here is that a far more nuanced inquiry is appropriate.  The Commission on rehearing can resolve this matter on the alternative ground suggested above, i.e., that while the Ohio statute required Dayton Power to join some form of transmission organization, the voluntary decision to join an RTO gave up more independence, particularly in the area of transmission planning, and that decision results in the creation of more public interest benefits than making a decision to join some other, less pervasively controlling form of transmission organization.

That finding coupled with prior Commission findings of the public interest benefits provided by the regional planning undertaken by RTOs, would harmonize federal and Ohio law, and would be perfectly acceptable under the case-by-case justification deemed necessary in *CPUC*.  The Commission can make a case-by-case decision finding that Dayton Power made a voluntary decision to join an RTO rather than some other form of transmission organization; that that decision has resulted in benefits to the public above and beyond that which would be provided if it had chosen to stay more independent and retain its transmission planning function by joining some other form of transmission organization that did not perform centralized transmission planning; and that this voluntary decision yields public benefits that justify granting the 219(c) Incentive.

        E.      Alternatively, The Commission Should Find that Dayton Power's Decision to Remain within PJM Is Voluntary, Consistent with the Holding the Commission Reached on Remand of CPUC.

After the 9th Circuit in CPUC remanded to the Commission with directions to undergo a case-by-case inquiry on Pacific Gas and Electric Company's eligibility for the 219(c) Incentive, the Commission established a hearing process, which resulted in a finding by the Commission that California law did not mandate that Pacific Gas & Electric ("PG&E") become a member of

- 13 -

the California Independent System Operator ("CAISO") and said nothing with respect to requirements for PGE to remain a member of CAISO.[24]  The Commission further discussed the federal policy implemented through Order No. 2000 that "the appropriate approach for facilitating the creation and efficient expansion of RTOs/ISOs was to make membership in the organizations voluntary for public utilities."[25]  The Commission further noted that "This longstanding policy of voluntary RTO/ISO formation and membership remains unchanged, and is reflected in CAISO's currently-effective Transmission Control Agreement—a Commission-jurisdictional agreement on file with the Commission— which allows PG&E to withdraw from CAISO by providing two-years' written notice to other CAISO members and receiving the necessary regulatory approvals.  The Commission concluded that:

> In light of the voluntary nature of RTO/ISO membership from the Commission's perspective and the lack of any relevant mandate under California law, we find that PG&E could unilaterally leave CAISO without obtaining CPUC authorization. Consequently, we find that the RTO-Participation Incentive induces PG&E to remain a participating member of CAISO and is consistent with the directives of FPA section 219.  Accordingly, we reaffirm the continuation of PG&E's 50 basis point ROE adder.[26]

On rehearing, the Commission should reach the same conclusion with respect to Dayton Power.  As with the CAISO's Transmission Control Agreement, pursuant to section 3.2 of the Consolidated Transmission Owners Agreement, executed by Dayton Power and PJM and on file as an approved tariff of this Commission, Dayton Power retains its rights to withdraw at any time from PJM with appropriate notice and subject to other conditions set forth therein.[27]  And, as

---

[24]  *Pacific Gas and Electric Company*, Order on Remand, Docket Nos. ER14-2529-005, et al., 168 FERC ¶ 61,038 at P 45 (2019).

[25]  *Id.* at P 51 (citations omitted).

[26]  *Id*. at P 52 (citations omitted).

[27]  Section 3.2, Consolidated Transmission Owners Agreement, PJM Rate Schedule FERC No.

was the case for PG&E and as discussed more fully in the section of this rehearing request above, Dayton Power could join a "transmission organization" as that term is defined by the Ohio statute, including the types of transmission organizations that this Commission has approved for purposes of promoting open-access, but which would not qualify for the 219(c) Incentive.[28] Dayton Power's decision to join PJM and its continuing decision not to withdraw and join a lesser form of transmission organization is voluntary.

F.     The Order Arbitrarily and Capriciously Is Unduly Discriminatory
       Against Dayton Power and Is Unworkable as Applied Across the Country.

To the best of Dayton Power's knowledge, every transmission owner within PJM who has previously sought an incentive for the 219(c) Incentive has been granted it. That includes other Ohio utilities subject to the same Ohio statute and other utilities operating in other States that have similar requirements or provided inducements in rate orders and settlement for their utilities to join PJM.

For example, Virginia, Michigan, Illinois all have state laws or state commission orders that impose various requirements relating to membership in a transmission organization. Virginia law requires "[e]ach incumbent electric utility owning, operating, controlling, or having an entitlement to transmission capacity" to "join or establish a regional transmission entity, which entity may be an independent system operator."[29] In addition, the Virginia General Assembly also directed its state commission to "adopt rules and regulations … establishing

---

42.

[28]  As cited supra n. 21, *see Louisville Gas & Electric Co.*, 114 FERC ¶ 61,282 (2006); *MidAmerican Energy Co*., 113 FERC ¶ 61,274 (2005); *Duke Power*, 113 FERC ¶ 61,288 (2005); *Entergy Services, Inc*., 110 FERC ¶ 61,295, *order on clarification*, 111 FERC ¶ 61,222 (2005), *order conditionally approving filing*, 115 FERC ¶ 61,095 (2006); *American Electric Power Co*., 91 FERC ¶ 61,208 at 61,747 (2000); relating to Independent Transmission Coordinators rather than Transmission Organizations as defined by the FPA.

[29] Va, Code Ann. § 56-577(A)(1); *see also* Va. Code Ann. § 56-579(A)-(B) (addressing state commission approval).

elements of regional transmission entity structures essential to the public interest" that would be applied "in determining whether to authorize transfer of ownership or control from an incumbent electric utility to a regional transmission entity."[30] Those regulations reaffirm "the obligation to join or establish [a regional transmission entity]"[31] and enumerate "five essential categories" of policies that the regional transmission entity must satisfy before the state commission would approve the transfer of transmission assets.[32]

Michigan's law gives "[e]ach investor-owned electric utility in this state" the "option" to "either join a FERC approved multistate regional transmission system organization or other FERC approved multistate independent transmission organization or divest its interest in its transmission facilities to an independent transmission owner."[33] It also makes clear that "if the electric utility withdraws … from a regional transmission system organization" then the state commission "shall direct the electric utility to join a FERC approved multistate regional transmission system organization selected by the commission."[34]

Illinois law includes a similar requirement that at one point required utilities to apply to FERC regarding "establishing or joining an independent system operator" or to join a "functional equivalent" that is "created under the rules of the [FERC].""[35]

---

[30] Va. Code Ann. § 56-579(B).

[31] 20 Va. Admin. Code 5-320-10.

[32] 20 Va. Admin. Code 5-320-30(B) (enumerating "(i) reliability practices, (ii) pricing and access policies, (iii) independent governance, (iv) consistency with FERC policy, and (v) fair compensation to the transferor" as essential categories). The regulations go on to provide more detailed criteria for several of those five categories. See 20 Va. Admin. Code 5-320-40 through 5-320-80.

[33] Mich. Comp. Laws Ann. 460.10w(1).

[34] *Id.* at (2)-(3).

[35] 220 ILCS 5/16-126(a), (b), (*l*).

Virginia, Michigan, and Illinois statutes are not explicitly before the Commission in this case.  But, the Order establishes a methodological approach to apply—and consistency will require it to apply—the same approach in Virginia, Michigan, Illinois and indeed throughout the country when analogous issues arise (as they inevitably will).

In fact, denying Dayton Power the 219(c) Incentive because of Ohio Rev. Code § 4928.12 would lead to incoherent outcomes in Ohio *itself*.[36] The other investor-owned transmission owners in Ohio are also subject to Section 4928.12 and they already receive the 219(c) Incentive.  The choices they face under Ohio state law are identical to those of Dayton Power.[37]

Implementation of the Order as applied to Dayton Power also sends a signal to other states that they can take action to reduce costs by requiring utilities to remain in RTOs.  Not only would this create disincentives to invest in transmission and an uneven playing field for financing these costs, but it also could lead to a patchwork of state laws that may apply inconsistently to large utilities that span multiple states.  Such inconsistent outcomes can be

---

[36] *See* Motion to Intervene Out-of-Time Of American Electric Power Corp. at 4, Docket Nos. ER20-1068-000, *et al.*, (Aug. 26, 2020) ("Given that AEP is subject to the same Ohio laws as Dayton, a denial of Dayton's request for the RTO Participation Adder could affect AEP's eligibility for the same adder in the future.").

[37] Duke Energy Ohio received approval of an RTO Participation Adder in 2015, *see PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029 at PP 10, 14 (2015), and a recent challenge to its continued collection of the RTO incentive was found to be beyond the scope of a Section 205 proceeding, *see Duke Energy Ohio, Inc.*, 163 FERC ¶ 61,173 at PP 17, 25 (2018). American Electric Power received the RTO Participation Adder in 2010 in Docket No. ER08-1329. *See American Electric Power Service Corp.*, Certification of Uncontested Settlement, 131 FERC ¶ 63,012 at P 13 (2010), *approved by* 133 FERC ¶ 61,007 (2010). Under a 2015 settlement, FirstEnergy/ATSI's "ROE values are inclusive of any incentive adder for RTO participation." *PJM Interconnection, L.L.C.*, Certification of Uncontested Settlement, 152 FERC ¶ 63,020 at P 13 (2015), *approved by* 153 FERC ¶ 61,106 (2015). Meanwhile, Ohio Rev. Code 4928.12 has been in effect and has remained unchanged since 1999.

- 17 -

avoided by realigning Commission policy with FPA §219's focus on the benefits that flow from participation in a Transmission Organization.

G.     The Order is Constitutionally Defective under the Supremacy and Commerce Clauses of the U.S. Constitution in Permitting Ohio State law to Nullify an Incentive that Was Enacted by the Federal Government.

The Order declines even to address the Constitutional issue of preemption that was presented in Dayton Power Initial Brief at 32-34 and in briefs filed by FirstEnergy Service Company (Initial Brief at 6-8, AEP Ohio Corporation (Initial Brief at 12-15, and WIRES Initial Brief at 5-6.[38]   The Commission itself set for paper hearing issues regarding how the Ohio statute should be interpreted and applied.[39]   In that context, it should be incumbent for the Commission to address squarely arguments presented in the paper hearing that interpretations of the Ohio statute that would bar Dayton Power from eligibility for the federally-mandated incentive are preempted.

On rehearing, the Commission should not only address this issue on the merits, but should find that preemption occurs for two, independent reasons.  As a threshold matter, State law is "preempted where 'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law,'" and "'where, under the circumstances of a particular case, the challenged state law stands as an obstacle to accomplishment and execution of [Congress's] full purposes and objectives.'"[40]  Interpreting the Ohio law in a way that bars eligibility from the 219(c) Incentive would violate the Constitutional doctrine of federal preemption in two ways.

---

[38]  Order at P 70.

[39]  The Dayton Power and Light Company, 172 FERC ¶ 61,140 at P22 (2020)("Paper Hearing Order").

[40]  *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016) (citations omitted).

First, federal law, 26 U.S.C. § 219 establishes that an incentive is to be provided by the FERC to a utility that joins a Transmission Organization. A State cannot nullify federal law in that regard by passing its own legislation on the same subject. The Order is Constitutionally defective in establishing a regulatory structure and outcome where the eligibility for a federally-mandated incentive can be nullified or will remain in place depending on the action of a State Government.[41]

Second, a State cannot make mandatory what Congress and the Commission have chosen to leave voluntary. In Section 219 of the FPA, Congress provided for "incentives" for participation in a transmission organization; it chose not to mandate such participation.[42] Likewise, in Section 202, Congress directed the Commission "both 'to divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy' and 'to promote and encourage such interconnection and coordination within each such district and between such districts.'"[43] The Commission has built on Section 202, and implemented Section 219, by, for two decades, pursuing a "voluntary approach to RTO formation" and membership.[44] On that basis, the

---

[41] *Edgar v. MITE Corp.*, 457 U.S. 624, 631 (1982) ("A state statute is void to the extent that it actually conflicts with a valid federal statute"). *Dow Chemical Co. v. Exxon Corp*, 139 F.3d 1470, 1473 (Fed. Cir. 1998) (State laws will be found to violate the Supremacy Clause when they "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."). *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-74 (2000), (even when not in direct conflict with a federal law, the state law could still be found unconstitutional under the Supremacy Clause if the "state law is an obstacle to the accomplishment and execution of Congress's full purposes and objectives." Congress need not expressly assert any preemption over state laws either, because Congress may implicitly assume this preemption under the Constitution. *Crosby, supra* at 386-388.

[42] 16 U.S.C. § 824s(c).

[43] *Pub. Util. Dist. No. 1 of Snohomish Cty., Washington*, 272 F.3d 607, 612 (D.C. Cir. 2001) (citing to FPA Section 202(a), 16 U.S.C. § 824a(a)) (emphasis added).

[44] Order No. 2000, 65 Fed. Reg. at 831, 834.

- 19 -

**JA261**

Commission has rejected "RTO . . . requirements" that, "had they been applied . . . would have, in effect, mandated . . . continued participation in an RTO, contrary to [the Commission's] policy that RTOs are voluntary."[45]  The Ohio statute, if construed together with section 219 to deem ineligible for the 219(c) Incentive any decision to join any form of transmission organization, would conflict with and frustrate this policy of Congress and the Commission—yielding conflict preemption.

Indeed, to underscore the point, it is helpful to imagine what would happen if *all* states adopted laws mandating such membership.  Such laws would make it impossible for the Commission to establish "incentives" for joining a 219(c) Transmission Organization because such membership would be deemed to already be mandatory for everyone.  Ohio cannot be allowed to adopt a rule that, if sister states followed suit, would disable the Commission from complying with Congress's commands.

The Commission cannot continue on rehearing to ignore this issue.  As an aside, Ohio law provides that "where there is more than one possible interpretation of a statute, a court will construe the statute so as to save it from constitutional infirmities."[46]  It is incumbent on the Commission, no less than Ohio courts, to interpret Ohio Rev. Code 4928.12 to avoid the infirmities that would arise from reading it to bar eligibility for the federal 219(c) Incentive for Ohio transmission owners .

Interpreting the Ohio law to compel RTO participation would also yield field preemption under *Hughes v. Talen Energy Marketing, LLC*.  That decision struck down a Maryland statute that "condition[ed] payment of funds" under a contract-for-differences on participating in and

---

[45] *E.On U.S. LLC*, 116 FERC ¶ 61,020 at P 9 (2006).

[46] *State v. Ritchey*, 64 N.E.3d 599, 601 (Ohio App. 2016) (citation omitted).

clearing PJM's capacity auctions.[47]    The Supreme Court stressed that Maryland had impermissibly "[d]oubt[ed] FERC's judgment" as to auction participation by "requir[ing] CPV to participate in the PJM capacity auction,"[48] and had unlawfully "[]tethered [payment] to a generator's wholesale market participation."[49]    Likewise here, Ohio would "invade[] FERC's regulatory turf" by requiring participation in a transmission organization and "tethering" the requirements of Ohio law to such participation.[50]    Indeed, when *Hughes* identified the "limit[s]" on its holding, it tellingly stated that "[n]othing in this opinion should be read to foreclose ... States from encouraging" their preferred policy results—not that the FPA left room for states to *mandate* those results.[51]    The Commission should avoid creating constitutional infirmities with the statute that the Ohio legislature passed by refraining from interpreting Ohio Rev. Code 4928.12 to mandate participation in a "transmission organization" (as defined in the Ohio statute) that is exactly co-extensive with the different definition of "Transmission Organization" in federal law.    And with a ruling that the two definitions are not identical, there is a compelling basis for finding that Dayton Power was not required by Ohio statute to join a federally-defined Transmission Organization.    Thus, its decision to join PJM was voluntary.

      H.     The Order Errs in Applying a New Generic Standard for
             Disallowance of the 219(c) Incentive to Dayton Power
             <u>Instead of through a Generic Rulemaking Process.</u>

      Commissioner Chatterjee correctly noted the "procedural disarray" caused by applying the a voluntariness test to this "narrow proceeding" involving Dayton Power while the

---

[47] 136 S. Ct. at 1299.

[48] *Id.* at 1297.

[49] *Id.* at 1299.

[50] *See id.* at 1297, 1299.

[51] *Id.* at 1299.

Commission is deep in the process of considering the very same issue on a generic basis in a rulemaking proceeding.[52]

Commissioner Chatterjee's concerns are on a solid administrative law footing. The heading of section 219(a) is "Rulemaking Required" and states that the incentives are to be established "by rule." The Commission did that initially in promulgating rules where a voluntariness requirement was proposed by certain commenters and rejected by the Commission. But, now via an adjudicatory hearing process, the Commission has effectively amended its rule by adding a voluntariness test.

Reviewing courts recognize that agencies have considerable deference both in interpreting federal statutes[53] and whether to apply those interpretations after a formal rulemaking process or an adjudication.[54] But, "there may be situations where the [agency's] reliance on adjudication would amount to an abuse of discretion."[55] A decision based on an improper reading of the federal statute will be remanded.[56] And if there is an ongoing rulemaking proceeding addressing essentially the same issues, the decision to proceed through individual litigant arbitration may be accorded far less or no deference. In *Cities of Anaheim v. FERC*,[57] the 9th Circuit ultimately found that the FERC adjudicatory order before it was validly issued, but did describe the legal principles used to determine that and noted in particular the limits that may apply on the authority of the FERC or any other administrative agency to proceed

---

[52] Order, Chatterjee dissent, at PP 2-3.

[53] *SEC v. Chenery Corp*., 318 U.S. 80 (1943).

[54] *NLRB v. Wyman-Gordon Co.,* 394 U.S. 750 (1969).

[55] *Bell Aerospace Co.,* 416 U.S. 267 at 294 (1974).

[56] *SEC v. Chenery Corp., supra* at 94.

[57] *Cities of Anaheim v. FERC*, 723 F.2d 656, 659 (9th Cir. 1984),

under an adjudicatory process where a rulemaking was more appropriate or actually already ongoing:

> Administrative agencies are free to announce new principles during adjudication. [citations omitted]. Two exceptions qualify this general proposition. First, agencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy. . . .
>
> The second limiting doctrine is that agencies may not use adjudication to circumvent the Administrative Procedure Act's rulemaking procedures. [citations omitted]. This exception is inapplicable to the present case. FERC has not used West Texas to amend a recently adopted rule, as in Montgomery Ward, Patel, and Ruangswang, or to supplant a pending rule-making proceeding, as in Ford Motor Co. v. FTC, 673 F.2d 1008 (9th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982)."

The analysis in Cities of Anaheim has particular significance in the context here where Dayton Power's filing made February 24, 2020, was in reliance on published rules in which the Commission had established an incentive for joining a Transmission Organization outlining filing requirements with no requirement to establish that joining must be voluntary.[58] Even at the time the rates took effect on October 3, 2020, the only pending notice of any changes to those rules was to increase the size of the incentive and make it crystal clear that no voluntariness test was to be employed.[59]

Under *Anaheim*, the Order reflects a sudden change in direction from all prior rulings related to the 219(c) Incentive as applied throughout PJM and this sudden change in direction is to Dayton Power's detriment and hardship after a filing made in reliance on the published rules and precedent.  In terms of the attractiveness to outside investors who look at ROE, Dayton Power is disadvantaged (unduly discriminated against) relative to every other transmission owning utility within PJM who has asked for and received the 219(c) Incentive.  And under

---

[58]  18 C.F.R. 35.35(e) (2020).

[59]  Transmission Incentives NOPR (2020) at P 8.

*Anaheim*, the Order effectively circumvents the ongoing rulemaking process where the same "voluntariness" issue is being considered for application nationally.

There is perhaps some ambiguity in the statute as to the Commission's discretion to act once the rules are promulgated within that first year of enactment. But the most normal reading of the statute and the authorities delegated by Congress to the Commission would be that future substantive changes to the rule should also be made following rulemaking procedures, not individual adjudicatory proceedings.

In *Ford Motor Co. v. FTC,* [60] the 9th Circuit vacated an adjudicatory order based on facts strikingly similar to those in presented here: the adjudicatory order imposed new requirements on a company before the agency where it was apparent that the order had broad applicability to others in the same business and while the agency was also simultaneously addressing the same issues in a generic rulemaking proceeding. The 9th Circuit's reasoning is instructive with respect to the order here for which rehearing is sought:

> "The F.T.C. could have formulated its position on U.C.C. § 9-504 and its application to the credit practices of car dealerships in its proposed trade rule on credit practices. It did not do so. The pending rulemaking proceeding and this adjudication seek to remedy, more or less, the same credit practices. . . . If the rule for deficiencies is thought by the F.T.C. to be "appropriately addressed by rulemaking," it should also address the problem of accounting for surpluses by a rulemaking proceeding, and not by adjudication.

> "Ultimately, however, we are persuaded to set aside this order because the rule of the case made below will have general application. It will not apply just to Francis Ford. Credit practices similar to those of Francis Ford are widespread in the car dealership industry; and the U.C.C. section the F.T.C. wishes us to interpret exists in 49 states. The F.T.C. is aware of this. It has already appended a "Synopsis of Determination" to the order, apparently for the purpose of advising other automobile dealerships of the results of this adjudication. To allow the order to stand as presently written would do far more than remedy a discrete violation of a singular Oregon law as the F.T.C. contends; it would create a national

---

[60] *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1010 (9th Cir. 1981), cert. denied, 459 US 999 (1982).

interpretation of U.C.C. § 9-504 and in effect enact the precise rule the F.T.C. has proposed, but not yet promulgated.

"Under these circumstances, the F.T.C. has exceeded its authority by proceeding to create new law by adjudication rather than by rulemaking."[61]

The 10th Circuit has also found it an abuse of discretion for agency action to announce a broad policy determination in a single adjudicative proceeding that bypasses rulemaking procedures.[62] Dayton Power notes that there is contrary authority that criticizes *Ford Motor* in favor of a more expansive amount of discretion for an agency to act by either adjudication or rulemaking.[63] But even that criticism is often muted when, as is the case here, there is a sudden shift in policy resulting to the detriment of those who relied on past policy[64] or an ongoing rulemaking proceeding addressing the same issue.[65]

As with the new FTC rule that was vacated in *Ford Motor* – there is an ongoing FERC rulemaking proceeding that will address the same issue of whether a voluntariness test is appropriately applied in determining whether a transmission owning utility is eligible for the 219(c) Incentive. That rulemaking process should not have been circumvented.

---

[61] *Id.,* at 1010.

[62] *Matzke v. Block*, 732 F.2d 799, 802 (10th Cir. 1984) (citing *First Bancorporation v. Board of Governors*, 728 F.2d 424 (10th Cir. 1984), *Ford Motor,* and other cases.

[63] *See General American Transp. Corp. v. ICC*, 883 F.2d 1029, 1031 (D.C. Cir. 1989); *Colorado Dep't of Social Services v. Dep't of Health and Human Services,* 585 F.Supp. 522, 525 (D. Col. 1984);

[64] *Cf., Boston Edison v. FERC,* 856 F.2d 361, 373 (1st Cir. 1988)*; Grace Petroleum Corp. v. FERC*, 815 F.2d 589, 592  n. 4 (10th Cir. 1987).

[65] *Community Care Foundation v. Thompson*, 2001 U.S.Dist LEXIS 25459 (D. D.C. 2001) (opining that *Anaheim* modifies *Ford Motor* by "limit[ing] this rule against the use of the adjudicatory function so that it applies only when adjudication is used to 'circumvent the Administrative Procedure Act's rule making procedures' by amending 'a recently adopted rule . . . or to supplant a pending rule-making.'

On rehearing, the Commission should rule as suggested by Commissioner Chatterjee: allowing Dayton Power's rates to reflect the 219(c) Incentive based on the current regulations and proceeding more expeditiously on the generic rulemaking.

## IV.    **Conclusion**

Wherefore, for the foregoing reasons, The Dayton Power and Light Company respectfully requests that the Commission grant its request for rehearing and issue an order approving the 219(c) Incentive of an ROE adder for inclusion in the PJM Open Access Transmission Tariff for Network Integrated Transmission Service provided by PJM to load within the Dayton Zone, effective October 3, 2020.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>On behalf of</td><td>The Dayton Power and Light Company</td></tr>
</table>

ss:    *Randall V. Griffin*

Randall V. Griffin
Chief Regulatory Counsel
AES US Services, LLC
1065 Woodman Drive
Dayton, OH 45432
(937) 259-7221 (office)
(937) 259-7813 (Facsimile)
randall.griffin@aes.com

Dated:  August 13, 2021

CERTIFICATE OF SERVICE

I hereby certify that I have this day, August 13, 2021, served via e-mail or by first-class mail, a copy of the foregoing on each party on the official service list compiled by the Secretary in this proceeding.

On behalf of          The Dayton Power and Light Company

ss:   *Randall V. Griffin*

Randall V. Griffin
Chief Regulatory Counsel
AES US Services, LLC
1065 Woodman Drive
Dayton, OH 45432
(937) 259-7221 (office)
937( 479-8983 (cell)
(937) 259-7813 (Facsimile)
randall.griffin@aes.com

- 27 -

**JA269**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power and Light Company          :          Docket No.    ER20-1068-00_

REQUEST FOR CLARIFICATION OF
PJM INTERCONNECTION, L.L.C.

PJM Interconnection, L.L.C. ("PJM") respectfully requests clarification of the Federal

Energy Regulatory Commission's ("Commission" or "FERC") July 15, 2021 Order on Paper

Hearing.[1]  Because some of the July 15 Order's findings relate directly to issues that are still

under consideration in a broader rulemaking docket (the "generic rulemaking"),[2] PJM seeks

clarification that nothing in the Commission's ruling in this case was intended to pre-decide

issues in the generic rulemaking as to how the RTO-Participation Incentive will be applied going

forward.[3]  On the face of the July 15 Order and absent the requested clarification, the

Commission risks running afoul of the principle that agencies should defer taking action in

specific adjudicatory matters where such action would supplant ongoing generic rulemakings.[4]

Moreover, the Commission should clarify certain statements in the July 15 Order opining

on a novel statutory issue relating to the definition of "Transmission Organizations" under the

Federal Power Act.  On two occasions, the Commission states that "there is no requirement [in

the statutory definition itself] that a Transmission Organization plan for expansion of

---

[1] *PJM Interconnection, L.L.C. and The Dayton Power and Light Company*, 176 FERC ¶ 61,025 (July 15, 2021) (the "July 15 Order").

[2] *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, 170 FERC ¶ 61,204 (2020) ("Original NOPR"); *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, 175 FERC ¶ 61,035 (2021) ("Supplemental NOPR") (collectively, the "generic rulemaking").

[3] The July 15 Order arguably intends to limit the reach of this case to an interpretation of Order No. 679's existing incentive rule.  *See* July 15 Order at P 25.

[4] *See City of Anaheim v. F.E.R.C.*, 723 F.2d 656, 659 (9th Cir. 1984) ("*Anaheim*").

1

transmission facilities."[5]  Despite being technically correct, these statements are an overly broad generalization on an issue that was not appropriate for the Commission to reach and make such a broad declaration about in this docket.  In this particular case, Dayton chose to join PJM, a Transmission Organization obliged to plan for the expansion of transmission facilities.  As such, the fact-specific inquiry here does not support an advisory finding as to the qualities of hypothetical Transmission Organizations that, if joined, would or would not trigger eligibility for incentive rate treatment.

In addition, the meaning of "Transmission Organization" must be considered with due consideration to Energy Policy Act of 2005's ("EPAct 2005") requirement that such an organization plan and expand transmission facilities where it also has an organized electricity market.[6]  The Commission should therefore clarify its imprecise statements so as not to infer that a Transmission Organization with an organized electricity market is not required to plan for the expansion of transmission facilities.  The Commission should clarify that its statements added in *dicta* are not precedential for future dockets but, rather are issues that should be addressed in future factually relevant situations or a general rulemaking.

For the reasons herein, the Commission should grant the clarifications PJM requests.

---

[5] July 15 Order at P 58; *id.* at P 58 n.124.

[6] Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005) (codified as amended in scattered sections of 42 U.S.C. and 16 U.S.C.) ("EPAct").

2

# I.    REQUEST FOR CLARIFICATION

Clarification is necessary because "agencies may not use adjudication to circumvent the Administrative Procedure Act's rulemaking procedures."[7]  The requested clarifications will reconcile this case with the Commission's pending generic rulemaking, offer an opportunity to address EPAct 2005's mandate that Transmission Organizations with organized electricity markets also have central planning authority, and minimize due process concerns.

## A.  Clarification would establish that this case does not pre-judge the generic rulemaking.

Because some of the July 15 Order's findings relate directly to issues that are still under consideration in the generic rulemaking, PJM seeks clarification that nothing in the Commission's ruling in this docket was intended to pre-decide issues in the generic rulemaking as to how the RTO-Participation Incentive may be applied in the future under a potentially new regulation.  In the generic rulemaking, several parties, PJM included, filed comments asserting that the Commission's reading of a "voluntariness" criterion into section 219(c) of the Federal Power Act runs counter to its statutory text and EPAct 2005's legislative history.[8]  These issues warrant Commission deliberation based on the consideration of the many comments filed on the subject in the generic rulemaking docket.  The record in that proceeding addresses, among other issues, a detailed review of the statutory text and its legislative history, an affidavit from the former Chair of the Energy and Commerce Committee of the United States House of Representatives and the Chairman of the joint House-Senate Energy Conference Committee at the time EPAct 2005 was being considered and section 219 of the Federal Power Act was

---

[7] *See Anaheim*, 723 F.2d at 659; *Duke Energy Moss Landing LLC*, 86 FERC ¶ 61,227, at 61815–16 (1999) (implying that an adjudication would circumvent the Administrative Procedure Act's rulemaking provisions if it supplants a pending rulemaking).

[8] *See* Comments of PJM Interconnection, L.L.C., Docket No. RM20-10-000, at 6-8, 14-16, 20-22 (filed June 25, 2021).

developed, and an analysis of the *California Public Utilities Commission* decision that the Commission cites to in this case.[9]

Notwithstanding the development of this robust record in the generic rulemaking, the July 15 Order applied a "voluntariness" criterion to decide this case without acknowledging or incorporating the generic rulemaking record let alone engaging with the generic rulemaking docket's record evidence or statutory and legislative history arguments.[10] Granting the requested clarification will make it clear that this docket is not pre-determining all of the evidence and arguments submitted in the generic rulemaking.

**B. Clarification provides an opportunity for the Commission to acknowledge that certain of its statements are not generally-applicable legal rules because they are not necessary to the case-specific disposition in this docket, and further recognize another EPAct 2005 requirement mandating Transmission Organizations with organized electricity markets to also plan and expand transmission facilities.**

The Commission should also clarify an overly broad generalization about Transmission Organizations that invites confusion in specific cases and in the generic rulemaking. The following two clauses strung together in paragraph 58 of the July 15 Order could be erroneously read as a generally-applicable rule of law: "the RTO Adder is not limited to a utility's membership in an RTO or ISO but to any Transmission Organization, and there is no requirement that a Transmission Organization plan for expansion of transmission facilities."[11] This cannot be the case. It would not have been appropriate for the Commission to both reach

---

[9] *Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 974-75 (9th Cir. 2018) ("*CPUC*").

[10] There are other examples of overlap that support the need for the requested clarification. Parties asserted in this proceeding and the generic rulemaking that the Commission should eschew a "voluntariness" criterion because it would require intensive analyses and interpretations of novel state law issues. Instead of addressing these issues generically as it should in accordance with the anti-circumvention principle, the Commission engaged in a state-specific analysis of Ohio law in this case by offering a federal guess about the meaning of an Ohio statute. *See, e.g.*, July 15 Order at P 60 ("While the Ohio statute does not include the term 'operational control,' a reasonable interpretation of the word 'control' means control in all aspects of operations.").

[11] July 15 Order at P 58.

this issue and make such a broad declaration in this docket.  Dayton chose to join PJM, which is

a Transmission Organization obliged to plan for the expansion of transmission facilities.  As

such, the case-specific inquiry here[12] does not support an advisory finding as to the qualities of

hypothetical Transmission Organizations that, if joined, would or would not trigger eligibility for

incentive rate treatment.

In addition, the July 15 Order overlooks EPAct 2005's requirement that Transmission

Organizations serving organized electricity markets must also undertake the responsibility to

plan and expand transmission facilities.  The July 15 Order gives a contrary impression when

discussing Transmission Organizations.  The Commission should clarify its imprecise statements

to account for this other EPAct 2005 mandate.

The July 15 Order observes that "[t]he definition of 'Transmission Organization' requires

operation of transmission facilities, *but not planning for expansion of those facilities*."[13]

However, this statement does not account for another related EPAct 2005 mandate that the

Commission "exercise [its] authority . . . in a manner that facilitates the planning and expansion

of transmission facilities" in "Transmission Organizations" with "organized electricity

markets."[14]  Indeed, "[t]o implement this requirement," the Commission directed each

Transmission Organization to file "an explicit statement of how its planning and expansion

---

[12] *See* July 15 Order at 13 ("we address Dayton's application for an RTO Adder based on the specific circumstances of its request").

[13] July 15 Order at P 58 n.124 (emphasis added); *id.* at P 58 ("there is no requirement [in the statutory definition itself] that a Transmission Organization plan for expansion of transmission facilities").

[14] EPAct 2005, Pub. L. No. 109-58, § 1233, 119 Stat. 594, 960 (2005), codified at 16 U.S.C. § 824q(b)(4) ("The Commission shall exercise the authority of the Commission under this chapter in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy the service obligations of the load-serving entities."); Section 1233(b) of EPAct 2005 ("FERC RULEMAKING ON LONG-TERM TRANSMISSION RIGHTS IN ORGANIZED MARKETS.— Within 1 year after the date of enactment of this section and after notice and an opportunity for comment, the Commission shall by rule or order, implement section 217(b)(4) of the Federal Power Act in Transmission Organizations, as defined by that Act with organized electricity markets.").

practices will take into account" certain needs, and "make its planning and expansion practices and procedures publicly available, including both the actual plans and any underlying information used to develop the plans."[15]  The Commission has also recognized that this mandate in EPAct 2005 for Transmission Organizations with organized electricity markets has implications for "coordinated, open and transparent transmission system planning" in Transmission Organizations.[16]  Moreover, these requirements of EPAct 2005 are also plainly acknowledged in the Supplemental NOPR, which identifies "regional transmission planning as well as access to numerous types of markets" among the most important benefits that accrue to utilities and consumers through participation in Transmission Organizations.[17]  The Commission should clarify that its statements added in *dicta* are not precedential for future dockets but, rather are issues that should be addressed in future factually-relevant situations or a general rulemaking.

Granting the requested clarification will help avoid confusion about the requirements of Transmission Organizations in specific cases and in the generic rulemaking.

### C.  Clarification will minimize due process concerns.

The minimization of due process concerns also weighs in favor of granting the requested clarification.  Parties have long observed that the same issues addressed in the generic rulemaking "may be addressed by the Commission in the paper hearing."[18]  The Commission chose to issue its decision in this docket even though the July 15 Order acknowledges the

---

[15] *Long-Term Firm Transmission Rights in Organized Electricity Markets*, Order No. 681, 116 FERC ¶ 61,077, at P 454, *order on reh'g*, Order No. 681-A, 117 FERC ¶ 61,201, at PP 94-95 (2006), *order on reh'g*, Order No. 681-B, 126 FERC ¶ 61,254 (2009).

[16] Order No. 681 at P 31.

[17] *See* Supplemental NOPR at P 14 & n.29.

[18] Motion to Lodge of PJM Interconnection, L.L.C., Docket No. ER20-1068-000, at 1 (filed October 19, 2020).

6

ongoing generic rulemaking, including the issuance in April 2021 of a Supplemental NOPR focusing exclusively on proposed changes to the RTO-Participation Incentive.[19]

What's more, the Supplemental NOPR was issued months *after* the paper hearing briefing deadlines passed in this docket.  Legitimate due process issues are implicated by these timing issues and the resulting misalignment in administrative records in separate dockets addressing substantially overlapping matter about the meaning of a statute.[20]  At a minimum, the Commission should have provided notice and invited supplemental paper hearing briefing in light of the Supplemental NOPR if its intent was to transform this narrow proceeding into a broader examination that would essentially displace a generic rulemaking.  Such additional minimal process would have ensured the development of a complete record – or at least one aligned with the activity in the generic rulemaking docket.  Here, the Commission actually stemmed the record by denying PJM's motion to lodge containing a discussion pertinent to both this case and the pending generic rulemaking.[21]  Thus, the clarifications requested will work to protect the rights of parties in this docket and the generic rulemaking.

---

[19] July 15 Order at PP 10, 25, and n.13.

[20] *See, e.g., Texas E. Transmission, LP*, 149 FERC ¶ 61,143, at PP 30-34; *id.* at P 34 ("[W]hen the Commission adopts a rule in an adjudication, parties in subsequent adjudications where the rule is applied must have an opportunity to challenge the basis of the rule, because unlike in a rulemaking proceeding they did not have such an opportunity in the first adjudication.").

[21] July 15 Order at PP 13, Order Paragraph (B).

## II.    CONCLUSION

For the reasons herein, the Commission should grant PJM's request for clarification.

Respectfully submitted,

By:    /s/ Mark J. Stanisz

Craig Glazer                                              Mark J. Stanisz
Vice President-Federal Government Policy    Senior Counsel
PJM Interconnection, L.L.C.                      PJM Interconnection, L.L.C.
1200 G Street, N.W., Suite 600                  2750 Monroe Blvd.
Washington, D.C. 20005                           Audubon, PA 19403
Ph: (202) 423-4743                                   Ph: (610) 666-4707
Fax: (202) 393-7741                                  Fax:(610) 666-8211
craig.glazer@pjm.com                             mark.stanisz@pjm.com

Date: August 16, 2021

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document on those parties on the

official Service List compiled by the Secretary in these proceedings.

Dated at Audubon, Pennsylvania this 16th day of August, 2021.


/s/ Mark J. Stanisz
Mark J. Stanisz
Senior Counsel
PJM Interconnection, L.L.C.
2750 Monroe Blvd.
Audubon, PA 19403
Ph: (610) 666-4707
mark.stanisz@pjm.com

176 FERC ¶ 62,136
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power & Light Company                    Docket No. ER20-1068-003

NOTICE OF DENIAL OF REHEARINGS BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(September 16, 2021)

Rehearings have been timely requested of the Commission's order issued on July 15, 2021, in this proceeding. *The Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (2021). In the absence of Commission action on the requests for rehearing within 30 days from the date the requests were filed, the requests for rehearing (and any timely requests for rehearing filed subsequently)[1] may be deemed denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2020); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the rehearing requests of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper. As provided in 18 C.F.R. § 385.713(d), no answers to the rehearing requests will be entertained.

Kimberly D. Bose,
Secretary.

---

[1] *See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by Cal. Indep. Sys. Operator & Cal. Power Exch.*, 95 FERC ¶ 61,173 (2001).

178 FERC ¶ 61,102
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                       James P. Danly, Allison Clements,
                       Mark C. Christie, and Willie L. Phillips.

The Dayton Power and Light Company                Docket. No.   ER20-1068-003

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued February 17, 2022)

1.      On February 25, 2020, the Dayton Power and Light Company (Dayton) submitted, pursuant to sections 205 and 219 of the Federal Power Act (FPA),[1] Part 35 of the Commission's regulations,[2] and Order No. 679,[3] a request for approval of certain transmission rate incentives for investment in transmission projects that Dayton asserts are needed for reliability (i.e., the Transmission Enhancement Plan Projects (TEP Projects)) (Incentive Rate Application).

2.      On August 17, 2020, the Commission granted, in part, and denied, in part, the Incentive Rate Application and set certain issues for paper hearing.[4]  Specifically, the Commission accepted and suspended for a five-month period Dayton's request for a 50 basis point adder to the authorized return on equity (ROE) to reflect Dayton's continued membership in PJM Interconnection, L.L.C. (PJM) (RTO Adder), subject to refund and the outcome of a paper hearing to explore whether Dayton has shown that its participation in PJM, or another Regional Transmission Organization (RTO) or Independent System Operator (ISO), is voluntary or if such participation is mandated by Ohio law.

---

[1] 16 U.S.C. §§ 824d, 824s.

[2] 18 C.F.R. pt. 35 (2021).

[3] *Promoting Transmission Inv. through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[4] *Dayton Power & Light Co.*, 172 FERC ¶ 61,140 (2020) (Initial Order).

Document Accession #: 20220217-3113

3.      On July 15, 2021, the Commission found that Dayton did not qualify for the RTO Adder and, therefore, denied Dayton's request for the RTO Adder.[5]  Multiple parties filed requests for rehearing and clarification of the RTO Adder Order.

4.      Pursuant to *Allegheny Defense Project v. FERC*,[6] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the FPA,[7] we are modifying the discussion in the RTO Adder Order and continue to reach the same result in this proceeding, as discussed below.[8]

## I.    **Background**

5.      In its Incentive Rate Application, Dayton requested various incentives, including an RTO Adder.  The Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (Ohio FEA) and Office of the Ohio Consumers' Counsel (OCC) protested Dayton's request for the RTO Adder.  They argued that the incentive was unnecessary because, under an Ohio statute, all transmission owners with facilities in Ohio are required to be members of PJM or an RTO.[9]

6.      In the August 17 Order, the Commission found that the requested 50 basis point RTO Adder had not been shown to be just and reasonable, and may be unjust, unreasonable, unduly discriminatory, or otherwise unlawful.[10]  The Commission accepted the RTO Adder for filing and suspended it for a five month period, subject to refund and the outcome of a paper hearing to explore whether Dayton had shown that its

---

[5] *Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (2021) (RTO Adder Order).

[6] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[7] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[8] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the RTO Adder Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[9] Ohio FEA Protest at 6; OCC Protest at 26 (citing Ohio Rev. Code § 4928.12).

[10] Initial Order, 172 FERC ¶ 61,140 at P 2.

Docket No. ER20-1068-003                                                    - 3 -

participation in PJM or another Transmission Organization[11] is voluntary, or if such participation is mandated by Ohio law.[12]

7.      The Commission directed responses to the following questions:

> (1) Is there an arrangement under which Dayton could withdraw from an RTO and comply with the Ohio law, while not being eligible for an RTO Participation Adder?  If so, please describe that alternative arrangement.  If not, please explain why not.

> (2) Explain how any alternative arrangement identified in response to Question 1 would comply with the Ohio Revised Code section 4928.12, but would not at the same time qualify for incentives for joining a Transmission Organization under section 35.35(e) of the Commission's regulations, 18 C.F.R § 35.35(e) (2019).  As part of your answer, please: (1) explain why such arrangement would not qualify for an incentive under section 35.35(e) of the Commission's regulations; and address each of the 9 requirements for such an arrangement specified in Ohio Revised Code section 4928.12(B) and explain how the arrangement satisfies each such requirement.[13]

8.      Following briefing, the Commission in the RTO Adder Order concluded that, given Ohio law, Dayton did not qualify for a 50 basis point RTO Adder under the Commission's current incentives policy because:  (1) Order No. 679 as interpreted in *CPUC* requires a showing of voluntary membership in such a Transmission

---

[11] Under Order No. 679, a transmission owner must join a Commission-approved Transmission Organization to receive the RTO Adder.  Order No. 679, 116 FERC ¶ 61,057 at P 327.  A Transmission Organization is "a Regional Transmission Organization, Independent System Operator, independent transmission provider, *or other transmission organization finally approved by the Commission for the operation of transmission facilities*."  16 U.S.C. § 796(29); 18 C.F.R. § 35.35(e) (2021) (emphasis added).

[12] Initial Order, 172 FERC ¶ 61,140 at P 22.

[13] *Id*. P 22 & app.

Organization,[14] and (2) Dayton's membership in a Transmission Organization is not
voluntary because the Ohio statute requires it.

9.      Requests for rehearing were respectively filed by:  (1) Dayton on August 13, 2021
(Dayton Request for Rehearing); (2) Indicated Ohio Transmission Owners[15] (Indicated
Owners) on August 13, 2021 (Indicated Owners Request for Rehearing); and (3) the
Edison Electric Institute (EEI) and WIRES LLC (collectively EEI/WIRES) on August 16,
2021 (EEI/WIRES Request for Rehearing).  On August 16, 2021, PJM filed a request for
clarification (PJM Request for Clarification).

## II.     Discussion

10.     We continue to find that Dayton does not qualify for a 50 basis point RTO Adder
under the Commission's current incentives policy because:  (1) Order No. 679 as
interpreted in *CPUC* requires a showing of voluntary membership in such a
Transmission Organization,[16] and (2) Dayton's membership in a Transmission
Organization is not voluntary because the Ohio statute requires it.  As discussed below,
the parties' arguments on rehearing do not persuade us that the Commission erred in
reaching this conclusion.

### A.     Validity of the Voluntariness Requirement

#### 1.     Requests for Rehearing

11.     Dayton, Indicated Owners and EEI/WIRES argue that a voluntariness requirement
is not included in section 219(c), and so none should apply based on a plain language

---

[14] *Id.* P 14 (citing *Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966, 975 (9th Cir.
2018) (*CPUC*) (finding that "the voluntariness of a utility's membership in a transmission
organization is logically relevant to whether it is eligible for an adder" under Order No.
679)).

[15] The Indicated Ohio Transmission Owners consist of American Electric Power
Service Corporation, on behalf of its affiliates Ohio Power Company and AEP Ohio
Transmission Company, Inc.; Duke Energy Ohio, Inc.; and FirstEnergy Service
Company, on behalf of its affiliates American Transmission Systems, Incorporated,
Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC,
West Penn Power Company, The Potomac Edison Company, and Monongahela Power
Company.

[16] *CPUC*, 879 F.3d at 975 (finding that "the voluntariness of a utility's
membership in a transmission organization is logically relevant to whether it is eligible
for an adder" under Order No. 679).

reading of the statute.[17]  Dayton argues that imposing a voluntariness requirement for the RTO Adder is *ultra vires* because, in its view, Congress did not delegate the power to establish a "voluntariness" requirement to the Commission in the statute.[18]  Dayton and Indicated Owners read section 219(c) as mandating entitlement to the RTO Adder in any situation where a transmission owner joins an RTO, regardless of whether state law requires membership.[19]

12.    Dayton and Indicated Owners claim that the Commission misread *CPUC* as requiring a showing of voluntariness under section 219 to receive an RTO Adder.[20]  Dayton and Indicated Owners argue the U.S. Court of Appeals for the Ninth Circuit (Ninth Circuit) did not speak to section 219, but instead focused on Order No. 679, admonished the Commission to consider voluntariness arguments raised by interveners, and then remanded the matter for further consideration.[21]

13.    EEI/WIRES argue that Order No. 679 should not be read to create a voluntariness requirement.[22]  They argue that, while Order No. 679 noted that continuing membership in RTOs "is generally voluntary," a footnote in Order No. 679 also noted that the incentive "applies to utilities that joined RTOs or ISOs because of merger conditions or market-based rate requirements."[23]

## 2.    Commission Determination

14.    We are not persuaded that the Commission erred in concluding that parties must demonstrate voluntariness in order to qualify for the RTO Adder.  As discussed in the

---

[17] Dayton Request for Rehearing at 4-5; Indicated Owners Request for Rehearing at 7-9; EEI/WIRES Request for Rehearing at 5-8.

[18] Dayton Request for Rehearing at 5-9; *see also* Indicated Owners Request for Rehearing at 7 (arguing the RTO Adder Order added an "extra-textual requirement").

[19] Dayton Request for Rehearing at 7; Indicated Owners Request for Rehearing at 7-9.

[20] Dayton Request for Rehearing at 8-9; Indicated Owners Request for Rehearing at 9-12.

[21] Dayton Request for Rehearing at 8-9; Indicated Owners Request for Rehearing at 9-12.

[22] EEI/WIRES Request for Rehearing at 7.

[23] *Id.* (quoting Order No. 679, 116 FERC ¶ 61,057 at P 331 & n.180).

RTO Adder Order,[24] Order No. 679 as interpreted by *CPUC* requires a showing of voluntariness. Section 219(c) states that, "[i]n the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization."[25] The Commission implemented this directive in Order No. 679, finding that an RTO Adder is appropriate for entities that choose to remain members of a Transmission Organization because, in relevant part, continuing membership is "generally voluntary."[26] As the court in *CPUC* observed, the Commission:

> has a longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced. This policy is incorporated in Order 679. The policy prohibits FERC from rewarding utilities for past conduct or for conduct which they are otherwise obligated to undertake.[27]

15.    Consistent with this precedent, we continue to find that *CPUC* interpreted Order No. 679 to include a voluntariness requirement.

16.    We disagree with Dayton's reading of *CPUC* as requiring only a "case-by-case" examination of adders, and not a rigid voluntariness showing.[28] *CPUC* did state that a "case-by-case review of incentive adders" was necessary "even for utilities that have demonstrated ongoing membership in transmission organizations."[29] But we do not view this language as suggesting that a transmission owner that has been shown to have acted involuntarily could demonstrate entitlement to the RTO Adder based on other factors,

---

[24] RTO Adder Order, 176 FERC ¶ 61,025 at PP 26-30.

[25] 16 U.S.C. § 824s(c).

[26] Order No. 679, 116 FERC ¶ 61,057 at P 331.

[27] *CPUC*, 879 F.3d at 977.

[28] Dayton Request for Rehearing at 8-9; Indicated Owners Request for Rehearing at 9-12.

[29] *CPUC*, 879 F.3d at 974.

given the court's clear pronouncement elsewhere in the opinion that incentives must induce voluntary action.[30]  Rather, *CPUC* treats voluntariness as a threshold question.[31]

17.     We are also not convinced by EEI/WIRES' argument that Order No. 679 itself anticipated exceptions to the rule that continuing membership in an RTO needed to be "generally voluntary."[32]  EEI/WIRES point to a footnote in Order No. 679 that noted the incentive "applies to utilities that joined RTOs or ISOs because of merger conditions or market-based rate requirements."[33]  Merger conditions or market-based rate requirements do not create the same level of involuntariness as state law.  A transmission owner can avoid or unwind a merger, and a transmission owner can choose a form of rates other than market-based rates, but state law is unavoidable if a transmission owner wishes to operate in that state.  Regardless, even if Order No. 679 could be fairly read to create limited exceptions to the voluntariness requirement for merger conditions and market-based rate requirements, *CPUC* makes clear that no similar exception to Order No. 679 exists for situations where state law mandates RTO participation.[34]

18.     We decline to address arguments by Dayton, Indicated Owners and EEI/WIRES[35] that the Ninth Circuit's interpretation of Order No. 679 is in conflict with the plain language of section 219(c).  The parties are making a collateral attack on Order No. 679 by arguing that Order No. 679 failed to go as far as section 219(c) requires.[36]

---

[30] *Id.* at 977.

[31] *Id.*  In any case, the court in *CPUC* made clear that it had multiple bases for remanding the Commission's order, *id.* at 978 ("FERC *also* acted arbitrarily and capriciously by creating a generic adder") (emphasis added), and "where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*." *Woods v. Interstate Realty Co.*, 337 U.S. 535 (1949).

[32] EEI/WIRES Request for Rehearing at 7.

[33] *Id.* (quoting Order No. 679, 116 FERC ¶ 61,057 at n.180).

[34] *CPUC*, 879 F.3d at 977.

[35] Dayton Request for Rehearing at 4-5; Indicated Owners Request for Rehearing at 7-9; EEI/WIRES Request for Rehearing at 5-8.

[36] *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 823 F.3d 641, 651 (D.C. Cir. 2016) ("it is 'hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation' in an individual adjudication"); *ISO New England Inc.*, 138 FERC ¶ 61,238, at P 17 (2012) ("a collateral attack is an attack on a judgment in a proceeding other than a direct appeal, and is generally

Docket No. ER20-1068-003                                          - 8 -

The August 17 Order did not solicit briefing on this issue as part of the paper hearing, and it was not briefed by all parties.  As such, we find that this issue is beyond the scope of this proceeding.  To the extent the parties are suggesting that the Commission should adopt a new policy to take the place of Order No. 679 (as interpreted by the Ninth Circuit in *CPUC*), the merits of such a prospective policy change would be better addressed by another procedural vehicle such as the ongoing transmission incentives generic proceeding.[37]

### B.    Application of the Voluntariness Requirement

#### 1.    Requests for Rehearing

19.    Dayton and Indicated Owners claim that the Commission failed to acknowledge that the "transmission entity" membership required under the Ohio statute is not "co-extensive" with the "Transmission Organization" membership required to qualify for the RTO Adder under FPA section 219.[38]  Specifically, Dayton and Indicated Owners assert that a transmission owner such as Dayton could join a transmission entity that would not require it to give up as much transmission planning autonomy and still satisfy the Ohio statute,[39] providing as an example an "independent coordinator of transmission" (ICT) structure focused primarily on coordinating open-access rather than providing full operational control.[40]  Indicated Owners argue that the Commission has in the past only approved transmission organizations that engage in central planning.[41]  Dayton argues

----

prohibited" (internal citations omitted)).

[37] *See Elec. Transmission Incentives Pol'y Under Section 219 of the Fed. Power Act*, Notice of Proposed Rulemaking, 170 FERC ¶ 61,204 (2020) (Transmission Incentives NOPR); *Elec. Transmission Incentives Pol'y Under Section 219 of the Fed. Power Act*, Supplemental Notice of Proposed Rulemaking, 86 FR 21972 (Apr. 26, 2021), 175 FERC ¶ 61,035 (2021) (Supplemental NOPR).

[38] Dayton Request for Rehearing at 11-12; *see also* Indicated Owners Request for Rehearing at 22-24.

[39] Dayton Request for Rehearing at 13; Indicated Owners Request for Rehearing at 22-24.

[40] Dayton Request for Rehearing at 15 n.28.

[41] Indicated Owners Request for Rehearing at 24 (citing *Long-Term Firm Transmission Rights in Organized Electricity Mkts*, Order No. 681, 116 FERC ¶ 61,077, at P 454 (2006) (quoting for proposition that "'[t]he new FPA definition of transmission organization leaves open th[e] possibility' that there are 'transmission organizations other than ISOs and RTOs approved by the Commission,' but that '[a]t the current time,

that precedent such as *CPUC* does not prohibit a finding of voluntariness because Dayton could unilaterally leave PJM and join another "transmission organization" that does not qualify for the RTO Adder.[42]  Thus, according to Dayton, by joining an RTO that requires giving up such planning autonomy, Dayton should qualify for the RTO Adder here.[43]  Dayton argues that its reading of the federal and state requirements avoids any constitutional conflict by "harmonizing" the federal and Ohio statutes.[44]

20.    Indicated Owners argue that, because the RTO Adder Order concedes that the Ohio statute does not limit transmission owners "membership to PJM or another RTO," Dayton's membership in PJM is voluntary and Dayton is entitled to the RTO Adder.[45] Indicated Owners suggest that there are substantial benefits created by transmission owners joining an RTO rather than another form of transmission organization, and those benefits should be incentivized.[46]

21.    PJM argues[47] that the Commission made an advisory finding as to "the qualities of hypothetical Transmission Organizations that, if joined, would or would not trigger

---

however, RTOs and ISOs are the only such organizations approved by the Commission'")).

   [42] Dayton Request for Rehearing at 13-15.

   [43] *Id.* at 13.

   [44] *Id.* at 10-13.

   [45] Indicated Owners Request for Rehearing at 25 (quoting RTO Adder Order, 176 FERC ¶ 61,025 at P 57).

   [46] *Id.* at 25-28.

   [47] While PJM's pleading is nominally styled as a "Request for Clarification," in substance, this part of its request seeks rehearing because, for example, PJM claims that the Commission's discussion is inconsistent with requirements of the EPAct 2005. PJM Request for Clarification at 5 (citing Energy Policy Act of 2005, Pub. L. No. 109-58, §§ 1261 *et seq.*, 119 Stat. 594 (2005) (EPAct 2005)).  However, we reject PJM's filing for failing to meet the Commission's requirements for submission of a request for rehearing of a Commission order.  *See* 18 C.F.R. §§ 385.713(c)(1), (2) (2021). Nonetheless, given the overlap with issues raised by other parties, we address these issues below.  *See* Indicated Owners Request for Rehearing at 24 (raising question of whether Transmission Organizations were required to conduct transmission planning).

eligibility for incentive rate treatment."[48]  PJM claims that the Commission's statement that "the RTO Adder is not limited to a utility's membership in an RTO or ISO but to any Transmission Organization, and there is no requirement that a Transmission Organization plan for expansion of transmission facilities" is incorrect, and that transmission planning is central to Transmission Organization responsibilities.[49]  PJM believes that there is tension between the RTO Adder Order's definition of "Transmission Organization" and EPAct 2005's "requirements" for Transmission Organizations.[50]  Specifically, PJM believes the Commission's definition is in conflict with the legislative history of EPAct 2005 and Order No. 681, which suggest that transmission planning is a component of Transmission Owners' responsibilities.[51]

## 2.  <u>Commission Determination</u>

22.     We are not persuaded by Dayton and Indicated Owners' arguments that the term "transmission entity" as used by the Ohio statute applies to a broader set of entities than "Transmission Organization" as defined under the FPA and the Commission's regulations.[52]  Ohio Rev. Code, § 4928.12 requires that:  (1) all transmission owners transfer control of their facilities to a qualifying transmission entity; (2) this qualifying transmission entity must be approved by FERC; and (3) this transmission entity must meet various criteria listed in the statute.[53]  Thus, the language of the Ohio statute

---

[48] PJM Request for Clarification at 5.

[49] *Id.* at 5 (quoting RTO Adder Order, 176 FERC ¶ 61,025 at P 58 n.124).

[50] PJM Request for Clarification at 5.

[51] *Id.* (citing Order No. 681, 116 FERC ¶ 61,077 at P 454 (stating "we will require each transmission organization to include in its compliance filing an explicit statement of how its planning and expansion practices will take into account the need to accommodate" certain requirements).

[52] As noted above, a Transmission Organization is "a Regional Transmission Organization, Independent System Operator, independent transmission provider, *or other transmission organization finally approved by the Commission for the operation of transmission facilities.*"  16 U.S.C. § 796(29); 18 C.F.R. § 35.35(e) (emphasis added).

[53] Ohio Rev. Code, § 4928.12(A) & (B).  Under the Ohio statute, the qualifying transmission entity must also:  (1) effect separate control of transmission facilities from control of generation facilities; (2) implement policies and procedures designed to minimize pancaked transmission rates within the state; (3) improve service reliability within the state; (4) achieve the objectives of an open and competitive electric generation marketplace, elimination of barriers to market entry, and preclusion of control of

explicitly requires that the qualifying transmission entity must be approved by the Commission.  Moreover, the parties have not presented the Commission with any convincing examples of a qualifying transmission entity that Dayton could join that would not also qualify as a Transmission Organization entitled to the RTO Adder.  Thus, we continue to find that the Ohio statute "requires membership in a qualifying transmission entity that is a Transmission Organization."[54]  Therefore, Dayton is not entitled to the RTO Adder because Dayton's Transmission Organization "membership is not voluntary."[55]

23.     We are not persuaded by Dayton's argument that it could join an alternative model—such as an ICT structure focused primarily on coordinating open-access—and satisfy the Ohio statute without being designated a Transmission Organization.[56]  We do not believe that the ICT model outlined by Dayton would qualify under the Ohio statute because, the ICT structure proposed by Dayton does not involve the transfer of "operational control of facilities to the ICT,"[57] and as a result would not satisfy the language of Ohio Rev. Code, § 4928.12(A).[58]  Further, the Ohio Supreme Court has interpreted Ohio Rev. Code, § 4928.12 to "require[ ] electric companies to join regional transmission organizations,"[59] and we defer to that interpretation by the "highest court in

---

bottleneck electric transmission facilities in the provision of retail electric service; (5) be of sufficient scope or otherwise operate to substantially increase economical supply options for consumers; (6) have a governance structure or control that is independent of the users of the transmission facilities; (7) operate under policies that promote positive performance designed to satisfy the electricity requirements of customers; and (8) be capable of maintaining real-time reliability of the electric transmission system, ensuring comparable and nondiscriminatory transmission access and necessary services, minimizing system congestion, and further addressing real or potential transmission constraints.  Ohio Rev. Code, §§ 4928.12 (B)(2)-(B)(9).

[54] RTO Adder Order, 176 FERC ¶ 61,025 at P 57.

[55] *CPUC*, 879 F.3d at 974-75, 977.

[56] Dayton Request for Rehearing at 15 n.28.

[57] RTO Adder Order, 176 FERC ¶ 61,025 at P 62.

[58] Ohio Rev. Code, § 4928.12 (A) (requiring the transfer of control); *see also* RTO Adder Order, 176 FERC ¶ 61,025 at PP 60-62 (rejecting alternative interpretations of the term "control").

[59] *Ohio Consumers' Couns. v. Pub. Util. Comm*., 111 Ohio St. 3d 384, at P 36

the appropriate state."[60]  In *Ohio Consumers*, the Ohio Supreme Court quoted
FERC-related precedent to describe the entities transmission owners must join, including
that the entities "'combine[ ] multiple power grids into a single transmission system'"
such that "each of them 'controls electricity transmission assets.'"[61]  The Ohio Supreme
Court noted that, "[o]nce FERC has designated a corporation as a regional transmission
organization, 'electricity-generating plants can interconnect with transmission lines
owned by [the organization] and then sell energy to one another.'"[62]  This interpretation
is inconsistent with the amount of control given from the transmission owner to a
qualifying entity in an ICT-type model, and shows an intent to follow the definition of
Transmission Organization in the FPA and the Commission's regulations.  Thus, we
continue to find that the Ohio Rev. Code, § 4928.12 would not be satisfied by the
alternative models the parties propose.[63]

---

(2006) (*Ohio Consumers*).

[60] *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 158
(1948).  Even if this were not the case, for the reasons discussed above and in the
RTO Adder Order, 176 FERC ¶ 61,025 at PP 57-62, we believe that the Ohio Supreme
Court's interpretation of the Ohio statute is the most logical reading of Ohio Rev. Code,
§ 4928.12.

[61] *Id.* P 5 (quoting *FPL Energy Marcus Hook, L.P. v. FERC.*, 430 F.3d 441, 443
(2005)).

[62] *Id.*

[63] In fact, Dayton itself argued to the Ohio Supreme Court in that proceeding that
Ohio Rev. Code, § 4928.12 required Dayton's "participation in a regional transmission
organization" without mentioning any alternative options such as joining an ICT
structure.  *Ohio Consumers' Couns. v. Pub. Util. Comm.*, Merit Brief of Intervening
Appellee, DPL, 2006 WL 402605 (Ohio) (Appellate Brief) ("This case is about the
authority of The Public Utilities Commission of Ohio to oversee the accounting practices
of Ohio public utilities under [Ohio Rev. Code, § 4905.13].  In the case below, the
Commission granted accounting authority to [Dayton] to defer, during its market
development period ("MDP"), certain expenses associated with [Dayton's] participation
in a regional transmission organization, *which [Dayton] was required by [Ohio Rev.
Code, § 4928.12] to join*.") (emphasis added).  The Ohio Supreme Court granted
Dayton's requested changes to its accounting procedures based in part on this undisputed
interpretation of the statute.  *See Ohio Consumers*, 111 Ohio St. 3d 384.

24.     We are also not convinced by Dayton's arguments that *PG&E*, the order on remand following *CPUC*, requires a different outcome here.[64]  In *PG&E*, the Commission found that the state encouraged transmission owners to join RTOs rather than mandating membership.[65]  Unlike *PG&E*, the Ohio statute at issue here does not use permissive language and instead provides mandatory requirements.[66]  Thus, we continue to find here that the RTO Adder is not justified because Dayton's Transmission Organization "membership is not voluntary."[67]

25.     Given that the Ohio Supreme Court has interpreted the Ohio statute to require participation in a "transmission organization" that follows the Commission's definition,[68] we find that we do not need to reach the questions raised by both PJM[69] and Indicated Owners[70] regarding whether all Transmission Organizations must engage in some transmission planning.  As discussed above, the Ohio Supreme Court's interpretation means that transmission owners *must* join a Transmission Organization, and under Commission precedent only *voluntarily* joining a Transmission Organization entitles a transmission owner to an RTO Adder.  The Ohio statute's requirement to join a Transmission Organization approved by the Commission remains whether or not Transmission Organizations must conduct transmission planning.

26.     We recognize that the RTO Adder Order could be read as an advisory finding that "there is no requirement that a Transmission Organization plan for expansion of transmission facilities."[71]  Accordingly, we modify the RTO Adder Order insofar as it could be read to rule on that matter.  As explained above, whether or not a Transmission Organization must conduct transmission planning is irrelevant to our determination in this matter that Dayton does not qualify for an RTO Adder.

---

[64] Dayton Request for Rehearing at 13-15.

[65] *PG&E*, 168 FERC ¶ 61,038, at PP 40-41 (2019), *order on reh'g*, 170 FERC ¶ 61,194, at PP 11-12 (2020).

[66] Ohio Rev. Code, § 4928.12.

[67] *CPUC*, 879 F.3d at 974-75, 77.

[68] *Ohio Consumers*, 111 Ohio St. 3d 384 at P 36.

[69] PJM Request for Clarification at 5.

[70] Indicated Owners Request for Rehearing at 25.

[71] RTO Adder Order, 176 FERC ¶ 61,025 at P 58.

Docket No. ER20-1068-003                                                    - 14 -

### C.    <u>Federalism Considerations</u>

#### 1.    <u>Requests for Rehearing</u>

27.    Dayton argues that the Ohio statute should be considered preempted by the Constitution to preserve what it describes as the "federally-mandated" incentive.[72] Dayton argues that the Ohio statute is preempted in two ways: (1) section 219 established an incentive to be granted by the Commission in situations where transmissions owners joined transmission organizations, and states had no right or ability to interfere with that incentive;[73] and (2) Ohio had no right to make participation in transmission organizations mandatory where Congress and the Commission permitted such participation to be voluntary.[74] Dayton argues that allowing such state actions would nullify Congressional intent.[75]

28.    Similarly, Indicated Owners argue that the Commission has authority over RTO participation, and the states cannot dictate participation in them.[76] Indicated Owners argue that the Ohio statute is preempted under the supremacy clause based on theories of both field preemption and conflict preemption.[77] While Indicated Owners concede that the Commission does not have the authority to invalidate state laws, Indicated Owners suggest that it should not adopt policies that allow states to dictate jurisdictional rates and argue that the Commission is providing "tacit approval of states subjecting utilities to federal filing requirements."[78]

29.    EEI/WIRES argue that state intent and policy goals should not trump federal intent and policy goals.[79] EEI/WIRES argue that the federal intent was to provide an incentive

---

[72] Dayton Request for Rehearing at 18-21.

[73] *Id.* at 19.

[74] *Id.* at 19-21.

[75] *Id.* at 21.

[76] Indicated Owners Request for Rehearing at 16-22.

[77] *Id.* at 18.

[78] *Id.* at 20.

[79] EEI/WIRES Request for Rehearing at 8-9.

Docket No. ER20-1068-003                                              - 15 -

for joining RTOs, and that eligibility should not rest on a state's policy around RTO participation.[80]

30.    EEI/WIRES argue that legal precedent bars states from compelling a public utility to make a section 205 filing, which they state is the only route to RTO participation.[81] They argue that permitting states to require transmission organization membership would preempt federal policy, which "with regard to RTOs has long been that membership in such organizations should be voluntary."[82]

## 2.    Commission Determination

31.    We continue to find that this proceeding is an inappropriate vehicle to address preemption concerns. As stated in the RTO Adder Order:

> This filing turns on whether accepting the proposed rate, i.e., the RTO Adder, would be just and reasonable, which, as relevant here and as discussed above, requires the Commission to consider whether a utility is currently a member of a Transmission Organization and whether that membership is voluntary.  By contrast, Supporting Parties['] preemption arguments seek a determination from the Commission regarding the constitutionality of an Ohio law. We find that, given the facts and circumstances before us, Dayton's Incentive Rate Application is not an appropriate procedural vehicle to address the constitutionality of the Ohio statute.[83]

32.    Thus, we continue to decline to address Dayton, Indicated Owners and EEI/WIRES' arguments regarding preemption.  As we noted in the August 17 Order, even if we agreed that the statute was preempted, only a federal court has the ultimate authority to invalidate the Ohio Statute.  Therefore, given this fact and the others outlined in the August 17 Order, we exercise our discretion not to further address the preemption

---

[80] *Id.* at 8-9.

[81] *Id.* at 10-11.

[82] *Id.*

[83] 176 FERC ¶ 61,025 at P 71 (internal citations omitted).

issue.[84]  As the facts stand currently before us, the Ohio law is in place, rendering Dayton's RTO participation mandatory.

33.     We are also not persuaded by the parties' various other arguments related to federalism.  Indicated Owners' argue that, even if the Commission cannot invalidate the state law, the Commission "*should* decline to adopt policies that allow a state law (or other state mandate) to dictate the level and form of Commission-jurisdictional rates under the FPA."[85]  Indicated Owners claim that the Commission is allowing "states to dictate which utilities are eligible for the Congressionally-mandated incentive, and which are not."[86]  Indicated Owners and EEI/WIRES argue that the Commission is providing "tacit approval of states subjecting utilities to federal filing requirements."[87]

34.     We disagree.  As noted, the court explained in *CPUC* that the Commission "has a longstanding policy," which was "incorporated in Order [No.] 679," that "prohibits [it] from rewarding utilities for past conduct or for conduct which they are otherwise obligated to undertake."[88]  The court further explained that providing an RTO Adder to a public utility that was obligated under state law to participate in a Transmission Organization violated that policy and Order No. 679, and it overturned the Commission's orders on that ground, among others.[89]

35.     Indicated Owners' and EEI/WIRES's arguments would require the Commission to contravene the very policy described in *CPUC*.  As, for the reasons explained,[90] Dayton is "obligated" to participate in a Transmission Organization, it would be inconsistent with

---

[84] *Id.*

[85] Indicated Owners Request for Rehearing at 20 (emphasis in original) (citing *Cities of Bethany v. FERC*, 727 F.2d 1131, 1137 (D.C. Cir. 1984); *Advanced Energy Econ.*, 163 FERC ¶ 61,030 (2018) (*Advanced Energy*); *Tri-State Generation & Transmission Ass'n, Inc.*, 172 FERC ¶ 61,173 (2020) (*Tri-State*)).

[86] *Id.* at 17.

[87] *Id.* at 21-22 (discussing *Mass. Dep't of Pub. Utils. v. United States*, 729 F.2d 886, 888 (1st Cir. 1984)); *see also* EEI/WIRES Request for Rehearing at 10-11.

[88] *CPUC*, 879 F.3d at 977.

[89] *Id.* at 978.

[90] *See supra* PP 22-24.

Commission policy and Order No. 679 to reward Dayton with a windfall for an action that it has no choice but to take.  We see no reason to depart from that policy here.

36.    To the extent that Indicated Owners' and EEI/WIRES's arguments could be read as advocating that the Commission abandon its longstanding policy and overrule its incorporation in Order No. 679, we also decline to do so.  We continue to believe that "only providing incentives to induce future voluntary conduct"[91] is good policy and appropriately balances Congress's direction in FPA section 219(c) with section 219(d)'s requirement that rates, including incentive adders, must remain just and reasonable and not unduly discriminatory or preferential.[92]  In addition, that policy has been incorporated into Commission precedent on incentives through notice-and-comment rulemaking and we believe it would be inappropriate to unilaterally abandon that policy in an adjudication involving a single public utility, especially when the Commission has opened a rulemaking proceeding to consider this very issue, among others.[93]

## D.    Procedural Considerations

### 1.    Requests for Rehearing

37.    Dayton and EEI/WIRES argue that the Commission should have used a generic rulemaking to address voluntariness, especially given the ongoing rulemaking addressing the RTO Adder.[94]  Dayton argues that section 219(a) requires incentives to be established by rulemaking, and once a rulemaking establishes the incentives then precedent limits further changes to the rules if such changes would cause undue hardship or circumvent the Administrative Procedure Act (APA)'s rulemaking procedures.[95]  Dayton argues that the RTO Adder Order represents a shift in policy, and would both cause Dayton hardship and circumvent the APA.[96]

---

[91] *CPUC*, 879 F.3d at 978.

[92] 16 U.S.C. § 824s(d).

[93] *See* Transmission Incentives NOPR, 170 FERC ¶ 61,204; Supplemental NOPR, 175 FERC ¶ 61,035.

[94] Dayton Request for Rehearing at 21-26 (discussing Transmission Incentives NOPR, 170 FERC ¶ 61,204); EEI/WIRES Request for Rehearing at 12-13.

[95] Dayton Request for Rehearing at 23 (citing *Cities of Anaheim v. FERC*, 723 F.2d 656, 659 (9th Cir. 1984); *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1010 (9th Cir. 1981), *cert. denied*, 459 U.S. 999 (1982)).

[96] *Id.* at 23-26; *see also* EEI/WIRES Request for Rehearing at 12-13 (arguing that

Docket No. ER20-1068-003                                                    - 18 -

38.     Indicated Owners argue that evaluating the "voluntariness" of transmission owners' participation in transmission organizations would be an unexplained shift in position by the Commission from the "longstanding policy" that RTO participation was voluntary.[97]

39.     Relatedly, PJM requests clarification that nothing in the RTO Adder Order was intended to pre-judge matters involved in the Transmission Incentives NOPR.[98]

## 2.      **Commission Determination**

40.     We are not persuaded by the arguments that the Commission should have waited for the generic proceeding to address whether Dayton's participation in PJM or another Transmission Organization is voluntary.  As discussed in the RTO Adder Order:

> It is not appropriate to defer action on Dayton's request for an RTO Adder until after resolution of any potential generic final rule that may result from the Transmission Incentives NOPR or Supplemental NOPR, as regardless of the outcome of those proceedings, we would need to apply the requirements of Order No. 679 to determine Dayton's rates for the locked-in period prior to the effective date of any new final rule.[99]

41.     We disagree with the position held by Indicated Owners that the RTO Adder Order represents a shift from the Commission's prior position in *PG&E* that, "under Commission precedent and policy, [a utility's] participation in [an RTO] is voluntary."[100] While Indicated Owners are correct that participation in Transmission Organizations is voluntary under Commission precedent and policy, the Ohio statute is not a product of Commission precedent or policy—and so cannot mark a shift thereof.  As the court in *CPUC* found, where a transmission owner acts involuntarily as a result of state action, the

---

the RTO Adder Order circumvents the APA).

[97] Indicated Owners Request for Rehearing at 12-14.

[98] PJM Request for Clarification at 3-4.

[99] RTO Adder Order, 176 FERC ¶ 61,025 at P 25.

[100] Indicated Owners Request for Rehearing at 13 (quoting *PG&E*, 168 FERC ¶ 61,038 at P 51); *see also* EEI/WIRES Request for Rehearing at 11 (arguing "federal policy with regard to RTOs has long been that membership in such organizations should be voluntary").

Document Accession #: 20220419-3113    Document: 66    Filed Date: 02/17/2022
Case: 21-4072    Document: 66    Filed: 12/15/2023    Page: 306

Docket No. ER20-1068-003                                                    - 19 -

Commission must consider its other "longstanding Commission policy that incentives should only be awarded to induce future behavior."[101]  The Commission's order in *PG&E*, on remand from the *CPUC* decision, did not modify that finding.[102]

42.    Similarly, we are not persuaded by Dayton's argument[103] that the Commission has departed from a policy of not requiring voluntariness to qualify for the RTO Adder. Dayton asserts that this policy existed because "all prior rulings related to the 219(c) Incentive as applied throughout PJM" permitted other transmission owners to receive the incentive.[104]  In the cases cited by Dayton, the issue of the Ohio statute's impact was not addressed by the Commission.  Indeed, Dayton has not pointed to any case where the RTO Adder has been challenged in Ohio and the Commission has granted that incentive. Accordingly, the cases cited by Dayton do not establish a policy regarding voluntariness. Even assuming *arguendo* that, prior to the *CPUC* decision, the Commission's policy had been to grant the RTO Adder in Ohio without requiring a voluntariness showing, such a policy could not have survived the Ninth Circuit's interpretation of Order No. 679 in *CPUC*.[105]  Following that decision, the Commission was required to determine whether RTO membership was voluntary before granting the incentive.

43.    Finally, in response to PJM's request, we find that it is unnecessary to clarify that nothing in the RTO Adder Order pre-judged matters involved in the Transmission Incentives NOPR.[106]  The Commission in the RTO Adder Order expressly stated that it was addressing the merits of only the issue of Dayton's qualification for the RTO Adder to resolve the proper rates covering the "locked-in period prior to the effective date of

---

[101] *CPUC*, 879 F.3d at 977.

[102] *Id.; cf. PG&E*, 168 FERC ¶ 61,038 (Glick, Comm'r concurring at P 3) (noting that the Commission's "decision to resolve this proceeding based entirely on an inquiry into whether [Pacific Gas and Electric Company (PG&E)] is required to remain in [California Independent System Operator (CAISO)]—suggests that, if state law actually required PG&E to remain in CAISO, an RTO-Participation Incentive might well be inappropriate.").

[103] Dayton Request for Rehearing at 23.

[104] *Id.*

[105] *CPUC*, 879 F.3d at 978 (awarding incentive adders to a company required to belong to an RTO "was a departure from FERC's longstanding policy that incentives should only be awarded to induce voluntary conduct").

[106] PJM Request for Clarification at 3-4.

Docket No. ER20-1068-003                                                    - 20 -

any new final rule."[107]  Having made that express statement, we find that PJM's requested clarification is unnecessary.

### E.    **Arbitrariness Considerations**

#### 1.    **Requests for Rehearing**

44.    Dayton argues that it is arbitrary for the Commission to reject RTO Adders in states where RTO membership is mandatory because transmission owners in such states lose the right to the incentive while those in other states with less strict rules maintain them.[108]  Dayton argues that the RTO Adder Order is also arbitrary because prior transmission owners were, to its knowledge, all granted the RTO Adder even when a state requirement of participation like Ohio's was in place.[109]  Dayton notes that Virginia, Michigan and Illinois all have requirements that transmission owners belong to a transmission organization.[110]  Dayton argues that other transmission owners in Ohio and subject to the Ohio statute have been granted the RTO Adder.[111]  Dayton claims that this leads to arbitrary outcomes, disincentives to invest in transmission and unfair competition outcomes for transmission owners.[112]

45.    Similarly, Indicated Owners and EEI/WIRES argue that the RTO Adder Order is arbitrary and capricious because it ignores the "substantial benefits" to customers and burdens to transmission owners caused by RTO participation.[113]  Indicated Owners and EEI/WIRES suggest that transmission owners that are required by state law to join RTOs

---

[107] RTO Adder Order, 176 FERC ¶ 61,025 at P 25 (finding that "regardless of the outcome of [the Transmission Incentives NOPR], we would need to apply the requirements of Order No. 679 to determine Dayton's rates for the locked-in period prior to the effective date of any new final rule").

[108] Dayton Request for Rehearing at 4-5.

[109] *Id.* at 15-18.

[110] *Id.* at 15.

[111] *Id.* at 17.

[112] *Id.*

[113] Indicated Owners Request for Rehearing at 14-17; EEI/WIRES Request for Rehearing at 9-10.

face the same benefits and burdens as those who join voluntarily, and it creates arbitrary advantages in the market to reward transmission owners in states without such laws.[114]

### 2.    Commission Determination

46.    We are not persuaded by Dayton, Indicated Owners and EEI/WIRES' various arguments[115] that requiring a showing of voluntariness is arbitrary because owners in such states lose the right to the incentive while those in other states with less strict rules maintain them.  As discussed above, that outcome is consistent with Order No. 697 as interpreted in *CPUC*.[116]  That outcome is a result of state law, and not because of an arbitrary application of the Commission's criteria.

47.    We also are not persuaded by Dayton's argument[117] that our finding that Dayton is ineligible for the RTO Adder is arbitrary because the Commission previously granted the RTO Adder to other Ohio utilities and in other states that Dayton claims have statutes similar to Ohio's.  First, the proceedings to which Dayton cites all predate the 2018 *CPUC* decision, which underlies our finding here.[118]  Second, no complaints were filed regarding the other utilities' incentive applications on this basis, and the issue of the Ohio statute's impact on voluntariness has never been directly addressed by the Commission.  In this proceeding, the Commission has only evaluated the impact of the Ohio statute on Dayton's application.  Any issues regarding the RTO Adder and the voluntariness requirement that go beyond Dayton's application or Ohio's statute would be more properly addressed in potential future proceedings involving other utilities.

---

[114] Indicated Owners Request for Rehearing at 16; EEI/WIRES Request for Rehearing at 10.

[115] Dayton Request for Rehearing at 4-5; Indicated Owners Request for Rehearing at 14-17; EEI/WIRES Request for Rehearing at 9-10.

[116] *CPUC*, 879 F.3d at 977.

[117] Dayton Request for Rehearing at 17.

[118] *See* Dayton Request for Rehearing at 17 (citing *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029, at PP 10, 14 (2015); *American Elec. Power Serv. Corp.*, Certification of Uncontested Settlement, 131 FERC ¶ 63,012, at P 13 (2010), *approved by* 133 FERC ¶ 61,007 (2010). *PJM Interconnection, L.L.C.*, Certification of Uncontested Settlement, 152 FERC ¶ 63,020, at P 13 (2015), *approved by* 153 FERC ¶ 61,106 (2015)).

Docket No. ER20-1068-003                                              - 2 -

<u>The Commission orders</u>:

     In response to the requests for rehearing and clarification, the RTO Adder Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.  Commissioner Danly is dissenting with a separate statement
                                 attached.

( S E A L )

                                       Debbie-Anne A. Reese,
                                       Deputy Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

The Dayton Power and Light Company                    Docket No.  ER20-1068-003

(Issued February 17, 2022)

DANLY, Commissioner, *dissenting*:

1.      I would grant rehearing and approve The Dayton Power and Light Company's 50 basis point adder for Regional Transmission Organization (RTO) participation.  As I wrote in my dissent when the Commission originally rejected the adder,[1] section 219(c)[2] of the Federal Power Act states that "the Commission shall . . . provide for incentives to each transmitting utility or electric utility *that* joins a Transmission Organization."[3] There is no requirement in the statute for the utility to voluntarily join an RTO.  The Commission itself established that extra-statutory requirement in Order No. 679 and subsequent orders.[4]

2.      I am aware of no instance where an appellate court has ruled that the Commission's Order No. 679 interpretation is consistent with the statute.[5]  It is not.

---

[1] *The Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (2021) (Danly, Comm'r, dissenting).

[2] 16 U.S.C. § 824s(c).

[3] *The Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (2021) (Danly, Comm'r, dissenting at P 2).

[4] *See Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, at P 331 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[5] *See Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966, 975 (9th Cir. 2018) (ruling that under Order No. 679, "the voluntariness of a utility's membership in a transmission organization is logically relevant to whether it is eligible for an adder" but not opining on whether Order No. 679 is consistent with FPA section 219(c)).

Docket No. ER20-1068-003                                             - 2 -

3.      Nothing in the majority's opinion on rehearing changes my mind about the plain language of section 219(c).[6]  The "voluntariness" requirement is the Commission's creation and remains at odds with the statute.

      For these reasons, I respectfully dissent.

_____

James P. Danly
Commissioner

---

[6] *See The Dayton Power & Light Co.*, 178 FERC ¶ 61,102 (2022).

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

The Dayton Power and Light Company,   )
American Electric Power Service        )
Corporation, Duke Energy Ohio, Inc.,   )
FirstEnergy Service Company,         )
Petitioners,                      )
                             )
                             )    Case No. 21-_____
       v.                       )
                             )
Federal Energy Regulatory Commission,  )
    Respondent.                 )
                             )
                             )
                             )

# PETITION FOR REVIEW OF THE DAYTON POWER AND LIGHT
# COMPANY, AMERICAN ELECTRIC POWER SERVICE
# CORPORATION, DUKE ENERGY OHIO, INC. AND FIRSTENERGY
# SERVICE COMPANY

Pursuant to Section 313(b) of the Federal Power Act ("FPA"), 16 U.S.C.

§ 825*l*(b), Rule 15(a) of the Federal Rules of Appellate Procedure ("FRAP"), and

Rule 15 of the Circuit Rules of the United States Court of Appeals for the Sixth

Circuit, The Dayton Power and Light Company dba AES Ohio ("AES Ohio"),

American Electric Power Service Corporation ("AEPSC"), Duke Energy Ohio,

Inc. ("Duke Energy Ohio"), and FirstEnergy Service Company ("FirstEnergy")

(collectively "Petitioners") hereby petition this Court for review of the following

orders of the Federal Energy Regulatory Commission ("FERC" or "Commission")

entered in FERC Docket No. ER20-1068:

**JA304**

- *The Dayton Power and Light Company*, Order on Paper Hearing, 176 FERC ¶ 61,025 (July 15, 2021) ("July 15 Order"); and

- *The Dayton Power and Light Company*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 176 FERC ¶ 62,136 (Sept. 16, 2021) ("Denial of Rehearing by Operation of Law").

These orders were entered in a proceeding initiated by Petitioner AES Ohio under Section 205 of the FPA, 16 U.S.C. § 824d.  Copies of these orders are attached hereto as **Exhibit A** and **Exhibit B** respectively.

The Commission's orders involved a request by AES Ohio to recover a 50-basis point adjustment to its Return on Equity ("ROE") as an incentive for its membership within PJM Interconnection, L.L.C. (PJM).  Each of the Petitioners timely filed a request for rehearing of the Commission's July 15 Order on August 13, 2021.  On September 16, 2021, the Commission denied rehearing by operation of law.  15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2021); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).  The Petitioners are thereby aggrieved by the Commission's ruling in the above-referenced orders and the above-referenced orders are ripe for review.

Each of the Petitioners is located in and has its principal place of business within this Circuit: AES Ohio's principal place of business is Dayton, Ohio; AEPSC's principal place of business is Columbus, Ohio; Duke Energy Ohio's principal place of business is Cincinnati, Ohio; and FirstEnergy's principal place of business is Akron, Ohio.

Respectfully submitted,

/s/ Stacey Burbure
Stacey Burbure
Senior Counsel
American Electric Power Service Corp.
801 Pennsylvania Ave, NW
Suite 735
Washington, DC 20004
(202) 383-3452
slburbure@aep.com

Counsel for AEPSC

/s/ Morgan E. Parke
Morgan E. Parke
Associate General Counsel
P. Nikhil Rao
Senior Corporate Counsel
FirstEnergy Service Company
76 South Main St.
Akron, OH 44308
(330) 384-2422
mparke@firstenergycorp.com
pnrao@firstenergycorp.com

Counsel for FirstEnergy

/s/ Johanna Dennehy
Johanna Dennehy
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, D.C.  20036
(202) 429-5515
jdennehy@steptoe.com

Counsel for AEPSC

/s/ Heather M. Horne
Heather M. Horne
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave., NW
Suite 200
Washington, DC  20004
Phone: (202) 824-8009
heather.horne@duke-energy.com

Counsel for Duke Energy Ohio

/s/ Randall V. Griffin
Randall V. Griffin
Chief Regulatory Counsel
AES US Services, LLC
1065 Woodman Drive
Dayton, OH 45432
(937) 479-8983
randall.griffin@aes.com

Counsel for AES Ohio

Dated:  November 15, 2021

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

The Dayton Power and Light Company,  )
American Electric Power Service  )
Corporation, Duke Energy Ohio, Inc.,  )
FirstEnergy Service Company,  )
Petitioners,  )
  )
  )    Case No. 22-\_\_\_\_\_
      v.  )
  )
Federal Energy Regulatory Commission,  )
    Respondent.  )
  )
  )
  )

# PETITION FOR REVIEW OF THE DAYTON POWER AND LIGHT COMPANY, AMERICAN ELECTRIC POWER SERVICE CORPORATION, DUKE ENERGY OHIO, INC. AND FIRSTENERGY SERVICE COMPANY

Pursuant to Section 313(b) of the Federal Power Act ("FPA"), 16 U.S.C. § 825*l*(b), Rule 15(a) of the Federal Rules of Appellate Procedure ("FRAP"), and Rule 15 of the Circuit Rules of the United States Court of Appeals for the Sixth Circuit, The Dayton Power and Light Company dba AES Ohio ("AES Ohio"), American Electric Power Service Corporation ("AEPSC"), Duke Energy Ohio, Inc. ("Duke Energy Ohio"), and FirstEnergy Service Company ("FirstEnergy") (collectively "Petitioners") hereby petition this Court for review of the following orders of the Federal Energy Regulatory Commission ("FERC" or "Commission")

entered in FERC Docket No. ER20-1068:

- Order on Paper Hearing, *Dayton Power & Light Co.*, 176 FERC
  ¶ 61,025 (2021); and

- Order Addressing Arguments Raised on Rehearing, *Dayton Power
  & Light Co.*, 178 FERC ¶ 61,102 (2022).

The foregoing orders were entered in a proceeding initiated by Petitioner AES

Ohio under Section 205 of the Federal Power Act, 16 U.S.C. § 824d. Copies of the

orders are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

The foregoing orders involved a request by AES Ohio to recover a 50-basis

point adjustment to its Return on Equity ("ROE") as an incentive for its

membership within PJM Interconnection, L.L.C. (PJM). On July 15, 2021, the

Commission issued an Order on Paper Hearing with respect to this application.

*See* Order on Paper Hearing, *Dayton Power & Light Co.*, 176 FERC ¶ 61,025

(2021) ("July 2021 Order"). Each of the Petitioners timely filed a request for

rehearing of the Commission's July 2021 Order on August 13, 2021. On

September 16, 2021, the Commission denied rehearing by operation of law. *See*

Notice of Denial of Rehearing by Operation of Law and Providing for Further

Consideration, *Dayton Power & Light Co.*, 176 FERC ¶ 62,136 (2021)

("September 2021 Order").

On November 15, 2021, Petitioners timely petitioned for review of the July

**JA308**

2021 Order and September 2021 Order on grounds that their requests for rehearing had been denied by operation of law, pursuant to section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc). *See Dayton Power and Light Co. et al. v. FERC*, 6th Cir. Appeal No. 21-4072. Appeal No. 21-4072 has been held in abeyance since December 30, 2021 in anticipation of the Commission issuing a further order setting out its justification for denying rehearing by operation of law, and the Petitioners in Appeal No. 21-4072 appealing that order.

On February 17, 2022, the Commission issued an order setting out its grounds for denying rehearing of its July 2021 Order. *See* Order Addressing Arguments Raised on Rehearing, *Dayton Power & Light Co.*, 178 FERC ¶ 61,102 (2022) ("February 2022 Order"). This petition timely seeks review of the February 2022 Order. *See* 16 U.S.C. § 825*l*(b). Once this petition is docketed, Petitioners intend to move to consolidate this appeal with Appeal No. 21-4072 and to file a motion to govern further proceedings in both dockets.[1]

Each of the Petitioners is located in and has its principal place of business within this Circuit: AES Ohio's principal place of business is Dayton, Ohio;

---

[1] Although Petitioners already petitioned for review of the July 2021 Order in Appeal No. 21-4072, they have included the July 2021 Order in this petition to preserve all rights in the event that the two appeals are not consolidated and proceed separately.

3

AEPSC's principal place of business is Columbus, Ohio; Duke Energy Ohio's

principal place of business is Cincinnati, Ohio; and FirstEnergy's principal place of

business is Akron, Ohio.

Respectfully submitted,

/s/ Stacey Burbure
Stacey Burbure
Senior Counsel
American Electric Power Service Corp.
801 Pennsylvania Ave, NW
Suite 735
Washington, DC 20004
(202) 383-3452
slburbure@aep.com

Counsel for American Electric Power
Service Corporation

/s/ P. Nikhil Rao (by permission)
Morgan E. Parke
Associate General Counsel
P. Nikhil Rao
Senior Corporate Counsel
FirstEnergy Service Company
76 South Main St.
Akron, OH 44308
(330) 384-2422
mparke@firstenergycorp.com
pnrao@firstenergycorp.com

Counsel for FirstEnergy Service
Company

/s/ William M. Keyser
William M. Keyser
Johanna Dennehy
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, D.C.  20036
(202) 429-3000
wkeyser@steptoe.com
jdennehy@steptoe.com

Counsel for American Electric Power
Service Corporation

/s/ Heather M. Horne (by permission)
Heather M. Horne
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave., NW
Suite 200
Washington, DC  20004
Phone: (202) 824-8009
heather.horne@duke-energy.com

Counsel for Duke Energy Ohio, Inc.

/s/ Randall V. Griffin (by permission)
Randall V. Griffin
Chief Regulatory Counsel
AES US Services, LLC
1065 Woodman Drive
Dayton, OH 45432

4

(937) 479-8983
randall.griffin@aes.com

*Counsel for The Dayton Power and
Light Company d/b/a AES Ohio*

Dated:  April 18, 2022

5