**Nos. 21-4072, 22-3351, 23-3196, 23-3324, 23-3366, & 23-3417**

In the

# United States Court of Appeals

## For the Sixth Circuit

———————

DAYTON POWER & LIGHT COMPANY, d/b/a AES OHIO, et al.,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

———————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———————

**FINAL BRIEF OF INTERVENOR DUKE ENERGY OHIO, INC.
IN SUPPORT OF RESPONDENT FEDERAL ENERGY
REGULATORY COMMISSION IN NOS. 23-3324 AND 23-3417**

———————

Heather M. Horne
DUKE ENERGY
CORPORATION
1301 Pennsylvania
Avenue, NW
Suite 200
Washington, DC 20004
T: (202) 824-8009

Noel H. Symons
Carrie Mobley
MCGUIREWOODS LLP
888 16th Street, NW
Suite 500
Washington, DC 20006
T: (202) 857-1700

Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

December 21, 2023

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 21-4072 (lead)    Case Name: Dayton Power & Light Company, et al. v. FERC

Name of counsel: Matthew A. Fitzgerald

Pursuant to 6th Cir. R. 26.1, Duke Energy Ohio, Inc.
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

Yes. Duke Energy Ohio is a direct, wholly-owned subsidiary of Cinergy Corp, which in turn is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK), a publicly traded company listed on the New York Stock Exchange.  Certain investment management companies —such as Vanguard Group, Inc.—may from time-to-time, through their subsidiaries and affiliates, own 10% or more of Duke Energy Corp. stock.  Otherwise, no entity owns 10% or more of Duke Energy Corp.'s stock.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ December 21, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Matthew A. Fitzgerald

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

i

# TABLE OF CONTENTS

**Page**

ORAL ARGUMENT STATEMENT ........................................................ 1

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE .............................................................. 3

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT ........................................................................................ 6

I.    Duke's settlement was extensively negotiated, meaningfully
      compromised, found fair by the Commission, and its overall
      ROE remains unchallenged today. ............................................ 6

II.   OCC and Buckeye's efforts to isolate Duke's adder fail. ......... 13

      A.    It does not matter if Duke "likely" could have obtained
            the adder in a separate proceeding. .................................. 14

      B.    There is no "undue discrimination" against Duke's
            customers. .......................................................................... 16

      C.    The adder is not an artificial inflation of Duke's ROE,
            and just because it is identifiable does not make it
            severable from the settlement. ......................................... 18

III.  Section 206 requires a finding that the overall ROE is unjust
      and unreasonable before baked-in components can be
      revisited. .................................................................................... 23

CONCLUSION ................................................................................... 29

# TABLE OF AUTHORITIES

**Page**

## Court Cases

*Cities of Bethany v. FERC,*
    727 F.2d 1131 (D.C. Cir. 1984) ........................................................... 17

*Emera Maine v. FERC,*
    854 F.3d 9 (D.C. Cir. 2017) ................................................................... 23

*Int'l Transmission Co. v. FERC,*
    988 F.3d 471 (D.C. Cir. 2021) .............................................................. 25

*MISO Transmission Owners v. FERC,*
    860 F.3d 837 (6th Cir. 2017) ......................................................... 10, 13

*Sithe/Independence Power Part., L.P. v. FERC,*
    165 F.3d 944 (D.C. Cir. 1999) .............................................................. 25

*United Mun. Distrib. Grp. v. FERC,*
    732 F.2d 202 (D.C. Cir. 1984) ............................................................. 17

## Administrative Cases

*Ala. Power Co.,*
    167 FERC ¶ 61,273 (2019) .................................................................... 18

*Cal. Indep. Sys. Operator Corp.,*
    126 FERC ¶ 61,081 (2009) .................................................................... 25

*City of Hamilton, Ohio et al. v. Kentucky Power Co.,*
    72 FERC ¶ 61,158 (1995) ...................................................................... 25

*DATC Path 15, LLC,*
    177 FERC ¶ 61,115 (2021) .................................................................... 19

*Duke Energy Ohio, Inc.,*
    133 FERC ¶ 61,058 (2010) .................................................................... 21

*Houlton Water Co.,*
    55 FERC ¶ 61,037 (1991) ...................................................................... 25

*ITC Holdings Corp.*,
    102 FERC ¶ 61,182 (2003) ................................................................. 26

*Ky. Utils. Co.*,
    129 FERC ¶ 61,099 (2009) ................................................................. 18

*Michigan Elec. Transmission Co.*,
    105 FERC ¶ 61,214 (2003) ................................................................. 26

*Midwest Indep. Transmission Sys. Operator, Inc.*,
    100 FERC ¶ 61,292 (2002), *order denying reh'g*, 102 FERC
    ¶ 61,143 (2003), *order on voluntary remand*, 106 FERC ¶
    61,302 (2004), *rev'd in part and remanded by Pub. Serv.
    Comm'n of Ky. v. FERC*, 397 F.3d 1004 (D.C. Cir. 2005) .................. 26

*Midwest Indep. Transmission Sys. Operator, Inc.*,
    Opinion No. 539, 153 FERC ¶ 61,101 (2015) ................................. 10-11

*Complaint Rehearing Order* (Order Addressing Arguments
    Raised on Rehearing, *Office of the Ohio Consumers'
    Counsel v. Am. Elec. Power Serv. Corp., et al.*),
    183 FERC ¶ 61,034 (2023) ................................. 1-2, 6, 14-15, 19, 26-28

*Complaint Order* (Order on Complaint, O*ffice of the Ohio
    Consumers' Counsel v. Am. Elec. Power Serv. Corp., et al.*),
    181 FERC ¶ 61,214 (2022) ........................................................... 1, 6, 15

Order No. 679, 116 FERC ¶ 61,057 (2006), *order on reh'g*,
    Order No. 679-A, 117 FERC ¶ 61,345 (2006) ................................ 14, 19

*PJM Interconnection, L.L.C.*,
    144 FERC ¶ 61,217 (2013) ................................................................. 12

*PJM Interconnection, L.L.C.*,
    151 FERC ¶ 61,029 (2015) ................................................... 7, 12, 19, 28

*Pub. Serv. Elec. & Gas Co.*,
    124 FERC ¶ 61,303 (2008) ................................................................. 17

*Pub. Serv. Elec. & Gas Co.*,
    177 FERC ¶ 61,004 (2021) ................................................................. 18

*S.C. Elec. & Gas Co.*,
  137 FERC ¶ 61,081 (2011)...................................................................18

*Trans Bay Cable LLC*,
  112 FERC ¶ 61,095 (2005)..................................................................18

**Statutes**

Federal Power Act Section 206, 16 U.S.C. § 824e(a) ..........................5, 23

**Other Authorities**

18 C.F.R. § 35.35(e)...................................................................................20

## ORAL ARGUMENT STATEMENT

Duke Energy Ohio, Inc. ("Duke") agrees with the statements of the petitioners and the Commission that oral argument would assist the Court.

## INTRODUCTION

There is not a whisper of evidence or argument by the Office of the Ohio Consumers' Counsel that the overall return on equity of 11.38% in Duke's settlement is unjust and unreasonable. The Commission noted that no such evidence existed in the record. *Complaint Order* P 64, JA488; *Complaint Rehearing Order* P 28, JA587 ("OCC has failed to provide any evidence to demonstrate that the overall ROEs are unjust and unreasonable."). This alone should defeat OCC's appeal.

Yet instead, OCC's theme is that because we can see the adder inside Duke's settlement, OCC should be able to extract it somehow and challenge it standing alone. OCC's position fails.

Duke's settlement is like a chocolate-chip cookie. The adder is the chocolate chips: visible, but baked in. In the oven of settlement, the dough expanded, the chocolate chips melted into the dough, and it all formed into one unified confection. OCC does not want to throw away

Duke's cookie and start over. It wants the chocolate chips pulled out. But Duke negotiated for the chocolate chips and got them baked into its cookie. Everyone agreed that Duke's cookie would be chocolate chip, and the Commission approved it holistically. In the years since, Duke's customers got the benefits Duke gave them in exchange for its chocolate chip cookie. Yet now, OCC wants the chocolate chips yanked out. The Commission rightly rejected this effort. It refused to destroy Duke's settlement and its (unchallenged) cookie by trying to dig out the chocolate chips. *See Complaint Rehearing Order* P 28, JA586-87 (refusing to "strip[] out a single component of an intricate financial package that the parties to the settlement found balanced and thus agreeable"). This Court should deny the OCC's petition.

## STATEMENT OF JURISDICTION

Duke adopts the jurisdictional statement in the petitioners' brief filed by Dayton Power & Light Co., American Electric Power Service Corp., and FirstEnergy Service Co.  AEP Br. 6-8.

## STATEMENT OF THE ISSUES

This brief addresses the fourth issue stated in the Brief for Respondent Federal Energy Regulatory Commission:  "Whether the Commission reasonably declined to modify comprehensive rate settlements to adjust negotiated returns on equity where the Commission had never specifically granted [RTO] Adders."  FERC Br. 4. The answer is yes.  The Commission reasonably declined to disturb Duke's settlement, and this Court should deny the OCC's petition.

## STATEMENT OF THE CASE

Duke adopts pages 25-27 of Respondent FERC's brief.  FERC Br. 25-27.

## SUMMARY OF ARGUMENT

The OCC's petition for review should be denied.

Duke's settlement was extensively negotiated, including participation by intervenor Buckeye Power and every other

transmission customer in Duke's zone who chose to participate. The overall ROE of 11.38%, including the adder, was an intricate compromise. That compromise settled not only the ROE itself (which was lower than Duke initially requested, yet higher than a transmission customer had initially counter-proposed), but also multiple other issues. Among them, to achieve the ROE, Duke assumed sole responsibility for millions of dollars in costs, reflecting its transition costs into PJM. Duke also assumed the great majority of responsibility for the risk that it would be ordered to pay several billion dollars over 60 years for MISO projects approved during its departure process. The parties even agreed to a non-severability provision, linking all of these terms together into one inseparable settlement. The Commission then examined the overall settlement and found it fair and reasonable. The OCC and Buckeye should not be allowed to pull the adder out of this settlement—especially given that they have never proved, or even argued, that the overall ROE is unjust and unreasonable.

OCC and Buckeye cannot isolate Duke's adder. Their theory that Duke could have obtained the adder through a separate proceeding is

nothing but supposition.  And parties make comprehensive settlements all the time in the shadow of what a court or agency is "likely" to do—but that does not undermine those settlements.  Nor is it unduly discriminatory against customers that comprehensive settlement-based rates may have components different from other companies' rates.  The adder is identifiable in Duke's ROE.  But it is not subject to a separate challenge.

Section 206 of the Federal Power Act, 16 U.S.C. § 824e(a), and both circuit and agency precedents require the Commission to find that the overall ROE is unjust and unreasonable before revisiting it.  This view of the statute, and agency policy, make extra good sense as applied to comprehensive settlements like Duke's.  The Commission rightly refused to revisit the adder component of Duke's settlement without any showing by the OCC that the overall rate had become unjust and unreasonable.

# ARGUMENT

The Commission properly declined to re-open Duke's settlement because the overall ROE remained fair and reasonable.

## I.    Duke's settlement was extensively negotiated, meaningfully compromised, found fair by the Commission, and its overall ROE remains unchallenged today.

There is no evidence or argument here that Duke's overall ROE of 11.38% is unjust or unreasonable under § 206.  The OCC never made any such argument to the Commission.  *Complaint Order* P 64, JA488 (noting that the "OCC has not adduced in this proceeding" any "evidence that the overall ROE has become unjust and unreasonable").  The Commission repeated the point on rehearing.  "OCC has failed to provide any evidence to demonstrate that the overall ROEs are unjust and unreasonable, such as by showing that the overall rate is outside of the 'zone of reasonableness.'" *Complaint Rehearing Order* P 28, JA587.  No one argued at the Commission, and no one is saying now, that the ROE deal struck in 2014 is unjust and unreasonable.

Instead, OCC asks this Court to cut out a piece of Duke's long-settled ROE.  But the ROE, including the adder, was set by an approved settlement—a settlement that compromised on multiple financial

6

issues.  Duke negotiated the settlement with every one of its transmission customers who cared to participate.  *See* Addendum at A-9 (*PJM Interconnection, L.L.C.*, Docket Nos. ER12-91-000 and ER12-92-000, Settlement Agreement, Explanatory Stmt. at 5 (filed Oct. 30, 2014)) (explaining that Duke had given notice to every transmission customer with load in Duke's zone, inviting them to participate in these negotiations).  For whatever reason, OCC did not participate, but Buckeye did, among others.  All of the transmission customers negotiating with Duke had every incentive to keep Duke's ROE down and to procure other financial benefits for themselves (and thus for consumers).  And they did.

The adder, along with many other compromise financial positions, thus was agreed to in a settlement between Duke and its customers after years of litigation and negotiations about what rates Duke could charge as a member of PJM after it moved from another RTO.  The adder was part of a package that resolved many complex issues and resulted in Duke accepting a far lower recovery than it had initially requested.  Duke accepted and relied on the adder as a key part of a

settlement in which it agreed to forgo millions and potentially billions of dollars that it was otherwise seeking to recover.

In fact, the Commission repeatedly *rejected* early versions of the Duke settlement, without prejudice, because it wanted to make sure that all relevant parties had notice of the issues being addressed and settled. *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029 at PP 2-5 (2015) (explaining the history of the settlement). In late 2013, Duke "provided notice to all PJM transmission customers with load in the [Duke] zone that settlement discussions in this proceeding had resumed and that settlement discussions might address transmission rate matters beyond the return o[n] equity issue." *Id.* at P 4. Three companies, including current intervenor Buckeye Power, then joined the others participating in the negotiations. *Id.* Nearly a year later, all parties reached a comprehensive settlement. *Id.*

The key parts of the Duke settlement are apparent on its face. They reflect meaningful and comprehensive compromise.

First, the agreed ROE number itself is an obvious compromise. Duke first asked for 12.38%—the same ROE it had as a part of MISO before it switched to PJM. *See* Addendum at A-1 (*PJM Interconnection,*

8

*L.L.C.*, Docket Nos. ER12-91-000 and ER12-92-000, Initial Filing, Proposed Att. H-22A, pg. 4, line 30 (filed Oct. 14, 2011)). Transmission customers objected, urging that 12.38% was too high. One customer proposed 10.00%, including any adder, as a fair ROE. *See* Addendum at A-4 (*PJM Interconnection, L.L.C.*, Docket Nos. ER12-91-000 and ER12-92-000, Protest, Motion to Intervene and Request for Suspension and Hearings by American Municipal Power at 23 (filed Nov. 4, 2011)). The parties ultimately settled on 11.38%, including the adder—some 100 basis points lower than Duke had requested and had previously received under MISO. Meanwhile the transmission customers agreed to accept an 11.38% ROE—above their initial position.

To secure a compromise agreement at an overall ROE of 11.38%, Duke made several obvious concessions. One is that Duke agreed to protect its transmission customers from 100 percent of "PJM Transition Costs," and "Internal Integration Costs." These costs represented millions of dollars. Addendum at A-31 (Settlement Agt., pg. 8) (defining "PJM Transition Costs" as including payment of $2.8 million, not including MISO exit fee costs).

Another concession from Duke was that it would protect its
transmission customers from 100 percent of "Legacy MTEP Costs" for
the 2012-2014 period, and from 70 percent of the Legacy MTEP Costs
forever.  The Legacy MTEP Costs refer to the possibility that Duke
would have been forced to pay a sizable share of the Multi-Value Project
costs approved by its former RTO just before Duke departed for PJM.
Addendum at A-30 (Settlement Agt., pg. 7) (defining "Legacy MTEP
Costs").

Those Multi-Value Projects were projected to cost billions of
dollars.  *MISO Transmission Owners v. FERC*, 860 F.3d 837, 839 (6th
Cir. 2017) ("But in early December 2011, just weeks before Duke's
scheduled departure, MISO approved a portfolio of sixteen projects,
estimated to cost billions of dollars in total.").  In fact, Duke's projected
share alone soared into the billions.  At the time of the settlement, in
late 2014, Duke faced the risk that it would owe $2.3 billion over a 60-
year period for the Multi-Value Projects.  *Midwest Indep. Transmission
Sys. Operator, Inc.*, Opinion No. 539, 153 FERC ¶ 61,101 at P 89 (2015).
Thus, the customers negotiating with Duke achieved certainty that the
2012-2014 Multi-Value Project costs would never flow through to them

10

at all, and certainty going forward that no more than 30 percent of those future costs would flow through to them, either. In exchange for these important things, the customers accepted the 11.38% ROE for Duke—again, well above what they had proposed, but still well below what Duke wanted.

After all, ROE percentages translate into dollars of revenue. OCC and Buckeye suggest that the adder and its revenue dollars somehow were not meaningful to the overall compromise. But they offer no basis for the counter-intuitive idea that Duke would have traded millions of dollars of benefits to consumers without accounting for, and relying on, every dollar that would result from the entire agreed ROE, regardless of its component parts.

The parties also agreed that none of them would ask the Commission to increase or decrease the 11.38% ROE before June 1, 2017. Addendum at A-33-34 (Settlement Agt., pg. 10-11). The only agreed exception was that if Duke ceased participating in an RTO before June 1, 2017, then the customers reserved the right to challenge the adder. *Id.*

11

Finally, the parties all agreed to a non-severability provision.
That is, "the various provisions of this Settlement Agreement are not
severable" and become effective all together or not at all.  Addendum at
A-38 (Settlement Agt., pg. 15).  The non-severability provision clarifies
that Duke and the customers agreed they were settling multiple issues
at once, dependent on each other, and that neither the Commission nor
anyone else could discard any single aspect of the agreement while
keeping the others.  The Commission *could not have* approved solely the
ROE, or the adder, separate from everything else.  And in fact, when
the Commission rejected an earlier version of the settlement, it said just
that.  *See PJM Interconnection, L.L.C.*, 144 FERC ¶ 61,217 at P 23
(2013) (noting that "[a]lthough the ROE provisions of the proposed
Settlement appear fair and reasonable, the non-severability provisions
preclude our acceptance" of just those provisions standing alone).

So when the Commission did ultimately approve Duke's
settlement in April 2015, it was on an all-or-nothing basis, by the
agreed terms of the settlement itself.  *PJM Interconnection, L.L.C.*, 151
FERC ¶ 61,029 at P 14.  The customers then received their benefits
under the settlement.  Duke paid all of its integration and PJM

12

transition costs.  Duke assumed the risk of billions of dollars in Multi-Value Project costs.  (Years later, this Court ruled that MISO could not inflict most of those costs onto Duke, *see MISO Transmission Owners*, 860 F.3d at 839).  Duke remained in PJM, and still does.  And Duke has carried on with its agreed and approved ROE, including the adder.  No one in 2014 argued that the big-picture deal struck was unfair.  Nor does anyone argue *now* that the big-picture deal struck is unjust or unreasonable.

The Commission is exactly right: "comprehensive settlement packages were the result of extended negotiations among multiple parties on a variety of issues stemming from [Duke's] entry into PJM, ultimately reaching complex agreements that no party contested." FERC Br. 57.

## II.    OCC and Buckeye's efforts to isolate Duke's adder fail.

OCC and Buckeye offer a handful of reasons why, in their view, the Commission must reconsider the adder separately from the rest of the settlement.  All these reasons fail.

### A.    It does not matter if Duke "likely" could have obtained the adder in a separate proceeding.

OCC suggests that Duke "likely" could have obtained the adder from the Commission regardless of the settlement.  OCC Br. 35-36.

OCC's argument is supposition.  The Commission stated that it "likely" would have granted an adder to Duke if it had been sought in a separate proceeding.  *Complaint Rehearing Order* P 28, JA586-87.  And the Commission had been clear, going back to Order 679, that it would consider adders case-by-case and retained discretion to deny them.  Order No. 679, 116 FERC ¶ 61,057 at P 326 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006).  Thus, "likely" is inherently not certain.  That Duke *probably* or *likely* could have gotten the adder in a separate proceeding does not matter.

Parties make settlements all the time in the shadow of what a court "probably" or "likely" would do with their case.  Parties even settle cases during appeals, when everyone knows that affirmance is by far the most likely outcome.  But that does not undermine those settlements or their comprehensive nature.  The theory that customers may not have had much "leverage" over the adder piece does not mean that somehow Duke ignored the adder's contribution to overall ROE

(and expected resulting revenues) when Duke agreed to trade millions of dollars in customer benefits for the overall ROE.

Nothing about the agreement suggests that it would have been identical if the overall ROE had been agreed at only 10.88%, or 10.38%. On the contrary, the agreement's non-severability provision says the opposite. After all, when the dust settles no customer should care much about individual rate components. They care what the overall rate they will have to pay will be. Here, they agreed to 11.38%.

OCC's argument that Duke likely could have gotten the adder anyway also fails to address the Commission's reasoning. The adder is baked into the settlement, and how the parties valued it or pivoted around it in settling numerous costly issues on an agreed non-severable basis cannot now be determined. *Complaint Order* P 64, JA488; *Complaint Rehearing Order* PP 28-29, JA586-88. The only thing that is known is that everything was on the table, and the parties contested the overall ROE value, which included the adder. *See* Addendum at A-4 (*PJM Interconnection, L.L.C.*, Docket Nos. ER12-91-000 and ER12-92-000, Protest, Motion to Intervene and Request for Suspension and Hearings by American Municipal Power at 23 (filed Nov. 4, 2011)).

### B. There is no "undue discrimination" against Duke's customers.

Next, OCC claims that consumers are treated differently in the Dayton/AEP versus Duke/American cases, and that this is unfair. OCC Br. 50-51.

One good resolution of that difference would be for *all* utilities to have the adder, for the reasons outlined in AEP's opening brief. Indeed, if this Court accepts AEP's contentions that the Commission went too far in removing AEP's adder, it hardly need address OCC's contentions that the Commission did not go far enough when it preserved Duke's and American's adders. OCC's petition can be denied on that ground alone.

In any case, rate disparities based on settlements are not unduly discriminatory. Duke's customers, unlike AEP or Dayton's, *agreed* to include an adder as part of agreeing to their overall 11.38% ROE. They took the opportunity to negotiate all aspects of the ROE, combined with other financial issues, and reached a complex compromise on them. That factual difference, if the Court's analysis reaches this far, is important.

Case law recognizes that settlements are important and rate disparities based on good-faith settlements are not unduly discriminatory.  *E.g., United Mun. Distrib. Grp. v. FERC*, 732 F.2d 202, 212 (D.C. Cir. 1984) ("a rate disparity among customers of the same public utility that was solely the result of a settlement among some of the parties was not unlawfully discriminatory").  *See also Cities of Bethany v. FERC*, 727 F.2d 1131, 1139-40 (D.C. Cir. 1984) (noting that "because the preservation of private contracts within the context of a rate-setting statutory scheme promotes economic stability," a settlement setting a rate "may justify a rate disparity, rendering it lawful").  There is no suggestion in this case of bad faith in negotiation or a sweetheart deal.  *Cf. Cities of Bethany*, 727 F.2d at 1140.

Duke settled with every one of its customers who wished to participate, and settled its rate issues as to all of its customers uniformly.  The simple fact that other utilities have different ROEs is far from a showing of undue discrimination.  The Commission has previously approved a variety of ROEs for different companies in different circumstances.  *See Pub. Serv. Elec. & Gas Co.*, 124 FERC ¶ 61,303 at P 1 (2008) (approving a 11.18% base ROE plus a 50 point

17

adder, for a total ROE of 11.68% for PSE&G); *Pub. Serv. Elec. & Gas Co.*, 177 FERC ¶ 61,004 (2021) (letter order approving a pre-arranged settlement agreement reducing the PSE&G ROE to 10.4%); *S.C. Elec. & Gas Co.*, 137 FERC ¶ 61,081 at P 4 (2011) (approving a settlement containing a base ROE of 10.55%); *Trans Bay Cable LLC*, 112 FERC ¶ 61,095 at P 26 (2005) (setting forth initial rate principles to apply to Trans Bay, including a 13.5% ROE based on risks assumed by the company); *Ala. Power Co.*, 167 FERC ¶ 61,273 at P 4 (2019) (approving a 10.6% ROE for Southern Company, with a five-year rate moratorium); *Ky. Utils. Co.*, 129 FERC ¶ 61,099 at P 4 (2009) (approving a settlement providing for an 11% ROE applicable to a series of wholesale service contracts with municipal customers).

### C. The adder is not an artificial inflation of Duke's ROE, and just because it is identifiable does not make it severable from the settlement.

Buckeye suggests that the adder is something extra, that inherently pushes Duke's ROE higher than the Commission would ever otherwise allow. Buckeye Br. 14. That is not true, and there is no evidence of it here.

To be clear, the Commission never needed to, and never did, approve Duke's adder as a stand-alone rate change. All it did was find that the overall deal struck—which Duke's customers agreed to—was fair and reasonable. *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029 at P 14 ("We approve the October 30, 2014 Settlement. . . . The Settlement appears to be fair, reasonable, and in the public interest, and is uncontested."). The approval order never mentions the adder. The Commission confirmed that it "approved a comprehensive settlement package, with a single overall figure for Duke's and [American's] ROEs." *Complaint Rehearing Order* P 30, JA588. In short, the settlement ROE was 11.38%. Had that overall ROE been "unfair" or "unreasonable" in view of the broader settlement package, it would not have been approved.

Further, Commission precedents confirm that ROE incentives cannot push overall ROE above the zone of reasonableness. "Consistent with the Commission's current policy on ROE incentives as set forth in Order No. 679, a utility's total ROE, inclusive of incentives, must be within the composite zone of reasonableness." *DATC Path 15, LLC*, 177 FERC ¶ 61,115 at P 69 (2021). *See also* Order No. 679, 116 FERC ¶

19

61,057 at P 2 ("[T]he Commission will permit incentives only if the incentive package as a whole results in a just and reasonable rate . . . an incentive rate of return sought by an applicant must be within a range of reasonable returns and the rate proposal as a whole must be within the zone of reasonableness before it will be approved."). That is, even if an "incentive" pushes ROE higher than it might have otherwise been, *see* 18 C.F.R. § 35.35(e), it cannot push the ROE above the zone of reasonableness. What matters, especially in a composite settlement, is the overall ROE.

Next, Buckeye asserts that Duke's view would allow it to keep the adder forever, even if it departed from an RTO after 2017.[1]  Buckeye Br. 14. This argument goes nowhere.

Leaving an RTO *always* requires reconsideration of overall ROE. In fact, the entire negotiation and settlement that led to this case occurred because Duke departed an RTO (MISO) and joined a different RTO (PJM). Duke's rate is now part of the PJM Tariff, so if it leaves PJM, it will need a new rate. Commission precedent bars a utility from

---

[1] Under Buckeye's own theory of the case, Duke cannot leave an RTO, making this (from their perspective) an impossible hypothetical.

departing from an RTO unless it proposes new replacement rates that are just and reasonable. *Duke Energy Ohio, Inc.*, 133 FERC ¶ 61,058 at P 14 (2010) ("the Commission continues to find that a utility may exit an RTO when it satisfies three requirements . . . (3) the replacement arrangements are just, reasonable and not unduly discriminatory").

In short, Duke would not even be allowed to depart from PJM without proposing a new transmission rate to the Commission, which would include an ROE. Whether the new rate, including a proposed new or continued ROE and its components, was just and reasonable would either be settled or contested and ruled on at the Commission. Thus, Duke's position does not guarantee it the adder forever, regardless of Duke's RTO participation.

Last, the OCC and Buckeye urge that because the settlement itself identifies the adder, and allowed a separate challenge to it under certain circumstances, their separate challenge here should also be allowed. OCC Br. 33-34, Buckeye Br. 18. This argument also fails.

The settlement states that no party will seek to increase or decrease the overall ROE from 2014 until at least June 1, 2017. Addendum at A-34 (Settlement Agt., p. 11). The stated exception is

that if Duke departed from RTO participation before June 1, 2017, then the customers could challenge the adder without violating their agreement to make no challenges to Duke's ROE during that time. *Id.*

This provision does not help OCC or Buckeye's argument. Duke never departed from RTO participation. Duke thus upheld its part of the bargain. Nothing in the settlement suggests that, now that June 2017 has passed, any stand-alone challenge to the adder is allowed. Instead, default law applies: any challenge to the settlement ROE must be made to the justness and reasonableness of the *overall* ROE. And the idea that the settling customers would have been allowed to object to the adder if Duke departed an RTO falls far short of proving the adder was a separable piece of the ROE. Had Duke departed the RTO, it would have had to propose a new rate anyway, including an ROE. Allowing the settling customers to argue against any adder in the new rate does not undercut the comprehensive settlement or its compromise overall ROE.

The parties to the settlement understood at the time that the entire settlement was the result of broad compromise on multiple issues. They chose not to hash out, at that time, how much of the

22

compromise centered on the adder or to what extent—and the Commission rightly refused to speculate about it years later.

## III.   Section 206 requires a finding that the overall ROE is unjust and unreasonable before baked-in components can be revisited.

AEP contends that § 206 requires the Commission to find the existing overall ROE "unjust and unreasonable" before it can alter the rate.  *See* 16 U.S.C. § 824e(a).  AEP is right.  AEP Br. 49-52.  And as applied to the settlements of Duke (and American), AEP's argument is even *stronger*, and the Commission properly agreed with it.

Section 206 states that "Whenever the Commission, after a hearing . . . shall find that any rate . . . collected by any public utility . . . is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate . . . and shall fix the same by order."  16 U.S.C. § 824e(a).

This Court has held that, in ROE cases, the plain text of the statute requires the Commission to find a company's current ROE unjust and unreasonable before revising that ROE.  *Emera Maine v. FERC*, 854 F.3d 9, 26 (D.C. Cir. 2017) (referring to "section 206's statutory directive that existing rates be found unlawful before FERC

has the authority to change those rates"). In *Emera Maine*, the Commission's § 206 proceeding set aside a total ROE of 11.14% in favor of a new ROE 57 basis points lower (10.57%). This Court rejected the Commission's action because it had failed to find the overall ROE unlawful before reducing that ROE. The Court called this rule "a form of statutory protection to a utility." *Id.* at 24.

*Emera Maine* applies here because OCC asked the Commission to revise Duke's overall ROE of 11.38% down to 10.88% without first finding the overall ROE unjust and unreasonable. *Id.* at 26 (noting that "the zone of reasonableness creates a broad range of potentially lawful ROEs," which requires specific rejection of the existing ROE by the Commission before it can revise or remove components). The Commission properly refused OCC's invitation to repeat the error in *Emera Maine*.

In addition, the "Commission itself has, in the past, interpreted the § 206 burden scheme to require a customer seeking an investigation into existing rates to provide some basis to question the reasonableness of the overall rate level, taking into account changes in all cost components and not just the challenged component."

24

*Sithe/Independence Power Part., L.P. v. FERC*, 165 F.3d 944, 951 (D.C. Cir. 1999) (citing *Houlton Water Co.*, 55 FERC ¶ 61,037, at 61,110 (1991) and *City of Hamilton, Ohio et al. v. Kentucky Power Co.*, 72 FERC ¶ 61,158 at 61,785 (1995)).  *See also Cal. Indep. Sys. Operator Corp.*, 126 FERC ¶ 61,081 at P 66 (2009) (rejecting a request to establish a § 206 proceeding when the proponents failed to explain how the features of the tariff they wished to challenge "would affect the justness and reasonableness of the entire . . . tariff.").

*International Transmission Co. v. FERC* is not to the contrary. 988 F.3d 471 (D.C. Cir. 2021).  First, as AEP points out, the petitioner in that case never raised or argued, and so the Court never addressed, the issue here: whether the Commission should consider the overall rate, and not just the adder, before changing the adder under § 206. Since the petitioner only argued that the Commission failed to find the *adder itself* unjust and unreasonable first, the Court's contrary conclusion that the Commission *did* find the adder unjust and unreasonable aptly resolved that case.  But that conclusion is irrelevant to the different argument made here.

Second, *International Transmission* is factually distinguishable as well from Duke (and American)'s case.  In *International Transmission*, the adders had been placed into the rate in separate proceedings.  In those cases, the "base" ROE of 12.88% had been approved for all MISO utilities.  *Midwest Indep. Transmission Sys. Operator, Inc.*, 100 FERC ¶ 61,292 at PP 1, 31 (2002), *order denying reh'g*, 102 FERC ¶ 61,143 (2003), *order on voluntary remand*, 106 FERC ¶ 61,302 (2004), *rev'd in part and remanded by Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004 (D.C. Cir. 2005).  The applicants, filing under § 205, separately sought and received 100-point adders.  *ITC Holdings Corp.*, 102 FERC ¶ 61,182 at P 68 (2003); *Michigan Elec. Transmission Co.*, 105 FERC ¶ 61,214 at P 20 (2003).

Thus, even if *International Transmission* could be instructive, its facts meaningfully differ from Duke's case, as the Commission found. *Complaint Rehearing Order* PP 37-38 & n.112, JA592-93 (concluding that *International Transmission* supported "reversing our prior stand-alone rulings that granted the RTO Adder in the first place," but that was "distinct from the situation of Duke and [American], where the parties to those settlement proceedings raised and negotiated the

matter in the settlement process leading to comprehensive settlements.").

Section 206, and the Commission's policy against re-examining rate components in isolation, make extra good sense as applied to approved settlements. "Policy considerations caution against adjusting settlement rates on a piecemeal basis." *Complaint Rehearing Order* P 29, JA587. In particular, "modifying individual components of settlements would undermine the certainty provided to settling parties and would be inconsistent with the Commission's longstanding policy of promoting settlements." *Complaint Rehearing Order* P 29, JA587.

Refusing to re-open individual components of a settlement also preserves the "precise trade-offs and concessions made by the parties," which the Commission would not know and thus not be positioned to revisit. *Complaint Rehearing Order* P 28, JA586. In short, "the Commission's policy [is] not to revisit individual elements of settlements unless it is shown that they make the overall rate unjust and unreasonable." *Complaint Rehearing Order* P 28, JA587. The Commission's policy is right.

27

In the end, the Commission must find a rate unjust and unreasonable to revisit it. Thus, a challenge to a simple component of a rate, without any challenge to the overall rate, should go nowhere. That is doubly true when the overall rate was approved all at once, and triply true when the overall rate was approved all at once in an uncontested settlement. As the Commission recognized, its approval of an agreed, uncontested settlement after years of negotiation is simple, categorical, and focused only on the fairness and reasonableness of the bottom line. *Complaint Rehearing Order* P 30, JA588 ("the Commission approved a comprehensive settlement package, with a single overall figure for Duke's and [American's] ROEs"); *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029 at P 14 (concluding in a single paragraph that "the [overall] Settlement appears to be fair, reasonable, and in the public interest, and is uncontested.").

By contrast, determination of an ROE through litigation requires examination and weighing of voluminous data about individual factors that all go into formation of the ROE. There is no such record here to allow separation of individual components of the overall ROE or to understand how they interact with other components and elements of

compromise among the parties.  The Commission rightly refused to revisit the components of Duke's settlement without a showing that the overall rate has become unjust and unreasonable under § 206.

## CONCLUSION

The OCC's petition for review should be denied.


Dated:  December 21, 2023

Respectfully submitted,

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
mfitzgerald@mcguirewoods.com

Noel H. Symons
Carrie Mobley
MCGUIREWOODS LLP
888 16th Street, NW
Suite 500
Washington, DC 20006
T: (202) 857-1700
nsymons@mcguirewoods.com
cmobley@mcguirewoods.com

Heather M. Horne
DUKE ENERGY CORPORATION
1301 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20004

T: (202) 824-8009
heather.horne@duke-energy.com

*Counsel for Intervenor Duke Energy Ohio, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and this Court's July 12, 2023 Order because it contains 5,280 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Century Schoolbook, 14-point font.

Dated: December 21, 2023          */s/ Matthew A. Fitzgerald*
                                  Matthew A. Fitzgerald

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2023, I electronically filed the foregoing brief with the Clerk of this Court using the appellate CM/ECF system, which will also serve counsel of record.

Dated: December 21, 2023          */s/ Matthew A. Fitzgerald*
                                   Matthew A. Fitzgerald

**ADDENDUM**

# INDEX

**Page**

*PJM Interconnection, L.L.C.*, Docket Nos. ER12-91-000 and ER12-92-000, Initial Filing, Proposed Att. H-22A (filed Oct. 14, 2011) (excerpt) ............................................................ A-1

*PJM Interconnection, L.L.C.*, Docket Nos. ER12-91-000 and ER12-92-000, Protest, Motion and Request by American Municipal Power (filed Nov. 4, 2011) (excerpt)............................................ A-3

*PJM Interconnection, L.L.C.*, Docket Nos. ER12-91-000 and ER12-92-000, Settlement Agreement (filed Oct. 30, 2014) (excerpt) ... A-5

Formula Rate - Non-Levelized                                    For the 12 months ended 12/31/_____

Rate Formula Template
Utilizing FERC Form 1 Data

DUKE ENERGY OHIO AND DUKE ENERGY KENTUCKY (DEOK)
SUPPORTING CALCULATIONS AND NOTES

| Line No. | **TRANSMISSION PLANT INCLUDED IN ISO RATES** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Total transmission plant (page 2, line 2, column 3) | | | | | | $ | - |
| 2 | Less transmission plant excluded from ISO rates   (Note M) | | | | | | | 0 |
| 3 | Less transmission plant included in OATT Ancillary Services   (Note N) | | | | | | | 0 |
| 4 | Transmission plant included in ISO Rates  (line 1 less lines 2 & 3) | | | | | | $ | - |
| | | | | | | | | |
| 5 | Percentage of transmission plant included in ISO Rates (line 4 divided by line 1) | | | | | TP= | | 0.00000 |

**TRANSMISSION EXPENSES**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6 | Total transmission expenses  (page 3, line 1, column 3) | | | | | | $ | - |
| 7 | Less transmission expenses included in OATT Ancillary Services   (Note L) | | | | | | | 0 |
| 8 | Included transmission expenses (line 6 less line 7) | | | | | | $ | - |
| | | | | | | | | |
| 9 | Percentage of transmission expenses after adjustment (line 8 divided by line 6) | | | | | | | 0.00000 |
| 10 | Percentage of transmission plant included in ISO Rates (line 5) | | | | | TP | | 0.00000 |
| 11 | Percentage of transmission expenses included in ISO Rates (line 9 times line 10) | | | | | TE= | | 0.00000 |

**WAGES & SALARY ALLOCATOR  (W&S)**

| | | Form 1 Reference | $ | TP | Allocation | | | |
|---|---|---|---|---|---|---|---|---|
| 12 | Production | 354.20.b | 0 | 0.00 | 0 | | | |
| 13 | Transmission | 354.21.b | 0 | 0.00 | 0 | | | |
| 14 | Distribution | 354.23.b | 0 | 0.00 | 0 | W&S Allocator | | |
| 15 | Other | 354.24,25,26.b | 0 | 0.00 | 0 | ($ / Allocation) | | |
| 16 | Total  (sum lines 12-15) | | 0 | | 0 | = | 0.00000 | = | WS |

**COMMON PLANT ALLOCATOR  (CE)        (Note O)**

| | | | $ | | % Electric | | W&S Allocator | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (line 17 / line 20) | | (line 16) | | CE | |
| 17 | Electric | 200.3.c | 0 | | | | | | | |
| 18 | Gas | 201.3.d | 0 | | 0.00000 | * | 0.00000 | = | 0.00000 | |
| 19 | Water | 201.3.e | 0 | | | | | | | |
| 20 | Total  (sum lines 17 - 19) | | 0 | | | | | | | |

**RETURN (R)**

| | | | | | | | $ | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 21 | | Long Term Interest (117, sum of 62.c through 67.c) | | | | | | 0 | | |
| | | | | | | | | | | |
| 22 | | Preferred Dividends (118.29c) (positive number) | | | | | | 0 | | |
| | | | | | | | | | | |
| 23 | Development of Common Stock: | Proprietary Capital (112.16.c) | | | | | | 0 | | |
| 24 | | Less Preferred Stock (line 28) | | | | | | 0 | | |
| 25 | | Less Account 216.1 (112.12.c) (enter negative) | | | | | | 0 | | |
| 26 | | Common Stock         (sum lines 23-25) | | | | | | 0 | | |

| | | (Note P) | $ | % | Cost | | Weighted | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 27 | Long Term Debt  (112, sum of 18.c through 21.c) | | 0 | 0% | 0.0000 | | 0.0000 | = | WCLTD | |
| 28 | Preferred Stock  (112.3.c) | | 0 | 0% | 0.0000 | | 0.0000 | | | |
| 29 | Common Stock  (line 26) | | 0 | 0% | 0.1238 | | 0.0000 | | | |
| 30 | Total  (sum lines 27-29) | | 0 | | | | 0.0000 | = | R | |

A-1

**REVENUE CREDITS**

ACCOUNT 447 (SALES FOR RESALE)   (Note Q)                           (310-311)

| | | Load | |
|---|---|---|---|
| 31 | a. Bundled Non-RQ Sales for Resale (311.x.h) | | 0 |
| 32 | b. Bundled Sales for Resale included in Divisor on page 1 | | - |
| 33 | Total of (a)-(b) | | 0 |
| 34 | ACCOUNT 454 (RENT FROM ELECTRIC PROPERTY)   (Note R) | $ | - |
| 35 | ACCOUNT 456.1 (OTHER ELECTRIC REVENUES)   (Note U)   (330.x.n) | $ | - |

Case: 21-4072   Document: 69   Filed: 12/21/2023   Page: 42

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket No. ER12-91-000** |
| | ) | |
| **Duke Energy Ohio, Inc. and** | ) | |
| **Duke Energy Kentucky,** | ) | **Docket No. ER12-92-000** |
| **Inc.** | ) | |
| | | **(not consolidated)** |

**PROTEST, MOTION TO INTERVENE AND**
**REQUEST FOR SUSPENSION AND HEARINGS**
**BY AMERICAN MUNICIPAL POWER, INC.**

On October 14, 2011, Duke Energy Ohio, Inc. ("DEO") and Duke Energy Kentucky, Inc.
("DEK") (jointly, "DEOK" or "the Companies") and PJM Interconnection, L.L.C. ("PJM")
jointly filed modifications to the PJM Open Access Transmission Tariff ("PJM OATT" or
"Tariff") in connection with the Companies' January 1, 2012 integration into PJM. PJM
submitted modifications to the PJM OATT, the Amended and Restated Operating Agreement of
PJM Interconnection, L.L.C. ("PJM OA"), the Reliability Assurance Agreement Among Load
Serving Entities in the PJM Region ("PJM RAA") and the Consolidated Transmission Owners
Agreement ("PJM TOA"). The Companies proposed modifications to the PJM OATT pertaining
to establishing and recovering DEOK's transmission revenue requirement, including formula rate
protocols. The Commission issued notice of the DEOK/PJM filing on October 17, 2011.

Pursuant to Rules 211, 212, and 214 of the Commission's Rules of Practice and
Procedure, 18 C.F.R. §§ 385.211, 385.212, and 385.214 (2011), American Municipal Power, Inc.
("AMP"), on behalf of itself and its members, hereby (i) moves to intervene in the captioned
proceedings, (ii) protests certain aspects of the PJM OATT revisions submitted in this docket,

November 1, 2011, the comparable market yield on 10-year Treasury bonds was 2.01%.[41]  While parties often disagree about the usefulness of Treasury bond yields in determining just and reasonable ROEs, they can be useful at a broad level in comparing capital market conditions at different points of time.  The foregoing comparison, as well as a plethora of other factors, demonstrate clearly that today's capital market conditions are quite different than those that existed when the Commission established the 12.38% ROE that DEOK seek to carry into their PJM transmission rates.

In sum, the Commission has used very different DCF methods when setting group ROEs than when setting single-company ROEs.  It would contravene the orders establishing ROEs in those two different settings to assume that the group ROE now in effect for DEOK (and other MISO transmission owners) can properly be carried over unchanged into the PJM tariff, where rates reflect individual company ROEs.  That, plus the vast difference in capital market conditions at the relevant points in time, argue strongly against permitting DEOK to continue using the 12.38% MISO ROE as the basis for determining the Companies' PJM transmission rates.

AMP has developed a preliminary "rough-cut" DCF analysis of DEOK using the national proxy group of fifteen utilities accepted by the Commission in *Duke Energy Carolinas, LLC, supra*.  A copy of AMP's preliminary analysis is attached to this Protest as Attachment 2.  AMP's analysis uses DCF data inputs for the six-month period of May-October 2011.  The calculated median return of that group, as shown in Attachment 2 (page 1 of 5) is 9.50%.  Assuming a 50 basis point adder would be tacked on for DEOK's RTO participation, the resulting 10.0% ROE is 238 basis points lower than the 12.38% MISO-wide ROE the Companies seek to carry over into their PJM transmission rates.  By AMP's calculations, reducing the Companies' claimed ROE by 238 basis points would cause a reduction in DEOK's annual transmission revenue requirement of

---

[41]  As posted at http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yield.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket Nos. ER12-91-000,** |
| **Duke Energy Ohio, Inc.** | ) | **ER12-91-002,** |
| **Duke Energy Kentucky, Inc.** | ) | **ER12-91-004,** |
| | ) | **ER12-91-005,** |
| | ) | **ER12-91-007,** |
| | ) | **ER12-91-008,** |
| | ) | **ER12-92-000,** |
| | ) | **ER12-92-002,** |
| | ) | **ER12-92-004,** |
| | ) | **ER12-92-005,** |
| | ) | **ER12-92-007,** |
| | ) | **and** |
| | ) | **ER12-92-008** |

**EXPLANATORY STATEMENT IN SUPPORT OF**
**SETTLEMENT AGREEMENT**

Pursuant to Rule 602 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("Commission" or "FERC"), 18 C.F.R. § 385.602 (2014), Duke Energy Ohio, Inc. and Duke Energy Kentucky, Inc. (jointly, the "Duke Companies"), on behalf of the Settling Parties (as hereinafter defined), submit this Explanatory Statement in support of the Settlement Agreement ("Settlement") filed herewith for the purpose of resolving all issues in this proceeding. This Explanatory Statement is provided in accordance with the Commission's Rules, and is not intended to alter any provision of the Settlement or any party's rights or obligations thereunder.

I.      **PROCEDURAL BACKGROUND**

On October 14, 2011, in Docket Nos. ER12-91-000 and ER12-92-000, the Duke Companies jointly filed, pursuant to section 205 of the Federal Power Act ("FPA"), proposed modifications to the PJM Interconnection, L.L.C. ("PJM") Open Access Transmission Tariff ("PJM Tariff") in connection with the Duke Companies' move from the Midwest Independent Transmission System Operator, Inc. *n/k/a* Midcontinent Independent System Operator, Inc. ("MISO" or "Midcontinent ISO") Regional Transmission Organization ("RTO") to the PJM RTO.  The Duke Companies' proposed modifications to the PJM Tariff pertained to establishing and recovering the Duke Companies' transmission revenue requirement, including formula rate protocols.   In addition, under section 205 of the FPA, PJM submitted proposed modifications to the PJM Tariff, the Amended and Restated Operating Agreement of PJM, the Reliability Assurance Agreement Among Load Serving Entities in the PJM Region, and the Consolidated Transmission Owners Agreement (collectively, the "PJM Agreements"). The Duke Companies and PJM jointly requested an effective date of January 1, 2012, for the proposed changes.

On November 4, 2011, American Municipal Power, Inc. ("AMP"), on behalf of itself and its members the cities of Hamilton and Lebanon, Ohio and Williamstown, Kentucky (Hamilton, Lebanon, and Williamstown, collectively referred to herein as the "AMP Members"), filed a timely motion to intervene, protest, and request for suspension and hearings in this proceeding.  Also on November 4, 2011, the Indiana Municipal

Power Agency ("IMPA") filed a timely motion to intervene and protest in this proceeding. No other party protested the filings.

On December 27, 2011, the Duke Companies filed a Request for Deferral of Action requesting that the Commission enable the Duke Companies, AMP and IMPA to continue settlement discussions that, if successful, would resolve all issues in this proceeding. The request was submitted on the condition that it would have no effect on the requested effective date of January 1, 2012. Solely in order to defer Commission action on the pending tariff change filing, the Duke Companies and PJM submitted on December 29, 2011, a ministerial filing that contained no changes to the existing tariff records filed in these dockets on October 14, 2011. The Commission issued public notice of the filing. No comments were filed.

On January 10, 2012, Hamilton filed a motion to intervene in this proceeding in its own right.

On February 24, 2012, the Duke Companies filed a second Request for Deferral of Action. The Commission issued public notice of the filing. No comments were filed.

On April 5, 2012, the Duke Companies and IMPA filed a settlement agreement in this proceeding that resolved all issues between the Duke Companies and IMPA ("April 5 Settlement").

On April 24, 2012, the Commission issued an order denying the Duke Companies' request to recover Legacy MTEP Costs (as defined in Article II of the Settlement) and PJM Transition Costs and Internal Integration Costs (as defined in Article II of the Settlement) from wholesale transmission customers, without prejudice to the filing under

3

section 205 of the FPA of a new request for such recovery.  *PJM Interconnection, L.L.C., et al.*, 139 FERC ¶ 61,068 (2012) ("April 24 Order").  The April 24 Order also established hearing and settlement judge procedures pursuant to section 206 of the FPA for determination of the Duke Companies' rate of return on common equity, and approved the April 5 Settlement between the Duke Companies and IMPA.  Consistent with the April 5 Settlement, IMPA later withdrew its protest of the Duke Companies' filing, leaving AMP (acting on its own behalf and on behalf of the AMP Members) as the only party with a protest in the proceeding.

On May 24, 2012, the Duke Companies filed revised tariff records in compliance with the April 24 Order.  On the same date, the Duke Companies filed a request for rehearing of the April 24 Order.

On February 4, 2013, the Duke Companies, AMP, and the AMP Members filed a settlement agreement in this proceeding.  That settlement agreement provided, among other things, for the recovery of Legacy MTEP Costs, PJM Transition Costs and Internal Integration Costs (each as defined in that settlement agreement)[1] from all wholesale transmission customers, together with a reimbursement to AMP and the AMP Members for 75 percent of the Legacy MTEP Costs and 100 percent of the PJM Transition Costs.

By order issued September 19, 2013, the Commission rejected that settlement agreement, stating, among other things, that it was "unclear . . . that all customers were on notice that these issues [the recovery of Legacy MTEP Costs, PJM Transition Costs,

---

[1]  These terms, as used in the February 4, 2013 settlement, had substantially the same meanings as they are given in Article II of the instant Settlement.

4

A-8

and Internal Integration Costs] would be resolved [in this proceeding]" and that the Duke
Companies had not shown that the settlement was not unduly discriminatory in failing to
extend the benefits offered to AMP to the Duke Companies' other wholesale transmission
customers. *PJM Interconnection, L.L.C., et al.*, 144 FERC ¶ 61,217 at PP 19-21 (2013)
("September 19 Order"). Thereafter, the parties resumed settlement discussions.

On October 18, 2013, AMP filed a request for rehearing of the September 19
Order.

On December 17, 2013, the Duke Companies provided notice to all PJM
transmission customers with load in the DEOK Zone (as hereinafter defined) that
settlement discussions in this proceeding had resumed, and that the settlement
negotiations might address transmission rate matters beyond the return on equity issue
specifically set for hearing and settlement procedures in the April 24 Order. That notice,
a copy of which is attached to the Settlement as Exhibit A, was sent to each of the
wholesale transmission customers with load in the DEOK Zone. Of importance, the
notice expressly and specifically advised recipients that the settlement negotiations might
encompass the Duke Companies' request for recovery in rates of all or a portion of the
legacy MISO Transmission Expansion Plan costs they incur. Specifically, Paragraph 4 of
the notice stated:

> Settlement negotiations have resumed in FERC Docket Nos. ER12-91 and ER12-92
> under the supervision of a FERC Administrative Law Judge. The settlement
> negotiations may address transmission rate matters beyond the return on equity issue
> specifically set for hearing and settlement procedures in the April 24, 2012 order,
> including the Duke Companies' recovery in rates of all or a portion of the legacy
> MISO Transmission Expansion Plan costs incurred by the Duke Companies.

5

A-9

The Duke Companies also stated in the notice that the outcome of the settlement negotiations could affect the amount paid for wholesale transmission service in the DEOK Zone, and that any customer wishing to intervene in the proceeding out of time should do so by January 7, 2014.

On December 18, 2013, The Dayton Power & Light Company ("Dayton") filed a motion to intervene.  On January 3, 2014, Buckeye Power, Inc. ("Buckeye") filed a motion to intervene.  On January 10, 2014, East Kentucky Power Cooperative, Inc. ("EKPC") filed a motion to intervene.  The Chief Judge granted these motions to intervene by orders issued January 9, 2014 and January 22, 2014.  One wholesale customer to which the December 17, 2013 notice was sent (American Electric Power) did not intervene.

Settlement discussions resumed following the Chief Judge's orders granting the additional interventions.  By order issued March 10, 2014, the Settlement Judge issued a report stating that the parties had reached an impasse in their settlement negotiations, and recommending that settlement judge procedures be terminated.  By order issued March 11, 2014, the Chief Judge accepted the recommendation of the Settlement Judge to terminate settlement judge procedures, and designated the Honorable Philip C. Baten to preside over the evidentiary hearing.  On March 24, 2014, the Chief Judge issued an order designating the Honorable Jennifer Whang as the substitute presiding administrative law judge.

By order issued April 2, 2014, Presiding Judge Whang adopted a procedural schedule for the trial in this proceeding.  On July 11, 2014, Presiding Judge Whang issued an order modifying the procedural schedule for the trial in this proceeding.

The parties continued informal settlement discussions during this period.  On July 30, 2014, the Duke Companies, AMP, Buckeye, EKPC and Hamilton submitted to Presiding Judge Whang an unopposed joint motion informing her that the parties had reached agreement on the terms of a negotiated resolution of the issues in these dockets, and requesting that the procedural schedule be suspended.  By order dated August 1, 2014, the Chief Judge suspended the procedural schedule to permit the preparation and filing of formal settlement documents.  A summary of those documents follows.

## II.    SUMMARY OF SETTLEMENT TERMS

The Settlement resolves all issues in this case among all parties to the case.  It is entered into by the Duke Companies, AMP on behalf of itself and its members, Buckeye on behalf of itself and its members, Dayton, EKPC on behalf of itself and its members, IMPA, Hamilton, and the Village of Blanchester, Ohio (an IMPA member)  (collectively, the "Settling Parties").  As noted above, earlier in this proceeding the Duke Companies entered into a settlement agreement with IMPA that resolved all issues in the case as between the Duke Companies and IMPA; this Settlement would replace that earlier settlement.[2]  Upon approval of the Settlement, the Duke Companies and AMP will

---

[2] Settlement, section 4.16.  Because of that replacement, Attachment H-22C to the PJM Tariff is no longer necessary and is being eliminated as of January 1, 2012.

withdraw their respective pending requests for rehearing in this proceeding.  Settlement, section 3.8.

One of the principal concerns expressed by the Commission in rejecting the February 4, 2013 Settlement among the Duke Companies, AMP and Hamilton was that it was "unclear . . . that all customers were on notice that these issues [the recovery of Legacy MTEP Costs, PJM Transition Costs, and Internal Integration Costs]" would be resolved in this proceeding.  September 19 Order at PP 20-21.  In order to resolve this concern with respect to any new settlement the parties might reach, the Duke Companies notified all wholesale transmission customers with load in the DEOK Zone that settlement negotiations were ongoing, that the settlement might address issues beyond the scope of the ROE issue set for hearing (specifically including the recovery of Legacy MTEP Costs), and that any party that wished to participate in the case could seek to intervene late and fully participate in the discussions.  See Settlement Exhibit A.  Three customers that received the notice – EKPC, Dayton and Buckeye – responded by intervening in this docket and participating in this Settlement.  In light of these facts, the Commission need not be concerned about whether all wholesale transmission customers with load in the DEOK Zone received notice of the settlement discussions and an opportunity to participate in those discussions.  Notice and an opportunity to participate were provided to all such customers.

Consistent with the notice given to customers, the Settlement includes a negotiated resolution of the Duke Companies' rate of return on common equity, as well as the Duke Companies' and wholesale transmission customers' respective obligations for Legacy

MTEP Costs associated with the Duke Companies' move to PJM. Settlement, section 3.2. The Settling Parties are mindful that, in the April 24 Order, the Commission rejected the Duke Companies' inclusion of Legacy MTEP Costs in rates, without prejudice to the Duke Companies' submission of a new filing that addressed the Commission's concerns. The Duke Companies sought rehearing of the April 24 Order, however, and that rehearing request remains pending before the Commission. As a result of these developments, the possibility existed that transmission customers in the DEOK Zone could become subject to the <u>full amount</u> of their allocated shares of Legacy MTEP Costs, PJM Transition Costs and Internal Integration Costs associated with the Duke Companies' move to PJM if the Duke Companies made a new filing to recover such costs, as permitted by the April 24 Order, or if the Duke Companies were successful in their request for rehearing of the April 24 Order (or in any subsequent petition for review of that Order). On the other hand, the Duke Companies faced the risk that they might be prevented from recovering <u>any</u> of these costs (*e.g.,* if the Commission were to reject the Duke Companies' new request for recovery and the Duke Companies' request for rehearing or petition for review of such order was unsuccessful). To hedge their respective risks, both sides have reached a compromise under which Duke will absorb 100% of the Wholesale Transmission Customers' Legacy MTEP Costs until the Settlement becomes effective, and 70% of those costs thereafter. Settlement, section 3.2. In addition, the Duke Companies will absorb 100% of Internal Integration Costs and PJM Transition Costs. Settlement, section 3.1.

As noted above, the instant Settlement does not implicate the concerns the Commission cited in rejecting the February 4, 2013 settlement.[3]  Through the December 17, 2013 notice given to all wholesale transmission customers with load in the DEOK Zone, all identifiable members of the class of potentially affected parties were advised of the issues that might be negotiated.  In particular, those entities were specifically and clearly informed that a negotiated resolution of the case might encompass the payment of Legacy MTEP Costs and other costs associated with the Duke Companies' move to PJM. Any possible concern with lack of notice to affected transmission customers thus was eliminated as a factor bearing on the justness and reasonableness of the instant Settlement.

Neither are the other concerns the Commission cited in rejecting the February 4, 2013 settlement relevant to the instant Settlement.  For example, another aspect of the earlier settlement the Commission found objectionable was the differing treatment of wholesale transmission customers.  In its order rejecting the prior settlement, the Commission stated:

> Given our earlier finding that recovering Legacy MTEP and Transition costs is not just and reasonable, we cannot find that the Settlement, which proposes recovering a portion of these costs from AMP and all of these costs from non-settling parties, is fair and reasonable and in the public interest.  Moreover, the fact that the Settlement provides greater benefits to AMP than the Duke Companies' other customers is inconsistent with the assumption that AMP's interests also represent the interests of other customers.  Accordingly, we find that the Settlement has not been shown to be fair and reasonable and in the public interest.

September 19 Order at P 21.

---

[3]  *See* September 19 Order at PP 19-21.

The concern that the prior settlement provided greater benefits to one set of transmission customers (AMP and Hamilton) than to other transmission customers is not apposite to the instant Settlement. Pursuant to the current Settlement, all wholesale transmission customers will be subject to the same tariff provisions and to the same rates, terms and conditions of service. Disparate treatment of customers therefore is no longer a matter with which the Commission need be concerned.

Further, as to the concern that the prior settlement permitted recovery of a portion of Legacy MTEP Costs without a cost-benefit study, the Commission's orders (including the September 19 Order) do not prohibit the affected parties from entering into a settlement that resolves that matter in a manner each such party finds acceptable. A key purpose of the Settlement is to resolve, and thereby moot, the Duke Companies' pending request for rehearing of the April 24 Order. If that rehearing request, or a subsequent court appeal raising the same issues, were successful, the Duke Companies might have been entitled to include in rates the PJM Transition Costs, Internal Integration Costs, and Legacy MTEP Costs in full. Furthermore, even if the only way the Duke Companies could recover those costs was through a section 205 filing that demonstrated a net benefit to customers, the Duke Companies would have been free to seek full recovery of such costs in such filing, not the more limited recovery agreed to as part of the Settlement. Thus, the Settlement operates to hedge the respective risks faced by each set of parties - the customers' risk of being charged Legacy MTEP and other costs without mitigation, and the Duke Companies' risk of securing no recovery of those costs at all. This very sort of risk-hedging is the essence of any settlement, and no particular issue

11

A-15

should be considered "out of bounds" lest parties be impeded in their efforts to achieve a complete and balanced resolution of the disputes that matter to them.

Neither the April 24 Order nor the September 19 Order prohibit the Duke Companies and transmission customers in the DEOK Zone from reaching a consensual resolution of the Legacy MTEP cost recovery issue, especially where the resolution provides for a greatly reduced level of recovery as compared to what the Duke Companies' initially requested. Here, as part of an overall package, the Duke Companies have agreed to absorb 70% of the Legacy MTEP costs that the Duke Companies' originally sought to recover in full from transmission customers in the DEOK Zone once the Settlement becomes effective (and 100% prior to that time). Transmission customers, for their part, are agreeing as part of an overall package that the transmission charges they pay will include 30% of the Legacy MTEP costs once the Settlement becomes effective (and none of such costs prior to that time), without the Duke Companies submitting a cost-benefit study. This trade-off is part of an integrated package of gives-and-takes that each set of parties finds agreeable. The Commission encourages parties to work toward just such negotiated solutions as an alternative to litigation, particularly in difficult cases (like this one) where the litigation is likely to be protracted and costly.[4] If for some reason the Settlement is not approved, wholesale transmission customers would be re-exposed to the risk of having to bear 100% of Legacy MTEP Costs, Internal Integration

---

[4] *See, e.g., Duke Energy Trading and Marketing Co.,* 117 FERC ¶ 61,039 at P 12 (2006).

12

Costs, and PJM Transition Costs, precisely the risk that they desire to mitigate through the Settlement.

The Settlement provides for revisions to Attachments H-22 and JJ to the PJM Tariff as set forth in Exhibits B and C to the Settlement. Settlement, section 3.4. The modified tariff provisions in Exhibit B, which would become effective as of January 1, 2012, effectuate the exclusion from rates of 100% of Legacy MTEP Costs, Internal Integration Costs and PJM Transition Costs, and the replacement of the April 5 Settlement with the instant Settlement for IMPA. The modified tariff provisions in Exhibit C, which would become effective as of the date on which the Commission accepts the Settlement, effectuate a reduction in the Duke Companies' rate of return on common equity ("ROE") from 12.38 percent to 11.38 percent (the latter consisting of a base ROE of 10.88 percent plus a fifty basis point adder for RTO membership), the continued exclusion from rates of 100% of Internal Integration Costs and PJM Transition Costs, and the exclusion from rates of 70% (and the inclusion in rates of 30%) of Legacy MTEP Costs.[5] Redlined sheets showing the changes to the currently effective tariff sheets are included as Attachment C to this filing.[6]

The Duke Companies are filing the changes to the PJM Tariff as part of the instant Settlement because they are an integral part of resolution of the pending issues in this proceeding. As is common and desirable for settlements of this nature, the Settlement is

---

[5] The Settlement also corrects two minor typographical errors in Attachment H-22A.

[6] Consistent with Section 4.b. of the Formula Rate Implementation Protocols, changes in the revenue requirement as a result of the settlement will be reflected in the next Annual Update, including interest as per section 35.19a of the Commission's regulations.

a global one - that is, it resolves all pending issues in the proceeding, including the issues that were set for hearing and those that remain pending before the Commission on rehearing. The Settling Parties engaged in good faith negotiations through the Commission's settlement procedures, and after several months of negotiations reached middle ground on the issues that were set for hearing as well as on the issues that were the subject of the rehearing requests. It would not have been possible to achieve a settlement that resolved all issues in the case without agreement on the revised tariff sheets that effectuate the Settling Parties' understandings and, therefore, the modified tariff sheets are an essential and integral part of the Settlement itself.

The Settlement also contains provisions that require the Settling Parties to forgo initiating a proceeding regarding the Settlement ROE with an effective date prior to June 1, 2017. Settlement, section 3.3. As part of the Settlement, the Duke Companies agree to withdraw their request for rehearing of the Commission's April 24 Order in this proceeding, including that order's commencement of a section 206 proceeding with respect to the Duke Companies' existing 12.38 percent ROE. AMP also agrees to withdraw its pending request for rehearing of the September 19 Order rejecting the earlier settlement among the Duke Companies, AMP and Hamilton. In order to ensure that the Commission does not act on those rehearing requests while the Settlement is pending before the Commission, section 3.8 of the Settlement requires the Duke Companies and AMP to request that the Commission hold their respective rehearing requests in abeyance pending action on the Settlement. The Duke Companies and AMP filed a joint motion for that purpose with the Commission on October 29, 2014.

As to the standard of review applicable to unilateral modification requests, the Settlement provides that, unless the Settling Parties otherwise agree in writing, any modification to the Settlement proposed by one of the parties after the Settlement has become effective shall, as between them, be subject to the "public interest" application of the just and reasonable standard. The Settlement also provides that any modifications to the Settlement proposed by the Commission acting *sua sponte* or by a non-Settling Party shall be subject to the just and reasonable standard. Settlement, section 4.9.

In addition to the foregoing, the Settlement also contains standard provisions commonly included in settlement agreements filed with the Commission.

## III. SERVICE

The Duke Companies have served a copy of this filing on all parties on the official service list to this proceeding. In addition, PJM has served a copy of this filing on all PJM members and on all state utility commissions in the PJM region by posting this filing electronically.

## IV. ADDITIONAL MATTERS

By letter order dated October 23, 2003, the Chief Administrative Law Judge requires all parties submitting Section 602 settlements to address five questions in their explanatory statement. These issues are addressed in this section.

### A. What are the issues underlying the settlement and what are the major implications?

The background of this proceeding is summarized above in Section I, and a summary of the Settlement appears in Section II. The Settlement is a negotiated rate case

compromise, and expressly states that no party shall be deemed to have agreed to any principle or position in this proceeding.

**B.      Whether any of the issues raise policy implications.**

The issues presented in the Settlement do not raise any major policy implications because the Settlement establishes no precedent.  It does, however, further the broad public interest in favor of settlements.[7]

**C.      Whether other pending cases may be affected.**

No other pending cases will be affected by the resolution of the instant proceeding.

**D.      Whether the settlement involves issues of first impression, or if there are any previous reversals on the issues involved.**

The Settlement settles a transmission tariff rate case without establishing any precedent on any issue, and as such it does not involve any issues of first impression or previous reversals on the issues involved.

**E.      Whether the proceeding is subject to the just and reasonable standard or whether there is _Mobile-Sierra_ language making it the standard, i.e., the applicable standard of review.**

The Settlement provides that, unless otherwise agreed to by the Settling Parties in writing, any proposed modifications to the Settlement, as between the Settling Parties, shall be subject to the "public interest" application of the just and reasonable standard of

---

[7]  _See Southern Union Gas Co. v. FERC_, 840 F.2d 964, 971 (D.C. Cir. 1988).

review; and that any modifications proposed by the Commission acting *sua sponte* or by a non-Settling Party shall be subject to the just and reasonable standard.[8]

## V.    CONCLUSION

The Settlement fairly and fully resolves all issues in this proceeding, including the Duke Companies' and AMP's pending rehearing requests, which the Duke Companies and AMP will withdraw upon approval of the Settlement. The Settlement has been negotiated in accordance with Commission rules and procedures, and Commission approval of the Settlement will save the Settling Parties and the Commission the considerable expense and effort of litigating the difficult and complex issues that have been amicably resolved through negotiation to the mutual satisfaction of the Settling Parties. The Settlement achieves rate certainty for the Settling Parties while preserving the rights of entities that had notice of, but chose not to participate in, the proceeding or the settlement process. For all the foregoing reasons, the Settling Parties request that the Commission (i) find that the Settlement is fair and reasonable, (ii) approve the Settlement without modification or condition, and (iii) allow the Settlement (including the modified tariff provisions submitted as part of the Settlement) to become effective in accordance with its terms.

---

[8] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956) (the *Mobile-Sierra* doctrine), as clarified in *Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish County, Washington,* 554 U.S. 527 (2008) and refined in *NRG Power Mktg. v. Maine Pub. Utils. Comm'n*, 558 U.S. 165 (2010).

Respectfully submitted,

_/s/ Gary A. Morgans_

Gary A. Morgans
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-6234
gmorgans@steptoe.com

Paul Kinny
Deputy General Counsel
Duke Energy Corporation
550 S. Tryon Street
Mail Code DEC45A
Charlotte, NC 28202
(980) 373-6609
paul.kinny@duke-energy.com

*Counsel for Duke Energy Ohio, Inc. and
Duke Energy Kentucky, Inc.*

On behalf of the Settling Parties

October 30, 2014

**ATTACHMENT 2**

**SETTLEMENT AGREEMENT**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket Nos. ER12-91-000 |
| Duke Energy Ohio, Inc. | ) | ER12-91-002 |
| Duke Energy Kentucky, Inc. | ) | ER12-91-004 |
| | ) | ER12-91-005 |
| | ) | ER12-91-007 |
| | ) | ER12-91-008 |
| | ) | ER12-92-000 |
| | ) | ER12-92-002 |
| | ) | ER12-92-004 |
| | ) | ER12-92-005 |
| | ) | ER12-92-007 |
| | ) | and ER12-92-008 |

**SETTLEMENT AGREEMENT**

This Settlement Agreement ("Settlement Agreement") is made pursuant to

Rule 602 of the Rules of Practice and Procedure of the Federal Energy Regulatory

Commission ("Commission" or "FERC"), 18 C.F.R. § 385.602 (2014), by and

among Duke Energy Ohio, Inc. ("DEO"), a corporation organized and existing

under the laws of the State of Ohio, Duke Energy Kentucky, Inc. ("DEK"), a

corporation existing under the laws of the Commonwealth of Kentucky, American

Municipal Power, Inc. ("AMP"), on behalf of itself and its members, Buckeye

Power, Inc. ("Buckeye"), on behalf of itself and its members, The Dayton Power

and Light Company ("Dayton"), East Kentucky Power Cooperative, Inc. ("East

Kentucky"), on behalf of itself and its members, the Indiana Municipal Power

Agency ("IMPA"), the City of Hamilton, Ohio ("Hamilton"), and the Village of

Blanchester, Ohio (each a "Settling Party" and all collectively, the "Settling

Parties"). The Settling Parties enter into this Settlement Agreement to resolve all

A-24

issues in Docket Nos. ER12-91-000, ER12-92-000, and the above-referenced sub-dockets.

**ARTICLE I**

**1.1.**    On October 14, 2011, in Docket Nos. ER12-91-000 and ER12-92-000, DEO and DEK (jointly, the "Duke Companies") jointly filed, pursuant to section 205 of the Federal Power Act ("FPA"), proposed modifications to the PJM Interconnection, L.L.C. ("PJM") Open Access Transmission Tariff ("PJM Tariff") in connection with the Duke Companies' move from the Midwest Independent Transmission System Operator, Inc. *n/k/a* Midcontinent Independent System Operator, Inc. ("MISO" or "Midcontinent ISO") Regional Transmission Organization ("RTO") to the PJM RTO.  The Duke Companies' proposed modifications to the PJM Tariff pertained to establishing and recovering the Duke Companies' transmission revenue requirement, including formula rate protocols.  In addition, under section 205 of the FPA, PJM submitted proposed modifications to the PJM Tariff, the Amended and Restated Operating Agreement of PJM, the Reliability Assurance Agreement Among Load Serving Entities in the PJM Region, and the Consolidated Transmission Owners Agreement (collectively, the "PJM Agreements").  The Duke Companies and PJM jointly requested an effective date of January 1, 2012, for the proposed changes.

**1.2.**    On November 4, 2011, AMP, on behalf of itself and its members Hamilton, Lebanon, and Williamstown (Hamilton, Lebanon, and Williamstown collectively referred to herein as the "AMP Members"), filed a timely motion to intervene, protest, and request for suspension and hearings in this proceeding.

Also on November 4, 2011, IMPA filed a timely motion to intervene and protest in this proceeding.  No other party protested the filings.

1.3.    On December 27, 2011, the Duke Companies filed a Request for Deferral of Action requesting that the Commission enable the Duke Companies, AMP and IMPA to continue settlement discussions that, if successful, would resolve all issues in this proceeding.  The request was submitted on the condition that it would have no effect on the requested effective date of January 1, 2012.  Solely in order to defer Commission action on the pending tariff change filing, the Duke Companies and PJM submitted on December 29, 2011, a ministerial filing that contained no changes to the existing tariff records filed in these dockets on October 14, 2011.  The Commission issued public notice of the filing.  No comments were filed.

1.4.    On January 10, 2012, Hamilton filed a motion to intervene in this proceeding in its own right.

1.5.    On February 24, 2012, the Duke Companies filed a second Request for Deferral of Action.  The Commission issued public notice of the filing.  No comments were filed.

1.6.    On April 5, 2012, the Duke Companies and IMPA filed a settlement agreement in this proceeding that resolved all issues between the Duke Companies and IMPA ("April 5 Settlement").

1.7.    On April 24, 2012, the Commission issued an order that denied recovery by the Duke Companies from wholesale transmission customers of Legacy MTEP Costs (as hereinafter defined) and PJM Transition Costs and

Internal Integration Costs (as hereinafter defined), without prejudice to a new filing under section 205 of the FPA seeking to justify such recovery, established hearing and settlement judge procedures pursuant to section 206 of the FPA for determination of the Duke Companies' rate of return on equity, and approved the April 5 Settlement.  *PJM Interconnection, L.L.C., et al.*, 139 FERC ¶ 61,068 (2012) ("April 24 Order").  IMPA subsequently withdrew its protest of the Duke Companies' filing, leaving AMP as the only party (on its own behalf and on behalf of the AMP Members) with a protest in the proceeding.

**1.8.**    On May 24, 2012, the Duke Companies filed revised tariff records in compliance with the April 24 Order.  On the same date, the Duke Companies filed a request for rehearing of the April 24 Order.

**1.9.**    On February 4, 2013, the Duke Companies, AMP, and the AMP Members filed a settlement agreement in this proceeding.  That settlement agreement provided, among other things, for the recovery of Legacy MTEP Costs, PJM Transition Costs and Internal Integration Costs (each as defined in that settlement agreement) from all wholesale transmission customers, together with a reimbursement to AMP and the AMP Members for 75 percent of the Legacy MTEP Costs and 100 percent of the PJM Transition Costs.

**1.10.**    By order issued September 19, 2013, the Commission rejected that settlement agreement, stating, among other things, that it was "unclear . . . that all customers were on notice that these issues [the recovery of Legacy MTEP Costs, PJM Transition Costs, and Internal Integration Costs] would be resolved [in this proceeding]" and that the Duke Companies had not shown that the settlement was

Page 4 of 20

not unduly discriminatory in failing to extend the benefits offered to AMP to the Duke Companies' other customers. *PJM Interconnection, L.L.C., et al.*, 144 FERC ¶ 61,217 at PP 19-20 (2013). Thereafter, the parties resumed settlement discussions.

**1.11.** On October 18, 2013, AMP filed a request for rehearing of the September 19, 2013 order.

**1.12.** On December 17, 2013, the Duke Companies provided notice to all of their wholesale transmission customers that settlement discussions in this proceeding had resumed, and that the settlement negotiations may address transmission rate matters beyond the return on equity issue specifically set for hearing and settlement procedures in the April 24 Order, including the Duke Companies' recovery in rates of all or a portion of the legacy MISO Transmission Expansion Plan costs incurred by the Duke Companies. A copy of that notice is attached as Exhibit A. The Duke Companies stated that the outcome of the settlement negotiations could affect the amount paid for wholesale transmission service in the DEOK Zone (as hereinafter defined), and that any customer wishing to intervene in the proceeding out of time should do so by January 7, 2014.

**1.13.** On December 18, 2013, Dayton filed a motion to intervene. On January 3, 2014, Buckeye filed a motion to intervene. On January 10, 2014, East Kentucky filed a motion to intervene. These motions were granted by the Chief Judge by orders issued January 9, 2014 and January 22, 2014.

**1.14.** Settlement discussions resumed following the Chief Judge's orders granting the additional interventions. By order issued March 10, 2014, the

Settlement Judge issued a report stating that the parties had reached an impasse in their settlement negotiations, and recommending that settlement judge procedures be terminated.  By order issued March 11, 2014, the Chief Judge accepted the recommendation of the Settlement Judge to terminate settlement judge procedures, and designated the Honorable Philip C. Baten to preside over the evidentiary hearing.   On March 24, 2014, the Chief Judge issued an order making a substitute designation of the Honorable Jennifer Whang to preside over the evidentiary hearing.

**1.15.**  By order issued April 2, 2014, Presiding Judge Whang adopted a procedural schedule for the trial in this proceeding.  On July 11, 2014, Presiding Judge Whang issued an order modifying the procedural schedule for the trial in this proceeding.

**1.16.**  Informal settlement discussions continued during this period.  On July 30, 2014, the Duke Companies, AMP, Buckeye, East Kentucky, and Hamilton submitted to Presiding Judge Whang  an unopposed joint motion informing her that the parties had reached agreement on the terms of a negotiated resolution of the issues in these dockets, and requesting that the procedural schedule be suspended.  By order dated August 1, 2014, the Chief Judge suspended the procedural schedule to permit the preparation and filing of formal settlement documents.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the Settling Parties, intending to be legally bound, agree as follows:

## ARTICLE II

All defined terms have the meanings set forth in this Settlement Agreement. All rules of construction and interpretation of this Settlement Agreement shall be as set forth in the PJM Tariff or PJM Agreements.

"DEOK Zone" means the DEOK Zone as set forth in the PJM Tariff.

"Internal Integration Costs" means the internal administrative costs incurred by the Duke Companies to accomplish their move from MISO into PJM.

"Legacy MTEP Costs" means all costs arising from obligations of the Duke Companies or the Wholesale Transmission Customers to pay any portion of the costs of identified transmission expansion projects included in any Midcontinent ISO Transmission Expansion Plan ("MTEP") that was approved by the MISO Board of Directors prior to the date of the Duke Companies' integration into PJM, including any such costs that arise from Multi-Value Projects, as defined in Section II.C of Attachment FF to the MISO open access transmission tariff, that were approved by the MISO Board of Directors prior to the date of the Duke Companies' integration into PJM.

"MISO" or "Midcontinent ISO" means the Midcontinent Independent System Operator, Inc. or the Midwest Independent Transmission System Operator, Inc., as it was formerly known, or the successor thereto.

"PJM" means PJM Interconnection, L.L.C., or the successor thereto.

"PJM Agreements" means the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C., the Reliability Assurance Agreement

Page 7 of 20

A-30

Among Load Serving Entities in the PJM Region, and the Consolidated Transmission Owners Agreement.

"PJM Formula Rate" means PJM Tariff Attachment H-22A, which was submitted by the Duke Companies in the filing in the above-referenced Docket Nos. ER12-91-000 and ER12-92-000.

"PJM RTEP Costs" means costs defined by PJM in Schedule 12 of the PJM Tariff and charged under Schedule 12-Appendix and Schedule 12-Appendix A of the PJM Tariff.

"PJM Tariff" means the PJM Interconnection, L.L.C. Open Access Transmission Tariff.

"PJM Transition Costs" means costs identified as "Transition Costs" in the Duke Companies' filings submitted in the above-referenced proceeding and therein proposed to be included in the PJM Formula Rate, specifically, costs associated with: (1) the Duke Companies' obligation under Article Five, Section II.B of the MISO Transmission Owners' Agreement ("MISO TOA") to pay certain amounts to MISO as an exit fee; (2) the Duke Companies' agreement, approved by the Commission in Docket No. ER11-2059-000, to pay MISO $1.8 million to resolve a dispute over MISO tariff revisions proposed to address alleged adverse effects on the feasibility of Long-Term Firm Transmission Rights resulting from the withdrawal of the Duke Companies from MISO; and (3) the Duke Companies' agreement to pay PJM approximately $1 million as compensation for PJM's costs incurred in connection with the Duke Companies' transition to PJM ("PJM Integration Costs").

"Wholesale Transmission Customers" means all entities receiving wholesale transmission service from PJM for electrical load in the DEOK Zone, either directly or indirectly as members of AMP, Buckeye, East Kentucky, or IMPA.

### ARTICLE III

**3.1.** *PJM Transition Costs and Internal Integration Costs.* Effective January 1, 2012, the Duke Companies' revenue requirement for wholesale transmission service provided by PJM for electrical load in the DEOK Zone shall exclude one hundred percent (100%) of PJM Transition Costs and Internal Integration Costs. This one hundred percent (100%) exclusion of such costs shall not be subject to change at any time or for any reason.

**3.2.** *Legacy MTEP Costs*

a. During the period beginning January 1, 2012 and through the day before the date this Settlement Agreement becomes effective in accordance with Section 4.3, the charges for wholesale transmission service for electrical load in the DEOK Zone shall exclude one hundred percent (100%) of Legacy MTEP Costs. The exclusion of one hundred percent (100%) of such costs shall not be subject to change at any time or for any reason.

b. On and after the date this Settlement Agreement becomes effective in accordance with Section 4.3 and continuing for so long as the Duke Companies remain subject to Legacy MTEP Costs, the charges for wholesale transmission service for electrical load in the DEOK Zone shall exclude seventy percent (70%) of any Legacy MTEP Costs, and shall include thirty percent (30%) of any Legacy MTEP Costs. The Duke Companies shall maintain in effect throughout such period tariff records that reflect the exclusion of seventy percent (70%) of such costs

Page 9 of 20

A-32

from, and the inclusion of thirty percent (30%) of such costs in, the charges for such wholesale transmission service.  The exclusion of seventy percent (70%) and inclusion of thirty percent (30%) of such costs shall not be subject to change at any time or for any reason.

c.  Nothing herein shall affect the payment obligation of a Wholesale Transmission Customer with respect to PJM RTEP Costs included in the charges for wholesale transmission service that PJM provides in the DEOK Zone, nor shall anything herein obligate the Duke Companies to provide reimbursement to any Wholesale Transmission Customer for all or any portion of PJM RTEP Costs included in the charges for wholesale transmission service that PJM provides in the DEOK Zone.

**3.3.**  *Return on Common Equity*

a.  On and after the date this Settlement Agreement becomes effective in accordance with Section 4.3 and continuing until changed by order of the Commission, the return on common equity ("ROE") in the Duke Companies' revenue requirement for wholesale transmission service shall be a total of 11.38%, consisting of a 10.88% base cost of common equity and a 0.5% ROE adder as permitted by Commission policy for participation in a regional transmission organization (hereinafter, the "Base/RTO ROE"), subject to the rights reserved in the proviso of Section 3.3.b.

b.  The Duke Companies shall make no unilateral filing seeking an increase in the Base/RTO ROE that would become effective before June 1, 2017. No Settling Party shall make a unilateral filing seeking a reduction in the

Base/RTO ROE that would become effective before June 1, 2017, nor shall any Settling Party support a request made by any other entity seeking a reduction in the Base/RTO ROE that would become effective before June 1, 2017; provided, however, that the Settling Parties (or any of them) shall not be precluded from making or supporting a filing to eliminate the 0.5% ROE adder if the Duke Companies terminate their participation in an RTO before June 1, 2017.

c.      Nothing herein shall affect either (i) the right of the Duke Companies to request an incentive ROE adder applicable to any specific transmission project or projects, if and as consistent with Commission policy, that would become effective before June 1, 2017, or (ii) the right of any Wholesale Transmission Customer to oppose such a request.

**3.4**    *Tariff Provisions.*

a.      Effective January 1, 2012, the tariff records included as Exhibit B to this Settlement Agreement shall replace and supersede the tariff records included in PJM Tariff Attachments H-22 and JJ that were filed in this proceeding on October 14, 2011 and May 24, 2012.  Not later than 30 days after the date this Settlement Agreement becomes effective in accordance with Section 4.3, the Duke Companies shall submit the tariff records included in Exhibit B to the Commission through eTariff as a compliance filing.  The Settling Parties shall not oppose or protest a filing made by the Duke Companies in conformity with this Section 3.4.a.

b.      Effective on the date this Settlement Agreement becomes effective in accordance with Section 4.3, the tariff records included as Exhibit C to this

Settlement Agreement shall replace and supersede the tariff records included in PJM Tariff Attachments H-22 and JJ that are attached as Exhibit B to this Settlement Agreement.  Not later than 30 days after the date this Settlement Agreement becomes effective in accordance with Section 4.3, the Duke Companies shall submit the tariff records included in Exhibit C to the Commission through eTariff as a compliance filing.  The Settling Parties shall not oppose or protest a filing made by the Duke Companies in conformity with this Section 3.4.b.

**3.5.** *Tariff Charges.*

a.      None of the Settling Parties shall initiate a proceeding for the purpose of seeking a change in the charges for Legacy MTEP Costs that are in conformance with Section 3.2, nor shall any of the Settling Parties, in any proceeding initiated by others, support a change in the charges for Legacy MTEP Costs that are in conformance with Section 3.2.

b.      No Settling Party shall initiate a proceeding for the purpose of seeking a reduction in the charges to Wholesale Transmission Customers for PJM RTEP Costs on the ground that Wholesale Transmission Customers are paying for Legacy MTEP Costs; nor shall any Settling Party, in any proceeding initiated by others, support a reduction in the charges to Wholesale Transmission Customers for PJM RTEP Costs on the ground that Wholesale Transmission Customers are paying for Legacy MTEP Costs.

**3.6.** *Satisfaction of Claims for Recovery of Legacy MTEP Costs.*  The Duke Companies agree that payment of the amounts of any Legacy MTEP Costs included in the rates to Wholesale Transmission Customers in the PJM Tariff, as

provided for in Section 3.2, fully satisfies and discharges any claimed right of the Duke Companies to recover from Wholesale Transmission Customers Legacy MTEP Costs or any other costs, charges or fees arising from or relating to the Duke Companies' participation in MISO prior to January 1, 2012. Accordingly, the Duke Companies shall not make any filing seeking recovery from any Wholesale Transmission Customer of Legacy MTEP Costs or any other costs, charges, or fees arising from or relating to the Duke Companies' participation in MISO prior to January 1, 2012, beyond or in addition to the recovery provided for in Section 3.2.

**3.7** *Resolution of All Hold Harmless Obligations.*  The Settling Parties agree that (a) the considerations provided by the Duke Companies under this Settlement Agreement to the Wholesale Transmission Customers are in resolution of "hold harmless" claims made by any Settling Party  pursuant to Article V, Section 2 of the MISO TOA and resolve all claims raised by any Settling Party in these proceedings; and that (b) the obligation of the Duke Companies to provide such considerations is contingent upon this Settlement Agreement becoming effective in accordance with Section 4.3.  The Duke Companies' compliance with the terms of this Settlement Agreement shall fully satisfy and discharge any and all obligations of the Duke Companies to render payment to any Settling Party according to the terms of Article V, Section 2 of the MISO TOA in connection with the Duke Companies' withdrawal from MISO, and such satisfaction and discharge shall not be affected by any amendment, substitute or successor to that provision, or any amendment, substitute or successor to the PJM Formula Rate filed in this proceeding.  Each of the Settling Parties agrees not to make any protest or raise

any claim against the Duke Companies or their parents or affiliates, before any government agency or court, asserting that the Duke Companies or their parents or affiliates owe any of the Settling Parties, respectively, any further "hold harmless" or other compensation under Article V, Section 2 of the MISO TOA, or any other monies or damages of any nature in connection with the Duke Companies' withdrawal from the Midcontinent ISO.

**3.8.** *Withdrawal of Rehearing Request.* Within five (5) days of the date of this Settlement Agreement, the Duke Companies and AMP shall request that the Commission hold in abeyance their respective May 24, 2012, and October 18, 2013 requests for rehearing in this proceeding pending action on this Settlement Agreement. In the event that this Settlement Agreement becomes effective pursuant to clause (a) of the first sentence of Section 4.3, then within five (5) days of the date that this Settlement Agreement becomes effective, the Duke Companies and AMP shall withdraw their respective May 24, 2012, and October 18, 2013 requests for rehearing in this proceeding. In the event that this Settlement Agreement becomes effective pursuant to clause (b) of the first sentence of Section 4.3, then within twenty (20) days of the date that this Settlement Agreement becomes effective the Duke Companies and AMP shall withdraw their respective May 24, 2012, and October 18, 2013 requests for rehearing in this proceeding. In the event that this Settlement Agreement does not become effective pursuant to Section 4.3, then the Duke Companies and AMP may, at their individual options, withdraw their respective requests that the

Commission hold in abeyance their respective May 24, 2012, and October 18,

2013 requests for rehearing in this proceeding.

## ARTICLE IV

**4.1.**  *Scope of the Agreement.*  This Settlement Agreement constitutes the

entire agreement among the Settling Parties with respect to the subject matter

addressed herein, and supersedes any and all prior or contemporaneous

representations, agreements, instruments and understandings between them,

whether written or oral.  There are no other oral understandings, terms, or

conditions, and none of the Settling Parties has relied upon any representation,

express or implied, not contained in this Settlement Agreement.  Nothing in this

Settlement Agreement should be construed as negating or fulfilling the obligations

or responsibilities of the Duke Companies or any of the Wholesale Transmission

Customers under the PJM Tariff or PJM Agreements.

**4.2.**  *Non-Severability.*  The Settling Parties agree and understand that the

various provisions of this Settlement Agreement are not severable and shall not

become operative unless and until this Settlement Agreement and the revised tariff

records provided for herein become effective as described in Section 4.3.

**4.3.**  *Effectiveness of Settlement Agreement.*  This Settlement Agreement

and the provisions hereof shall become effective upon (a) the issuance of an order

by the Commission accepting or approving this Settlement Agreement without

condition or modification, or (b) the issuance of an order by the Commission

accepting or approving this Settlement Agreement with condition(s) or

modification(s), if no Settling Party files notice with the Commission within fifteen

(15) days of the approval of the Settlement Agreement stating that it objects to

such condition(s) or modification(s).  If any Settling Party files such notice, the Settlement Agreement shall be null and void and of no force or effect.

**4.4.**    *Reservations.*  Notwithstanding the provisions of Sections 4.2 and 4.3, the provisions of Section 3.8 (holding of request for rehearing in abeyance), Section 4.6 (confidentiality of settlement discussions), and Section 4.7 (assurances of cooperation) shall become effective upon execution of the Settlement Agreement.

**4.5.**    *No Precedent.*  This Settlement Agreement is submitted pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2014), and is inadmissible as evidence in any proceeding except a proceeding involving a claim of breach of, or an effort to enforce, this Settlement Agreement.  It is further understood and agreed that this Settlement Agreement constitutes a negotiated agreement and, except as explicitly set forth herein, no Settling Party shall be deemed to have approved, accepted, agreed or consented to any principle or position in this proceeding.

**4.6.**    *Settlement Discussions.*  The discussions between and among the Settling Parties that have produced this Settlement Agreement have been conducted with the explicit understanding, pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2014), that all offers of settlement and discussions relating thereto shall be privileged and confidential, shall be without prejudice to the position of any Settling Party or participant presenting any such offer or participating in any such discussion, and

are not to be used in any manner in connection with this proceeding, any other proceeding, or otherwise, except to the extent necessary to enforce its terms.

**4.7.** *Further Assurances.* Each Settling Party shall cooperate with and support, and shall not take any action inconsistent with: (i) the filing of this Settlement Agreement with the Commission, and (ii) efforts to obtain Commission acceptance or approval of this Settlement Agreement without change or condition. No Settling Party shall take any action that is inconsistent with the provisions of this Settlement Agreement.

**4.8.** *Waiver.* No provision of this Settlement Agreement may be waived except through a writing signed by an authorized representative of the waiving Settling Party or the waiving Settling Parties. Waiver of any particular provision of this Settlement Agreement shall not be deemed to waive any other provision or provisions hereof.

**4.9.** *Modifications/Standard of Review.* Unless the Settling Parties otherwise agree in writing, any modification to this Settlement Agreement proposed by one of the Settling Parties after the Settlement Agreement has become effective in accordance with Section 4.3 shall, as between them, be subject to the "public interest" application of the just and reasonable standard of review set forth in *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956) (the *Mobile-Sierra* doctrine), as clarified in *Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish County, Washington*, 128 S.Ct. 2733, 171 L. Ed. 2d 607 (2008) and refined in *NRG Power Mktg. v. Maine Pub.*

Page 17 of 20

*Utils. Comm'n*, 130 S. Ct. 693, 700 (2010).  Any modification proposed by the Commission acting *sua sponte* or by a non-Settling Party shall be subject to the just and reasonable standard.

**4.10.**  *Successors and Assigns.*  This Settlement Agreement is binding upon and for the benefit of the Settling Parties and their successors and assigns.

**4.11.**  *Captions and References to Sections.*  The captions in this Settlement Agreement are for convenience of reference only and are not a part of this Settlement Agreement and do not in any way limit or amplify the terms and provisions of this Settlement Agreement and shall have no effect on its interpretation.  Unless otherwise indicated, references to "Sections" in this Settlement Agreement refer to sections in this Settlement Agreement.

**4.12.**  *Ambiguities Neutrally Construed.*  This Settlement Agreement is the result of negotiations among, and has been reviewed by, each Settling Party and its respective counsel.  Accordingly, this Settlement Agreement shall be deemed to be the product of each Settling Party, and no ambiguity shall be construed in favor of or against any Settling Party based on authorship of this Settlement Agreement.

**4.13.**  *Authorization.*  Each person executing this Settlement Agreement on behalf of a Settling Party represents and warrants that he or she is duly authorized and empowered to act on behalf of, and to authorize this Settlement Agreement to be executed on behalf of, the Settling Party that he or she represents.

**4.14.**  *Notices.*  All notices, demands, and other communications hereunder shall be in writing and shall be delivered to each Settling Party's "Corporate

Page 18 of 20

A-41

Official" as found on the Commission's website at http://www.ferc.gov/docs-filing/corp-off.asp or the representative(s) of each Settling Party included on the official service list in Docket Nos. ER12-91-000 and ER12-92-000.

    **4.15.** *Counterparts.*  This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

    **4.16** *Termination of Prior IMPA Settlement Agreement.*  Effective on the date that this Settlement Agreement becomes effective in accordance with Section 4.3, the April 5 Settlement shall be terminated, and shall be of no force or effect.

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _Gary A. Morgan_     Date: _10.29.14_

DUKE ENERGY KENTUCKY, INC.

By: _Gary A. Morgan_     Date: _10.29.14_

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____     Date: _____

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____     Date: _____

THE DAYTON POWER AND LIGHT COMPANY

By: _____     Date: _____

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____     Date: _____

INDIANA MUNICIPAL POWER AGENCY

By: _____     Date: _____

CITY OF HAMILTON, OHIO

By: _____     Date: _____

VILLAGE OF BLANCHESTER, OHIO

By: _____     Date: _____

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _____    Date: _____

DUKE ENERGY KENTUCKY, INC.

By: _____    Date: _____

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: 10/14/2014

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

THE DAYTON POWER AND LIGHT COMPANY

By: _____    Date: _____

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

INDIANA MUNICIPAL POWER AGENCY

By: _____    Date: _____

CITY OF HAMILTON, OHIO

By: _____    Date: _____

VILLAGE OF BLANCHESTER, OHIO

By: _____    Date: _____

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _____    Date: _____

DUKE ENERGY KENTUCKY, INC.

By: _____    Date: _____

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _*signature*_    Date: 10/8/14

THE DAYTON POWER AND LIGHT COMPANY

By: _____    Date: _____

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

INDIANA MUNICIPAL POWER AGENCY

By: _____    Date: _____

CITY OF HAMILTON, OHIO

By: _____    Date: _____

VILLAGE OF BLANCHESTER, OHIO

By: _____    Date: _____

Page 20 of 20

A-45

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _____ Date: _____

DUKE ENERGY KENTUCKY, INC.

By: _____ Date: _____

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____ Date: _____

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____ Date: _____

THE DAYTON POWER AND LIGHT COMPANY

By: _Randall V. Griffin_ Date: _10-16-2014_

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____ Date: _____

INDIANA MUNICIPAL POWER AGENCY

By: _____ Date: _____

CITY OF HAMILTON, OHIO

By: _____ Date: _____

VILLAGE OF BLANCHESTER, OHIO

By: _____ Date: _____

Page 20 of 20

A-46

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _____     Date: _____

DUKE ENERGY KENTUCKY, INC.

By: _____     Date: _____

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____     Date: _____

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____     Date: _____

THE DAYTON POWER AND LIGHT COMPANY

By: _____     Date: _____

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _Ann Coblus_     Date: _10/22/14_
          _Counsel_

INDIANA MUNICIPAL POWER AGENCY

By: _____     Date: _____

CITY OF HAMILTON, OHIO

By: _____     Date: _____

VILLAGE OF BLANCHESTER, OHIO

By: _____     Date: _____

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement
Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _____    Date: _____

DUKE ENERGY KENTUCKY, INC.

By: _____    Date: _____

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS
MEMBERS

By: _____    Date: _____

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

THE DAYTON POWER AND LIGHT COMPANY

By: _____    Date: _____

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF
ITSELF AND ITS MEMBERS

By: _____    Date: _____

INDIANA MUNICIPAL POWER AGENCY

By: _Basel Nao_____    Date: _10/10/14_ BP

CITY OF HAMILTON, OHIO

By: _____    Date: _____

VILLAGE OF BLANCHESTER, OHIO

By: _____    Date: _____

Page 20 of 20

A-48

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement

Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _____     Date: _____

DUKE ENERGY KENTUCKY, INC.

By: _____     Date: _____

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS
MEMBERS

By: _____     Date: _____

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____     Date: _____

THE DAYTON POWER AND LIGHT COMPANY

By: _____     Date: _____

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF
ITSELF AND ITS MEMBERS

By: _____     Date: _____

INDIANA MUNICIPAL POWER AGENCY

By: _____     Date: _____

CITY OF HAMILTON, OHIO

By: _____ A/CM    Date: 10/23/14

VILLAGE OF BLANCHESTER, OHIO

By: _____     Date: _____

IN WITNESS WHEREOF, the Settling Parties have caused this Settlement Agreement to be duly executed.

DUKE ENERGY OHIO, INC.

By: _____    Date: _____

DUKE ENERGY KENTUCKY, INC.

By: _____    Date: _____

AMERICAN MUNICIPAL POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

BUCKEYE POWER, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

THE DAYTON POWER AND LIGHT COMPANY

By: _____    Date: _____

EAST KENTUCKY POWER COOPERATIVE, INC., ON BEHALF OF ITSELF AND ITS MEMBERS

By: _____    Date: _____

INDIANA MUNICIPAL POWER AGENCY

By: _____    Date: _____

CITY OF HAMILTON, OHIO

By: _____    Date: _____

VILLAGE OF BLANCHESTER, OHIO

By: _John M. Carman Act Mayor_    Date: _10-6-2014_

Page 20 of 20

A-50