**NOS. 21-4072 and 22-3351**
**(Consolidated with Nos. 23-3196, 23-3324, 23-3366 and 23-3417)**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

————————

**THE DAYTON POWER AND LIGHT COMPANY, ET AL.**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION**

————————

**ON PETITION FOR REVIEW OF ORDERS OF
THE FEDERAL ENERGY REGULATORY COMMISSION**

————————

**INTERVENORS' BRIEF, IN SUPPORT OF RESPONDENT FERC,
OF OFFICE OF THE OHIO CONSUMERS' COUNSEL
AND BUCKEYE POWER, INC.
IN NOS. 21-4072, 22-3351, 23-3196, and 23-3366**

MAUREEN WILLIS
CONSUMERS' COUNSEL
Angela O'Brien
Deputy Consumers' Counsel
**Office of the Ohio Consumers' Counsel**
65 East State Street, 7th Floor Columbus, Ohio 43215
(614) 466-8574 – Telephone
Angela.Obrien@occ.ohio.gov

[Additional Intervenors' Counsel listed on next page]

NOVEMBER 21, 2023:  Initial Intervenors' Brief In Support of FERC
DECEMBER  21, 2021:  Final Intervenors' Brief In Support of FERC

Denise C. Goulet
Wendy Simon-Pearson
McCarter & English, LLP
1301 K Street, N.W.
Suite 1000 West
Washington, DC 20005
(202) 753-3400
dgoulet@mccarter.com
wsimonpearson@mccarter.com

*Special Counsel to the Ohio Office of the Attorney General for the Office of the Ohio Consumers' Counsel*

Cynthia S. Bogorad
David E. Pomper
Jeffrey M. Bayne
Lauren L. Springett
Spiegel & McDiarmid LLP
1875 Eye Street, NW
Suite 700
Washington, DC  20006
(202) 879-4000
cynthia.bogorad@spiegelmcd.com
david.pomper@spiegelmcd.com
jeffrey.bayne@spiegelmcd.com
lauren.springett@spiegelmcd.com

*Attorneys for Intervenor Buckeye Power, Inc.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure and Circuit Rule 26.1(a) of the United States Court of Appeals for the Sixth Circuit, the Office of the Ohio Consumers' Counsel ("OCC") is not required to file a corporate disclosure statement.

OCC is a state agency that is the statutory representative of approximately 4.5 million Ohio residential utility consumers in proceedings before state and federal administrative agencies, including the Federal Energy Regulatory Commission, and the courts. No publicly held company has any ownership interest in OCC.

Buckeye Power, Inc. is a non-profit generation and transmission cooperative, owned and governed by its member distribution cooperatives, which are in turn each Ohio non-profit cooperatives owned by their retail member-consumers. Buckeye Power, Inc. has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in Buckeye Power, Inc.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ........................................... - 1 -
JURISDICTION ................................................................................................ - 1 -
STATEMENT OF ISSUES ............................................................................... - 1 -
STATEMENT OF THE CASE ......................................................................... - 2 -
SUMMARY OF ARGUMENT ......................................................................... - 2 -
ARGUMENT .................................................................................................... - 4 -

   I.     STANDARD OF REVIEW ....................................................................... - 4 -

  II.    SECTION 219 DOES NOT MANDATE CHARGING
        RATEPAYERS RTO ADDERS THAT WOULD ACCOMPLISH
        NOTHING. ............................................................................................... - 5 -

 III.    TRANSMISSION OWNERS' PREEMPTION ARGUMENTS ARE
        NOT A BASIS FOR VACATING FERC'S ORDERS. ....................... - 12 -

     A.    FERC properly declined to determine if federal law preempts the
          Ohio law ................................................................................................ - 13 -

     B.    The preemption issue is not ripe for review. .................................... - 15 -

     C.    If the Court undertakes review of the preemption issue in these
          appeals, it should find that federal law does not preempt Ohio law in
          this case. ............................................................................................... - 17 -

 IV.    FERC'S ORDERS ARE NOT ARBITRARY AND CAPRICIOUS. .. - 30 -

     A.    FERC need not re-examine AEP's entire rate before finding it unjust
          and unreasonable for AEP to collect an inapposite Adder. ............... - 30 -

     B.    FERC did not authorize AEP's RTO Adder in a settlement. ............ - 34 -

     C.    FERC never found AEP's participation in a Transmission
          Organization to be voluntary for purposes of determining its
          eligibility for the RTO Adder. ........................................................... - 36 -

     D.    FERC's rulings regarding Dayton's ineligibility for the RTO Adder
          do not discriminate against Dayton, nor do they hurt its ability to
          raise capital. ......................................................................................... - 37 -

CONCLUSION AND PRAYER FOR RELIEF ................................................ - 38 -
CERTIFICATE OF COMPLIANCE ...................................................... - 41 -
CERTIFICATE OF SERVICE ........................................................................ - 42 -
ADDENDUM

# TABLE OF AUTHORITIES

## Court Cases

*Arizona v. United States*,
    567 U.S. 387 (2012)...................................................................................17, 19

*Atl. Ref. Co. v. Pub. Serv. Comm'n*,
    360 U.S. 378 (1959)..............................................................................25

*Atlantic City Elec. Co. v. FERC*,
    295 F.3d 1 (D.C. Cir 2002)...................................................................27

*Buckley v. Valeo*,
    424 U.S. 1 (1976).................................................................................16

*California Pub. Util. Comm'n v. FERC*,
    879 F.3d 966 (9th Cir. 2018) ...............................................................6, 8

*California v. ARC America Corp.*,
    490 U.S. 93 (1989)...............................................................................22

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    468 U.S. 837 (1984).............................................................................14

*City of Detroit, Mich. v. Fed. Power Comm'n*,
    230 F.2d 810 (D.C. Cir. 1955)..............................................................9

*Coal. for Competitive Elec. v. Zibelman*,
    906 F.3d 41 (2d Cir. 2018) ..................................................................19

*Delek US Holdings, Inc. v. US*,
    32 F.4th 495 (6th Cir. 2022) ................................................................7

*Duke Power Co. v. Federal Power Comm'n*,
    401 F.3d 930 (D.C. Cir. 1968)..............................................................27

*Emera Maine v. FERC*,
    854 F.3d 9 (D.C. Cir. 2017).................................................................31, 32

*Federal Power Comm'n v. Hope Natural Gas Co.*,
    320 U.S. 591 (1944)............................................................................37

iii

*FERC v. Elec. Power Supply Ass'n*,
 577 U.S. 260 (2016)..............................................................................19

*French v. Boner*,
 940 F.2d 659 (6th Cir. 1991) ........................................................15, 16

*Goodyear Atomic Corp. v. Miller*,
 486 U.S. 174 (1988)................................................................................8

*Hughes v. Talen Energy Mktg. LLC*,
 578 U.S. 150 (2016)..........................................................16, 19, 22, 25

*Int'l Paper Co. v. Ouellette*,
 479 U.S. 481 (1987)..............................................................................26

*Int'l Transmission Co. v. FERC*,
 988 F.3d 471 (D.C. Cir. 2021)........................................................5, 30

*Kuhn v. Washtenaw Cnty.*,
 709 F.3d 612 (6th Cir. 2013) ...............................................................18

*Louisiana Pub. Serv. Comm'n v. FCC*,
 476 U.S. 355 (1986)..............................................................................13

*Me. PUC v. FERC*,
 454 F.3d 278 (D.C. Cir. 2006)..............................................................9

*Merrick v. Diageo Ams. Supply, Inc.*,
 805 F.3d 685 (6th Cir. 2015) ...............................................................28

*Mo. River Energy Servs. v. FERC*,
 918 F.3d 954 (D.C. Cir. 2019)..............................................................38

*Monongahela Power Co. v. Schriber*,
 322 F. Supp. 2d 902 (S.D. Ohio 2004)................................................29

*Nat'l Ass'n of Regul. Util. Commissioners v. FERC*,
 964 F.3d 1177 (D.C. Cir. 2020)............................................................14

*New York State Dept. of Social Servs. v. Dublino*,
 413 U.S. 405 (1973)..............................................................................20

iv

*New York v. FERC*,
    535 U.S. 1 (2002)..................................................................................13, 23

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019).......................................................................................7

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*,
    489 U.S. 493 (1989)......................................................................................28

*Oneok, Inc. et al. v. Learjet, Inc., et al.*,
    575 U.S. 373 (2015)..............................................................18, 19, 21, 22, 26

*Patriotic Veterans, Inc. v. Indiana*,
    736 F.3d 1041 (7th Cir. 2013) .....................................................................28

*Piedmont Env't Council v. FERC*,
    558 F.3d 304 (4th Cir. 2009) .......................................................................24

*Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp.*,
    485 U.S. 495 (1988)......................................................................................26

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)......................................................................................19

*Sithe/Independent Power Partners, L.L.P. v. FERC*,
    165 F.3d 944 (D.C. Cir. 1999).......................................................................32

*South Carolina Public Service Authority v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014).......................................................................24

*State Corp. Comm'n v. FERC*,
    876 F.3d 332 (D.C. Cir. 2017).......................................................................38

*Virginia Uranium, Inc. v. Warren*,
    139 S. Ct. 1894 (2019)..................................................................................26

*Wisconsin Pub. Intervenor v. Mortier*,
    501 U.S. 597 (1991)......................................................................................15

## Administrative Cases

*Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, Supplemental Notice of Proposed Rulemaking, 175 FERC ¶ 61,035 (2021) ................................................................. 12

*New England Power Pool*, 97 FERC ¶ 61,093 (2001) ................................................................. 9

*New PJM Cos.*, 106 FERC ¶ 63,029 (2004) ................................................................. 36

*Office of the Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp., et al.*, 181 FERC ¶ 61,214 (2022) ................................................... 11, 12, 14, 35

*Promoting Transmission Investment through Pricing Reform*, Order No. 679, 71 FR 43294 (July 31, 2006), FERC Stats. & Regs. ¶ 31,222 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006) ................................................................. 10, 11, 12, 36

*Revised Filing Requirements Under Part 33 of the Commission's Reguls.*, Order No. 642, 65 Fed. Reg. 70,984, at 71,012 (Nov. 28, 2000), FERC Stats. & Regs. ¶ 31,111 (2000) (cross-referenced at 94 FERC ¶ 61,289), *order on reh'g*, Order No. 642-A, 66 Fed. Reg. 16,121 (Mar. 23, 2001), 94 FERC ¶ 61,289 (2001) ................................................. 23

*Seminole Elec. Coop. Inc. v. Duke Energy Fla., Inc.*, 147 FERC ¶ 61,237 (2014) ................................................................. 32

*The Dayton Power and Light Co.*, 176 FERC ¶ 61,025 (2021) ("Dayton Order"), JA.197 ................... 2, 12, 14, 37

## Federal Statutes

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, 961-62 (2005) ................................................................. 9

Federal Power Act
Section 3, 16 U.S.C. § 796(29) ................................................................. 2
Section 201, 16 U.S.C. § 824 ................................................................. 20, 27
Section 202, 16 U.S.C. § 824a ................................................................. 24, 26, 27, 29
Section 203, 16 U.S.C. § 824b ................................................................. 22

Section 205, 16 U.S.C. §§ 824d......................................................7
Section 206, 16 U.S.C. § 824e..............................7, 30, 31, 32, 33
Section 215, 16 U.S.C. § 824o.........................................20, 21
Section 216, 16 U.S.C. § 824p.............................................23
Section 219, 16 U.S.C. § 824s..............................2, 5, 7, 29

Natural Gas Act
    Section 1, 15 U.S.C. § 717.............................................8

Ohio Revised Code
    § 4905.03................................................................24
    § 4905.05................................................................24
    § 4905.06................................................................24
    § 4911.02................................................................24
    § 4928.12.......................................................2, 17, 37
    § 4928.111..............................................................24

Ohio Administrative Code
    Rule 4901:1-10-27.......................................................25

Public Utilities Regulatory Policy Act of 1978
    Section 205, 16 U.S.C. § 824a-1(a)(2)................................21

## Regulations

18 C.F.R. § 35.35(e)................................................33, 34

## STATEMENT REGARDING ORAL ARGUMENT

Intervenors in Support of the Federal Energy Regulatory Commission ("FERC" or "the Commission") in Case Nos. 21-4072, 22-3351, 23-3196, and 23-3366, The Ohio Office of the Consumers' Counsel ("OCC") and Buckeye Power, Inc., ("Buckeye"), request oral argument for the reasons set forth in the July 31, 2023 Opening Brief of Petitioner, OCC ("OCC Opening Brief"). OCC Opening Br. in Nos. 23-3324 and 23-3417, *Am. Elec. Power Serv. Corp. v. FERC*, 6th Cir. No. 21-4072, ECF No. 47.

## JURISDICTION

Intervenors in Support of FERC in Case Nos. 21-4072, 22-3351, 23-3196, and 23-3366, OCC and Buckeye, support the Jurisdictional Statement set forth in OCC's Opening Brief in Case Nos. 23-3324 and 23-3417. OCC Opening Br. 2.

## STATEMENT OF ISSUES

OCC and Buckeye adopt all but one of the Statement of Issues presented in FERC's Brief. We adopt Issue Nos. 1 through 3. FERC Br. 4. These first three issues relate to the petitions for review submitted by The Dayton Power and Light Company ("Dayton"), American Electric Power Service Corporation ("AEP") and FirstEnergy Corporation ("FirstEnergy"), collectively the "Transmission Owners" in Case Nos. 21-4072, 22-3351, 23-3196, and 23-3366. OCC and Buckeye do not agree with the characterization of Issue No. 4 in FERC's Brief relating to OCC's

- 1 -

Petitions for Review in Case Nos. 23-3324 and 23-3417. *id.* OCC and Buckeye

will address the fourth issue in their Reply Briefs. *See also* OCC Opening Br. 4-5.

## STATEMENT OF THE CASE

Intervenors OCC and Buckeye adopt the Statement of the Case presented in

FERC's Brief with respect to the Transmission Owners' petitions for review in

Case Nos. 21-4072, 22-3351, 23-3196, and 23-3366. FERC Br. 5-27.

## SUMMARY OF ARGUMENT

To protect consumers to be served through newly-unbundled transmission,

the Ohio General Assembly mandated that all transmission service providers in the

state participate in an Regional Transmission Organization ("RTO").[1] FERC

correctly determined that Dayton, and the Ohio affiliates of AEP are not eligible

for the RTO Adder rate incentive under Federal Power Act ("FPA") section 219,

16 U.S.C. § 824s, and applicable FERC law. The inclusion of an adder on top of a

---

[1] FPA Section 219(c) discusses incentives for a "Transmission Organization." The FPA defines that term as "a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities. 16 U.S.C. § 796(29). Ohio Revised Code 4928.12(a) uses the term "qualified transmission entity" when mandating state transmission utility participation in an RTO. The Ohio statute sets out the criteria for qualification of a transmission entity, which essentially satisfy all of the FERC requirements to be an RTO. Nos. 23-3324 and 23-3417, Complaint 8-10; JA.334-36;  Nos. 21-4072 and 22-3355, *The Dayton Power and Light Co.,* 176 FERC ¶ 61,025, P 54 (2021) ("Dayton Order"), JA.197. We use these terms interchangeably in this brief.

utility's return on equity rate, where that adder has no potential to influence or induce behavior, is not an incentive and it is not just and reasonable, as FPA section 219 requires.

FERC policy, pre-dating section 219, has long held that incentives are just and reasonable only where they encourage the utility to prospectively undertake some behavior. FERC correctly ruled in both cases below that an RTO Adder could not encourage behavior – here, joining a Transmission Organization or a Regional Transmission Organization – that is already mandated by state law.

FERC also correctly declined to address the Transmission Owners' arguments that the Ohio state law is preempted by federal law. FERC has no authority to declare a state law unconstitutional. FERC reasonably treated Ohio law as binding on Transmission Owners for purposes of evaluating whether their participation in a Transmission Organization is voluntary. FERC reasonably found that the record was insufficient to address the state law preemption issue. This Court should decline Transmission Owners' request that this Court address the issue prematurely on review of FERC's orders.

Transmission Owners' preemption arguments also fail on their merits. No federal law requires utility participation in a Transmission Organization to be voluntary. Additionally, nothing in federal law expressly forbids the states from passing laws mandating participation in an RTO. Congress left many important

issues regarding transmission to the states.  Accordingly, the Ohio law is not preempted under the incorrect theory that Congress gave FERC such extensive, exclusive authority over the entire field of transmission regulation. Ohio law also is not preempted under the conflict preemption doctrine, as there is no conflict between the Ohio law and federal law. Instead, both seek the same objective of getting transmission utilities to coordinate and join Transmission Organizations.

There also is no merit to the Transmission Owners' remaining arguments that (a) FERC must review the reasonableness of the overall return before removing the RTO Adder incentive from AEP's rates; (b) FERC granted AEP its RTO Adder in a settlement proceeding; (c) FERC previously found that AEP's participation in an RTO was voluntary; and (d) FERC's treatment of Dayton is discriminatory because it will hurt the utility's ability to raise capital. None of these arguments is correct. OCC and Buckeye agree with FERC's refutation of these arguments in its Brief.

## ARGUMENT

## I.    STANDARD OF REVIEW

Intervenors OCC and Buckeye adopt the Standard of Review presented in FERC's Brief with respect to the Transmission Owners' appeals in Case Nos. 21-4072, 22-3351, 23-3196, and 23-3366. FERC Br. 30-33.

## II.    SECTION 219 DOES NOT MANDATE CHARGING RATEPAYERS RTO ADDERS THAT WOULD ACCOMPLISH NOTHING.

RTO Adders increase transmission rates to consumers by inflating profits beyond what FERC would otherwise allow.[2] Transmission Owners claim that FPA section 219, 16 U.S.C. § 824s, entitles them to this increase even where it serves no purpose – *i.e.*, that FERC cannot condition the Adder on a utility's voluntary participation in a Transmission Organization because "FERC must provide incentives to every utility that 'joins a Transmission Organization,' *regardless of the reason*." TO Br. 29 (emphasis added). That claim is untethered from the statutory text. Far from prohibiting FERC from imposing a voluntariness requirement, section 219 contains multiple provisions that direct FERC not to allow incentive-based rate treatments unless they serve to induce desired utility behavior. At minimum, these provisions permit FERC's policy that incentives be available only where they can have that effect.

1.    In section 219(c), Congress directed FERC to "provide for *incentives*" to utilities to join Transmission Organizations. 16 U.S.C. § 824s(c) (emphasis added); *see also* 16 U.S.C. § 824s(a) (directing FERC to "establish, by rule,

---

[2] "[A] FERC-authorized return on equity determines the extent to which a utility in the highly regulated electricity sector may earn a profit. FERC ties 'adders' to certain behaviors or characteristics of utilities, incentivizing needed actions by bumping up their returns on equity above the base level set by FERC." *Int'l Transmission Co. v. FERC*, 988 F.3d 471, 474 (D.C. Cir. 2021) ("*Int'l Transmission*").

*incentive-based* (including performance-based) rate treatment") (emphasis added). A voluntariness condition is essential if RTO Adders are to be limited, as the statute requires, acting  as an *incentive* for specific utility conduct.

An incentive is a benefit to induce an action that may not otherwise be performed. *See, e.g.*, *Incentive*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/incentive ("something that incites or has a tendency to incite to determination or action"). "[S]ince an incentive cannot induce behavior that is already legally mandated, 'the voluntariness of a utility's membership in a transmission organization is logically relevant to whether it is eligible for an Adder.'" Dayton Order P 27, JA.183 (quoting *California Pub. Util. Comm'n v. FERC*, 879 F.3d 966, 974 (9th Cir. 2018)) ("*CPUC*"). In the Orders on review, FERC correctly concluded that because Ohio law commands Ohio utilities to participate in a Transmission Organization, their participation is not incited or influenced by whether they receive an RTO Adder through FERC-jurisdictional transmission rates.

When Transmission Owners and PJM Interconnection, L.L.C. ("PJM"), the RTO the Transmission Owners joined, claim that FERC cannot condition RTO Adders on voluntariness, they effectively erase the word "incentive" from the statutory text. Their claim thus "runs afoul of the canon against surplusage . . . which provides that 'every word and every provision is to be given effect [and that

n]one should needlessly be given an interpretation that causes it . . . to have no consequence.'" *Delek US Holdings, Inc. v. US*, 32 F.4th 495, 498 (6th Cir. 2022) (alteration in original) (quoting *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019)). Had Congress intended for FERC to authorize increased transmission rates for every utility that participates in a Transmission Organization "regardless of the reason" for that participation, as Transmission Owners claim (TO Br. 2, 29), there would be no reason for the multiple references to incentives in section 219. A bonus payment that does not have any potential to induce or influence behavior is a handout or windfall – not incentive-based rate treatment. Where state law requires RTO participation, including an Adder in transmission rates just means the consumers will pay higher rates with no added benefit.

2.      A provision of section 219 that Transmission Owners' Brief completely ignores – section 219(d) – also constrains all incentive-based rate treatment under section 219 to the "just and reasonable" standard of FPA sections 205 and 206. 16 U.S.C. § 824s(d) (referencing 16 U.S.C. §§ 824d, 824e). Transmission Owners' failure to acknowledge section 219(d) (TO Br. 28-36) does not remove this overarching just and reasonable requirement from section 219. There can be no question that section 219(d) limits incentives that fall under 219(c), as subsection (d) applies to "*[a]ll rates* approved under the rules adopted pursuant to this section [*i.e.*, section 219]." 16 U.S.C. § 824s(d) (emphasis added).

Courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184 (1988), and in section 219 Congress required FERC to implement incentive-based rates within the bounds of established standards for what constitutes just and reasonable rates. Longstanding FERC and court precedent confirms the logical proposition that incentive-based rates must, in fact, be needed to encourage the desired action. *See CPUC,* 879 F.3d 966 at 977 (summarizing "a series of FERC decisions and statements" that establish FERC's "longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced[,] . . . [which] prohibits FERC from rewarding utilities for past conduct or for conduct which they are otherwise obligated to undertake").

Indeed, this understanding of just and reasonable rates dates back to the time of FERC's predecessor, the Federal Power Commission. Under analogous provisions requiring just and reasonable rates under the Natural Gas Act, 15 U.S.C. § 717 ("NGA"), the D.C. Circuit explained that "[i]f the Commission contemplates increasing rates for the purpose of encouraging exploration and development, or the ownership by pipeline companies of their own producing facilities, *it must see to it that the increase is in fact needed, and is no more than is needed, for the*

*purpose*." *City of Detroit, Mich. v. Fed. Power Comm'n*, 230 F.2d 810, 817 (D.C. Cir. 1955) (emphasis added).

In the decades since, the Commission and courts have held that incentive-based rates are just and reasonable only when they materially affect voluntary, prospective behavior. For instance, FERC rejected an application for an incentive-based project where it found that the incentive premium would "unjustly reward [the utility] for doing what it is supposed to do, i.e., to adequately maintain its facilities in a prudent, cost-effective manner." *New England Power Pool*, 97 FERC ¶ 61,093, at 61,477 (2001), *reh'g on other issues*, 98 FERC ¶ 61,249 (2002). Likewise, past conduct does not warrant incentive-based rate treatment under "the obvious proposition that FERC will not, and cannot, create incentives to motivate conduct that has already occurred." *Me. PUC v. FERC*, 454 F.3d 278, 289 (D.C. Cir. 2006) ("*MPUC*") (upholding FERC's granting of incentive adder that FERC had concluded "does not only reward past action," *id*. at 288).

Notably, Congress's enactment of section 219 followed close on the heels of FERC's decisions in the cases just cited. The FERC order reviewed in *MPUC*, for example, issued "March 24, 2004," *MPUC* at 281, the year before section 219 was enacted (on August 8, 2005). *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, 961-62 (2005). Thus, when Congress enacted section 219, FERC had recently reiterated its longstanding standard that incentive-based rate increases

are reasonable only where they produce ratepayer benefit by motivating desired regulated-entity behavior. Had Congress meant to override that standard, it would not have imposed a reasonableness constraint on all incentives, nor used the word "incentives" in the first place.

Thus, FERC's voluntariness requirement accords with section 219(c)'s requirement that any RTO Adder be an *incentive* and with section 219(d)'s limitation that all incentive-based rate treatments be subject to FERC's standards for just and reasonable rates.

3.     At minimum, and sufficient for denying Transmission Owners' petitions for review, nothing in FPA section 219 or Order No. 679, *Promoting Transmission Investment through Pricing Reform*, Order No. 679, 71 FR 43294 (July 31, 2006), FERC Stats. & Regs. ¶ 31,222 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *required* FERC to award Dayton and AEP a 50-basis-point return on equity increase that would serve no purpose. Even if section 219 were read as permitting FERC to award RTO Adders for mandated participation, FERC was well within its discretion to deny the Adder based on the specific circumstances presented.

Congress did not establish blanket requirements in section 219; it directed FERC to develop rules for incentive-based rate treatment to encourage certain desired conduct. The rule FERC established in Order No. 679 for RTO Adders is

to "consider specific incentives on a case-by-case basis" and approve incentives "when justified." Order No. 679 P 326. In particular, FERC did "not . . . establish a specific incentive for joining a Commission-approved regional planning organization," and it did "not make a generic finding on the duration of incentives." *id.* PP 327, 332. As explained in more detail in FERC's Brief (at 36-38), no party sought judicial review of Order No. 679 and any attempts to relitigate the rules established in that order are an impermissible collateral attack.

Based on the records in the proceedings below, FERC properly concluded that it was not just and reasonable for Dayton to include the RTO Adder in its rates and that it was unjust and unreasonable for AEP to continue to collect that Adder. As discussed above, because these utilities are legally obligated under Ohio law to participate in Transmission Organizations, FERC reasonably concluded that an Adder that inflated the return on equity to encourage that already-mandated participation was not justified.

Moreover, the statute refers to incentive-based rate treatment for utilities that *join* a Transmission Organization. Here, the utilities in question joined PJM, their current Transmission Organization, nearly two decades ago. "AEP integrated its operating companies into PJM in 2004," *Office of the Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp., et al.*, 181 FERC ¶ 61,214, P 78 n.153 (2022)), JA.493, ("Complaint Order"), and "Dayton . . . has been a member of PJM since

2004," Dayton Order P 4, JA.174. Because AEP and Dayton (as well as the other two Ohio transmission utilities, FirstEnergy's affiliate, American Transmission Systems, Inc. ("ATSI"), and Duke Energy Ohio, LLC ("Duke")) are not *joining* a Transmission Organization – and their continued participation is mandated by Ohio law – nothing in the statute entitles them to incentive-based rate treatment.[3] Likewise, nothing in Order No. 679 requires FERC to grant incentive-based rate treatment in perpetuity to utilities that joined Transmission Organizations a generation ago.

## III.   TRANSMISSION OWNERS' PREEMPTION ARGUMENTS ARE NOT A BASIS FOR VACATING FERC'S ORDERS.

In its Orders below, and in its Brief, FERC declined to comment on the question of whether the FPA preempts the Ohio law. Dayton Order P 71; JA.204; Complaint Order P 84, JA.497; FERC Br. 44. Given FERC's lack of authority to invalidate or preempt state law, FERC acted appropriately and well within its discretion. Moreover, courts of original jurisdiction are the proper forum to resolve

---

[3] Indeed, a pending FERC proposed rulemaking would modify the Commission's regulations to provide for RTO Adders only "for a period of three years after a transmitting utility newly joins a Transmission Organization." *Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act*, Supplemental Notice of Proposed Rulemaking, 175 FERC ¶ 61,035, P 8, 86 Fed. Reg. 21,972, P 9 (2021). Although there is no Final Rule and that three-year limit has not yet been adopted, nothing in the current case-by-case rule requires FERC to grant incentive-based rate treatment to utilities that joined a Transmission Organization well over a decade ago. Nor does the statute.

questions of federal preemption, and this Court should decline Transmission Owners' request to prematurely address this important question without the benefit of an agency or lower court decision and without the involvement of all relevant parties. Finally, even if the Court decides to address the issue *de novo,* the Ohio state law is not preempted by any federal law.

### A. FERC properly declined to determine if federal law preempts the Ohio law.

As a matter of common law, federal agencies are not authorized to declare that a state law is preempted. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("*Louisiana PSC*"); *New York v. FERC*, 535 U.S. 1, 18 (2002) ("*New York*"). And FERC's governing statutes do not give it the authority to review state laws for preemption. As a result, FERC does not have jurisdiction to invalidate or preempt the Ohio law. Without such authority, FERC did not act arbitrarily or capriciously in refusing to consider the question of preemption.

A federal agency such as FERC may decide an issue of state law preemption only if Congress explicitly delegates it that power. The Supreme Court has long held that "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana PSC*, 476 U.S. at 374. In order to determine whether Congress has delegated that power to a federal agency, the Court must interpret FERC's governing statute. *New York*, 535 U.S. at 18. FERC found that the FPA does not

give it authority to preempt state laws. Dayton Order P 71, JA.204; Complaint

Order P 84, JA.497.  FERC's interpretation of its jurisdictional authority under the

FPA should enjoy *Chevron* deference.[4] *Nat'l Ass'n of Regul. Util. Commissioners*

*v. FERC*, 964 F.3d 1177 (D.C. Cir. 2020) ("*NARUC*"); FPA § 201, 16 U.S.C. §

824(b)(1).

Transmission Owners recognize that "FERC is not institutionally well-

situated to interpret" state laws (although they do not seek review of FERC's

interpretation of the Ohio law). TO Br. 33. Yet they criticize FERC for failing to

take the more extreme step of *overruling* the Ohio state law mandating

Transmission Organization participation by transmission utilities doing business in

Ohio. The invasiveness of FERC action in overruling a state law would far exceed

that involved in interpreting a state law. Ruling a state law preempted is beyond

FERC's jurisdictional authority. OCC Answer to AEP *et al.* Request for Rehearin*g*

14, JA.564 ("OCC Rehearing Answer").

Indeed, Transmission Owners appear to concede that FERC lacks such

authority, claiming that "[n]o one asked FERC to *enjoin* the Ohio Statute," they

"asked FERC only to assess the validity of the Ohio Statute." TO Br. 46. That is a

distinction without a difference. If FERC were to declare the Ohio law invalid

---

[4] *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 468 U.S. 837
(1984) (judicial deference is given to a federal agency's interpretation of its
authorizing statute).

because it is preempted by federal law, that necessarily means it does not have the

force of law. *See Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991)

(explaining that under the Supremacy Clause, state laws that are contrary to federal

law "are invalid") (citation omitted). Transmission Owners offer no authority for

their suggestion that a state law can be treated as inconsistent with federal law for

some purposes but not others.

Ultimately, the issue in the proceedings below was whether the Ohio

utilities' participation in a Transmission Organization was voluntary. Because the

Ohio law requirement that they participate in a Transmission Organization is in

force, and FERC has no authority to invalidate it, FERC had no choice but to

acknowledge its effect on the Ohio Transmission Owners. Accordingly, FERC

reasonably declined to address Transmission Owners' preemption arguments.

## B. The preemption issue is not ripe for review.

OCC and Buckeye also agree with FERC (FERC Br. 44-47) that

Transmission Owners' efforts to obtain *de novo* review of the preemption question

here – without *any* ruling on this issue from an agency or lower court – would be

inappropriate because the issue is not ripe. *See, e.g.*, *French v. Boner*, 940 F.2d

659, 660 (6th Cir. 1991) ("*French*") (declining to address the constitutionality of a

city's apportionment plan because the issue had not been determined by the

District Court below). The Sixth Circuit in that case found that "[a] case is not ripe

if its prematurity or the abstractness of the wrongs involved prevent meaningful or effective adjudication." *French* at 659 (citing *Buckley v. Valeo*, 424 U.S. 1 (1976)) (overturned on other grounds).  As FERC correctly explains, "[h]ere, the fact-intensive agency record is not sufficient to consider preemption, nor have all relevant parties briefed the issue." FERC Br. 47.[5] FERC did not rule on the state law preemption issue; it simply recognized that declaring a state law preempted was beyond its jurisdictional authority. It would therefore be premature and inappropriate for this Court to address this issue for the first time.

The preemption issue on appeal here is not like the preemption issue on appeal in *Hughes v. Talen Energy Mktg. LLC,* 578 U.S. 150 (2016) ("*Talen Energy Mktg.*") cited by the Transmission Owners (TO Br. 38-39, 42-43). As FERC notes in its Brief (FERC Br. 46-47), "the preemption cases on which Transmission Owners rely . . .  did not arise on direct review of Commission orders."  Those cases arose in a challenge to the constitutionality of a state's law in federal district court or in state courts where the litigants had full opportunity to address the legal and factual issues. That did not happen here. No lower court or administrative agency has reviewed Ohio's interest in regulating how transmission utilities do

_____

[5] FERC states that the Ohio Attorney General's Office has not had the opportunity to weigh in on the constitutionality of the state's law. Counsel for the Public Utilities Commission of Ohio and OCC, while appearing in this appeal, each represents only the specific interests of the agency for which they work; neither is authorized to speak in this proceeding for the Ohio Attorney General.

business in the state in a restructured electric industry environment. The Court should decline to undertake that review *de novo* where the facts relating to the state law have not yet been determined.

### C. If the Court undertakes review of the preemption issue in these appeals, it should find that federal law does not preempt Ohio law in this case.

In *Arizona v. United States*, 567 U.S. 387 (2012) ("*Arizona*"), the United States Supreme Court stated that "[f]ederalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398. While the Supremacy Clause of the U.S. Constitution provides for clear deference to federal law pre-empting state law, that deference exists only where Congress has specifically withdrawn specified powers from the state. That can occur only where there is a federal statute containing an express preemption provision, where Congress has occupied an entire field of regulation, or where the state law poses a conflict with federal law. *id*. at 399.

In the case of Ohio Revised Code § 4928.12, the law mandating Transmission Organization participation by Ohio utilities, none of these factors are present. No federal law expressly prohibits the states from regulating who may provide transmission services in their states. Nor is there a federal law occupying the entire field of transmission. OCC Rehearing Answer 14-15, JA.564-65.

Finally, the Ohio law does not conflict with any requirement of federal law. There is no requirement in federal law that utility participation in Transmission Organizations be voluntary, and rather than conflict with the objectives of federal law, the Ohio law in fact *furthers* the federal policy of encouraging transmission utilities to join Transmission Organizations. *id.*

### 1. Transmission Owners do not claim that the Ohio law is expressly preempted by federal law, and there is no such provision in the FPA.

This Court has stated that arguments are waived if they are not raised in a party's opening brief. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). Because Transmission Owners do not claim express preemption, they have waived and forfeited that claim.

In any event, express preemption may occur only when a federal statute contains explicit language stating that the federal law preempts the state law. The FPA contains no language prohibiting a state from establishing eligibility requirements for transmission companies to do business in that state.

### 2. The FPA does not field-preempt the Ohio law.

In *Oneok, Inc. et al. v. Learjet, Inc., et al.*, 575 U.S. 373 (2015) ("*Oneok*"), the U.S. Supreme Court stated that courts must proceed cautiously when a state law is challenged as preempted by federal law, "finding pre-emption only where detailed examination convinces us [the court] that a matter falls within the pre-

empted fields as defined by our precedents." *Oneok*, 575 U.S. at 385. The Court ruled in *Arizona* that "[t]he intent to displace state law altogether can be inferred from a framework of regulation "so pervasive ... that Congress left no room for the States to supplement it" or where there is a "federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

FERC's scope of authority under the FPA does not "assum[e] near-infinite breadth," as Congress granted FERC certain authority while also "limit[ing] FERC's regulatory reach, and thereby maintain[ing] a zone of exclusive state jurisdiction." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016). And as Justice Sotomayor has explained, "the Federal Power Act, like all collaborative federalism statutes, envisions a federal-state relationship marked by interdependence," and therefore "[p]re-emption inquiries related to such collaborative programs are particularly delicate." *Talen Energy Mktg.*, 578 U.S. 150, 167 (2016) (Sotomayor, J., concurring); *see also Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41, 50 (2d Cir. 2018) ("*Zibelman*") ("When 'coordinate [sic] state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a

less persuasive one.'") (quoting *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 421 (1973)).

Transmission Owners argue that FPA section 201(b), 16 U.S.C. § 824(b), creates "exclusive" jurisdiction over transmission and interstate wholesale sales, and therefore a state may not take any action that would directly regulate transmission, such as Ohio's mandate that utilities join a Transmission Organization to access Ohio's retail consumers. TO Br. 38-39, 42-44. That claim is contrary to the statute, as well as field preemption precedent.

FPA section 201(b) is not an unlimited grant of exclusive jurisdiction. In passing the FPA, Congress carefully sought to limit FERC's authority over transmission, recognizing that the states likewise exercised some jurisdiction in that field. For instance, FPA section 201 expressly provides for state regulation over certain electric transmission transactions, such as jurisdiction over intrastate transmission and transmission facilities used to supply electricity to the transmitting entity. 16 U.S.C. § 824(b)(1).

Other provisions of the FPA confirm that Congress did not grant FERC exclusive jurisdiction over every aspect of transmission service. For instance, FPA section 215 on electric reliability expressly states that "[n]othing in this section shall be construed to preempt any authority of any State to take action to ensure the safety, adequacy, and reliability of electric service within that State, as long as

such action is not inconsistent with any reliability standard [approved by FERC]." 16 U.S.C. § 824o(i)(3). There is no allegation here that the Ohio law conflicts with a FERC-approved reliability standard.

In addition, section 205 of the Public Utilities Regulatory Policy Act of 1978, 16 U.S.C. § 824a-1, permits – but does not require – FERC to exempt electric utilities from state laws that prohibit voluntary coordination of electric utilities, unless such action is required by federal law or is "designed to protect public health, safety, or welfare, or the environment or conserve energy or is designed to mitigate the effects of emergencies resulting from fuel shortages." 16 U.S.C. § 824a-1(a)(2). Notably, this provision does *not* require FERC to exempt electric utilities from state laws that *mandate* coordination. And there is no similar provision that allows FERC to exempt utilities from state laws that *require* coordination among utilities. This discretionary, case-by-case approach to FERC's role where states *prohibit* voluntary coordination confirms that federal law does not prohibit States from requiring coordination, including Transmission Organization participation.

Nor does the Ohio law impermissibly intrude on federally regulated activities. The Supreme Court has "emphasize[d] the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok* at 385 (emphasis added). The important distinction here is whether the state

law is "*aimed directly*" at the federally regulated activity – *i.e.*, whether Ohio's law mandating participation in a Transmission Organization steps on FERC's toes with respect to matters specifically within its exclusive jurisdiction, or is aimed at subjects left to the states to regulate. *id.*

As the Court in *Oneok* concluded, "no one could claim that FERC's regulation of this physical activity for purposes of wholesale rates forecloses every other form of state regulation that affects those rates." *id*. at 386-387.[6] For example, the Court stated that the NGA does not foreclose traditional state regulation such as blue sky laws, which could raise wholesale rates. *id*. Instead, the Court recognized that "States have a long history of providing 'common-law and statutory remedies against monopolies and unfair business practices.'" *id*. at 374 (citing *California v. ARC America Corp.*, 490 U.S. 93, 101, 109 (1989)). Similarly, although FERC has authority under FPA section 203, 16 U.S.C. § 824b, to determine whether mergers are in the public interest, and may examine impacts on retail competition, that authority is not exclusive. FERC's longstanding policy is to evaluate "a proposed merger's impact on retail competition" only in circumstances where "a state lacks adequate authority to consider such matters and requests us to

---

[6] Note that while *Oneok* involved FERC's authority under the NGA, but not the FPA, "the relevant provisions of the two statutes are analogous" and courts "routinely relied on NGA cases in determining the scope of the FPA, and vice versa." *Talen Energy Mktg.*, 578 U.S. at 164 n.10.

do so." *Revised Filing Requirements Under Part 33 of the Commission's Reguls.*, Order No. 642, 65 Fed. Reg. 70,984, at 71,012 (Nov. 28, 2000), FERC Stats. & Regs. ¶ 31,111 (2000) (cross-referenced at 94 FERC ¶ 61,289), *order on reh'g*, Order No. 642-A, 66 Fed. Reg. 16,121 (Mar. 23, 2001), 94 FERC ¶ 61,289 (2001).

Likewise, in *New York*, the Supreme Court found that FERC could properly regulate the price of transmission services in unbundled or retail choice states, to remedy the wholesale discrimination it found in that case, while leaving the states to regulate the price of transmission in bundled, or non-retail choice states. *New York*, 535 U.S. at 23-24. The Court explicitly recognized the rights of states that have not restructured to retain authority over bundled transmission rates for retail customers. *id*. While FERC alone has jurisdiction over transmission *rates* in unbundled states like Ohio, that does not mean the retail choice states have lost all jurisdiction over every aspect of providing transmission service. States such as Ohio share with FERC a necessary and essential oversight function for certain aspects of transmission service, *e.g.*, siting of transmission lines.[7] The Transmission Owners recognize that transmission siting and construction are among those areas within the field of transmission regulation that Congress left to

---

[7] This state oversight role is recognized in FPA section 216, 16 U.S.C. § 824p.

the states. TO Br. 39, n.13 (citing *Piedmont Env't Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009)).[8]

Here, Ohio law is aimed at matters uniquely subject to Ohio: the conditions for doing business as a transmission utility in Ohio in a restructured environment. For example, Ohio Revised Code § 4905.03(C), 4905.05 and 4905.06 subject public utilities in Ohio to regulation by the Public Utilities Commission of Ohio ("PUCO"), including electric utilities providing transmission service in the state. Ohio Revised Code § 4911.02 requires the PUCO to adopt rules that specify minimum service quality, safety, and reliability requirements, including prescriptive standards for inspection, maintenance, repair and replacement of the transmission and distribution systems of electric utilities. Ohio Revised Code § 4928.111 requires the PUCO to consult with "entities that own or control transmission facilities to review the transmission infrastructure in this state."

---

[8] Transmission Owners wrongly suggest (TO Br. 39 n.13) that, other than siting and construction, any matter related to transmission falls within FERC's exclusive jurisdiction, citing to *South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014). That case – which did not involve any claims of preemption of state law – does not support their argument that the Ohio law should be preempted. There, the D.C. Circuit found that FERC reasonably concluded that "Section 202(a) posed no bar to adoption of the challenged transmission planning reforms," because planning of future facilities falls outside of the scope of the voluntary coordination FERC was directed to encourage under that provision. *id.* at 59. As discussed below in Part III.C.3, coordinated operation of existing transmission facilities may constitute "coordination" under FPA section 202(a), but that is relevant only to that statute's *limit on FERC's authority*. It in no way suggests that the statute poses any bar on what *states* may require.

Ohio regulations implementing these statutes further govern the inspection, maintenance, repair, and replacement of transmission and distribution facilities. Ohio Administrative Code, Rule 4901:1-10-27. Ohio regulations also require a transmission system performance assessment every five years. Ohio Administrative Code, Rule 4901:1-10-27(C). Electric utilities and transmission owners also must file annual reports with the state assessing the reliability of its transmission circuits. *id.*

The Ohio law requiring entities owning or controlling transmission facilities in Ohio to participate in a Transmission Organization is part of this set of state laws and regulations that address matters properly within Ohio's jurisdiction. They are fully compatible with FERC's jurisdictional scope and consumer-protection mandate. *See Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 388 (1959) (finding that FERC's primary obligation is to provide a "complete, permanent, and effective bond of protection from excessive rates and charges" for consumers.). To the extent that they incidentally affect matters within FERC's jurisdiction, that is not a basis for field preemption. The Supreme Court held that "[s]tates, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain." *Talen Energy Mktg.*, 578 U.S. at 164.

### 3. The Ohio law is not conflict preempted by the FPA.

A state law can be considered conflict preempted only where (i) compliance with both federal and state regulations is impossible, or (ii) state law stands as an obstacle to achieving Congress' objectives. *Oneok*, 575 U.S. at 377; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491-492 (1987). In determining whether a federal statute preempts state law due to conflict preemption, this Court must pay close attention to the text and structure of the federal and state statutes. In *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) ("*Virginia Uranium*"), the United States Supreme Court stated that "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." *id*. at 1901. Instead, conflict preemption arguments can prevail only if there is a specific "a constitutional text or a federal statute" that displaces or conflicts with state law. *Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988); *Virginia Uranium*, 139 S. Ct. at 1901.

Transmission Owners base their conflict preemption argument on an alleged "conflict[] with Congress's voluntary policy regarding RTO membership," presumably relying on FPA section 202(a), 16 U.S.C. § 824a(a). TO Br. 44; *see*

*also id.* (claiming that "the federal framework envisions" voluntary membership).[9]

But there is no federal *requirement* that participation in a Transmission

Organization be voluntary. Rather, FPA section 202(a) exclusively addresses

actions *FERC* may and may not take, stating only that such participation cannot,

under this section, be mandated by FERC. Indeed, the case law that Transmission

Owners themselves cite explains that this "provision does not provide *FERC* with

any substantive powers 'to *compel* any particular interconnection or technique of

coordination.'" *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 12 (D.C. Cir 2002)

(quoting *Duke Power Co. v. Federal Power Comm'n*, 401 F.3d 930, 943 (D.C. Cir.

1968)) (first emphasis added, second original). Critically, this statutory provision is

silent as to what states may do; it does not impose limits on state actions.

    As a result, it is not impossible to comply with both this FPA provision and

a state law like Ohio's. Notably, federal law imposes obligations on FERC, not the

utilities. The Ohio law conversely governs the behavior of utilities seeking to

provide transmission service in Ohio, but imposes no obligations on FERC and

interferes with none of FERC's statutory mandates. Given the different targets of

the state and federal law, there can be no conflict.

---

[9] Transmission Owners do not cite any particular FPA provisions in their section
on conflict preemption, but to the extent they would rely on FPA section 201(b),
16 U.S.C. § 824(b), such reliance would be plainly wrong. Section 201(b) makes
no comment on Transmission Organization participation (or coordination more
broadly), voluntary or otherwise.

Moreover, it is perfectly possible for a utility to be required to join a Transmission Organization under state law, whether or not it is required to do so by FERC under federal law. Well established floor pre-emption principles allow states to set more stringent laws than the federal government – they just cannot set less stringent laws. "'The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption.'" *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 695 (6th Cir. 2015) (quoting *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013)). To the extent the Transmission Organization participation mandate in the Ohio law can be seen as more stringent than the participation FERC is instructed to encourage under federal law, that is not a conflict with federal law.

The Ohio law also is not an obstacle to federal law or achieving Congress's objectives. Conflict preemption can occur only when there would be "clear damage" to federal goals. *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 522 (1989). "Given the FPA's dual regulatory scheme, 'conflict-pre-emption analysis must be applied sensitively in this area, so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.'" *Zibelman*, 906 F.3d 41, 55 (quoting *Nw. Cent. Pipeline Corp.*, 489 U.S. at 515).

Here, the state law goal is the *same* as the federal goal –utility participation in Transmission Organizations. OCC Rehearing Answer 15-16, JA.565-66.  The Ohio General Assembly passed the Ohio law in 1999, as part of an energy restructuring package that "require[d] the [Ohio electric] utilities to reorganize their operations into at least three component parts so as to facilitate meaningful competition among the various functions of generating, transmitting and delivering power," *Monongahela Power Co. v. Schriber*, 322 F. Supp. 2d 902, 915 (S.D. Ohio 2004). In order to protect consumers to be served through newly-unbundled transmission, the Ohio General Assembly mandated that all transmission service providers participate in an RTO.

The Ohio law is thus consistent with, and in fact furthers, Congress's goal in section 202(a) of utility coordination. It is also consistent with Congress's desire in FPA section 219(c) to promote utility participation in Transmission Organizations. And it is consistent with FPA section 219(d) and FERC's longstanding policy that, in order for rates to be just and reasonable, federally-authorized incentives must be limited to only where necessary to encourage behavior that might not otherwise occur. The federal statute aligns perfectly with the Ohio statute's intent to protect and benefit consumers from degraded transmission services. This Court should reject Transmission Owners' attempt to distort this alignment into a conflict.

## IV.    FERC'S ORDERS ARE NOT ARBITRARY AND CAPRICIOUS.

### A. FERC need not re-examine AEP's entire rate before finding it unjust and unreasonable for AEP to collect an inapposite Adder.

In challenging the OCC Complaint and Rehearing Orders, AEP argues that FERC "failed to make the finding required under FPA Section 206 [16 U.S.C. § 824e] that AEP's existing transmission rates were outside the zone of reasonableness before replacing those rates with new rates that exclude the RTO adder." TO Br. 27. Section 206, however, contains no such requirement.

As explained in FERC's Brief (FERC Br. 54-56), FERC can remove or reduce previously granted incentive-based rate treatment on a single-issue basis pursuant to section 206.[10] In *Int'l Transmission*, FERC reduced an incentive adder, meant to induce transmission companies' independence from electricity market participants, after finding that the companies at issue had lost some of their independence. The D.C. Circuit upheld FERC's decision as consistent with the statutory requirements of section 206. *Int'l Transmission*, 988 F.3d at 485.

---

[10] This is not to suggest that FERC can terminate *only* incentive adders that it previously granted on a single-issue basis. OCC and Buckeye previously showed that it was contrary to law, arbitrary, and capricious for FERC to allow ATSI and Duke to continue collecting an RTO Adder because those Adders were accepted as part of settlement packages. OCC Opening Br. 37-43; Opening Brief of Intervenor Buckeye Power, Inc. in Support of Pet'r Off. of the Ohio Consumers' Couns., *Dayton Power & Light Co. v. FERC*, 6th Cir. No. 21-4072, ECF No. 52.

Although the D.C. Circuit was not confronted with the precise question AEP raises here, AEP identifies no cases holding, or even implying, that section 206 bars FERC from adjusting incentive-based rate treatment unless FERC first re-examines the utility's base rate and finds that the summed base and incentive exceed a zone of reasonableness.

AEP more generally argues that FERC must find an overall rate to be unjust and unreasonable before imposing a replacement rate. But the case law it cites does not support this argument. AEP (TO Br. 49) cites *Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017) for the proposition that section 206 requires FERC to first determine that an existing rate is unjust or unreasonable before establishing a new rate. While that statement alone is correct, it does not support AEP's argument that "to *remove* the adder, a complainant must demonstrate, and FERC must find, that the overall rate, inclusive of the adder, lies *outside* the zone of reasonableness." TO Br. 51. In fact, *Emera Maine* says precisely the opposite: "while showing that the existing rate is entirely outside of the zone of reasonableness may illustrate that the existing rate is unlawful . . . that is not the *only* way in which FERC can satisfy its burden under section 206." *Emera Maine*, 854 F.3d at 24 (italics original, underlining added). Instead, "[w]hether a rate, even one within the zone of reasonableness, is unlawful depends on the particular circumstances of the case." *id.* at 23. Based on the particular circumstances in the

Complaint Order, FERC reasonably found that it was unjust and unreasonable for AEP's Ohio affiliates to collect an RTO Adder for which they are ineligible.

AEP's reliance on *Sithe/Independent Power Partners, L.L.P. v. FERC*, 165 F.3d 944 (D.C. Cir. 1999) is also misplaced. At the outset, the court in that case did *not* hold that section 206 prohibits FERC from altering a rate that is within a zone of reasonableness. Rather, the court merely noted "in the past" FERC required "a customer seeking an investigation into existing rates to provide some basis to question the reasonableness of the overall rate level, taking into account changes in all cost components and not just the challenged component," *id.* at 951 (alterations and quotation marks omitted), before explaining that it could not uphold FERC's orders on that basis because FERC "*did not articulate this as its basis for dismissing [the] complaint*," *id.* (emphasis added).

In addition, FERC has adjusted incentive-based rate treatment pursuant to section 206 based on an examination of just the incentive adder. *See International Transmission*, 988 F.3d at 485. And FERC routinely issues orders pursuant to section 206 that focus solely on the return on equity component of rates. *See, e.g.*, OCC Opening Br. 43-49; *Emera Maine*, 854 F.3d at 27 (holding that, in the context of a section 206 complaint challenging a utility's base return on equity, FERC must make an "actual finding as to the lawfulness of [a utility's] *existing base [return on equity]*") (emphasis added); *Seminole Elec. Coop. Inc. v. Duke*

*Energy Fla., Inc.*, 147 FERC ¶ 61,237, P 21 (2014) (setting a complaint alleging an unjust and unreasonable return on equity "for investigation and a trial-type evidentiary hearing under section 206"), *settlement approved* 153 FERC ¶ 61,182 (2015).

In any event, the inclusion of an RTO Adder in the rate of a utility that does not qualify for that Adder – thereby increasing the rate and costs to consumers above what would otherwise be allowed[11] – *is* a basis to question the reasonableness of the overall rate. AEP's contrary interpretation of section 206 should be rejected because it would produce absurd results. Consider a utility that (1) joins a Transmission Organization, (2) applies and receives authorization to include an RTO Adder in its rates, then (3) immediately leaves the Transmission Organization once FERC authorizes the RTO Adder. According to AEP, FERC would be powerless to remove this plainly ineligible RTO Adder from the utility's rates unless and until it finds the overall rate to be outside of a zone of reasonableness. But because FERC's initial authorization of the Adder would necessarily have found the combined RTO Adder and base return on equity to be just and reasonable, 16 U.S.C. § 824s(d), and re-examination of base rates often

---

[11] FERC's regulations define incentive-based rate treatment as "a return on equity that is higher than the return on equity the Commission might otherwise allow if the public utility did not join a Transmission Organization." 18 C.F.R. § 35.35(e).

takes many years,[12] FERC would likely be unable to remove the Adder for some time – even though the utility is no longer participating in a Transmission Organization.

Nothing in the FPA requires this absurd result. There is no dispute that AEP's Ohio affiliates' rates are higher than what otherwise would be allowed because of the RTO Adder, as that is the very definition of incentive-based rate treatment. 18 C.F.R. § 35.35(e). Because AEP's Ohio affiliates are not eligible for this RTO Adder, they are not eligible for an inflated total rate. Thus, their rates – whether considering the RTO Adder alone or the rates as a whole – are unjust and unreasonable.

### B. FERC did not authorize AEP's RTO Adder in a settlement.

AEP is incorrect in its argument (TO Br. 54-56) that FERC's removal of the RTO Adder from its rates unduly discriminates against it vis-à-vis FERC's decision to allow ATSI and Duke to retain the RTO Adder. OCC and Buckeye agree with FERC's response that AEP's affiliates, Ohio Power and AEP Ohio, each explicitly requested that FERC authorize the RTO Adder for each company, and that FERC "[i]n each case . . . specifically approved the incentive." FERC Br. 51; *see also* Complaint Rehearing Order P 38, JA.593.

---

[12] For example, the return on equity complaint at issue in *Emera Me.* was brought in 2011, and has not yet been resolved.

OCC and Buckeye further agree with FERC that the Adder remained in rates during the settlement discussions and no party to those settlement proceedings challenged the inclusion of the RTO Adder in AEP's rates. FERC Br. 54 (citing Complaint Order P 62, JA.486). Indeed, as OCC pointed out in its Opening Brief in these proceedings, FERC's orders in the settlement proceedings referenced the RTO Adder not because it had been an issue set for settlement, but rather because the settlement orders had to state that the Adder was included in the rates in order to prevent AEP from seeking the adder a second time in later proceedings. OCC Opening Br. 28, 34-37. No party challenged the initial award of the RTO Adder until OCC filed its Complaint in Docket No. EL22-34-000 below.

Finally, as explained in OCC's Opening Brief in these proceedings and Buckeye's Opening Brief in support of OCC, the issue of whether the RTO Adder was approved in a settlement or in a separate stand-alone order is irrelevant. All rates are subject to FERC regulation and are subject to the same statutory standard, whether FERC accepts an RTO Adder through a stand-alone request or a settlement. OCC Opening Br. 29-37. Both the initial order in the stand-alone proceeding and the settlement agreement make clear that the RTO Adder is included. Thus, AEP's eligibility for the Adder could be questioned in a later proceeding notwithstanding how the Adder came to be included in AEP's rates.

**C. FERC never found AEP's participation in a Transmission Organization to be voluntary for purposes of determining its eligibility for the RTO Adder.**

AEP's argument that FERC previously found that its membership in PJM was voluntary (TO Br. 59) is just wrong. OCC and Buckeye agree with FERC's response that FERC "reasonably concluded in its analysis in that case, which predated the Incentives Rule [Order No. 679], nearly two decades ago and in a different statutory and regulatory context, is not determinative here." FERC Br. 66-67.

In *New PJM Cos.*, 106 FERC ¶ 63,029, P 55 (2004), a FERC Administrative Law Judge found that AEP "signed on voluntarily" to PJM because it saw substantive benefits from membership. TO Br. 60 But that statement arose prior to the passage of FPA section 219 in the unrelated context of whether AEP's membership in PJM was voluntary vis-à-vis AEP's agreement in a separate merger proceeding to join an RTO as a condition of merger approval. No party in that case raised the question of whether the Ohio law mandated AEP's participation in PJM. As AEP witnesses testified in *New PJM Cos.*, FERC "approved the merger, as conditioned, and required AEP to indicate its acceptance of the conditions, which it did on March 27, 2000." Case Nos. 23-3324 and 23-3417, OCC Answer to AEP Motion to Dismiss 26-27, JA.449-50 (citing *New PJM Cos.*, 106 FERC ¶ 63,029 at P 43). Moreover, even before the merger proceeding in 2000, Ohio Revised Code

§ 4928.12, effective October 5, 1999, required AEP to join an RTO. Complaint 8-

10, JA.334-36. There was nothing voluntary about its membership.

**D. FERC's rulings regarding Dayton's ineligibility for the RTO Adder do not discriminate against Dayton, nor do they hurt its ability to raise capital.**

Dayton argues (TO Br. 63-64) that FERC RTO Adder denial disadvantaged

its ability to raise capital, as compared to transmission owners in other PJM states.

That argument is both irrelevant and meritless. That argument is irrelevant because

the RTO Adder bears no nexus to the objective of the *base rate of return*, which is

to ensure a sufficient return on equity to raise capital. Indeed, decades of precedent

confirms that a regulated, just and reasonable return on equity – *i.e.*, the *base*

return, without incentive-based rate treatment – is one that is "sufficient to assure

confidence in the financial integrity of the enterprise, so as to maintain its credit

and to attract capital" *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S.

591 (1944) (discussing just and reasonable rates under analogous NGA

provisions); *see also* Dayton Order P 29, JA.185 ("[I]t is the *base ROE*, rather than

incentives such as RTO Adder, that was intended to ensure a utility's financial

integrity.") (emphasis added).

OCC and Buckeye agree with FERC's response that the RTO Adder is

"justified only as an incentive to induce those transmission owners – located in

states that do not require them to participate in transmission organizations – to

continue their voluntary participation." FERC Br. 71-72. Thus, FERC's order does not unduly discriminate against Dayton because it is not similarly-situated to transmission owners in PJM states that have not passed a law mandating their utilities' participation in a Transmission Organization. *See Mo. River Energy Servs. v. FERC*, 918 F.3d 954, 958 (D.C. Cir. 2019) (holding that "[a] mere difference in the treatment of two entities does not violate [the prohibition on undue discrimination]; instead, undue discrimination occurs only if the entities are 'similarly situated'") (quoting *State Corp. Comm'n v. FERC*, 876 F.3d 332, 335 (D.C. Cir. 2017)). Moreover, Dayton provided no evidence in the proceeding below, nor does it cite to any evidence that denial of the RTO Adder would, in fact, hurt its ability to raise capital.

## CONCLUSION AND PRAYER FOR RELIEF

The Court should affirm FERC's decisions (1) denying the RTO Adder to Dayton, and (2) directing AEP to remove the RTO Adder from its rates charged to Ohio transmission customers.

Respectfully submitted,

**FOR THE OFFICE OF THE OHIO CONSUMERS' COUNSEL**

*/s/ Denise C. Goulet*
Denise C. Goulet
Wendy Simon-Pearson
McCarter & English, LLP

1301 K Street, NW, Suite 1000 West
Washington, DC 20005
(202) 753-3400
dgoulet@mccarter.com
wsimonpearson@mccarter.com

Special Counsel to the Ohio Office of the Attorney
General for the Office of the Ohio Consumers'
Counsel

Denise C. Goulet is Admitted to the United States
Court of Appeals for the Sixth Circuit
D.C. Bar # 496559

MAUREEN WILLIS
CONSUMERS' COUNSEL

Angela O'Brien, Deputy Consumers' Counsel
**Office of the Ohio Consumers' Counsel** 65 East
State Street, 7th Floor
Columbus, Ohio 43215
(614) 466-8574 – Telephone
angela.obrien@occ.ohio.gov

**FOR INTERVENOR BUCKEYE POWER, INC.**

/s/ Cynthia S. Bogorad
Cynthia S. Bogorad
David E. Pomper
Jeffrey M. Bayne
Lauren L. Springett
Spiegel & McDiarmid LLP
1875 Eye Street, NW
Suite 700
Washington, DC  20006
(202) 879-4000
cynthia.bogorad@spiegelmcd.com
david.pomper@spiegelmcd.com
jeffrey.bayne@spiegelmcd.com
lauren.springett@spiegelmcd.com

*Attorneys for Intervenor Buckeye Power, Inc.*

Cynthia Bogorad is Admitted to the United States
Court of Appeals for the Sixth Circuit

Dated: November 21, 2023
FINAL INTERVENORS' BRIEF:  December 21, 2023

## Certificate of Compliance With Type-Volume Limit,
## Typeface Requirements, and Type-Style Requirements

1.     This brief complies with the type-volume limitation of Federal Rules of

Appellate Procedure "(Fed. R. App. P.") 32(a)(7)(B) because it contains 9,068

words (of the 9,100 words allotted Intervenors in Support of FERC in this case)

as determined by the word-counting feature of Microsoft Word, excluding the

parts of the brief exempted by Fed. R. App. P. Rule 32(f) and Sixth Circuit Rule

32(b)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. Rule

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using Microsoft

Word 2010 in Times New Roman 14-point font.

>                    */s/ Denise C. Goulet*
>                    Denise C. Goulet
>                    McCarter & English, LLP
>                    1301 K Street, N.W.
>                    Suite 1000 West
>                    Washington, D.C. 20005
>                    (202) 753-3400
>                    dgoulet@mccarter.com
>
>                    Special Counsel to the Ohio Office of the
>                    Attorney General for the Office of the Ohio
>                    Consumers' Counsel

Dated:  November 21, 2023
FINAL INTERVENORS' BRIEF:  December 21, 2023

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing will be made electronically via

CM/ECF system. All participants in the case are registered CM/ECF users and will

be served by the appellate CM/ECF system.

Dated this 21st day of November, 2023
FINAL INTERVENORS' BRIEF:  December 21, 2023

*/s/Denise C. Goulet*

Denise C. Goulet
McCarter & English, LLP
1301 K Street, N.W.
Suite 1000 West
Washington, D.C. 20005
(202) 753-3400
dgoulet@mccarter.com

Special Counsel to the Ohio Office of the
Attorney General for the Office of the Ohio
Consumers' Counsel

# ADDENDUM

**Statutes**

1.  Federal Power Act

    a.  Section 3, 16 U.S.C. § 796 (29), Definitions . . . . . . . . . . . . . . . . . . . 1

    b.  Section 201, 16 U.S.C. § 824, Declaration of Policy . . . . . . . . . . . 2

    c.  Section 202, 16 U.S.C. § 824a, Interconnection and coordination of facilities; emergencies; transmission to foreign countries . . . . . . . . 5

    d.  Section 203, 16 U.S.C. §824b,  Disposition of property; consolidations; purchase of securities . . . . . . . . . . . . . . . . . . . . . . 10

    e.  Section 205, Rates and Charges, Schedules 16 U.S.C. § 824d . . . . . . . . . . . . . ..  . . . . . . . . . . . . . . . . . . . . .  13

    f.  Section 206, Power of Commission To Fix Rates and Charges, 16 .S.C. § 824e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    g.  Section 215, 16 U.S.C. s 824o, Electric Reliability . . . . . . . . . . . . 21

    h.  Section 216, 16 U.S.C. § 824p, Siting of Interstate Electric Transmission Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    i.  Section 219, 16 U.S.C. § 824s,  Transmission Infrastructure Investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2.  Public Utility Regulatory Policy Act

    a.  Section 205, 16 USC § 824a-1, Pooling . . . . . . . . . . . . . . . . . . . . . 38

3.  Natural Gas Act

    a.  Section 1, 15 U.S.C. §717, Regulation of Natural Gas Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . 40

4.  Ohio Revised Code

    a.  Section 4905.03, Public Utility Company Definitions . . . . . . . . . . 42

b.  Section 4905.05, Scope of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . 45

c.  Section 4905.06, General Supervision . . . . . . . . . . . . . . . . . . . . . . 46

d.  Section 4911.02, Consumers' Counsel – Powers and Duties . . . . . . 47

e.  Section 4928.12, Qualifying Transmission Entities . . . . . . . . . . . 48

f.  Section 4928.111, Review of Distribution and Transmission
Infrastructure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Regulations**

1.  FERC Regulations

a.  18 C.F.R. §35.35e Transmission Infrastructure Investment . . . . . . . 52

2.  Ohio Regulations

a.  Ohio Administrative Code, Rule 4901:1-10-27, Inspection,
Maintenance, Repair, and Replacement of Transmission and
Distribution Facilities (Circuits and Equipment) . . . . . . . . . . . . . . . 53

**Designation of Relevant FERC Documents for Joint Appendix**

# FEDERAL POWER ACT, SECTION 3, 16 U.S.C. § 796(29) DEFINITIONS

**(29)** T\ RANSMISSION ORGANIZATION.

The term "Transmission Organization" means a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities.

# Federal Power Act Section 201, 16 U.S.C. § 824

**(a)  FEDERAL REGULATION OF TRANSMISSION AND SALE OF ELECTRIC ENERGY**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b)  USE OR SALE OF ELECTRIC ENERGY IN INTERSTATE COMMERCE**

**(1)**  The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

**(2)**  Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the

Commission for any purposes other than the purposes specified in the preceding sentence.

**(c)** **ELECTRIC ENERGY IN INTERSTATE COMMERCE**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d)** **"SALE OF ELECTRIC ENERGY AT WHOLESALE" DEFINED**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e)** **"PUBLIC UTILITY" DEFINED**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f)** **UNITED STATES, STATE, POLITICAL SUBDIVISION OF A STATE, OR AGENCY OR INSTRUMENTALITY THEREOF EXEMPT**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g)** **BOOKS AND RECORDS**

  **(1)** Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

    **(A)** an electric utility company subject to its regulatory authority under State law,

**(B)**  any exempt wholesale generator selling energy at wholesale to such electric utility, and

**(C)**  any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

**(2)**  Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

**(3)**  Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

**(4)**  Nothing in this section shall—

**(A)**  preempt applicable State law concerning the provision of records and other information; or

**(B)**  in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

**(5)**   As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

# Federal Power Act Section 202, 16 U.S.C. § 824a
# Interconnection and Coordination of Facilities; Emergencies; Transmission to Foreign Countries

**(a) REGIONAL DISTRICTS; ESTABLISHMENT; NOTICE TO STATE COMMISSIONS.**

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

**(b) SALE OR EXCHANGE OF ENERGY; ESTABLISHING PHYSICAL CONNECTIONS**

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: Provided, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected

by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

## (c) TEMPORARY CONNECTION AND EXCHANGE OF FACILITIES DURING EMERGENCY

(1)   During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party.

(2)   With respect to an order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, the Commission shall ensure that such order requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation and minimizes any adverse environmental impacts.

(3)   To the extent any omission or action taken by a party, that is necessary to comply with an order issued under this subsection, including any omission or action taken to voluntarily comply with such order, results in noncompliance with, or causes such party to not comply with, any Federal, State, or local environmental law or regulation, such omission or action shall not be considered a violation of such environmental law or regulation, or subject such party to any requirement, civil or criminal liability, or a citizen suit under such environmental law or regulation.

(4)

 (A) An order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation shall expire not later than 90 days after it is issued. The Commission may renew or reissue such order pursuant to paragraphs (1) and (2) for subsequent periods, not to exceed 90 days for each period, as the Commission determines necessary to meet the emergency and serve the public interest.

 (B) In renewing or reissuing an order under subparagraph (A), the Commission shall consult with the primary Federal agency with expertise in the environmental interest protected by such law or regulation, and shall include in any such renewed or reissued order such conditions as such Federal agency determines necessary to minimize any adverse environmental impacts to the extent practicable. The conditions, if any, submitted by such Federal agency shall be made available to the public. The Commission may exclude such a condition from the renewed or reissued order if it determines that such condition would prevent the order from adequately addressing the emergency necessitating such order and provides in the order, or otherwise makes publicly available, an explanation of such determination.

(5) If an order issued under this subsection is subsequently stayed, modified, or set aside by a court pursuant to section 825l of this title or any other provision of law, any omission or action previously taken by a party that was necessary to comply with the order while the order was in effect, including any omission or action taken to voluntarily comply with the order, shall remain subject to paragraph (3).

**(d)** TEMPORARY CONNECTION DURING EMERGENCY BY PERSONS WITHOUT JURISDICTION OF COMMISSION

During the continuance of any emergency requiring immediate action, any person or municipality engaged in the transmission or sale of electric energy and not otherwise subject to the jurisdiction of the Commission may make such temporary connections with any public utility subject to the jurisdiction of the Commission or may construct such temporary facilities for the transmission of electric energy in interstate commerce as may be necessary or appropriate to meet such emergency, and shall not become subject to the jurisdiction of the Commission by reason of such temporary connection or temporary construction: Provided, That such temporary connection shall be discontinued or such temporary construction

removed or otherwise disposed of upon the termination of such emergency: Provided further, That upon approval of the Commission permanent connections for emergency use only may be made hereunder.

**(e) TRANSMISSION OF ELECTRIC ENERGY TO FOREIGN COUNTRY**

After six months from August 26, 1935, no person shall transmit any electric energy from the United States to a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may by its order grant such application in whole or in part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate.

**(f) TRANSMISSION OR SALE AT WHOLESALE OF ELECTRIC ENERGY; REGULATION**

The ownership or operation of facilities for the transmission or sale at wholesale of electric energy which is (a) generated within a State and transmitted from the State across an international boundary and not thereafter transmitted into any other State, or (b) generated in a foreign country and transmitted across an international boundary into a State and not thereafter transmitted into any other State, shall not make a person a public utility subject to regulation as such under other provisions of this subchapter. The State within which any such facilities are located may regulate any such transaction insofar as such State regulation does not conflict with the exercise of the Commission's powers under or relating to subsection (e).

**(g) CONTINUANCE OF SERVICE**

In order to insure continuity of service to customers of public utilities, the Commission shall require, by rule, each public utility to—

    (1)   report promptly to the Commission and any appropriate State regulatory authorities any anticipated shortage of electric energy or capacity which would affect such utility's capability of serving its wholesale customers,

(2) submit to the Commission, and to any appropriate State regulatory authority, and periodically revise, contingency plans respecting—
(A) shortages of electric energy or capacity, and
(B) circumstances which may result in such shortages, and

(3) accommodate any such shortages or circumstances in a manner which shall—
(A) give due consideration to the public health, safety, and welfare, and
(B) provide that all persons served directly or indirectly by such public utility will be treated, without undue prejudice or disadvantage.

# Federal Power Act Section 203, 16 U.S.C. § 824b
## Disposition of Property; Consolidations; Purchase of Securities

**(a) AUTHORIZATION**

(1)   No public utility shall, without first having secured an order of the Commission authorizing it to do so—

    (A)   sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $10,000,000;

    (B)   merge or consolidate, directly or indirectly, its facilities subject to the jurisdiction of the Commission, or any part thereof, with the facilities of any other person, or any part thereof, that are subject to the jurisdiction of the Commission and have a value in excess of $10,000,000, by any means whatsoever;

    (C)   purchase, acquire, or take any security with a value in excess of $10,000,000 of any other public utility; or

    (D) purchase, lease, or otherwise acquire an existing generation facility—
        (i) that has a value in excess of $10,000,000; and
        (ii) that is used for interstate wholesale sales and over which the Commission has jurisdiction for ratemaking purposes.

(2)   No holding company in a holding company system that includes a transmitting utility or an electric utility shall purchase, acquire, or take any security with a value in excess of $10,000,000 of, or, by any means whatsoever, directly or indirectly, merge or consolidate with, a transmitting utility, an electric utility company, or a holding company in a holding company system that includes a transmitting utility, or an electric utility company, with a value in excess of $10,000,000 without first having secured an order of the Commission authorizing it to do so.

(3)   Upon receipt of an application for such approval the Commission shall give reasonable notice in writing to the Governor and State commission of each of the States in which the physical property affected, or any part thereof, is situated, and to such other persons as it may deem advisable.

(4)     After notice and opportunity for hearing, the Commission shall approve the proposed disposition, consolidation, acquisition, or change in control, if it finds that the proposed transaction will be consistent with the public interest, and will not result in cross-subsidization of a non-utility associate company or the pledge or encumbrance of utility assets for the benefit of an associate company, unless the Commission determines that the cross-subsidization, pledge, or encumbrance will be consistent with the public interest.

(5)     The Commission shall, by rule, adopt procedures for the expeditious consideration of applications for the approval of dispositions, consolidations, or acquisitions, under this section. Such rules shall identify classes of transactions, or specify criteria for transactions, that normally meet the standards established in paragraph (4). The Commission shall provide expedited review for such transactions. The Commission shall grant or deny any other application for approval of a transaction not later than 180 days after the application is filed. If the Commission does not act within 180 days, such application shall be deemed granted unless the Commission finds, based on good cause, that further consideration is required to determine whether the proposed transaction meets the standards of paragraph (4) and issues an order tolling the time for acting on the application for not more than 180 days, at the end of which additional period the Commission shall grant or deny the application.

(6)   For purposes of this subsection, the terms "associate company", "holding company", and "holding company system" have the meaning given those terms in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(7)

(A) Not later than 180 days after September 28, 2018, the Commission shall promulgate a rule requiring any public utility that is seeking to merge or consolidate, directly or indirectly, its facilities subject to the jurisdiction of the Commission, or any part thereof, with those of any other person, to notify the Commission of such transaction not later than 30 days after the date on which the transaction is consummated if—

(i)   the facilities, or any part thereof, to be acquired are of a value in excess of $1,000,000; and

(ii)  such public utility is not required to secure an order of the Commission under paragraph (1)(B).

(B) In establishing any notification requirement under subparagraph (A), the Commission shall, to the maximum extent practicable, minimize the paperwork burden resulting from the collection of information.

**(b) ORDERS OF COMMISSION**

The Commission may grant any application for an order under this section in whole or in part and upon such terms and conditions as it finds necessary or appropriate to secure the maintenance of adequate service and the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may from time to time for good cause shown make such orders supplemental to any order made under this section as it may find necessary or appropriate.

# Federal Power Act, Section 205, 16 U.S.C. § 824d

**(a) JUST AND REASONABLE RATES**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) PREFERENCE OR ADVANTAGE UNLAWFUL**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) SCHEDULES**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) NOTICE REQUIRED FOR RATE CHANGES**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein

provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) SUSPENSION OF NEW RATES; HEARINGS; FIVE-MONTH PERIOD**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) REVIEW OF AUTOMATIC ADJUSTMENT CLAUSES AND PUBLIC UTILITY PRACTICES; ACTION BY COMMISSION; "AUTOMATIC ADJUSTMENT CLAUSE" DEFINED**

    **(1)**    Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough

review of automatic adjustment clauses in public utility rate schedules to examine—

**(A)**    whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

**(B)**    whether any such clause reflects any costs other than costs which are—

    **(i)**    subject to periodic fluctuations and

    **(ii)**    not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

**(2)**    Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

**(3)**    The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

**(A)**    modify the terms and provisions of any automatic adjustment clause, or

**(B)**    cease any practice in connection with the clause,
if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

**(4)**    As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) INACTION OF COMMISSIONERS**

**(1)    IN GENERAL**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

**(A)**    the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825l(a) of this title; and

**(B)**    each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2)    APPEAL**

If, pursuant to this subsection, a person seeks a rehearing under section 825l(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825l(b) of this title.

# Federal Power Act Section 206, 16 U.S.C. § 824e

**(a)** **UNJUST OR PREFERENTIAL RATES, ETC.; STATEMENT OF REASONS FOR CHANGES; HEARING; SPECIFICATION OF ISSUES**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b)** **REFUND EFFECTIVE DATE; PREFERENTIAL PROCEEDINGS; STATEMENT OF REASONS FOR DELAY; BURDEN OF PROOF; SCOPE OF REFUND ORDER; REFUND ORDERS IN CASES OF DILATORY BEHAVIOR; INTEREST**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under

this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c)** **REFUND CONSIDERATIONS; SHIFTING COSTS; REDUCTION IN REVENUES; "ELECTRIC UTILITY COMPANIES" AND "REGISTERED HOLDING COMPANY" DEFINED**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

**(d)** **INVESTIGATION OF COSTS**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in

cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e)    SHORT-TERM SALES**

  **(1)**  In this subsection:

      **(A)**  The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

      **(B)**  The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

  **(2)**  If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

  **(3)** This section shall not apply to—

      **(A)**  any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

      **(B)**  an electric cooperative.

  **(4)**

      **(A)**  The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

      **(B)**  The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same

geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

**(C)** In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

# Federal Power Act Section 215, 16 U.S.C. § 824o
## Electric Reliability

**(a) DEFINITIONS**

For purposes of this section:

(1)     The term "bulk-power system" means—
(A) facilities and control systems necessary for operating an interconnected electric energy transmission network (or any portion thereof); and
(B) electric energy from generation facilities needed to maintain transmission system reliability.

        The term does not include facilities used in the local distribution of electric energy.

(2)     The terms "Electric Reliability Organization" and "ERO" mean the organization certified by the Commission under subsection (c) the purpose of which is to establish and enforce reliability standards for the bulk-power system, subject to Commission review.

(3)     The term "reliability standard" means a requirement, approved by the Commission under this section, to provide for reliable operation of the bulk-power system. The term includes requirements for the operation of existing bulk-power system facilities, including cybersecurity protection, and the design of planned additions or modifications to such facilities to the extent necessary to provide for reliable operation of the bulk-power system, but the term does not include any requirement to enlarge such facilities or to construct new transmission capacity or generation capacity.

(4)     The term "reliable operation" means operating the elements of the bulk-power system within equipment and electric system thermal, voltage, and stability limits so that instability, uncontrolled separation, or cascading failures of such system will not occur as a result of a sudden disturbance, including a cybersecurity incident, or unanticipated failure of system elements.

(5)     The term "Interconnection" means a geographic area in which the operation of bulk-power system components is synchronized such that the failure of one or more of such components may adversely affect the ability of the operators of other components within the system to maintain reliable operation of the facilities within their control.

(6)    The term "transmission organization" means a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities.

(7)    The term "regional entity" means an entity having enforcement authority pursuant to subsection (e)(4).

(8)    The term "cybersecurity incident" means a malicious act or suspicious event that disrupts, or was an attempt to disrupt, the operation of those programmable electronic devices and communication networks including hardware, software and data that are essential to the reliable operation of the bulk power system.

**(b) JURISDICTION AND APPLICABILITY**

(1)    The Commission shall have jurisdiction, within the United States, over the ERO certified by the Commission under subsection (c), any regional entities, and all users, owners and operators of the bulk-power system, including but not limited to the entities described in section 824(f) of this title, for purposes of approving reliability standards established under this section and enforcing compliance with this section. All users, owners and operators of the bulk-power system shall comply with reliability standards that take effect under this section.

(2)    The Commission shall issue a final rule to implement the requirements of this section not later than 180 days after August 8, 2005.

**(c) CERTIFICATION**

Following the issuance of a Commission rule under subsection (b)(2), any person may submit an application to the Commission for certification as the Electric Reliability Organization. The Commission may certify one such ERO if the Commission determines that such ERO—

(1)    has the ability to develop and enforce, subject to subsection (e)(2), reliability standards that provide for an adequate level of reliability of the bulk-power system; and

(2)    has established rules that—

(A)    assure its independence of the users and owners and operators of the bulk-power system, while assuring fair stakeholder representation in the selection of its directors and balanced decisionmaking in any ERO committee or subordinate organizational structure;

(B)    allocate equitably reasonable dues, fees, and other charges among end users for all activities under this section;

(C)    provide fair and impartial procedures for enforcement of reliability standards through the imposition of penalties in accordance with subsection (e) (including limitations on activities, functions, or operations, or other appropriate sanctions);

(D)    provide for reasonable notice and opportunity for public comment, due process, openness, and balance of interests in developing reliability standards and otherwise exercising its duties; and

(E)    provide for taking, after certification, appropriate steps to gain recognition in Canada and Mexico.

## (d) RELIABILITY STANDARDS

(1)    The Electric Reliability Organization shall file each reliability standard or modification to a reliability standard that it proposes to be made effective under this section with the Commission.

(2)    The Commission may approve, by rule or order, a proposed reliability standard or modification to a reliability standard if it determines that the standard is just, reasonable, not unduly discriminatory or preferential, and in the public interest. The Commission shall give due weight to the technical expertise of the Electric Reliability Organization with respect to the content of a proposed standard or modification to a reliability standard and to the technical expertise of a regional entity organized on an Interconnection-wide basis with respect to a reliability standard to be applicable within that Interconnection, but shall not defer with respect to the effect of a standard on competition. A proposed standard or modification shall take effect upon approval by the Commission.

(3)    The Electric Reliability Organization shall rebuttably presume that a proposal from a regional entity organized on an Interconnection-wide basis for a reliability standard or modification to a reliability standard to be applicable on an Interconnection-wide basis is just, reasonable, and not unduly discriminatory or preferential, and in the public interest.

(4)    The Commission shall remand to the Electric Reliability Organization for further consideration a proposed reliability standard or a modification to a reliability standard that the Commission disapproves in whole or in part.

(5)    The Commission, upon its own motion or upon complaint, may order the Electric Reliability Organization to submit to the Commission a proposed reliability standard or a modification to a reliability standard that addresses a

specific matter if the Commission considers such a new or modified reliability standard appropriate to carry out this section.

(6)    The final rule adopted under subsection (b)(2) shall include fair processes for the identification and timely resolution of any conflict between a reliability standard and any function, rule, order, tariff, rate schedule, or agreement accepted, approved, or ordered by the Commission applicable to a transmission organization. Such transmission organization shall continue to comply with such function, rule, order, tariff, rate schedule or agreement accepted, approved, or ordered by the Commission until—

    (A)    the Commission finds a conflict exists between a reliability standard and any such provision;

    (B)    the Commission orders a change to such provision pursuant to section 824e of this title; and

    (C)    the ordered change becomes effective under this subchapter.

If the Commission determines that a reliability standard needs to be changed as a result of such a conflict, it shall order the ERO to develop and file with the Commission a modified reliability standard under paragraph (4) or (5) of this subsection.

**(e) ENFORCEMENT**

(1)    The ERO may impose, subject to paragraph (2), a penalty on a user or owner or operator of the bulk-power system for a violation of a reliability standard approved by the Commission under subsection (d) if the ERO, after notice and an opportunity for a hearing—
(A) finds that the user or owner or operator has violated a reliability standard approved by the Commission under subsection (d); and
(B) files notice and the record of the proceeding with the Commission.

(2)    A penalty imposed under paragraph (1) may take effect not earlier than the 31st day after the ERO files with the Commission notice of the penalty and the record of proceedings. Such penalty shall be subject to review by the Commission, on its own motion or upon application by the user, owner or operator that is the subject of the penalty filed within 30 days after the date such notice is filed with the Commission. Application to the Commission for review, or the initiation of review by the Commission on its own motion, shall not operate as a stay of such penalty unless the Commission otherwise orders upon its own motion or upon application by the user, owner or operator that is the subject of such penalty. In any proceeding to review a penalty imposed under paragraph (1), the Commission, after notice and

opportunity for hearing (which hearing may consist solely of the record before the ERO and opportunity for the presentation of supporting reasons to affirm, modify, or set aside the penalty), shall by order affirm, set aside, reinstate, or modify the penalty, and, if appropriate, remand to the ERO for further proceedings. The Commission shall implement expedited procedures for such hearings.

(3)    On its own motion or upon complaint, the Commission may order compliance with a reliability standard and may impose a penalty against a user or owner or operator of the bulk-power system if the Commission finds, after notice and opportunity for a hearing, that the user or owner or operator of the bulk-power system has engaged or is about to engage in any acts or practices that constitute or will constitute a violation of a reliability standard.

(4)    The Commission shall issue regulations authorizing the ERO to enter into an agreement to delegate authority to a regional entity for the purpose of proposing reliability standards to the ERO and enforcing reliability standards under paragraph (1) if—

(A)    the regional entity is governed by—

(i) an independent board;

(ii) a balanced stakeholder board; or

(iii) a combination independent and balanced stakeholder board.

(B)    the regional entity otherwise satisfies the provisions of subsection (c)(1) and (2); and

(C)    the agreement promotes effective and efficient administration of bulk-power system reliability.

The Commission may modify such delegation. The ERO and the Commission shall rebuttably presume that a proposal for delegation to a regional entity organized on an Interconnection-wide basis promotes effective and efficient administration of bulk-power system reliability and should be approved. Such regulation may provide that the Commission may assign the ERO's authority to enforce reliability standards under paragraph (1) directly to a regional entity consistent with the requirements of this paragraph.

(5)    The Commission may take such action as is necessary or appropriate against the ERO or a regional entity to ensure compliance with a reliability standard or any Commission order affecting the ERO or a regional entity.

(6)    Any penalty imposed under this section shall bear a reasonable relation to the seriousness of the violation and shall take into consideration the efforts of such user, owner, or operator to remedy the violation in a timely manner.

**(f) CHANGES IN ELECTRIC RELIABILITY ORGANIZATION RULES**

The Electric Reliability Organization shall file with the Commission for approval any proposed rule or proposed rule change, accompanied by an explanation of its basis and purpose. The Commission, upon its own motion or complaint, may propose a change to the rules of the ERO. A proposed rule or proposed rule change shall take effect upon a finding by the Commission, after notice and opportunity for comment, that the change is just, reasonable, not unduly discriminatory or preferential, is in the public interest, and satisfies the requirements of subsection (c).

**(g) RELIABILITY REPORTS**

The ERO shall conduct periodic assessments of the reliability and adequacy of the bulk-power system in North America.

**(h) COORDINATION WITH CANADA AND MEXICO**

The President is urged to negotiate international agreements with the governments of Canada and Mexico to provide for effective compliance with reliability standards and the effectiveness of the ERO in the United States and Canada or Mexico.

**(i) SAVINGS PROVISIONS**

(1)    The ERO shall have authority to develop and enforce compliance with reliability standards for only the bulk-power system.

(2)    This section does not authorize the ERO or the Commission to order the construction of additional generation or transmission capacity or to set and enforce compliance with standards for adequacy or safety of electric facilities or services.

(3)    Nothing in this section shall be construed to preempt any authority of any State to take action to ensure the safety, adequacy, and reliability of electric service within that State, as long as such action is not inconsistent with any reliability standard, except that the State of New York may establish rules that result in greater reliability within that State, as long as such action does not result in lesser reliability outside the State than that provided by the reliability standards.

(4)     Within 90 days of the application of the Electric Reliability Organization or other affected party, and after notice and opportunity for comment, the Commission shall issue a final order determining whether a State action is inconsistent with a reliability standard, taking into consideration any recommendation of the ERO.

(5)     The Commission, after consultation with the ERO and the State taking action, may stay the effectiveness of any State action, pending the Commission's issuance of a final order.

## (j) REGIONAL ADVISORY BODIES

The Commission shall establish a regional advisory body on the petition of at least two-thirds of the States within a region that have more than one-half of their electric load served within the region. A regional advisory body shall be composed of one member from each participating State in the region, appointed by the Governor of each State, and may include representatives of agencies, States, and provinces outside the United States. A regional advisory body may provide advice to the Electric Reliability Organization, a regional entity, or the Commission regarding the governance of an existing or proposed regional entity within the same region, whether a standard proposed to apply within the region is just, reasonable, not unduly discriminatory or preferential, and in the public interest, whether fees proposed to be assessed within the region are just, reasonable, not unduly discriminatory or preferential, and in the public interest and any other responsibilities requested by the Commission. The Commission may give deference to the advice of any such regional advisory body if that body is organized on an Interconnection-wide basis.

## (k) ALASKA AND HAWAII

The provisions of this section do not apply to Alaska or Hawaii.

# Federal Power Act Section 216, 16 U.S.C. § 824p
## Siting of Interstate Electric Transmission Facilities

**(a) DESIGNATION OF NATIONAL INTEREST ELECTRIC TRANSMISSION CORRIDORS**

(1)    Not later than 1 year after August 8, 2005, and every 3 years thereafter, the Secretary of Energy (referred to in this section as the "Secretary"), in consultation with affected States and Indian Tribes, shall conduct a study of electric transmission capacity constraints and congestion.

(2)    Not less frequently than once every 3 years, the Secretary, after considering alternatives and recommendations from interested parties (including an opportunity for comment from affected States and Indian Tribes), shall issue a report, based on the study under paragraph (1) or other information relating to electric transmission capacity constraints and congestion, which may designate as a national interest electric transmission corridor any geographic area that—

　　　　(i) [1] is experiencing electric energy transmission capacity constraints or congestion that adversely affects consumers; or

　　　　(ii) [2] is expected to experience such energy transmission capacity constraints or congestion.

(3)    Not less frequently than once every 3 years, the Secretary, in conducting the study under paragraph (1) and issuing the report under paragraph (2), shall consult with any appropriate regional entity referred to in section 824o of this title.

(4)    In determining whether to designate a national interest electric transmission corridor under paragraph (2), the Secretary may consider whether—

(A)    the economic vitality and development of the corridor, or the end markets served by the corridor, may be constrained by lack of adequate or reasonably priced electricity;

(B)
　　　　(i) economic growth in the corridor, or the end markets served by the corridor, may be jeopardized by reliance on limited sources of energy; and
　　　　(ii) a diversification of supply is warranted;

(C)    the energy independence or energy security of the United States would be served by the designation;

(D)    the designation would be in the interest of national energy policy;

(E)    the designation would enhance national defense and homeland security;

(F)    the designation would enhance the ability of facilities that generate or transmit firm or intermittent energy to connect to the electric grid;

(G)    the designation—

(i)    maximizes existing rights-of-way; and

(ii)    avoids and minimizes, to the maximum extent practicable, and offsets to the extent appropriate and practicable, sensitive environmental areas and cultural heritage sites; and

(H)    the designation would result in a reduction in the cost to purchase electric energy for consumers.

**(b) CONSTRUCTION PERMIT**

Except as provided in subsection (i), the Commission may, after notice and an opportunity for hearing, issue one or more permits for the construction or modification of electric transmission facilities in a national interest electric transmission corridor designated by the Secretary under subsection (a) if the Commission finds that—

(1)

(A)    a State in which the transmission facilities are to be constructed or modified does not have authority to—

(i) approve the siting of the facilities; or

(ii) consider the interstate benefits or interregional benefits expected to be achieved by the proposed construction or modification of transmission facilities in the State;

(B)    the applicant for a permit is a transmitting utility under this chapter but does not qualify to apply for a permit or siting approval for the proposed project in a State because the applicant does not serve end-use customers in the State; or

(C)    a State commission or other entity that has authority to approve the siting of the facilities—

(i) has not made a determination on an application seeking approval pursuant to applicable law by the date that is 1 year after the later of—

(I)  the date on which the application was filed; and

(II) the date on which the relevant national interest electric transmission corridor was designated by the Secretary under subsection (a);

(ii) has conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce

transmission capacity constraints or congestion in interstate commerce or is not economically feasible; or

    (iii) has denied an application seeking approval pursuant to applicable law;

(2)    the facilities to be authorized by the permit will be used for the transmission of electric energy in interstate commerce;

(3)    the proposed construction or modification is consistent with the public interest;

(4)    the proposed construction or modification will significantly reduce transmission congestion in interstate commerce and protects or benefits consumers;

(5)    the proposed construction or modification is consistent with sound national energy policy and will enhance energy independence; and

(6)    the proposed modification will maximize, to the extent reasonable and economical, the transmission capabilities of existing towers or structures.

## (c) PERMIT APPLICATIONS

(1)    Permit applications under subsection (b) shall be made in writing to the Commission.

(2)    The Commission shall issue rules specifying—
    (A) the form of the application;
    (B) the information to be contained in the application; and
    (C) the manner of service of notice of the permit application on interested persons.

## (d) COMMENTS

In any proceeding before the Commission under subsection (b), the Commission shall afford each State in which a transmission facility covered by the permit is or will be located, each affected Federal agency and Indian tribe, private property owners, and other interested persons, a reasonable opportunity to present their views and recommendations with respect to the need for and impact of a facility covered by the permit.

## (e) RIGHTS-OF-WAY

(1)    In the case of a permit under subsection (b) for electric transmission facilities to be located on property other than property owned by the United States or a State, if the permit holder cannot acquire by contract, or is unable

to agree with the owner of the property to the compensation to be paid for, the necessary right-of-way to construct or modify, and operate and maintain, the transmission facilities and, in the determination of the Commission, the permit holder has made good faith efforts to engage with landowners and other stakeholders early in the applicable permitting process, the permit holder may acquire the right-of-way by the exercise of the right of eminent domain in the district court of the United States for the district in which the property concerned is located, or in the appropriate court of the State in which the property is located.

(2)    Any right-of-way acquired under paragraph (1) shall be used exclusively for the construction or modification of electric transmission facilities within a reasonable period of time after the acquisition.

(3)    The practice and procedure in any action or proceeding under this subsection in the district court of the United States shall conform as nearly as practicable to the practice and procedure in a similar action or proceeding in the courts of the State in which the property is located.

(4)    Nothing in this subsection shall be construed to authorize the use of eminent domain to acquire a right-of-way for any purpose other than the construction, modification, operation, or maintenance of electric transmission facilities and related facilities. The right-of-way cannot be used for any other purpose, and the right-of-way shall terminate upon the termination of the use for which the right-of-way was acquired.

## (f) COMPENSATION

(1)    Any right-of-way acquired pursuant to subsection (e) shall be considered a taking of private property for which just compensation is due.

(2)    Just compensation shall be an amount equal to the fair market value (including applicable severance damages) of the property taken on the date of the exercise of eminent domain authority.

## (g) STATE LAW

Nothing in this section precludes any person from constructing or modifying any transmission facility in accordance with State law.

## (h) COORDINATION OF FEDERAL AUTHORIZATIONS FOR TRANSMISSION FACILITIES

(1)    In this subsection:

(A)  The term "Federal authorization" means any authorization required under Federal law in order to site a transmission facility.

(B)  The term "Federal authorization" includes such permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law in order to site a transmission facility.

(2)  The Department of Energy shall act as the lead agency for purposes of coordinating all applicable Federal authorizations and related environmental reviews of the facility.

(3)  To the maximum extent practicable under applicable Federal law, the Secretary shall coordinate the Federal authorization and review process under this subsection with any Indian tribes, multistate entities, and State agencies that are responsible for conducting any separate permitting and environmental reviews of the facility, to ensure timely and efficient review and permit decisions.

(4)

(A)  As head of the lead agency, the Secretary, in consultation with agencies responsible for Federal authorizations and, as appropriate, with Indian tribes, multistate entities, and State agencies that are willing to coordinate their own separate permitting and environmental reviews with the Federal authorization and environmental reviews, shall establish prompt and binding intermediate milestones and ultimate deadlines for the review of, and Federal authorization decisions relating to, the proposed facility.

(B)  The Secretary shall ensure that, once an application has been submitted with such data as the Secretary considers necessary, all permit decisions and related environmental reviews under all applicable Federal laws shall be completed—

(i) within 1 year; or

(ii) if a requirement of another provision of Federal law does not permit compliance with clause (i), as soon thereafter as is practicable.

(C)  The Secretary shall provide an expeditious pre-application mechanism for prospective applicants to confer with the agencies involved to have each such agency determine and communicate to the prospective applicant not later than 60 days after the prospective applicant submits a request for such information concerning—

(i) the likelihood of approval for a potential facility; and

(ii) key issues of concern to the agencies and public.

(5)

 (A) As lead agency head, the Secretary, in consultation with the affected agencies, shall prepare a single environmental review document, which shall be used as the basis for all decisions on the proposed project under Federal law.

 (B) The Secretary and the heads of other agencies shall streamline the review and permitting of transmission within corridors designated under section 503 of the Federal Land Policy and Management Act [3] (43 U.S.C. 1763) by fully taking into account prior analyses and decisions relating to the corridors.

 (C) The document shall include consideration by the relevant agencies of any applicable criteria or other matters as required under applicable law.

(6)

 (A) If any agency has denied a Federal authorization required for a transmission facility, or has failed to act by the deadline established by the Secretary pursuant to this section for deciding whether to issue the authorization, the applicant or any State in which the facility would be located may file an appeal with the President, who shall, in consultation with the affected agency, review the denial or failure to take action on the pending application.

 (B) Based on the overall record and in consultation with the affected agency, the President may—
(i) issue the necessary authorization with any appropriate conditions; or
(ii) deny the application.

 (C) The President shall issue a decision not later than 90 days after the date of the filing of the appeal.

 (D) In making a decision under this paragraph, the President shall comply with applicable requirements of Federal law, including any requirements of—
(i) the National Forest Management Act of 1976 (16 U.S.C. 472a et seq.);
(ii) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);
(iii) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.);
(iv) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and
(v) the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.).

(7)

    (A)   Not later than 18 months after August 8, 2005, the Secretary shall issue any regulations necessary to implement this subsection.

    (B)

        (i) Not later than 1 year after August 8, 2005, the Secretary and the heads of all Federal agencies with authority to issue Federal authorizations shall enter into a memorandum of understanding to ensure the timely and coordinated review and permitting of electricity transmission facilities.

        (ii) Interested Indian tribes, multistate entities, and State agencies may enter the memorandum of understanding.

    (C)   The head of each Federal agency with authority to issue a Federal authorization shall designate a senior official responsible for, and dedicate sufficient other staff and resources to ensure, full implementation of the regulations and memorandum required under this paragraph.

(8)

    (A)   Each Federal land use authorization for an electricity transmission facility shall be issued—

        (i) for a duration, as determined by the Secretary, commensurate with the anticipated use of the facility; and

        (ii) with appropriate authority to manage the right-of-way for reliability and environmental protection.

    (B)   On the expiration of the authorization (including an authorization issued before August 8, 2005), the authorization shall be reviewed for renewal taking fully into account reliance on such electricity infrastructure, recognizing the importance of the authorization for public health, safety, and economic welfare and as a legitimate use of Federal land.

(9)   In exercising the responsibilities under this section, the Secretary shall consult regularly with—

    (A)   the Federal Energy Regulatory Commission;

    (B)   electric reliability organizations (including related regional entities) approved by the Commission; and

    (C)   Transmission Organizations approved by the Commission.

**(i) INTERSTATE COMPACTS**

(1)     The consent of Congress is given for three or more contiguous States to enter into an interstate compact, subject to approval by Congress, establishing regional transmission siting agencies to—
(A) facilitate siting of future electric energy transmission facilities within those States; and
(B) carry out the electric energy transmission siting responsibilities of those States.

(2)     The Secretary shall provide technical assistance to regional transmission siting agencies established under this subsection.

(3)     The regional transmission siting agencies shall have the authority to review, certify, and permit siting of transmission facilities, including facilities in national interest electric transmission corridors (other than facilities on property owned by the United States).

(4)     The Commission shall have no authority to issue a permit for the construction or modification of an electric transmission facility within a State that is a party to a compact, unless the Secretary determines that the members of the compact are in disagreement after the later of—
(A) the date that is 1 year after the date on which the relevant application for the facility was filed; and
(B) the date that is 1 year after the date on which the relevant national interest electric transmission corridor was designated by the Secretary under subsection (a).

**(j) RELATIONSHIP TO OTHER LAWS**

(1)     Except as specifically provided, nothing in this section affects any requirement of an environmental law of the United States, including the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(2)     Subsection (h)(6) shall not apply to any unit of the National Park System, the National Wildlife Refuge System, the National Wild and Scenic Rivers System, the National Trails System, the National Wilderness Preservation System, or a National Monument.

**(k) ERCOT**

This section shall not apply within the area referred to in section 824k(k)(2)(A) of this title.

# FEDERAL POWER ACT, SECTION 219, 16 U.S.C. § 824s
## TRANSMISSION INFRASTRUCTURE INVESTMENT

**(a) RULEMAKING REQUIREMENT**

Not later than 1 year after August 8, 2005, the Commission shall establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of electric energy in interstate commerce by public utilities for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion.

**(b) CONTENTS** The rule shall—

**(1)** promote reliable and economically efficient transmission and generation of electricity by promoting capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce, regardless of the ownership of the facilities;

**(2)** provide a return on equity that attracts new investment in transmission facilities (including related transmission technologies);

**(3)** encourage deployment of transmission technologies and other measures to increase the capacity and efficiency of existing transmission facilities and improve the operation of the facilities; and

**(4)** allow recovery of—

   **(A)** all prudently incurred costs necessary to comply with mandatory reliability standards issued pursuant to section 824o of this title; and
   **(B)** all prudently incurred costs related to transmission infrastructure development pursuant to section 824p of this title.

**(c) INCENTIVES**

In the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization. The Commission shall ensure that any costs recoverable pursuant to this subsection may be recovered by such utility through the transmission rates charged by such utility or through the transmission rates

charged by the Transmission Organization that provides transmission service to such utility.

**(d)** **JUST AND REASONABLE RATES**

All rates approved under the rules adopted pursuant to this section, including any revisions to the rules, are subject to the requirements of sections 824d and 824e of this title that all rates, charges, terms, and conditions be just and reasonable and not unduly discriminatory or preferential.

## Public Utility Regulatory Policies Act, § 205, 16 U.S.C. § 824a–1
## Pooling

**(a) STATE LAWS**

The Commission may, on its own motion, and shall, on application of any person or governmental entity, after public notice and notice to the Governor of the affected State and after affording an opportunity for public hearing, exempt electric utilities, in whole or in part, from any provision of State law, or from any State rule or regulation, which prohibits or prevents the voluntary coordination of electric utilities, including any agreement for central dispatch, if the Commission determines that such voluntary coordination is designed to obtain economical utilization of facilities and resources in any area. No such exemption may be granted if the Commission finds that such provision of State law, or rule or regulation—

(1)     is required by any authority of Federal law, or

(2)     is designed to protect public health, safety, or welfare, or the environment or conserve energy or is designed to mitigate the effects of emergencies resulting from fuel shortages.

**(b) POOLING STUDY**

(1)     The Commission, in consultation with the reliability councils established under section 202(a) of the Federal Power Act [16 U.S.C. 824a], the Secretary, and the electric utility industry shall study the opportunities for—
(A) conservation of energy,
(B) optimization in the efficiency of use of facilities and resources, and
(C) increased reliability, through pooling arrangements. Not later than 18 months after November 9, 1978, the Commission shall submit a report containing the results of such study to the President and the Congress.

(2)     The Commission may recommend to electric utilities that such utilities should voluntarily enter into negotiations where the opportunities referred to in paragraph (1) exist. The Commission shall report annually to the President and the Congress regarding any such recommendations and subsequent actions taken by electric utilities, by the Commission, and by the Secretary under this Act, the Federal

Power Act [16 U.S.C. 791a et seq.], and any other provision of law. Such annual reports shall be included in the Commission's annual report required under the Department of Energy Organization Act [42 U.S.C. 7101 et seq.].

# Natural Gas Act Section 1, 15 U.S.C. § 717
## Regulation of Natural Gas Companies

**(a)** NECESSITY OF REGULATION IN PUBLIC INTEREST

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

**(b)** TRANSACTIONS TO WHICH PROVISIONS OF CHAPTER APPLICABLE

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

**(c)** INTRASTATE TRANSACTIONS EXEMPT FROM PROVISIONS OF CHAPTER; CERTIFICATION FROM STATE COMMISSION AS CONCLUSIVE EVIDENCE

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over

rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

**(d)** **VEHICULAR NATURAL GAS JURISDICTION**

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

**(1)** not otherwise a natural-gas company; or

**(2)** subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

# Ohio Revised Code, §4905.03, Public Utility Company Definitions

As used in this chapter, any person, firm, copartnership, voluntary association, joint-stock association, company, or corporation, wherever organized or incorporated, is:

(A) A telephone company, when engaged in the business of transmitting telephonic messages to, from, through, or in this state;

(B) A for-hire motor carrier, when engaged in the business of transporting persons or property by motor vehicle for compensation, except when engaged in any of the operations in intrastate commerce described in divisions (B)(1) to (9) of section 4921.01 of the Revised Code, but including the carrier's agents, officers, and representatives, as well as employees responsible for hiring, supervising, training, assigning, or dispatching drivers and employees concerned with the installation, inspection, and maintenance of motor-vehicle equipment and accessories;

(C) An electric light company, when engaged in the business of supplying electricity for light, heat, or power purposes to consumers within this state, including supplying electric transmission service for electricity delivered to consumers in this state, but excluding a regional transmission organization approved by the federal energy regulatory commission;

(D) A gas company, when engaged in the business of supplying artificial gas for lighting, power, or heating purposes to consumers within this state or when engaged in the business of supplying artificial gas to gas companies or to natural gas companies within this state, but a producer engaged in supplying to one or more gas or natural gas companies, only such artificial gas as is manufactured by that producer as a by-product of some other process in which the producer is primarily engaged within this state is not thereby a gas company. All rates, rentals, tolls, schedules, charges of any kind, or agreements between any gas company and any other gas company or any natural gas company providing for the supplying of artificial gas and for compensation for the same are subject to the jurisdiction of the public utilities commission.

(E) A natural gas company, when engaged in the business of supplying natural gas for lighting, power, or heating purposes to consumers within this state. Notwithstanding the above, neither the delivery nor sale of Ohio-produced

natural gas or Ohio-produced raw natural gas liquids by a producer or gatherer under a public utilities commission-ordered exemption, adopted before, as to producers, or after, as to producers or gatherers, January 1, 1996, or the delivery or sale of Ohio-produced natural gas or Ohio-produced raw natural gas liquids by a producer or gatherer of Ohio-produced natural gas or Ohio-produced raw natural gas liquids, either to a lessor under an oil and gas lease of the land on which the producer's drilling unit is located, or the grantor incident to a right-of-way or easement to the producer or gatherer, shall cause the producer or gatherer to be a natural gas company for the purposes of this section.

All rates, rentals, tolls, schedules, charges of any kind, or agreements between a natural gas company and other natural gas companies or gas companies providing for the supply of natural gas and for compensation for the same are subject to the jurisdiction of the public utilities commission. The commission, upon application made to it, may relieve any producer or gatherer of natural gas, defined in this section as a gas company or a natural gas company, of compliance with the obligations imposed by this chapter and Chapters 4901, 4903, 4907, 4909, 4921, and 4923. of the Revised Code, so long as the producer or gatherer is not affiliated with or under the control of a gas company or a natural gas company engaged in the transportation or distribution of natural gas, or so long as the producer or gatherer does not engage in the distribution of natural gas to consumers.

Nothing in division (E) of this section limits the authority of the commission to enforce sections 4905.90 to 4905.96 of the Revised Code.

(F) A pipe-line company, when engaged in the business of transporting natural gas, oil, or coal or its derivatives through pipes or tubing, either wholly or partly within this state, but not when engaged in the business of the transport associated with gathering lines, raw natural gas liquids, or finished product natural gas liquids;

(G) A water-works company, when engaged in the business of supplying water through pipes or tubing, or in a similar manner, to consumers within this state;

(H) A heating or cooling company, when engaged in the business of supplying water, steam, or air through pipes or tubing to consumers within this state for heating or cooling purposes;

(I) A messenger company, when engaged in the business of supplying messengers for any purpose;

(J) A street railway company, when engaged in the business of operating as a common carrier, a railway, wholly or partly within this state, with one or more tracks upon, along, above, or below any public road, street, alleyway, or ground, within any municipal corporation, operated by any motive power other than steam and not a part of an interurban railroad, whether the railway is termed street, inclined-plane, elevated, or underground railway;

(K) A suburban railroad company, when engaged in the business of operating as a common carrier, whether wholly or partially within this state, a part of a street railway constructed or extended beyond the limits of a municipal corporation, and not a part of an interurban railroad;

(L) An interurban railroad company, when engaged in the business of operating a railroad, wholly or partially within this state, with one or more tracks from one municipal corporation or point in this state to another municipal corporation or point in this state, whether constructed upon the public highways or upon private rights-of-way, outside of municipal corporations, using electricity or other motive power than steam power for the transportation of passengers, packages, express matter, United States mail, baggage, and freight. Such an interurban railroad company is included in the term "railroad" as used in section 4907.02 of the Revised Code.

(M) A sewage disposal system company, when engaged in the business of sewage disposal services through pipes or tubing, and treatment works, or in a similar manner, within this state.

As used in division (E) of this section, "natural gas" includes natural gas that has been processed to enable consumption or to meet gas quality standards or that has been blended with propane, hydrogen, biologically derived methane gas, or any other artificially produced or processed gas.

As used in this section, "gathering lines" has the same meaning as in section 4905.90 of the Revised Code, and "raw natural gas liquids" and "finished product natural gas liquids" have the same meanings as in section 4906.01 of the Revised Code.

# Ohio Revised Code Section 4905.05, Scope of jurisdiction.

The jurisdiction, supervision, powers, and duties of the public utilities commission extend to every public utility and railroad, the plant or property of which lies wholly within this state and when the property of a public utility or railroad lies partly within and partly without this state to that part of such plant or property which lies within this state; to the persons or companies owning, leasing, or operating such public utilities and railroads; to the records and accounts of the business thereof done within this state; and to the records and accounts of any companies which are part of an electric utility holding company system exempt under section 3(a)(1) or (2) of the "Public Utility Holding Company Act of 1935," 49 Stat. 803, 15 U.S.C. 79c, and the rules and regulations promulgated thereunder, insofar as such records and accounts may in any way affect or relate to the costs associated with the provision of electric utility service by any public utility operating in this state and part of such holding company system.

Nothing in this section, or section 4905.06 or 4905.46 of the Revised Code pertaining to regulation of holding companies, grants the public utilities commission authority to regulate a holding company or its subsidiaries which are organized under the laws of another state, render no public utility service in the state of Ohio, and are regulated as a public utility by the public utilities commission of another state or primarily by a federal regulatory commission, nor do these grants of authority apply to public utilities that are excepted from the definition of "public utility" under divisions (A)(1) to (3) of section 4905.02 of the Revised Code.

## Ohio Revised Code Section 4905.06, General Supervision.

The public utilities commission has general supervision over all public utilities within its jurisdiction as defined in section 4905.05 of the Revised Code, and may examine such public utilities and keep informed as to their general condition, capitalization, and franchises, and as to the manner in which their properties are leased, operated, managed, and conducted with respect to the adequacy or accommodation afforded by their service, the safety and security of the public and their employees, and their compliance with all laws, orders of the commission, franchises, and charter requirements. The commission has general supervision over all other companies referred to in section 4905.05 of the Revised Code to the extent of its jurisdiction as defined in that section, and may examine such companies and keep informed as to their general condition and capitalization, and as to the manner in which their properties are leased, operated, managed, and conducted with respect to the adequacy or accommodation afforded by their service, and their compliance with all laws and orders of the commission, insofar as any of such matters may relate to the costs associated with the provision of electric utility service by public utilities in this state which are affiliated or associated with such companies. The commission, through the public utilities commissioners or inspectors or employees of the commission authorized by it, may enter in or upon, for purposes of inspection, any property, equipment, building, plant, factory, office, apparatus, machinery, device, and lines of any public utility. The power to inspect includes the power to prescribe any rule or order that the commission finds necessary for protection of the public safety. In order to assist the commission in the performance of its duties under this chapter, authorized employees of the motor carrier enforcement unit, created under section 5503.34 of the Revised Code in the division of state highway patrol, of the department of public safety may enter in or upon, for inspection purposes, any motor vehicle of any motor carrier.

In order to inspect motor vehicles owned or operated by a motor carrier engaged in the transportation of persons, authorized employees of the motor carrier enforcement unit, division of state highway patrol, of the department of public safety may enter in or upon any property of any motor carrier engaged in the intrastate transportation of persons.

# OHIO REVISED CODE § 4911.02
## CONSUMERS' COUNSEL – POWERS AND DUTIES

(A) The consumers' counsel shall be appointed by the consumers' counsel governing board, and shall hold office at the pleasure of the board.

(B)(1) The counsel may sue or be sued and has the powers and duties granted the counsel under this chapter, and all necessary powers to carry out the purposes of this chapter.

(2) Without limitation because of enumeration, the counsel:

(a) Shall have all the rights and powers of any party in interest appearing before the public utilities commission regarding examination and cross-examination of witnesses, presentation of evidence, and other matters;

(b) May take appropriate action with respect to residential consumer complaints concerning quality of service, service charges, and the operation of the public utilities commission;

(c) May institute, intervene in, or otherwise participate in proceedings in both state and federal courts and administrative agencies on behalf of the residential consumers concerning review of decisions rendered by, or failure to act by, the public utilities commission;

(d) May conduct long range studies concerning various topics relevant to the rates charged to residential consumers.

(C) The counsel shall follow the policies of the state as set forth in Chapter 4929. of the Revised Code that involve supporting retail natural gas competition.

# OHIO REVISED CODE § 4928.12
# QUALIFYING TRANSMISSION ENTITIES

(A) Except as otherwise provided in sections 4928.31 to 4928.40 of the Revised Code, no entity shall own or control transmission facilities as defined under federal law and located in this state on or after the starting date of competitive retail electric service unless that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities, as described in division (B) of this section, that are operational.

(B) An entity that owns or controls transmission facilities located in this state complies with division (A) of this section if each transmission entity of which it is a member meets all of the following specifications:

(1) The transmission entity is approved by the federal energy regulatory commission.

(2) The transmission entity effects separate control of transmission facilities from control of generation facilities.

(3) The transmission entity implements, to the extent reasonably possible, policies and procedures designed to minimize pancaked transmission rates within this state.

(4) The transmission entity improves service reliability within this state.

(5) The transmission entity achieves the objectives of an open and competitive electric generation marketplace, elimination of barriers to market entry, and preclusion of control of bottleneck electric transmission facilities in the provision of retail electric service.

(6) The transmission entity is of sufficient scope or otherwise operates to substantially increase economical supply options for consumers.

(7) The governance structure or control of the transmission entity is independent of the users of the transmission facilities, and no member of its board of directors has an affiliation, with such a user or with an affiliate of a user during the member's tenure on the board, such as to unduly affect the transmission entity's performance. For the purpose of division (B)(7) of this

section, a "user" is any entity or affiliate of that entity that buys or sells electric energy in the transmission entity's region or in a neighboring region.

(8) The transmission entity operates under policies that promote positive performance designed to satisfy the electricity requirements of customers.

(9) The transmission entity is capable of maintaining real-time reliability of the electric transmission system, ensuring comparable and nondiscriminatory transmission access and necessary services, minimizing system congestion, and further addressing real or potential transmission constraints.

(C) To the extent that a transmission entity under division (A) of this section is authorized to build transmission facilities, that transmission entity has the powers provided in and is subject to sections 1723.01 to 1723.08 of the Revised Code.

(D) For the purpose of forming or participating in a regional regulatory oversight body or mechanism developed for any transmission entity under division (A) of this section that is of regional scope and operates within this state:

(1) The commission shall make joint investigations, hold joint hearings, within or outside this state, and issue joint or concurrent orders in conjunction or concurrence with any official or agency of any state or of the United States, whether in the holding of those investigations or hearings, or in the making of those orders, the commission is functioning under agreements or compacts between states, under the concurrent power of states to regulate interstate commerce, as an agency of the United States, or otherwise.

(2) The commission shall negotiate and enter into agreements or compacts with agencies of other states for cooperative regulatory efforts and for the enforcement of the respective state laws regarding the transmission entity.

(E) If a qualifying transmission entity is not operational as contemplated in division (A) of this section, division (A)(13) of section 4928.34 of the Revised Code, or division (G) of section 4928.35 of the Revised Code, the commission by rule or order shall take such measures or impose such requirements on all for-profit entities that own or control electric

transmission facilities located in this state as the commission determines necessary and proper to achieve independent, nondiscriminatory operation of, and separate ownership and control of, such electric transmission facilities on or after the starting date of competitive retail electric service.

## Ohio Revised Code Section 4928.111,
## Review of Distribution and Transmission Infrastructure

The public utilities commission shall consult with electric distribution utilities to review the distribution infrastructure in this state and shall consult with regional transmission organizations and entities that own or control transmission facilities to review the transmission infrastructure in this state.

## FERC REGULATIONS, SECTION 35.35(e), 18 C.F.R. § 35.35(e)
## TRANSMISSION INFRASTRUCTURE INVESTMENT

(e) *Incentives for joining a Transmission Organization.* The Commission will authorize an incentive-based rate treatment, as discussed in this paragraph (e), for public utilities that join a Transmission Organization, if the applicant demonstrates that the proposed incentive-based rate treatment is just and reasonable and not unduly discriminatory or preferential. Applicants for the incentive-based rate treatment must make a filing with the Commission under section 205 of the Federal Power Act. For purposes of this paragraph (e), an incentive-based rate treatment means a return on equity that is higher than the return on equity the Commission might otherwise allow if the public utility did not join a Transmission Organization. The Commission will also permit transmitting utilities or electric utilities that join a Transmission Organization the ability to recover prudently incurred costs associated with joining the Transmission Organization, either through transmission rates charged by transmitting utilities or electric utilities or through transmission rates charged by the Transmission Organization that provides services to such utilities.

## Ohio Administrative Code Rule 4901:1-10-27,
### Inspection, Maintenance, Repair, and Replacement of Transmission and Distribution Facilities (Circuits and Equipment).

(A)   This rule applies to the inspection, maintenance, repair, and replacement of utility transmission and distribution system facilities (circuits and equipment). The rebuttable presumption that an electric utility and/or transmission owner is providing adequate service pursuant to paragraph (F) of rule 4901:1-10-02 of the Administrative Code, does not apply to this rule.

(B)   Distribution system performance assessment. For electric distribution circuits, the electric utility shall comply with rule 4901:1-10-11 of the Administrative Code.

(C)   Transmission system performance assessment. Every five years each electric utility and transmission owner shall file with the commission a report setting forth its methodology used to assess the reliability of its transmission circuits. That methodology shall be subject to review and acceptance by the director of the rates and analysis department.

(1)   Each electric utility or transmission owner shall submit a method to assess circuit reliability based on the total number of sustained outages per circuit per calendar year and other factors proposed by the electric utility, or required by the electric reliability organization (ERO), the regional reliability organization (RRO), or the regional transmission operator, which affect circuit performance, together with supporting justification for that method.

(a)   If the electric utility and/or transmission owner and the director of the rates and analysis department can not agree on a method to assess transmission circuit reliability, the electric utility and/or transmission owner shall apply, within ninety calendar days after the submission of its proposal, to the commission for a hearing and shall file a written report along with documentation supporting its methodology.

(b)   Revisions to a previously accepted methodology for assessing the reliability of its transmission circuits, shall be submitted for review and acceptance along with supporting justification to the director of the utilities department, no later than ninety calendar days prior to the beginning of the next succeeding calendar year.

(2) Each electric utility or transmission owner shall submit a report on electronic media in a format prescribed by the commission on or before March thirty-first of each year, that identifies the performance of each transmission circuit for the previous calendar year. Each annual report shall, at a minimum, provide the following information for each transmission circuit:

(a) The circuit identification number.

(b) The circuit name (if different from the origin terminus).

(c) The circuit origin and terminus.

(d) The circuit voltage level (KV).

(e) The circuit mileage.

(f) The circuit in-service date, where available.

(g) The number of unplanned outages (sustained and momentary if available) and their causes by circuit.

(h) The substation(s) and/or distribution circuit(s) affected by each of the outages reported for paragraph (C)(2)(g) of this rule, by circuit.

(i) A description of and the rationale for any remedial action taken or planned to improve circuit performance or for taking no remedial action.

(j) The start and completion dates of any remedial action taken or planned.

(k) The applicable ERO standard requirement.

(l) The applicable ERO standard violation.

(3) The annual report shall be submitted in a form prescribed by the commission or its staff.

(D) Transmission and distribution facilities inspections.

Unless otherwise determined by the commission, each electric utility and transmission owner shall, at a minimum, inspect its electric transmission and distribution facilities (circuits and equipment) to maintain quality, safe, and reliable service on the following scheduled basis:

(1) Distribution - all distribution circuits and equipment, including above-ground facilities associated with the operation of underground circuits, shall be inspected at least once every five years.

(2) Transmission - all transmission circuits and equipment shall be inspected at least once every year.

(3) Substations - all transmission and distribution substations and equipment shall be inspected twelve times annually, with no inspection interval exceeding forty calendar days between inspections.

(4) On or before March thirty-first of each year, each electric utility and transmission owner shall submit a report in an electronic medium, in a format prescribed by the commission or its staff, of the electric utility's and/or transmission owner's compliance with the inspection schedule in paragraphs (D)(1) to (D)(3) of this rule for the preceding calendar year. The annual report of inspection compliance shall include:

(a) A listing of distribution circuits inspected during the year and, for each listed circuit, the date(s) such inspection was performed.

(b) A listing of transmission circuits inspected during the year and, for each listed circuit, the date(s) such inspections were performed.

(c) A listing of all substations and the date of each inspection during the year.

(d) The date(s) when any circuits or substations were added or retired during the reporting year.

(E)    Transmission and distribution inspection, maintenance, repair, and replacement programs.

(1) Each electric utility and transmission owner shall establish, maintain, and comply with written programs, policies, procedures, and schedules for the inspection, maintenance, repair, and replacement of its transmission and distribution circuits and equipment. These programs shall establish preventative requirements for the electric utility to maintain safe and reliable service. Programs shall include, but are not limited to, the following facilities:

 (a) Poles and towers.

 (b) Circuit and line inspections.

 (c) Primary enclosures (e.g., pad-mounted transformers and pad-mounted switch gear) and secondary enclosures (e.g., pedestals and handholes).

 (d) Line reclosers.

 (e) Line capacitors.

 (f) Right-of-way vegetation control.

 (g) Substations.

(2) Each electric utility shall file its inspection, maintenance, repair, and replacement programs, instituted pursuant to paragraph (E)(1) of this rule, with the commission, and simultaneously provide a copy of the filing to the director of the service monitoring and enforcement department. The electric utility's filing shall include supporting justification and rationale based upon generally accepted industry practices and procedures.

(3) If a filing to establish the electric utility's inspection, maintenance, repair, and replacement programs is not acted upon by the commission within forty-five calendar days after it is filed, the inspection, maintenance, repair, and replacement programs shall be deemed approved on the forty-sixth day after filing.

(4) Each electric utility and transmission owner shall maintain records sufficient to demonstrate compliance with its transmission and

distribution facilities inspection, maintenance, repair, and replacement programs as required by this rule. Each electric utility and transmission owner shall record all deficiencies revealed by inspections or tests and all actions taken to correct those deficiencies. Lines and equipment with recorded defects that could reasonably be expected to endanger life or property shall be promptly repaired, disconnected, or isolated. All remaining deficiencies shall be corrected by the end of the calendar year following the year of the inspection or testing that originally revealed such deficiencies was completed. The electric utility shall document all deficiencies that are not corrected within the designated time, including the reason for not taking corrective action.

(F)    Inspection, maintenance, repair, and replacement program revisions and amendments.

    (1) All revisions or amendments (including modification to a current program, addition of a new program, or elimination of an existing program) requested by an electric utility shall be filed with the commission as outlined in paragraph (E)(2) of this rule.

    (2) If a filing to revise or amend the electric utility's inspection, maintenance, repair, and replacement programs is not acted upon by the commission within forty-five days after it is filed, the inspection, maintenance, repair, and replacement programs shall be deemed approved on the forty-sixth day after filing.

## DESIGNATION OF RELEVANT FERC DOCUMENTS
## FOR JOINT APPENDIX

**Sixth Circuit Court Case Nos. 23-3196, 23-3324, 23-3366 and 23-341**
**FERC Docket No. EL23-34-000**

| Record Entry No. From Certified Index to the Record | Description | Pages |
|---|---|---|
| R.1 | Complaint – Office of the Ohio Consumers' Counsel v. American Electric Power Service Corp., *et al.* (Feb. 24, 2022) | All |
| R.32 | Answer to Ohio Consumers' Counsel to Answer of American Electric Power Service Corporation, *et al.* (Apr. 15, 2022) | All |
| R.39 | Order on Complaint, *Office of the Ohio Consumers' Counsel v. American Electric Power Service Corp., et al.,* 181 FERC ¶ 61,214 (2022) | All |
| R.43 | Ohio Consumers' Counsel's Motion for Leave to Answer and Answer to American Electric Power Service Corporation, *et al.*(Feb. 1, 2023) | |
| R.49 | Order Addressing Arguments Raised on Rehearing, *Office of the Ohio Consumers' Counsel v. American Electric Power Service Corp., et al.,* 183 FERC ¶ 61,034 (2023) | All |

**Sixth Circuit Case Nos. 21-4072 and 22-3351**
**FERC Docket No. ER20-1068-000**

| Record Entry No. From Certified Index to the Record | Description | Pages |
|---|---|---|
| R.42 | Order on Paper Hearing, *The Dayton Power and Light Co.,* 176 FERC ¶ 61,025 (2021) | All |