Nos. 21-4072, 22-3351, 23-3196, 23-3324, 23-3366, 23-3417

IN THE

# United States Court of Appeals

FOR THE SIXTH CIRCUIT

DAYTON POWER & LIGHT COMPANY, d/b/a AES OHIO;
AMERICAN ELECTRIC POWER SERVICE CORPORATION;
DUKE ENERGY OHIO, INC.; FIRSTENERGY SERVICE COMPANY,
*Petitioners,*
v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

## BRIEF OF PETITIONERS DAYTON POWER & LIGHT CO., AMERICAN ELECTRIC POWER SERVICE CORP., AND FIRSTENERGY SERVICE CO.

William M. Rappolt
Assistant General Counsel, FERC
AES US SERVICES, LLC
4300 Wilson Blvd
Arlington, VA 22203
(571) 533-9018
william.rappolt@aes.com

*Counsel for The Dayton Power and
Light Co. d/b/a AES Ohio*

Matthew E. Price
Zachary B. Cohen
Victoria Hall-Palerm
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC 20001
(202) 639-6000
mprice@jenner.com

*Counsel for American Electric
Power Service Corp., in its own
name and on behalf of its public
utility affiliates Ohio Power Co. and
AEP Ohio Transmission Co., Inc.*

*Additional Counsel List On Inside Cover*

William M. Keyser
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202)429-8186
wkeyser@steptoe.com

*Counsel for American Electric Power Service Corp., in its own name and on behalf of its public utility affiliates Ohio Power Co. and AEP Ohio Transmission Co., Inc.*

Morgan E. Parke
Associate General Counsel
P. Nikhil Rao
Senior Corporate Counsel
FIRSTENERGY SERVICE COMPANY
76 South Main Street
Akron, OH 44308
(330) 384-2422
mparke@firstenergycorp.com
pnrao@firstenergycorp.com

Sanford I. Weisburst
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
sandyweisburst@quinnemanuel.com

*Counsel for FirstEnergy Service Company on behalf of and as agent for American Transmission Systems, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3196,23-3366          Case Name: Dayton Power & Light, et al. v. FERC

Name of counsel: Matthew E. Price

Pursuant to 6th Cir. R. 26.1, American Electric Power Service Corp.

*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> See attachment.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

CERTIFICATE OF SERVICE

I certify that on _____ July 31, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Matthew E. Price

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**ATTACHMENT TO PETITIONER'S DISCLOSURE**
**OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST**

**Question 1.**  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

Yes.

AEPSC has filed its Petition for Review in its own name and on behalf of its public utility affiliates Ohio Power Company and AEP Ohio Transmission Company Inc.

American Electric Power Service Corporation ("AEPSC") states that it is a corporation organized and existing under the laws of the State of New York. AEPSC is a wholly owned subsidiary of American Electric Power Company, Inc. ("AEP").

Ohio Power Company is a corporation organized and existing under the laws of Ohio.  Ohio Power Company is a wholly-owned subsidiary of AEP.

AEP Ohio Transmission Company, Inc. is a corporation organized and existing under the laws of Ohio.  AEP Ohio Transmission Company, Inc.'s ultimate parent is AEP.

AEP is a New York corporation whose common stock is held by the public and traded on the NASDAQ Stock Market.  AEP has no parent company. Certain institutional investors including Vanguard may from time to time hold 10 percent or more of the outstanding shares of AEP, but to AEP's knowledge no publicly-held company has a 10 percent or greater ownership interest in AEP.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 21-4072, 22-3351      Case Name: Dayton Power & Light, et al. v. FERC

Name of counsel: William M. Rappolt

Pursuant to 6th Cir. R. 26.1, Dayton Power & Light Co. d/b/a AES Ohio
Name of Party

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

See attachment.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ July 31, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ William M. Rappolt

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**Corporate Disclosure Statement of**
**The Dayton Power and Light Company d/b/a AES Ohio**

The Dayton Power and Light Company d/b/a AES Ohio ("Dayton") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Dayton, Ohio. Dayton is a public utility company subject to the jurisdiction of FERC.

Dayton is a subsidiary of DPL Inc., which is a subsidiary of AES DPL Holdings, LLC. AES DPL Holdings, LLC is a subsidiary of The AES Corporation ("AES"). AES is a Delaware corporation with its principal place of business in Arlington, Virginia. AES has issued shares of stock and debt securities to the public. Investment funds owned by the Vanguard Group Inc. ("Vanguard") hold over ten percent of the publicly-traded shares of AES. Vanguard is investor-owned by its fund shareholders.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 21-4072, 22-3351        Case Name: Dayton Power & Light, et al. v. FERC

Name of counsel:  Sanford I. Weisburst

Pursuant to 6th Cir. R. 26.1, FirstEnergy Service Company on behalf of/as agent for ATSI
                                          *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> FirstEnergy Service Company and its transmission-owning affiliates are direct or indirect wholly-owned subsidiaries of FirstEnergy Corp., a publicly-held, publicly-traded company.  Certain publicly-traded investment companies--such as BlackRock, Inc.--may from time-to-time, through their subsidiaries and affiliates, own 10% or more of FirstEnergy Corp. stock. Such owners exercise passive ownership and do not have day-to-day decision-making authority.  Otherwise, no entity owns 10% or more of FirstEnergy Corp.'s stock.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ July 31, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Sanford I. Weisburst

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

RULE 26.1 STATEMENT ...................................................................i

TABLE OF AUTHORITIES.......................................................... viii

STATEMENT REGARDING ORAL ARGUMENT ................................. xiv

INTRODUCTION .......................................................................1

JURISDICTION.........................................................................6

ISSUES PRESENTED ................................................................8

STATEMENT OF THE CASE .......................................................9

    A.    Background ..................................................................9

        1.    The Interstate Transmission System ...................................9

        2.    Regional Transmission Organizations ...............................10

        3.    The RTO Adder ............................................................11

        4.    *California Public Utilities Commission v. FERC* (9th Cir.) .......12

        5.    The Ohio Statute ..........................................................13

    B.    Factual Background........................................................14

        1.    Petitioners' RTO Membership and Rates ...........................14

        2.    Procedural History ........................................................18

            a.    *Dayton* Proceeding.................................................18

            b.    *OCC* Proceeding....................................................21

            c.    These Appeals .......................................................25

STANDARD OF REVIEW............................................................25

SUMMARY OF ARGUMENT .......................................................26

ARGUMENT............................................................................28

I.    FERC's Orders Conflict with the Unambiguous Text of
      Section 219(c)..................................................................28

      A.    The Text of Section 219(c) Does Not Permit a
            Voluntariness Requirement. .......................................28

      B.    The *CPUC* Decision Did Not Consider the Text of
            Section 219(c). ...........................................................33

      C.    Petitioners Are Not Making an Improper Collateral
            Attack..........................................................................35

II.   FERC's Orders Must Be Vacated Because They Are
      Premised Solely on a State Law That Is Preempted.........................37

      A.    Congress Has Occupied the Field of Interstate
            Transmission and Determined That Coordination of
            Transmission Facilities Should Be Voluntary. ...........38

      B.    The Ohio Statute Is Preempted. ................................42

            1.    The Ohio Statute Is Field-Preempted.................42

            2.    The Ohio Statute Is Conflict-Preempted. ...........44

      C.    FERC's Orders Must Be Vacated Because They Are
            Premised on a Preempted State Law. .........................45

III.  FERC's *OCC* Orders Were Arbitrary and Capricious in
      Several Respects (*AEP Only*).................................................48

      A.    FERC Unlawfully Removed AEP's RTO Adder
            Without First Finding Its Rate as a Whole Unjust or
            Unreasonable. .............................................................49

      B.    FERC Irrationally Distinguished Between Identically
            Situated Entities. ........................................................52

      C.    FERC Arbitrarily Departed from Its Own Prior Factual
            Finding Without Reasoned Explanation.....................59

IV.   FERC's *Dayton* Order Was Arbitrary and Capricious
      (*Dayton Only*). .................................................................63

CONCLUSION ...............................................................................64

# TABLE OF AUTHORITIES

## CASES

*Advanced Energy Management Alliance v. FERC*, 860 F.3d 656 (D.C. Cir. 2017) ................................................................14

*AEP Appalachian Transmission Co.*, 130 FERC ¶ 61,075 (2010) ................................................................16, 54

*AEP Appalachian Transmission Co.*, 135 FERC ¶ 61,066 (2011) ................................................................ 16-17

*American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995) ................................47

*American Electric Power Co.*, 90 FERC ¶ 61,242 (2000) (Opinion No. 442), *on reh'g*, 91 FERC ¶ 61,129 (2000) (Opinion No. 442-A), *aff'd sum nom. Wabash Valley Power Ass'n v. FERC*, 268 F.3d 1105 (D.C. Cir. 2001) ................................................................15

*American Electric Power Service Corp.*, 124 FERC ¶ 61,306 (2008) ................................................................16, 35, 54, 57

*American Electric Power Service Corp.*, 133 FERC ¶ 61,007 (2010) ................................................................16

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ................................................................63

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018) ...............54, 56, 64

*Appalachian Power Co.*, 167 FERC ¶ 61,156 (2019) ................................17, 54

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................42

*Atlantic City Electric Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002) ................40

*Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527 (6th Cir. 1999) ................................................................31

*California Independent System Operator, Inc.*, 126 FERC ¶ 61,081 (2009) ................................................................50

*California Public Utilities Commission v. FERC*, 29 F.4th 454 (9th Cir. 2022) ...................................................................................13

*California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) .....................................................12, 13, 19, 34

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).............................................31

*Central Iowa Power Cooperative v. FERC*, 606 F.2d 1156 (D.C. Cir. 1979) ...............................................................................40, 45

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .......................................................29

*Consumers' Research v. FCC*, 67 F.4th 773 (6th Cir. 2023)............................25

*County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999) ..........................................................................................53

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000).................44

*Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017)..................................49, 50

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)........................59, 61

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................59, 63

*FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016) ...........................9

*Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958)......................36

*Gade v. National Solid Waste Management Ass'n*, 505 U.S. 88 (1992)..........................................................................................44

*Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016) ........38, 39, 43

*Illinois Commerce Commission v. FERC*, 721 F.3d 764 (7th Cir. 2013) ..........................................................................................42

*International Transmission Co. v. FERC*, 988 F.3d 471 (D.C. Cir. 2021) ..........................................................................................52

*ITC Holdings Corp.*, 121 FERC ¶ 61,229 (2007)................................................51

*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005)....................................................................................................31

*Johnson v. Bauman*, 27 F.4th 384 (6th Cir. 2022).....................................31-32

*Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625 (2012)................42

*Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023)....................29

*Louisville Gas & Electric Co. v. FERC*, 988 F.3d 841 (6th Cir. 2021) ......................................................................................................25

*Louisville Gas & Electric Co. v. LG&E Energy LLC*, 114 FERC ¶ 61,282 (2006) ...............................................................................11

*Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129 (1936).....................................................................................34

*Motor Vehicle Manufacturers United States Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).....................25, 46

*National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005)..............................................61

*National Wildlife Federation v. Secretary of United States Department of Transportation*, 960 F.3d 872 (6th Cir. 2020) ..................34

*New PJM Cos.*, 106 FERC ¶ 63,029 (2004), *aff'd*, 107 FERC ¶ 61,271 (2004)..........................................................................60

*New PJM Cos.*, 107 FERC ¶ 61,271 (2004) (Opinion No. 472)...........15, 60, 61

*New York v. FERC*, 535 U.S. 1 (2002) ...................................................10, 38, 39

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)........................................42, 43

*Orion Reserves Ltd. Partnership v. Salazar*, 553 F.3d 697 (D.C. Cir. 2009) ..............................................................................34

*Piedmont Environmental Council v. FERC*, 558 F.3d 304 (4th Cir. 2009) ....................................................................................39

*PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,318 (2004)..............................14

*PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029 (2015)..............................55

*PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,106 (2015)..............................18

*Promoting Transmission Investment Through Pricing Reform*, 116 FERC ¶ 61,057 (2006) (Order No. 679), *order on reh'g*, 117 FERC ¶ 61,345 (2007) (Order No. 679-A) ........................12, 35, 51

*Promoting Transmission Investment Through Pricing Reform*, 117 FERC ¶ 61,345 (2006) (Order No. 679-A) ................................32, 35, 51

*Public Citizen, Inc. v. Rubber Manufacturers Ass'n*, 533 F.3d 810 (D.C. Cir. 2008) .........................................................................31

*Regional Transmission Organizations*, 89 FERC ¶ 61,285, FERC Stats. & Regs. ¶ 31,089 (1999) (Order No. 2000)...............10, 11, 41

*Sithe/Independent Power Partners, L.P. v. FERC*, 165 F.3d 944 (D.C. Cir. 1999) .........................................................................50

*South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ....................................................................39, 40

*State ex rel. Balderas v. U.S. Nuclear Regulatory Commission*, 59 F.4th 1112 (10th Cir. 2023) ...........................................................16

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ...........................33

*United States v. Davis*, 970 F.3d 650 (6th Cir. 2020) ........................................31

*United States v. Gardner*, 32 F.4th 504 (6th Cir.), *cert. denied*, 143 S. Ct. 251 (2022)......................................................................31

*West Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) .....................................................................................54

Statutes

220 ILCS 5/16-126 .........................................................................37

5 U.S.C. § 706 ...............................................................................26

16 U.S.C. § 791 *et seq.* ...............................................................9

16 U.S.C. § 824 ...........................................................9, 33, 37, 38, 39

16 U.S.C. § 824a ....................................................................11, 37, 40

16 U.S.C. § 824a-1 .......................................................................62

16 U.S.C. § 824d ....................................................................10, 46

16 U.S.C. § 824e ....................................................................21, 46, 49

16 U.S.C. § 824*l* ...........................................................................8

16 U.S.C. § 824o ...........................................................................11

16 U.S.C. § 824s ....................................................1, 3, 8, 11, 29, 32

Mich. Comp. Laws Ann. 460.10w .............................................37

Nev. Rev. Stat. Ann. § 704.79886 ............................................37

Ohio Rev. Stat. § 4928.12 ...............................2, 13, 14, 37, 42, 43

Va. Code Ann. § 56-577 ............................................................37

Other Authorities

18 C.F.R. 35.34.............................................................................11

Brief of Respondent FERC, *CPUC*, No. 16-70481 (9th Cir. Sept.
    19, 2016), ECF No. 26.............................................................35

Collins English Dictionary—Complete and Unabridged, "Each,"
    Dictionary.com, https://www.dictionary.com/browse/each......................29

Collins English Dictionary—Complete and Unabridged, "Join," Dictionary.com, https://www.dictionary.com/browse/join ........................30

PJM, *Open Access Transmission Tariffs*, OATT Attachment H-14, https://agreements.pjm.com/oatt/18412 ..................................................61

PJM, *Open Access Transmission Tariffs*, Attachment H-20, https://agreements.pjm.com/oatt/18749 .........................................................61

OATT, Attachment H-20-AEPTCo (pjm.com)...................................................61

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument. These consolidated petitions for review present complex questions of first impression, including the interpretation of a federal statute (Section 219(c) of the Federal Power Act) and the validity of a state statute under the Supremacy Clause. The procedural history of the case is also complex as it involves two separate agency proceedings that have been consolidated for appellate review. Accordingly, Petitioners believe oral argument would be helpful to the Court.

## INTRODUCTION

Petitioners own electric transmission lines and related facilities. Some of those assets are located in Ohio, but the Federal Energy Regulatory Commission ("FERC"), rather than any Ohio governmental entity, has exclusive jurisdiction pursuant to the Federal Power Act ("FPA") over interstate transmission facilities and rates. FERC and Congress determined that interstate transmission functions most efficiently if transmission owners' assets are operated in a coordinated fashion as a regional transmission grid. Regional Transmission Organizations ("RTOs") achieve this coordination by taking over operational control and planning responsibility from the transmission owners.

In 2005, Congress sought to promote owners' membership in an RTO through FPA Section 219(c), which directs FERC to "provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization." 16 U.S.C. § 824s(c). Petitioners joined an RTO named PJM Interconnection, L.L.C ("PJM"), which covers 13 states and the District of Columbia.

For more than a decade, FERC complied with Section 219(c) by doing exactly what the statute says: providing "each … utility that joins a

Transmission Organization" with a 50 basis-point adder to the utility's authorized return on equity ("ROE") included in its rates.[1] But in the first order ("*Dayton*") now on review, in a 3-2 decision, FERC abruptly changed course. FERC denied the adder to The Dayton Power & Light Company ("Dayton") on the ground that Ohio (in which Dayton's transmission assets are located) mandates RTO membership under state law, *see* Ohio Rev. Stat. § 4928.12, and that the rate adder is available only to utilities that *voluntarily* join an RTO.

In a follow-on proceeding initiated by the Office of Ohio Consumers' Counsel ("*OCC*"),[2] FERC relied on *Dayton* to remove the adder from the rates charged by affiliates of Petitioner American Electric Power Service Corporation ("AEP") that own transmission assets in Ohio.

FERC's orders must be reversed for several reasons. First, Section 219(c)'s plain text requires FERC to provide the rate adder to "each … utility that joins" an RTO, regardless of the reason why the utility joined.

---

[1] For example, if a transmission owner were otherwise entitled to an ROE of 10.00% on its investment in transmission assets, joining an RTO would increase that ROE from 10.00% to 10.50%. ROE is one component of the overall rate charged by the transmission owner to its customers.

[2] OCC is an Ohio governmental entity that represents Ohio retail electricity customers.

16 U.S.C. § 824s(c).  If Congress had wanted to limit the rate adder to utilities that joined voluntarily, it could have done so.

Second, Section 219(c)'s application cannot depend on whether state law mandates RTO membership because the Federal Power Act gives *FERC* exclusive jurisdiction over transmission facilities and directs that the decision whether to join an RTO should be voluntary.  States have no power to override Congress's choice and order utilities to turn over the operational control of their transmission facilities to a third party.  FERC declined to decide whether the Ohio law was preempted, stating that that issue should be decided by a court.  This Court can and should so decide.  Because the Ohio law is preempted, FERC's orders rest upon an erroneous premise and must be vacated.

Third, AEP contends that FERC's order removing its Ohio affiliates' rate adder was arbitrary and capricious in several respects.[3]  (a) As a threshold matter, FERC was first required to make a finding that the *total transmission rate* for AEP's Ohio affiliates (inclusive of the adder) was outside the range of just and reasonable rates.  Under FPA Section 206 (the provision under which OCC brought its complaint challenging those rates),

---

[3]  Dayton and ATSI do not join this argument.

FERC cannot require a change to a transmission owner's rates without that threshold finding. Yet the record contained no evidence to support such a finding, and FERC did not make any such finding. Instead, it incorrectly examined the adder in isolation.

(b) AEP (but not American Transmission Systems, Inc. ("ATSI")[4]) contends that FERC further erred by treating AEP differently than two other similarly situated Ohio utilities, Duke Energy Ohio, LLC ("Duke") and ATSI. AEP, Duke, and ATSI are all subject to the same Ohio statute. FERC ruled (correctly) that it would not remove the RTO membership adder from Duke's and ATSI's transmission rates because those rates resulted from comprehensive settlements. As FERC explained, it would be inappropriate "to change unilaterally a single aspect of such a comprehensive settlement." JA488 (*Office of the Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp.*, 181 FERC ¶ 61,214 at P 64 (2022) ("*OCC Order*")). The parties bargained against a backdrop in which the

---

[4] ATSI and Dayton do not join this argument. ATSI reserves its right to argue, in an intervenor brief in support of FERC, that, as FERC found, ATSI is not similarly situated to AEP. In other words, ATSI will defend FERC's decision to deny OCC's Complaint seeking a reduction of ATSI's rate.

transmission owners could claim the adder, and the resulting rate emerging from the settlement reflected that expectation.

AEP argues, however, that the same was true of AEP. Its transmission rate, too, was the product of a complex settlement reached against a backdrop in which it could claim the rate adder. To take away AEP's adder now does exactly what FERC said it would not do: undermine the foundation of a settlement.

(c) AEP also contends that FERC erred in finding that its membership in PJM was involuntary. AEP joined PJM as a multi-state transmission system, spanning Indiana, Michigan, Ohio, Kentucky, Tennessee, Virginia, and West Virginia; AEP's decision was not driven by Ohio's statute. Recognizing as much, FERC expressly found in 2004—*after* the Ohio statute's enactment—that AEP had joined PJM voluntarily. FERC provided no reasoned explanation for now abandoning that finding—indeed, it failed even to acknowledge doing so.

Finally, Dayton argues that FERC arbitrarily and capriciously discriminated against it in denying the adder, because other similarly situated utilities still have an adder in their rates. This will negatively impact Dayton's access to investment capital.

*    *    *

At a time when significant new investment is needed to modernize and maintain the Nation's electric grid, FERC's orders will negatively affect investment in ways Congress did not intend. As dissenting Commissioner Chatterjee explained, "permitting some RTO/ISO members to receive the RTO Adder, while prohibiting other members from receiving that same incentive, creates an uneven playing field in the competition for investment capital." JA206-07 (*Dayton Power & Light Co.*, 176 FERC ¶ 61,025, Chatterjee Dissent at P 2 n.4 (2021) ("*Dayton* Order")). Companies with transmission assets predominantly in Ohio will (all else equal) have a lower ROE than other companies participating in PJM and other surrounding RTOs, negatively impacting their ability to attract capital—even though all are members of an RTO. The orders should be vacated.

## JURISDICTION

This case arises from two FERC proceedings. In the first, *Dayton*, FERC issued its order on July 15, 2021. JA173-209 (*Dayton* Order). Petitioners timely requested rehearing on August 13, 2021. JA243-69. Rehearing was denied when FERC did not act on the rehearing request within thirty days. JA279 (176 FERC ¶ 62,136 (2021)). Petitioners timely

6

filed a petition for review in this Court on November 16, 2021. No. 21-4072 (6th Cir.). FERC issued a substantive order regarding rehearing on February 17, 2022. JA280-303 (178 FERC ¶ 61,102 (2022)) ("*Dayton Rehearing Order*"). Petitioners timely petitioned for review of that order on April 18, 2022. No. 22-3351 (6th Cir.).

The second FERC proceeding, *OCC*, was initiated by a Complaint filed by OCC against Duke, ATSI, and AEP on behalf of its Ohio affiliates, challenging their transmission rates. JA324-52 (OCC Complaint). On December 15, 2022, FERC granted the Complaint as to AEP, and denied it as to Duke and ATSI. JA464-502 (*OCC* Order). AEP timely requested rehearing on January 17, 2023. JA503-27. Rehearing was denied on February 17, 2023. JA574 (182 FERC ¶ 62,095 (2023)). AEP timely petitioned for review in this Court on March 8, 2023. No. 23-3196 (6th Cir.). FERC issued a substantive order regarding rehearing on April 20, 2023. JA575-98 (183 FERC ¶ 61,034 (2023)) ("*OCC* Rehearing Order"). AEP timely petitioned for review of that order on April 26, 2023. No. 23-3366 (6th Cir.). OCC also petitioned for review insofar as the order denied OCC's Complaint. Nos. 23-3324, 23-3417 (6th Cir.). This Court consolidated the cases.

This Court has jurisdiction and venue to review these FERC orders, as "the public utilit[ies] to which the order[s] relate[]" are located within this Circuit. 16 U.S.C. § 824*l*(b).

## ISSUES PRESENTED

1.    Whether FERC's orders denying an RTO adder to Dayton and removing the adder from the rates of AEP's Ohio affiliates violate FPA Section 219(c), 16 U.S.C. § 824s(c), which instructs that FERC "shall provide for incentives to *each transmitting utility or electric utility that joins a Transmission Organization*" (emphasis added), regardless why they joined.

2.    Whether FERC acted arbitrarily, capriciously, or contrary to law when it denied Dayton an RTO adder and removed the adder from the rates of AEP's Ohio affiliates on the ground that an Ohio state law mandated their membership in an RTO, when that Ohio law is preempted by the FPA.

3.    (AEP Only) Whether FERC acted arbitrary and capriciously, and contrary to law, when:

a. It granted OCC's Complaint as to AEP without first making the threshold finding that AEP's existing transmission rate, taken as a whole, was outside the range of just and reasonable rates.

b. It distinguished AEP from similarly situated entities Duke

8

and ATSI without adequate explanation or support.

c. It departed without explanation from its prior finding that AEP's membership in PJM was voluntary.

4.  (Dayton Only) Whether FERC acted arbitrarily and capriciously by denying Dayton an RTO adder when other similarly situated utilities retain an adder.

## STATEMENT OF THE CASE

### A.  Background

#### 1.  *The Interstate Transmission System*

Electricity is typically produced and delivered to customers in three steps. First, power plants generate electricity. Second, electricity is "transmitted" over long distances on the high-voltage transmission system from power plants to substations. Third, electricity is "distributed" from substations to end-use customers over the lower-voltage distribution system. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265-68 (2016). This case concerns the transmission step.

Under the FPA, 16 U.S.C. § 791 *et seq.*, transmission of electricity in interstate commerce is regulated exclusively by FERC. *See id.* § 824(b)(1) ("The Commission shall have jurisdiction over all facilities for such

transmission [*i.e.*, 'transmission of electric energy in interstate commerce']"). FERC reviews and approves the rates transmission owners charge for transmitting energy and ensures they are "just and reasonable." *Id.* § 824d(a).

Historically, the same utility generated, transmitted, and distributed its electricity as part of a package to end-use consumers. *See New York v. FERC*, 535 U.S. 1, 5-6 (2002). But in the late twentieth century, policymakers and industry leaders realized that electricity could be generated and delivered more efficiently and reliably as part of a regional grid, with coordinated operations by a neutral grid operator. *See Regional Transmission Organizations*, 89 FERC ¶ 61,285, FERC Stats. & Regs. ¶ 31,089 at 30,993-94 (1999) ("Order 2000").

## 2. *Regional Transmission Organizations*

FERC's solution in Order 2000 was the formation of regional transmission organizations ("RTOs"), *i.e.*, independent regional grid operators. These entities must have four characteristics—(1) independence from transmission owners; (2) regional scope; (3) operational control over the transmission system; and (4) exclusive authority over short-term reliability. Order 2000, FERC Stats. & Regs. ¶ 31,089 at 30,993-94.

10

FERC did not mandate RTO membership, however. Instead, Congress and FERC determined that such a decision should be voluntary. *See id.* (adopting voluntary approach); 16 U.S.C. § 824a(a) (directing FERC to "divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" (emphasis added)). After all, joining an RTO fundamentally transforms a transmission owner's operations. The owner cedes operational control and planning to a third party (the RTO) and must obtain FERC's approval of any withdrawal from an RTO. 18 C.F.R. 35.34(f), (k)(7); *Louisville Gas & Elec. Co. v. LG&E Energy LLC*, 114 FERC ¶ 61,282 at P 27 (2006) (discussing standard for FERC review of proposed withdrawal). Thus, the decision to join an RTO is significant and has long-term ramifications.

### 3.   *The RTO Adder*

To encourage RTO membership, Congress amended the FPA in 2005 to direct that FERC "shall[] … provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization," FPA § 219(c), 16 U.S.C. § 824s(c), such as an RTO, *id.* § 824o(a)(6).

11

FERC implemented that provision in Order 679, *Promoting Transmission Investment Through Pricing Reform*, 116 FERC ¶ 61,057 (2006) ("Order 679"). There, FERC identified the "basis for the incentive" as twofold: first, "the benefits that flow from membership in such organizations," and second, "the fact [that] continuing membership is generally voluntary." *Id.* at P 331. "Generally voluntary" implies that sometimes membership is not voluntary—yet Order 679 did not deny the adder to non-voluntary members. Indeed, FERC declined to adopt commenters' proposals that would have made transmission owners ineligible for the adder if they were ordered to join an RTO by state law. *Id.* at P 316.

After Order 679, FERC routinely granted adders to transmission owners that joined RTOs, including transmission owners that joined RTOs pursuant to state requirements. This went unchallenged for 15 years, during which time owners came to rely on the adder in structuring their investment decisions.

### 4. California Public Utilities Commission v. FERC *(9th Cir.)*

All this changed following a 2018 decision by the Ninth Circuit. *See Cal. Pub. Utils. Comm'n v. FERC*, 879 F.3d 966 (9th Cir. 2018) ("*CPUC*"). The court reversed a FERC order that, in keeping with FERC's common

practice since Order 679, had summarily granted Pacific Gas & Electric Company ("PG&E") the adder due to its membership in a California RTO.

FERC had argued that Order 679 permitted FERC to grant adders even to transmission owners who were subject to state-law mandates requiring RTO membership. *Id.* at 974. The Ninth Circuit disagreed and found FERC's position inconsistent with the text of Order 679. According to the court, RTO membership gives transmission owners a presumption of eligibility for an adder, but that presumption could be rebutted by showing that membership was involuntary. *Id.* at 974-75. The court reasoned that Order 679 was intended to induce a transmission owner to change its behavior, and thus the adder could only rationally be applied to incentivize voluntary conduct. *Id.*[5] In reaching this decision, the court focused solely on Order 679 and did not address the text of Section 219(c).

### 5.    *The Ohio Statute*

In 1999, prior to Section 219(c)'s enactment, Ohio enacted Ohio Revised Code § 4928.12 ("Ohio Statute"). Section 4928.12 provides that "no entity shall own or control transmission facilities as defined under federal

---

[5] On remand, FERC found that the California rule did not mandate RTO membership and therefore awarded the incentive adder. *See Cal. Pub. Utils. Comm'n v. FERC*, 29 F.4th 454, 461, 468 (9th Cir. 2022).

law and located in [Ohio] … unless that entity is a member of, and transfers control of those facilities to, one or more qualifying transmission entities … that are operational." *Id.* § 4928.12(A). The statute further requires that, *inter alia*, the "transmission entity" be "approved by [FERC]," *id.* § 4928.12(B), the "transmission entity effects separate control of transmission facilities from control of generation facilities," and "governance structure or control of the transmission entity is independent of the users of the transmission facilities," *id.* § 4928.12(B)(2), (7).

## B.    Factual Background

### 1.    *Petitioners' RTO Membership and Rates*

Petitioners are transmission owners that have joined PJM Interconnection, L.L.C. ("PJM"), the RTO that "oversees the electric grid covering all or parts of thirteen Mid-Atlantic and Midwestern states and the District of Columbia." *Adv. Energy Mgmt. All. v. FERC*, 860 F.3d 656, 659 (D.C. Cir. 2017).

***Dayton.*** Dayton owns transmission facilities and delivers electricity to over 520,000 customers in the Dayton, Ohio area. Dayton joined PJM in 2004. *PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,318 at P 14 (2004). But Dayton did not seek to change its rates to include the RTO adder at that

time.  Rather, its pre-existing rates were rolled into the PJM tariff without including any RTO adder.  Dayton first sought a rate change, including the adder, in this case, as described *infra* pp. 18-20.

*AEP.*   AEP's affiliates generate, transmit, distribute, and sell electricity in several states across the Midwest, including Ohio.  They maintain the nation's largest electricity transmission system, with approximately 40,000 miles of transmission lines.  AEPSC is the service company that coordinates activities among AEP's operating entities, including filings before FERC.  AEP's affiliates Ohio Power and AEP Ohio Transmission Company Inc. are based in Ohio.

In 1998, a year before Ohio enacted the Ohio Statute, AEP voluntarily committed to join an RTO as part of a proposed merger.  *See Am. Elec. Power Co.*, 90 FERC ¶ 61,242 at 61,788 (2000), *on reh'g*, 91 FERC ¶ 61,129 (2000).  Several years later, FERC allowed the AEP East Companies, which include Ohio Power, to join PJM, notwithstanding opposition by Virginia.  *See New PJM Cos.*, 107 FERC ¶ 61,271 at P 129 (2004).  In that order, FERC summarily affirmed an administrative law judge's conclusion that "AEP's commitment to join PJM was 'voluntary….'"  *Id.* at PP 41–44.

Thereafter, in 2008, the AEP East Companies sought to amend their rates to, *inter alia*, include an RTO adder. *See, e.g.*, *Am. Elec. Power Serv. Corp.*, 124 FERC ¶ 61,306 at P 30 (2008). In 2010, following a corporate reorganization, affiliates known as AEP PJM Transcos, which include AEP Ohio Transmission, likewise made a rate filing that included a 50 basis-point RTO adder. *See AEP Appalachian Transmission Co.*, 130 FERC ¶ 61,075 at P 21 (2010). These filings were challenged and AEP settled both cases; the parties retained the FERC-awarded 50 basis-point RTO rate adder in the settlement agreements: "The agreed-upon cost of common equity to be used in the formula rate is 10.99%, plus a 50 basis-point adder for AEP's continuing participation in the PJM RTO, resulting in an 11.49% total ROE…." A11 (Docket No. ER08-1329, AEP East Companies 2010 Offer of Settlement at 7); A29 (Docket No. ER10-355, AEP PJM Transcos 2010 Offer of Settlement at 7).[6] FERC approved the settlements. *Am. Elec. Power Serv. Corp.*, 133 FERC ¶ 61,007 (2010) (AEP East Companies); *AEP*

---

[6] These documents were filed in other FERC dockets, and as such are appropriate subjects of judicial notice. *See State ex rel. Balderas v. U.S. Nuclear Regul. Comm'n*, 59 F.4th 1112, 1120 n.5 (10th Cir. 2023) (documents filed with an agency and publicly available on agency website are subject to judicial notice). For the Court's convenience, relevant excerpts of these documents are included in an Addendum to this brief ("A__").

*Appalachian Transmission Co.*, 135 FERC ¶ 61,066 at P 12 (2011) (AEP PJM Transcos).

Later, in 2018, AEP agreed to a separate settlement to resolve litigation over the ROE component of its rates. *See Appalachian Power Co.*, 167 FERC ¶ 61,156 (2019). In that settlement, the parties agreed that AEP's total ROE would continue to "include an additional 50 basis points for PJM RTO membership." A139 (ER18-1202, AEP 2018 Offer of Settlement, Marked Sheet at Note S).

*ATSI.* ATSI is an indirect operating subsidiary of FirstEnergy Corporation. ATSI is headquartered in Akron, Ohio, and owns transmission facilities in Ohio and Pennsylvania. JA468 (*OCC* Order at P 10).

After ATSI joined PJM, FERC in 2015 approved an uncontested settlement concerning ATSI's rates. *See* A73-95 (Settlement Agreement and Offer of Settlement, Docket No. ER15-303-000 (July 20, 2015) ("ATSI Settlement Agreement")). That settlement was "black box" in that it did not specify or enumerate the components comprising the overall 10.38% ROE. As to an RTO adder component, the settlement stated only that it was "inclusive of *any* incentive adder for RTO participation." A87 (ATSI Settlement Agreement, § II.C.2 (July 20, 2014)) (emphasis added); *see also*

17

*PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,106, at P 3 (2015) ("ATSI Settlement Order"). Pursuant to the Settlement Order, ATSI filed the rate and FERC approved it. A96-98 (Commission Letter Order, Docket No. ER15-303-002 (Mar. 11, 2016)).

### 2.  *Procedural History*

#### a.  Dayton *Proceeding*

Although Dayton had been legally entitled to seek the RTO adder since 2004 based on its membership in PJM, Dayton did not ask FERC to include it until 2020.

In February 2020, Dayton filed an application with FERC seeking incentive rate treatment, including the ROE adder, to support a significant investment in Dayton's transmission system for several transmission projects. *See* JA13-95 (Dayton Application). Dayton's transmission system was aging. It largely dated from the 1950s and 1970s; about 60% of it was over 50 years old. About 500 miles consisted of nearly 60-year-old wood pole lines. JA18 (*Id.* at 6). Consequently, Dayton experienced poorly performing circuits, outages, and increased maintenance requirements. *Id.* Dayton planned to make significant investments in transmission—amounting to a 40% increase in its gross transmission plant—to modernize its system,

improve reliability, and meet federal planning standards. JA13-14 (*Id.* at 1-2). In requesting the RTO adder, Dayton sought to support these investments by placing itself in the same competitive posture for investment capital as other transmission owners in PJM and other RTOs. JA16 (*Id.* at 4).

Several parties, including OCC, protested, arguing that the adder was improper because Ohio law mandated RTO membership. JA281 (*Dayton* Rehearing Order at P 5). FERC ultimately denied Dayton's request for the adder, JA173-209 (*Dayton* Order), and denied rehearing, JA281 (*Dayton* Rehearing Order at P 4).

Relying heavily on the Ninth Circuit's decision in *CPUC*, FERC ruled that RTO adders are appropriate only "for entities that *choose* to remain members of a Transmission Organization." JA284-85 (*Dayton* Rehearing Order at P 14 (quoting Order 679, 116 FERC ¶ 61,057 at P 331)). FERC considered itself bound by *CPUC*'s interpretation of Order 679 and concluded that "*CPUC* interpreted Order No. 679 to include a voluntariness requirement." JA285 (*Id.* at P 15); *see also* JA284-85 (*Id.* at P 14) (noting that, under *CPUC*, FERC may not "reward[] utilities for past conduct or for

19

conduct which they are otherwise obligated to undertake" (quoting *CPUC*, 879 F.3d at 977)).

Dayton argued that FERC's reading of Order 679 conflicted with the plain language of FPA Section 219(c) and was thus unlawful. JA286-87 (*Id.* at P 18). But FERC refused to address that contention on the merits, instead characterizing it as a collateral attack on the validity of Order 679, JA286-87 (*id.*)—even though FERC had previously applied Order 679 to grant the adder to other transmission owners who belonged to PJM and other RTOs without regard to whether membership was required by state law.

Dayton also argued that the Ohio Statute was preempted by the FPA, because Ohio had no authority to mandate RTO membership. JA293 (*Id.* at P 27). FERC similarly declined to consider that argument, remarking that "this proceeding is an inappropriate vehicle to address preemption concerns" and that "only a federal court has the ultimate authority to invalidate the Ohio Statute." JA294-95 (*Id.* at PP 31-32).

FERC denied Dayton's request for the adder, JA283 (*id.* at P 10), and subsequently denied rehearing. JA281 (*Id.* at P 4).

### b.    OCC *Proceeding*

Shortly after FERC's substantive rehearing order in *Dayton*, OCC filed a Complaint with FERC under FPA Section 206, 16 U.S.C. § 824e, seeking to eliminate the RTO adders received by Duke, ATSI, and AEP's affiliates Ohio Power and AEP Ohio Transmission, and seeking refunds for amounts collected under those adders running from the date the Complaint was filed.  *See* JA324-52 (OCC Complaint).  Relying heavily on FERC's order in *Dayton*, OCC argued that AEP, ATSI, and Duke all were governed by the same Ohio statute as Dayton, and that under this statute, RTO participation was mandatory rather than voluntary, and thus no RTO adder could be included in rates.  JA334-40 (*Id.* at 8-14).

FERC granted the Complaint as to AEP's Ohio affiliates but denied it as to Duke and ATSI.   *See* JA464-502 (*OCC* Order); JA575-98 (*OCC* Rehearing Order).  As to Duke and ATSI, FERC concluded that FERC could not simply strip an adder out of the rate without disturbing the entirety of these global settlements. JA488 (*OCC* Order at P 64).  As FERC explained, any adder was "embedded in a comprehensive settlement package submitted to FERC to resolve a complex, multi-issue dispute," and it would be inappropriate "to change unilaterally a single aspect of such a

comprehensive settlement." JA488 (*Id.*). As FERC acknowledged, one "cannot know what, if anything, the parties agreed to in exchange for settling on those ROE figures." JA488-89 (*Id.* at 65). Because FERC considered it impossible to know what ROE Duke or ATSI would have agreed to or bargained for if the RTO adder had been unavailable, it declined to disturb these transmission owners' rates.

As to AEP, however, FERC reached a different conclusion. Although AEP's rates also emerged from complex settlements, FERC noted that it had already specifically granted the AEP entities a 50 basis-point RTO adder *before* the settlement was reached. JA486 (*Id.* at P 62). Thus, in FERC's view, the adder could be stripped out of the rate without disrupting the settlement—never mind that the parties negotiated their settlement, and agreed upon a base ROE, against a backdrop in which the adder had been approved. JA486-87 (*Id.* at PP 62-63). Accordingly, FERC ordered the 50 basis-point adder deducted from Ohio Power's and AEP Ohio Transmission's rates. JA492-93 (*Id.* at P 77).

As in *Dayton*, FERC declined to address AEP's arguments that Order 679 (as interpreted by *CPUC* and applied by FERC here) conflicts with FPA Section 219(c) or that the Ohio statute is preempted by federal law. JA496-

97 (*Id.* at PP 83-84). AEP also argued that FERC's holding conflicted with a prior FERC decision from 2004, expressly finding that AEP's membership in PJM was voluntary (even though the Ohio Statute was already enacted). FERC did not acknowledge or justify its abandonment of that prior finding. JA475-76 (*Id.* at P 36 & n.58).

AEP sought rehearing, contending that FERC's distinction between Duke and ATSI on the one hand, and AEP's Ohio affiliates on the other, was error. JA590-92 (*OCC* Rehearing Order at PP 35-36). AEP argued that all of these transmission owners charged rates reached through settlements, and the availability of the RTO adder certainly affected the negotiation of the settlements, but it was impossible to say exactly how. JA590-92 (*Id.*). In particular, Duke's settlement identified the adder specifically, providing for an ROE of 10.88% base ROE plus a 50 basis-point RTO adder. *See* JA468 (*OCC* Order at P 9); A64. That was no different than how AEP's settlement was structured. *See* A11, A29, A139 (Note S).

True, AEP's settlement negotiations in 2010 and 2018 took place against a backdrop in which the RTO adder had been awarded. But there was no requirement that the adder be part of the ultimate settlement agreement establishing AEP's overall ROE, and AEP argued that the

availability of the RTO adder doubtless affected the parties' settlement positions, since, at the end of the day, transmission owners and their customers care about the overall ROE, rather than the component parts. JA510-12 (AEP Rehearing Request at 8-10).

FERC disagreed, ruling that because the AEP companies had received RTO adders in proceedings separate from the ones being settled, the adders could be treated as separate and distinct from the subsequent settlements. JA592-93 (*OCC* Rehearing Order at PP 37-38).

FERC also again declined to consider AEP's arguments that FERC's voluntariness requirement conflicted with Section 219(c) or that the Ohio law was preempted. JA595 (*Id.* at P 42).

Finally, FERC rejected AEP's argument that FERC had failed to explain the discrepancy between its voluntariness finding and FERC's prior finding that AEP had voluntarily joined PJM. JA595-96 (*Id.* at PP 41, 43). FERC's sole justification was that its prior decision predated *Dayton*, *CPUC*, and Order 679. JA595-96 (*Id.* at P 43).

### c.    *These Appeals*

Dayton, ATSI, Duke, and AEP petitioned for review of FERC's *Dayton* Order and *Dayton* Rehearing Order.  AEP petitioned for review of FERC's *OCC* Order and *OCC* Rehearing Order.

OCC likewise petitioned for review of FERC's *OCC* Order and *OCC* Rehearing Order.  This Court consolidated all six cases.

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*.  *Consumers' Rsch. v. FCC*, 67 F.4th 773, 783 (6th Cir. 2023).  This Court "defer[s] to [FERC] 'only when the Commission bases its interpretation on its 'factual findings or technical expertise.'"  *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021) (citation omitted).

This Court reviews FERC's "action, findings, and conclusions" under the Administrative Procedure Act, 5 U.S.C. § 706(2).  "[I]n all cases agencies must engage in 'reasoned decisionmaking,'" including "articulat[ing] a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made."  *Louisville Gas*, 877 F.3d at 846 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983)).  A failure to engage in reasoned

decisionmaking renders the decision "arbitrary, capricious, … or otherwise not in accordance with law," and it must be set aside.  5 U.S.C. § 706(2)(A).

## SUMMARY OF ARGUMENT

The *Dayton* and *OCC* Orders are unlawful and must be vacated.

1. FERC's determination that Section 219(c) rate adders may be granted *only* to entities that voluntarily join RTOs conflicts with the plain statutory text.  Section 219(c) unambiguously states that an incentive must be awarded "to each" transmission owner "that joins" an RTO, and makes no reference to the reasons for joining.  Congress could have conditioned the adder on voluntary membership—such as by granting it to utilities "that choose to join" an RTO—but it did not.  FERC may not add words to the statute, but in the orders below, that is precisely what it did.

2. FERC also acted arbitrarily and capriciously and contrary to law in denying Dayton's adder and removing AEP's Ohio affiliates' adders based on a preempted state law.  FERC's orders were premised entirely on the Ohio Statute that requires transmission owners to turn operational control of their transmission facilities over to RTOs.  But Congress assigned FERC exclusive authority over interstate transmission facilities and determined that whether to join an RTO should be a voluntary decision.  The Ohio

Statute unlawfully intrudes on the field that Congress has occupied exclusively, and conflicts with the policy Congress adopted.  As a result, the Ohio Statute is preempted.  FERC thus acted arbitrarily and capriciously in relying on the preempted statute to make its rate decisions.

3. (AEP Only)  a.  AEP argues that FERC failed to make the finding required under FPA Section 206 that AEP's existing transmission rates were outside the zone of reasonableness before replacing those rates with new rates that exclude the RTO adder.  Instead, FERC erroneously considered the RTO adder in isolation.

b.  AEP further argues that FERC's error was particularly clear in this case, which involved a transmission rate reached through settlement. FERC recognized as much with respect to Duke and ATSI, acknowledging that the RTO adder could not be eliminated from their rates without undermining the settlements that gave rise to the rates, as it was impossible to know after the fact what role the adder played in the parties' bargain.  But FERC failed to provide a reasoned explanation for treating AEP differently. All three obtained transmission rates as part of complex negotiated settlements in which the parties bargained against the backdrop of the RTO incentive.

c.  AEP finally argues that FERC acted arbitrarily and capriciously in departing, without a reasoned explanation, from its prior finding that AEP (including the Ohio affiliates) voluntarily joined PJM.

4.  (Dayton only)  Dayton argues that FERC arbitrarily discriminated against Dayton in denying it the adder while other utilities located in states that mandate RTO membership continue to receive the adder.

## ARGUMENT

### I.    FERC's Orders Conflict with the Unambiguous Text of Section 219(c).

The *Dayton* and *OCC* Orders are contrary to law and must be vacated. Relying on the Ninth Circuit's interpretation of Order 679 in *CPUC*, FERC held that RTO adders were unavailable to Dayton and AEP's Ohio affiliates because Ohio law required the transmission owners to join an RTO, and thus membership was not voluntary.  *See supra* at 19-24.  But neither the Ninth Circuit nor FERC considered whether a voluntariness requirement is permitted under Section 219(c).  It is not.

#### A.    The Text of Section 219(c) Does Not Permit a Voluntariness Requirement.

FPA Section 219(c) states that "the Commission *shall[]* ... provide for incentives *to each* transmitting utility or electric utility *that joins* a

Transmission Organization." 16 U.S.C. § 824s(c) (emphasis added). The statutory text could not be clearer: FERC must provide incentives to every utility that "joins a Transmission Organization," regardless of the reason. Where, as here, "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).[7]

Section 219(c)'s plain text requires FERC to provide incentives "to each" utility "that joins" an RTO. 16 U.S.C. § 824s(c). The words "to each" show that FERC has no discretion to create subcategories of transmission owners and provide the adder to some but not to others; rather, it must give the adder "to each." To "each" means to "every one … considered individually."[8]

---

[7] Petitioners preserve the argument that, even if this Court finds the statute ambiguous (which it is not) no deference should be given to FERC's interpretation because *Chevron* should be overturned. *See Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (considering whether to overrule *Chevron*).

[8] Collins English Dictionary—Complete and Unabridged, "Each," Dictionary.com, https://www.dictionary.com/browse/each.

And in considering each owner individually, all that matters under the statute is whether that owner "joins" an RTO. "Joins," in turn, means "to come into contact or union with,"[9] and is agnostic as to the reason. The word is simply descriptive of the relationship between the transmission owner and the RTO. This accords with ordinary English: when a child joins the Cub Scouts, one doesn't ask whether the parents required the child to join, or whether the child joined voluntarily. "Joins" just describes the fact of membership. So too when a transmission owner joins an RTO.

As Commissioner Danly noted in dissenting from the *OCC* Order, if Congress wanted FERC to distinguish between transmission owners that joined voluntarily and those that did not, it could easily have done so. JA499 (*OCC* Order, Danly Dissent at P 2). For example, Congress could have provided for adders for those owners "that elect to join" (or "decide," "choose," "opt," etc.). *See* JA499 (*Id.*) Or Congress could have given FERC discretion to decide whether to award the adder, telling FERC that it "may" (rather than "shall") "provide for incentives" to transmitting utilities that join RTOs.

---

[9]    Collins English Dictionary—Complete and Unabridged, "Join," Dictionary.com, https://www.dictionary.com/browse/join.

But Congress did no such thing. Instead, it simply directed that FERC "shall" award the adder "to each" utility "that joins" an RTO. JA499-500 (*Id.* at PP 2-3). "If Congress had meant otherwise … it could have said so. But it didn't." *United States v. Gardner*, 32 F.4th 504, 533 (6th Cir.), *cert. denied*, 143 S. Ct. 251 (2022). Courts presume that Congress knows how to say what it means, and it means what it says, and they "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. ICE*, 543 U.S. 335, 341 (2005); *see, e.g.*, *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176-77 (1994).

Thus, FERC may not create a voluntariness requirement by "add[ing] words that are not in the statute that the legislature enacted." *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816-17 (D.C. Cir. 2008); *United States v. Davis*, 970 F.3d 650, 657 (6th Cir. 2020) ("Any other reading would require us to add words to the statute that are not there."); *Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 533 (6th Cir. 1999).

Nor can FERC "rewrite a statute just because [it] believe[s] that doing so would better effectuate Congress's purposes." *Johnson v. Bauman*,

27 F.4th 384, 393 (6th Cir. 2022). The best evidence of Congress's intent is the words it wrote.

It is true that Section 219 describes the RTO adders as "incentive-based … rates," 16 U.S.C. § 824s(a). But Congress itself decided not to make RTO membership mandatory, and Congress certainly assumed that states would not be legislating in this sphere, given Congress's occupation of the field, *see infra* at 37-42. Thus, Section 219(c)'s operative language—directing FERC to award an incentive "to each" utility "that joins," 16 U.S.C. § 824s(c)—does not permit FERC to consider *why* a utility has joined an RTO.

That makes policy sense. As FERC has explained, "the consumer benefits, including reliability and cost benefits, provided by Transmission Organizations are well documented," and the "best way to ensure those benefits are spread to as many consumers as possible is to provide an incentive that is widely available to member utilities." *Promoting Transmission Investment Through Pricing Reform*, 117 FERC ¶ 61,345 at P 86 (2006) ("Order 679-A"). Congress sought to spread the benefits of RTO membership to "as many consumers as possible" by mandating an incentive for *any* utility that joined an RTO.

Moreover, to the extent Congress even contemplated the possibility of state membership requirements, *but see infra* at 37-42, there is good reason why it would not have made the availability of the membership incentive dependent upon them. FERC is not institutionally well-situated to interpret those various state laws and determine what, exactly, state law requires to the extent the meaning is disputed.

Reading the statute to make FERC's ratemaking decisions contingent upon state laws is also inconsistent with the structure of the FPA more broadly, which gives FERC control over transmission rates. 16 U.S.C. § 824(b)(1). Yet FERC's orders effectively subdelegate an aspect of the federal rate framework to state commissions or the state legislative process. If Congress intended that exception to the general rule giving FERC exclusive control over rates, it needed to speak more clearly. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004).

## B. The *CPUC* Decision Did Not Consider the Text of Section 219(c).

Notwithstanding the plain text of Section 219(c), FERC argued that Order 679, as interpreted by *CPUC*, compelled it to limit the adder to transmission owners that voluntarily join an RTO.

33

FERC cannot rely on *CPUC* to avoid the plain meaning of the statute. The *CPUC* decision addressed only Order 679, and did not consider or address the consistency of that order with Section 219(c)'s text. Nor could it: the parties themselves did not raise arguments about the statutory text and instead disputed only the meaning of Order 679.[10]

Order 679 and *CPUC* are thus beside the point here. This case is about the meaning of Section 219(c). And it is well-established that "[a] regulation which … operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134 (1936) (quotation marks omitted); *accord Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 877 (6th Cir. 2020) (agencies may only "carry into effect the will of Congress as expressed by the statute"); *Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("[A] regulation

---

[10] Moreover, the Ninth Circuit did not even hold that Order 679 *requires* voluntariness. Instead, it held that FERC had failed to provide an adequate explanation for why voluntariness was not required in light of its other prior policy. *CPUC*, 879 F.3d at 977-79. Thus, the Ninth Circuit did not conclude that the Commission could never award an RTO adder to a utility whose participation in an RTO was mandated, only that it must provide a reasoned explanation for doing so. *Id.* at 978-79. If FERC had explained on remand that voluntariness was required under Section 219(c), that would have satisfied the Ninth Circuit's judgment.

contrary to a statute is void.").  Thus, FERC cannot point to Order 679 to defend orders that violate Section 219(c).

## C.    Petitioners Are Not Making an Improper Collateral Attack.

In its orders below, FERC dismissed these meritorious arguments as a collateral attack on Order 679.  JA286-87 (*Dayton* Rehearing Order at P 18); JA496-97 (*OCC* Order at P 83).  Not so.  For starters, prior to *CPUC*, FERC *agreed with Petitioners* that voluntariness was *not* required under either Section 219 or Order 679.  *See* Order 679-A, 117 FERC ¶ 61,345 at P 86; *see also*, *e.g.*, Brief of Respondent FERC at 8-9, 16-19, *CPUC*, No. 16-70481 (9th Cir. Sept. 19, 2016), ECF No. 26; *Am. Elec. Power Serv. Corp.*, 124 FERC ¶ 61,306 at P 30 (granting AEP the adder despite the Ohio Statute mandating membership).

In fact, in issuing Order 679, FERC reviewed comments from several parties arguing that "the incentive should not be allowed for public utilities ordered to join Transmission Organizations by statute."  Order 679-A, 117 FERC ¶ 61,345 at P 83; *accord* Order 679, 116 FERC ¶ 61,057 at P 316. FERC declined to so limit the adder.  Order 679, 116 FERC ¶ 61,057 at PP 326-327, 331; Order 679-A, 117 FERC ¶ 61,345 at P 86.

Thus, until *CPUC*, FERC interpreted Order 679 to require RTO adders *even in* cases where states *had* required RTO membership. There was no conflict between Section 219(c) and Order 679 as FERC had interpreted and applied it.

Accordingly, Petitioners had no cause to seek review of Order 679 at the time it was adopted by FERC. And Petitioners were not parties to the FERC order that went up on appeal to the Ninth Circuit in *CPUC*. Thus, Petitioners' first opportunity to argue that a voluntariness requirement is inconsistent with Section 219(c) came in *Dayton*. FERC cannot invoke the "collateral attack" mantra to cut off judicial review of a rule that now, for the first time, directly affects Petitioners. *See, e.g.*, *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958).

At bottom, FERC cannot defend its policy based on a regulation that violates the statute. Section 219(c) is unambiguous that a utility that joins an RTO shall receive an adder. FERC cannot superimpose a voluntariness requirement that Congress declined to adopt. Because the orders below violate the plain text of Section 219(c), they must be vacated as contrary to law.

36

## II.  FERC's Orders Must Be Vacated Because They Are Premised Solely on a State Law That Is Preempted.

FERC's orders must also be vacated because they are premised entirely on an Ohio statute mandating RTO membership that is preempted by the FPA.[11]  FERC declined to address Petitioners' arguments on this point, insisting that only a federal court may opine on the validity of the state statute.  This Court is such a court, and it should hold that the Ohio Statute is preempted.

The Ohio Statute regulates "transmission facilities *as defined under federal law*" by mandating that an owner of such facilities in Ohio "*transfer[] control of those facilities*" to an RTO.  Ohio Rev. Stat. § 4928.12(A) (emphasis added).  But Congress has given FERC "jurisdiction over all facilities for such transmission," 16 U.S.C. § 824(b), and specifically directed that the "interconnection and coordination of facilities for … transmission" is to be "voluntary," *id.* § 824a(a).  The Ohio Statute intrudes on a field Congress has reserved exclusively for FERC, and conflicts with federal law by mandating what Congress determined should be voluntary.  Therefore, the Ohio

---

[11]  Ohio is one of only five states (others are Illinois, Michigan, Nevada, and Virginia) that mandate RTO membership.  *See* 220 ILCS 5/16-126(a), (b), (*l*); Mich. Comp. Laws Ann. 460.10w; Nev. Rev. Stat. Ann. § 704.79886; Va. Code Ann. § 56-577(A)(1).

Statute is preempted.  Accordingly, it was arbitrary and capricious for FERC to rely on that state law in its orders.

### A. Congress Has Occupied the Field of Interstate Transmission and Determined That Coordination of Transmission Facilities Should Be Voluntary.

1. Section 201(b) of the FPA, 16 U.S.C. § 824(b), grants FERC "jurisdiction over *all facilities for [interstate] transmission* … of electric energy." 16 U.S.C. § 824(b)(1) (emphasis added).  Section 201(b) reserves for states authority only over "facilities used for the generation of electric energy" and "facilities used in local distribution or only for the transmission of electric energy in *intra*state commerce." *Id.* § 824(b)(1) (emphasis added).

FERC's authority over interstate transmission facilities is exclusive. The Supreme Court has already recognized that the same sentence in Section 201(b) "allocates to FERC *exclusive* jurisdiction" over interstate wholesale sales. *Hughes v. Talen Energy Mktg. LLC*, 578 U.S. 150, 163 (2016) (emphasis added).  As a result, it has found states' attempts to regulate wholesale sales to be preempted. *See id.*  That same reasoning applies with full force to the field of interstate transmission facilities.[12]  The

---

[12]  There is no dispute that the transmission facilities at issue are used for transmission in interstate commerce. *New York*, 535 U.S. at 16

statutory provision analyzed in *Hughes* covers both interstate wholesale sales and interstate transmission facilities. *See* 16 U.S.C. § 824(b)(1) ("The Commission shall have jurisdiction over all facilities for [interstate] transmission or sale of electric energy [at wholesale]."). "This statutory text … unambiguously authorizes FERC to assert jurisdiction over two separate activities—transmitting and selling." *New York*, 535 U.S. at 19-20. Both are "domain[s] Congress reserved to FERC alone." *Hughes*, 578 U.S. at 153-54. Indeed, FERC has even "broader authority" over transmission than over wholesale sales. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 63 (D.C. Cir. 2014).[13]

2. Exclusive federal authority over the operation of existing interstate transmission facilities is underscored by Section 202(a) of the FPA, which

---

("transmissions on the interconnected national grids constitute transmissions in interstate commerce").

[13] To be sure, Congress has left states the authority "to approve or deny permits for the siting and construction of electric transmission facilities" in the exercise of historical police powers. *Piedmont Env't Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009). But these historic state powers regarding whether and where a transmission line will be built do not extend to regulation about how interstate transmission lines are to be operated and coordinated once constructed, *South Carolina*, 762 F.3d at 59—let alone to mandate that operational control be turned over to an RTO, which itself is a relatively recent creation of federal law.

directs FERC to "divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the … transmission[] … of electric energy."  16 U.S.C. § 824a(a) (emphasis added).  "[C]oordination" refers to "the coordinated *operation* of existing transmission facilities," *South Carolina*, 762 F.3d at 59—that is, operational control over those facilities.

Congress's choice to make interconnection and coordination voluntary was deliberate.  "Congress was convinced that 'enlightened self-interest' would lead utilities to engage voluntarily in power planning arrangements, and it was not willing to mandate that they do so." *Cent. Iowa Power Coop. v. FERC*, 606 F.2d 1156, 1168 (D.C. Cir. 1979) (citation omitted). Accordingly, Section 202(a) "has been definitively interpreted to make clear that Congress intended coordination and interconnection arrangements [to] be left to the 'voluntary' action of the utilities." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 12 (D.C. Cir. 2002).  The statute also provides that FERC "shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations." 16 U.S.C. § 824a(a).

Consistent with these statutory directives, FERC has promulgated regulations, including Order 2000, embracing a "voluntary approach" to RTO membership and rejecting a mandate.  *See* Order 2000, FERC Stats. & Regs. ¶ 31,089 at 30,993.  In Order 2000, FERC considered comments specifically urging that membership in RTOs should be made mandatory.  FERC expressly rejected them, concluding instead that "an open collaborative process that relies on voluntary regional participation" will produce RTOs that are better "tailored to specific needs of each region." *Id.* at 30,995. FERC also found a policy of voluntary interconnection better suited to meet the challenges transmission owners and regulators faced in "the rapidly evolving state of the electric industry." *Id.* at 31,033.

FERC also received comments from transmission owners that RTOs may not be financially attractive or viable for every transmission owner, so membership should not be mandated.  *Id.* at 31,030.  FERC's voluntary approach respected owners' concerns about penalties for non-participation, given that some owners have legitimate reasons to refrain from interconnection, including financial implications, external constraints, and even legal barriers. *Id.* at 31,030, 31,033.

41

Thus, under federal law, "[m]embership in an RTO is voluntary," and "members who think they're being mistreated … can vote with their feet." *Ill. Comm. Comm'n v. FERC*, 721 F.3d 764, 776 (7th Cir. 2013).

## B.    The Ohio Statute Is Preempted.

The Ohio Statute, Ohio Rev. Stat. § 4928.12(A), is preempted. It both intrudes on a field that Congress has reserved exclusively for FERC, and directly conflicts with Congress's policy of voluntary interconnection and coordination.

### 1.    The Ohio Statute Is Field-Preempted.

When Congress exclusively occupies a given field, state laws that aim directly at or regulate within that field are invalid. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 730 (2012) (state legislation is preempted when it regulates in a "field" that "Congress intended federal law to occupy … exclusively"). Field preemption does not require any direct conflict, but rather follows directly from federal law evincing Congress's intent "to foreclose *any* state regulation in the area." *Arizona v. United States*, 567 U.S. 387, 401 (2012) (emphasis added).

Under this precedent, the Ohio Statute is field-preempted. By its terms, the Ohio Statute targets federally regulated transmission facilities by requiring their owners to turn operational control of those facilities over to an RTO. It specifically regulates "transmission facilities as defined under federal law." Ohio Rev. Stat. § 4928.12(A). And it requires transmission owners with assets in Ohio to become "a member of, and transfer[] control of [those] facilities to" a "qualifying transmission entity," *id.*, a term defined by reference to federal law, *id.* § 4928.12(B)(1) ("The transmission entity is approved by the federal energy regulatory commission."). The Ohio Statute regulates in the heartland of the field—the operation and coordination of interstate transmission facilities—that Congress reserved for FERC.

Indeed, the Ohio Statute "aims" at FERC's exclusive field, *Oneok*, 575 U.S. at 385, even more directly than the Maryland program invalidated in *Hughes*. There, the state of Maryland tried to indirectly modify FERC's rate for wholesale sales by guaranteeing a Maryland generator an extra payment for wholesale sales that it made. 578 U.S. at 163. The Court held that the state requirements "invade[d] FERC's regulatory turf" by indirectly "adjusting an interstate wholesale rate" subject to FERC's jurisdiction. *Id.*

Here, Ohio has acted directly.  It has dictated how transmission owners may engage in interstate transmission (only through an RTO) and who must have operational control of interstate transmission facilities (only an RTO).  Accordingly, under well settled field-preemption principles, the Ohio Statute is preempted.

### 2.    The Ohio Statute Is Conflict-Preempted.

The Ohio Statute is also preempted because it directly conflicts with Congress's voluntary policy regarding RTO membership.  Where there is a conflict between federal and state laws, the state law must give way as a matter of federal supremacy.  *See, e.g., Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).  A conflict exists if it is impossible to comply with both state and federal law, or if the state law poses an obstacle to the "full purposes and objectives" of the federal law.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quotation marks omitted).

Ohio's mandate creates an impossibility as well as an obstacle to the federal policy of voluntary membership, resulting in preemption.  First, the impossibility: it is impossible to join an RTO voluntarily (as the federal framework envisions) while at the same time being compelled to do so (as the Ohio Statute requires).  Second, the obstacle: the Ohio Statute frustrates

the federal model of voluntary membership in transmission organizations, and creates an insuperable obstacle to the achievement of that policy. Put simply, a state mandate is an obvious obstacle to a congressional policy that is "expressly voluntary." *Cent. Iowa Power*, 606 F.2d at 1168.[14] Accordingly, the Ohio Statute is conflict-preempted.

### C. FERC's Orders Must Be Vacated Because They Are Premised on a Preempted State Law.

Petitioners repeatedly asked FERC to address whether the Ohio Statute is preempted, as such a finding would mean that the Ohio Statute could not support denial of an RTO adder. FERC, however, refused to consider preemption, asserting that the "proceeding [wa]s not an appropriate procedural vehicle" and there was "not … a sufficient record on this constitutional issue." JA497 (*OCC* Order at P 84); *see also* JA595 (*OCC* Rehearing Order at P 42) ("We are not persuaded by AEPSC's arguments that the Commission erred by declining to address preemption arguments."); JA294-95 (*Dayton* Rehearing Order at PP 31-32) ("[E]ven if we agreed that the statute was preempted, only a federal court has the ultimate authority

---

[14] The Ohio Statute is particularly problematic for transmission owners such as ATSI, which has transmission facilities both within Ohio and a neighboring state (Pennsylvania).

to invalidate the Ohio Statute.  Therefore, … we exercise our discretion not to further address the preemption issue.").

FERC's conclusory responses are insufficient to meet its obligation to respond meaningfully to these arguments.  FERC's *Dayton* and *OCC* Orders were premised entirely on the existence of a valid state law that mandated Dayton and AEP's RTO membership.  The correctness of that premise thus lies at the core of the agency's action.  An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider," as it has here in relying on a preempted statute, or "entirely failed to consider an important aspect of the problem," namely, whether states may validly require RTO membership.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

FERC's refusal to respond meaningfully on this point seems to stem from its observation that "only a federal court has the ultimate authority to invalidate the Ohio statute."  JA497 (*OCC* Order at P 84).  This refusal was misguided.  Petitioners asked FERC only to assess the validity of the Ohio Statute in the context of FERC's *own* rate determination.  No one asked FERC to *enjoin* the Ohio Statute.  Rate determinations are FERC's core responsibility under FPA Sections 205 and 206.  16 U.S.C. §§ 824d, 824e.

Addressing the validity of the state law was therefore not only permissible, but *essential* for FERC to determine whether the RTO adder is just and reasonable.  FERC cannot rationally decide to make its own rates contingent on whether a state enacts a law mandating RTO membership without assessing whether the state has authority to enact such a law.

In any event, FERC acknowledged the "ultimate authority" of a federal court to consider preemption.  JA497 (*OCC* Order at P 84).  This Court accordingly can decide whether the Ohio Statute is preempted, and if so, vacate FERC's orders predicated on that state law.[15]

The Court has everything it needs to resolve this pure question of law. There is no basis for FERC's assertion in the *OCC* proceedings that it lacked an adequate record to consider this legal issue.  JA497 (*OCC* Order at P 84). Petitioners raised their preemption argument fully in both *Dayton* and *OCC*. Although FERC curiously noted in *OCC* that the Ohio Attorney General did

---

[15] To be clear, Petitioners do not ask this Court to enjoin the state law either. They ask this Court to assess the validity of the state law solely in the context of FERC's rate determination—just as a party in a private tort or contract dispute might raise a preemption defense to the plaintiff's state-law claims.  The court would then decide the validity of the state's law in the context of evaluating the tort or contract claim.  *See, e.g., Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995).

not intervene at FERC, JA497 (*Id.* at P 84 n.175), that is irrelevant: core principles of due process and the Administrative Procedure Act require FERC to address a transmission owner's defense of its filed rate regardless whether a state attorney general has intervened.  In any case, the Ohio Attorney General has intervened before this Court, so Ohio will be heard regarding the validity of its statute.

## III.  FERC's *OCC* Orders Were Arbitrary and Capricious in Several Respects (*AEP Only*)

Even if Section 219(c) did include a voluntariness requirement, and even if Ohio could lawfully require utilities to turn over control of their interstate transmission facilities to a third party, the *OCC* Orders regarding AEP's Ohio affiliates still require vacatur for three reasons: First, FERC improperly ordered the removal of AEP's adder without first determining its transmission rate as a whole was unjust and unreasonable, in violation of Section 206.  Second, FERC arbitrarily and capriciously treated AEP differently than Duke and ATSI, even though all three entities charged rates

48

emanating from settlements.[16]   Third, FERC arbitrarily and capriciously disregarded a prior factual finding that AEP joined PJM voluntarily.

## A.   FERC Unlawfully Removed AEP's RTO Adder Without First Finding Its Rate as a Whole Unjust or Unreasonable.

Under FPA Section 206, before FERC can impose a replacement rate, it must first find "that [the] rate[] … charge[d] … by a[] public utility for any transmission … is unjust[ or] unreasonable." 16 U.S.C. § 824e(a). "Only *after* having made the determination that the utility's rate fails that test may FERC exercise its section 206 authority to impose a new rate." *Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C Cir. 2017).  FERC cannot meet that burden just by showing that a different rate might be better than the current rate, because there is a zone of reasonableness that encompasses a range of permissible rates.  *See id.* at 23.

Here, OCC brought its Complaint pursuant to Section 206, but never showed—and FERC never found—that AEP's rate overall was unjust and unreasonable.  Instead, FERC purported to satisfy its burden under Section 206 by determining that the rate adder, standing by itself, was unjust and

---

[16]  As explained in note 4, *supra*, ATSI intends to file an intervenor's brief in support of FERC on this one rationale, *i.e.*, defending FERC's ruling declining to remove ATSI's RTO adder because such an adder, if it even was a part of ATSI's rates, emerged from a comprehensive settlement.

unreasonable. But customers pay rates based on a total ROE, inclusive of the adder. If the ROE inclusive of the adder is within the zone of reasonableness, FERC is not permitted to reduce the ROE by stripping out the adder. *See Sithe/Indep. Power Partners, L.P. v. FERC*, 165 F.3d 944, 951 (D.C. Cir. 1999) (holding that, before modifying a rate under Section 206, the Commission must "provide some basis to question the reasonableness of the overall rate level, taking into account changes in all cost components and not just the challenged component" (alteration and quotation marks omitted)); *accord, e.g., Cal. Indep. Sys. Operator, Inc.*, 126 FERC ¶ 61,081 at P 66 (2009).

FERC refused to follow that rule here because, it explained, it allowed transmission owners to include the adder in their rates "on a single-issue basis" "separate from all other ROE issues." JA486 (*OCC* Order at P 62). Therefore, FERC reasoned, it could remove the adder in the same way. But transmission owners generally, and AEP in particular, sought to include the RTO adder by making filings under Section 205, which does not require any predicate finding of unjustness and unreasonableness before a rate can be changed. *Emera Maine*, 854 F.3d at 24. And before approving an adder,

FERC still required the transmission owner to show that the overall rate, inclusive of the adder, remained within the zone of reasonableness.[17]

Accordingly, to *remove* the adder, a complainant must demonstrate, and FERC must find, that the overall rate, inclusive of the adder, lies *outside* the zone of reasonableness. Typically this is done through expert testimony comparing the transmission owner's ROE to the ROEs of peers facing a similar risk profile. The peers will establish a range of reasonableness, against which the particular owner's ROE can be evaluated. Here, OCC made no effort to provide any such evidence. Instead, it simply argued the rates must *per se* be unjust because they included an adder. That is not enough to satisfy Section 206.

---

[17]   *See ITC Holdings Corp. v. Interstate Power & Light Co.*, 121 FERC ¶ 61,229, at P 40 (2007) ("Even an incentive ROE must be within the zone of reasonableness."); Order 679, 116 FERC ¶ 61,057 at P 2 ("[U]nder the Rule, the Commission will permit incentives only if the incentive package as a whole results in a just and reasonable rate. For example, an incentive rate of return sought by an applicant must be within a range of reasonable returns and the rate proposal as a whole must be within the zone of reasonableness before it will be approved."), *order on reh'g*, Order 679-A, 117 FERC ¶ 61,345, at P 67 ("[E]ach applicant will, first, be required to justify a higher ROE under the revised nexus test and, second, to justify where in the zone of reasonableness that return should lie.").

FERC relied on *International Transmission Co. v. FERC*, 988 F.3d 471 (D.C. Cir. 2021), to conclude that it did not need to assess the justness and reasonableness of the rate as a whole. JA487 (*OCC* Order at P 63 n.124). FERC reads too much into that case. The utility's challenge there was that FERC never made a threshold finding that the *adder itself* no longer was just and reasonable—and the D.C. Circuit held that FERC had made such a finding. 988 F.3d at 485-86. The utility there did not make, and the court did not consider, the argument advanced here: that under Section 206 FERC may not strip an adder out of the rate without first concluding *that the rate as a whole*, and not only the adder considered in isolation, is unjust and unreasonable.

## B. FERC Irrationally Distinguished Between Identically Situated Entities.[18]

FERC's arbitrary and capricious decision with regard to AEP was underscored by the inconsistent treatment of AEP relative to Duke and ATSI. As to those transmission owners, FERC correctly recognized that it would be improper to remove the RTO adder from their rates "absent

---

[18] ATSI and Dayton do not join this argument and ATSI reserves the right to argue that, as FERC found, it is not similarly situated to AEP. *See also supra* n.4.

evidence that the overall ROE has become unjust and unreasonable." JA488 (*OCC* Order at P 64.)   FERC explained that their rates arose out of "a comprehensive settlement package submitted to the Commission to resolve a complex, multi-issue dispute among those entities, their customers, and other affected parties." JA488 (*Id.*).   Consequently, it was impossible to disentangle, after the fact, what rate the parties would have bargained for in the settlement negotiations had the RTO adder been removed from the equation. JA488 (*Id.*).   FERC therefore concluded: "we do not find it would be appropriate to change unilaterally a single aspect of such a comprehensive settlement, at least absent evidence that the overall ROE has become unjust and unreasonable." JA488 (*Id.*).   Because "OCC ha[d] not adduced" any such evidence, FERC left Duke's and ATSI's rates intact.   JA488 (*Id.*).

FERC inexplicably declined to apply that same rule to AEP, even though the exact same considerations apply to AEP.   This error, too, requires vacatur.   It is a bedrock principle of administrative law "that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (quotation marks and alteration omitted).   When distinguishing among several utilities, FERC must

"provide a reasoned analysis, resting on articulated objective, nondiscriminatory, and evenhanded criteria, that would justify treating [a market participant] differently than [others]." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 21 (D.C. Cir. 2014); *accord ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

AEP's transmission rate and RTO adder stem from multiple settlements. In 2010, AEP settled disputes related to the AEP East Companies' 2008 transition to formula rates and the AEP PJM Transcos' 2010 rate filing following a corporate reorganization. *See Am. Elec. Power Serv. Co.*, 124 FERC ¶ 61,306 at PP 1, 3; *AEP Appalachian Transmission Co.*, 130 FERC ¶ 61,075 at PP 1-3. In those agreements, the parties agreed to provide the AEP East Companies and AEP PJM Transcos with a base ROE of "10.99%, plus a 50 basis point adder for AEP's continuing participation in the PJM RTO, resulting in an 11.49% total ROE." A11 (AEP East Companies 2010 Offer of Settlement at 7); A29 (AEP PJM Transcos 2010 Offer of Settlement at 7).

Later, in 2018, AEP agreed to reduce its base ROE and resolve several other issues in a settlement arising from a complaint brought by municipal power providers. *See Appalachian Power Co.*, 167 FERC ¶ 61,156; A106-07

54

(AEP 2018 Offer of Settlement at 2-3).  Although the 2018 settlement was focused on AEP's base ROE, as reflected in the tariff sheet filed with the offer of settlement, the parties agreed that AEP's total ROE still "include[d] an additional 50 basis points for PJM RTO membership."  A139 (AEP 2018 Offer of Settlement, Marked Sheet at Note S).  Thus, the parties reached their agreement regarding the base ROE assuming that AEP would enjoy the RTO adder.

Duke's ROE comes from a settlement structured similarly.  Specifically, in 2014, Duke settled issues relating to its move from MISO to PJM, agreeing to a "base ROE of 10.88 percent plus a fifty basis point adder for RTO membership" for a total ROE of 11.38 percent.  A64 (*PJM Interconnection, L.L.C.*, Docket No. ER12-91, Explanatory Statement at 13 (Oct. 30, 2014)); *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,029 at P 10 (2015).

As a result, the AEP and Duke settlements are virtually indistinguishable.  Each stemmed from "comprehensive settlement package[s]," each settlement "resolve[d] … complex, multi-issue dispute[s]," and for each, "[w]e do not know the precise trade-offs and concessions made

by [the] parties to those proceedings during the settlement process." JA488 (*OCC* Order at P 64).

FERC failed to provide a "reasoned analysis" of its different treatment of AEP. *ANR Storage Co.*, 904 F.3d at 1024 (quotation marks omitted). It attempted to justify its differential treatment of the transmission owners based on how and when the adders were initially granted, while ignoring the subsequent rate settlements. AEP received its RTO adder "in separate proceedings under Section 219," and then adjusted only its base ROE later as part of the settlement negotiations. JA592-93 (*OCC* Rehearing Order at P 37). FERC suggested that the settlement negotiations would have included "only negotiating the base ROE." JA592-93 (*Id.*) But the parties were not required to retain the adder as part of the settlement. And the availability of the RTO adder doubtless affected their negotiations and the ultimate resolution.

FERC's rationale does not withstand scrutiny. In the Duke and ATSI proceedings, as FERC specifically acknowledged, the parties negotiated the transmission owners' ROEs against the backdrop of the companies' entitlements to the RTO adder. *See* JA488 (*OCC* Order at P 64) (speculating that the rates agreed upon may have been different "had the Commission

policy on RTO Adders been different"—in other words, had Duke and ATSI not been entitled to such adders).  Thus, although the parties were negotiating about "ROE figures," JA488-89 (*id.* P 65), FERC nonetheless concluded that it could not isolate the RTO adder because it was impossible to know whether or how the negotiating parties relied on that incentive in reaching the ultimate transmission rate.

That is equally true for AEP.  The 2018 settlement was about AEP's "ROE figures." JA488-89 (*Id.*).  The complaint giving rise to that settlement focused on the base ROE; however, the financial impact of the ROE includes the impact of the 50 basis-point adder.  Therefore, its impact on the ultimate resolution of the case cannot be ignored.  And the parties negotiated AEP's base ROEs against a backdrop in which the RTO adder had been granted, but where many other issues remained live.  *See, e.g., Am. Elec. Power Serv. Corp.*, 124 FERC ¶ 61,306 at P 30 ("Granting up to 50 basis points of incentive ROE does not remove any other issue pertaining to the ROE from consideration during the hearing and settlement judge procedures, including the appropriate proxy group and the screening criteria for the proxy group.").  Had the RTO adder been denied or eliminated, negotiations over the base ROE may well have played out differently.  After all, both

customers and utilities ultimately care about the overall ROE—not what portion consists of a base rate versus an incentive.

In sum, just as for Duke and ATSI, so too for AEP we cannot "know the precise trade-offs and concession made by the parties to those proceedings," and how those trade-offs and concessions may have been shaped by FERC's grant of a membership incentive (or not). JA488 (*OCC Order* at P 64). AEP, like Duke and ATSI, negotiated in the shadow of the expectation of receiving an RTO adder, which doubtless affected all parties' positions on the base ROE. The adder cannot be considered or revoked in a vacuum.

Given these facts, FERC's conclusions that "we cannot know what, if anything, the parties agreed to in exchange for settling on [the agreed] ROE figures" and that "[w]e do not know … the terms to which and conditions to which those parties would have agreed with respect to Ohio transmission assets had [FERC] policy on RTO Adders been different" apply to AEP no less than to Duke or ATSI. JA488-89 (*Id.* at PP 64-65). FERC had no reasoned basis here to distinguish between these parties and this fact alone requires vacatur of the *OCC* orders on review.

## C.    FERC Arbitrarily Departed from Its Own Prior Factual Finding Without Reasoned Explanation.

FERC's *OCC* orders are also arbitrary and capricious because FERC departed without reasoned explanation from a prior order finding that AEP's membership in PJM is voluntary.  AEP operates as a multi-state system, and it joined PJM as such based on considerations transcending Ohio.

When an agency changes position, it must "provide a reasoned explanation for its change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  And when its new position "rests upon factual findings that contradict those which underlay its prior policy"—as here—an even "more detailed justification" is required "than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  "It would be arbitrary or capricious to ignore such matters.... [A] reasoned explanation is needed for disregarding facts and circumstances that underlay … the prior policy." *Id.* at 515-16.

FERC failed this test of reasoned decisionmaking here.  In prior orders, it expressly found that AEP (including its Ohio affiliates) voluntarily joined PJM.  Yet in the *OCC* Order, it reversed course and concluded otherwise.  And it failed to explain, or even acknowledge, the discrepancy.

In 2004 (several years after the Ohio Statute was enacted), FERC affirmed findings by an administrative law judge, including a finding that AEP voluntarily joined PJM. *New PJM Cos.*, 107 FERC ¶ 61,271 at PP 41-44; *see also New PJM Cos.*, 106 FERC ¶ 63,029 at P 55 (2004) (ALJ finding that AEP "signed on voluntarily" to PJM because "AEP saw substantive benefits from membership in a Commission-approved RTO"). Indeed, FERC repeated the ALJ's findings that "since at least September 1999," AEP had "continuously and conscientiously pursued membership in an RTO." 107 FERC ¶ 61,271 at P 41. FERC considered AEP's own statements and noted that "there has been no statement from AEP that its commitment to join a Commission-approved RTO was anything but voluntary." *Id.* (quotation marks omitted). FERC affirmed the ALJ's findings and ultimately ruled that AEP's "voluntary coordination" into PJM was "designed to obtain economical utilization of facilities and resources," *id.* at P 52, and that "AEP's joining PJM w[ould] produce more efficient utilization of facilities than having AEP remain outside PJM," *id.* at P 56.

FERC's 2004 conclusion makes sense. AEP is an integrated, multi-state transmission entity. The AEP East Companies and AEP PJM Transcos did not (until the Orders under review) have separate transmission

rates for each state in which they operate—rather, they share FERC-approved multi-utility rates that cover utilities in different states across AEP's multi-state footprint. *See generally* PJM, *Open Access Transmission Tariffs*, OATT Attachment H-14, https://agreements.pjm.com/oatt/18412 (AEP East Cos.); *id.* Attachment H-20, https://agreements.pjm.com/oatt/18749 (AEP Transcos). AEP therefore voluntarily chose to join PJM on a *company-wide* basis. FERC's prior decision finding its membership voluntary was sound. 107 FERC ¶ 61,271 at PP 41, 44, 52.

Yet below FERC discarded its prior decision with hardly a mention, finding now that the Ohio affiliates' membership was compelled by the Ohio Statute. FERC failed to "provide a reasoned explanation" for this abrupt change in course. *Encino Motorcars*, 579 U.S. at 221. In its initial order, FERC acknowledged its prior finding only in a footnote noting AEP's arguments on this point. JA475-76 (*OCC* Order at P 36 n.58). This utter silence left an "[u]nexplained inconsistency" that the agency made no attempt to fill. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). In the rehearing order, FERC offered little more, stating only (in the very last paragraph) that it was "not convinced" by

AEP's arguments that its decision was in tension with its prior order. JA595-96 (*OCC* Rehearing Order at P 43).

FERC attempted to distinguish its prior order as arising in a different context ("AEP's determination to join PJM was voluntary under section 205(a) of PURPA"[19]) and was "not determinative of AEPSC affiliates' qualification for RTO Adders." JA595-96 (*Id.*)  This terse statement hardly constitutes an explanation.  FERC did not explain how a decision to join could be voluntary for one purpose but not for another.

FERC also asserted that, because its prior finding predated Order 679 and the Ninth Circuit's *CPUC* decision, the finding could not shed any light on AEP's entitlement for an RTO adder. JA595-96 (*Id.*)  Again, that makes little sense.  Nothing in *CPUC* or Order 679 purported to call into question whether AEP voluntarily joined PJM in 2004.  The *CPUC* decision interpreting Order 679 simply purported to change the import of such a finding in relation to the RTO membership incentive.  What matters is that

---

[19] The Public Utility Regulatory Policies Act of 1978 exempts utilities from state laws that would prohibit the voluntary coordination of electric utilities. *See* 16 U.S.C. § 824a-1(a).

FERC's finding was made in 2004, *after* the Ohio Statute was passed.  If FERC now wants to disregard that finding, it needs to explain why.

Not only did FERC abruptly abandon its prior finding without a reasoned explanation, it appeared not even to "display awareness that it *is* changing position."  *Fox*, 556 U.S. at 515; *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017) (finding arbitrary and capricious a change in policy where agency's "main defense … [was] to insist that nothing changed").  That alone is enough to warrant vacatur of the portion of the order in the *OCC* proceedings taking away the RTO adder from AEP's Ohio affiliates.

## IV.  FERC's *Dayton* Order Was Arbitrary and Capricious (*Dayton Only*).[20]

As discussed above, Dayton applied for the adder to support its construction of significant transmission projects that were designed to improve the reliability of its system.  JA13-14 (Dayton Application at 1-2).  Dayton is surrounded by transmission owners in PJM and the Midcontinent Independent System Operator ("MISO") that have received the adder, some of which are subject to state RTO membership mandates.  *See supra* n.11.

---

[20]  AEP and ATSI do not join this argument.

As result, Dayton is at a disadvantage as compared to such entities when attempting to attract capital its significant reliability investments. As Commissioner Chatterjee explained when dissenting from the *Dayton* Order, "permitting some RTO/ISO members to receive the RTO Adder, while prohibiting other members from receiving that same incentive, creates an uneven playing field in the competition for investment capital." JA206-07 *(Dayton* Order, Chatterjee Dissent, P 2 n.4).

Without providing a reasoned analysis explaining why Dayton is being treated differently than similarly situated, competing transmission owners, FERC's denial of the ROE adder is unlawful. *ANR Storage Co.*, 904 F.3d at 1024-25.

## CONCLUSION

This Court should vacate FERC's order in *Dayton* denying Dayton's application for an RTO adder (with instructions to grant the application) and vacate FERC's order in *OCC* removing an RTO adder from the rates of AEP's Ohio affiliates.

64

December 22, 2023

/s/ William M. Rappolt

William M. Rappolt
Assistant General Counsel, FERC
AES US SERVICES, LLC
4300 Wilson Blvd
Arlington, VA 22203
(571) 533-9018
william.rappolt@aes.com

*Counsel for The Dayton Power and Light Co. d/b/a AES Ohio*

Respectfully submitted,

/s/ Matthew E. Price

Matthew E. Price
Zachary B. Cohen
Victoria Hall-Palerm
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC 20001
(202) 639-6000
mprice@jenner.com
zcohen@jenner.com
vhall-palerm@jenner.com

William M. Keyser
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-8186
wkeyser@steptoe.com

*Counsel for American Electric Power Service Corp., in its own name and on behalf of its public utility affiliates Ohio Power Co. and AEP Ohio Transmission Co., Inc.*

Morgan E. Parke
Associate General Counsel
P. Nikhil Rao
Senior Corporate Counsel
FIRSTENERGY SERVICE COMPANY
76 South Main Street
Akron, OH 44308
(330) 384-2422
mparke@firstenergycorp.com
pnrao@firstenergycorp.com

/s/ Sanford I. Weisburst
Sanford I. Weisburst
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
sandyweisburst@quinnemanuel.com

*Counsel for FirstEnergy Service Company on behalf of and as agent for American Transmission Systems, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation set forth in FRAP 27(d)(2). This document contains 12,857 words, excluding the parts exempted by FRAP 32(f) and 6th Cir. R. 32-4. I also certify that this document complies with the typeface and type-style requirements of FRAP 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Century Expanded in 14-point font.

December 22, 2023                    */s/ Matthew E. Price*
                                     Matthew E. Price

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing will be served via the Court's electronic filing system and served on all counsel of record on this 22nd day of December, 2023.


December 22, 2023                    */ s/ Matthew E. Price*
                                     Matthew E. Price

**ADDENDUM**

# INDEX

FERC Docket No. ER08-1329, American Electric Power Service Corporation, Explanatory Statement in Support of Settlement Agreement (Apr. 7, 2010) .......................................................... A1

FERC Docket No. ER10-355, American Electric Power Service Corporation, Explanatory Statement in Support of Settlement Agreement (Sept. 24, 2010) .................................................... A19

FERC Docket No. ER11-3251-000, Midwest Independent Transmission System Operator, Inc. Section 205 Filing to Reflect the Termination of American Transmission Systems, Inc.'s Status as a Transmission Operator, Owner, and Local Balancing Authority in the Midwest Independent Transmission System Operator, Inc. (Mar. 31, 2011) .............................................. A40

FERC Docket No. ER11-3251-000, *Midwest Independent Transmission System Operator, Inc.*, Commission Letter Order (May 20, 2011) ...................................................................... A44

FERC Docket No. ER12-91, Duke Energy Ohio, Inc. and Duke Energy Kentucky, Inc., Explanatory Statement in Support of Settlement Agreement (Oct. 30, 2014) .................................................. A47

FERC Docket No. ER15-303-000, American Transmission Systems, Inc., Explanatory Statement in Support of Settlement Agreement and Offer of Settlement (July 20, 2015) ........................... A70

FERC Docket No. ER15-303-002, *American Transmission System, Inc.*, Commission Letter Order (Mar. 11, 2016) .................................... A96

FERC Docket No. ER18-1202, American Electric Power Service Corporation, Explanatory Statement in Support of Settlement Agreement and Offer of Settlement (Mar. 28, 2018) ........................ A100

 ORIGINAL



FILED
SECRETARY OF THE
COMMISSION

2010 APR -8  A II: 32

FEDERAL ENERGY
REGULATORY COMMISSION

**American Electric Power**
801 Pennsylvania Avenue N.W.
Suite 320
Washington, DC  20004
AEP.com

*PART 1 OF 3*

April 7, 2010

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A
Washington, D.C. 20426

**Monique Rowtham-
Kennedy**
Senior Counsel –
Regulatory Services
(202) 383-3436
(202) 383-3459 (F)

Re:   **American Electric Power Service Corporation,**
      FERC Docket No. ER08-1329

Dear Secretary Bose:

Pursuant to Rule 602 of the Federal Energy Regulatory Commission's (the
"Commission") Rules of Practice and Procedure, 18 C.F.R.§385.602 (2008),
American Electric Power Service Corporation ("AEPSC") on behalf of its affiliates,
Appalachian Power Company, Columbus Southern Power Company, Indiana
Michigan Power Company, Kentucky Power Company, Kingsport Power Company,
Ohio Power Company, and Wheeling Power Company (collectively "AEP" or the
"AEP East Companies"), and on behalf of Blue Ridge Power Agency, Craig-
Botetourt Electric Cooperative, The Musser Companies (Black Diamond Power Co.,
Elk Power Co., and Union Power Co,), Indiana Municipal Power Agency, City of
Dowagiac, Michigan, American Municipal Power-Ohio, Inc, The AEP Intervenor
Group[1], Wabash Valley Power Association, Inc., Buckeye Power, Inc. and Indiana
and Michigan Municipal Distributors Association (collectively, the "Joint
Intervenors"), (individually, a "Settling Party," and, collectively, the "Settling
Parties") submit an original and fourteen copies of an Offer of Settlement intended to
resolve without need for evidentiary procedures all issues set for hearing in the

---

[1] The AEP Intervenor Group consists of large industrial customers that take service from one or more AEP
East Operating Companies.

Kimberly D. Bose, Secretary
April 7, 2010
Page 2 of 3

captioned proceedings. In addition, this Settlement is supported or not opposed by all parties who have intervened in this proceeding[2].

This Offer of Settlement includes the following documents:

1.   Explanatory Statement (Appendix A);

2.   Settlement Agreement (Appendix B), and several attachments described below;

3.   Draft Order Approving Settlement Agreement (Appendix C), and

4.   Service List (Appendix D).

The attachments to the Settlement Agreement, Appendix B, include the following:

1.   Attachment A, Cost of Service and Formula Rate Settlement Principles;

2.   Attachment B-1, Revised Tariff language (Blacklined);

3.   Attachment B-2, Revised Tariff language (Clean);

4.   Attachment C, Interest Calculation Examples Pursuant to 18 C.F.R. § 35.19a.; and

7.   Attachment D, Populated Formula Rate Template for Rates Effective July 1, 2009.

8.   Attachment E, Allowable PBOP Expense Formula

All parties in this proceeding and the Commission's Trial Staff have had the opportunity to review and comment on the Offer of Settlement, and no party has objected to its provisions. The Settling Parties expect this Offer of Settlement to be unopposed. PJM Interconnection , LLC ("PJM") has represented to AEP that, if the Commission approves the Offer of Settlement, PJM will file conformed tariff sheets implementing the settlement's terms.

AEP requests that the appropriate number of copies of this filing be transmitted to Presiding Administrative Law Judge Karen Johnson in accordance with Commission Rule 602(b)(2)(i). In accordance with Rule 602(d), copies of this filing have been

---

[2] In addition to the Settling Parties, these include the Maryland Office of Peoples Counsel, Office of the Attorney General of the Commonwealth of Virginia Division of Consumer Counsel, North Carolina Electric Membership Corporation, Kentucky Public Service Commission, Old Dominion Electric Cooperative, Public Service Commission of Maryland, PJM Interconnection, LLC, Dominion Resources Services, Inc., PJM Commercial and Industrial End Users, Steel Dynamics, Inc, PHI Companies, PPL Electric Utilities Corporation, FirstEnergy Companies, Ameren Services Company ("Ameren"), PSEG Companies, Hoosier Energy Rural Electric Cooperative, Inc., Exelon Corporation, and Consumers Energy Company

Kimberly D. Bose, Secretary
April 7, 2010
Page 3 of 3

served on all participants in this proceeding and on all affected transmission owners and customers within PJM.

The Settling Parties request that, if the Settlement Agreement is unopposed and if no comments contesting the Settlement Agreement have been filed once the comment period specified in Rule 602(f) has passed, the Settling Parties request that Judge Johnson certify the Settlement Agreement to the Commission, as required by Rule 602(g)(1), as expeditiously as possible.

Respectfully submitted

Monique Rowtham-Kennedy
Senior Counsel
American Electric Power Service Corporation

Enclosures
Cc: Service List

A3

**Appendix A**
**EXPLANATORY STATEMENT**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

American Electric Power Service     )       Docket No. ER08-1329-000
Corporation                         )

**EXPLANATORY STATEMENT
IN SUPPORT OF SETTLEMENT AGREEMENT**

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18

C.F.R. § 385.602 (2008), American Electric Power Service Corporation ("AEPSC"), on

behalf of Appalachian Power Company, Columbus Southern Power Company, Indiana

Michigan Power Company, Kentucky Power Company, Kingsport Power Company,

Ohio Power Company, and Wheeling Power Company (collectively "AEP" or the "AEP

East Companies") and certain parties to these Proceedings[1], (individually, "Settling

Party," and together, "Settling Parties") submit this Explanatory Statement in support of

the concurrently filed Settlement Agreement, which is intended to resolve all issues in

this proceeding. In addition, this Settlement is supported or not opposed by all parties

who have intervened in this proceeding[2].

---

[1] The Settling Parties include: Blue Ridge Power Agency, Craig-Botetourt Electric Cooperative, The Musser Companies (Black Diamond Power Co., Elk Power Co., and Union Power Co,), Indiana Municipal Power Agency, City of Dowagiac, Michigan, American Municipal Power, Inc, The AEP Intervenor Group*1*, Wabash Valley Power Association,Inc., Buckeye Power, Inc. and Indiana and Michigan Municipal Distributors Association (collectively, the "Joint Intervenors"),

[2] In addition to the Settling Parties, these include the Maryland Office of Peoples Counsel, Office of the Attorney General of the Commonwealth of Virginia Division of Consumer Counsel, North Carolina Electric Membership Corporation, Kentucky Public Service Commission, Old Dominion Electric Cooperative, Public Service Commission of Maryland, PJM Interconnection, LLC, Dominion Resources Services, Inc., PJM Commercial and Industrial End Users, PHI Companies, PPL Electric Utilities Corporation, FirstEnergy Companies, Ameren Services Company ("Ameren"), PSEG Companies, Hoosier Energy Rural Electric Cooperative, Inc., Exelon Corporation, and Consumers Energy Company

.

1

## I.    INTRODUCTION

The AEP East Companies are operating companies of the American Electric Power System providing electric service to customers at retail and wholesale in parts of Indiana, Kentucky, Michigan, Ohio, Tennessee, Virginia, and West Virginia. AEPSC is a company that provides professional and business services to the AEP East Companies. The AEP East Companies are members of the PJM Interconnection, LLC ("PJM"), a Commission-approved regional transmission organization ("RTO") which, among other things, offers transmission service on a regional basis pursuant to an Open Access Transmission Tariff ("OATT").

Transmission rates in PJM are currently zonal in nature (except for certain high-voltage facilities constructed pursuant to the PJM regional transmission expansion plan ("RTEP"), the costs of which are allocated to more than one PJM zone). In general, customers within a particular rate zone, corresponding generally to the system of a transmission-owning member of PJM, pay a rate for network integration transmission service ("NITS") that reflects the cost of service of the zonal transmission facilities. AEP recovers its annual transmission cost of service ("TCOS") for the AEP East Companies' zone of PJM ("AEP Zone") through charges assessed by PJM pursuant to Attachment H-14 of the PJM OATT. The transmission-owning members of PJM retain the right to make filings under Section 205 of the Federal Power Act, 16 U.S.C. § 824, *et seq*., to change the rate for service in their zones. Historically within PJM, AEP's transmission revenue requirements and the resulting unit charges have been stated rather than formulaic. Under a stated rate approach, AEP's transmission revenue requirement and

2

unit charges for service to load within the pricing zone change only as the result of a
Federal Power Act ("FPA") Section 205 or Section 206 rate filing.

On July 31, 2008, AEP filed with the Commission an application to increase its
zonal transmission rates under the PJM OATT and to convert its stated zonal rates into
formula rates. Formula rates allow cost-based rates, with certain exceptions, to be
adjusted annually to reflect changes in the TCOS and other factors underlying such rates.
AEP sought an effective date of October 1, 2008. The proposed formula rate included
Formula Rate Implementation Protocols and a Blank Formula Rate Template to be
populated annually with cost of service data to calculate the Annual Transmission
Revenue Requirement ("ATRR") supporting the charges in effect during each Rate Year.
The ATRR calculated by application of the formula rate encompasses the TCOS both for
facilities owned by the AEP East Companies that were constructed pursuant to the PJM
RTEP and for facilities that predate or are outside the scope of the RTEP process. The
formula rate provides a means for separately evaluating the revenue requirement for AEP
Zone (NITS) and regional (RTEP) facilities that are allocated by PJM to transmission
customers outside the AEP Zone.

AEP's filing included a Completed Formula Rate Template that would establish
AEP's proposed ATRR for a shortened initial period[3]. The completed template
applicable to the initial period then would be followed by annual updates effective from
July 1 each year through June 30 of the following year ("Rate Year"). The ATRR will
include certain projected cost data, and will be "trued-up" annually to reflect actual costs

---

[3] The initial period as proposed was to have been October 1, 2008 through June 30, 2009, but was
shortened by imposition of a five-month suspension of the effective date to run from March 1, 2009
through June 30, 2009. The first annual update was implemented as of July 1, 2009, pursuant to the as-
filed formula rate, subject to refund.

3

and other relevant factors. Amounts over-collected or under-collected then would be refunded or charged to customers, with interest.

Motions to intervene in this proceedings were filed by Blue Ridge Power Agency, Craig-Botetourt Electric Cooperative, The Musser Companies (Black Diamond Power Co., Elk Power Co., and Union Power Co.), Indiana Municipal Power Agency, City of Dowagiac, Michigan, Old Dominion Electric Cooperative, American Municipal Power, Inc.[4], The AEP Intervenor Group[5], Wabash Valley Power Association, Inc., Buckeye Power, Inc., and Indiana Michigan Municipal Distributors Association ( collectively, the "Joint Intervenors"), the Maryland Office of Peoples Counsel ("MOPC"), Office of the Attorney General of the Commonwealth of Virginia Division of Consumer Counsel ("Virginia Consumer Counsel"), North Carolina Electric Membership Corporation ("NCEMC"), Kentucky Public Service Commission, Public Service Commission of Maryland, PJM Interconnection, LLC ("PJM"), Dominion Resources Services, Inc. ("Dominion Services"), PJM Commercial and Industrial End Users, PHI Companies ("PHI"), PPL Electric Utilities Corporation ("PPL"), FirstEnergy Companies ("FirstEnergy"), Ameren Services Company ("Ameren"), PSEG Companies ("PSEG"), Hoosier Energy Rural Electric Cooperative, Inc. ("Hoosier"), Exelon Corporation ("Exelon"), and Consumers Energy Company ("Consumers").

Protests of AEP's filing were submitted by the Joint Intervenors, MOPC and the Virginia Consumer Counsel. AEP filed an answer to the protests. On September 30, 2008, the Commission issued an order accepting AEP's proposed formula rates for filing,

---

[4] American Municipal Power, Inc. previously was known as "American Municipal Power-Ohio, Inc." (or "AMP-Ohio"). The change in name was made effective on July 1, 2009.
[5] The AEP Intervenor Group consists of large industrial customers that take service from one or more AEP East Operating Companies.

4

subject to certain modifications to be made in a compliance filing and after hearing. In doing so, the Commission suspended the proposed formula rates for five months, making them effective, as modified, on March 1, 2009, subject to refund, set the proposed rates for hearing, and established settlement judge procedures. *Order Accepting and Suspending Revised Tariff Sheets and Establishing Hearing and Settlement Judge Procedures*, 124 FERC ¶ 61,306 (2008). On October 30, 2008, AEP submitted a compliance filing in which, among other things, AEP proposed amendments to sections 3(d) and 3(e) of the Formula Rate Protocols to remove language that could be interpreted as limiting rights of parties under section 206 of the Federal Power Act.

On February 5, 2009, in response to a request by Commission staff, AEP filed an amendment to its compliance filing in which additional changes to section 3(d) of the Formula Rate Protocols were proposed to further clarify that the customer protocols do not limit a customer's or the Commission's rights with respect to challenges to the inputs into the formula rate. On March 13, 2009, the Commission accepted AEP's compliance filing. *See* Letter Order issued March 13, 2009 in Docket Nos. ER08-1329-002 and ER08-1329-003.

The Honorable Karen Johnson was appointed Settlement Judge. Judge Johnson convened the first settlement conference on October 21, 2008. Settlement discussions continued since then, and included informal information gathering and numerous conferences, meetings and telephone conversations. The Commission's Trial Staff participated actively in the discussions. Judge Johnson submitted periodic reports to the Commission on the progress of the settlement discussions.

5

A9

Ultimately, the settlement discussions culminated in the Settlement Agreement being filed herewith. The Settling Parties are AEP and the Joint Intervenors. MOPC and Virginia Consumer Counsel have indicated by their signature on the Settlement Agreement that, while they are not Settling Parties, they will not contest the settlement. Thus, all of the entities that protested AEP's rate filing are either Settling Parties or have indicated in writing that they will not contest the Settlement Agreement. The only entities that are not Settling Parties and have not indicated by their signature on the Settlement Agreement that they do not object to the Settlement Agreement are the Commission Trial Staff and various other intervenors, including several other PJM transmission-owning utilities who had intervened in the proceeding but had not filed protests. AEP has canvassed all of the intervenors who elected not to sign the Settlement Agreement andotests. AEP has canvassed all of the intervenors who elected not to join in the Settlement and understands that they either support or do not oppose the Settlement Agreement.

## II.    SUMMARY OF SETTLEMENT AGREEMENT

The substantive terms of the Settlement Agreement are set forth in five Attachments to the Settlement Agreement, as follows:

     A. Cost of Service and Formula Rate Settlement Principles;

     B. Revised tariff language, in Blacklined (B-1) and Clean (B-2) format, that will be incorporated in the PJM OATT;

     C. Interest Calculation Examples Pursuant to 18 C.F.R. § 35.19a;

     D. Populated Formula Rate Template for Rates Effective July 1, 2009; and

     E. Allowable PBOP Expense Formula.

6

A10

The following is a summary of each of the Attachments:

## A.   Cost-of-Service and Formula Rate Settlement Principles

The Cost-of-Service and Formula Rate Settlement Principles (Attachment A to the Settlement Agreement) set forth agreed-upon methods for determining certain specified elements of the ATRR[6]. The principles cover a variety of TCOS elements and related matters, including retail vs. wholesale ratemaking practices, costs of transmission studies, rate base, expenses, capital structure, costs of capital, return on common equity, cost allocator factors, and formula rate implementation.

Significant provisions in Attachment A include agreements regarding return on equity, capital structure, cost of capital, and interest rate derivative hedging on long term debt (collectively "Cost of Capital"), treatment of Post Retirement Benefits Other Than Pensions ("PBOP") expenses and transmission depreciation rates.

**1.   Cost of Capital.** The agreements on Cost of Capital are set forth in Section I. D. of Attachment A. The agreed-upon cost of common equity to be used in the formula rate is 10.99%, plus a 50 basis point adder for AEP's continuing participation in the PJM RTO, resulting in an 11.49% total ROE. The Settlement Agreement also limits the amount of any incentive ROE that AEP may seek for a period of 36 months from the effective date of the Settlement. That limitation is 125 basis points above the Base ROE. This limits to 12.74% the ROE that AEP may request for any project as to which AEP seeks an incentive ROE. For the period between March 1, 2009 and December 31, 2011, specified maximum percentages ("Equity Caps") will apply to the amounts of common

---

[6] As filed, the rate formula contained initial inputs for the charges that, pursuant to the Commission's September 30 Order, became effective March 1, 2009, subject to refund, and remained in effect until June 30, 2009. AEP has posted its first annual update of the inputs to the formula rate, which went into effect on July 1, 2009 and will remain in effect until June 30, 2010, subject to true-up as described in the formula.

7

equity in AEP's capital structure that AEP can use in determining the after-tax weighted

average cost-of-equity for purposes of the formula rate (regardless of the actual

percentage of equity). The Equity Caps are: 55% for Ohio Power Company, 51% for

Columbus Southern Power, and 50% for Appalachian Power, Indiana Michigan Power,

and Kentucky Power. The Equity Caps will be implemented only in TCOS calculations

pursuant to provisions governing the annual reconciliation between projected and actual

costs ("true-up" provisions) of the Formula Rate (that is, the Equity Caps will not apply

in the Annual Updates except for the portion of the update that trues-up the prior-year

cost of service). Further, if the amount of common equity in the actual capitalization of

any AEP East Company subject to an Equity Cap exceeds the Equity Cap, the amount of

common equity exceeding the cap will be assigned the same cost rate as long-term debt.

Finally, there is an agreed-upon limitation on the amount of gains or losses from certain

eligible interest rate hedging in which AEP may engage that is includible in the cost of

debt. Those gains or losses may not exceed an amount that is equal to five (5) basis

points in the weighted average cost of capital.

      **2.    PBOP Expenses.** The treatment of PBOP Expenses is addressed in

Section I.C.6 of Attachment A. The Settling Parties have agreed upon a specified amount

of PBOP expenses ($48.1 million) that will be allocable to the TCOS based on a labor

expense allocator. The Settling Parties also have agreed to a process, which is set forth in

Attachment F, for changing that amount in the event that AEP either over-recovers or

under-recovers such expenses on a cumulative basis from and after the effective date of

the Settlement. Any change in the stated PBOP expense amount that is required by the

agreed-upon process must be filed with the Commission under Section 205 before it can

8

become effective in the formula rate. The Settlement provides that the methodology for determining whether a change in the stated PBOP expense is required (because the amount of over- or under-recovery exceeds a specified threshold) is subject to the *Mobile-Sierra* "public interest" standard.

        3.   **Depreciation Rates.**  Depreciation rates are addressed in Section I.C.5 of Attachment A. The Settling Parties have agreed that the formula rate would use AEP's composite depreciation rates which are based on state commission-approved and FERC-approved depreciation rates. Attachments B-1 and B-2 contain a summary of AEP's state approved depreciation rates for transmission plant. AEP will make a section 205 filing at FERC to seek changes to its composite depreciation rate methodology or to reflect in the formula rate calculations any change in state-approved or FERC-approved depreciation rates.

        **B.**    **Revised Tariff Sheets**

      Resolution of the issues as set forth in Attachment A requires certain changes to the tariff sheets for transmission services for the AEP Zone. Attachments B-1 and B-2 provide tariff language, including the Formula Rate Implementation Protocols, that the Settling Parties have agreed is necessary to implement the Settlement Agreement. Accordingly, these attachments will be incorporated in the PJM OATT following Commission approval of the Settlement Agreement.

      Among other changes, the revised Formula Rate Implementation Protocols provide more time than originally proposed for customers to submit information requests and raise challenges to the Annual Updates. The Formula Rate Implementation Protocols provide that, except as expressly provided, nothing in the formula rate limits any

9

interested party's rights to make a filing under Section 205, 206 or 306 of the Federal Power Act.

## C.   Revised Formula Rate Template

The Blank Formula Rate Template ,which is included in Attachments B-1 and B-2, has been revised from that accepted by the Commission in its September 30, 2008 and March 13, 2009 Orders to reflect the Cost-of-Service and Formula Rate Settlement Principles set forth in Attachment A.

## D.   Interest Calculation Examples

The Settlement Agreement provides that the True-Up adjustments for AEP revenue requirements will be rolled forward to be refunded or collected during the next Rate Year.  The Interest Calculation Examples contained in Attachment C to the Settlement Agreement illustrate how interest on refunds or additional charges will be computed in each case, consistent with using an amortization methodology with interest rates derived from provisions of 18 C.F.R. § 35.19a.

## E.   Populated Formula Rate Template for Rates Effective July 1, 2009

Resolution of the issues as set forth in Attachment A requires changes to the populated Formula Rate Template for rates effective July 1, 2009 through June 30, 2010 (posted in May 2009).  Attachment D to Appendix B consists of the agreed-upon populated Formula Rate Template, which calculates the ATRR for the Rate Year beginning July 1, 2009 and ending June 30, 2010 based on the settlement methodology. AEP will submit a Motion to expedite implementation of the revised rates resulting from the revised populated template effective January 1, 2010.  If approved, this change in

10

A14

going forward invoicing will reduce the collections, and subsequent refunds due, for the last six months of the Rate Year.

### III.   PROCEDURAL ASPECTS OF SETTLEMENT AGREEMENT

The remaining provisions of the Settlement Agreement address procedural aspects of the Settlement Agreement including implementation, non-severability, rights reserved, waiver and amendment, and the scope of review.  Specifically, with specified exceptions, the standard of review for modifications to the Settlement Agreement (including changes to the formula rate and values used in computing the formula rate) that are proposed by any Settling Party will be the "just and reasonable" standard under FPA § 205/206. Certain specific provisions are subject to a more stringent standard for unilateral modification requests: *viz.*, the "public interest" standard adopted in the *Sierra-Mobile* line of cases.  Provisions as to which a unilateral request for modification would require a "public interest" showing are: (i) the methodology set forth in Attachment A, section I.C.6, for determining whether AEP is required to file a change to the PBOP expense allowance; (ii) the duration and amount of the Equity Caps established pursuant to Attachment A, paragraph I.D.2.c; (iii) the duration and amount of the limitation, set forth in Attachment A, paragraph I.D.1.a, on the amount of any incentive return on common equity AEP may request; and (iv) the limitation on the amount of eligible hedging gains and losses AEP may reflect in the cost of long-term debt.  The standard of review for modifications to the Settlement Agreement proposed by any non-party to the Settlement Agreement and the Commission acting *sua sponte*, after it is approved by the Commission, will be the most stringent standard permitted by law.

### IV.   RESPONSES TO REQUIRED QUESTIONS

11

A15

By order dated October 23, 2003, the Chief Administrative Law Judge requires that five questions be answered as part of every Explanatory Statement submitted in support of a proposed settlement. The questions and specific responses thereto applicable to this Settlement Agreement are as follows:

**1.     What are the issues underlying the settlement and what are the major implications?**

The issues raised in this proceeding that underlie the Settlement Agreement are:

What should be the appropriate Formula Rate Template to determine annual transmission revenue requirements at each annual Update, and what just and reasonable provisions and protocols should the formula rate contain?

**2.     Whether any of the issues raise policy implications.**

The resolution of the underlying issues does not raise any policy implications.

**3.     Whether other pending cases may be affected.**

The Settlement Agreement addresses the specific transmission service formula rates at issue in this proceeding. No other pending cases are affected.

**4.     Whether the settlement involves issues of first impression, or if there are any previous reversals on the issues involved?**

There are no issues of first impression presented in this proceeding or resolved by the Settlement Agreement. There are no previous reversals with respect to the transmission formula rates at issue in this proceeding.

**5.     Whether the proceeding is subject to the just and reasonable standard or whether there is *Mobile-Sierra* language making it the standard, *i.e.*, the applicable standards of review.**

This proceeding on AEP's rate filing is subject to the just and reasonable standard. Section 6.7 of the Settlement Agreement states that, except as specified, a unilateral request by a Settling Party to modify any provision of the Settlement

12

A16

Agreement would be subject to the "just and reasonable" standard under FPA §205/206. Section 6.7 also identifies the provisions of the Settlement Agreement as to which a unilateral request for modification by a Settling Party would be governed by the more stringent "public interest" standard of *Sierra-Mobile*. As for a unilateral modification request by a non-Settling Party or a proceeding in which the Commission acting *sua sponte* seeks to modify the Settlement Agreement, the standard of review shall be the most stringent standard permitted by applicable law.

## V.    CONCLUSION

As discussed above, the attached Settlement Agreement resolves all issues in the captioned proceeding, and the Settling Parties urge the Commission to accept the Settlement Agreement without condition or modification. The Settling Parties in this proceeding have authorized counsel for AEP to make this filing on their behalf.

Respectfully submitted,

Kevin F. Duffy
Monique Rowtham-Kennedy
American Electric Power Service Corporation
801 Pennsylvania Avenue, N.W.
Suite 320
Washington, D.C. 20004-2684
Telephone: 202-383-3436
Fax: 202-383-3459
Counsel for American Electric Power Service
Corporation

April 7, 2010

13

A17

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Settlement filed by American Electric Power

Service Corporation was served upon the parties to this proceeding this <u>seventh</u> day

of <u>April</u> 2010.

Monique Rowtham-Kennedy
American Electric Power Service Corporation
801 Pennsylvania Avenue, N.W.
Suite 320
Washington, D.C. 20004-2684
Telephone: 202-383-3436
Fax: 202-383-3459

14

A18

Document Accession #: 20100927-0005     Filed Date: 09/24/2010

ORIGINAL



FILED
SECRETARY OF THE
COMMISSION

2010 SEP 24 P 3: 51

FEDERAL ENERGY
REGULATORY COMMISSION

**American Electric Power**
801 Pennsylvania Avenue N.W.
Suite 320
Washington, DC 20004
AEP.com

September 24, 2010

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A
Washington, D.C. 20426

**Monique Rowtham-**
**Kennedy**
Senior Counsel –
Regulatory Services
(202) 383-3436
(202) 383-3459 (F)

Re:   **American Electric Power Service Corporation,**
        FERC Docket No. ER10-355-000

Dear Secretary Bose:

Pursuant to Rule 602 of the Federal Energy Regulatory Commission's (the "Commission") Rules of Practice and Procedure, 18 C.F.R.§385.602 (2010), American Electric Power Service Corporation ("AEPSC") on behalf of its affiliates, AEP Appalachian Transmission Company Inc., AEP Indiana Michigan Transmission Company Inc., AEP Kentucky Transmission Company Inc., AEP Ohio Transmission Company Inc., and AEP West Virginia Transmission Company Inc. (collectively the "AEP East Transmission Companies")  and AEP Southwestern Transmission Company Inc., and AEP Oklahoma Transmission Co., Inc. (collectively the "AEP West Transmission Companies") (AEPSC, the AEP East Transmission Companies and the AEP West Transmission Companies are collectively referred to herein as "AEP"), and on behalf of the Blue Ridge Power Agency, Craig-Botetourt Electric Cooperative,  East Texas Electric Cooperative, Northeast Texas Electric Cooperative, Inc., Tex-La Electric Cooperative of Texas, Inc., Indiana Municipal Power Agency, Old Dominion Electric Cooperative, American Municipal Power, Inc., The AEP Intervenor Group, Buckeye Power, Inc., Arkansas Electric Cooperative Corporation and Golden Spread Cooperative, Inc., and Indiana Michigan Municipal Distributors Association (individually, a "Settling Party," and, collectively, the "Settling Parties") submit an original and fourteen copies of  an Offer of Settlement intended to resolve without need for evidentiary procedures all issues set for hearing in the captioned proceedings.

This Offer of Settlement includes the following documents:

Document Accession #: 20100927-0006   Filed Date: 09/24/2010

Kimberly D. Bose, Secretary
September 24, 2010
Page 2 of 3

1. Explanatory Statement (Appendix A);

2. Settlement Agreement (Appendix B), and several attachments described below;

3. Draft Order Approving Settlement Agreement (Appendix C), and

4. Service List (Appendix D).

The attachments to the Settlement Agreement, Appendix B, include the following:

1. Attachment A-1, Cost of Service and Formula Rate Settlement Principles for the AEP East Transmission Companies;

2. Attachment A-2 Formula Rate Implementation Protocols for the AEP East Transmission Companies

3. Attachment B-1, Cost of Service and Formula Rate Settlement Principles for the AEP West Transmission Companies

4. Attachment B-2 Formula Rate Implementation Protocols for the AEP West Transmission Companies

5. Attachment C-1, Revised PJM (Part A) and SPP (Part B) Tariff language (Blacklined);

6. Attachment C-2, Revised PJM (Part A) and SPP (Part B) Tariff language (Clean);

7. Attachment D, AEP Transmission Companies' (Part A – PJM, Part B – SPP) Populated Formula Rate Templates for Revised Rates Effective July 1, 2010.

All parties in this proceeding and the Commission's Trial Staff have had the opportunity to review and comment on the Offer of Settlement, and no party has indicated an intention to contest its provisions. The Settling Parties expect this Offer of Settlement to be unopposed. PJM Interconnection, LLC ("PJM") and the Southwest Power Pool ("SPP") have represented to AEP that, if the Commission approves the Offer of Settlement, PJM and SPP will file conformed tariff sheets implementing the settlement's terms.

AEP requests that the appropriate number of copies of this filing be transmitted to Presiding Administrative Law Judge David Coffman in accordance with Commission Rule 602(b)(2)(i). In accordance with Rule 602(d), copies of this filing have been served on all participants in this proceeding and on all affected transmission owners and customers within PJM.

The Settling Parties request that, if the Settlement Agreement is unopposed and if no comments contesting the Settlement Agreement have been filed once the comment

Document Accession #: 20100927-0005    Filed Date: 09/24/2010

Kimberly D. Bose, Secretary
September 24, 2010
Page 3 of 3

period specified in Rule 602(f) has passed, the Settling Parties request that Judge
Coffman certify the Settlement Agreement to the Commission, as required by Rule
602(g)(1), as expeditiously as possible.

Respectfully submitted,

Monique Rowtham-Kennedy
Senior Counsel
American Electric Power Service Corporation

Enclosures

A21

Document Accession #: 20100527-0005    Filed Date: 09/14/2010

# APPENDIX A
# EXPLANATORY STATEMENT

Document Accession #: 20100927-0009    Filed Date: 09/24/2010

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

American Electric Power Service     )          Docket No. ER10-355-000
Corporation                         )

**EXPLANATORY STATEMENT
IN SUPPORT OF SETTLEMENT AGREEMENT**

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18

C.F.R. § 385.602 (2010), American Electric Power Service Corporation ("AEPSC"), on

behalf of AEP Appalachian Transmission Company Inc., AEP Indiana Michigan

Transmission Company Inc., AEP Kentucky Transmission Company Inc., AEP Ohio

Transmission Company Inc., and AEP West Virginia Transmission Company Inc.

(collectively the "AEP East Transmission Companies"),  and AEP Southwestern

Transmission Company Inc., and AEP Oklahoma Transmission Co., Inc. (collectively the

"AEP West Transmission Companies") (AEPSC, the AEP East Transmission Companies

and the AEP West Transmission Companies are collectively referred to herein as

"AEP"), and on behalf of the Blue Ridge Power Agency, Craig-Botetourt Electric

Cooperative,  East Texas Electric Cooperative, Northeast Texas Electric Cooperative,

Inc., Tex-La Electric Cooperative of Texas, Inc., Indiana Municipal Power Agency, Old

Dominion Electric Cooperative, American Municipal Power, Inc., The AEP Intervenor

Group, Buckeye Power, Inc., Arkansas Electric Cooperative Corporation and Golden

Spread Cooperative, Inc. ("AECC/Golden Spread"), and Indiana Michigan Municipal

Distributors Association (individually, a "Settling Party," and, collectively, the "Settling

Parties") submit this Explanatory Statement in support of the concurrently filed

1

A23

Document Accession #: 20100527-0005   Filed Date: 05/24/2010

Settlement Agreement, which is intended to resolve all issues set for hearing in this proceeding.

## I.   INTRODUCTION

The AEP East Transmission Companies and the AEP West Transmission Companies are transmission owning public utility subsidiaries of the AEP Transmission Company, LLC ("AEPTCo"). AEPSC is a company that provides professional and business services to the AEPTCo and its subsidiaries. The AEP East Transmission Companies are members of the PJM Interconnection, LLC ("PJM") and the AEP West Transmission Companies are members of Southwest Power Pool ("SPP"). PJM and SPP are Commission-approved regional transmission organizations ("RTOs") which, among other things, offer transmission service on a regional basis pursuant to an Open Access Transmission Tariff ("OATT"). AEP established AEPTCo to develop, construct, own and operate transmission facilities interconnected to existing AEP operating companies' facilities within the PJM and SPP RTO regions.

On December 1, 2009, AEP filed with the Commission an application requesting acceptance of a formula rate to recover the costs of investments in transmission facilities owned by AEPTCo subsidiaries in the PJM and SPP regions. The proposed formula rates are similar to formula rates on file for operating company subsidiaries of American Electric Power Company, Inc. ("AEP") in PJM and in SPP.[1]  Like those formula rates, the proposed formula rates would establish an up-to-date revenue requirement for transmission services over the facilities of the AEPTCo subsidiaries under the PJM and

---

[1] *See American Elec. Power Serv. Co. ,* 127 FERC ¶ 61,292 (2009);  *See also American Elec. Power Serv. Co,,* 124 FERC ¶ 61,306 (2008)

Document Accession #: 20100327-0000    Filed Date: 00/24/2010

SPP OATTs, as applicable, and implement a transmission cost of service formula rate
similar to formula rates that the Commission has accepted for other transmission owners
within RTOs. AEPSC requested that the proposed rates be accepted effective February 1,
2010.

Motions to intervene in this proceedings were filed by Blue Ridge Power Agency,
Craig-Botetourt Electric Cooperative,  East Texas Electric Cooperative, Northeast Texas
Electric Cooperative, Inc., Tex-La Electric Cooperative of Texas, Inc., Indiana Municipal
Power Agency, Old Dominion Electric Cooperative, American Municipal Power, Inc.,
The AEP Intervenor Group, Buckeye Power, Inc., ( collectively, the "Indicated
Intervenors"), AECC/Golden Spread, the Maryland Office of Peoples Counsel
("MOPC"), Indiana Michigan Municipal Distributors Association , North Carolina
Electric Membership Corporation, Kentucky Public Service Commission, Public Service
Commission of Maryland, Public Service Electric and Gas Company, Indiana Utility
Regulatory Commission ("IURC" or "Indiana Commission"), Indiana Office of Utility
Consumer Counselor, Pennsylvania Public Utility Commission,  Public Utilities
Commission of Ohio, Arkansas Public Service Commission, Southwest Power Pool, Inc.,
Oklahoma Municipal Power Authority, Old Dominion Committee for Fair Utility Rates,
Steel Dynamics, Inc., and Exelon Corporation.

Protests of AEP's filing were submitted by the Indicated Intervenors, MOPC,
Indiana Commission and AECC/Golden Spread.  AEP filed an answer to the protests on
January 6, 2010 and AECC/Golden Spread filed an answer to AEP's answer on January
21, 2010.  On January 28, 2010, the Commission issued an order accepting AEP's
proposed formula rates for filing, suspended their effectiveness for five months, to be

3

A25

effective July 1, 2010, subject to refund and condition, and to the outcome of hearing and settlement judge procedures. *Order Accepting And Suspending Formula Rates, Subject To Refund, And Establishing Hearing And Settlement Judge Procedures,* 130 FERC ¶ 61,075 (2010).

On March 1, 2010, AECC/Golden Spread filed a Motion For Clarification Or, In The Alternative, Request For Rehearing seeking clarification or rehearing that (1) the Commission's approval of a 50 basis point ROE adder for RTO membership did not constitute approval of the requested ROE of 11.9 percent or a determination that AEP did not violate the settlement approved in Docket No. ER07-1069 by filing for an ROE in excess of 11.2 percent prior to January 31, 2011 and (2) the fact that the Commission did not summarily reject AEP's filing constitutes neither a finding that the filing did not violate the filed rate nor a determination that no remedy would be appropriate if the filed rate were found to have been violated. This Motion is still pending.

The Honorable David H. Coffman was appointed Settlement Judge. Judge Coffman convened the first settlement conference on April 6, 2010. Settlement discussions continued thereafter, and included informal information gathering and numerous conferences, meetings and telephone conversations. The Commission's Trial Staff participated actively in the discussions. Judge Coffman submitted periodic reports to the Commission on the progress of the settlement discussions. Ultimately, the settlement discussions culminated in the Settlement Agreement being filed herewith. The Settling Parties are AEP, the Blue Ridge Power Agency, Craig-Botetourt Electric Cooperative, East Texas Electric Cooperative, Northeast Texas Electric Cooperative, Inc., Tex-La Electric Cooperative of Texas, Inc., Indiana Municipal

4

A26

Document Accession #: 20150427-5035    Filed Date: 09/24/2010

Power Agency, Old Dominion Electric Cooperative, American Municipal Power, Inc.,
The AEP Intervenor Group, Buckeye Power, Inc., AECC/Golden Spread, and Indiana
Michigan Municipal Distributors Association.  It is the understanding of the Settling
Parties that MOPC and Indiana Commission may file comments on the appropriateness
of the rate filing of the AEP Transcos.  Commission Trial Staff and various other
intervenors are also not parties to the Settlement.  However Commission Trial Staff has
indicated that it will support the settlement.  Other intervenors have indicated that they
either take no position with respect to the Settlement or do not oppose it.[2]   Kentucky
Public Service Commission ("KPSC") neither supports nor opposes the settlement with
the understanding that AEP Kentucky Transmission Company Inc. will seek approval
from the KPSC before constructing or financing any facilities that would otherwise be
constructed or financed by Kentucky Power Company where such construction or
financing by Kentucky Power Company would require KPSC approval.

## II.     SUMMARY OF SETTLEMENT AGREEMENT

The substantive terms of the Settlement Agreement are set forth in five

Attachments to the Settlement Agreement, as follows:

- Attachment A-1, Cost of Service and Formula Rate Settlement Principles
  for the AEP East Transmission Companies;
- Attachment A-2 Formula Rate Implementation Protocols for the AEP East
  Transmission Companies

---

[2] The following parties have indicated that the take no position with respect to the Settlement:  MOPC,
Steel Dynamics, Inc.,  Public Service Commission of Maryland, Public Service Electric and Gas Company,
Indiana Office of Utility Consumer Counselor, Pennsylvania Public Utility Commission,  Public Utilities
Commission of Ohio, Arkansas Public Service Commission, Southwest Power Pool, Inc., Old Dominion
Committee for Fair Utility Rates and Oklahoma Municipal Power Authority.

5

Document Accession #: 20100527-0000    Filed Date: 05/24/2010

- Attachment B-1, Cost of Service and Formula Rate Settlement Principles for the AEP West Transmission Companies

- Attachment B-2 Formula Rate Implementation Protocols for the AEP West Transmission Companies

- Attachment C-1, Revised PJM (Part A) and SPP (Part B) Tariff language (Blacklined);

- Attachment C-2, Revised PJM (Part A) and SPP (Part B) Tariff language (Clean);

- Attachment D, AEP Transmission Companies' (Part A – PJM, Part B – SPP) Populated Formula Rate Templates for Revised Rates Effective July 1, 2010.

The following is a summary of each of the Attachments:

### A.    Cost-of-Service and Formula Rate Settlement Principles

The Cost-of-Service and Formula Rate Settlement Principles (Attachment A-1 and Attachment B-1 to the Settlement Agreement) set forth agreed-upon methods for determining certain specified elements of the Annual Transmission Revenue Requirements ("ATRR").[4]   The principles in Attachment A-1 apply to the formula rates of the AEP East Transmission Companies and the principles set forth in Attachment B-1 apply to the formula rates of the AEP West Transmission Companies.   The principles cover a variety of TCOS elements and related matters, including retail vs. wholesale ratemaking practices, costs of transmission studies, rate base, expenses, capital structure, return on common equity and other costs of capital, cost allocation factors, and formula rate implementation processes and procedures.

Significant provisions in Attachment A-1 and B-1 include agreements regarding formation costs; return on equity, capital structure, long term debt cost, and interest rate

---

[4]  AEP has posted its first annual update of the inputs to the formula rate, which went into effect on July 1, 2010 and will remain in effect until June 30, 2011, subject to true-up as described in the formula.

6

A28

Document Accession #: 20100527-0000    Filed Date: 09/24/2010

derivative hedging on long term debt (collectively "Cost of Capital"); treatment of Post Retirement Benefits Other Than Pensions ("PBOP") expenses; and transmission depreciation rates.

### 1.    Formation Costs

The agreements regarding treatment of Formation Costs are set forth in Section I.C.7 of Attachment A-1 and in Section I.C.8 of Attachment B-1.  The Settlement provides that one half of the AEP Transmission Companies' Formation costs incurred before June 30, 2010 will be included in the formula rate, with such amount to be allocated equally among the AEP Transmission Companies and amortized over four years.  There will be no carrying charges on the unamortized balance of recoverable formation costs.  Formation costs incurred after June 30, 2010 shall not be included in the transmission formula rates of the AEP Transmission Companies or the AEP Operating Companies and shall not be otherwise recoverable in FERC-regulated rates.

### 2.    Cost of Capital

#### (a) The AEP East Transmission Companies

The agreements on Cost of Capital for the AEP East Transmission Companies are set forth in Section I. D. of Attachment A-1.  The agreed-upon cost of common equity to be used in the formula rate is 10.99%, plus a 50 basis point adder for AEP's continuing participation in the PJM RTO, resulting in an 11.49% total ROE ("Base ROE").  The Settlement Agreement also limits the amount of any incentive ROE that AEP may seek for a period of 36 months from the effective date of the Settlement.  That limitation is 125 basis points above the Base ROE.  This limits to 12.74% the ROE that AEP may request for any project as to which AEP seeks an incentive ROE.

7

A29

Document Accession #: 20100527-0000    Filed Date: 09/24/2010

The Settlement also provides that the AEP East Transmission Companies will establish long-term debt ("LTD") and equity investments in the AEP East Transmission Companies as soon as is practicable (*i.e.,* establish actual capital structure and long term debt and preferred equity costs). Until that time, the AEP East Transmission Companies will use the actual consolidated (weighted composite) capital structure and LTD cost rate of the AEP Operating Companies in PJM[3], subject to a 50% equity ratio cap. When applied to the consolidated East Operating Companies' actual capital structure, the individual Operating Company equity caps pursuant to the East Operating Companies' settlement in Docket ER08-1329 shall be applied first before the 50% Equity Cap pursuant to the instant settlement is applied to the weighted composite East Operating Companies' capital structure. The composite weighted average long term debt cost rate of the East Operating Companies, exclusive of hedging costs and Indiana-Michigan Operating Company's spent nuclear fuel disposal funding costs, shall apply.

When an individual AEP East Transmission Company has an actual capital structure, which is first achieved when the Transmission Company issues its own first long term debt issuance in its own name, or the individual Transmission Company has debt financing specifically allocated from an issuance by AEP Transmission Company LLC or AEP Transmission Holding Company LLC or a higher AEP corporate entity, the actual long term debt cost and capital structure of that individual East Transmission Company shall be used in the Projected and True Up formula rates for that individual

---

[3]    The AEP Operating Companies in PJM are: Appalachian Power Company, Columbus Southern Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, and Wheeling Power Company.

Document Accession #: 20100427-0000   Filed Date: 09/24/2010

company, subject to the 50% Equity Ratio cap.  In transitioning from the use of the proxy composite capital cost of the East Operating Companies in PJM to an actual capital structure, long term debt cost and preferred equity cost, a transitioning AEP East Transmission Company's actual capital structure and cost rates will be implemented for the projected transmission cost of service in the first formula rate Annual Update after the issuance of long-term debt or allocation of debt financing from an associated company establishing the transitioning East Company's actual capital structure and cost of debt. The True-Up TCOS in that Annual Update will continue to be based on the East Operating Companies' composite capital structure and LTD cost, and preferred equity costs. Further, if the amount of common equity in the weighted composite East Operating Companies' capitalization or in the actual capitalization of any AEP East Transmission Company exceeds the Equity Cap, the amount of common equity exceeding the cap will be assigned the same cost rate as long-term debt. The Equity Ratio cap can be removed or adjusted only after June 30, 2013 and only through a filing under section 205 or 206 of the Federal Power Act.

### (b) The AEP West Transmission Companies

The agreements on Cost of Capital for the AEP West Transmission Companies are set forth in Section I. D. of Attachment B.  The agreed-upon cost of common equity to be used in the formula rate is 11.2%, including a 50 basis point adder for AEP's continuing participation in the SPP RTO.  The Settlement also establishes a Moratorium Period from July 1, 2010 through and including June 30, 2013 during which time AEP will limit any request for an incentive ROE pursuant to Order No. 679 or Order No. 679-

9

A31

Document Accession #: 20120327-0000   Filed Date: 03/26/2010

A to not more than the base ROE plus 125 basis points. This limits to 12.45% the ROE that AEP may request for any project as to which AEP seeks an incentive ROE. The Settlement also provides that the AEP West Transmission Companies will establish LTD and Equity investments in the AEP West Transmission Companies as soon as is practicable (actual capital structure and long term debt costs and preferred equity costs). Until that time, the AEP Southwestern Transmission Company will use the actual capital structure and LTD cost rate of Southwestern Electric Power Company, Inc ("SWEPCO") subject to the 52.5% equity ratio cap provided in the Settlement approved in Docket No. ER07-1069 and AEP Oklahoma Transmission Company will use the actual capital structure and LTD cost rate of Public Service Company of Oklahoma ("PSO") subject to the 52.5% equity ratio cap provided in the Settlement approved in Docket No. ER07-1069. After an AEP West Transmission Company issues long term debt, or receives a specific allocation of long term debt financing issued by AEP Transmission Company LLC or AEP Transmission Holding Company LLC or another AEP entity other than an AEP operating company, its actual capital structure and cost of debt, subject to the Equity Ratio Cap described in section I.D.2(c) of Attachment B-1, will be implemented for the Projected TCOS in the first formula rate Annual Update after the individual AEP West Transmission Company's issuance of long-term debt or receipt of a specific allocation of long term debt financing issued by AEP Transmission Company LLC or AEP Transmission Holding Company LLC or another AEP entity other than an AEP Operating Company to establish the such company's actual capital structure and cost of debt. In the rate year when an individual AEP West Transmission Company transitions to actual capital structure and debt cost pursuant to this Settlement, the True-Up TCOS in

10

A32

Document Accession #: 20120927-0000   Filed Date: 09/24/2010

that Annual Update for that transition rate year will continue to be based on PSO's actual

capital structure and LTD cost rate. Appendix B-1.2 to Attachment B-1 describes the

manner in which the weighted average composite capital structure and cost of long term

debt and preferred equity costs of the AEP West Operating Companies shall be

calculated. In applying the formula rate, the amounts of common equity, used in

determining the weighted average cost of capital to be used for an AEP West

Transmission Company, shall not exceed 50% percent of the total true-up capitalization

("Equity Cap"), regardless of the actual amounts of common equity capital outstanding.

The Equity Cap can be removed or adjusted only after June 30, 2013 and only through a

filing under section 205 or 206 of the Federal Power Act.

      **2.**   **PBOP Expenses.** The treatment of PBOP Expenses is addressed in

Section I.C.6 of Attachment A-1 and in Section I.C.7 of Attachment B-1. The Settling

Parties have agreed upon a specified rate for inclusion of PBOP costs in O&M expenses

($0.094 x dollar cost of direct labor expense). For the AEP East Transmission

Companies, the Settling Parties also have agreed to a process for changing that amount in

the event that the AEP Transmission Companies are projected to either over-recover or

under-recover such expenses on a cumulative basis from and after the effective date of

the Settlement. Any change in the stated PBOP expense amount that is required by the

agreed-upon process must be filed with the Commission under Section 205 before it can

become effective in the formula rate. The Settlement provides that the methodology for

determining whether a change in the stated PBOP expense is required (because the

amount of over- or under-recovery exceeds a specified threshold) is subject to the

*Mobile-Sierra* "public interest" standard.

11

A33

Document Accession #: 20100527-0000    Filed Date: 05/24/2010

3.    **Depreciation Rates.**  Depreciation rates are addressed in Section I.C.5 and Appendix A.1.2 of Attachment A-1 and Section I.C.9 and Appendix B.1.1 of Attachment B-1.  The Settling Parties have agreed that the formula rate would use AEP's composite depreciation rates which are based on state commission-approved and FERC-approved depreciation rates. Appendices A.1.2 and B.1.1 each contain a summary of AEP's state approved depreciation rates for transmission plant.  AEP will make a section 205 filing at FERC to seek changes to its composite depreciation rate methodology or to reflect in the formula rate calculations any change in state-approved or FERC-approved depreciation rates.

**B.    Revised Tariff Sheets**

Resolution of the issues as set forth in Attachments A-1, A-2, B-1 and B-2 requires certain changes to the tariff sheets for transmission services for the AEP Zone. Attachments C-1 and C-2 provide tariff language, including the Formula Rate Implementation Protocols, that the Settling Parties have agreed are necessary to implement the Settlement Agreement in the PJM and SPP RTO regions, respectively. Accordingly, these attachments will be incorporated in the PJM and SPP OATTs following Commission approval of the Settlement Agreement.

Among other changes, the revised Formula Rate Implementation Protocols provide more time than originally proposed for customers to submit information requests and raise challenges to the Annual Updates.  The Formula Rate Implementation Protocols provide that, except as expressly provided, nothing in the formula rate limits any interested party's rights to make a filing under Section 205, 206 or 306 of the Federal Power Act.

12

A34

Document Accession #: 20100927-0000   Filed Date: 09/24/2010

### C.   Revised Formula Rate Template

The Blank Formula Rate Templates,which are included in Attachments C-1 and C-2, have been revised from that accepted by the Commission in its January 28, 2010 Order to reflect the Cost-of-Service and Formula Rate Settlement Principles set forth in Attachments A-1 and B-1.

### D.   Populated Formula Rate Template for Rates Effective July 1, 2010

Resolution of the issues as set forth in Attachments A-1 and B-1 requires changes to the populated Formula Rate Template for rates effective for the first Rate Year July 1, 2010 through June 30, 2011 (posted in May 2010).  Attachment D to Appendix B consists of the agreed-upon populated Formula Rate Templates, which calculate the (projected) Annual Transmission Revenue Requirement for the first Rate Year based on net plant projected to December 31, 2010 and otherwise historical 2009 cost data pursuant to the settlement methodologies for the AEP East and West Transmission Companies, respectively.  AEP will submit a Motion to expedite implementation of the revised rates resulting from the revised populated template effective July 1, 2010.  If approved, this change in going forward invoicing will reduce the collections, and subsequent refunds due upon true-up to actual calendar year 2010 costs in the 2011 Annual Update.

### III.   PROCEDURAL ASPECTS OF SETTLEMENT AGREEMENT

The remaining provisions of the Settlement Agreement address procedural aspects of the Settlement Agreement including implementation, non-severability, rights reserved, waiver and amendment, and the scope of review.  Specifically, with specified exceptions, the standard of review for modifications to the Settlement Agreement (including changes

Document Accession #: 20100927-0000    Filed Date: 09/24/2010

to the formula rate and values used in computing the formula rate) that are proposed by any Settling Party will be the "just and reasonable" standard under FPA § 205/206. Certain specific provisions are subject to a more stringent standard for unilateral modification requests: *viz.*, the "public interest" standard adopted in the *Sierra-Mobile* line of cases. Provisions as to which a unilateral request for modification would require a "public interest" showing are: (i) the methodology set forth in Attachment A-1, section I.C.6, for determining whether AEP is required to file a change to the PBOP expense allowance; (ii) the duration and amount of the Equity Ratio Caps established pursuant to Attachment A-1 and Attachment B-1; and (iii) the duration and amount of the limitation, set forth in Attachment A-1 and Attachment B-1, on the amount of any incentive return on common equity AEP may request. The standard of review for modifications to the Settlement Agreement proposed by any non-party to the Settlement Agreement and the Commission acting *sua sponte*, after it is approved by the Commission, will be the most stringent standard permitted by law.

## IV.    RESPONSES TO REQUIRED QUESTIONS

By order dated October 23, 2003, the Chief Administrative Law Judge requires that five questions be answered as part of every Explanatory Statement submitted in support of a proposed settlement. The questions and specific responses thereto applicable to this Settlement Agreement are as follows:

### 1.    What are the issues underlying the settlement and what are the major implications?

The issues raised in this proceeding that underlie the Settlement Agreement are: What should be the appropriate Formula Rate Template to determine annual transmission

Document Accession #: 20100927-0000    Filed Date: 09/24/2010

revenue requirements at each Annual Update, and what just and reasonable provisions

and protocols should the formula rate contain?

**2.      Whether any of the issues raise policy implications.**

The resolution of the underlying issues does not raise any policy implications.

**3.      Whether other pending cases may be affected.**

The Settlement Agreement addresses the specific transmission service formula

rates at issue in this proceeding.  No other pending cases are affected.

**4.      Whether the settlement involves issues of first impression, or if there are any previous reversals on the issues involved?**

There are no issues of first impression presented in this proceeding or resolved

by the Settlement Agreement.  There are no previous reversals with respect to the

transmission formula rates at issue in this proceeding.

**5.      Whether the proceeding is subject to the just and reasonable standard or whether there is *Mobile-Sierra* language making it the standard, *i.e.,* the applicable standards of review.**

This proceeding on AEP's rate filing is subject to the just and reasonable

standard.  Section 6.7 of the Settlement Agreement states that, except as specified, a

unilateral request by a Settling Party to modify any provision of the Settlement

Agreement would be subject to the "just and reasonable" standard under FPA §205/206.

Section 6.7 also identifies the provisions of the Settlement Agreement as to which a

unilateral request for modification by a Settling Party would be governed by the more

stringent "public interest" standard of *Sierra-Mobile*.  As for a unilateral modification

request by a non-Settling Party or a proceeding in which the Commission acting *sua*

*sponte* seeks to modify the Settlement Agreement, the standard of review shall be the

most stringent standard permitted by applicable law.

15

A37

Document Accession #: 20100927-0000    Filed Date: 09/24/2010

## V.    CONCLUSION

As discussed above, the attached Settlement Agreement resolves all issues in the

captioned proceeding, and the Settling Parties urge the Commission to accept the

Settlement Agreement without condition or modification.  The Settling Parties in this

proceeding have authorized counsel for AEP to make this filing on their behalf.


Respectfully submitted,


Monique Rowtham-Kennedy
American Electric Power Service Corporation
801 Pennsylvania Avenue, N.W.
Suite 320
Washington, D.C. 20004-2684
Telephone: 202-383-3436
Fax: 202-383-3459
Counsel for American Electric Power Service
Corporation


Sept 24, 2010


16

A38

Document Accession #: 20100927-0005   Filed Date: 09/24/2010

## CERTIFICATE OF SERVICE

I hereby certify that I have this day arranged for service of the foregoing documents on each party on the official service list compiled by the Secretary in this proceeding.

Monique Rowtham-Kennedy
American Electric Power Service Corporation
801 Pennsylvania Avenue, N.W.
Suite 320
Washington, D.C. 20004-2684
Telephone: 202-383-3436
Fax: 202-383-3459

September 24, 2010

Document Accession #: 20110331-5184      Filed Date: 03/31/2011



**Gregory A. Troxell**
Assistant General Counsel
Direct Dial: 317-249-5821
E-mail: gtroxell@midwestiso.org

March 31, 2011

<u>Via E-Filing</u>

Honorable Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20246

      Re:    **Midwest Independent Transmission System Operator, Inc.
Section 205 Filing to Reflect the Termination of American Transmission
Systems, Inc.'s Status as a Transmission Operator, Owner, and Local
Balancing Authority in the Midwest Independent Transmission System
Operator, Inc.
Docket No. ER11-___-000**

Dear Secretary Bose:

      Pursuant to Section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d, and Part 35 of the regulations of the Federal Energy Regulatory Commission ("FERC" or "Commission"), 18 C.F.R. § 35, *et. seq*., the Midwest Independent Transmission System Operator, Inc. ("Midwest ISO") hereby respectfully submits proposed revisions to its Open Access Transmission, Energy and Operating Reserve Markets Tariff ("Tariff") to reflect the termination of American Transmission Systems, Inc.'s ("ATSI") status as a transmission operator, owner and local balancing authority in the Midwest ISO, effective June 1, 2011.[1]

**I.     Background**

      On August 17, 2009, FirstEnergy Service Company, on behalf of ATSI, filed a request seeking Commission approval to terminate ATSI's membership in the Midwest ISO and to transfer its facilities and operational control thereof into PJM Interconnection, L.L.C. ("PJM"). ATSI had officially given notice of its intent to withdraw from the Midwest ISO on July 31, 2009, consistent with the requirements set forth in Article Five of the Midwest ISO Transmission Owners Agreement ("TO Agreement").

---

[1]   The Midwest ISO has discussed the current filing with FirstEnergy Service Company, and they have no objections to its contents. Nothing in this filing addresses or waives the rights, arguments, legal positions, or procedural standing of FirstEnergy Service Company or any of the company's subsidiaries or affiliates in any proceedings currently pending before the Commission.

**Midwest Independent**     **Mailing Address:**     **Overnight Deliveries:**     **www.midwestiso.org**
**Transmission System Operator, Inc.**     **P. O. Box 4202**     **720 City Center Drive**     **317-249-5400**
     **Carmel, IN 46082-4202**     **Carmel, IN 46032**

Honorable Kimberly D. Bose
March 31, 2011
Page 2 of 4

On December 19, 2009, the Commission granted in part and denied in part ATSI's realignment request, subject to certain conditions.[2] Among other things, the Commission determined that ATSI had satisfied, or will satisfy, the requirements for withdrawal from the Midwest ISO, as established under the terms of the TO Agreement. ATSI's withdrawal from the Midwest ISO is currently scheduled for June 1, 2011.

**II.    DISCUSSION OF PROPOSED TARIFF REVISIONS**

The Midwest ISO proposes revisions to the following sections of the Tariff to reflect ATSI's scheduled withdrawal from the Midwest ISO, effective June 1, 2011:

- Module B, Sections 34.1 and 34.2. Section 34.1 describes the monthly demand charge for which Network Customers are responsible. Section 34.2 discusses the determination of a Network Customer's monthly network load. As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO. Accordingly, the Midwest ISO proposes to delete references to ATSI and rates and charges that are specific to ATSI that are currently included in Sections 34.1 and 34.2.

- Schedule 7: Long-Term and Short-Term Firm Point-to-Point Service. As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO. Accordingly, the Midwest ISO proposes to delete references to ATSI and rates specific to ATSI that are currently included in Schedule 7.

- Schedule 8: Non-Firm Point-to-Point Transmission Service. As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO. Accordingly, the Midwest ISO proposes to delete references to ATSI and rates specific to ATSI that are currently included in Schedule 8.

- Schedule 9: Network Integration Transmission Service. As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO. Accordingly, the Midwest ISO proposes to delete references to ATSI and rates specific to ATSI that are currently included in Schedule 9.

- Schedule 26: Network Upgrade Charge from Transmission Expansion Plan. As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO. Accordingly, the Midwest ISO proposes to delete references to ATSI that are currently included in Schedule 26.

- Attachment O: Rate Formulae. As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO. Accordingly, the Midwest ISO proposes to delete references to ATSI that are currently included in Attachment O.

---

[2]    *American Transmission Systems, Inc.*, 129 FERC ¶ 61,249 (2009).

Document Accession #: 20110331-5184        Filed Date: 03/31/2011

Honorable Kimberly D. Bose
March 31, 2011
Page 3 of 4

Likewise, the Midwest ISO also proposes to remove ATSI's Attachment O Formula Rate Template from the Tariff.

- <u>Attachment P:  List of Grandfathered Agreements</u>.  As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO.  Accordingly, references to ATSI's Grandfathered Agreements are proposed to be deleted from Attachment P.

- <u>Attachment FF-4:  Transmission Owners Integrating Local Planning Processes</u>.  As of the withdrawal date, ATSI will no longer be a transmission-owning member of the Midwest ISO.  Accordingly, the Midwest ISO proposes to delete references to ATSI that are currently included in Attachment FF-4.

### III.    DOCUMENTS SUBMITTED WITH THIS FILING

The documents being submitted with this filing are as follows:

Tab A – Redlined Tariff

Tab B – Clean Tariff

### IV.    EFFECTIVE DATE

The Midwest ISO respectfully requests an effective date of June 1, 2011 to coincide with the proposed date of ATSI's withdrawal from the Midwest ISO.

### V.    NOTICE, SERVICE AND REQUEST FOR WAIVER

A.    Notice

Please place the following persons on the official service list in this proceeding:

Gregory A. Troxell*
Corrie Bilke*
Midwest Independent Transmission
System Operator, Inc.
P.O. Box 4202
Carmel, IN 46082
Telephone:  (317) 249-5400
Fax:  (317) 249-5912
gtroxell@midwestiso.org
cbilke@midwestiso.org

*  Persons authorized to receive service

Document Accession #: 20110331-5184    Filed Date: 03/31/2011

Honorable Kimberly D. Bose
March 31, 2011
Page 4 of 4

       B.     Service

The Midwest ISO has served a copy of this filing electronically, including attachments, upon all Tariff Customers, Midwest ISO Members, Member representatives of Transmission Owners and Non-Transmission Owners, the Midwest ISO Advisory Committee participants, as well as state commissions within the Region. In addition, the filing has been posted electronically on the Midwest ISO's website at www.midwestiso.org under the heading "Library" then "FERC Filings and Orders" for other interested parties in this matter.

       C.     Request for Waiver

The Midwest ISO respectfully submits that the requirements of Section 35.13 of the Commission's regulations that have not been specifically addressed herein are inapplicable to this filing. To the extent that the Commission determines any such or other rules to be applicable, the Midwest ISO respectfully requests waiver of the requirements of such provisions.

**VI.**    **CONCLUSION**

For the foregoing reasons, the Midwest ISO respectfully requests that the Commission approve the proposed amendments to the Tariff, effective June 1, 2011.

                                    Respectfully submitted,

                                    */s/ Gregory A. Troxell*
                                    Gregory A. Troxell
                                    Midwest Independent Transmission
                                      System Operator, Inc.
                                    P.O. Box 4202
                                    Carmel, IN 46082-4202
                                    Telephone: (317) 249-5400
                                    Fax: (317) 249-5912
                                    gtroxell@midwestiso.org

Attachments

Document Accession #: 20110520-3009    Filed Date: 05/20/2011

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, DC 20426

OFFICE OF ENERGY MARKET REGULATION

In Reply Reference To:
Midwest Independent Transmission
System Operator, Inc.
Docket No. ER11-3251-000

May 20, 2011

Midwest Independent Transmission
 System Operator, Inc.
Attention:  Gregory A. Troxell
            Attorney
P.O. Box 4202
Carmel, IN 46082

Dear Mr. Troxell:

On March 31, 2011, Midwest Independent Transmission System Operator, Inc. (MISO) submitted proposed revisions to it Open Access Transmission, Energy and Operating Reserve Markets Tariff to reflect the termination of American Transmission Systems, Inc.'s (ATSI) status as a transmission operator, owner and local balancing authority in MISO, effective June 1, 2011.[1]  Pursuant to authority delegated to the Director, Division of Electric Power Regulation-Central, under 18 C.F.R. § 375.307, the submittal in the above referenced docket is accepted for filing with an effective date of June 1, 2011, as requested.

Notice of the filing was published in the *Federal Register* with comments, protests, or interventions due on or before April 21, 2011.  No adverse comments or protests were filed.  Under 18 C.F.R. § 385.210, interventions are timely if made within the time prescribed by the Secretary.  Under 18 C.F.R. § 385.214, the filing of a timely motion to intervene makes the movant a party to the proceeding, if no answer in opposition is filed within fifteen days. The filing of a timely notice of intervention makes a State Commission a party to the proceeding.

---

[1] On December 19, 2009, the Commission conditionally granted ATSI's withdrawal from MISO. *American Transmission Systems, Inc.* 129 FERC ¶ 61,249 (2009).

A44

Document Accession #: 20110520-3009    Filed Date: 05/20/2011

Docket No. ER11-3251-000                                                           - 2 -

This action does not constitute approval of any service, rate, charge, classification, or any rule, regulation, contract, or practice affecting such rate or service provided for in the filed documents; nor shall such action be deemed as recognition of any claimed contractual right or obligation affecting or relating to such service or rate; and such action is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against any of the applicant(s).

This order constitutes final agency action. Requests for rehearing by the Commission may be filed within 30 days of the date of issuance of this order, pursuant to 18 C.F.R. § 385.713.

Sincerely,


Penny S. Murrell, Director
Division of Electric Power
 Regulation – Central

A45

Document Accession #: 20110520-3009        Filed Date: 05/20/2011

Document Content(s)

ER11-3251-000.DOC.......................................................1

Gary A. Morgans
202 429 6234
gmorgans@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

October 30, 2014

The Honorable Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

> **Re:**   ***PJM Interconnection, L.L.C., Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc.*, Docket Nos. ER12-91-000, et al. and ER12-92-000, et al. Settlement Agreement**

Dear Secretary Bose:

Pursuant to Rule 602 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("Commission" or "FERC"), 18 C.F.R. § 385.602 (2014), Duke Energy Ohio, Inc. and Duke Energy Kentucky, Inc. (together "the Duke Companies") submit for filing, on behalf of themselves and the active parties in these proceedings, an executed Settlement Agreement ("Settlement") and related documents that resolve all issues in the case.  Under the Settlement, the Duke Companies and American Municipal Power, Inc. will withdraw their pending petitions for rehearing, and the above-shown dockets will be closed.

The Honorable Kimberly D. Bose
October 30, 2014
Page 2



## I.    INFORMATION SUBMITTED WITH THIS FILING

This submission includes, along with this transmittal letter, the following

documents:

- Explanatory Statement (Attachment 1);

- Settlement Agreement (Attachment 2), including three exhibits:

  o  Exhibit A:  Duke Notice to Customers dated December 17, 2013

  o  Exhibit B:  Changes to Tariff Records effective January 1, 2012

  o  Exhibit C:  Changes to Tariff Records effective on the date the Settlement
     is effective

- Redlined Tariff Records, showing the changes effective January 1, 2012
  (Attachment 3)

- Redlined Tariff Records, showing the changes effective on the date the
  Settlement is effective (Attachment 4)

- Proposed Letter Order (Attachment 5); and

- Certificate of Service (Attachment 6).

## II.    COMMENTS

In accordance with Rule 602(f), 18 C.F.R. § 385.602(f) (2014), initial comments

on the Settlement are due no later than November 19, 2014.  Pursuant to Rule 602(f)(3),

18 C.F.R. § 385.602(f)(3) (2014), any failure to file a comment constitutes a waiver of all

objections to the Settlement.  Reply comments are due December 1, 2014.

The Honorable Kimberly D. Bose
October 30, 2014
Page 3



## III.    SERVICE

Pursuant to Rules 602(d) and 2010 (18 C.F.R. §§ 385.602(d) and 2010 (2014)), the

Duke Companies have served, either by paper or electronic service, the Settlement, and

all related documents listed above, on all parties listed on the official service list

compiled by the Secretary in this proceeding and on all other persons required to be

served by operation of Rule 602(d).

## IV.    REQUESTED RELIEF

The Duke Companies request that the Settlement be certified to the Commission

for its approval, and that the Commission approve the Settlement without condition or

modification.  In accordance with section 3.4 of the Settlement, not later than 30 days

after the date the Settlement becomes effective, the Duke Companies will cause to be

filed with the Commission the tariff records included in Exhibits B and C of the

Settlement through eTariff as a compliance filing.

Please contact me if you have any questions.  Thank you for your assistance in this

matter.

The Honorable Kimberly D. Bose
October 30, 2014
Page 4



Respectfully submitted,

  _/s/  Gary A. Morgans_

Gary A. Morgans
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-6234
gmorgans@steptoe.com

Paul Kinny
Deputy General Counsel
Duke Energy Corporation
550 S. Tryon Street
Mail Code DEC45A
Charlotte, NC 28202
(980) 373-6609
paul.kinny@duke-energy.com

*Counsel for Duke Energy Ohio, Inc. and
Duke Energy Kentucky, Inc.*

**ATTACHMENT 1**

**EXPLANATORY STATEMENT**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket Nos. ER12-91-000,** |
| **Duke Energy Ohio, Inc.** | ) | **ER12-91-002,** |
| **Duke Energy Kentucky, Inc.** | ) | **ER12-91-004,** |
| | ) | **ER12-91-005,** |
| | ) | **ER12-91-007,** |
| | ) | **ER12-91-008,** |
| | ) | **ER12-92-000,** |
| | ) | **ER12-92-002,** |
| | ) | **ER12-92-004,** |
| | ) | **ER12-92-005,** |
| | ) | **ER12-92-007,** |
| | ) | **and** |
| | ) | **ER12-92-008** |

**EXPLANATORY STATEMENT IN SUPPORT OF**
**SETTLEMENT AGREEMENT**

Pursuant to Rule 602 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("Commission" or "FERC"), 18 C.F.R. § 385.602 (2014), Duke Energy Ohio, Inc. and Duke Energy Kentucky, Inc. (jointly, the "Duke Companies"), on behalf of the Settling Parties (as hereinafter defined), submit this Explanatory Statement in support of the Settlement Agreement ("Settlement") filed herewith for the purpose of resolving all issues in this proceeding. This Explanatory Statement is provided in accordance with the Commission's Rules, and is not intended to alter any provision of the Settlement or any party's rights or obligations thereunder.

## I.    PROCEDURAL BACKGROUND

On October 14, 2011, in Docket Nos. ER12-91-000 and ER12-92-000, the Duke Companies jointly filed, pursuant to section 205 of the Federal Power Act ("FPA"), proposed modifications to the PJM Interconnection, L.L.C. ("PJM") Open Access Transmission Tariff ("PJM Tariff") in connection with the Duke Companies' move from the Midwest Independent Transmission System Operator, Inc. *n/k/a* Midcontinent Independent System Operator, Inc. ("MISO" or "Midcontinent ISO") Regional Transmission Organization ("RTO") to the PJM RTO.  The Duke Companies' proposed modifications to the PJM Tariff pertained to establishing and recovering the Duke Companies' transmission revenue requirement, including formula rate protocols.  In addition, under section 205 of the FPA, PJM submitted proposed modifications to the PJM Tariff, the Amended and Restated Operating Agreement of PJM, the Reliability Assurance Agreement Among Load Serving Entities in the PJM Region, and the Consolidated Transmission Owners Agreement (collectively, the "PJM Agreements").  The Duke Companies and PJM jointly requested an effective date of January 1, 2012, for the proposed changes.

On November 4, 2011, American Municipal Power, Inc. ("AMP"), on behalf of itself and its members the cities of Hamilton and Lebanon, Ohio and Williamstown, Kentucky (Hamilton, Lebanon, and Williamstown, collectively referred to herein as the "AMP Members"), filed a timely motion to intervene, protest, and request for suspension and hearings in this proceeding.  Also on November 4, 2011, the Indiana Municipal

Power Agency ("IMPA") filed a timely motion to intervene and protest in this proceeding. No other party protested the filings.

On December 27, 2011, the Duke Companies filed a Request for Deferral of Action requesting that the Commission enable the Duke Companies, AMP and IMPA to continue settlement discussions that, if successful, would resolve all issues in this proceeding. The request was submitted on the condition that it would have no effect on the requested effective date of January 1, 2012. Solely in order to defer Commission action on the pending tariff change filing, the Duke Companies and PJM submitted on December 29, 2011, a ministerial filing that contained no changes to the existing tariff records filed in these dockets on October 14, 2011. The Commission issued public notice of the filing. No comments were filed.

On January 10, 2012, Hamilton filed a motion to intervene in this proceeding in its own right.

On February 24, 2012, the Duke Companies filed a second Request for Deferral of Action. The Commission issued public notice of the filing. No comments were filed.

On April 5, 2012, the Duke Companies and IMPA filed a settlement agreement in this proceeding that resolved all issues between the Duke Companies and IMPA ("April 5 Settlement").

On April 24, 2012, the Commission issued an order denying the Duke Companies' request to recover Legacy MTEP Costs (as defined in Article II of the Settlement) and PJM Transition Costs and Internal Integration Costs (as defined in Article II of the Settlement) from wholesale transmission customers, without prejudice to the filing under

3

section 205 of the FPA of a new request for such recovery.  *PJM Interconnection, L.L.C., et al.*, 139 FERC ¶ 61,068 (2012) ("April 24 Order").  The April 24 Order also established hearing and settlement judge procedures pursuant to section 206 of the FPA for determination of the Duke Companies' rate of return on common equity, and approved the April 5 Settlement between the Duke Companies and IMPA.  Consistent with the April 5 Settlement, IMPA later withdrew its protest of the Duke Companies' filing, leaving AMP (acting on its own behalf and on behalf of the AMP Members) as the only party with a protest in the proceeding.

On May 24, 2012, the Duke Companies filed revised tariff records in compliance with the April 24 Order.  On the same date, the Duke Companies filed a request for rehearing of the April 24 Order.

On February 4, 2013, the Duke Companies, AMP, and the AMP Members filed a settlement agreement in this proceeding.  That settlement agreement provided, among other things, for the recovery of Legacy MTEP Costs, PJM Transition Costs and Internal Integration Costs (each as defined in that settlement agreement)[1] from all wholesale transmission customers, together with a reimbursement to AMP and the AMP Members for 75 percent of the Legacy MTEP Costs and 100 percent of the PJM Transition Costs.

By order issued September 19, 2013, the Commission rejected that settlement agreement, stating, among other things, that it was "unclear . . . that all customers were on notice that these issues [the recovery of Legacy MTEP Costs, PJM Transition Costs,

---

[1] These terms, as used in the February 4, 2013 settlement, had substantially the same meanings as they are given in Article II of the instant Settlement.

4

and Internal Integration Costs] would be resolved [in this proceeding]" and that the Duke Companies had not shown that the settlement was not unduly discriminatory in failing to extend the benefits offered to AMP to the Duke Companies' other wholesale transmission customers. *PJM Interconnection, L.L.C., et al.*, 144 FERC ¶ 61,217 at PP 19-21 (2013) ("September 19 Order"). Thereafter, the parties resumed settlement discussions.

On October 18, 2013, AMP filed a request for rehearing of the September 19 Order.

On December 17, 2013, the Duke Companies provided notice to all PJM transmission customers with load in the DEOK Zone (as hereinafter defined) that settlement discussions in this proceeding had resumed, and that the settlement negotiations might address transmission rate matters beyond the return on equity issue specifically set for hearing and settlement procedures in the April 24 Order. That notice, a copy of which is attached to the Settlement as Exhibit A, was sent to each of the wholesale transmission customers with load in the DEOK Zone. Of importance, the notice expressly and specifically advised recipients that the settlement negotiations might encompass the Duke Companies' request for recovery in rates of all or a portion of the legacy MISO Transmission Expansion Plan costs they incur. Specifically, Paragraph 4 of the notice stated:

> Settlement negotiations have resumed in FERC Docket Nos. ER12-91 and ER12-92 under the supervision of a FERC Administrative Law Judge. The settlement negotiations may address transmission rate matters beyond the return on equity issue specifically set for hearing and settlement procedures in the April 24, 2012 order, including the Duke Companies' recovery in rates of all or a portion of the legacy MISO Transmission Expansion Plan costs incurred by the Duke Companies.

The Duke Companies also stated in the notice that the outcome of the settlement negotiations could affect the amount paid for wholesale transmission service in the DEOK Zone, and that any customer wishing to intervene in the proceeding out of time should do so by January 7, 2014.

On December 18, 2013, The Dayton Power & Light Company ("Dayton") filed a motion to intervene. On January 3, 2014, Buckeye Power, Inc. ("Buckeye") filed a motion to intervene. On January 10, 2014, East Kentucky Power Cooperative, Inc. ("EKPC") filed a motion to intervene. The Chief Judge granted these motions to intervene by orders issued January 9, 2014 and January 22, 2014. One wholesale customer to which the December 17, 2013 notice was sent (American Electric Power) did not intervene.

Settlement discussions resumed following the Chief Judge's orders granting the additional interventions. By order issued March 10, 2014, the Settlement Judge issued a report stating that the parties had reached an impasse in their settlement negotiations, and recommending that settlement judge procedures be terminated. By order issued March 11, 2014, the Chief Judge accepted the recommendation of the Settlement Judge to terminate settlement judge procedures, and designated the Honorable Philip C. Baten to preside over the evidentiary hearing. On March 24, 2014, the Chief Judge issued an order designating the Honorable Jennifer Whang as the substitute presiding administrative law judge.

By order issued April 2, 2014, Presiding Judge Whang adopted a procedural schedule for the trial in this proceeding.  On July 11, 2014, Presiding Judge Whang issued an order modifying the procedural schedule for the trial in this proceeding.

The parties continued informal settlement discussions during this period.  On July 30, 2014, the Duke Companies, AMP, Buckeye, EKPC and Hamilton submitted to Presiding Judge Whang an unopposed joint motion informing her that the parties had reached agreement on the terms of a negotiated resolution of the issues in these dockets, and requesting that the procedural schedule be suspended.  By order dated August 1, 2014, the Chief Judge suspended the procedural schedule to permit the preparation and filing of formal settlement documents.  A summary of those documents follows.

## II.    SUMMARY OF SETTLEMENT TERMS

The Settlement resolves all issues in this case among all parties to the case.  It is entered into by the Duke Companies, AMP on behalf of itself and its members, Buckeye on behalf of itself and its members, Dayton, EKPC on behalf of itself and its members, IMPA, Hamilton, and the Village of Blanchester, Ohio (an IMPA member)  (collectively, the "Settling Parties").  As noted above, earlier in this proceeding the Duke Companies entered into a settlement agreement with IMPA that resolved all issues in the case as between the Duke Companies and IMPA; this Settlement would replace that earlier settlement.[2]  Upon approval of the Settlement, the Duke Companies and AMP will

---

[2]  Settlement, section 4.16.  Because of that replacement, Attachment H-22C to the PJM Tariff is no longer necessary and is being eliminated as of January 1, 2012.

withdraw their respective pending requests for rehearing in this proceeding.  Settlement, section 3.8.

One of the principal concerns expressed by the Commission in rejecting the February 4, 2013 Settlement among the Duke Companies, AMP and Hamilton was that it was "unclear . . . that all customers were on notice that these issues [the recovery of Legacy MTEP Costs, PJM Transition Costs, and Internal Integration Costs]" would be resolved in this proceeding.  September 19 Order at PP 20-21.  In order to resolve this concern with respect to any new settlement the parties might reach, the Duke Companies notified all wholesale transmission customers with load in the DEOK Zone that settlement negotiations were ongoing, that the settlement might address issues beyond the scope of the ROE issue set for hearing (specifically including the recovery of Legacy MTEP Costs), and that any party that wished to participate in the case could seek to intervene late and fully participate in the discussions.  See Settlement Exhibit A.  Three customers that received the notice – EKPC, Dayton and Buckeye – responded by intervening in this docket and participating in this Settlement.  In light of these facts, the Commission need not be concerned about whether <u>all</u> wholesale transmission customers with load in the DEOK Zone received notice of the settlement discussions and an opportunity to participate in those discussions.  Notice and an opportunity to participate were provided to all such customers.

Consistent with the notice given to customers, the Settlement includes a negotiated resolution of the Duke Companies' rate of return on common equity, as well as the Duke Companies' and wholesale transmission customers' respective obligations for Legacy

8

MTEP Costs associated with the Duke Companies' move to PJM.  Settlement, section 3.2. The Settling Parties are mindful that, in the April 24 Order, the Commission rejected the Duke Companies' inclusion of Legacy MTEP Costs in rates, without prejudice to the Duke Companies' submission of a new filing that addressed the Commission's concerns. The Duke Companies sought rehearing of the April 24 Order, however, and that rehearing request remains pending before the Commission.  As a result of these developments, the possibility existed that transmission customers in the DEOK Zone could become subject to the full amount of their allocated shares of Legacy MTEP Costs, PJM Transition Costs and Internal Integration Costs associated with the Duke Companies' move to PJM if the Duke Companies made a new filing to recover such costs, as permitted by the April 24 Order, or if the Duke Companies were successful in their request for rehearing of the April 24 Order (or in any subsequent petition for review of that Order).  On the other hand, the Duke Companies faced the risk that they might be prevented from recovering any of these costs (*e.g.,* if the Commission were to reject the Duke Companies' new request for recovery and the Duke Companies' request for rehearing or petition for review of such order was unsuccessful).  To hedge their respective risks, both sides have reached a compromise under which Duke will absorb 100% of the Wholesale Transmission Customers' Legacy MTEP Costs until the Settlement becomes effective, and 70% of those costs thereafter.  Settlement, section 3.2. In addition, the Duke Companies will absorb 100% of Internal Integration Costs and PJM Transition Costs.  Settlement, section 3.1.

As noted above, the instant Settlement does not implicate the concerns the Commission cited in rejecting the February 4, 2013 settlement.[3]  Through the December 17, 2013 notice given to all wholesale transmission customers with load in the DEOK Zone, all identifiable members of the class of potentially affected parties were advised of the issues that might be negotiated.  In particular, those entities were specifically and clearly informed that a negotiated resolution of the case might encompass the payment of Legacy MTEP Costs and other costs associated with the Duke Companies' move to PJM.  Any possible concern with lack of notice to affected transmission customers thus was eliminated as a factor bearing on the justness and reasonableness of the instant Settlement.

Neither are the other concerns the Commission cited in rejecting the February 4, 2013 settlement relevant to the instant Settlement.  For example, another aspect of the earlier settlement the Commission found objectionable was the differing treatment of wholesale transmission customers.  In its order rejecting the prior settlement, the Commission stated:

> Given our earlier finding that recovering Legacy MTEP and Transition costs is not just and reasonable, we cannot find that the Settlement, which proposes recovering a portion of these costs from AMP and all of these costs from non-settling parties, is fair and reasonable and in the public interest.  Moreover, the fact that the Settlement provides greater benefits to AMP than the Duke Companies' other customers is inconsistent with the assumption that AMP's interests also represent the interests of other customers.  Accordingly, we find that the Settlement has not been shown to be fair and reasonable and in the public interest.

September 19 Order at P 21.

---

[3]  *See* September 19 Order at PP 19-21.

The concern that the prior settlement provided greater benefits to one set of transmission customers (AMP and Hamilton) than to other transmission customers is not apposite to the instant Settlement. Pursuant to the current Settlement, all wholesale transmission customers will be subject to the same tariff provisions and to the same rates, terms and conditions of service. Disparate treatment of customers therefore is no longer a matter with which the Commission need be concerned.

Further, as to the concern that the prior settlement permitted recovery of a portion of Legacy MTEP Costs without a cost-benefit study, the Commission's orders (including the September 19 Order) do not prohibit the affected parties from entering into a settlement that resolves that matter in a manner each such party finds acceptable. A key purpose of the Settlement is to resolve, and thereby moot, the Duke Companies' pending request for rehearing of the April 24 Order. If that rehearing request, or a subsequent court appeal raising the same issues, were successful, the Duke Companies might have been entitled to include in rates the PJM Transition Costs, Internal Integration Costs, and Legacy MTEP Costs in full. Furthermore, even if the only way the Duke Companies could recover those costs was through a section 205 filing that demonstrated a net benefit to customers, the Duke Companies would have been free to seek full recovery of such costs in such filing, not the more limited recovery agreed to as part of the Settlement. Thus, the Settlement operates to hedge the respective risks faced by each set of parties - the customers' risk of being charged Legacy MTEP and other costs without mitigation, and the Duke Companies' risk of securing no recovery of those costs at all. This very sort of risk-hedging is the essence of any settlement, and no particular issue

should be considered "out of bounds" lest parties be impeded in their efforts to achieve a complete and balanced resolution of the disputes that matter to them.

Neither the April 24 Order nor the September 19 Order prohibit the Duke Companies and transmission customers in the DEOK Zone from reaching a consensual resolution of the Legacy MTEP cost recovery issue, especially where the resolution provides for a greatly reduced level of recovery as compared to what the Duke Companies' initially requested. Here, as part of an overall package, the Duke Companies have agreed to absorb 70% of the Legacy MTEP costs that the Duke Companies' originally sought to recover in full from transmission customers in the DEOK Zone once the Settlement becomes effective (and 100% prior to that time). Transmission customers, for their part, are agreeing as part of an overall package that the transmission charges they pay will include 30% of the Legacy MTEP costs once the Settlement becomes effective (and none of such costs prior to that time), without the Duke Companies submitting a cost-benefit study. This trade-off is part of an integrated package of gives-and-takes that each set of parties finds agreeable. The Commission encourages parties to work toward just such negotiated solutions as an alternative to litigation, particularly in difficult cases (like this one) where the litigation is likely to be protracted and costly.[4] If for some reason the Settlement is not approved, wholesale transmission customers would be re-exposed to the risk of having to bear 100% of Legacy MTEP Costs, Internal Integration

---

[4] *See, e.g., Duke Energy Trading and Marketing Co.,* 117 FERC ¶ 61,039 at P 12 (2006).

Costs, and PJM Transition Costs, precisely the risk that they desire to mitigate through the Settlement.

The Settlement provides for revisions to Attachments H-22 and JJ to the PJM Tariff as set forth in Exhibits B and C to the Settlement.  Settlement, section 3.4.  The modified tariff provisions in Exhibit B, which would become effective as of January 1, 2012, effectuate the exclusion from rates of 100% of Legacy MTEP Costs, Internal Integration Costs and PJM Transition Costs, and the replacement of the April 5 Settlement with the instant Settlement for IMPA.  The modified tariff provisions in Exhibit C, which would become effective as of the date on which the Commission accepts the Settlement, effectuate a reduction in the Duke Companies' rate of return on common equity ("ROE") from 12.38 percent to 11.38 percent (the latter consisting of a base ROE of 10.88 percent plus a fifty basis point adder for RTO membership), the continued exclusion from rates of 100% of Internal Integration Costs and PJM Transition Costs, and the exclusion from rates of 70% (and the inclusion in rates of 30%) of Legacy MTEP Costs.[5]  Redlined sheets showing the changes to the currently effective tariff sheets are included as Attachment C to this filing.[6]

The Duke Companies are filing the changes to the PJM Tariff as part of the instant Settlement because they are an integral part of resolution of the pending issues in this proceeding.  As is common and desirable for settlements of this nature, the Settlement is

---

[5] The Settlement also corrects two minor typographical errors in Attachment H-22A.

[6] Consistent with Section 4.b. of the Formula Rate Implementation Protocols, changes in the revenue requirement as a result of the settlement will be reflected in the next Annual Update, including interest as per section 35.19a of the Commission's regulations.

a global one - that is, it resolves all pending issues in the proceeding, including the issues that were set for hearing and those that remain pending before the Commission on rehearing. The Settling Parties engaged in good faith negotiations through the Commission's settlement procedures, and after several months of negotiations reached middle ground on the issues that were set for hearing as well as on the issues that were the subject of the rehearing requests. It would not have been possible to achieve a settlement that resolved all issues in the case without agreement on the revised tariff sheets that effectuate the Settling Parties' understandings and, therefore, the modified tariff sheets are an essential and integral part of the Settlement itself.

The Settlement also contains provisions that require the Settling Parties to forgo initiating a proceeding regarding the Settlement ROE with an effective date prior to June 1, 2017. Settlement, section 3.3. As part of the Settlement, the Duke Companies agree to withdraw their request for rehearing of the Commission's April 24 Order in this proceeding, including that order's commencement of a section 206 proceeding with respect to the Duke Companies' existing 12.38 percent ROE. AMP also agrees to withdraw its pending request for rehearing of the September 19 Order rejecting the earlier settlement among the Duke Companies, AMP and Hamilton. In order to ensure that the Commission does not act on those rehearing requests while the Settlement is pending before the Commission, section 3.8 of the Settlement requires the Duke Companies and AMP to request that the Commission hold their respective rehearing requests in abeyance pending action on the Settlement. The Duke Companies and AMP filed a joint motion for that purpose with the Commission on October 29, 2014.

14

As to the standard of review applicable to unilateral modification requests, the Settlement provides that, unless the Settling Parties otherwise agree in writing, any modification to the Settlement proposed by one of the parties after the Settlement has become effective shall, as between them, be subject to the "public interest" application of the just and reasonable standard. The Settlement also provides that any modifications to the Settlement proposed by the Commission acting *sua sponte* or by a non-Settling Party shall be subject to the just and reasonable standard. Settlement, section 4.9.

In addition to the foregoing, the Settlement also contains standard provisions commonly included in settlement agreements filed with the Commission.

## III.    SERVICE

The Duke Companies have served a copy of this filing on all parties on the official service list to this proceeding. In addition, PJM has served a copy of this filing on all PJM members and on all state utility commissions in the PJM region by posting this filing electronically.

## IV.    ADDITIONAL MATTERS

By letter order dated October 23, 2003, the Chief Administrative Law Judge requires all parties submitting Section 602 settlements to address five questions in their explanatory statement. These issues are addressed in this section.

### A.    What are the issues underlying the settlement and what are the major implications?

The background of this proceeding is summarized above in Section I, and a summary of the Settlement appears in Section II. The Settlement is a negotiated rate case

15

compromise, and expressly states that no party shall be deemed to have agreed to any principle or position in this proceeding.

**B.        Whether any of the issues raise policy implications.**

The issues presented in the Settlement do not raise any major policy implications because the Settlement establishes no precedent.  It does, however, further the broad public interest in favor of settlements.[7]

**C.        Whether other pending cases may be affected.**

No other pending cases will be affected by the resolution of the instant proceeding.

**D.        Whether the settlement involves issues of first impression, or if there are any previous reversals on the issues involved.**

The Settlement settles a transmission tariff rate case without establishing any precedent on any issue, and as such it does not involve any issues of first impression or previous reversals on the issues involved.

**E.        Whether the proceeding is subject to the just and reasonable standard or whether there is *Mobile-Sierra* language making it the standard, i.e., the applicable standard of review.**

The Settlement provides that, unless otherwise agreed to by the Settling Parties in writing, any proposed modifications to the Settlement, as between the Settling Parties, shall be subject to the "public interest" application of the just and reasonable standard of

---

[7] *See Southern Union Gas Co. v. FERC*, 840 F.2d 964, 971 (D.C. Cir. 1988).

16

review; and that any modifications proposed by the Commission acting *sua sponte* or by a non-Settling Party shall be subject to the just and reasonable standard.[8]

## V.    CONCLUSION

The Settlement fairly and fully resolves all issues in this proceeding, including the Duke Companies' and AMP's pending rehearing requests, which the Duke Companies and AMP will withdraw upon approval of the Settlement. The Settlement has been negotiated in accordance with Commission rules and procedures, and Commission approval of the Settlement will save the Settling Parties and the Commission the considerable expense and effort of litigating the difficult and complex issues that have been amicably resolved through negotiation to the mutual satisfaction of the Settling Parties. The Settlement achieves rate certainty for the Settling Parties while preserving the rights of entities that had notice of, but chose not to participate in, the proceeding or the settlement process. For all the foregoing reasons, the Settling Parties request that the Commission (i) find that the Settlement is fair and reasonable, (ii) approve the Settlement without modification or condition, and (iii) allow the Settlement (including the modified tariff provisions submitted as part of the Settlement) to become effective in accordance with its terms.

---

[8] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp*., 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co*., 350 U.S. 348 (1956) (the *Mobile-Sierra* doctrine), as clarified in *Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish County, Washington,* 554 U.S. 527 (2008) and refined in *NRG Power Mktg. v. Maine Pub. Utils. Comm'n*, 558 U.S. 165 (2010).

Respectfully submitted,

   */s/ Gary A. Morgans*

Gary A. Morgans
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-6234
gmorgans@steptoe.com

Paul Kinny
Deputy General Counsel
Duke Energy Corporation
550 S. Tryon Street
Mail Code DEC45A
Charlotte, NC 28202
(980) 373-6609
paul.kinny@duke-energy.com

*Counsel for Duke Energy Ohio, Inc. and
Duke Energy Kentucky, Inc.*

On behalf of the Settling Parties

October 30, 2014

# ALSTON&BIRD LLP

The Atlantic Building
950 F Street, NW
Washington, DC 20004-1404

202-239-3300
Fax:202-239-3333
www.alston.com

July 20, 2015

The Honorable Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

> **Re:** ***PJM Interconnection, L.L.C.***
> ***American Transmission Systems, Incorporated***
> **Settlement Agreement and Offer of Settlement**
> **Docket No. ER15-303-000**

Dear Secretary Bose:

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2014), American Transmission Systems, Incorporated ("ATSI"), American Municipal Power, Inc., on behalf of itself and its individual members, Buckeye Power, Inc. and Industrial Energy Users-Ohio (together, the "Settling Parties") submit the enclosed Settlement Agreement and Offer of Settlement ("Settlement") and accompanying materials resolving through settlement the above-captioned proceeding.

## I.    CONTENTS

This submission includes the following materials:

1. This letter of transmittal;
2. An Explanatory Statement in support of the Settlement (Appendix A);
3. The Settlement, which includes, as Attachments A, B, C and D thereto, replacement tariff sheets for PJM's Open Access Transmission Tariff ("PJM Tariff"), in clean and redlined format (Appendix B);[1]

---

[1]    Because of eTariff filing requirements, subsequent to Commission acceptance of the Settlement, ATSI and PJM, as Tariff administrator, will file the tariff sheets to reflect the revisions agreed to in the Settlement.

The Honorable Kimberly D. Bose
July 20, 2015
Page 2

4.   A draft form of letter order approving the Settlement (Appendix C); and

5.   A certificate of service certifying that the Settlement documents, including this transmittal letter, were served in accordance with the requirements of Rules 2010 and 602(d) of the Commission's Rules of Practice and Procedure (18 C.F.R. §§ 385.2010, 385.602(d) (2014)) (Appendix D).

## II.    COMMENTS

In accordance with Rule 602(f), 18 C.F.R. § 385.602(f), the Settling Parties advise the recipients of this letter that initial comments on the Settlement are due no later than **August 10, 2015**, and reply comments are due no later than **August 19, 2015**.  Pursuant to Rule 602(f)(3), 18 C.F.R. § 385.602(f)(3), any failure to file a comment constitutes a waiver of all objections to the Settlement.

## III.    SERVICE

Copies of this filing have been served electronically on the parties listed on the Commission's official service list for this proceeding.

Respectfully submitted,

*/s/ Kenneth G. Jaffe*
Kenneth G. Jaffe
Richard P. Sparling
Alston & Bird LLP
950 F Street, NW
Washington, DC 20004

*Attorneys for American Transmission*
  *Systems, Incorporated*
*On behalf of the Settling Parties*

A71

**APPENDIX A**
**Explanatory Statement**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    )
American Transmission Systems, Incorporated    )        Docket No. ER15-303-000

EXPLANATORY STATEMENT
IN SUPPORT OF SETTLEMENT AGREEMENT
AND OFFER OF SETTLEMENT

American Transmission Systems, Incorporated ("ATSI"), American Municipal Power, Inc., on behalf of itself and its individual members, Buckeye Power, Inc., and Industrial Energy Users-Ohio (each a "Settling Party" and collectively, the "Settling Parties") submit this Explanatory Statement pursuant to Rule 602 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("FERC" or the "Commission"), 18 C.F.R. § 385.602 (2014), in support of the Settlement Agreement ("Settlement") entered into as of July 20, 2015.

The Settlement is submitted as an Offer of Settlement to resolve completely, upon the Commission's acceptance of the Settlement without condition or modification unacceptable to the Settling Parties, all issues raised in this proceeding.  Subject to the conditions set forth in the Settlement, the agreement of the Settling Parties is as follows.

I.    **Background**

Article I of the Settlement provides a procedural background for this proceeding.  Section I.A of the Settlement states that ATSI is an indirect wholly-owned subsidiary of FirstEnergy Corp.  It is a transmission-only utility that owns, operates and maintains transmission facilities in Ohio and western Pennsylvania.  ATSI makes its transmission facilities available on an open access basis under the PJM Interconnection, L.L.C. ("PJM") Open Access Transmission Tariff

A73

("PJM Tariff").

Section I.A also notes that on October 31, 2014, ATSI submitted for filing revisions to its transmission formula rate and protocols set forth in Attachments H-21, H-21A and H-21B of the PJM Tariff (the "October 31 Filing"). The proposed revisions changed ATSI's transmission formula rate from a "historic" to a "forward-looking" formula rate. Under the revised formula rate, transmission charges during a rate year (which will coincide with a calendar year) are based on projections of ATSI's transmission-related costs during the period when the charges are collected, subject to later true-up.

Section I.B of the Settlement describes the interventions and protests filed in response to the October 31 Filing.

Section I.C of the Settlement describes the Commission's order accepting the October 31 Filing. Namely, on December 31, 2014, the Commission accepted and suspended the October 31 Filing for a nominal period to become effective January 1, 2015, subject to refund and the outcome of hearing and settlement judge procedures (the "December 31 Order"). The Commission also instituted an investigation under section 206 of the Federal Power Act within Docket No. ER15-303-000 into ATSI's authorized return on equity ("ROE").[1] And, on January 6, 2015, the Commission's Secretary issued a "Notice of Institution of Section 206 Proceeding and Refund Effective Date," in which the refund effective date established pursuant to section 206(b) of the Federal Power Act was specified as the date of publication of the notice in the *Federal Register*. That publication occurred on January 12, 2015.[2]

Section I.D of the Settlement details the settlement procedures that took place before the

---

[1]    *PJM Interconnection, L.L.C., et al.*, 149 FERC ¶ 61,292 (2014).

[2]    80 Fed. Reg. 1501 (Jan. 12, 2015).

Honorable John P. Dring as the Settlement Judge to assist the parties in arriving at a settlement of the issues in this case.  Judge Dring convened settlement conferences on January 13, 2015, February 12, 2015, April 21, 2015, June 4, 2015 and June 16, 2015.  Subsequent to the June 16, 2015 settlement conference, the parties reached an agreement in principle concerning the terms of a settlement, which are embodied in the Settlement.

## II.    <u>Terms of Settlement</u>

Section II.A of the Settlement specifies that, effective as of January 1, 2015, the ATSI formula rate template (Attachment H-21A of the PJM Tariff) submitted in the October 31 Filing and accepted by the Commission in the December 31 Order shall be replaced in its entirety with the formula rate template set forth in Attachment A to the Settlement (referred to in the Settlement as the "Settlement Template").

Section II.B of the Settlement provides that, effective as of the Effective Date, as defined in section III.A, the ATSI formula rate protocols (Attachment H-21B of the PJM Tariff) submitted in the October 31 Filing and accepted by the Commission in the December 31 Order shall be replaced in their entirety with the protocols set forth in Attachment B to the Settlement (referred to in the Settlement as the "Settlement Protocols").

Section II.C of the Settlement specifies the terms under which ATSI's ROE will be set for the period subsequent to January 1, 2015.  It provides that ATSI's ROE used in the formula rate shall be set as follows:

a.  For the period January 1, 2015 through June 30, 2015, the ROE value used in the formula rate shall be fixed at 12.38%.

b.  For the period July 1, 2015 through December 31, 2015, the ROE value used in the

3

A75

formula rate shall be fixed at 11.06%.

c.  For the period commencing January 1, 2016, the ROE value used in the formula rate shall be fixed at 10.38%.

Section II.C also states that all ROE values are inclusive of any incentive adder for RTO participation.  It adds that nothing in the Settlement shall preclude ATSI from submitting a proposal for an ROE adder to reflect the risks and challenges of a PJM Regional Transmission Enhancement Plan transmission project in charges under Schedule 12 of the PJM Tariff or any other party from protesting any such proposal by ATSI.

Section II.C further states that the 10.38% ROE value shall remain in effect until changed pursuant to section 205 or section 206 of the Federal Power Act, 16 U.S.C. § 824d or § 824e, provided that the effective date for any change to the 10.38% ROE value made pursuant to section 205 or section 206 shall be no earlier than January 1, 2018.  It adds that any proposal by ATSI for an ROE adder to reflect the risks and challenges of a PJM Regional Transmission Enhancement Plan transmission project in charges under Schedule 12 of the PJM Tariff shall not be considered a change to the 10.38% ROE value.

Section II.D of the Settlement provides that ATSI shall provide credits to transmission customers based on amounts collected during the period beginning January 1, 2015 in excess of the transmission revenue requirement based on the ROE values established under section II.C.1 of the Settlement, as applicable to the period covered by the calculation, and the Settlement Template, together with interest calculated in accordance with the formula rate protocols.  Such credits shall be paid, at ATSI's election, either through (a) immediate cash refunds; or (b) the application of credits to transmission charges calculated in the next following Annual Update and True-Up (as those terms are defined in the Settlement Protocols); provided that, whichever

4

A76

option ATSI elects, interest calculated in accordance with section 35.19a of the Commission's regulations shall continue to accrue until the credits are effected.

Section II.E of the Settlement concerns tariff revisions and states that the matters resolved by the Settlement shall be implemented through revisions to the PJM Tariff, Attachments H-21A (ATSI's formula rate template) and H-21B (ATSI's formula rate protocols). Tariff sheets containing the Settlement Template and Settlement Protocols are attached to the Settlement, in clean format as Attachments A and B, respectively, and in redline format as Attachments C and D, respectively. Pursuant to Order No. 714, Electronic Tariff Filings, FERC Stats. & Regs. ¶ 31,276 (2008), ATSI, in conjunction with PJM, shall make a compliance filing to enter the tariff records into the eTariff database after the Effective Date (defined below and in section III.A of the Settlement). In the compliance filing, ATSI or PJM, as appropriate, shall request that the Commission make the tariff records containing the Settlement Template and itemizing the sequence of ROE values established in section II.C.1 effective as of January 1, 2015, and the tariff records containing the Settlement Protocols effective as of the Effective Date, as defined in section III.A.

Section II.F of the Settlement states that upon the satisfaction of the conditions to the effectiveness of the Settlement set forth in section III.B of the Settlement, the Settlement shall operate as a full and final settlement, release, discharge, accord and satisfaction of all the issues, disputes, claims, demands, liabilities, rights, and/or obligations related to or arising out of this proceeding.

Section III.A of the Settlement defines the "Effective Date" for the Settlement. It states that the Settlement shall take effect on the date the Settlement is accepted by the Commission in a Final Order, provided that, if the Commission accepts the Settlement subject to condition or

modification, all Settling Parties notify the other Settling Parties and the Commission in accordance with section III.B that any such condition or modification is acceptable. For purposes of the Settlement, an order shall be deemed to be a "Final Order" as of the date it is issued by the Commission if no comments are filed in opposition to the Settlement, or, if such comments are filed, the date rehearing is denied by the Commission, or, if rehearing is not sought, the date on which the right to seek Commission rehearing expires.

Section III.B of the Settlement identifies the conditions to which the Settlement is subject. It provides that the Settlement is expressly conditioned upon the acceptance of all provisions thereof by the Commission in accordance with Rule 602, without condition or modification. If the Commission fails to accept the Settlement in its entirety without condition or modification, then the Settlement shall not become effective and shall be null and void, unless (i) the Commission's order accepted the Settlement subject to one or more conditions or modifications; (ii) each of the Settling Parties notifies all of the other Settling Parties and the Commission in writing within ten (10) days of such Commission order that it accepts such condition(s) or modification(s); and (iii) the order becomes a Final Order. No Settling Party shall be bound by any part of the Settlement and the Settlement shall be null and void unless it becomes effective in the manner provided by this Article III, as applicable.

Section IV.A of the Settlement concerns modifications, and states that, if the Settling Parties agree to change the terms of the Settlement, they shall do so only through a written amendment, executed by the Settling Parties, and accepted by the Commission.

Section IV.B of the Settlement concerns the Standard of Review, and states that the standard of review for any modification to the Settlement, whether (i) set forth in a written amendment executed by the Settling Parties, or (ii) pursuant to the Commission's exercise of its

6

A78

authority under section 206 of the Federal Power Act, whether acting *sua sponte* or on a complaint filed by a Settling Party or by a non-Settling Party, shall be the "just and reasonable" standard.

Article V of the Settlement contains miscellaneous settlement provisions. Section V.A specifies that the discussions among the Settling Parties have been conducted with the explicit understanding and agreement, pursuant to Rule 602(e) of the Commission's Rules of Practice and Procedure, that all offers of settlement and discussions relating thereto are and shall be privileged, shall be without prejudice to the positions of any Settling Party or participant presenting any such offer or participating in any such discussion, and are not to be used in any manner in connection with this proceeding or otherwise.

Section V.B states that the Settlement is entered into upon the understanding that it constitutes a negotiated agreement and, except as explicitly set forth therein, no Settling Party shall be deemed to have approved, accepted, agreed to, or consented to any principle or position advanced or taken in this proceeding by any other participant, or to have prejudiced positions taken or that may be taken by such Settling Party in this or any other proceeding. The Settlement shall not be cited or relied upon as precedent for any purpose, including retail ratemaking, or as establishing any issue or principle, except to the extent of enforcing the terms and conditions of the Settlement itself. Nothing in the Settlement shall be deemed a "settled practice" as that term was interpreted and applied in *Public Service Comm'n of New York v. FERC*, 642 F.2d 1335 (D.C. Cir. 1980).

Section V.C states that section headings are used in the Settlement solely for convenience of reference and shall not be used to interpret or modify the terms of the Settlement.

Section V.D provides that, other than the moratorium on the effective date of changes to

the settled ROE in section II.C.3, nothing in the Settlement shall constitute a waiver of, or limitation on, any Settling Party's rights under sections 205 or 206 of the Federal Power Act.

### III.    Policy Considerations of the Settlement

By order dated October 23, 2003, the Chief Administrative Law Judge requires that five questions be answered as part of every Explanatory Statement submitted in support of a proposed settlement agreement.  The questions, and specific responses applicable to the Settlement, are as follows:

**1.    What are the issues underlying the settlement and what are the major implications?**

The Settlement addresses three categories of issues:  (i) ATSI's formula rate template (PJM Tariff, Attachment H-21A); (ii) ATSI's formula rate protocols (PJM Tariff, Attachment H-21B); and (iii) the ROE that ATSI will use to calculate its transmission revenue requirement. The Settlement resolves these issues by modifying the terms of the formula rate template and protocols to address and resolve the issues and concerns raised in this proceeding.  Under the Settlement, the Settling Parties have agreed to a modification of ATSI's ROE as set forth in section II.C of the Settlement.  The Settling Parties have also agreed to ATSI's provision of credits to transmission customers and filing for Commission acceptance of revisions to Attachments H-21A and H-21B of the PJM OATT to incorporate the modifications to the formula rate template, protocols, and ROE, as set forth in the Settlement.  The Settling Parties believe this resolution of these underlying issues is reasonable and adequate.  Consequently, the Settling Parties believe the Settlement is fair, reasonable and in the public interest.

**2.    Whether any of the issues raise policy implications.**

The underlying issues raised in this proceeding and the Settlement's resolution of these

8

issues do not raise any policy implications.  And, the Settlement does not raise policy implications beyond the justness and reasonableness of the Settlement package as a whole, except to the extent that any of the foregoing discussion may be regarded as addressing an issue of Commission policy.

**3.      Whether any other pending cases will be affected.**

No other cases will be affected by the Settlement.

**4.      Whether the settlement involves issues of first impression, or if there are any previous reversals on the issues involved.**

The Settlement does not involve any issues of first impression.  The Settling Parties are not aware of any reversals on the issues involved.

**5.      Whether the proceeding is subject to the just and reasonable standard or whether there is *Mobile-Sierra* language making it the standard, *i.e.,* the applicable standards of review.**

The Settlement is subject to the "just and reasonable" standard of review.  Section IV.B of the Settlement sets forth the Settling Parties' intent with respect to the standard of review that would apply to proposed changes to the Settlement.  The standard of review for any modification to the Settlement, whether (i) set forth in a written amendment executed by the Settling Parties, (ii) pursuant to the Commission's exercise of its authority under section 206 of the Federal Power Act, whether acting *sua sponte* or on a complaint filed by a Settling Party, or (iii) proposed by a non-Settling Party, shall be the "just and reasonable" standard.

**IV.    <u>Conclusion</u>**

As discussed above and in the Settlement, the Settlement resolves all of the issues raised by the Settling Parties in this proceeding.  The Settling Parties believe this resolution is reasonable and adequate to provide for the accurate calculation of ATSI's transmission rates.

The Settlement also is consistent with the Commission's policies encouraging settlements. Further, the Settlement is fair, reasonable and in both the public interest and the Settling Parties' interests in resolving this proceeding without protracted litigation. Accordingly, the Commission should approve the Settlement without condition or modification.

Respectfully submitted,

**_/s/ Kenneth G. Jaffe_**
Kenneth G. Jaffe
Richard P. Sparling
Alston & Bird, LLP
950 F Street, NW
Washington, DC 20004

*Attorneys for American Transmission*
 *Systems, Incorporated*
*On behalf of the Settling Parties*

10

A82

**APPENDIX B**
**Settlement**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

PJM Interconnection, L.L.C.                          )
American Transmission Systems, Incorporated   )          Docket No. ER15-303-000

**SETTLEMENT AGREEMENT**
**AND**
**OFFER OF SETTLEMENT**

This Settlement Agreement ("Settlement"), submitted to the Federal Energy Regulatory Commission ("FERC" or the "Commission") for approval as an Offer of Settlement pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2014), is entered into as of July 20, 2015 by American Transmission Systems, Incorporated ("ATSI"); American Municipal Power, Inc., on behalf of itself and its individual members ("AMP"); Buckeye Power, Inc. ("Buckeye"); and Industrial Energy Users-Ohio (each a "Settling Party" and collectively, the "Settling Parties").

This Settlement is submitted as an Offer of Settlement to resolve completely, upon the Commission's acceptance of this Settlement without condition or modification unacceptable to the Settling Parties, all issues in this proceeding. Subject to the conditions set forth in this Settlement, including the acceptance by the Commission of this Settlement in its entirety without condition or modification unacceptable to the Settling Parties, and with the understanding that each term of this Settlement is in consideration and support of every other term, the Settling Parties agree as follows.

A84

I.      **BACKGROUND**

A.      **The October 31 Filing**

ATSI is an indirect wholly-owned subsidiary of FirstEnergy Corp.  ATSI is a transmission-only utility that owns, operates and maintains transmission facilities in Ohio and western Pennsylvania.  ATSI makes its transmission facilities available on an open access basis under the PJM Interconnection, L.L.C. ("PJM") Open Access Transmission Tariff ("PJM Tariff").

On October 31, 2014, ATSI submitted for filing revisions to its transmission formula rate and protocols set forth in Attachments H-21, H-21A and H-21B of the PJM Tariff (the "October 31 Filing").  The proposed revisions changed ATSI's transmission formula rate from a "historic" to a "forward-looking" formula rate.  Under the revised formula rate, transmission charges during a rate year (which will coincide with a calendar year) are based on projections of ATSI's transmission-related costs during the period when the charges are collected, subject to later true-up.

B.      **Interventions, Protests and Responsive Pleadings**

In response to the October 31 Filing, AMP and Buckeye filed motions to intervene and protests, challenging certain aspects of the filing and requesting various forms of relief from the Commission.  Industrial Energy Users-Ohio and other parties filed motions to intervene.

C.      **The December 31, 2014 Order**

On December 31, 2014, the Commission accepted and suspended the October 31 Filing for a nominal period to become effective January 1, 2015, subject to refund and the outcome of hearing and settlement judge procedures (the "December 31 Order").  The Commission also instituted an investigation under section 206 of the Federal Power Act within Docket No. ER15-

2

303-000 into ATSI's authorized return on equity ("ROE").[1]  On January 6, 2015, the Commission's Secretary issued a "Notice of Institution of Section 206 Proceeding and Refund Effective Date," in which the refund effective date established pursuant to section 206(b) of the Federal Power Act was specified as the date of publication of the notice in the *Federal Register*. That publication occurred on January 12, 2015.[2]

### D.    Settlement Procedures

On January 8, 2015, the Chief Administrative Law Judge appointed the Honorable John P. Dring as the Settlement Judge to assist the parties in arriving at a settlement of the issues in this case.  Judge Dring convened settlement conferences on January 13, 2015, February 12, 2015, April 21, 2015, June 4, 2015 and June 16, 2015.  Subsequent to the June 16, 2015 settlement conference, the parties reached an agreement in principle concerning the terms of a settlement, which are embodied in this Settlement.

## II.    TERMS OF SETTLEMENT

The Settling Parties have agreed to resolve all issues in this proceeding on the terms set forth in this Settlement.

### A.    Revisions to the Formula Rate Template

Effective as of January 1, 2015, the ATSI formula rate template (Attachment H-21A of the PJM Tariff) submitted in the October 31 Filing and accepted by the Commission in the December 31 Order shall be replaced in its entirety with the formula rate template set forth in Attachment A to this Settlement (the "Settlement Template").

---

[1]    *PJM Interconnection, L.L.C., et al.*, 149 FERC ¶ 61,292 (2014).

[2]    80 Fed. Reg. 1501 (Jan. 12, 2015).

3

**B.      Revisions to the Formula Rate Protocols**

Effective as of the Effective Date, as defined in section III.A, the ATSI formula rate protocols (Attachment H-21B of the PJM Tariff) submitted in the October 31 Filing and accepted by the Commission in the December 31 Order shall be replaced in their entirety with the protocols set forth in Attachment B to this Settlement (the "Settlement Protocols").

**C.      ROE**

1.      ATSI's ROE used in the formula rate shall be set as follows:

     a.   For the period January 1, 2015 through June 30, 2015, the ROE value used in the formula rate shall be fixed at 12.38%.

     b.   For the period July 1, 2015 through December 31, 2015, the ROE value used in the formula rate shall be fixed at 11.06%.

     c.   For the period commencing January 1, 2016, the ROE value used in the formula rate shall be fixed at 10.38%.

2.      All ROE values in section II.C.1 are inclusive of any incentive adder for RTO participation.  Nothing in this Settlement shall preclude ATSI from submitting a proposal for an ROE adder to reflect the risks and challenges of a PJM Regional Transmission Enhancement Plan transmission project in charges under Schedule 12 of the PJM Tariff or any other party from protesting any such proposal by ATSI.

3.      The 10.38% ROE value established by section II.C.1.c shall remain in effect until changed pursuant to section 205 or section 206 of the Federal Power Act, 16 U.S.C. § 824d or § 824e, provided that the effective date for any change to the 10.38% ROE value made pursuant to section 205 or section 206 shall be no earlier than January 1, 2018.  Any proposal by ATSI for an ROE adder to reflect the risks and challenges of a PJM Regional Transmission Enhancement

4

Plan transmission project in charges under Schedule 12 of the PJM Tariff shall not be considered a change to the 10.38% ROE value.

### D.    Credits

ATSI shall provide credits to transmission customers based on amounts collected during the period beginning January 1, 2015 in excess of the transmission revenue requirement based on the ROE values established under section II.C.1, as applicable to the period covered by the calculation, and the Settlement Template, together with interest calculated in accordance with section 35.19a of the Commission's Regulations, 18 C.F.R. § 35.19a (2014).  Such credits shall be paid, at ATSI's election, either through (a) immediate cash refunds; or (b) the application of credits to transmission charges calculated in the next following Annual Update and True-Up (as those terms are defined in the Settlement Protocols); provided that, whichever option ATSI elects, interest calculated in accordance with section 35.19a of the Commission's regulations, 18 C.F.R. § 35.19a (2014), shall continue to accrue until the credits are effected.

### E.    Tariff Sheet Revisions

The matters resolved by this Settlement shall be implemented through revisions to the PJM Tariff, Attachments H-21A (ATSI's formula rate template) and H-21B (ATSI's formula rate protocols).  Tariff sheets containing the Settlement Template and Settlement Protocols are attached hereto, in clean format as Attachments A and B, respectively, and in redline format as Attachments C and D, respectively.  Pursuant to Order No. 714, *Electronic Tariff Filings*, FERC Stats. & Regs. ¶ 31,276 (2008), ATSI, in conjunction with PJM, shall make a compliance filing to enter the tariff records into the eTariff database after the Effective Date, as defined in section III.A.  In the compliance filing, ATSI or PJM, as appropriate, shall request that the Commission make the tariff records containing the Settlement Template and itemizing the sequence of ROE

5

A88

values established in section II.C.1 effective as of January 1, 2015, and the tariff records

containing the Settlement Protocols effective as of the Effective Date, as defined in section III.A.

### F.    Resolution of Issues

Upon the satisfaction of the conditions to the effectiveness of this Settlement set forth in

section III.B, this Settlement shall operate as a full and final settlement, release, discharge,

accord and satisfaction of all the issues, disputes, claims, demands, liabilities, rights, and/or

obligations related to or arising out of this proceeding.

## III.    EFFECTIVE DATE AND CONDITIONS

### A.    Effective Date

This Settlement shall take effect on the date the Settlement is accepted by the

Commission in a Final Order, provided that, if the Commission accepts this Settlement subject to

condition or modification, all Settling Parties notify the other Settling Parties and the

Commission in accordance with section III.B that any such condition or modification is

acceptable (the "Effective Date").  For purposes of this Settlement, an order shall be deemed to

be a "Final Order" as of the date it is issued by the Commission if no comments are filed in

opposition to this Settlement, or, if such comments are filed, the date rehearing is denied by the

Commission, or, if rehearing is not sought, the date on which the right to seek Commission

rehearing expires.

### B.    Conditions

This Settlement is expressly conditioned upon the acceptance of all provisions hereof by

the Commission in accordance with Rule 602, without condition or modification.  If the

Commission fails to accept this Settlement in its entirety without condition or modification, then

6

the Settlement shall not become effective and shall be null and void, unless (i) the Commission's order accepted the Settlement subject to one or more conditions or modifications; (ii) each of the Settling Parties notifies all of the other Settling Parties and the Commission in writing within ten (10) days of such Commission order that it accepts such condition(s) or modification(s); and (iii) the order becomes a Final Order.

No Settling Party shall be bound by any part of this Settlement and the Settlement shall be null and void unless it becomes effective in the manner provided by this Article III, as applicable.

## IV.    MODIFICATIONS TO SETTLEMENT; STANDARD OF REVIEW

### A.    Modifications

If the Settling Parties agree to change the terms of this Settlement, they shall do so only through a written amendment, executed by the Settling Parties, and accepted by the Commission.

### B.    Standard of Review

The standard of review for any modification to this Settlement, whether (i) set forth in a written amendment executed by the Settling Parties, or (ii) pursuant to the Commission's exercise of its authority under section 206 of the Federal Power Act, whether acting *sua sponte* or on a complaint filed by a Settling Party or by a non-Settling Party, shall be the "just and reasonable" standard.

## V.    MISCELLANEOUS

A.    The discussions among the Settling Parties have been conducted with the explicit understanding and agreement, pursuant to Rule 602(e) of the Commission's Rules of Practice

and Procedure, that all offers of settlement and discussions relating thereto are and shall be privileged, shall be without prejudice to the positions of any Settling Party or participant presenting any such offer or participating in any such discussion, and are not to be used in any manner in connection with this proceeding or otherwise.

    **B.**    This Settlement is entered into upon the understanding that it constitutes a negotiated agreement and, except as explicitly set forth herein, no Settling Party shall be deemed to have approved, accepted, agreed to, or consented to any principle or position advanced or taken in this proceeding by any other participant, or to have prejudiced positions taken or that may be taken by such Settling Party in this or any other proceeding.  This Settlement shall not be cited or relied upon as precedent for any purpose, including retail ratemaking, or as establishing any issue or principle, except to the extent of enforcing the terms and conditions of the Settlement itself.  Nothing herein shall be deemed a "settled practice" as that term was interpreted and applied in *Public Service Comm'n of New York v. FERC*, 642 F.2d 1335 (D.C. Cir. 1980).

    **C.**    Section headings are used in this Settlement solely for convenience of reference and shall not be used to interpret or modify the terms of this Settlement.

    **D.**    Other than the moratorium on the effective date of changes to the settled ROE in section II.C.3, nothing in this Settlement shall constitute a waiver of, or limitation on, any Settling Party's rights under sections 205 or 206 of the Federal Power Act.

IN WITNESS WHEREOF, this Settlement is entered into as of the date first written above by and between the Settling Parties through their authorized representatives, who represent that they are fully authorized to do so on behalf of their principals.

_____
Kenneth G. Jaffe
Richard P. Sparling
Alston & Bird, LLP
950 F Street, NW
Washington, DC 20004
*Attorneys for American Transmission*
  *Systems, Incorporated*

_____
Gary J. Newell
Jennings, Strouss & Salmon, PLC
1350 I Street, NW
Suite 810
Washington, D.C. 20005-3305
*Attorney for American Municipal*
  *Power, Inc.*

_____
Peter C. Lesch
Thompson Hine LLP
1919 M Street, N.W.
Suite 700
Washington, DC 20036-1600
*Attorney for Buckeye Power, Inc.*

_____
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
777 North Capitol Street, NE
Suite 401
Washington, DC 20002
*Attorney for the Industrial Energy*
  *Users-Ohio*

9

IN WITNESS WHEREOF, this Settlement is entered into as of the date first written above by and between the Settling Parties through their authorized representatives, who represent that they are fully authorized to do so on behalf of their principals.

_____
Kenneth G. Jaffe
Richard P. Sparling
Alston & Bird, LLP
950 F Street, NW
Washington, DC 20004
*Attorneys for American Transmission
 Systems, Incorporated*

_____
Gary J. Newell
Jennings, Strouss & Salmon, PLC
1350 I Street, NW
Suite 810
Washington, D.C. 20005-3305
*Attorney for American Municipal
Power, Inc.*

_____
Peter C. Lesch
Thompson Hine LLP
1919 M Street, N.W.
Suite 700
Washington, DC 20036-1600
*Attorney for Buckeye Power, Inc.*

_____
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
777 North Capitol Street, NE
Suite 401
Washington, DC 20002
*Attorney for the Industrial Energy
 Users-Ohio*

9

Case: 21-4072     Document: 75     Filed: 12/22/2023     Page: 180

IN WITNESS WHEREOF, this Settlement is entered into as of the date first written above by and between the Settling Parties through their authorized representatives, who represent that they are fully authorized to do so on behalf of their principals.

| | |
|---|---|
| Kenneth G. Jaffe<br>Richard P. Sparling<br>Alston & Bird, LLP<br>950 F Street, NW<br>Washington, DC 20004<br>*Attorneys for American Transmission Systems, Incorporated* | Gary J. Newell<br>Jennings, Strouss & Salmon, PLC<br>1350 I Street, NW<br>Suite 810<br>Washington, D.C. 20005-3305<br>*Attorney for American Municipal Power, Inc.* |
| Peter C. Lesch<br>Thompson Hine LLP<br>1919 M Street, N.W.<br>Suite 700<br>Washington, DC 20036-1600<br>*Attorney for Buckeye Power, Inc.* | Robert A. Weishaar, Jr.<br>McNees Wallace & Nurick LLC<br>777 North Capitol Street, NE<br>Suite 401<br>Washington, DC 20002<br>*Attorney for the Industrial Energy Users-Ohio* |

9

IN WITNESS WHEREOF, this Settlement is entered into as of the date first written above by and between the Settling Parties through their authorized representatives, who represent that they are fully authorized to do so on behalf of their principals.


_____
Kenneth G. Jaffe
Richard P. Sparling
Alston & Bird, LLP
950 F Street, NW
Washington, DC 20004
*Attorneys for American Transmission*
 *Systems, Incorporated*

_____
Gary J. Newell
Jennings, Strouss & Salmon, PLC
1350 I Street, NW
Suite 810
Washington, D.C. 20005-3305
*Attorney for American Municipal*
*Power, Inc.*


_____
Peter C. Lesch
Thompson Hine LLP
1919 M Street, N.W.
Suite 700
Washington, DC 20036-1600
*Attorney for Buckeye Power, Inc.*

_____
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
777 North Capitol Street, NE
Suite 401
Washington, DC  20002
*Attorney for the Industrial Energy*
 *Users-Ohio*


9

A95

Document Accession #: 20160311-3030    Filed Date: 03/11/2016

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, DC 20426

OFFICE OF ENERGY MARKET REGULATION

American Transmission System, Incorporated
Docket No.    ER15-303-002

Issued:  3/11/16

Alston & Bird LLP
950 F Street, NW
Washington, DC 20004

PJM Interconnection, L.L.C.
Pauline Foley
2750 Monroe Blvd
Norristown, PA 19403

Attention:    Kenneth G. Jaffe, Attorney for American Transmission System,
Incorporated

Reference:    Superseding Settlement Agreement Compliance Filing

Dear Mr. Jaffe:

On January 15, 2016, you filed on behalf of American Transmission System,
Incorporated (ATSI) a compliance filing to implement the settlement agreement
(Settlement) filed on July 20, 2015 by ATSI, American Municipal Power, Inc.,
Buckeye Power, Inc, Industrial Energy Users –Ohio (collectively, Settlement Parties).[1]  ATSI
explains that the Settlement was approved by the Commission on October 29, 2015 and
resolves all issues in this proceeding.[2]  ATSI further explains that the instant superseding

---

[1] OATT ATT H-21A, OATT Attachment H-21A - ATSI, 3.2.0,
OATT ATT H-21A App D, OATT Attachment H-21A Appendix D - ATSI, 1.1.0,
OATT Att H-21A App D, OATT Attachment H-21A Appendix D (True-up), 0.2.0,
OATT ATT H-21A App E, OATT Attachment H-21A Appendix E - ATSI, 1.1.0,
OATT Att H-21A App E, OATT Attachment H-21A Appendix E (True-up), 0.2.0,
OATT Att H-21A App H, OATT Attachment H-21A Appendix H, 0.2.0,  OATT ATT H-
21B, OATT Attachment H-21B - ATSI Protocol, 1.2.0.

[2] *American Transmissions Systems, Inc.*, 153 FERC ¶ 61,106 (2015).

Document Accession #: 20160311-3030      Filed Date: 03/11/2016

Docket No. ER15-303-002                                                - 2 -

filing corrects certain discrepancies identified by the Settling Parties in the original compliance filing filed with the Commission on November 30, 2015.

We note that the formula rate template filed as part of the Settlement contains references to certain costs that are the subject of a related, ongoing proceeding (i.e., ATSI's exit from the Midcontinent Independent System Operator, Inc. (MISO) and integration into PJM).[3]  Specifically, line 5a of ATSI's formula rate template has placeholders that refer to the costs of transmission projects previously identified in the MISO Transmission Expansion Plan and approved by the MISO Board of Directors prior to ATSI's integration into PJM.  Therefore, our approval of the formula rate template in the Settlement is subject to the outcome of the ATSI integration proceeding.

Pursuant to the authority delegated to the Director, Division of Electric Power Regulation – East, under 18 C.F.R. § 375.307, your submittal is accepted for filing, effective as requested.

The filing was noticed on January 15, 2016, with comments, interventions, and protests due on or before February 5, 2016.  Pursuant to Rule 214 (18 C.F.R. § 385.214 (2015)), to the extent that any timely filed motions to intervene and any motion to intervene out-of-time were filed before the issuance date of this order, such interventions are granted.  Granting late interventions at this stage of the proceeding will not disrupt the proceeding or place additional burdens on existing parties.

This acceptance for filing shall not be construed as constituting approval of the referenced filing or of any rate, charge, classification, or any rule, regulation, or practice affecting such rate or service contained in your filing; nor shall such acceptance be deemed as recognition of any claimed contractual right or obligation associated therewith; and such acceptance is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against ATSI or PJM Interconnection, L.L.C.

This order constitutes final agency action.  Requests for rehearing by the Commission may be filed within 30 days of the date of issuance of this order, pursuant to 18 C.F.R. § 385.713.

Sincerely,

---

[3] The ATSI integration proceeding spans across several pending filings in Docket Nos. ER11-2815 and ER11-2814.

Document Accession #: 20160311-3030     Filed Date: 03/11/2016

Docket No. ER15-303-002                                          - 3 -

Kurt M. Longo, Director
Division of Electric Power
Regulation – East

Document Content(s)
ER15-303-002 Delegated Letter.DOC........................................1



Steven J. Ross
202 429 6279
sross@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

March 28, 2018

The Honorable Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC  20426

Re:    ***Appalachian Power Co., et al.,* Docket No. ER18-___-000**
       (***American Municipal Power, Inc., et al. v.* Docket No. EL17-13-00_)**
       <u>**Settlement Agreement and Offer of Settlement**</u>

Dear Secretary Bose,

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, American

Electric Power Service Corporation ("AEPSC"), on behalf of its affiliates Appalachian Power

Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power

Company, Ohio Power Company, and Wheeling Power Company (collectively the "AEP East

Operating Companies"), and AEP Appalachian Transmission Company, Inc., AEP Indiana

Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio

Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc. (collectively

the "AEP East Transmission Companies," and with the AEP East Operating Companies "AEP")

hereby submits an executed Settlement Agreement that is intended to  provide a final and

A100

The Honorable Kimberly D. Bose
March 28, 2018



complete resolution of all issues raised by the Complainants and set for hearing in the docket.[1]

The Offer of Settlement is tendered jointly by AEP and the Settling Complainants.[2]

    In accordance with Rule 602(c)(1), the settlement filing consists of:

    1.       This transmittal letter;

    2.       An Explanatory Statement;

    3.       The Settlement Agreement (including Exhibits A & B);

    4.       Clean Tariff Attachment; and

    5.       Marked Tariff Attachment.

Pro forma tariff records also are being submitted with the settlement filing: the tariff records for the AEP East Operating Companies (Attachments H-14B Part I and Part II of the PJM Tariff); and the AEP East Transmission Companies (Attachments H-20B Part I and Part II of the PJM Tariff).

    AEP certifies that it is serving a link to this settlement filing on all parties in Docket EL17-13.  AEP will also file a copy of this transmittal letter only in that docket, in accordance

---

[1] Pursuant to Order No. 714, this filing is submitted by PJM on behalf of AEP as part of an XML filing package that conforms with the Commission's regulations.  PJM has agreed to make all filings on behalf of the PJM Transmission Owners in order to retain administrative control over the PJM Tariff.  Thus, AEP has requested PJM submit the tariff revisions discussed below that are part of the settlement in the eTariff system as part of PJM's electronic Intra-PJM Tariff.

[2] One of the original Complainants, Old Dominion Electric Cooperative ("ODEC"), states that it does not affirmatively support the Settlement but also does not oppose it.  Therefore, the Complainants other than ODEC are referred to in the settlement documents as the "Settling Complainants."

2

The Honorable Kimberly D. Bose
March 28, 2018



with Staff's preference as to the filing of settlements that require new dockets be opened.[3]  In addition, PJM has served a copy of this filing on all PJM Members and on all state utility regulatory commissions in the PJM Region by posting this filing electronically.  In accordance with the Commission's regulations,[4] PJM will post a copy of this filing to the FERC filings section of its internet site, located at the following link: http://www.pjm.com/documents/ferc-manuals/ferc-filings.aspx with a specific link to the newly-filed document, and will send an e-mail on the same date as this filing to all PJM Members and all state utility regulatory commissions in the PJM Region[5] alerting them that this filing has been made by PJM and is available by following such link.  If the document is not immediately available by using the referenced link, the document will be available through the referenced link within 24 hours of the filing.  Also, a copy of this filing will be available on the Commission's eLibrary website located at the following link: http://www.ferc.gov/docs-filing/elibrary.asp in accordance with the Commission's regulations and Order No. 714.

Communications concerning this docket should be sent to the following:

Christopher K. Duffy                        Steven Ross
ckduffy@aep.com                          sross@steptoe.com
614.716.2319                               202.429.6279

---

[3] Also note that later today, AEP plans to file a Motion for Interim Rates associated with the new docket created by this filing as well as in other pending dockets.

[4] *See* 18 C.F.R §§ 35.2(e) and 385.2010(f)(3) (2017).

[5] PJM already maintains, updates and regularly uses e-mail lists for all PJM members and affected state commissions.

The Honorable Kimberly D. Bose
March 28, 2018



In accordance with Commission regulations, comments on the Settlement Agreement are due twenty (20) days from the date of this filing, making comments due April 17, 2018.  Reply comments are due April 27, 2018.  As set forth in Rule 602(f)(3), failure to file comments within these time periods will be deemed a waiver of the right to file comments on the Settlement Agreement.

Respectfully submitted,
_____ */s/ Steven Ross*

Counsel for
American Electric Power Service Corporation

Attachments

cc:    The Honorable Steven L. Sterner
        All participants

4

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person

designated on the official service list compiled by the Secretary in Docket No. EL17-13.

Dated at Washington, D.C., this 28th day of March, 2018.

*/s/ Kevin Haggerty*
Kevin Haggerty
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
khaggerty@steptoe.com
(202) 429-6745

1

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| American Municipal Power, Inc. | ) | |
| Blue Ridge Power Agency | ) | |
| Craig-Botetourt Electric Cooperative | ) | |
| Indiana Michigan Municipal Distributors Association | ) | |
| Indiana Municipal Power Agency | ) | |
| Old Dominion Electric Cooperative, Inc. | ) | |
| Wabash Valley Power Association, Inc. | ) | |
| Complainants | ) | |
| | ) | Docket No. EL17-13-000 |
| v. | ) | |
| | ) | |
| Appalachian Power Company | ) | |
| Indiana Michigan Power Company | ) | |
| Kentucky Power Company | ) | |
| Kingsport Power Company | ) | |
| Ohio Power Company | ) | |
| Wheeling Power Company | ) | |
| AEP Appalachian Transmission Company, Inc. | ) | |
| AEP Indiana Michigan Transmission Company, Inc. | ) | |
| AEP Kentucky Transmission Company, Inc. | ) | |
| AEP Ohio Transmission Company, Inc. | ) | |
| AEP West Virginia Transmission Company, Inc. | ) | |
| Respondents | ) | |

**EXPLANATORY STATEMENT IN SUPPORT OF**
**SETTLEMENT AGREEMENT AND OFFER OF SETTLEMENT**

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2017), complainants American Municipal Power, Inc., Blue Ridge Power Agency, Craig-Botetourt Electric Cooperative, Indiana Michigan Municipal Distributors Association, Indiana Municipal Power Agency, and Wabash Valley Power Association, Inc.[1] and the

---

[1] One of the original Complainants, Old Dominion Electric Cooperative ("ODEC"), states that it does not affirmatively support the Settlement but also does not oppose it. As the terms are used herein, the Complainants

[Footnote continued on following page]

Respondents[2] in this proceeding submit the following Explanatory Statement in support of the Settlement Agreement and Offer of Settlement ("Settlement") being filed concurrently herewith. As explained below, the Settlement would provide a final and complete resolution of all issues raised by the Complainants and set for hearing in the docket. The Settling Parties submit that the Settlement provides a fair and reasonable resolution of the pending issues and that the Commission's approval of the Settlement would be in the public interest.

## I.    INTRODUCTION

On October 27, 2016, the Complainants filed a complaint pursuant to Section 206 of the Federal Power Act ("FPA"), 16 U.S.C. §§ 824e (2015), and Rule 206 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.206 (2017) alleging that the 10.99% base return on common equity ("Base ROE") currently used to calculate the Respondents' annual transmission revenue requirements under Attachments H-14 and H-20 of the PJM Open Access Transmission Tariff ("PJM Tariff") is excessive and therefore unjust and unreasonable. Complainants asked Commission to establish a just and reasonable Base ROE, make the new Base ROE effective as of October 27, 2016 (the filing date of the complaint), and order refunds with interest calculated in accordance with the Commission's Regulations.[3] The Respondents timely answered the complaint and opposed the Complainants' request for relief.

---

other than ODEC are the "Settling Complainants." Individually, any Settling Complainant and any Respondent is a "Settling Party," and, collectively, the Settling Complainants and the Respondents are the "Settling Parties."

[2] The Respondents are: (1) Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, and Wheeling Power Company (together, the AEP East Operating Companies); and (2) AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc. (together, the AEP East Transcos). The Respondents are collectively referred to herein as the "AEP East Companies" or "AEP."

[3] *See* section 35.19a of the Commission's Regulations, 18 C.F.R. § 35.19a (2017).

On November 16, 2017, the Commission issued an order setting the complaint for hearing and directing the parties to engage in settlement judge procedures.[4]  On November 21, 2017, the Commission's Chief Administrative Law Judge issued an order designating Judge Steven L. Sterner to act as Settlement Judge.  The parties met before Judge Sterner twice (on December 8, 2017 and February 15, 2018) and exchanged settlement offers and counter-offers.  Following the second settlement conference, the Settling Parties reached agreement in principle on the terms set forth in the Settlement.

## II.    ITEMS INCLUDED IN THE SETTLEMENT FILING

Along with this Explanatory Statement, the Settling Parties are submitting the Settlement Agreement and Offer of Settlement (including revised tariff sheets) and a certificate of service.

## III.    SUMMARY OF THE SETTLEMENT

Following is an overview of the terms of the Settlement.  In the event any provision of the Settlement differs from its description in this Explanatory Statement, the terms of the Settlement govern.

**Article I** of the Settlement provides a description of the procedural background of the Settlement.

**Article II** sets forth the scope of the Settlement and states that it presents a resolution of all issues raised by the Complainants and set for hearing in this docket by the Commission's November 16, 2017 order.

---

[4]    *American Municipal Power, Inc. v. Appalachian Power Company*, 161 FERC ¶ 61,192 (2017).  The Commission also established a refund effective date of October 27, 2016, as requested in the complaint.

**Article III** sets forth the substantive terms of the Settlement.  **Part III.A.1** states that the Base ROE used to calculate charges for the AEP East Companies under PJM Tariff Attachments H-14 and H-20 shall be reduced from 10.99% to 9.85% for services rendered on and after January 1, 2018.  **Part III.A.2** states that the equity component included in each AEP East Company's capital structure shall be the lesser of such AEP East Company's actual equity capital component (expressed as a percentage) or 55%.[5]  The 9.85% base ROE and the 55% equity cap will be effective for service rendered on and after January 1, 2018 and will remain in effect until superseded pursuant to one or more filings made in compliance with Section 205 or Section 206 of the Federal Power Act.  **Part III.A.3** of the Settlement addresses the effect of the Tax Cuts and Jobs Act of 2017 ("TCJA") on the AEP East Companies' revenue requirements and charges for services rendered on and after January 1, 2018.  It provides that the provisions of the TCJA will be applied in full beginning with the interim rates to be requested by AEP rather than being recognized for the first time through the True-Up Adjustment for 2018.  Part III.A.3 also provides that any accumulated deferred income taxes that are (i) rendered "excess" by the TCJA's change in the corporate income tax rate and (ii) not subject to TCJA provisions governing the availability of normalization accounting will be returned to customers over 10 years.  Finally, **Part III.A.4** provides that, for the period between the date the Complaint was filed and December 31, 2017, the AEP East Companies shall calculate and direct PJM to provide a lump-sum credit against charges otherwise payable by transmission customers equal to the sum of (i) $50 million, and (ii) interest on that $50 million amount calculated at a specified rate for the period from April 1,

---

[5]  Any portion of the equity capital in an AEP East Company's capital structure that exceeds the 55% limitation will be included in the long-term debt component of that company's capital structure.

2018 through the date that the $50 million credit is applied to the rates charged under PJM Tariff Attachments H-14A and H-20A.[6]

The Settlement also includes provisions governing the implementation of the substantive settlement terms. **Part III.B** states that, concurrent with the filing of the Settlement, AEP will file a motion for permission to implement interim tariff sheets that incorporate the terms of the Settlement into the settlement tariff sheets currently pending before the Commission in connection with the settlement filed in Docket Nos. ER17-405 and ER17-406 ("Settlement Tariff Sheets").[7] Not more than five (5) business days after the issuance of an order granting AEP's request for interim rate authority, AEP will direct PJM to post a revised Annual Projection and associated rates for 2018 calculated in accordance with the Settlement Tariff Sheets.[8] AEP will direct PJM to utilize the revised Annual Projection in assessing charges for services furnished on and after January 1, 2018 by (i) applying interim rates based on the revised Annual Projection and the Settlement Tariff Sheets, and (ii) providing each affected PJM transmission customer with a one-time billing credit for service provided during the months in 2018 that precede the date on which the Settlement Tariff Sheets are first applied on an interim basis. The billing credit will be equal to the difference between the charges assessed to the customer based on the originally

---

[6]  The interest rate specified in the Settlement is the refund interest rate posted by the Commission at https://www.ferc.gov/enforcement/acct-matts/interest-rates.asp expressed on a monthly basis, compounded in accordance with section 35.19a of the Commission's Regulations. Part III.A.4 also calls for an adjustment if the posted interest rate varies from that specified in the Settlement.

[7]  Docket Nos. ER17-405 and ER17-406 involve proposed amendments to PJM Tariff Attachments H-14A and H-20A to implement "forward-looking" formula rates for the AEP East Companies rather than rates based on historic costs. An uncontested settlement of those dockets was filed on December 14, 2017 and was certified to the Commission on January 17, 2018.

[8]  The revised Annual Projection will incorporate the terms of settlement specified in Part III.A of the Settlement in the calculations provided for in PJM Tariff Attachments H-14B and H-20B as set forth in the tariff sheets pending Commission approval in Docket Nos. ER17-405 and ER17-406, and including a new projection of the stated PBOP rate for the AEP Operating Companies. The revised Annual Projection will make no other changes to components of the Annual Projection for 2018 previously posted for AEP.

posted Annual Projection and the charges that would have been assessed to the customer had those charges been based on the revised Annual Projection and the rates contained in the Settlement Tariff Sheets during such months.  AEP will direct PJM to implement the billing adjustment not later than the second month after the month in which an order granting AEP's request for interim rate authority is issued.[9]

**Article  IV** provides that the Settlement will be effective on the date on which a Commission Order accepting or approving the Settlement without modification or condition unacceptable to any Settling Party becomes final and non-appealable.

**Article V** states that, in entering into the Settlement, no Settling Party will be deemed to have approved or accepted any fact, principle or method, and that the Commission's approval of the Settlement does not constitute precedent, will not be used to prejudice any otherwise available rights or arguments of any Settling Party in any future proceeding, and may not be used as evidence that a particular method is a "long-standing practice" or a "settled practice."

**Article  VI** establishes the standard of review applicable to modifications of the Settlement.  Unless the Settling Parties otherwise agree in writing, the standard of review for any modification proposed by one or more (but fewer than all) of the Settling Parties will be the "public interest" application of the just and reasonable standard of review.  The standard of review for any modification requested by a non-Settling Party or initiated by the Commission acting *sua sponte* will be the ordinary "just and reasonable" standard of review.

---

[9]  Part III.B.4 of the Settlement specifies steps to be taken in the event the Commission does not accept or approve the Settlement without modification or condition unacceptable to any Settling Party, and if the Settling Parties are unable to agree on alternative, mutually acceptable terms.

**Article VII** of the Settlement contains miscellaneous provisions governing such matters as interpretation, admissibility of the Settlement, waiver and preservation of the Settling Parties' rights under Sections 205 and 206 of the Federal Power Act.

Finally, **Settlement Exhibits A and B** provide clean and marked tariff sheets that implement the terms of the Settlement.[10]

## IV.    THE SETTLEMENT SHOULD BE CERTIFIED AND APPROVED

The Settlement would provide a complete and final resolution of all issues raised by the Complainants and set for hearing in this proceeding.  In the view of the Settling Parties, the Settlement taken as a whole resolves those issues in a manner that is fair and reasonable.  Among the factors supporting approval of the Settlement is that it provides certain benefits to the Complainants and others that could not have been achieved through litigation, avoids the costs and uncertainty of litigation, and conserves the resources of the parties and the Commission.  The Settling Parties therefore submit that approval of the Settlement is in the public interest.  On that basis, the Settling Parties respectfully request that the Settlement Judge promptly certify the settlement to the Commission and that the Commission approve the Settlement.

## V.    RESPONSES TO QUESTIONS

By order dated October 23, 2003, the Chief Administrative Law Judge required that five questions be answered as part of every Explanatory Statement submitted in support of a proposed settlement. The questions and specific responses applicable to this Settlement are as follows:

---

[10] The revised tariff sheets appended to the Settlement Agreement incorporate the terms of the Settlement into the settlement tariff sheets pending before the Commission in connection with the settlement filed in Docket Nos. ER17-405 and ER17-406.  The Marked Tariff Sheets included in Settlement Exhibit B show changes to the settlement tariff sheets pending in  Docket Nos. ER17-405 and ER17-406 that are necessary to implement the terms of the Settlement being filed herewith.

1.    **What are the issues underlying the settlement and what are the major implications?**

The principal issue underlying the Settlement is the level of the Base ROE to be included in the determination of revenue requirements and rates for the AEP East Companies under PJM Tariff Attachments H-14A and H-20A.  The Settlement provides for a substantial reduction in the Base ROE as well as a cap on the equity component of the AEP East Companies' capital structures, accelerated recognition of the effects of the Tax Cuts and Jobs Act of 2017, and a significant refund.  The aggregate effect is a reduction in the transmission rates charged to customers in the AEP Zone of PJM.

2.    **Whether any of the issues raise policy implications?**

The issues resolved by the Settlement do not raise any policy implications.

3.    **Whether other pending cases may be affected?**

No pending cases will be affected by the Settlement.  Although the Settlement provides for AEP to request interim rates that incorporate the terms of Settlement in this proceeding into the settlement tariff sheets pending before the Commission in Docket Nos. ER17-405 and ER17-406,[11] the Settlement has no effect on the substantive terms of the ER17-405/-406 settlement.

4.    **Whether the settlement involves issues of first impression, or if there are any previous reversals on the issues involved?**

The Settlement does not involve issues of first impression or previous reversals by the Commission.

5.    **Whether the proceeding is subject to the just and reasonable standard or whether there is *Mobile-Sierra* language making it the standard (*i.e.*, the applicable standards of review)?**

---

[11] As pointed out above (note 8, *supra*), a settlement of Docket Nos. ER17-405 and ER17-406 was filed on December 14, 2017 and was certified to the Commission on January 17, 2018.

Article VI of the Settlement establishes the applicable standard of review for modifications to the Settlement. The Settlement provides that the standard of review the Commission shall apply when acting on any modification proposed by any Settling Party that is not agreed to by all other Settling Parties shall be the "public interest" standard of review. Changes proposed by a non-Settling Party or by the Commission acting *sua sponte* shall be subject to the ordinary "just and reasonable" standard of review.

## VI.    CONCLUSION

For the reasons stated above, the Settling Parties request that the Settlement Judge promptly certify the Settlement to the Commission and that the Commission approve the Settlement without condition or modification.

Respectfully submitted,


__*/s/   Gary J. Newell*___
Gary J. Newell
Andrea I. Sarmentero Garzón
Jennings, Strouss & Salmon, PLC
1350 I Street, NW
Suite 810
Washington, DC 20005-3305

*Attorneys for American Municipal Power, Inc.*
*on behalf of the Settling Complainants*

__*/s/   Steven J. Ross*_____
Steven J. Ross
Heather M. Horne
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

*Attorneys for Respondents*

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| American Municipal Power, Inc. | ) | |
| Blue Ridge Power Agency | ) | |
| Craig-Botetourt Electric Cooperative | ) | |
| Indiana Michigan Municipal Distributors Association | ) | |
| Indiana Municipal Power Agency | ) | |
| Old Dominion Electric Cooperative | ) | |
| Wabash Valley Power Association, Inc. | ) | |
| Complainants | ) ) | |
| v. | ) ) | Docket No. EL17-13-000 |
| Appalachian Power Company | ) | |
| Indiana Michigan Power Company | ) | |
| Kentucky Power Company | ) | |
| Kingsport Power Company | ) | |
| Ohio Power Company | ) | |
| Wheeling Power Company | ) | |
| AEP Appalachian Transmission Company, Inc. | ) | |
| AEP Indiana Michigan Transmission Company, Inc. | ) | |
| AEP Kentucky Transmission Company, Inc. | ) | |
| AEP Ohio Transmission Company, Inc. | ) | |
| AEP West Virginia Transmission Company, Inc. | ) | |
| Respondents | ) ) | |

## SETTLEMENT AGREEMENT AND OFFER OF SETTLEMENT

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R.

§ 385.602 (2017) and in accordance with other applicable Commission procedures,[1] American

Municipal Power, Inc., Blue Ridge Power Agency, Craig-Botetourt Electric Cooperative, Indiana

Michigan Municipal Distributors Association, Indiana Municipal Power Agency, and Wabash

---

[1] *See, e.g., Notice of Additional eTariff Type of Filing Codes* (Dec. 1, 2016); *Amended Notice to the Public on Information to be Provided with Settlement Agreements and Guidance on the Role of Settlement Judges* (Dec. 15, 2016); *Notice to the Public - Procedures Governing Rule 602 Settlement Filings* (Oct. 13, 2017).

Valley Power Association, Inc. (the "Complainants")[2] and the Respondents[3] in this proceeding hereby file this Settlement Agreement and Offer of Settlement ("Settlement") as a full and complete resolution of all issues raised by the Complainants and set for hearing in the docket.[4] The Settling Parties submit that the Settlement provides a fair and reasonable resolution of the pending issues and that the Commission's approval of the Settlement would be in the public interest.

**ARTICLE I**
**PROCEDURAL HISTORY**

On October 27, 2016, the Complainants filed a complaint pursuant to Section 206 of the Federal Power Act ("FPA"), 16 U.S.C. §§ 824e (2015), and Rule 206 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.206 (2016) alleging that the 10.99% base return on common equity ("Base ROE") currently used to calculate the Respondents' annual transmission revenue requirements under Attachments H-14 and H-20 of the PJM Open Access Transmission Tariff ("PJM Tariff") is excessive and therefore unjust and unreasonable. Complainants requested that the Commission establish a just and reasonable Base ROE, make the new Base ROE effective as of October 27, 2016 (the filing date of the complaint), and order refunds with interest

---

[2]   One of the original Complainants, Old Dominion Electric Cooperative, states that it does not affirmatively support the Settlement but also does not oppose it.

[3]   The Respondents are:  (1) Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, and Wheeling Power Company (together, the AEP East Operating Companies); and (2) AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc. (together, the AEP East Transcos).  The Respondents are hereby collectively referred to herein as the "AEP East Companies" or "AEP."

[4]   As the terms are used herein, the Complainants other than ODEC are the "Settling Complainants."  Individually, any Settling Complainant and any Respondent is a "Settling Party," and, collectively, the Settling Complainants and the Respondents are the "Settling Parties."

calculated in accordance with the Commission's Regulations.[5]  The Respondents timely answered the complaint and opposed the Complainants' request for relief.

On November 16, 2017, the Commission issued an order setting the complaint for hearing and directing the parties to engage in settlement judge procedures.[6]  On November 21, 2017, the Commission's Chief Administrative Law Judge issued an order designating Judge Steven L. Sterner to act as Settlement Judge.  Judge Sterner convened settlement conferences on December 8, 2017 and February 15, 2018. During and after those settlement conferences, the participants engaged in settlement negotiations and exchanged settlement offers and counter-offers. Following the second settlement conference, the Settling Parties reached agreement in principle on the terms of settlement set out below.  In the view of the Settling Parties, the Settlement represents a fair and reasonable resolution of the issues in the case, provides certain benefits to Complainants that could not have been achieved through litigation, and avoids the costs and uncertainty of litigation.

## ARTICLE II
## SCOPE OF SETTLEMENT

This Settlement represents a complete and final resolution of all issues raised by the Complainants and set for hearing by the Commission in its November 16, 2017 order in this proceeding.

---

[5]    *See* section 35.19a of the Commission's Regulations, 18 C.F.R. § 35.19a (2017).

[6]    *American Municipal Power, Inc. v. Appalachian Power Company*, 161 FERC ¶ 61,192 (2017). The Commission also established a refund effective date of October 27, 2016, as requested in the complaint.

## ARTICLE III
## TERMS OF SETTLEMENT AND IMPLEMENTATION

**A.     Terms of Settlement**

The Settling Parties agree that the calculation of Respondents' annual transmission revenue requirements and related charges established pursuant to PJM Tariff Attachments H-14 and H-20 shall conform to the terms set forth below.  Revised tariff sheets implementing the terms of the Settlement are appended to this Settlement Agreement as Settlement Exhibit A (Clean Tariff Sheets) and Settlement Exhibit B (Marked Tariff Sheets).[7]

1.     <u>Base ROE</u>

The Base ROE used to calculate Respondents' revenue requirements and charges under PJM Tariff Attachments H-14B and H-20B shall be reduced from 10.99% to 9.85% for services rendered on and after January 1, 2018.  The 9.85% base ROE shall remain in effect until superseded pursuant to one or more filings made in compliance with Section 205 or Section 206 of the Federal Power Act.

2.     <u>Equity Component Limitation</u>

For the purpose of calculating Respondents' revenue requirements and charges under PJM Tariff Attachments H-14B and H-20B, the capital structure of each AEP East Company shall be determined in accordance with the following for services rendered on and after January 1, 2018:

---

[7]   The revised tariff sheets appended to this Settlement Agreement incorporate the terms of this Settlement into the settlement tariff sheets pending before the Commission in connection with the settlement filed in Docket Nos. ER17-405 and ER17-406.   The Marked Tariff Sheets included in Settlement Exhibit B show changes to the settlement tariff sheets pending in  Docket Nos. ER17-405 and ER17-406 (with the revisions called for by the (ER17-405/-406 settlement incorporated and not marked) that are necessary to implement the terms of the instant Settlement.

(a)     The equity component included in each AEP East Company's capital structure[8] shall be the lesser of such AEP East Company's actual equity capital component (expressed as a percentage) or 55%; and

(b)     Any portion of the equity capital in an AEP East Company's capital structure that exceeds the 55% limitation shall be included in the long-term debt component of such company's capital structure.

The foregoing limitation on the equity capital component of each AEP East Company's capital structure shall remain in effect until superseded pursuant to one or more filings made in compliance with Section 205 or Section 206 of the Federal Power Act.

3.     Effects of 2017 Tax Law Changes

For the purpose of calculating Respondents' revenue requirements and charges under PJM Tariff Attachments H-14B and H-20B for services rendered on and after January 1, 2018:

(a)     The provisions of the Tax Cuts and Jobs Act of 2017, Public Law No. 115-97 (codified at 131 Stat. 2054) (hereinafter, "TCJA") shall be applied in full beginning with the interim rates provided for in Section III.B.2 hereof rather than being recognized for the first time through the True-Up Adjustment for 2018; and

(b)     Any portion of the "excess tax reserve" (as defined in TCJA section 1561(d)(3)(A)) that is not subject to the requirements for the availability of the normalization method of accounting set forth in TCJA section 1561(d)(1) or 1561(d)(2) shall be reduced ratably over

---

[8]     As shown at PJM Tariff Attachment H-14B (AEP East Companies - Transmission Cost of Service Formula Rate Utilizing Actual/Projected FERC Form 1 Data), line 152 and associated worksheets; and PJM Tariff Attachment H-20B (AEPTCo Subsidiaries in PJM - Transmission Cost of Service Formula Rate Utilizing Actual/Projected FERC Form 1 Data), line 135 and associated worksheets.

a 10-year period through credits to the federal income tax expense component of the revenue requirement calculated pursuant to PJM Tariff Attachments H-14B and H-20B.

    4.    <u>One-Time Reduction of Projected and Actual Revenue Requirements</u>

In consideration of the terms of settlement, for the period between the date that the Complaint was filed and December 31, 2017, the AEP East Companies shall calculate and direct PJM to provide a lump-sum credit against charges otherwise payable by transmission customers equal to the sum of (i) $50 million, and (ii) interest on such $50 million amount calculated at a monthly rate of 0.354% for the period from April 1, 2018 through the date that such $50 million is credited to the rates charged under PJM Tariff Attachments H-14A and H-20A, compounded quarterly in accordance with 18 C.F.R. § 35.19a(a)(iii)(B).  The lump sum credit shall be provided through a reduction in the amounts payable pursuant to the first monthly transmission service billing statement issued by PJM in accordance with PJM Tariff Attachments H-14A and H-20A following the date on which an order granting AEP's request for interim rate authority (to be filed pursuant to paragraph III.B.1 hereof) is granted.  If the interest rate posted by the Commission as effective for the period between April 1, 2018 and the date on which the foregoing credit is provided varies from an effective monthly rate of 0.354%, the amount of the lump-sum credit shall be adjusted to reflect the actual posted interest rate, and a corresponding charge or credit shall be included in the True-Up Adjustment for 2018 calculated in accordance with section 2 of PJM Tariff Attachments H-14A and H-20A.

**B.**    **Implementation**

The Settling Parties agree that the following steps shall be taken to implement the terms of settlement specified in section III.A above.

1.     Concurrently with the filing of this Settlement with the Commission, AEP shall file with the Commission's Chief Administrative Law Judge a motion for permission to implement interim tariff sheets that incorporate the terms of this Settlement into the settlement tariff sheets pending before the Commission in connection with the settlement filed in Docket Nos. ER17-405 and ER17-406 ("Settlement Tariff Sheets").  AEP shall be authorized to represent in its motion that the Settling Complainants support the request for interim rate authority allowing the Settlement Tariff Sheets to be placed into effect pending Commission consideration of this Settlement.

2.     Not more than five (5) business days after the Commission's Chief Administrative Law Judge issues an order granting AEP's request for interim rate authority, AEP shall direct PJM to post a revised Annual Projection and associated rates for 2018 calculated in accordance with the Settlement Tariff Sheets.  The revised Annual Projection shall incorporate the terms of settlement specified in section III.A above in the calculations provided for in PJM Tariff Attachments H-14B and H-20B as set forth in the tariff sheets pending before the Commission for approval in Docket Nos. ER17-405 and ER17-406, and including a new projection of the stated PBOP rate for the AEP Operating Companies.  The revised Annual Projection shall make no other changes to components of the Annual Projection for 2018 previously posted for AEP.  AEP shall direct PJM to utilize the revised Annual Projection in assessing charges for services furnished on and after January 1, 2018 by (i) applying interim rates that are based on the revised Annual Projection and the Settlement Tariff Sheets, beginning with the first monthly transmission service billing statement issued by PJM following the date on which AEP's request for interim rate authority is granted, and (ii) providing each PJM transmission customer subject to charges calculated in accordance with PJM Tariff Attachments H-14 and H-20 with a billing adjustment

for service provided during the months in 2018 that precede the date on which the Settlement Tariff Sheets are first applied on an interim basis, which adjustment shall be in the form of a one-time billing credit equal to the difference between the charges assessed to the customer based on the originally posted Annual Projection and the charges that would have been assessed to the customer had those charges been based on the revised Annual Projection and the rates contained in the Settlement Tariff Sheets during such months.  AEP shall direct PJM to implement the foregoing billing adjustment not later than the second month after the month in which an order granting AEP's request for interim rate authority is issued.

3.      Upon the issuance of a Commission order accepting or approving the Settlement without modification or condition unacceptable to any Settling Party, the Settlement Tariff Sheets shall supersede the affected portions of PJM Tariff Attachments H-14 and H-20 with an effective date of January 1, 2018.

4.      In the event the Settlement is not accepted or approved without modification or condition unacceptable to any Settling Party, and if the Settling Parties are unable to agree on alternative, mutually acceptable terms, then (i) this Settlement shall be of no force or effect and shall be deemed to be withdrawn, (ii) the proceedings in Docket Nos. EL17-13-000 shall continue, (iii) the Settlement Tariff Sheets shall be ineffective, and the previously effective versions of PJM Tariff Attachments H-14 and H-20 shall be reinstated pending further Commission action in this proceeding, and (iv) AEP shall be reimbursed for the difference between the charges that would have been assessed pursuant to the previously effective versions of PJM Tariff Attachments H-14 and H-20 and the charges that were assessed pursuant to the grant of interim rate authority that are attributable to the provisions of this Settlement.

## ARTICLE IV
## SETTLEMENT EFFECTIVE DATE

This Settlement shall be effective on the date on which a Commission Order accepting or approving this Settlement without modification or condition unacceptable to any Settling Party becomes final and non-appealable ("Settlement Effective Date"). The Settlement shall bind the Settling Parties as of the Settlement Effective Date.

## ARTICLE V
## NO PRECEDENTIAL EFFECT

It is specifically understood and agreed that the Settlement represents an agreement for the purpose of consensual resolution of the captioned docket and that no Settling Party shall be deemed to have approved, accepted, agreed, or consented to any fact, concept, theory, principle, or method in this proceeding. The Commission's approval of this Settlement (i) shall not constitute precedent, (ii) shall not be used to prejudice any otherwise available rights or arguments of any Settling Party in any future proceeding, other than to enforce the terms of this Settlement, and (iii) shall not be used as evidence that a particular method is a "long-standing practice," as that term is used in *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578 (D.C. Cir. 1975), or a "settled practice," as that term is used in *Public Service Commission of New York v. FERC*, 642 F.2d 1335 (D.C. Cir. 1980).

## ARTICLE VI
## STANDARD OF REVIEW FOR SETTLEMENT MODIFICATION

Unless the Settling Parties otherwise agree in writing, the standard of review for any modification to this Settlement proposed by one or more of the Settling Parties after the Settlement Effective Date shall be the "public interest" application of the just and reasonable standard of review set forth in *United Gas Pipe Line Co. v. Mobile Gas Service Corp*., 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co*., 350 U.S. 348 (1956)

(the *Mobile-Sierra* doctrine), as clarified in *Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County*, 554 U.S. 527 (2008) and refined in *NRG Power Marketing, LLC v. Maine Public Utilities Commission*, 558 U.S. 165, 174-75 (2010). The standard of review for any modifications to this Settlement requested by a non-Settling Party or initiated by the Commission acting *sua sponte* shall be the ordinary just and reasonable standard of review. *See Morgan Stanley Capital Group Inc*., 554 U.S. 527.

### ARTICLE VII
### MISCELLANEOUS

**A.    Final Resolution.**  Upon its acceptance or approval by the Commission without modification or condition unacceptable to any Settling Party, this Settlement shall be a final and complete resolution of all issues raised by the Complainants and set for hearing in this proceeding.

**B.    Binding.**  This Settlement is binding upon and for the benefit of the Settling Parties and their successors and assigns.

**C.    Exhibits; Entire Agreement.**  The exhibits to this Settlement Agreement are incorporated by reference as an integral part of the Settlement Agreement.  This Settlement Agreement constitutes the entire agreement between and among the Settling Parties with reference to the subject matter hereof and supersedes all prior or contemporaneous understandings or agreements, oral or written, between the Settling Parties with respect to the subject matter of this Settlement.

**D.    Interpretation.**  No Settling Party shall be deemed to have drafted this Settlement, and this Settlement shall not be construed against any Settling Party as the author.

**E.    Conflict.**  In the event of a conflict between terms contained in this Settlement and those of the attached Explanatory Statement, the terms of this Settlement shall control.

**F.    Admissibility of Settlement.**    This Settlement is submitted pursuant to Rule 602(e) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602(e). Unless and until the Settlement becomes effective pursuant to its terms, the Settlement shall be of no effect and shall not be admissible in evidence or in any way described or discussed in any proceeding before any court or regulatory body (except in comments on the Settlement in this proceeding). In addition, the discussions that produced this Settlement have been conducted with the understanding, pursuant to Rule 602(e), that all offers of settlement, and any discussions relating thereto, are and shall be privileged, shall be without prejudice to the position of any Settling Party, and are not to be used in any manner in connection with this or any other proceeding.

**G.    Contingent on Commission Approval.**    The terms and conditions of this Settlement are expressly contingent upon acceptance or approval by the Commission of this Settlement without material modification or condition. If the Commission by order conditions its approval of this Settlement or requires its modification, the Settlement shall be deemed withdrawn, shall not be considered to be part of the record in this proceeding, shall not become effective and shall be null and void, unless all of the Settling Parties, within ten business days of the issuance of the Commission's order, subject to extension by agreement of all of the Settling Parties, either (i) accept the Commission's modifications and conditions, or (ii) modify the Settlement to address or obviate the Commission's concerns.

**H.    Waiver.** No provision of this Settlement Agreement may be waived except through a writing signed by an authorized representative of the waiving Settling Party or the waiving Settling Parties. Waiver of any particular provision of this Settlement Agreement shall not be deemed to waive any other provision or provisions hereof.

**I.**     **Section 205 and 206 Filings**. Nothing contained herein shall be construed as affecting in any way the right of Respondents unilaterally to make an application to the Commission under Section 205 of the FPA to modify prospectively, in whole or in part, the Base ROE or Equity Component Limitation established for settlement purposes pursuant to sections III.A.1 and III.A.2 hereof, or the right of the Settling Complainants to oppose any such application.  Nothing contained herein shall be construed as affecting in any way the right of the Settling Complainants unilaterally to make an application to the Commission under Section 206 and/or Section 306 of the FPA to modify prospectively, in whole or in part, the Base ROE or Equity Component Limitation established for settlement purposes pursuant to section III.A.1 and section III.A.2 hereof, or the right of Respondents to oppose any such application.

**J.**     **Titles and Headings.** The titles and headings of the Settlement are for reference and convenience purposes only.  They are not to be construed or taken into account in interpreting the Settlement and do not qualify, modify, or explain the effect of the Settlement.

**K.**     **Enforceability and Waiver.** Any failure of any Settling Party (i) to enforce any of the provisions of this Settlement, or (ii) to require compliance with any of its terms at any time during the term of this Settlement, shall in no way affect the validity of this Settlement, or any part hereof, and shall not be deemed a waiver of the right of such Settling Party thereafter to enforce any and each such provision.

**L.**     **Counterparts.**  This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

[Signature blocks follow]

## SETTLING COMPLAINANTS

**American Municipal Power, Inc.**

By: _[signature]_

Pamala Sullivan
Executive Vice President of Power Supply &
Generation

March 21, 2018
_____
(Date)

**Blue Ridge Power Agency**

By: _____

Alice J. Wolfe
General Manager

_____
(Date)

**Craig-Botetourt Electric Cooperative**

By: _____

Shawn C. Hildebrand
Chief Executive Officer

_____
(Date)

**Indiana Michigan Municipal
Distributors Association**

By: _____

John Griffith, Superintendent
City of Sturgis Electric Department

_____
(Date)

**Indiana Municipal Power Agency**

By: _____

Raj Rao
President and Chief Executive Officer

_____
(Date)

**Wabash Valley Power Association, Inc.**

By: _____

Lee R. Wilmes
Executive Vice President Risk & Resource
 Portfolio

_____
(Date)

-13-

A126

## SETTLING COMPLAINANTS

**American Municipal Power, Inc.**

By: _____

_____
Pamala Sullivan
Executive Vice President of Power Supply &
Generation

_____
(Date)

**Blue Ridge Power Agency**

By: *Alice J. Wolfe*

_____
Alice J. Wolfe
General Manager

3/21/2018
_____
(Date)

**Craig-Botetourt Electric Cooperative**

By: _____

_____
Shawn C. Hildebrand
Chief Executive Officer

_____
(Date)

**Indiana Michigan Municipal
Distributors Association**

By: _____

_____
John Griffith, Superintendent
City of Sturgis Electric Department

_____
(Date)

**Indiana Municipal Power Agency**

By: _____

_____
Raj Rao
President and Chief Executive Officer

_____
(Date)

**Wabash Valley Power Association, Inc.**

By: _____

_____
Lee R. Wilmes
Executive Vice President Risk & Resource
 Portfolio

_____
(Date)

-13-

A127

**SETTLING COMPLAINANTS**

**American Municipal Power, Inc.**

By: _____

_____
Pamala Sullivan
Executive Vice President of Power Supply &
Generation

_____
(Date)

**Blue Ridge Power Agency**

By: _____

_____
Alice J. Wolfe
General Manager

_____
(Date)

**Craig-Botetourt Electric Cooperative**

By: _X. Hildebrand_

_____
Shawn C. Hildebrand
Chief Executive Officer

_March 21, 2018_
(Date)

**Indiana Michigan Municipal
Distributors Association**

By: _____

_____
John Griffith, Superintendent
City of Sturgis Electric Department

_____
(Date)

**Indiana Municipal Power Agency**

By: _____

_____
Raj Rao
President and Chief Executive Officer

_____
(Date)

**Wabash Valley Power Association, Inc.**

By: _____

_____
Lee R. Wilmes
Executive Vice President Risk & Resource
Portfolio

_____
(Date)

-13-

## SETTLING COMPLAINANTS

**American Municipal Power, Inc.**

By:

————————————————
Pamala Sullivan
Executive Vice President of Power Supply &
Generation

————————————————
(Date)

**Blue Ridge Power Agency**

By:

————————————————
Alice J. Wolfe
General Manager

————————————————
(Date)

**Craig-Botetourt Electric Cooperative**

By:

————————————————
Shawn C. Hildebrand
Chief Executive Officer

————————————————
(Date)

**Indiana Michigan Municipal Distributors Association**

By:

*John J Griffith*

John Griffith, Superintendent
City of Sturgis Electric Department

March 21, 2018
————————————————
(Date)

**Indiana Municipal Power Agency**

By:

————————————————
Raj Rao
President and Chief Executive Officer

————————————————
(Date)

**Wabash Valley Power Association, Inc.**

By:

————————————————
Lee R. Wilmes
Executive Vice President Risk & Resource
 Portfolio

————————————————
(Date)

Case: 21-4072     Document: 75     Filed: 12/22/2023     Page: 216

## SETTLING COMPLAINANTS

**American Municipal Power, Inc.**

By: _____

_____
Pamala Sullivan
Executive Vice President of Power Supply &
Generation

_____
(Date)

**Blue Ridge Power Agency**

By: _____

_____
Alice J. Wolfe
General Manager

_____
(Date)

**Craig-Botetourt Electric Cooperative**

By: _____

_____
Shawn C. Hildebrand
Chief Executive Officer

_____
(Date)

**Indiana Michigan Municipal
Distributors Association**

By: _____

_____
John Griffith, Superintendent
City of Sturgis Electric Department

_____
(Date)

**Indiana Municipal Power Agency**

By: _Raj R. Rao_

_____
Raj Rao
President and Chief Executive Officer

_3/21/18_
(Date)

**Wabash Valley Power Association, Inc.**

By: _____

_____
Lee R. Wilmes
Executive Vice President Risk & Resource
 Portfolio

_____
(Date)

-13-

A130

## SETTLING COMPLAINANTS

**American Municipal Power, Inc.**

By: _____

_____
Pamala Sullivan
Executive Vice President of Power Supply &
Generation

_____
(Date)

**Blue Ridge Power Agency**

By: _____

_____
Alice J. Wolfe
General Manager

_____
(Date)

**Craig-Botetourt Electric Cooperative**

By: _____

_____
Shawn C. Hildebrand
Chief Executive Officer

_____
(Date)

**Indiana Michigan Municipal
Distributors Association**

By: _____

_____
John Griffith, Superintendent
City of Sturgis Electric Department

_____
(Date)

**Indiana Municipal Power Agency**

By: _____

_____
Raj Rao
President and Chief Executive Officer

_____
(Date)

**Wabash Valley Power Association, Inc.**

By: _____

_____
Lee R. Wilmes
Executive Vice President Risk & Resource
Portfolio

3/21/18
_____
(Date)

-13-

Case: 21-4072   Document: 75   Filed: 12/22/2023   Page: 218

**RESPONDENTS**

**Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc.**

By: _____
(Signature)

Raja Sundararajan
(Name)

V.P. Regulatory Services
(Title)

3/23/18
(Date)

March 23, 2018

- 14 -

A132

# Exhibit A

# Clean Tariff Sheets

ATTACHMENT H-14B
BLANK FORMULA TEMPLATE - CLEAN

AEP East Companies                     For Twelve Months Ended
Transmission Cost of Service Formula Rate
Utilizing   Actual/Projected FERC Form 1 Data

**COMPANY NAME HERE**

| Line No. | | | | | | Transmission Amount |
|---|---|---|---|---|---|---|
| 1 | REVENUE REQUIREMENT (w/o incentives) | (ln 130) | | | | $0 |
| | | | Total | Allocator | | |
| 2 | REVENUE CREDITS | (Worksheet E ln 8) (Note A) | - | DA | 1.00000 | $ - |
| 3 | Facility Credits under PJM OATT Section 30.9 | (Worksheet E ln 9) (Note X) | | | | $ - |
| 4 | REVENUE REQUIREMENT For All Company Facilities | (ln 1 less ln 2 plus ln 3) | | | | $ - |

**MEMO:  The Carrying Charge Calculations on lines 7 to 12 below are used in calculating project revenue requirements billed through PJM Schedule 12, Transmission Enhancement Charges.  The total non-incentive revenue requirements for these projects shown on line 5 is included in the total on line 4.**

| | | | | | | |
|---|---|---|---|---|---|---|
| 5 | Revenue Requirement for PJM Schedule 12 Facilities (w/o incentives)  (Worksheet J/K) | | - | DA | 1.00000 | $ - |
| 6 | NET PLANT CARRYING CHARGE w/o intra-AEP charges or credits or ROE incentives (Note B) | | | | | |
| 7 | Annual Rate | ( (ln 1 - ln 95)/((ln 42) x 100) ) | | | | 0.00% |
| 8 | Monthly Rate | (ln 7 / 12) | | | | 0.00% |
| 9 | NET PLANT CARRYING CHARGE ON LINE 7 , w/o depreciation or ROE incentives (Note B) | | | | | |
| 10 | Annual Rate | ( (ln 1 - ln 95 - ln 100 ) /((ln 42) x 100) ) | | | | 0.00% |
| 11 | NET PLANT CARRYING CHARGE ON LINE 10, w/o Return, income taxes or ROE incentives (Note B) | | | | | |
| 12 | Annual Rate | ( (ln 1 - ln 95 - ln 100 - ln 125 - ln 126) /((ln 42) x 100) ) | | | | 0.00% |
| 13 | ADDITIONAL REVENUE REQUIREMENT for projects w/ incentive ROE's (Note B) (Worksheet J/K) | | | | | - |
| 14 | **REVENUE REQUIREMENT FOR SCHEDULE 1A CHARGES** | | | | | |
| 15 | Total Load Dispatch & Scheduling (Account 561) | Line 75 Below | | | | - |
| 16 | Less:  Load Dispatch - Scheduling, System Control and Dispatch Services (321.88.b) | | | | | |
| 17 | Less:  Load Dispatch - Reliability, Planning & Standards Development Services (321.92.b) | | | | | |
| 18 | Total 561 Internally Developed Costs | (Line 15 - Line 16 - Line 17) | | | | - |

A134

AEP East Companies

Transmission Cost of Service Formula Rate

Utilizing  Actual/Projected FERC Form 1 Data

COMPANY NAME HERE

| | (1) | (2)<br>Data Sources | | (3) | (4) | | (5)<br>Total |
|---|---|---|---|---|---|---|---|
| | **RATE BASE CALCULATION** | **(See "General Notes")** | **TO Total** | | **Allocator** | | **Transmission** |
| Line<br>No. | | | | NOTE C | | | |
| | GROSS PLANT IN SERVICE | | | | | | |
| 19 | Production | (Worksheet A ln 14.(b)) | - | NA | 0.00000 | - |
| 20 | Less: Production ARO (Enter Negative) | (Worksheet A ln 14.(c)) | - | NA | 0.00000 | - |
| 21 | Transmission | (Worksheet A ln 14.(d) & TCOS Ln 134) | - | DA | | - |
| 22 | Less: Transmission ARO (Enter Negative) | (Worksheet A ln 14.(e)) | - | TP | 0.00000 | - |
| 23 | Distribution | (Worksheet A ln 14.(f)) | - | NA | 0.00000 | - |
| 24 | Less: Distribution ARO (Enter Negative) | (Worksheet A ln 14.(g)) | - | NA | 0.00000 | - |
| 25 | General Plant | (Worksheet A ln 14.(h)) | - | W/S | 0.00000 | - |
| 26 | Less: General Plant ARO (Enter Negative) | (Worksheet A ln 14.(i)) | - | W/S | 0.00000 | - |
| 27 | Intangible Plant | (Worksheet A ln 14.(j)) | - | W/S | 0.00000 | - |
| 28 | TOTAL GROSS PLANT | (sum lns 19 to 27) | - | **GP=** | **0.000000** | - |
| | | | | **GTD=** | **-** | |
| 29 | ACCUMULATED DEPRECIATION AND AMORTIZATION | | | | | |
| 30 | Production | (Worksheet A 28.(b)) | - | NA | 0.00000 | - |
| 31 | Less: Production ARO (Enter Negative) | (Worksheet A 28.(c)) | - | NA | 0.00000 | - |
| 32 | Transmission | (Worksheet A 28.(d) & ln 43.(c)) | - | **TP1=** | 0.00000 | - |
| 33 | Less: Transmission ARO (Enter Negative) | (Worksheet A 28.(e)) | - | **TP1=** | 0.00000 | - |
| 34 | Distribution | (Worksheet A 28.(f)) | - | NA | 0.00000 | - |
| 35 | Less: Distribution ARO (Enter Negative) | (Worksheet A 28.(g)) | - | NA | 0.00000 | - |
| 36 | General Plant | (Worksheet A 28.(h)) | - | W/S | 0.00000 | - |
| 37 | Less: General Plant ARO (Enter Negative) | (Worksheet A 28.(i)) | - | W/S | 0.00000 | - |
| 38 | Intangible Plant | (Worksheet A 28.(j)) | - | W/S | 0.00000 | - |
| 39 | TOTAL ACCUMULATED DEPRECIATION | (sum lns 30 to 38) | - | | | - |
| 40 | NET PLANT IN SERVICE | | | | | |
| 41 | Production | (ln 19 + ln 20 - ln 30 - ln 31) | - | | | - |
| 42 | Transmission | (ln 21 + ln 22 - ln 32 - ln 33) | - | | | - |
| 43 | Distribution | (ln 23 + ln 24 - ln 34 - ln 35) | - | | | - |
| 44 | General Plant | (ln 25 + ln 26 - ln 36 - ln 37) | - | | | - |
| 45 | Intangible Plant | (ln 27 - ln 38) | - | | | - |
| 46 | TOTAL NET PLANT IN SERVICE | (sum lns 41 to 45) | - | **NP=** | **0.000000** | - |
| 47 | DEFERRED TAX ADJUSTMENTS TO RATE BASE    (Note D) | | | | | |
| 48 | Account No. 281.1 (enter negative) | (Worksheet B, ln 2 & ln 5.E) | - | NA | | - |
| 49 | Account No. 282.1 (enter negative) | (Worksheet B, ln 7 & ln 10.E) | - | DA | | - |
| 50 | Account No. 283.1 (enter negative) | (Worksheet B, ln 12 & ln 15.E) | - | DA | | - |
| 51 | Account No. 190.1 | (Worksheet B, ln 17 & ln 20.E) | - | DA | | - |
| 52 | Account No. 255 (enter negative) | (Worksheet B, ln 24 & ln 25.E) | - | DA | | - |
| 53 | TOTAL ADJUSTMENTS | (sum lns 48 to 52) | - | | | - |
| 54 | PLANT HELD FOR FUTURE USE | (Worksheet A ln 44.(e) & ln 45.(e)) | - | DA | | - |
| 55 | REGULATORY ASSETS | (Worksheet A ln 51.(e)) | - | DA | | - |
| 56 | UNFUNDED RESERVES (ENTER NEGATIVE) (NOTE Y) | (Worksheet A ln 54.(e)) | | W/S | | - |
| 57 | WORKING CAPITAL | (Note E) | | | | |
| 58 | Cash Working Capital | (1/8 * ln 78) | - | | | - |
| 59 | Transmission Materials & Supplies | (Worksheet C, ln 2.(F)) | - | TP | 0.00000 | - |
| 60 | A&G Materials & Supplies | (Worksheet C, ln 3.(F)) | - | W/S | 0.00000 | - |
| 61 | Stores Expense | (Worksheet C, ln 4.(F)) | - | GP | 0.00000 | - |
| 62 | Prepayments (Account 165) - Labor Allocated | (Worksheet C, ln 8.G) | - | W/S | 0.00000 | - |
| 63 | Prepayments (Account 165) - Gross Plant | (Worksheet C, ln 8.F) | - | GP | 0.00000 | - |
| 64 | Prepayments (Account 165) - Transmission Only | (Worksheet C, ln 8.E) | - | DA | 1.00000 | - |
| 65 | Prepayments (Account 165) - Unallocable | (Worksheet C, ln 8.D) | - | NA | 0.00000 | - |
| 66 | TOTAL WORKING CAPITAL | (sum lns 58 to 65) | - | | | - |
| 67 | IPP CONTRIBUTIONS FOR CONSTRUCTION | (Note F) (Worksheet D, ln 8.B) | - | DA | 1.00000 | |
| 68 | RATE BASE  (sum lns 46, 53, 54, 55, 56, 66, 67) | | - | | | - |

A135

AEP East Companies
Transmission Cost of Service Formula
Rate
Utilizing  Actual/Projected FERC Form 1 Data
COMPANY NAME HERE

| | (1) | | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|---|
| | **EXPENSE, TAXES, RETURN & REVENUE** | | **Data Sources** | | | **Total** |
| | **REQUIREMENTS** | | | | | |
| | **CALCULATION** | | **(See "General Notes")** | **TO Total** | **Allocator** | **Transmission** |
| Line No. | | | | | | |
| | **OPERATION & MAINTENANCE EXPENSE** | | | | | |
| 69 | Production | 321.80.b | | | | |
| 70 | Distribution | 322.156.b | | | | |
| 71 | Customer Related Expense | 322 & 323.164,171,178.b | | | | |
| 72 | Regional Marketing Expenses | 322.131.b | | | | |
| 73 | Transmission | 321.112.b | | | | |
| 74 | TOTAL O&M EXPENSES | (sum lns 69  to 73) | - | | | |
| 75 | Less: Total Account 561 | (Note G) (Worksheet F, ln 14.C) | - | | | |
| 76 | Less: Account 565 | (Note H) 321.96.b | | | | |
| 77 | Less: Regulatory Deferrals & Amortizations | (Note I) (Worksheet F, ln 4.C) | - | | | |
| 78 | Total O&M Allocable to Transmission | (lns 73 - 75 - 76 - 77) | - | TP | 0.00000 | - |
| 79 | Administrative and General | 323.197.b (Notes J and M) | | | | |
| 80 | Less:  Acct. 924, Property Insurance | 323.185.b | | | | |
| 81 | Acct. 9260039 PBOP Expense | PBOP Worksheet O Line 9 & 10, (Note K) | | | | |
| 82 | Acct. 9260057 PBOP Medicare Subsidy | PBOP Worksheet O Line 11, (Note K) | | | | |
| 83 | PBOP Expense Billed From AEPSC | PBOP Worksheet O Line 13, (Note K) | | | | |
| 84 | Acct. 928, Reg. Com. Exp. | 323.189.b | | | | |
| 85 | Acct. 930.1, Gen. Advert. Exp. | 323.191.b | | | | |
| 86 | Acct. 930.2, Misc. Gen. Exp. | 323.192.b | | | | |
| 87 | Balance of A & G | (ln 79 - sum ln 80  to ln 86) | - | W/S | 0.00000 | - |
| 88 | Plus: Acct. 924, Property Insurance | (ln 80) | - | GP | 0.00000 | - |
| 89 | Acct. 928 - Transmission Specific | Worksheet F ln 20.(E) (Note L) | - | TP | 0.00000 | - |
| 90 | Acct 930.1 - Only safety related ads -Direct | Worksheet F ln 37.(E) (Note L) | - | TP | 0.00000 | - |
| 91 | Acct 930.2 - Misc Gen. Exp. - Trans | Worksheet F ln 43.(E) (Note L) | - | DA | 1.00000 | - |
| 92 | Settlement Approved PBOP Recovery | PBOP Worksheet O, Col. C (Note M) | | W/S | 0.00000 | - |
| 93 | A & G Subtotal | (sum lns 87 to 92) | - | | | - |
| 94 | O & M EXPENSE SUBTOTAL | (ln 78 + ln 93) | - | | | - |
| 95 | Plus: Transmission Lease Payments To Affiliates in Acct 565 (Company Records) (Note H) | | | DA | 1.00000 | - |
| 96 | TOTAL O & M EXPENSE | (ln 94 + ln 95) | - | | | - |
| 97 | | DEPRECIATION AND AMORTIZATION EXPENSE | | | | |
| 98 | Production | 336.2-6.f | | NA | 0.00000 | - |
| 99 | Distribution | 336.8.f | | NA | 0.00000 | - |
| 100 | Transmission | 336.7.f | | TP1 | 0.00000 | - |
| 101 | General | 336.10.f | | W/S | 0.00000 | - |
| 102 | Intangible | 336.1.f | | W/S | 0.00000 | - |
| 103 | TOTAL DEPRECIATION AND AMORTIZATI0N | (Ln 98+99+ 100+101+102) | - | | | - |
| 104 | TAXES OTHER THAN INCOME | (Note N) | | | | |
| 105 | Labor Related | | | | | |
| 106 | Payroll | Worksheet H ln 24.(D) | - | W/S | 0.00000 | - |
| 107 | Plant Related | | | | | |
| 108 | Property | Worksheet H-1 ln 3.(C) & 3.(G) | - | DA | | 0 |
| 109 | Gross Receipts/Sales & Use | Worksheet H ln 24.(F) | - | NA | 0.00000 | - |
| 110 | Other | Worksheet H ln 24.(E) | - | GP | 0.00000 | - |
| 111 | TOTAL OTHER TAXES | (sum lns 106 to 110) | - | | | - |
| 112 | INCOME TAXES | (Note O) | | | | |
| 113 | T=1 - {[(1 - SIT) * (1 - FIT)] / (1 - SIT * FIT * p)} = | | 0.00% | | | |
| 114 | EIT=(T/(1-T)) * (1-(WCLTD/WACC)) = | | 0.00% | | | |
| 115 | where WCLTD=(ln 154) and WACC = (ln 157) | | | | | |
| 116 | and FIT, SIT & p are as given in Note O. | | | | | |
| 117 | GRCF=1 / (1 - T)  = (from ln 113) | | - | | | |

A136

| | | | | | | |
|---|---|---|---|---|---|---|
| 118 | Amortized Investment Tax Credit (enter negative) | (FF1 p.114, ln 19.c) | - | | | |
| 119 | Excess Deferred Income Tax | (Note U) | - | DA | 1.00000 | - |
| 120 | Tax Effect of Permanent and Flow-Through Differences | (Note U) | - | DA | 1.00000 | - |
| 121 | Income Tax Calculation | (ln 114 * ln 126) | - | | | - |
| 122 | ITC adjustment | (ln 117 * ln 118) | - | GP | 0.00000 | - |
| 123 | Excess Deferred Income Tax | (ln 117 * ln 119) | - | | | - |
| 124 | Tax Effect of Permanent and Flow-Through Differences | (ln 117 * ln 120) | - | | | - |
| 125 | TOTAL INCOME TAXES | (sum lns 121 to 124) | - | | | - |
| 126 | RETURN ON RATE BASE (Rate Base*WACC) | (ln 68 * ln 157) | - | | | - |
| 127 | INTEREST ON IPP CONTRIBUTION FOR CONST. (Note F) (Worksheet D, ln 2.(B)) | | - | DA | 1.00000 | - |
| 128 | (Gains) / Losses on Sales of Plant Held for Future Use (Worksheet N, ln 4, Cols. ((F) & (H))) | | | - | | |
| 129 | Tax Impact on Net Loss / (Gain) on Sales of Plant Held for Future Use (ln 128 * ln 114) | | | - | | - |
| 130 | TOTAL REVENUE REQUIREMENT | (sum lns 96, 103, 111, 125, 126, 127, 128, 129) | - | | | - |

AEP East Companies
Transmission Cost of Service Formula Rate
Utilizing  Actual/Projected FERC Form 1 Data
COMPANY NAME HERE

**SUPPORTING CALCULATIONS**

ln
No.   TRANSMISSION PLANT INCLUDED IN PJM TARIFF

| | | | | |
|---|---|---|---|---|
| 131 | Total transmission plant | (ln 21) | | - |
| 132 | Less transmission plant excluded from PJM Tariff  (Worksheet A, ln 42, Col. (d)) (Note P) | | | - |
| 133 | Less transmission plant included in OATT Ancillary Services (Worksheet A, ln 42, Col. (b)) (Note Q) | | | - |
| 134 | Transmission plant included in PJM Tariff | (ln 131 - ln 132 - ln 133) | | - |
| 135 | Percent of transmission plant in PJM Tariff | (ln 134 / ln 131) | **TP =** | **0.00000** |

| 136 | WAGES & SALARY ALLOCATOR (W/S) | (Note R) | Direct Payroll | Payroll Billed from AEP Service Corp. | Total | | |
|---|---|---|---|---|---|---|---|
| 137 | Production | 354.20.b | | - | NA | 0.00000 | - |
| 138 | Transmission | 354.21.b | | - | TP | 0.00000 | - |
| 139 | Regional Market Expenses | 354.22.b | | - | NA | 0.00000 | - |
| 140 | Distribution | 354.23.b | | - | NA | 0.00000 | - |
| 141 | Other (Excludes A&G) | 354.24,25,26.b | | - | NA | 0.00000 | - |
| 142 | Total | (sum lns 137 to 141) | 0 | 0 | 0 | | |
| 143 | Transmission related amount | | | | | **W/S=** | **0.00000** |

| | | | | |
|---|---|---|---|---|
| 144 | WEIGHTED AVERAGE COST OF CAPITAL (WACC) | | | $ |
| 145 | Long Term Interest | (Worksheet M, ln 37, col. (d)) | | - |
| 146 | Preferred Dividends | (Worksheet M, ln 71) | | - |
| 147 | Development of Common Stock: | | | |
| 148 | Proprietary Capital | (Worksheet M, ln 14, col. (b)) | | |
| 149 | Less: Preferred Stock | (Worksheet M, ln 14, col. (c)) | | |
| 150 | Less: Account 216.1 | (Worksheet M, ln 14, col. (d)) | | |
| 151 | Less: Account 219 | (Worksheet M, ln 14, col. (e)) | | |
| 152 | Common Stock | (ln 148 - ln 149 - ln 150 - ln 151) | | - |
| 153 | | | **Capital Structure** $ | Limit Actual  Cap | Cost (Note S) | Weighted |

A137

|  |  |  |  | Limit |  |  |
|---|---|---|---|---|---|---|
| 154 | Long Term Debt  (Note T) Worksheet M, ln 28, col. (g), ln 38, col. (d)) | - | 0.00% | 0.00% | - | 0.0000 |
| 155 | Preferred Stock (ln 149) | - | 0.00% | 0.00% | - | 0.0000 |
| 156 | Common Stock (ln 152) | - | 0.00% | 0.00% | 10.35% | 0.0000 |
| 157 | Total (Sum lns 154 to 156) | - |  |  | **WACC=** | **0.0000** |

| | Capital Structure Equity Limit | |
|---|---|---|
| 158 | (Note Z) | 55% |

AEP East Companies
Transmission Cost of Service Formula Rate
Utilizing Actual/Projected FERC Form 1 Data
COMPANY NAME HERE

**Letter   Notes**

General Notes: a) References to data from Worksheets are indicated as: Worksheet X, Line#.Column.X

A   Revenue credits include:

1) Forfeited Discounts.

2) Miscellaneous Service Revenues.

3) Rental revenues earned on assets included in the rate base.

4) Revenues for associated business projects provided by employees whose labor and overhead costs are in the transmission cost of service.

5) Other electric revenues.

6) Revenues for grandfathered PTP contracts included in the load divisor.

7) If AEP East companies have any directly assigned transmission facilities, the revenue credits in the AEP East formula rate shall include all revenues associated with those directly assigned transmission facilities, irrespective of whether the loads of the customer are included in the formula rate divisor; provided however, such addition to revenue credits shall not be reflected if the costs of such directly assigned transmission facilities are not included in the transmission plant balances on which the formula rate ATRR is based.

See Worksheet E for details.

B   The annual and monthly net plant carrying charges on page 1 are used to compute the revenue requirement for RTEP sponsored upgrades or those projects receiving approved incentive-ROE's. Interest will be calculated based on Worksheet Q and any over under recovery will be filed and posted as part of the informational filing.

C   Transmission Plant Balances in this study are projected or actual average 13-month balances.

D   The total-company balances shown for Accounts 281, 282, 283, 190 only reflect ADIT that relates to utility operations. The balance of Account 255 is reduced by prior flow through and is completely excluded if the utility chose to utilize amortization of tax credits against FIT expense. An exception to this is pre-1971 ITC balances, which are required to be taken as an offset to rate base. Account 281 is not allocated.  In compliance with FERC Rulemaking the calculation of ADIT in the annual projection will be performed in accordance with IRS regulation Section1.167(I)-I(h)(6)(ii).

RM02-7-000, Asset Retirement Obligation deferrals have been removed from ratebase. Transmission ADIT allocations are shown on WS B.

The company will not include the ADIT portion of deferred hedge gains and losses in rate base.Detailed balances for the projected or actual period, distinguished between utility and non-utility balances, will be filed and posted as part of the information filing.

E   Cash Working Capital assigned to transmission is one-eighth of O&M allocated to transmission, as shown on line 78. It excludes:

1) Load Scheduling & Dispatch Charges in account 561 that are collected in the OATT Ancillary Services Revenue, as shown on line 75.

2) Costs of Transmission of Electricity by Others, as described in Note H.

3) The impact of state regulatory deferrals and amortizations, as shown on line  77

4) All A&G Expenses, as shown on line 93.

F   Consistent with Paragraph 657 of Order 2003-A, the amount on line 67 is equal to the balance of IPP System Upgrade Credits owed to transmission customers that made contributions toward the construction of System upgrades, and includes accrued interest and unreturned balance of contributions.  The annual interest expense is included on line 127.

G   Removes from the cost of service the Load Scheduling and Dispatch expenses booked to accounts 561.1 through 561.8.  Expenses recorded in these accounts, with the exception of 561.4 & 561.8 (lines 16 & 17 above) are recovered in Schedule 1A, OATT ancillary services rates. See Worksheet F, lines 5 through 14, for descriptions and the Form 1 Source of these accounts' balances.

H   Removes cost of transmission service provided by others to determine the basis of cash working capital on line 78. To the extent such service is incurred to provide the PJM service at issue, e.g. lease payments to affiliates, such cost is added back on line 95 to determine the total O&M collected in the formula. The amount on line 95 is also excluded in the calculation of the FCR percentage calculated on lines 6 through 12. The addbacks  on line 95 of activity recorded in 565 represents inter-company sales or purchases of transmission capacity necessary to meet each AEP company's transmission load relative to their available transmission capacity. The company records referenced on line 95 is the COMPANY NAME HERE general ledger.

I   Removes the impact of state regulatory deferrals or their amortization from Transmission O&M expense.

J   General Plant and Administrative & General expenses, other than in accounts 924, 928, and 930, will be functionalized  based on the Wages & Salaries "W/S" allocator. The allocation basis for accounts 924, 928 and 930 are separately presented in the formula. A change in the allocation method for an account must be approved via a 205 filing with the FERC.

K   These deductions on lines 81 through 83 are to remove from the cost of service the expenses recorded by the company for Postemployment Benefits Other than Pensions (PBOP). See Note M below for the recoverable PBOP expense.

L   Expenses recorded in FERC Accounts 928 (Regulatory Commission Expense), 930.1 (Safety Related Advertising) and 930.2 (Miscellaneous General Expenses) that are not directly related to or properly allocable to transmission service will be removed from the TCOS. If AEP includes any expenses booked to these accounts in future ATRR updates, AEP must provide supporting information demonstrating that the underlying activities are directly related to providing transmission service.  Account 930.2 includes the expenses incurred by the transmission function for Associated Business Development revenues given as a credit to the TCOS on Worksheet E.

M   See note K above.  Per the settlement in Docket ER08-1329, recoverable PBOP expense is based on an annual total for the operating companies that is ratiooed to them based on the total of actual annual PBOP costs, including charges from the AEP Service Corporation. The calculation of the recoverable amount for each company is shown on Worksheet O.

N   Includes only FICA, unemployment, highway, property and other assessments charged in the current year.  Gross receipts, sales & use and taxes related to income are excluded.

O   The currently effective income tax rate,  where FIT is the Federal income tax rate; SIT is the State income tax rate, and p = the percentage of federal income tax deductible for state income taxes.  See Worksheet G for the development of the Company's composite SIT.

A utility that elected to utilize amortization of tax credits against taxable income, rather than book tax credits to Account No. 255 and reduce rate base, must reduce its income tax expense by the amount of the Amortized Investment Tax Credit (Form 1, 266.8.f.).

(ln 118) multiplied by (1/1-T) .  If the applicable tax rates are zero enter 0.

Inputs Required:     FIT =     0.00%

SIT=     0.00%     (State Income Tax Rate or Composite SIT. Worksheet G))

p =     0.00%     (percent of federal income tax deductible for state purposes)

The formula rate shall reflect the applicable state and federal statutory tax rates in effect during the period the calculated estimated unit charges are applicable.  If the statutory tax rates change during such period, the rate used in the formula shall be weighted by the number of days of the pre-change rate and post-change rate each is in effect.

P   Removes plant excluded from the OATT because it does not meet the PJM's definition of Transmission Facilities or is otherwise ineligible to be recovered under the OATT.

Q   Removes transmission plant (e.g. step-up transformers) included in the development of OATT ancillary service rates and not already removed for reasons outlined in Note P.

R   Includes functional wages & salaries billed by AEP Service Corporation  for support of the operating company.

S   Long Term Debt cost rate = long-term interest (ln 145) /average long term debt (ln 154).  Preferred Stock cost rate = preferred dividends (ln 146) / preferred outstanding (ln 155). Common Stock cost rate (ROE) = 10.35%, per the settlement in FERC Docket No. EL17-13.  It includes an additional 50 basis points for PJM RTO membership. The amount of eligible hedging gains or losses included in total interest expense is limited to five basis points of the capital structure. Details and calculations of the weighted average cost of capital are shown on Worksheet M. Eligible Hedging Gains and Losses are computed on Worksheet M. The unamortized balance of eligible hedge gains/losses and related ADIT amounts shall not flow through the formula rate.

T   The Long Term Debt balance for I&M includes the accumulated balance of principle and related interest for Spent Nuclear Fuel Disposal Costs collected prior to April 7, 1983. This total balance of _____ at 12/31/___ is not included in the balance in line 154 above. The cost rates for long-term debt shall include interest expense and related periodic expenses (such as remarketing and letter of credit fees) as recorded in FERC Account 427 or 430, amortization of issuance costs (including insurance) and discounts as recorded in FERC Account 428, issuance premiums as recorded in FERC Account 429 and losses or gains on reacquired debt as recorded in FERC Accounts 428.1 or

A139

429.1, respectively.  The cost rates for preferred stock (if applicable) shall include the dividends.

U    Excess / (Deficit) Deferred Income Taxes will be amortized over the average remaining life of the assets to which it relates, unless the Commission requires a different amortization period. The Tax Effect of Permanent Differences captures the differences in the income taxes due under the Federal and State tax calculations that are not the result of a timing difference, including but not limited to depreciation related to capitalized AFUDC equity and meals and entertainment deductions. The Tax Effect of Flow-Through differences captures current tax expense related to timing differences on items for which tax deductions were used to reduce customer rates through the use of flow-through accounting in a prior period.  Transmission balances for the projected or actual period, will be filed and posted as part of the informational filing.

V    Cash investment in prepaid pension and benefits recorded in FERC Account 165 is permitted to be included in the formula.  A labor expense allocation factor will be used to allocate total company costs.  All other prepayments recorded in FERC Account 165 are directly assigned to the transmission function,  allocated or excludable balances detailed on Worksheet C.

W    The formula rate shall allocate property tax expense based on the as filed net plant cost allocation method detailed on Worksheet H.

X    Under Section 30.9 of the PJM OATT, a network customer that owns existing transmission facilities that are integrated with the Transmission Provider's Transmission System may be eligible to receive consideration either through a billing credit or some other mechanism.  Calculation of any credit under this subsection, pursuant to approval by FERC for inclusion in this formula rate for collection on behalf of the network customer, shall be addressed in either the Network Customer's Service Agreement or any other agreement between the parties.

Y    The cost of service will make a rate base adjustment to remove unfunded reserves associated with contingent liabilites recorded to Accounts 228.1-228.4 from rate base.

Z    Per the settlement in EL17-13, equity is limited to 55% of the Company's capital structure.  If the percentage of actual equity exceeds the cap, the excess is included as long term debt in the capital structure.