**Nos. 21-4072, 22-3351, 23-3196, 23-3324, 23-3366, 23-3417**

IN THE

# United States Court of Appeals

FOR THE SIXTH CIRCUIT

DAYTON POWER & LIGHT COMPANY, d/b/a AES OHIO;
AMERICAN ELECTRIC POWER SERVICE CORPORATION;
DUKE ENERGY OHIO, INC.; FIRSTENERGY SERVICE COMPANY,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**REPLY BRIEF OF PETITIONERS
DAYTON POWER & LIGHT CO., AMERICAN ELECTRIC
POWER SERVICE CORP., AND FIRSTENERGY SERVICE CO.**

William M. Rappolt
Assistant General Counsel,
FERC
AES US SERVICES, LLC
4300 Wilson Blvd
Arlington, VA 22203
(571) 533-9018
william.rappolt@aes.com

*Counsel for The Dayton Power
and Light Co. d/b/a AES Ohio*

Matthew E. Price
Zachary B. Cohen
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC 20001
(202) 639-6000
mprice@jenner.com

*Counsel for American Electric Power
Service Corp., in its own name and
on behalf of its public utility
affiliates Ohio Power Co. and AEP
Ohio Transmission Co., Inc.*

*Additional Counsel Listed On Inside Cover*

William M. Keyser
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202)429-8186
wkeyser@steptoe.com

*Counsel for American Electric Power Service Corp., in its own name and on behalf of its public utility affiliates Ohio Power Co. and AEP Ohio Transmission Co., Inc.*

Morgan E. Parke
Associate General Counsel
P. Nikhil Rao
Senior Corporate Counsel
FIRSTENERGY SERVICE COMPANY
76 South Main Street
Akron, OH 44308
(330) 384-2422
mparke@firstenergycorp.com
pnrao@firstenergycorp.com

Sanford I. Weisburst
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
sandyweisburst@quinnemanuel.com

*Counsel for FirstEnergy Service Company on behalf of and as agent for American Transmission Systems, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iii

INTRODUCTION .................................................................... 1

ARGUMENT .................................................................... 6

I.    FERC's Orders Violate the Plain Text of Section 219(c). ................ 6

    A.    Section 219(c) Depends Only on Whether a Utility Joined an RTO—Not Why It Did So ...................................... 6

    B.    The Transmission Owners' Argument Based on Section 219(c) Is Not a Collateral Attack. ........................... 10

        1.    The Transmission Owners Had No Reason to Seek Review of Order 679 Because FERC Agreed with Them ........................................................ 10

        2.    A Statutory Challenge to an Agency's Application of Its Rules Is Not a Forbidden Collateral Attack ........................................................ 14

II.   The Orders Should Be Vacated Because They Are Premised on a Federally Preempted State Law. .......................................... 17

    A.    FERC's Refusal to Consider Preemption Was a Failure of Reasoned Decision-Making .................................. 17

    B.    This Court Should Decide Preemption .................................. 19

    C.    The Ohio Statute Is Preempted ........................................... 21

        1.    Field Preemption Applies ............................................ 21

        2.    Conflict Preemption Applies ........................................ 24

III.  FERC's *OCC* Orders Were Arbitrary and Capricious (*AEP Only*) .............................................................................. 26

A.    FERC Arbitrarily and Capriciously Treated AEP Differently Than Other Similarly Situated Transmission Owners ........................................................ 26

B.    FERC Failed to Make the Finding Required to Impose a New ROE ................................................................... 27

C.    FERC Failed to Explain Its Abandonment of a Prior Factual Finding That AEP Joined PJM Voluntarily. .......... 31

IV.   FERC Arbitrarily and Capriciously Denied the Adder to Dayton (*Dayton Only*) ...................................................... 33

CONCLUSION ......................................................................... 33

# TABLE OF AUTHORITIES

## CASES

*American Electric Power Service Corp.*, 124 FERC ¶ 61,306 (2008) .................................................................................. 9, 12

*California Public Utilities Commission*, 132 FERC ¶ 61,047 (2010) .......................................................................................... 19

*California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) ..................................................................... 1

*City of Redding v. FERC*, 693 F.3d 828 (9th Cir. 2012) ................... 10, 14

*Commonwealth Edison Co. v. United States Nuclear Regulatory Commission*, 830 F.2d 610 (7th Cir. 1987) ...................... 15

*Consumers' Research v. FCC*, 67 F.4th 773 (6th Cir. 2023) ................... 15

*Dominion Resources, Inc. v. FERC*, 286 F.3d 586 (D.C. Cir. 2002) .......................................................................................... 10

*El Paso Electric Co. v. FERC*, 832 F.3d 495 (5th Cir. 2016) ................ 10

*Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017) ........................ 27, 28

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ..................... 32

*Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958) ........... 2, 15

*Herr v. United States Forest Service*, 803 F.3d 809 (6th Cir. 2015) .......................................................................................... 15

*Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016) ..................................................................................... 22, 24

*International Transmission Co. v. FERC*, 988 F.3d 471 (D.C. Cir. 2021) ................................................................................... 29

*Kansas Corporation Commission v. ITC Great Plains, LLC*, 172 FERC ¶ 61,037, *on reh'g*, 173 FERC ¶ 61,160 (2020) ................ 30

*Midwest Power Systems, Inc.*, 78 FERC ¶ 61,067 (1997) ....................... 19

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).............................................................................................. 18

*Natural Resource Defence Council v. NRC*, 823 F.3d 641 (D.C. Cir. 2016)....................................................................................... 16

*New England Ratepayers Ass'n*, 168 FERC ¶ 61,169 (2019)............. 18-19

*New Jersey Department of Environmental Protection v. NRC*, 561 F.3d 132 (3d Cir. 2009) ............................................................ 16

*New York v. FERC*, 535 U.S. 1 (2002) .................................... 3, 22, 23, 24

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015).................................... 22

*Promoting Transmission Investment through Pricing Reform*, 116 FERC ¶ 61,057 (2006) (Order No. 679) ................... 1, 7, 9, 11, 28

*Promoting Transmission Investment Through Pricing Reform*, 117 FERC ¶ 61,345 (2007) (Order No. 679-A)................................. 11

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947)........................................... 10

*Simms v. National Highway Traffic Safety Administration*, 45 F.3d 999 (6th Cir. 1995)..................................................................... 17

*Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013) ................... 3

*Weaver v. Federal Motor Carrier Safety Administration*, 744 F.3d 142 (D.C. Cir. 2014) ................................................................ 15

*Wos v. E.M.A.*, 568 U.S. 627 (2013)........................................................ 24

STATUTES

16 U.S.C. § 824 ................................................................................ 21, 22

16 U.S.C. § 824a-1 ........................................................................... 25, 31

16 U.S.C. § 824a ................................................................................ 4, 24

16 U.S.C. § 824e ................................................................. 27, 31

16 U.S.C. § 824o ..................................................................... 22

16 U.S.C. § 824s.................................................... 1, 2, 3, 6, 8, 9, 28

Ohio Rev. Code Ann. § 4928.12 ........................................... 2, 21

**OTHER AUTHORITIES**

Brief of Respondent FERC, *California Public Utilities Commission v. FERC*, No. 16-70481 (9th Cir. Sept. 19, 2016), 2016 WL 5391636 ............................................. 13, 14

# INTRODUCTION

FERC does not attempt to reconcile its Orders with the plain language of Federal Power Act ("FPA") Section 219(c), which directs FERC to "provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization." 16 U.S.C. § 824s(c). Instead, FERC calls Petitioners' statutory arguments a collateral attack on its regulations, claiming the arguments should have been raised when Order 679 (adopting those regulations)[1] was issued in 2006.

That position is doubly flawed. First, the notion that Petitioners Dayton, AEP, and ATSI (collectively, "Transmission Owners") should have sought review of Order 679 in 2006 is galling revisionist history: For over a decade before the Ninth Circuit's *2018* decision in *California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) ("*CPUC*"), FERC *agreed* with the Transmission Owners that the Section 219(c) adder did not depend on whether a state law mandated membership in a Regional Transmission Organization ("RTO"). Indeed, FERC *granted* AEP's adder in 2008, even though Ohio's law mandating

---

[1] *Promoting Transmission Inv. through Pricing Reform*, 116 FERC ¶ 61,057 (2006) ("Order 679").

membership, Ohio Rev. Code Ann. § 4928.12 ("Ohio Statute"), already existed.  Parties have no reason to challenge an agency rulemaking when the agency has adopted the approach with which those parties agree.  If the agency later changes its view, a party may then challenge the agency's new position without that challenge being labelled a collateral attack.

Second, even if FERC had adopted its current position back in Order 679, a party still may make a statutory challenge to a regulation when the agency applies the regulation to the party in an adjudication.  That is not a prohibited collateral attack.  *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546-47 (D.C. Cir. 1958); Transmission Owners Br. 36.  FERC does not respond.

Once FERC's meritless collateral attack argument is set aside, only the plain text of the statute remains—and FERC does not address it.  The statute directs that an adder be given to "each transmitting utility or electric utility that joins a Transmission Organization," period.  16 U.S.C. § 824s(c).  The Court should vacate on that basis.

FERC's Orders also require vacatur because the Ohio Statute on which they are premised is federally preempted.   FERC cannot

reasonably make its "rate treatments" under Section 219, 16 U.S.C. § 824s(a), dependent on state laws that Congress preempted. FERC again rests on a meritless procedural dodge. Its Orders claimed that a court has "the ultimate authority" to decide preemption. JA497 (*OCC Order*, P 84). Yet now FERC asserts that this Court should *not* exercise such authority. But this Court has jurisdiction and the question has been presented—and thus this Court has the "unflagging" obligation to decide it, *Sprint Comm'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013), unless FERC's order is vacated for other reasons. FERC protests that there is an inadequate factual record to decide preemption, but it does not identify any facts requiring development. Instead, FERC concedes preemption is a "legal question." FERC Br. 44. So does the Public Utilities Commission of Ohio, represented by the Ohio Attorney General. *See* Pub. Utils. Comm'n of Ohio ("PUCO") Br. 5.

As to that legal question, Intervenors (but not FERC) offer a tepid defense. They do not dispute that Congress has given FERC exclusive authority to regulate interstate transmission. *New York v. FERC*, 535 U.S. 1, 5-7 (2002). However, they note that states have authority to regulate (a) *intrastate* transmission and (b) transmission of energy

*consumed by the transmitter*.  PUCO Br. 6-7, 10-11; OCC Br. 20-21.  But this case involves neither.  Instead, it concerns a state statute regulating *interstate* transmission of energy to be *consumed by others*—a statute that requires a transmission owner to turn over operational control of its interstate transmission facilities to an independent third party.  That is exactly the field that Congress occupied.  And concerning conflict preemption, given Congress's explicit provision that coordination should be "voluntary," 16 U.S.C. § 824a(a), Intervenors cannot deny a conflict between the federal "voluntary" approach and a state's *mandatory* approach.

AEP and Dayton (but not ATSI) argued that the Orders are arbitrary and capricious for other reasons, too.  First, FERC arbitrarily treated AEP differently from Duke and ATSI.  FERC notes that it specifically approved AEP's adder, unlike for the other companies.  That is non-responsive.  For all three companies, the overall return on equity ("ROE") ultimately was determined through a settlement, and the negotiations occurred against a backdrop in which the companies were entitled to the adder.  Stripping out AEP's adder after the fact

undermines its settlement, no less than doing so would undermine Duke's and ATSI's.

Second, FERC could not take away AEP's adder without first finding, under FPA Section 206, that AEP's overall ROE was unjust and unreasonable. FERC claims no such finding was needed, but cites nothing beyond a single case that, as AEP explained and OCC acknowledges, did not consider the argument AEP is making. FERC does not respond.

Third, FERC failed to explain why it disregarded a prior finding that AEP—which operates under a single transmission rate in multiple states—joined PJM voluntarily, notwithstanding the Ohio Statute. FERC asserts that the finding was made in a different context but does not explain why that matters.

Finally, FERC fails meaningfully to respond to Dayton's argument that by treating similarly situated entities differently, FERC is unfairly disadvantaging Dayton in its attempts to attract capital.

# ARGUMENT

## I.     FERC's Orders Violate the Plain Text of Section 219(c).

### A.     Section 219(c) Depends Only on Whether a Utility Joined an RTO—Not Why It Did So.

The Orders are inconsistent with the plain text of FPA Section 219(c), which states that FERC shall "provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization."   16 U.S.C. § 824s(c); Transmission Owners Br. 28-33. Under the statute, eligibility for the adder turns solely on whether the utility "joins"—not why.  *See* JA499-500 (*OCC* Order, Danly Dissent).

FERC's brief ignores the statutory text altogether.   OCC, meanwhile, argues that giving the adder to utilities subject to a state mandate to "join" an RTO would read the word "incentive" out of the statute. OCC Br. 6.  Not so.  The statute does not use the word "incentive" as a determinant of eligibility; rather, the "incentive" is what the transmission owner gets if it is a "transmitting utility or electric utility *that joins* a Transmission Organization." 16 U.S.C. § 824s(c) (emphasis added).   The incentive, by increasing the ROE, then motivates investment in new transmission, which was Congress's goal, *id.* § 824s(b), by making it easier for the utility to attract capital.

Words matter. Congress could have said, but did not say, that FERC should provide an "incentive *for* transmission owners *to join*" an RTO; instead, Congress said that FERC should provide "for incentives *to each*" transmission owner "*that joins*" an RTO. Under Congress's formulation, joining itself entitles utilities to receive the incentive, no matter why—whether because they chose to join because of the incentive, would have joined anyway, or were required to join (for example, because of a merger commitment). Order 679, P 331 & n.180. OCC's interpretation inserts a limitation that does not exist in the statute.

FERC asserts that requiring "voluntariness" is "good policy" because it is "key" to whether an incentive "induc[es] … action." FERC Br. 35, 41; OCC Br. 5 (similar). But policy arguments are beside the point; what matters is the statutory text. And anyway, Congress's goal was not to encourage RTO membership for its own sake; rather, it was to channel investment dollars to utilities best able to "attract[] new investment in transmission facilities" and to give investors incentives for "capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in

interstate commerce, regardless of the ownership of the facilities." 16 U.S.C. § 824s(b)(1)-(2).

These purposes would be frustrated if the adder were available only to *some* RTO members. All utilities joining an RTO face the same risks, and their customers see the same benefits, regardless of why they joined. *See* Transmission Owners Br. 11. If the adder were available only to utilities that joined voluntarily, utilities required to join would be disadvantaged in the competition for investment dollars. All else equal, they would earn a lower ROE despite facing the same risks. This would result in uneven and distorted investment patterns that would hamper an efficient build-out of the grid. *See* JA206-07 (*Dayton* Order, Chatterjee Dissent, P 2 n.4).

FERC notes that a utility is required to "seek Commission approval" to receive the adder, and that FERC "declined to create a generic incentive for all members" of an RTO. FERC Br. 35-36. That is true but irrelevant. FERC required utilities to seek approval in individual cases to ensure that an adder would not elevate a particular utility's ROE so much that it exceeded an upper bound of reasonableness: FERC "permit[ted] incentives only if the incentive package as a whole

8

results in a just and reasonable rate." Order 679, P 2; *see also* 16 U.S.C. § 824s(d) (requiring FERC to ensure that the rate inclusive of the adder remains just and reasonable); Transmission Owners Br. 51 n.17 (collecting cases).[2]

Thus, in AEP's case, notwithstanding the Ohio Statute, FERC granted "up to 50 basis points of incentive ROE for AEP's continued participation in PJM," but stated that this grant was "subject to … zone of reasonable returns determined following the hearing ordered below." *Am. Elec. Power Serv. Corp.*, 124 FERC ¶ 61,306 at P 30 (2008).

Finally, OCC asserts that, while Section 219(c) allows an adder for utilities that "join" an RTO, it does not authorize an adder for those utilities that remain in an RTO they previously joined. OCC Br. 11-12. This rehashes an argument that FERC rejected in Order 679. Order 679, P 331.[3] And in the Orders below, FERC did not deny the adder for Dayton

---

[2] OCC incorrectly suggests (Br. 7-9) that Section 219(d) requires FERC to assess whether the adder itself would be just and reasonable in a given case. Rather, Section 219(d) requires FERC only to ensure that the *overall* rate (including the adder) remains just and reasonable.

[3] Order 679 stated that "entities that have already joined, and that remain members of, an RTO, ISO, or other Commission-approved Transmission Organization, are eligible to receive this incentive." Order 679, P 331.

or AEP on that basis, so it cannot support affirmance. *See SEC v.*
*Chenery Corp.*, 332 U.S. 194, 196 (1947).

**B.     The Transmission Owners' Argument Based on Section
219(c) Is Not a Collateral Attack.**

Instead of engaging with the statute's text, FERC labels the
Transmission Owners' argument a "collateral attack." This is meritless
for two independent reasons.

**1.     The Transmission Owners Had No Reason to Seek
Review of Order 679 Because FERC Agreed With
Them.**

Whether a challenge to a regulation is an improper collateral attack
depends on "whether a reasonable firm in [the Transmission Owners']
position would have perceived *a very substantial risk* that [Order 679]
meant what the Commission now says it meant." *Dominion Res., Inc. v.*
*FERC*, 286 F.3d 586, 589 (D.C. Cir. 2002) (emphasis added); *City of*
*Redding v. FERC*, 693 F.3d 828, 837 (9th Cir. 2012); *El Paso Elec. Co. v.*
*FERC,* 832 F.3d 495, 504 (5th Cir. 2016).

Here, no reasonable transmission owner would have perceived a
risk, let alone a "very substantial" one, that eligibility for the adder
turned on whether membership was voluntary.

In Order 679 itself, FERC rejected comments "assert[ing] that the incentive should not apply where a transmission owner is ordered to join a RTO/ISO by statute." Order 679, P 316. FERC explained that "[t]he basis for the incentive is a recognition of the benefits that flow from membership in such organizations and the fact continuing membership is *generally* voluntary," *id.* (emphasis added)—but it did not limit the incentive to utilities that joined voluntarily.

On rehearing, in Order 679-A,[4] FERC again considered the argument that "the incentive should not be allowed for public utilities ordered to join Transmission Organizations by statute, merger conditions or other regulatory requirements." Order 679-A, P 83. FERC again rejected that argument, stating: "We affirm the finding in the Final Rule that *the incentive applies to all utilities joining transmission organizations*…." *Id.* at P 86 (emphasis added).

Based on these statements, there would have been no reason for the Transmission Owners to seek review of Order 679 and Order 679-A. If

---

[4] *Promoting Transmission Investment Through Pricing Reform*, 117 FERC ¶ 61,345 (2007) ("Order 679-A").

they had done so, the petitions would have been dismissed for lack of injury.

That is confirmed by FERC's conduct immediately following Order 679. FERC admits, "It is true that, in the decade following [Order 679], the Commission routinely granted the Participation Adder without considering whether participation was voluntary." FERC Br. 39. Indeed, when FERC granted the adder to AEP in 2008, *after* the Ohio Statute was enacted, FERC reaffirmed that "the incentive applies to *all utilities* joining the transmission organization." *Am. Elec. Power Serv. Corp.*, 124 FERC ¶ 61,306 at P 30 (emphasis added).

FERC contends, disingenuously, that, while "some parties may have assumed that the Commission would apply the Rule [in] a certain way," that assumption does not excuse the failure to seek review when Order 679 was issued. FERC Br. 38. But FERC's policy was not a matter of optimistic "assumption": FERC stated in Order 679 that voluntariness did not matter, and FERC applied that approach for years after Order 679.

Indeed, FERC routinely did so through 2018. In its briefs in the *CPUC* appeal, FERC was crystal clear:

12

- "Some commenters argued that any utilities legally required to join a regional organization should not be eligible for the incentive…. The Commission, however, declined to limit the incentive based on such concerns."  Br. of Respondent FERC at 7-8, *Cal. Pub. Utils. Comm'n v. FERC*, No. 16-70481 (9th Cir. Sept. 19, 2016), 2016 WL 5391636.

- "[T]en years ago in its rulemaking, the Commission already considered, but did not adopt, the argument that California now resurrects—that Pacific Gas is ineligible for an incentive because it is purportedly required by law to join, and remain in, a regional transmission organization."  *Id.* at 13; *see also id.* at 18.

- "California challenged the orders here using the same argument the Commission already considered and declined in its Incentives Rule—*i.e.*, that utilities legally mandated to join regional transmission organizations should not receive incentive adders."  *Id.* at 28-29 (footnote omitted).

Indeed, FERC even argued in *CPUC* that the California Commission had engaged in a collateral attack by arguing that voluntariness should

matter—an argument that FERC said it had rejected in Order 679. *Id.* at 29.

Accordingly, there is no merit to FERC's assertion that the Transmission Owners should have ignored FERC's stated policy and challenged a rule that did not injure them, on the off chance that some day a "court would interpret" FERC's regulations and find that FERC "had failed to adhere to its own" rule. FERC Br. 38, 39. "The collateral attack doctrine … does not require prescience," *City of Redding*, 693 F.3d at 838, nor does it require parties to bring appeals to protect themselves despite lacking any injury-in-fact. "Because FERC itself read" Order 679 to allow adders for utilities required to join RTOs, "Petitioners' identical interpretation of that order was surely not unreasonable." *Id.* FERC's "collateral attack" argument fails.

### 2. A Statutory Challenge to an Agency's Application of Its Rules Is Not a Forbidden Collateral Attack.

The collateral attack argument is meritless for a second reason: Even if one accepts *arguendo* that Order 679 imposed a voluntariness requirement in 2006, that still would not prevent the Transmission Owners from making a statutory challenge to Order 679 in this case.

For decades, the law has been clear that the collateral attack doctrine, rooted in the "statutory time limit restricting judicial review of [an agency's] action," applies "only to cut off review directly from the order promulgating a rule.  It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it." *Functional Music,* 274 F.2d at 546; *Consumers' Rsch. v. FCC*, 67 F.4th 773, 785 (6th Cir. 2023) (quoting and relying on *Functional Music*).  If it were otherwise, "many parties ultimately affected by a rule" would be denied "an opportunity to question its validity." *Functional Music*, 274 F.2d at 546.

Thus, an agency rule uncontested within the statutory review period "does not enter a promised land free from legal challenge." *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 821 (6th Cir. 2015).  Rather, "when an agency seeks to apply the rule, those affected may challenge that application on the grounds that it conflicts with the statute from which its authority derives." *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014); *Commonwealth Edison Co. v. U.S. Nuclear Regul. Comm'n*, 830 F.2d 610, 614 (7th Cir. 1987).  FERC's position is particularly perplexing here, when it acknowledges that its framework

governing the RTO membership adder *requires* "consider[ing] …
applications on a case-by-case basis."  FERC Br. 35.

FERC cites two cases for the proposition that an agency need not
hear a challenge to a regulation in an individual adjudication.  FERC Br.
38 (citing *N.J. Dep't of En't Prot. v. NRC*, 561 F.3d 132, 143 (3d Cir. 2009)
("*NJDEP*"); *Nat. Res. Def. Council v. NRC*, 823 F.3d 641, 651 (D.C. Cir.
2016) ("*NRDC*")).  Neither supports FERC's position.  Both involved
challenges, in nuclear plant relicensing proceedings, to a regulation that
had generically determined the environmental effects of a hypothetical
terrorist attack on a nuclear plant.  The intervenors challenged the
regulation on statutory grounds, arguing that various statutes required
the regulation to be revisited.  They also challenged the regulation on
policy grounds, arguing that the generic determination gave insufficient
weight to the risk.  In each case, the courts addressed the statutory
challenge on the merits, *NJDEP*, 561 F.3d at 137-43; *NRDC*, 823 F.3d at
651-53, but refused to entertain the policy argument because it was a
collateral attack, *NJDEP*, 561 F.3d at 143-44; *NRDC*, 823 F.3d at 653-
54.  These cases are consistent with the Transmission Owners' position:
FERC's Orders violate Section 219(c).  (While the Transmission Owners

also believe that the Orders are bad policy, they do not press that argument in this appeal.)  An agency may have no obligation to rethink a generic policy determination in an individual adjudication; but it does have an ongoing obligation to abide by federal statutes.[5]

## II. The Orders Should Be Vacated Because They Are Premised on a Federally Preempted State Law.

### A. FERC's Refusal to Consider Preemption Was a Failure of Reasoned Decision-Making.

FERC rejected Dayton's application for an adder, and took away AEP's previously granted adder, on the premise that the Ohio Statute mandated their membership in an RTO.  But the Ohio Statute is preempted by the FPA, and so it cannot serve as a lawful basis for denying the adder.  Congress did not intend for FERC's rates to depend upon whether a state passed a law that, under the Supremacy Clause, the state had no power to enact.

---

[5] FERC (Br. 38) also cites *Simms v. National Highway Traffic Safety Administration*, 45 F.3d 999, 1010 (6th Cir. 1995).  But there, this Court described as an improper collateral attack a declaratory judgment action brought by an "interested party" challenging regulations.  The agency was not applying those regulations to those plaintiffs in an adjudication, as FERC is doing to Transmission Owners here.

Reasoned decision-making required FERC to address this argument. If the Ohio Statute is preempted, then FERC cannot reasonably rely on it to deny the adder. An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider," such as a state law that Congress preempted. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nor can FERC simply ignore this issue. By refusing to consider whether Congress wanted to permit state laws like the Ohio Statute, and then setting rates as though Congress did, FERC "entirely failed to consider an important aspect of the problem." *Id.*

FERC's brief does not explain how it could reasonably decide to deny adders to Transmission Owners without considering whether Congress intended to preempt the Ohio Statute. Instead, FERC suggests that the agency could simply "exercise[] its discretion" to ignore this issue. FERC Br. 44. But reasoned decision-making is not discretionary.

FERC contends that preemption is better decided by a court, FERC Br. 44, and OCC contends that FERC lacks jurisdiction to decide preemption, OCC Br. 13-14. FERC, however, is capable of deciding preemption questions in the first instance and often does so. *E.g., New*

18

*England Ratepayers Ass'n*, 168 FERC ¶ 61,169 (2019) (New Hampshire law preempted); *Cal. Pub. Utils. Comm'n*, 132 FERC ¶ 61,047 (2010) (California law not preempted); *Midwest Power Sys., Inc.*, 78 FERC ¶ 61,067 (1997) (Iowa law preempted in part).[6]  Here, the issue was squarely presented to FERC, and reasoned decision-making required FERC to address it.

## B.    This Court Should Decide Preemption.

Although the Court could vacate FERC's Orders and require FERC to decide preemption, the Court should decide the merits now in the interest of judicial efficiency.  Specifically, because preemption is a "legal question," FERC Br. 44, on which a court can reach "the ultimate determination," JA204 (*Dayton* Order, P 71), the Court's and parties'

---

[6] The cases cited by OCC (Br. 13) do not address this issue.  They concern whether an agency can preempt state law by regulation, and they hold that a regulation can have preemptive force when authorized by Congress.  This case involves the preemptive force of a statute.

OCC also divines a concession in Petitioners' acknowledgement that FERC cannot enjoin a state statute.  OCC Br. 14-15.  Not so.  A federal agency cannot issue an injunction because it has no power to hold a state officer in contempt.  But FERC can declare that a state law is preempted, and if a state flouts that declaration, a party can then seek an injunction against the state officer in federal court.

resources would be conserved by the Court deciding this fully-briefed issue now rather than in a later appeal.

Although FERC refused to consider preemption on the ground that a court was better suited to address it, FERC now tells this Court not to do so, pointing to "the posture of these individual adjudications." FERC Br. 44. But FERC does not explain what about the posture is problematic. The question of preemption was extensively briefed at FERC, *e.g.*, JA373-80 (AEP Answer 19-26); JA520-23 (AEP Rehearing 18-21), and the validity of the Ohio Statute under federal law is of central importance. If the Ohio Statute is invalid, it cannot be the basis for denying the adder. FERC also contends that "the administrative records" and "orders now on judicial review" "center" on other issues. FERC Br. 46; *see also* OCC Br. 15-16. But neither FERC nor its Intervenors (including the Ohio Attorney General) identify any way in which the existing record or briefing is insufficient to permit this Court to decide this legal question.

### C.    The Ohio Statute Is Preempted.

#### 1.    Field Preemption Applies.

FERC makes no argument on the merits.  Intervenors, meanwhile, try to change the subject.  They never grapple with the relevant text of the FPA, which gives FERC exclusive jurisdiction over "transmission of electric energy in interstate commerce" and "all facilities for such transmission."  16 U.S.C. § 824(b).  Nor do they discuss the text of the Ohio Statute, which plainly trespasses on the federal field by providing that "no entity shall own or control transmission facilities as defined under federal law and located in this state … unless that entity is a member of, and transfers control of those facilities to" a FERC-approved transmission organization governed independently from the transmission owner.  Ohio Rev. Code Ann. § 4928.12(A), (B)(1), (7).

Instead, Intervenors argue that Congress preserved state authority to regulate "transmission of electric energy in *intrastate* commerce, or over facilities for the transmission of electric energy *consumed wholly by the transmitter*."  FPA § 201(b); 16 U.S.C. § 824(b) (emphasis added); PUCO Br. 6-7, 10-11; OCC Br. 20.  Based on this, they claim that regulating the electric industry is a "shared function."  PUCO Br. 6, 10.

But this case does not involve either.  It involves the *interstate* transmission of energy to be consumed by *others*, and the FPA clearly commits *that* field to exclusive federal regulation by FERC.  *New York*, 535 U.S. at 18-20 (describing FERC's jurisdiction over interstate transmissions); *see also Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154 (2016) ("FERC has exclusive authority" over the fields committed to federal regulation under FPA Section 201(b)).  Indeed, PUCO admits as much.  It acknowledges: "Section 201(b) of the FPA grants FERC exclusive jurisdiction over facilities used in *interstate* electric transmission…."  PUCO Br. 10.  Yet interstate transmission facilities are exactly the "target" at which the Ohio Statute "aims." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015).

OCC argues that because states can do various other things, they must be able to do this, too, but none of the analogies hold:

- FPA Section 215(i)(3), OCC Br. 20-21, is a savings clause pertaining only to "this section," 16 U.S.C. § 824o(i)(3), and does not override the division of authority in FPA Section 201(b), *id.* § 824(b).

22

- States' powers to approve mergers, OCC Br. 22, are obviously different from forcing transmission owners to surrender control of their facilities to an unrelated, independent third party like an RTO.

- States' retention of control over transmission to end-user *retail* customers when they pay a bundled rate, *id.* at 23 (citing *New York*, 535 U.S. 1), is irrelevant where the transmission facilities at issue carry energy for *wholesale* sale and Ohio customers do not pay a bundled rate (as OCC admits, Br. 23).

- States retain control over siting of transmission facilities, *id.*— but once those facilities are built and energized, the electricity they transmit flows in interstate commerce, and they are subject to FERC's control. *New* York, 535 U.S at 7 ("any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce").

Finally, OCC says states can impose conditions on doing business, Br. 24, but such an end-around would swallow the Supremacy Clause.   As the Supreme Court stated, "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority."

*Hughes*, 578 U.S. at 164; *see also Wos v. E.M.A.*, 568 U.S. 627, 637 (2013) ("proper analysis requires consideration of what the state law in fact does, not how [a] litigant might choose to describe it.").

PUCO also argues for a presumption against preemption.  PUCO Br. 8-9.  No such presumption applies here, however, because states *never* had authority to regulate interstate electricity transmissions.  The FPA was enacted precisely to fill that regulatory gap.  *See New York*, 535 U.S. at 5-7.  The Ohio Statute intrudes into the federal field and is preempted.

### 2.    Conflict Preemption Applies.

The Ohio Statute also conflicts directly with Congress's policy in FPA Section 202(a) that membership in a transmission organization should be *voluntary*.  *See* 16 U.S.C. § 824a(a) (authorizing FERC to divide the country into "regional districts for the *voluntary* interconnection and coordination of facilities" (emphasis added)).  OCC contends that this provision governs only FERC, leaving states free to mandate membership.  OCC Br. 27.  But Section 202 suggests nothing of the sort; instead, it contemplates only a consultative role for states.  FERC must allow state commissions to "present … views and recommendations," which FERC "shall receive and consider."  16 U.S.C. § 824a(a).  That

limited role is incompatible with state authority to override the federal policy of voluntariness and mandate RTO membership.

OCC responds by citing 16 U.S.C. § 824a-1, which allows FERC to exempt utilities from state laws that *prohibit* voluntary coordination between utilities.  OCC Br. 21.  That does not help OCC; the provision does not authorize states to *mandate* coordination, but rather underscores that the federal policy is one of "*voluntary* coordination."  16 U.S.C. § 824a-1(a) (emphasis added).  OCC also claims that FPA Section 202 sets a floor and not a ceiling for state requirements.  OCC Br. 28. But requiring RTO membership *departs* from the federal scheme.  RTO membership cannot simultaneously be both "voluntary," as the federal framework requires, and mandatory, as Ohio has required.

Finally, OCC claims that Ohio's goal is the same as the federal goal—to encourage RTO participation.  *Id.* at 29.  But Congress prescribed the means for pursuing that goal: promoting *voluntary* interconnection and coordination of facilities.  Ohio's mandate conflicts directly with the federal scheme and is therefore preempted.

III. **FERC's *OCC* Orders Were Arbitrary and Capricious *(AEP Only)*.**

   A. **FERC Arbitrarily and Capriciously Treated AEP Differently Than Other Similarly Situated Transmission Owners.**

FERC defends its decision to treat AEP differently than Duke or ATSI on the ground that AEP received permission to include an adder *before* it negotiated a settlement over its base ROE, while Duke and ATSI included an adder in a settlement that FERC then approved. FERC Br. 57-59; OCC Br. 34-35. That is a distinction without a difference given FERC's reasoning for allowing Duke and ATSI to keep their adders.

AEP, Duke, and ATSI all negotiated their settlements against the same backdrop. True, AEP had previously been granted a 50-basis-point adder, but as FERC admits, everyone knew Duke and ATSI "likely would have [been] granted the Adders" too. FERC Br. 61. In all three cases, the parties bargained expecting to receive the incentive, and they reached a settlement that accounted for it.

As FERC's Orders explained, "[w]e do not know the precise trade-offs and concessions made by [the] parties … during the settlement process and the terms … and conditions to which those parties would have agreed … had the Commission policy on RTO Adders been

different." JA488 (*OCC* Order, P 64). Carving the adder out of the overall ROE now, after the fact, "would, *in effect*, modify the settlement agreement by stripping out a single component of an intricate financial package that the parties to the settlement found balanced and thus agreeable." JA586-87 (*OCC* Rehearing Order, P 28) (emphasis added). That is just as much true for AEP as for the other two utilities.

## B. FERC Failed to Make the Finding Required to Impose a New ROE.

FERC's decision to disturb AEP's settlement is particularly problematic because FERC never found that AEP's existing overall ROE was unjust and unreasonable. Instead, it simply carved out 50 basis points. FERC cannot do so, however, without first making a finding regarding the overall ROE.

OCC brought its complaint under FPA Section 206, 16 U.S.C. § 824e, under which FERC is required "to make an explicit finding that Transmission Owners' existing rate was unjust and unreasonable before proceeding to set a new rate." *Emera Maine v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017). The phrase "just and reasonable" encompasses a "broad range of potentially reasonable ROEs." *Id.* at 21.

27

Consistent with its duty to conduct a case-by-case analysis, FERC Br. 35, FERC necessarily decided that AEP's overall ROE of 10.35%—the base plus the adder, *see* A139 (Note S)—was just and reasonable. *See Transmission Owners* Br. 50-51 & n.17 (collecting authorities); Order 679, P 2; 16 U.S.C. § 824s(d). Therefore, under Section 206, FERC may not reduce the 10.35% ROE without first finding that 10.35% now lies outside the zone of reasonableness. *Emera Maine*, 854 F.3d at 25 ("Without a showing that the existing rate is unlawful, FERC has no authority to impose a new rate.").

OCC quotes a sentence from *Emera Maine* out of context to suggest that FERC can do what it did here. *See* OCC Br. 31. In fact, the very next sentence in the opinion states: "[S]ection 206 required FERC to make an explicit finding that Transmission Owners' existing rate was unjust and unreasonable before proceeding to set a new rate." *Emera*, 854 F.3d at 24. Here, FERC never made that finding. FERC's brief does not say otherwise.

FERC asserts that it did not need to make such a finding because it "had previously granted the Participation Adder on each utility's specific application for the incentive." FERC Br. 49; *id.* at 51-52. That is

28

irrelevant.  When FERC approved a settlement in 2008 that included the adder, it did so ensuring that the *overall* ROE, inclusive of the adder, was just and reasonable.  And when, in 2018, FERC approved a settlement that lowered AEP's base ROE, it necessarily determined that the *overall* ROE, inclusive of the adder, remained just and reasonable.  To grant the OCC's complaint and reduce the ROE, FERC needed first to find that the *overall* ROE that it had previously found just and reasonable had now become unjust and unreasonable.  It never did so.[7]

FERC asserts that "just as it can award an incentive adder on a single-issue basis, [it] can remove such an adder on a single-issue basis." *Id.* at 54.  The only case it cites is *International Transmission Co. v. FERC*, 988 F.3d 471 (D.C. Cir. 2021).  FERC Br. 54; OCC Br. 30-31.  The Transmission Owners addressed this case in their opening brief (at 52) and explained that the utility there did not make the argument advanced here, so the court did not consider it; thus, the case does not support FERC's position.  FERC's brief simply ignores that problem, *see* FERC Br. 55—even while OCC acknowledges that "the D.C. Circuit was not

---

[7] OCC says that FERC "routinely issue[d] orders … that focus solely on the return on equity component of rates."  OCC Br. 32.  AEP agrees.  That is what FERC should have done here—focused on the ROE *as a whole*.

confronted with the precise question" at issue here.  OCC Br. 31.  (The same is true of the sole agency decision FERC cites, *Kansas Corp. Commission v. ITC Great Plains, LLC*, 172 FERC ¶ 61,037, *on reh'g*, 173 FERC ¶ 61,160 (2020).)  This leaves FERC without any case to support its position.

OCC says that a utility's inclusion of an adder for which it doesn't qualify "*is* a basis to question the reasonableness of the overall rate." OCC Br. 33.  AEP agrees.  But the *answer* to that question turns on whether the overall rate remains within the zone of reasonableness.  If so, then FERC has no power to change the rate.  OCC says "[t]here is no dispute that AEP's Ohio affiliates' rates are higher than what otherwise would be allowed," *id*. at 34, but that is *exactly* what is in dispute, and what FERC never decided.  AEP would argue that its overall ROE is within the broad zone of just and reasonable ROEs and should not be disturbed.  It was OCC's burden to prove otherwise, and FERC's obligation to so find, before changing AEP's ROE.  OCC made no effort to meet that burden, and FERC made no such finding.

OCC contends this would lead to "absurd" results because FERC can take a long time deciding a complaint.  *Id*.  But Congress provided

for a refund period of 15 months with interest, dating back to the filing of the complaint. 16 U.S.C. § 824e(b). To the extent OCC thinks this provision is under-compensatory because FERC may take longer to resolve a complaint, that is an argument for Congress, not the Court.

### C.    FERC Failed to Explain Its Abandonment of a Prior Factual Finding That AEP Joined PJM Voluntarily.

In 2004, several years after the Ohio Statute was enacted, FERC affirmed the factual finding that, since at least 1999, AEP had voluntarily been a member of PJM. *See* Transmission Owners Br. 60. That finding made sense because AEP joined PJM as a multi-state system including not only Ohio but also Kentucky, West Virginia, Indiana, and Michigan, all with a single transmission rate. *Id.* at 60-61. FERC's brief dismisses the relevance of this finding as having been made in connection with a different statute. FERC Br. 66-67; *see also* OCC Br. 36-37. But that statute called for FERC to address whether AEP's involvement with PJM was "voluntary coordination." *See* 16 U.S.C. § 824a-1(a). FERC insists that that finding of "voluntary" membership does not control whether membership was "voluntary" for purposes of Order 679. But FERC does not explain why the same word "voluntary" should mean two different things. If FERC is going to depart from its

prior finding, it must explain why.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

FERC asserts (Br. 67) that its prior finding preceded Order 679, but does not explain why that matters.  Order 679 did not change historical facts about whether a utility joined PJM voluntarily; it just changed (according to FERC's post-*CPUC* interpretation) the legal consequences of those facts.  FERC also says that it "did not even note the 2004 decision" finding AEP's membership to be voluntary when it granted adders to AEP's Ohio affiliates in 2008 and 2010.  FERC Br. 68.  That is unsurprising, because, as discussed above, FERC did not think voluntariness was relevant to eligibility for an adder until the Ninth Circuit's 2018 *CPUC* decision.[8]

FERC cannot simply ignore a prior factual finding, or disregard it by saying it is old or was made in connection with a different statute.  It

---

[8] FERC now speculates (Br. 67 n.7) that one particular AEP affiliate, AEP Ohio, was not involved in the 2004 proceeding, but does not explain why that matters.  AEP Ohio joined PJM along with all of AEP's other affiliates.  FERC concluded in 2004 that AEP and its affiliates did so voluntarily, and the Orders on review failed to grapple with that prior conclusion.  *See* JA487 (*OCC* Order, P 63 n.126 (the prior finding that "AEPSC's affiliates' decision to specifically join PJM was voluntary is irrelevant")).

must explain why its age, or the different statutory context, make it inapplicable here.  It has not done so, and consequently has not engaged in reasoned decision-making.

## IV. FERC Arbitrarily and Capriciously Denied the Adder to Dayton (*Dayton Only*).

Dayton highlighted the disadvantage it faces in attracting capital because surrounding utilities have retained the adder, even though some are subject to state statutes like Ohio's.  FERC insists this poses no problem because a utility's base ROE should be sufficient to attract capital.  FERC Br. 72; *see also* OCC Br. 37-38.  This is not a reasonable response.  Imagine three similarly risky utilities, which all have the same base ROE.  Now imagine that two of the three also have a 50-basis point adder.  The two with the adder will obviously be better able to attract capital.  FERC's policy self-evidently creates an uneven playing field for capital by treating similarly situated entities differently.

## CONCLUSION

The Court should vacate FERC's order in *Dayton* denying an RTO adder (with instructions to grant the application) and vacate FERC's order in *OCC* eliminating the RTO adder for AEP's Ohio affiliates.

December 22, 2023                    Respectfully submitted,

/s/ William M. Rappolt              /s/ Matthew E. Price

William M. Rappolt                  Matthew E. Price
Assistant General Counsel,          Zachary B. Cohen
FERC                                JENNER & BLOCK LLP
AES US SERVICES, LLC                1099 New York Avenue NW
4300 Wilson Blvd                    Washington, DC 20001
Arlington, VA 22203                 (202) 639-6000
(571) 533-9018                      mprice@jenner.com
william.rappolt@aes.com             zcohen@jenner.com

*Counsel for The Dayton Power       William M. Keyser
and Light Co. d/b/a AES             STEPTOE & JOHNSON LLP
Ohio*                               1330 Connecticut Avenue, NW
                                    Washington, DC 20036
                                    (202) 429-8186
                                    wkeyser@steptoe.com

                                    *Counsel for American Electric Power
                                    Service Corp., in its own name and
                                    on behalf of its public utility
                                    affiliates Ohio Power Co. and AEP
Morgan E. Parke                     Ohio Transmission Co., Inc.*
Associate General Counsel
P. Nikhil Rao                       /s/ Sanford I. Weisburst
Senior Corporate Counsel            Sanford I. Weisburst
FIRSTENERGY SERVICE                 QUINN EMANUEL URQUHART &
COMPANY                                SULLIVAN, LLP
76 South Main Street                51 Madison Avenue, 22nd Floor
Akron, OH 44308                     New York, NY 10010
(330) 384-2422                      (212) 849-7000
mparke@firstenergycorp.com          sandyweisburst@quinnemanuel.com
pnrao@firstenergycorp.com

*Counsel for FirstEnergy Service Company on behalf of and as agent
for American Transmission Systems, Inc.*

34

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document complies with the type-volume limitation set forth in Fed. R. App. P. 27(d)(2).  This document contains 6,491 words, excluding the parts exempted by FRAP 32(f) and 6th Cir. R. 32-4.  I also certify that this document complies with the typeface and type-style requirements of FRAP 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Century Schoolbook in 14-point font.

December 22, 2023                    */s/ Matthew E. Price*
                                     Matthew E. Price

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing will be served via the Court's electronic filing system and served on all counsel of record on this 22nd day of December, 2023.

December 22, 2023                          <u>*/s/ Matthew E. Price*</u>
                                          Matthew E. Price